# EXHIBIT 1



1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3    ------------------------------------------x
     YELENA RUDERMAN,
4
              Plaintiff,
5         v.        Civil Action No: 1:19-cv-2987

6    LAW OFFICE OF YURIY PRAKHIN, P.C.,
     and YURIY PRAKHIN, in both his individual
7    and professional capacities,

8              Defendants.

9    ------------------------------------------x

10         Deposition of YELENA RUDERMAN, called for

11   Oral Examination in the above-entitled action,

12   said deposition being taken pursuant to Rules

13   governing Federal Procedure in the State

14   of New York, held at the offices of U.S. LEGAL

15   SUPPORT - BROOKLYN, One Pierrepont Plaza;

16   Brooklyn, New York on Thursday, September 24,

17   2020 commencing at 10:32 a.m., before MICHAEL

18   WILLIAMS, a Notary Public and Registered

19   Professional Court Reporter.

20

21

22         Pages 16-22 have been marked

23   CONFIDENTIAL - ATTORNEYS EYES ONLY

24

25

1            Ruderman

2     A.     I don't recall.

3     Q.     When you started with Mr. Prakhin's

4  law firm, do you remember what your salary was?

5     A.     Yes.

6     Q.     And what was your salary?

7     A.     30,000, 35.

8     Q.     And that was in 2012?

9     A.     Correct.

10     Q.     Did you receive any pay increases?

11     A.     Yes.

12     Q.     When?

13     A.     When I was admitted.

14     Q.     And what was your pay increase?

15     A.     I believe it was 50 to -- 50 or

16  something.  50.

17     Q.     While you were employed there in

18  2012 until '17, did you receive other pay

19  increases?

20     A.     Yes.

21     Q.     Do you recall what they were?

22     A.     I mean, when I left the firm in

23  2017, my salary was, I believe it was 75.

24     Q.     During your employment, the first

25  time with the Prakhin Law Firm, did you receive

Deposition of Ruderman
09/24/2020

135

```
1                    Ruderman

2       Q.    And which one was tried to verdict?

3       A.    The summary jury trial.

4       Q.    And what was the verdict?

5       A.    I lost.

6       Q.    And did you have a second chair

7   during the trial?

8       A.    No.

9       Q.    Did you have any other trials while

10  at Mallilo & Grossman?

11      A.    Not that I recall.

12      Q.    It states here that you left Mallilo

13  & Grossman in May of 2018; is that correct?

14      A.    Yes, I believe so.

15      Q.    Why did you leave Mallilo &

16  Grossman?

17      A.    To go work for Yuriy Prakhin again.

18      Q.    And how did that come about?

19      A.    I spoke to Mr. Prakhin on a weekend,

20  and he asked me if I knew any Russian speaking

21  attorneys looking for an associate position.  I

22  said no but I'll keep it in mind.

23            And then he said are you looking,

24  and I said no, but we can discuss it.  It depends

25  on what you're offering, and then it -- and then
```

1              Ruderman

2  I came in and spoke to him a few days after that.

3      Q.    Do you recall when that telephone

4  call occurred?

5      A.    On a Sunday.

6      Q.    They called you on your cell phone?

7      A.    Yes.

8      Q.    What number?

9      A.    646 477-2642, no.

10     Q.    I'm sorry?

11     A.    472.

12     Q.    You can't change your testimony.

13     A.    I'm not sure if that's the number he

14  called me on.  That's why I'm saying that.

15     Q.    What were the end four numbers

16  again?

17     A.    2642.

18     Q.    Is that your current cell phone?

19     A.    Cell phone number, yes.

20     Q.    Have you had a different cell phone

21  number?

22     A.    Yeah.  I just don't recall when.

23          MS. DONNELLY:  Give me one second.

24          (Interruption from the record.)

25     Q.    So after you alleged Mr. Prakhin

1              Ruderman

2   called you on your cell phone, did you go into

3   the office to meet with anybody?

4        A.    Yes, with him.

5        Q.    Did you meet with just him or did

6   you meet with anybody else as well?

7        A.    Just him.  I mean, I saw other

8   people in the office, but I only met with him to

9   discuss possible employment.

10       Q.    And do you recall when that

11  occurred?

12       A.    No, a few days after he called me.

13       Q.    And what did you discuss with Mr.

14  Prakhin?

15       A.    He asked me what it would take for

16  me to come back.

17       Q.    And what did you tell him?

18       A.    That, well, he asked me what it

19  would take for me to come back, and I was still

20  at Mallilo.  I said it would take at the very

21  least to match what I get at Mallilo or to at

22  least match it or beat it.

23            And I said in order to come back, I

24  would need paralegals or a paralegal, and I don't

25  remember what else I said.  That's all I recall

1           Ruderman

2   right now.

3       Q.     At the time that you met with Mr.

4   Prakhin, what was your salary at Mallilo &

5   Grossman?

6       A.     I believe it was 90,000.

7       Q.     So somewhere between February of

8   2017 and May of 2018 you received a 10,000 dollar

9   increase in compensation?

10      A.     Sounds about right.

11      Q.     And do you recall when you received

12  that increase?

13      A.     No.

14      Q.     And how did Mr. Prakhin respond to

15  your negotiations?

16      A.     He said he would match -- I don't

17  recall the specifics, but he did tell me he would

18  give me a paralegal, a caseload and a percentage

19  of the settlement, and he would match or give me

20  more than what Mallilo had given me.

21      Q.     When you had left the Prakhin Law

22  Firm in 2017, did you have a caseload?

23      A.     Yes, I believe so.

24      Q.     And then you left the Prakhin Law

25  Firm in 2017?

1          Ruderman

2     A.    Sure, yes.

3     Q.    Did you eventually have a paralegal

4  assigned to you?

5     A.    Yes.

6     Q.    When was that?

7     A.    The first one was I believe at the

8  end of September, something like that, middle,

9  end of September maybe.

10    Q.    September of 2018?

11    A.    Correct.

12    Q.    Just making sure we're on the same

13  page.

14          When you first started back with the

15  Prakhin Law Firm, did you receive another copy of

16  the handbook?

17    A.    No.

18    Q.    Were you aware of the handbook?

19    A.    If another one existed?

20    Q.    Yes.

21    A.    No, I knew nothing about it.

22    Q.    Did anyone tell you when you

23  commenced your employment with the Law Office of

24  Mr. Prakhin that you were subject to a six months

25  probationary period?

1           Ruderman

2      A.     Not that I recall.

3      Q.     Did anyone tell you that in 2014?

4      A.     Yes.

5      Q.     And, in fact, it is contained in the

6   2014 handbook, correct?

7      A.     I guess, and everybody is subject to

8   the six month probation period would receive

9   health insurance after six months.  I received

10  mine immediately when I started employment the

11  second time.

12     Q.     When you say you received it right

13  away, immediately, what do you mean by that?

14     A.     I was given health insurance when I

15  started, a week later, something like that.

16     Q.     When you started in 2018, did anyone

17  advise you of what the expectations were for your

18  position as an associate at that time?

19     A.     I don't recall that they were any

20  different other than I would have a much greater

21  caseload, and I was assigned a paralegal.  It was

22  my responsibility to manage the paralegal's work.

23     Q.     So what was your understanding of

24  what was attorney work and what was other legal

25  work when you went to the Prakhin Law Firm in

1          Ruderman

2     Q.     How many phone calls did you have

3  with clients?

4     A.     I don't have that.  I don't know.

5     Q.     100?

6     A.     I don't know.

7     Q.     Do you have any approximation?

8     A.     No.

9     Q.     How many phone calls did you have

10 with insurance adjusters?

11    A.     I don't know.

12    Q.     What about insurance companies?

13    A.     I don't know.

14    Q.     Would you make notes in Saga if you

15 had those conversations?

16    A.     I would try to.

17          MR. HARTZBAND:  Objection.

18    A.     I don't know if I always did.

19    Q.     Between June of 2018 through August

20 of 2018, do you believe you performed your job

21 responsibilities in a satisfactory manner?

22          MR. HARTZBAND:  Objection.

23    A.     Do I believe so?

24    Q.     Yes.

25    A.     I did not receive -- I don't recall

1              Ruderman

2    receiving any complaints about my job

3    performance.

4        Q.    That wasn't my question.

5        A.    I believe so.

6        Q.    Now, I think one of the things that

7    you testified to, at least in 2014, was that the

8    expectation was that you would work 40 hours a

9    week; is that correct?

10            MR. HARTZBAND:  Objection.

11       A.    No, I said I believe it might have

12   been -- I don't know if I testified to that, but

13   yeah, maybe.

14            MS. DONNELLY:  If you want me to

15   mark this, I will, but she is not going to be

16   able to read it.  So I can just read it to her

17   and identify the Bates stamp.

18            MS. HUOT:  Okay.  You said --

19            MR. HARTZBAND:  What is the

20   document?

21            MS. DONNELLY:  It is the time

22   records, the hour summary report.

23            MS. HUOT:  Right.  What was your

24   alternative?

25            MS. DONNELLY:  I said I can just

1              Ruderman

2      Q.    On your cell phone?

3      A.    Yes.

4      Q.    Did you advise Irene Raskin?

5      A.    Yes.

6      Q.    On the cell phone?

7      A.    No.  I believe I did it in person

8  when I returned to work.

9      Q.    And when did you return to work?

10     A.    One or two days after the diagnosis.

11     Q.    And when did you tell Erica Larson?

12     A.    I believe it was the day I was

13  diagnosed.

14     Q.    At the time of your diagnosis, did

15  you provide your employer with any medical

16  documentation?

17     A.    At the time of my -- he didn't

18  request any.

19     Q.    At any time during your employment

20  with the Prakhin firm, did you provide Mr.

21  Prakhin or anybody at the firm with any medical

22  records?

23     A.    No, I was never requested to do

24  that.

25     Q.    Any doctors notes?

1          Ruderman

2     A.     No, I was not requested to do that.

3          MR. HARTZBAND:  Objection.

4     Q.     Mr. Prakhin never requested medical

5 documentation?

6     A.     No.

7          MR. HARTZBAND:  Objection.

8     Q.     Ms. Raskin never requested medical

9 documentation?

10     A.     No.

11     Q.     And you never provided any?

12          MR. HARTZBAND:  Objection.

13     A.     No.

14     Q.     At any time between September 2018

15 to December 2018, did your impairment impact your

16 ability to perform your job?

17     A.     I don't understand your question.

18     Q.     Were you able to perform your job

19 once you began experiencing problems with your

20 eyes?

21     A.     It became a little more difficult

22 and with the help of my paralegals, yes, I was

23 able to do my job.

24     Q.     Excuse me?

25     A.     You did not hear me?

```
1              Ruderman

2  plaintiff, I don't know what the video was

3  showing.  I don't remember.  It wasn't because of

4  my impairment.

5       Q.    Are you aware of your ethical

6  responsibility as an attorney regarding

7  representation of your client?

8       A.    Yes, I am.

9       Q.    What is it?

10      A.    I don't understand your question.

11      Q.    You just told me you're aware of

12  your ethical responsibility.

13      A.    I have to represent my client to the

14  best of my ability.

15      Q.    Were there other ways in which your

16  vision impairment affected your ability to

17  perform your job responsibilities?

18      A.    No, not that I recall.

19      Q.    Did you request any accommodation

20  from Mr. Prakhin or any from Irene Raskin?

21      A.    Yes.

22      Q.    What accommodation did you request?

23      A.    I requested that the Dragon be

24  provided to me, which is software that you record

25  into and it transcribes what you're saying.  I
```

```
 1              Ruderman
 2   requested magnifying devices, and that I be
 3   allowed to install software on the computer that
 4   would aid me, and I advised them of OrCam
 5   glasses, O-R-C-A-m, glasses that I purchased that
 6   would assist me with working.
 7       Q.    When did you make these requests?
 8            MR. HARTZBAND:  Objection.
 9       A.    I don't recall exact times, but they
10   were made on several occasions at separate times.
11       Q.    When was the first time you made
12   these alleged requests?
13            MR. HARTZBAND:  Objection.
14       A.    Maybe when I started getting blurry
15   in October.  I asked for a magnifying glass of
16   some sort.
17       Q.    And who did you ask?
18       A.    Irene Raskin.
19       Q.    Did you put that request in writing?
20       A.    No.  I don't think so.
21       Q.    Did you submit any medical
22   documentation in support of that request?
23            MR. HARTZBAND:  Objection.
24       A.    I wasn't asked to.
25       Q.    When in October did you make that
```

1                    Ruderman

2   request?

3        A.     Probably like mid October.

4               MS. DONNELLY:  Do you need a break?

5               THE WITNESS:  Yes.

6               (A break from the record was taken.)

7               MS. DONNELLY:  What was the last

8   question?

9               (The record was read.)

10              MS. DONNELLY:  Mark that.

11              (Defendant's Exhibit N marked for

12   identification.)

13       A.     Okay.

14       Q.     Have you seen that document before?

15       A.     I don't recall, no.

16       Q.     It's a copy of a receipt from Amazon

17   confirming your purchase of a lighted magnifier.

18       A.     Okay.

19       Q.     On November 10th.

20       A.     Okay.

21       Q.     Does that refresh your recollection

22   as to when you purchased a magnifier?

23       A.     Yes.

24              MR. HARTZBAND:  Objection.  Just to

25   clarify, the document reads November 9, but the

1              Ruderman

2    delivery date of November 10th.

3              MS. DONNELLY:  Correct.  The

4    delivery date is November 10th.  Purchase date

5    was November 9th.

6         Q.    So that was in November, correct,

7    not October?

8         A.    Yes.

9         Q.    Did you submit this receipt to

10   anybody at the employer for reimbursement?

11        A.    I don't recall.

12        Q.    Did you e-mail this receipt to

13   anybody at the employer for reimbursement?

14        A.    No.  I was -- no.  I was told to

15   purchase it myself.  I was never told I would be

16   reimbursed.

17        Q.    And who told you to purchase it

18   yourself?

19        A.    Irene Raskin.

20        Q.    What other requests for

21   accommodation did you make?

22        A.    I requested that Dragon be provided

23   to me, because it was previously purchased by

24   Yuriy for a different employee, and that was -- I

25   asked for reimbursement for OrCam glasses or

1            Ruderman

2   contribution to their purchase, and I asked that

3   I be -- and I purchased my own Zoom software and

4   asked that I can use it or have help with someone

5   installing it for me.

6       Q.    Why did you purchase Zoom software

7   in 2018?

8       A.    Why or when?

9       Q.    Why?

10      A.    To assist me with my visual

11  impairment.

12      Q.    Zoom?

13      A.    No.  It is a different kind.  Is it

14  called Zoom?  I think it is.  It is Zoom.  Maybe

15  on the receipts.  It wasn't the Zoom that you're

16  thinking of.  This is for the visually impaired.

17      Q.    So when did you request that Dragon?

18      A.    To -- no, Jaws.  I'm sorry.  It is

19  called Jaws, Jaws.

20      Q.    When did you request that Dragon

21  dictation be purchased?

22      A.    I mentioned it a couple of times.  I

23  knew that it was purchased for a previous

24  employee who was a slow typier and liked to

25  dictate stuff.  So I had asked if it was still in

1              Ruderman

2    the office, and no one helped me find it.

3          I asked Yuriy and I asked Irene if

4    they knew where it was.  Yuriy -- I asked Yuriy.

5    He said he didn't, and he told me to ask Irene

6    and Irene didn't know.

7        Q.    So you asked if they knew where it

8    was in the office?

9        A.    Right.

10       Q.    Okay.

11             And that was verbally?

12       A.    Yes.

13       Q.    When was that?

14       A.    I believe it was a couple times in

15   November and December.

16       Q.    Okay.

17             And you indicated about the OrCam

18   glasses.

19       A.    Yes.

20       Q.    When did you ask them about those?

21       A.    After I purchased them, and I had a

22   discussion with Yuriy about my vision.  I told

23   him that I purchased these glasses, and that they

24   were very expensive and I needed help to pay for

25   them.

09/24/2020

217

1              Ruderman

2      Q.     What was the cost of the glasses?

3      A.     I don't recall.  Maybe like 3500.  I

4  don't recall.

5      Q.     And when did you purchase them?

6      A.     I purchased them before I was in the

7  hospital.  So somewhere the first or second week

8  of November, I believe.

9      Q.     And did you provide a receipt to

10  anybody at the employer for reimbursement?

11      A.     No.  Nobody requested one.

12      Q.     Did you provide any medical

13  documentation to the employer regarding your

14  request for the glasses?

15            MR. HARTZBAND:  Objection.

16      A.     I don't understand the question,

17  but, no, I did not provide any medical

18  documentation to my employer.

19      Q.     You never provided any medical

20  documentation to your employer?

21      A.     Correct.

22            MR. HARTZBAND:  Objection.

23      A.     And I was never requested to by

24  same.

25      Q.     And you don't know whether it was

1              Ruderman

2    assist me, but afterwards I found out that there

3    was cheaper options.  So I returned them.

4        Q.    When did you return them?

5        A.    I don't know.

6        Q.    How did you return them?

7        A.    Oh, I think, I believe I -- they

8    were sold on eBay.  I don't remember.  I don't

9    know.  I didn't take care of it.

10       Q.    Who took care of it?

11       A.    I believe a family member.

12       Q.    What family member?

13       A.    I don't recall.

14       Q.    I believe you also identified Jaws?

15       A.    Yes.

16       Q.    Is that correct?

17       A.    Yes.

18       Q.    And what is Jaws?

19       A.    Software for the computer that reads

20   to you and for the visually impaired.

21       Q.    And did you purchase that?

22       A.    I did.

23       Q.    When did you purchase it?

24       A.    I purchased it I believe December.

25   Maybe the first week of December or the first day

1           Ruderman

2  of December.  Right at the beginning of December.

3      Q.     And did you ever submit any invoice

4  for reimbursement to Mr. Prakhin?

5      A.     I did not.  I was not requested to

6  do so.

7      Q.     In the past you had submitted

8  invoices to Mr. Prakhin for reimbursement,

9  correct?

10     A.     For parking?

11     Q.     For anything?

12     A.     I don't recall other than parking.

13     Q.     Were you requested to submit those?

14     A.     Yes.

15     Q.     By who?

16     A.     That was just common knowledge.

17  Every submitted it.

18          So I don't remember who was the

19  first one to instruct me to do it but, yeah,

20  whoever the officer manager would be would

21  request copies of receipts or whatever.

22     Q.     And did you ever use the Jaws?

23     A.     I attempted to.

24     Q.     In fact, you did not find it to be

25  helpful; is that correct?

1              Ruderman

2      A.     That's not true.

3      Q.     You can finish your answer.

4      A.     It didn't seem to work with Yuriy's

5  computer.

6      Q.     Did you install it on the computer?

7      A.     Yes.  We tried.

8      Q.     What do you mean you tried?  You

9  were unable to install it?

10     A.     I had a friend who was good with

11  computers come in to try to figure out why it

12  wasn't really working with Yuriy's computer.

13          And then Yuriy was uncomfortable

14  that I was using his computer and installing new

15  software on it.  So I decided it was best that I

16  -- and I couldn't really figure out how to work

17  it, so I uninstalled it.

18     Q.     Do you currently have it installed

19  on your computer?

20     A.     No, I do not.

21     Q.     So of the --

22     A.     I have a different version of it.

23     Q.     Okay.

24          Of the three items that you alleged

25  you requested Yuriy to purchase for you, would

09/24/2020

225

```
 1              Ruderman
 2   any of them have assisted you in performing your
 3   job responsibilities?
 4         MR. HARTZBAND:  Objection.
 5   A.     Yes.
 6   Q.     Which ones?
 7   A.     Jaws, if he allowed me and assisted
 8   me in installing it, that would have helped me.
 9   What were the three items?  Dragon would have
10   helped me, yes.  I was never provided that and,
11   at the time, magnifying things were helping me
12   and OrCam was helping me.  I just found different
13   solutions after I was terminated.
14   Q.     Does Jaws help you see surveillance
15   video at depositions?
16         MR. HARTZBAND:  Objection.
17   A.     I don't know.  I never used it at a
18   deposition.
19   Q.     Does jaws help you read handwriting
20   on documents at depositions?
21         MR. HARTZBAND:  Objection.
22   A.     I don't know.  I didn't try it.
23   Q.     Would Jaws enable you to see minute
24   detail in photographs at depositions?
25         MR. HARTZBAND:  Objection.
```

```
 1              Ruderman

 2      A.     I wouldn't use Jaws to look at

 3   minute details.  I would use magnifying stuff.

 4      Q.     Such as a magnifying glass?

 5      A.     Well, at that time, yes, but I

 6   didn't really need to.  I don't know.

 7      Q.     What would assist you to view video

 8   surveillance videos at depositions?

 9              MR. HARTZBAND:  Objection.

10      A.     I don't need assistance at viewing

11   surveillance video at depositions.  I view that

12   video in advance.  I viewed that.

13              I had probably taken -- because I

14   had taken 3,000 grams of steroid.  I don't need

15   assistance.

16              And if I feel the video in advance

17   is not clear for me, then my computer that is

18   bigger and stuff, can magnify things.

19      Q.     Well, if you don't?

20      A.     So what would assist me is a bigger

21   screen.

22      Q.     If you don't get a surveillance

23   video in advance.

24      A.     Okay, then I could --

25      Q.     Would you be able to view it at a
```

1              Ruderman

2    deposition?

3        A.    Yes, if I had my laptop, yes.

4             MR. HARTZBAND:  Objection.

5        A.    I could put, if it is on a CD or

6    USB, I could put it in and look at it or if it is

7    on a big screen, sure.

8             But, again, you're asking me

9    hypothetical questions, and I'm not generally

10   faced with surveillance videos.

11       Q.    Excuse me?

12       A.    I don't generally view surveillance

13   videos that aren't provided in advance.

14       Q.    Not regularly part of personal

15   injury cases?

16       A.    No.

17            MR. HARTZBAND:  Objection.

18       A.    I haven't seen that many, no, and I

19   have not been shown one without being provided in

20   advance.

21       Q.    And what about photographs, are you

22   able to read them?

23       A.    You asked me that, and I said, yes,

24   generally if the photograph is clear, I could see

25   it.

1          Ruderman

2          And, again, I did have magnifying

3   things that make things bigger.

4      Q.    Now, we spoke earlier about

5   maintaining confidentiality of clients documents;

6   is that correct?

7      A.    Yes.

8      Q.    And that documents that are

9   confidential for clients should not be shared

10  outside of the litigation process; is that

11  correct?

12         MR. HARTZBAND:  Objection.

13     A.    I guess so.

14         MS. DONNELLY:  Can you mark that.

15         (Defendant's Exhibit P marked for

16  identification.)

17         MS. HUOT:  Can we take a quick

18  break?

19         MS. DONNELLY:  Sure.

20         MS. HUOT:  Are you in the middle of

21  a question?

22         MS. DONNELLY:  No, I am not.

23         (A break from the record was taken.)

24     Q.    We spoke about Jaws earlier,

25  correct?

1              Ruderman

2     A.     Because I -- when I said those

3  things because I can function and work and live

4  on my own and can continue working.

5     Q.     But it is true that your LHON, your

6  vision impairment, does substantially limit your

7  ability to see, correct?

8     A.     Yes, yes.

9     Q.     You also testified earlier you have

10 not applied for disability.

11         Do you remember that?

12    A.     Yes.

13    Q.     Why haven't you applied for

14 disability?

15    A.     Because if you're -- I consider,

16 because, as far as I understand, if you're

17 disabled, you can't work and I intend on working

18 if I can work.

19    Q.     And I just want to clarify one point

20 of confusion.

21         When you were at work at the Prakhin

22 Firm, you requested at least two different

23 devices that magnify things.

24         One a magnifying glass, one a full

25 page magnifier; is that right?

```
1              Ruderman

2      A.    Yes.

3      Q.    And you asked for the magnifying

4  glass from Irene Raskin around mid October of

5  2018; is that correct?

6      A.    Yes.

7      Q.    And then later you ordered a full

8  page magnifier on November 9; is that correct?

9      A.    Yes, I did.

10     Q.    And you did it after Miss Raskin had

11 instructed you to order it, correct?

12     A.    Yes.

13     Q.    You also testified earlier that at

14 some point you had someone install or attempt to

15 install Jaws on your computer at the Prakhin

16 firm.

17         Do you remember that?

18     A.    Yes.

19     Q.    Was Mr. Prakhin made aware that you

20 were attempting to install Jaws?

21     A.    I believe, right, okay.  I was

22 attempting to figure out how to work Jaws.  Yes,

23 he was aware.

24         One, he saw somebody in my office,

25 and then Irene Raskin told me to tell him that I
```