# EXHIBIT 2

**Page 1**

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF NEW YORK
 4    INDEX NO:  1:19-cv-2987
 5    - - - - - - - - - - - - - X
 6    YELENA RUDERMAN,
 7                      Plaintiff,
 8         -against-
 9    LAW OFFICE OF YURIY PRAKHIN,
10    PC, and YURIY PRAKHIN, in both
11    his individual and professional
12    capacities,
13                      Defendants.
14    - - - - - - - - - - - - - X
15                      Virtual Deposition
                        New York, New York
16
                        October 15, 2020
17                      10:25 a.m.
18
19         DEPOSITION of YURIY PRAKHIN, the
20    Defendant, by the Plaintiff, in the
21    above-entitled action, held at the above
22    time and place, pursuant to Order, via
23    Virtual Zoom, taken before Tracie Shand, a
24    shorthand reporter and Notary Public
25    within and for the State of New York.
```

Page 131

1                Yuriy Prakhin
2    but --
3        Q.    I didn't mean to cut you off.
4    Go ahead.
5        A.    But to give reasonable
6    accommodation, I need to know exactly what
7    this person needs.  In case of Ruderman,
8    she never asked for any accommodation.
9    Not to mention the fact that I never knew
10   that she needs accommodation.
11              So, I repeat, she never
12   submitted any requests, especially, she
13   never submitted any doctor's request, for
14   accommodation needed for her to improve
15   her performance.
16              THE WITNESS:  Can we have a
17       break, guys?
18              MR. HARTZBAND:  Yes.  I would
19       like to just finish this section
20       before we break for lunch.  If you
21       need a shorter break, I'm happy to do
22       that.
23              THE WITNESS:  Okay.  I'm going
24       to stay with you.
25       Q.    Did you ever ask Ms. Ruderman to

Page 132

1          Yuriy Prakhin
2  provide a doctor's note?
3      A.    Yes.
4      Q.    When did you ask her?
5      A.    I asked her on several
6  occasions.  Especially, when she started
7  to miss work.
8          Not only me, the manager, Irene
9  Raskin, she asked her for any papers from
10 the doctor, whether it's notes, diagnosis,
11 or anything which can confirm that she is
12 suffering from any kind of impairment,
13 which can show us that we can accommodate
14 her with her needs.
15     Q.    When did Ms. Raskin make this
16 request?
17     A.    As far as I understand, she
18 informed Ms. Raskin about her issues
19 before she informed me about that.  So, I
20 would assume beginning of October, maybe,
21 end of the September.  I'm guessing.
22     Q.    You're assuming that Ms. Raskin
23 made this request around the time that Ms.
24 Ruderman shared the vision issue with Ms.
25 Raskin?

1               Yuriy Prakhin
2       A.    Yes.  She first had the
3    conversation with Ms. Raskin that she had
4    some blurred vision.  Ms. Raskin, as far
5    as I remember, as far as I know, she said,
6    "listen, if you have any issues, get the
7    papers from the doctor, go to Yuriy, and
8    discuss how he can help you with it."
9       Q.    Were you there for that
10   conversation between Ms. Raskin and Ms.
11   Ruderman?
12      A.    No.
13      Q.    How do you know what was said?
14      A.    Ms. Raskin later on told me
15   about that.
16      Q.    Was Ms. Raskin's and Ms.
17   Ruderman's initial conversation, was that
18   in person?
19      A.    Yes.
20      Q.    Your conversation with Ms.
21   Raskin, was that in person as well?
22      A.    Yes.
23      Q.    Do you believe that Ms. Ruderman
24   was not entitled to an accommodation
25   because she didn't request one?

1           Yuriy Prakhin
2   put the information regarding the
3   conversation.  Or if another attorney goes
4   to the court for appearances, or for EBT,
5   he also use Saga.
6           For all the office Saga is very
7   important whoever handled the case doesn't
8   really matter.  What matter is notes.
9        Q.    You mentioned you discussed
10  about a month in you had a discussion with
11  Ms. Ruderman about her performance, right?
12       A.    Yes.
13       Q.    Any documents reflecting that
14  discussion?
15       A.    You asked and I answered no.
16       Q.    Did you have any other
17  discussions with her prior to what you
18  testified to about her performance prior
19  to firing her?
20       A.    Prior to I hired her for the
21  second time?
22       Q.    Prior to firing her.
23             We're talking about the second
24  term of employment.
25             Hold on.

Page 214

1      Yuriy Prakhin
2      You had one discussion with her
3   about her performance you say about a
4   month in.
5      Did you have any other
6   discussions?
7      A.   Yes.
8      Q.   When did you next speak with Ms.
9   Ruderman about her performance?
10     A.   The next conversation was again
11  during a couple of months after she start
12  working with the case, again, pertaining
13  to the notes.  Mainly, mainly, what I saw,
14  it was absence of notes in Saga.
15  Especially, the fact that the number of
16  cases she handled in Queens, the absence
17  of notes become the big problem for her.
18  I spoke about that with her for the second
19  time around two months, approximately,
20  after I hired her.
21     Q.   You discussed this with her over
22  the phone?
23     A.   Personally, in my office.
24     Q.   In person?
25     A.   Yes.

Page 215

1           Yuriy Prakhin
2      Q.    Are there any documents or any
3   audio recordings reflecting those
4   conversations?
5      A.    No.
6      Q.    Did you talk with anybody else
7   other than Ms. Ruderman about this issue
8   with her notes?
9      A.    Yes.  Manager knew about this
10  problem as well.
11     Q.    When did you talk to Irene
12  Raskin about it?
13     A.    Approximately, the same time
14  that I spoke with Ruderman.  Maybe, the
15  day before, each time the day before.
16  Usually, I discuss the problem with
17  manager and, then, I talk to the lawyer.
18     Q.    Did you speak with Ms. Raskin
19  over the phone about it?
20     A.    No.  We communicate in person.
21     Q.    You did speak with Ms. Raskin
22  over the phone about Ms. Ruderman, right?
23     A.    I don't recall that.
24     Q.    Apart from the two discussions
25  you mentioned, was there ever a third time

```
                                              Page 216
 1                Yuriy Prakhin
 2     where you discussed Ms. Ruderman's
 3     performance issue prior to firing her?
 4          A.    Yes.
 5          Q.    When was that?
 6          A.    The next discussion was three
 7     months or three and a half months after I
 8     hired her.  The discussion was initiated
 9     by the fact that she started to miss work.
10     She started to disappear with or without
11     notice.  So, later on, she explained that
12     it was because of her eyes problem, but
13     initially, I didn't know about that.  What
14     I knew that she started to take days off
15     and sometimes she did ask and sometimes,
16     which was much worse, she just leave the
17     job without any warning, text, or she
18     communicated with manager saying that I
19     cannot come tomorrow.
20          Q.    Is there something wrong with
21     her communicating that she couldn't come
22     into work with the manager?
23          A.    Yes.  The wrong thing is that if
24     she has appearances, or EBTs, the day when
25     she didn't come, it make very hard for us
```

1  　　　　　　　　Yuriy Prakhin
2  to manage the office.  We needed to cover
3  her absence.  We needed to send someone,
4  some attorney who have basically his own
5  job to do.  We need to send this attorney
6  to cover absence of Ms. Ruderman when it
7  was notify in the office based on when she
8  was absent.
9  　　　Q.　　So, Ms. Ruderman missed EBTs
10 giving less than a day's notice?
11 　　　A.　　Sometimes she gave advance
12 notice.  Sometimes.
13 　　　Q.　　Did she ever miss an EBT without
14 giving at least a day's notice?
15 　　　A.　　I don't know whether it was EBT
16 or regular appearances, but, yes,
17 sometimes she inform us about the fact
18 that she cannot come, literally, in the --
19 even before the day or by morning the same
20 day.
21 　　　Q.　　So, if you have an EBT or an
22 appearance scheduled, how do you handle
23 that?
24 　　　　　　Do you e-mail another attorney
25 asking that person to cover?

Page 218

1        Yuriy Prakhin
2    A.   Yes.  Exactly.  I send someone
3 to cover.  Someone who was busy by
4 handling his own business or her own
5 business.
6    Q.   During this third meeting you
7 had with her, did you discuss the Saga
8 notes at all?
9    A.   Yes.  This topic come out each
10 time I have a discussion with her.
11   Q.   After you hired Ms. Ruderman as
12 a probationary employee, you have a
13 performance review with her one month in,
14 then, two months in and, then, three
15 months in and there's this persistent
16 issue with the Saga, right?
17   A.   Yes.
18   Q.   Why didn't you just fire her
19 then?
20   A.   Because I always give people
21 second chance.  Like, I gave it before to
22 Mr. Nahas or to Mr. Revis.
23   Q.   Do you view being under the
24 influence of drugs or alcohol at work as
25 an equal offense as not doing the Saga

Page 222

1        Yuriy Prakhin
2    A.    Because she want to work on her
3    own, yes.
4    Q.    How many cases did Mrs. Gabo
5    manage before she left?
6    A.    I would say 200, maybe, more.
7    Q.    When she left, you had to figure
8    out what to do with all those cases,
9    right?
10   A.    Yes.
11   Q.    How to reallocate them to other
12   attorneys?
13   A.    Yes.
14   Q.    Did you decide how those cases
15   would be reallocated?
16   A.    Yes.
17   Q.    Did you decide alone or did
18   somebody else have a say in that process?
19   A.    Alone.
20   Q.    Mrs. Gabo had no role in
21   deciding where her cases went?
22   A.    Yes.  She had no role.
23   Q.    Ms. Raskin had no role in
24   deciding how the cases would be
25   distributed?

Page 223

```
 1              Yuriy Prakhin
 2     A.    No.
 3     Q.    You mentioned that some of those
 4  cases were assigned to Ms. Ruderman,
 5  right?
 6     A.    Yes.
 7     Q.    About how many were assigned to
 8  her?
 9     A.    I would say around 80, 90.  I'm
10  not sure about the exact number, but
11  somewhere in this vicinity.
12     Q.    Did you say 80 to 90 or eight to
13  nine?
14     A.    Let's say between 80 and 100.
15  I'm not sure exactly.
16     Q.    80 to 100.
17           Were cases assigned to Sandra
18  Beron as well?
19     A.    Yes.
20     Q.    How many cases were assigned to
21  her?
22     A.    I would say the same amount.
23     Q.    Were any of Mrs. Gabo's cases
24  assigned to other attorneys?
25     A.    Could be, yes.  I don't recall
```

Page 224

1           Yuriy Prakhin
2  the number of the cases which were
3  assigned to each of the attorneys, but if
4  you ask whether the cases were assigned to
5  other attorneys, probably yes.
6      Q.   Fair to say, the lion's share of
7  Mrs. Gabo's cases were assigned to Ms.
8  Ruderman and Ms. Baron?
9      A.   A lot of her cases were assigned
10 to Ms. Ruderman, yes.
11     Q.   My question was, were most of
12 Gabo's cases assigned to Ms. Ruderman and
13 Ms. Baron?
14     A.   I would not say that.  It was
15 divided between Sandra Beron, Ms.
16 Ruderman, and other attorneys, but a lot
17 of cases, as I said the number, was
18 assigned to Ms. Ruderman.
19     Q.   Ms. Ruderman had about 80 to
20 100, Ms. Baron had about 80 to 100, which
21 attorney was given the third most cases?
22     A.   It could be -- it could be --
23          THE REPORTER:  I'm sorry.  I
24     don't understand what you're saying.
25          MR. HARTZBAND:  I can spell the

1        Yuriy Prakhin
2   that allows someone to speak into a
3   microphone and have the words they speak
4   turned into text?
5            MS. DONNELLY:  Objection.
6            You can answer.
7       A.   From time to time I watch TV and
8   I saw the devices in some kind of
9   commercial, but I never used them and no
10  one in my office use them.
11      Q.   You mentioned earlier that you
12  did have conversations with Ms. Ruderman
13  about a computer program, right?
14      A.   Yes.
15      Q.   I don't want to ask you to
16  repeat what you've already testified to.
17           You mentioned just now a
18  conversation with her around the
19  installation of the computer program,
20  right?
21      A.   Yes.
22      Q.   What do you remember about that
23  conversation?
24      A.   You already asked, but I repeat
25  the answer.  I said that she can install

```
                                              Page 261
 1               Yuriy Prakhin
 2   whatever program that will help her to
 3   work however she needs to do it with my IT
 4   guy not to disturb the office system.
 5        Q.    Did Ms. Ruderman over anyone
 6   else ever attempt to install the computer
 7   program that you discussed with her?
 8        A.    I don't know about that.  I
 9   doubt, but I don't know about that.
10        Q.    Did you ever discuss with Ms.
11   Ruderman who would pay for the computer
12   program she had mentioned to you?
13        A.    No.  There was no discussion
14   about payments.
15        Q.    So, you agreed to have her
16   install the program as long as she went
17   through Mr. Pusachev and the issue never
18   came up?
19        A.    Yes.
20        Q.    Were you ready to pay for that
21   device?
22              MS. DONNELLY:  Objection.
23        A.    If she would ask after this day,
24   I would consider that.
25        Q.    Did you expect her to pay for
```

Page 276

1           Yuriy Prakhin
2    brought during the time same into the
3    office a lot of money when she got for
4    that bonuses in or about $100,000.  This
5    is just for comparison reason.  I'm
6    telling you why my office sustained
7    financial difficulty during the time when
8    Ms. Ruderman worked in my office.
9         Q.     Any other reasons?
10        A.     No.
11               I iterated a lot.  For other
12   reasons, I don't recall that right now.
13        Q.     Did Ms. Ruderman's absences from
14   work play any role in your decision to
15   fire her?
16        A.     Yes.  I mentioned that.
17        Q.     Did that include the two week
18   long absence she took?
19        A.     Yes.
20        Q.     Do other attorneys at your
21   office ever cover for each other's
22   appearances or depositions?
23        A.     Yes.  This is what happens in
24   personnel, yes.
25        Q.     You mentioned the client