# EXHIBIT 3

Page 1

1

2      UNITED STATES DISTRICT COURT

3      EASTERN DISTRICT OF NEW YORK

4      Index No. 1:19-cv-2987

5      ----------------------------------------x

       YELENA RUDERMAN,

6

                              Plaintiff,

7

               - against  -

8

9      LAW OFFICE OF YURIY PRAKHIN, P.C., and

       YURIY PRAKHIN, in both his individual and

10     professional capacities,

11                            Defendants.

       ----------------------------------------x

12                            December 12, 2020

13                            10:03 a.m.

14

15            DEPOSITION of a non-party

16     witness, IRENE H. GABO, ESQ., pursuant to

17     Notice, taken by the Plaintiff, held via

18     Zoom Video Conferencing, before Abner D.

19     Berzon, a Registered Professional

20     Reporter, Certified Realtime Reporter and

21     Notary Public of the State of New York,

22     via Zoom Video Conferencing.

23

24

25

Page 46

1                          GABO
2        Q.     Okay.   What did you think of
3    Ms. Ruderman's performance during the
4    period after she was rehired in 2018?
5        A.     I think she came back with more
6    experience and a better -- better
7    knowledge of, you know, CPLR and caseloads
8    and things like that.   I think they threw
9    a lot at her at Mallilo & Grossman.
10       Q.     So you think she was a better
11   attorney than she was during her initial
12   stint at the firm, at which time she was
13   less experienced?
14       A.     Yes.
15       Q.     At any time in 2018, did
16   Mr. Prakhin ever tell you he was
17   dissatisfied with the quality of
18   Ms. Ruderman's work?
19       A.     No.
20       Q.     Did he ever tell you he was
21   dissatisfied with the notes she was or
22   were you not entering into SAGA.
23       A.     Yes.
24       Q.     What did he tell you about SAGA?
25       A.     That she didn't always enter her

```
                                              Page 51
 1                       GABO
 2              (Time noted:  10:49 a.m.)
 3              (Brief recess.)
 4              (Time noted:  10:53 a.m.)
 5   BY MR. HARTZBAND:
 6       Q.    Ms. Gabo, at any time in 2018,
 7   did Mr. Prakhin ever tell you he was upset
 8   with or dissatisfied with the amount that
 9   Ms. Ruderman relied on Erica Larssen?
10       A.    No.
11       Q.    Dissatisfied with the amount
12   that she relied on Patricia Belous?
13       A.    No.
14       Q.    Did he ever tell you he was
15   dissatisfied with the amount of time
16   Ms. Ruderman was in or out of the office?
17       A.    No.
18       Q.    Did he ever tell you he was
19   dissatisfied with any other aspect of
20   Ms. Ruderman's performance, apart from the
21   areas we've just discussed?
22              (Witness loses Zoom connection.)
23              MR. HARTZBAND:  We can go off
24       the record.
25              (Time noted:  10:53 a.m.)
```

Page 52

1                     GABO
2              (Discussion held off the
3        record.)
4              (Time noted:  10:58 a.m.)
5              (Discussion held off the
6        record.)
7              (Record read.)
8        A.    No.
9        Q.    Ms. Gabo, to your knowledge, did
10   Mr. Prakhin ever tell Ms. Ruderman that he
11   was dissatisfied with her performance in
12   any way?
13       A.    I don't know.
14       Q.    Did Ms. Ruderman ever tell you
15   that she believed Mr. Prakhin was
16   dissatisfied with her performance?
17       A.    No.
18       Q.    To your knowledge, did any
19   clients ever complain to the firm about
20   Ms. Ruderman during her second term of
21   employment?
22       A.    No.
23       Q.    We discussed earlier that you
24   left the firm in October -- on October 1st
25   of 2018; correct?

Page 53

```
 1                          GABO
 2        A.     Correct.
 3        Q.     About how many cases did you
 4   manage prior to your decision to leave the
 5   firm?
 6        A.     About 250 of my own, and about
 7   500 of everybody else's.
 8        Q.     Wow!  And when you left, the
 9   majority of the cases you were managing on
10   your own were transferred to Ms. Ruderman;
11   right?
12               MS. DONNELLY:  Objection.
13        A.     No.
14        Q.     Let's back up then.  How were
15   the cases that you were transferred, that
16   you were managing, distributed among other
17   attorneys at the firm before you left?
18        A.     We had another attorney who was
19   handling premises cases.  Her name was
20   Sandra Beron.  And I believe I more or
21   less equally split it between Ms. Ruderman
22   and Ms. Beron.
23        Q.     Did you give cases to any other
24   attorneys?
25        A.     I don't believe so.
```

1                    GABO
2       Q.    And so you said you had about
3    250 cases of your own, so roughly 125 to
4    Ms. Beron, 125 to Ms. Ruderman?
5       A.    I would say maybe a little more
6    to Ms. Beron, because she already had a
7    paralegal she was working with, and Yelena
8    was kind of starting new with these new
9    paralegals.  Probably about a hundred to
10   Ms. Ruderman.
11      Q.    What paralegal was Ms. Beron
12   working with?
13      A.    Her first name was Yesenia.
14      Q.    Were you in favor of this
15   distribution of your cases going
16   exclusively to Ms. Ruderman and Ms. Beron?
17           MS. DONNELLY:  Objection.
18      A.    There was nobody else.
19      Q.    There were no other attorneys at
20   the firm?
21      A.    Not that handled premises case
22   on a regular basis.
23      Q.    Did you leave -- did you believe
24   Ms. Ruderman and Ms. Beron were well suit
25   to do handle the cases after you left?

```
                              GABO
 1
 2        Q.    Okay.  I'm going to stop sharing
 3   my screen with you for now.
 4              Ms. Gabo, we discussed earlier a
 5   program called SAGA in which Prakhin firm
 6   attorneys are expected enter notes
 7   regarding their cases; right?
 8        A.    Correct.
 9        Q.    In your experience working at
10   the firm, how diligent were attorneys at
11   the Prakhin firm about entering notes in
12   SAGA?
13        A.    Not very diligent.
14        Q.    And you'd say that generally
15   about the attorneys, or are you speaking
16   about any particular person?
17        A.    Generally.
18        Q.    So they didn't operate -- they
19   didn't update SAGA as frequently as they
20   should?
21        A.    As I'd like them to.
22        Q.    As much as Mr. Prakhin would
23   like them to as well?
24        A.    Of course.
25        Q.    And that was an ongoing concern
```

Page 70

1                    GABO

2  at the firm?

3       A.    True.

4       Q.    And that included in 2018, up

5  until you left; right?

6       A.    Yes.

7             MS. DONNELLY:  Objection.

8       Q.    During her first term of

9  employment at the firm from, up until

10  February or so of 2017, Ms. Ruderman, like

11  other attorneys, also failed to update

12  SAGA as frequently as she should; right?

13       A.    Correct.

14       Q.    And that included entering EBT

15  notes into SAGA; right?

16       A.    Correct.

17       Q.    In your opinion, would that have

18  been a valid basis to terminate

19  Ms. Ruderman's employment?

20             MS. DONNELLY:  Objection.

21       A.    No.

22       Q.    Are you aware of any attorney,

23  in all of your time working at the firm,

24  who's been fired for failing to update or

25  enter notes into SAGA as frequently as he

```
                                          Page 71
 1                    GABO
 2   or she should?
 3        A.    No.
 4        Q.    Okay.
 5             MR. HARTZBAND:  Let's just take
 6        two minutes here.  We're gonna go
 7        through several exhibits in a row.
 8        Rather than making you all wait on the
 9        record, I'll just introduce them now.
10             (Time noted:  11:18 a.m.)
11             (Brief recess.)
12             (Time noted:  11:22 a.m.)
13             (Plaintiff's Exhibit 65,
14        printout of e-mail from Sandra Beron
15        regarding EBT's, dated September 11,
16        2018, Bates stamped D07450, marked for
17        identification, this date.)
18   BY MR. HARTZBAND:
19        Q.    So I pulled up a few documents.
20   So, Ms. Gabo, I pulled up a few documents
21   that I'd like to go over with you.  I'm
22   gonna share my screen as we have with the
23   other exhibits we've gone over today.  Are
24   you able to see my screen?  Ms. Gabo,
25   you're muted right now.  We can't hear
```

```
                                        Page 72

 1                      GABO
 2    you.
 3         A.    Yes.   Can you make it bigger?
 4         Q.    Yes.   Absolutely.   So, just for
 5    the record, this document was produced by
 6    defendants Bates stamped D7450.   It's a
 7    one-page document.   I'm going to zoom in
 8    on the message for you.   Are you able to
 9    see it now?
10         A.    Yes.
11         Q.    Okay.   Please review the e-mail
12    that's in front of you.   Let me know when
13    you are done.
14         A.    Yes.
15         Q.    Okay.   This is an e-mail from
16    Sandra Beron to several attorneys firm;
17    right?
18         A.    Correct.
19         Q.    And in this e-mail she's
20    reminding those attorneys to be more
21    diligent about updating SAGA; right?
22              MS. DONNELLY:   Objection.
23         A.    Putting in EBT to notes into
24    SAGA.
25         Q.    Into SAGA.
```

```
                                          Page 73

 1                      GABO
 2            Because failing to enter EBT
 3    notes in SAGA was a common widespread
 4    problem at the firm; right?
 5            MS. DONNELLY:  Objection.
 6       A.    I wouldn't say it was
 7    widespread, but I would have liked more
 8    notes than there were.
 9       Q.    Was failing to input EBT notes a
10    problem that Ms. Ruderman only had, or
11    that other attorneys had as well?
12            MS. DONNELLY:  Objection.
13       A.    I think other attorneys had as
14    well.
15       Q.    Do you read Ms. Beron's e-mail
16    as being direct to do Ms. Ruderman
17    specifically?
18       A.    No.
19       Q.    Do you read it as being directed
20    to any particular person?
21       A.    No, because when the EBTs were
22    assigned, they weren't assigned to you
23    because you handled the case.  They were
24    assigned to you because you were available
25    that day.  So it's possible that Sandy
```

Page 74

1                         GABO

2    would do Yelena's EBT and Yelena would do

3    Greg's EBT, so I think it was addressed to

4    everybody.

5         Q.    Because attorneys were covering

6    each other's EBTs on a regular basis?

7         A.    All the time, yes.

8         Q.    And those notes were not always

9    being put into SAGA or not being put into

10   SAGA in a timely manner?

11              MS. DONNELLY:  Objection.

12        A.    Correct.

13              (Plaintiff's Exhibit 66,

14        printout of e-mails from Irene Gabo

15        dated September 24, 2018, Bates

16        stamped D010015 regarding useful tips

17        for handling of files, marked for

18        identification, this date.)

19        Q.    I'm going to show you the next

20   document that I've marked for us here.  It

21   is a one-page document produced by

22   defendants at Bates stamped D 10358 and

23   marked as Exhibit  -- oh, excuse me.  I'm

24   reading the wrong Bates number.  The Bates

25   number is D 10015.  Although it's covered

```
 1                   GABO
 2  by the exhibit sticker which says
 3  Exhibit No. 66.
 4            I'd like you to review this
 5  entire e-mail and let me know when you're
 6  done.  Let me see if I can make it big
 7  enough --
 8      A.    Okay.
 9      Q.    Okay.  Are you able to read
10  that?
11      A.    Yes.
12      Q.    You've read the document?
13      A.    Yes.
14      Q.    And I'm just going to show you
15  the very top of it, just the From, Sent,
16  To, and Subject, because that was not
17  visible to you when I zoomed in.
18      A.    Yes.
19      Q.    This is an e-mail you sent to
20  several attorneys and paralegals at the
21  firm; right?
22      A.    Correct.
23      Q.    And in this the e-mail, you are
24  reminding the staff of the firm,
25  generally, to be more diligent about
```

```
 1                    GABO
 2   updating SAGA; right?
 3        A.    Correct.
 4              (Plaintiff's Exhibit 67,
 5        printout of e-mails between Yelena
 6        Ruderman to Irene Gabo dated August 6,
 7        2018 regarding Falkovich, Tatyana v.
 8        The City of New York Bates stamped
 9        D010358, marked for identification,
10        this date.)
11        Q.    Okay.  I'm going to show you
12   another document.  This one has been
13   marked as Exhibit No. 67.  It's Bates
14   stamped D 10358.  It's a one-page
15   document.  I'm going to zoom in on the
16   e-mail chain so you can review it.
17        A.    Okay.
18        Q.    This is an e-mail exchange
19   between you and Ms. Ruderman; right?
20        A.    Yes.
21        Q.    In the first e-mail in the
22   chain, marked Monday, August 6th, 2018, at
23   12:21 p.m., you wrote to Ms. Ruderman:
24   "Was EBT of P held?"  No docs for 2018,
25   including April order."
```

```
 1                    GABO
 2           Do you see that?
 3      A.    Yes.
 4      Q.    Were you referring to documents
 5   in SAGA?
 6      A.    Yes.
 7      Q.    And in reply, at 12:42 p.m.,
 8   Ms. Ruderman wrote:  "No notes re:  P's
 9   EBT..." and sent a message after that as
10   well.  Do you see that?
11      A.    Yes.
12      Q.    And she's telling you that
13   another attorney, another attorney, not
14   her, failed to enter notes regarding the
15   Plaintiff's EBT in SAGA; right?
16      A.    No.  That's not what she's
17   saying.
18      Q.    What is she saying?
19      A.    She's saying it's possibly the
20   Plaintiff's EBT was waived and, in this
21   kind of situation, it's most likely
22   because the plaintiff appeared for a
23   preliminary hearing called a 50-h, so a
24   lot of times, if that was done, the City
25   would waive the EBT of the plaintiff later
```

```
                                          Page 78

 1                    GABO

 2    on.

 3              (Plaintiff's Exhibit 68,

 4        printout of e-mails dated November 20,

 5        2018, Bates stamped D09648, D09645 and

 6        D09646 regarding December NOIs, marked

 7        for identification, this date.)

 8        Q.    I see.  And we can go to the

 9    next document.  This document has been

10    marked Plaintiff's Exhibit No. 68.  It's a

11    three-page document, Bates stamped, D 9646

12    to D 9648.  I'd like you to read the full

13    document, but I think we can go through

14    the first couple of pages pretty quickly.

15    This is D 9646.  Let me know when I can

16    scroll up from here.

17        A.    Scroll up.

18        Q.    This is D 9645.

19        A.    Okay.  Scroll up.

20        Q.    It's the first page that -- I'll

21    zoom in closely on those last three e-mail

22    chains of e-mails.

23

24        A.    Okay.  Go up, please.  Okay, I

25    see it.
```

```
                                          Page 79
1                      GABO
2        Q.     This is an e-mail chain
3    involving you and other attorneys and
4    staff at the firm?
5        A.      Attorneys and paralegals.
6        Q.      And at the very top of the
7    chain, the most recent e-mail, it's sent
8    by Lilit Avetisyan, who, at least at this
9    time, was an attorney at the firm; right?
10       A.     Correct.
11       Q.     To your knowledge, is Lilit
12   still working at the firm?
13       A.     No idea.
14       Q.     And Lilit writes:  "You're
15   right.  Sorry.  I must have never updated
16   the date after the PC."
17              Do you see that?
18       A.     Yes.
19       Q.     What's she referring to?
20       A.     I don't know.
21              (Plaintiff's Exhibit 69,
22        printout of e-mails dated December 8
23        and 12, 2018 regarding Fishman, Chana
24        v. JIB Realty Holding Co., Bates
25        stamped D011069, marked for
```

```
                                          Page 80
 1                      GABO
 2        identification, this date.)
 3        Q.      And then the last, for this
 4   stretch, is Plaintiff's Exhibit No. 69,
 5   document Bates stamped D 11069.  It's a
 6   one-page document.  I'm going to zoom in
 7   on the relevant part, really the only
 8   part -- it's blank underneath here -- so
 9   you can read it more easily.
10        A.      Yes.
11        Q.      Let me know when you are done.
12   You're done?
13        A.      Yes.
14        Q.      At the beginning of the chain,
15   there's an e-mail from you to Ms. Ruderman
16   on December 8th at 3:23 p.m.; right?
17        A.      Correct.
18        Q.      And you wrote:  "Ask Greg for
19   EBT notes on this one."  Do you see that?
20        A.      Yes.
21        Q.      You were asking Ms. Ruderman to
22   have Greg Nahas provide his EBT notes on a
23   particular case; right?
24        A.      Correct.
25        Q.      And that's because those notes
```

```
                                          Page 81
 1                   GABO
 2   were not in SAGA; right?
 3       A.     Correct.
 4       Q.     Okay.  I'm going to stop sharing
 5   my screen.
 6              Ms. Gabo, are you aware that
 7   Ms. Ruderman suffers from a vision
 8   impairment?
 9       A.     I'm sorry.  Say it again.
10       Q.     Are you aware that Ms. Ruderman
11   suffers from a vision impairment?
12       A.     At the present?
13       Q.     At present, are you aware?
14       A.     Yes.
15       Q.     When did you first learn of
16   Ms. Ruderman's vision impairment?
17              MS. DONNELLY:  Objection.
18       A.     You would have to be
19   more specific, because I believe her
20   vision impairment changed in severity.
21       Q.     When did you first learn that
22   Ms. Ruderman was having any trouble
23   seeing?
24       A.     September.
25       Q.     September?  Do you recall
```

Page 103

```
 1                         GABO
 2   discussed this condition with Mr. Prakhin,
 3   or you just don't recall doing so?
 4        A.    I don't recall it.
 5        Q.    And same answer for Ms. Raskin?
 6        A.    Correct.
 7              MR. HARTZBAND:  Alright.  We're
 8        done with those exhibits.
 9        Q.    Ms. Gabo, did you ever ask
10   Ms. Ruderman to provide you or the firm
11   with medical documentation regarding the
12   issue with her vision?
13        A.    No.
14        Q.    To your knowledge, did
15   Mr. Prakhin ever ask Ms. Ruderman to
16   provide medical documentation regarding
17   the vision impairment?
18        A.    Not to my knowledge.
19        Q.    To your knowledge, did
20   Ms. Raskin ever ask Ms. Ruderman to
21   provide such documentation?
22        A.    Not to my knowledge.
23        Q.    Did you ever have a discussion
24   with Mr. Prakhin or Ms. Raskin about
25   Ms. Ruderman providing a doctor's note or
```

```
 1                    GABO
 2  other medical documentation of her vision
 3  impairment?
 4      A.    I don't think so.
 5      Q.    Going back to your testimony
 6  from a moment ago, do you recall when you
 7  were in Israel searching for the glasses
 8  you referenced?
 9      A.    I think it must have been
10  Passover 2019.  So April.  I would say
11  late April.
12      Q.    Ms. Ruderman took -- you
13  mentioned earlier that Ms. Ruderman took
14  some absences from work --
15      A.    Correct.
16      Q.    -- during her time at the firm.
17      A.    Correct.
18      Q.    And, in particular, she took two
19  absences that were a week long; right?
20            MS. DONNELLY:  Objection.
21      A.    I don't recall how long they
22  were, but I know she was absent.
23      Q.    Do you recall over what periods
24  of time she was absent?
25      A.    One had to be between September
```