# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

YELENA RUDERMAN,

        Plaintiff,

v.

LAW OFFICE OF YURIY PRAKHIN, P.C.
AND YURIY PRAKHIN, in both his individual
and professional capacities,

        Defendants.

Civil Action No.: 1:19-cv-2987-RJD-RLM

---

## DECLARATION OF STEVEN KORYTNY

Pursuant to 28 U.S.C. § 1746, STEVEN KORYTNY, being duly sworn, deposes and says:

1. I was employed by Defendants Law Office of Yuriy Prakhin, P.C. (the "Firm") and Yuriy Prakhin (together, "Defendants") as Lead Negotiator from approximately February 2013 through September 2018.

2. Yelena Ruderman and I worked together at the Firm over several years, both before and after she lost much of her vision and was diagnosed with Leber's hereditary optic neuropathy ("LHON").

3. Throughout her employment – both before and after she began to suffer from LHON – Ms. Ruderman was one of the Firm's most reliable attorneys.

4. In fact, Ms. Ruderman handled depositions, court appearances, and motion practices on many of the Firm's most valuable slip-and-fall cases.

5. Prior to her diagnosis, no one, including Mr. Prakhin, would have disputed Ms. Ruderman's capabilities.

1

6. This is evidenced by Defendants' decision to rehire Ms. Ruderman, with a significant raise in salary, after she left the Firm.

7. Ms. Ruderman's value to the Firm is further evidenced by Mr. Prakhin's decision to assign her a very large portion of the slip-and-fall cases previously handled by Irene Gabo, Esq., the Firm's former Managing Attorney.

8. Prior to learning of her diagnosis, Mr. Prakhin also moved Ms. Ruderman into the Managing Attorney's office – another clear sign of her strong standing in the Firm at the time.

9. After Ms. Ruderman's diagnosis, I often found myself amazed that she continued to keep up with all of the demands of her job.

10. There were no signs that Ms. Ruderman's performance slipped at all following the loss of her vision.

11. To the best of my knowledge, Mr. Prakhin never told Ms. Ruderman or anyone else at the Firm that he believed otherwise.

12. I have spoken personally with Ms. Ruderman's paralegals, who have confirmed that, while Ms. Ruderman of course had to learn new methods to perform her work in light of her impaired vision, she continued to manage her caseload successfully.

13. In fact, after I left the Firm, my current law firm hired Ms. Ruderman to perform *per diem* work on several cases.

14. My current law firm has been more than satisfied with Ms. Ruderman's work on these matters and has continued to use her.

15. It is clear to me that Mr. Prakhin decided to fire Ms. Ruderman as soon as he learned that she suffered from LHON, which, as I understand it, is a lifetime condition with no known cure.

PLAINTIFF 000111

16. This is evidenced by Mr. Prakhin's refusal to allow Ms. Ruderman to install speech recognition software on her Firm computer, even after Ms. Ruderman purchased the software at her own expense.

17. Defendants' complete unwillingness to provide even modest disability-related accommodations to Ms. Ruderman speaks to their discriminatory animus toward her.

18. My belief that Defendants fired Ms. Ruderman because of her disability is also based on countless conversations I have had with Mr. Prakhin.

19. Indeed, while I was no longer working at the Firm as of Ms. Ruderman's termination, up until my departure, Mr. Prakhin regularly consulted with me regarding employee terminations and other personnel decisions.

20. Mr. Prakhin did not once mention to me that he was considering terminating Ms. Ruderman's employment or was otherwise dissatisfied with her work.

21. Through my conversations with Mr. Prakhin, I learned that he is motivated almost exclusively by financial considerations.

22. Moreover, Mr. Prakhin evinced a consistent (though incorrect and misguided) belief that employing anyone who will require extended leave or an accommodation for a disability will cost him money and, therefore, should be let go.

23. For example, Mr. Prakhin fired several female employees as soon as he believed they might be pregnant.

24. Admittedly, these employees' terminations were warranted based on poor performance and/or misconduct.

25. However, it was Mr. Prakhin's belief that the employees were pregnant – not their performance and/or misconduct – that ultimately motivated Defendants' decision to fire them.

PLAINTIFF 000112

26. He intimated to me that he believed it was necessary to fire these women immediately, before they disclosed their pregnancies to him, so that he could avoid paying them for maternity leave.

27. Mr. Prakhin was also concerned that his insurance premiums would increase if employees took short- or long-term disability leave.

28. I believe Mr. Prakhin may have fired Ms. Ruderman out of fear that she might ask for disability leave and, therefore, cause the Firm's insurance premiums to increase.

29. Mr. Prakhin failed to appreciate that – in addition to being morally wrong – firing Ms. Ruderman because of her disability exposed the Firm to far greater financial liability.

30. Seemingly blinded by prejudice, Mr. Prakhin also apparently failed to consider that Ms. Ruderman had continued to work even after her diagnosis and, therefore, was unlikely to seek disability leave.

31. Defendants' decision to fire Ms. Ruderman is made all the more shocking by the conduct Mr. Prakhin has allowed to go on within the Firm's offices.

32. By way of example only, Mr. Prakhin was once made aware that an employee was drunk at work and took no action other than to send the employee home to "sleep it off."

33. On another occasion, an employee passed out on a train and was brought to Mr. Prakhin's home by the police.

34. Mr. Prakhin seemingly had no problem with this.

35. When a different employee threatened a co-worker with a razor blade within the Firm's offices, Mr. Prakhin again took no action.

36. Mr. Prakhin also declined to terminate an employee who stole the Firm's credit card to make personal purchases.

PLAINTIFF 000113

37. Even after being made aware that this same employee was using drugs in the Firm's bathroom, Mr. Prakhin brushed it off and kept the employee on board.

38. In addition to the foregoing, Defendants have retained countless employees despite well-documented performance issues and obvious incompetence.

39. That Mr. Prakhin would allow all of this to occur, yet fire one of his most competent attorneys based on her lost vision and with no evidence that she could not perform her job, speaks volumes about the prejudices he holds against Ms. Ruderman based on her disability.

40. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 24, 2019
Brooklyn, New York

_____
Steven Korytny

_____
BIRKEVICH EDUARD
Notary Public State of New York
No. 01BI6272387
Qualified in Kings County
Commission Expires 11/19/2020

PLAINTIFF 000114