## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| YELENA RUDERMAN,<br><br>                         Plaintiff,<br><br>            v.<br><br>LAW OFFICE OF YURIY PRAKHIN, P.C. and YURIY PRAKHIN, in both his individual and professional capacities,<br><br>                         Defendants. | Civil Action No.: 1:19-cv-2987-RJD-RLM |

## PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT

Plaintiff Yelena Ruderman ("Plaintiff"), by and through her undersigned counsel, Faruqi & Faruqi, LLP, pursuant to Local Civil Rule ("Local Rule") 56.1(b) and the individual rules of this Court, and in response to the Rule 56.1 Statement of Undisputed Material Facts annexed to the Motion for Summary Judgment brought by Defendants Law Office of Yuriy Prakhin P.C. (the "Firm") and Yuriy Prakhin ("Prakhin") (together, "Defendants"), respectfully submits the following statement of material facts in dispute, which demonstrates that there are genuine issues of material fact to be tried as to Plaintiff and with respect to her claims.  All statements and admissions herein are made without prejudice and solely for the purpose of responding to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Motion for Summary Judgment.

All citations contained in Plaintiff's Local Rule 56.1 Counterstatement are to documents annexed to the Declaration of Innessa M. Huot ("Huot Decl."). Unless otherwise noted, all references to exhibits to the Huot Decl. are cited as "Ex. __." [1] [2]

## PLAINTIFF'S COUNTERSTATEMENT OF DISPUTED FACTS

A.    **Mr. Prakhin and The Firm**

**DEFENDANTS' PARAGRAPH 1**

1.    The Firm is a small, plaintiff-side personal injury, medical malpractice law firm located at 1883 86th Street, 2nd Floor, Brooklyn, New York 11214. (Prakhin Aff., ¶ 2[3]; Zohar Aff., ¶ 2).

**RESPONSE TO PARAGRAPH 1**

Admit that the Firm is located at 1883 86th Street, 2nd Floor, Brooklyn, New York 11214, but dispute Defendants' characterization of the Firm as "small." Prakhin testified that the Firm earned more than $10 million in 2019 and approximately $8 to $9 million in 2018. Prakhin Dep. 98:19-99:22. However, Defendants' records reveal that the Firm reported $30,058,766.00 in

---

[1] The transcript of Plaintiff's Deposition and the Errata Sheet is referred to as **"Plaintiff Dep."** and is attached to the Huot Decl. as Ex. 1; the transcript of Defendant Prakhin is referred to as **"Prakhin Dep."** and is attached to the Huot Decl. as Ex. 2; the transcript of Defendant Prakhin's 30(b)(6) Deposition, on behalf of Defendant the Firm, is referred to as **"Prakhin 30(b)(6) Dep."** and is attached to the Huot Decl. as Ex. 3; the transcript of Irene Gabo's Deposition is referred to as **"Gabo Dep."** and is attached to the Huot Decl. as Ex. 4; the transcript of Irene Raskin's Deposition is referred to as **"Raskin Dep."** and is attached to the Huot Decl. as Ex. 5; the transcript of Patricia Belous's Deposition is referred to as **"Belous Dep."** and is attached to the Huot Decl. as Ex. 6; the transcript of Erica Larssen's Deposition is referred to as **"Larssen Dep."** and is attached to the Huot Decl. as Ex. 7; the transcript of Alexander Pusachev's Deposition is referred to as **"Pusachev Dep."** and is attached to the Huot Decl. as Ex. 8.

[2] Plaintiff's privilege log is attached to the Huot Decl. as Ex. 9.

[3] The Affidavit of Defendant Yuriy Prakhin filed in support of Defendants' Motion for Summary Judgment at ECF No. 71 is referred to by Defendants and herein as **"Prakhin Aff."** The Affidavit of Irene Raskin filed in support of Defendants' Motion for Summary Judgment at ECF No. 72 is referred to by Defendants and herein as **"Raskin Aff."** The Affidavit of Patricia Belous filed in support of Defendants' Motion for Summary Judgment at ECF No. 75 is referred to by Defendants and herein as **"Belous Aff."** The Affidavit of Erica Larssen filed in support of Defendants' Motion for Summary Judgment at ECF No. 74 is referred to by Defendants and herein as **"Larssen Aff."** The Affidavit of Gil Zohar filed in support of Defendants' Motion for Summary Judgment at ECF No. 73 is referred to by Defendants and herein as **"Zohar Aff."**

revenue in 2019, and $17,907,882.00 in revenue in 2018.  *See* Ex. 10 at D11975, D11964.  Prakhin

paid himself $407,692.00 from the Firm in each of these two years.  *Id*. at D11974, D11981.  Also,

Prakhin himself reported additional income of $7,676,668.00 in 2019 and $2,250,021.00 for 2018.

*Id*. at D11984, D11982.

Prakhin founded the Firm nearly two decades ago and it has grown to dozens of employees

that handle thousands of cases at any given time.  *See* Prakhin Dep. 92:21-93:20; Gabo Dep. 53:3-

7 (managed 250 of her own cases and 500 cases of other Firm attorneys).  The Firm is also

successfully able to generate new business through "newspaper, TV, [and] radio."  Prakhin

30(b)(6) Dep. 91:9-16.

**DEFENDANTS' PARAGRAPH 2**

2.      Mr. Prakhin is the founder and President of the Firm.  (Prakhin Aff., ¶ 2; Prakhin

Tr. at 93:9-15).

**RESPONSE TO PARAGRAPH 2**

Admit for purposes of this motion.

**DEFENDANTS' PARAGRAPH 3**

3.      Currently, the Firm employs approximately twenty (20) individuals, including

attorneys, paralegals, and office staff. (Prakhin Tr. at 93:21-24; Prakhin Aff., ¶ 2; Raskin Aff., ¶

2).

**RESPONSE TO PARAGRAPH 3**

Dispute.  Records produced by Defendants reflect that the Firm employed at least up to 52

individuals during the relevant time period, including, Galina Stiler; Olga Gochman; Yesenia

Olmedo; Marina Pritsker; Irene Gabo ("Gabo"); Irene Raskin ("Raskin"); Prakhin; Plaintiff;

Gregory Nahas; Lilit Avetisyan; Anna Broxmeyer; Nick Serlin; Sandra Beron ("Beron"); Stephen

Revis; William Lawlor; Erica Larssen ("Larssen"); Patricia Belous ("Belous"); Kristina Hovsepyan; Beatrice Benders; Alla Beyn; Dmitriy Magidov; Tosin Adeyinka; Polina Gorodetskaya; James Hargrove; Steven Kory; Rachel Kaylie; Maksim Blanc; Edward Lehman; Max Lakhmatova; Masha Lakhmatova; Tosin Adeyinka; Kate Tarasiuk; Jeannette Nieves; Leti Benitez; Mark Posner; Sabina Rakhmanova; Natasha Pevzner; "Akhundova"; "Brandon"; "Gulia"; "Christina"; "Veronica"; "Elijah"; "William". *See* Ex. 11. Additionally, Defendants provided interrogatory responses listing several additional attorneys that worked for Defendants, including Ken Yilmaz, Francis Leone, and Christopher Trochiano. *See* Ex. 12 "Defendants' Responses to Plaintiff's First Set of Interrogatory Requests" at Paragraph 13. Also, Prakhin testified that there were "plenty of attorneys that are not mentioned" in his interrogatory responses, such as: James Marina, Alex Smolyar, Daniel Berke, Edward Drantivy, Peter Coates; further stating that there "could be more[.]" *See* Prakhin Dep. 44:13-45:16. As such, throughout the relevant time period, Defendants employed well over 52 individuals.

**DEFENDANTS' PARAGRAPH 4**

4.    Upon commencing employment, each employee is also provided with a copy of the Firm's Employee Handbook. (Prakhin Tr. at 140:10-141:24; Raskin Aff., ¶ 3, Ex. 2; Larssen Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 4**

Admit that the Firm has an Employee Handbook, but dispute that all employees are provided a copy of the same upon commencement of their employment and dispute that Plaintiff was provided a copy upon the commencement of her employment either in 2012 or 2018. Plaintiff commenced her first period of employment with Defendants in September 2012. *See* Plaintiff Dep. 90:22-91:2; Prakhin Aff. ¶ 4. However, Plaintiff did not receive a copy of the Employee

4

Handbook until on or around June 13, 2014 when she acknowledged receipt of the same – nearly two years later. *See* Ex. 13 at D11941 (Plaintiff's signed acknowledgement of receipt of the first version of the Employee Handbook); Plaintiff Dep. 96:6-97:19 (stating that she did not receive the Employee Handbook until June 13, 2014). Further, Defendants updated the Employee Handbook in or around 2016 or 2017 (*see* Response to Paragraph 7), but never issued the updated version to Plaintiff after Defendants re-hired her in June 2018. *See* Plaintiff Dep. 145:14-17 ("[Q:] When you first started back with the [Firm], did you receive another copy of the handbook? [A:] No."); Raskin Aff. at Ex. 2; Declaration of Plaintiff Yelena Ruderman ("Plaintiff Decl.") ¶ 13. Similarly, Prakhin testified that employees already working at the Firm when Prakhin updated the employee handbook were not given the updated version. *See* Prakhin Dep. 142:18-143-3.

## DEFENDANTS' PARAGRAPH 5

5.      Irene Raskin ("Ms. Raskin") commenced employment with the Firm in 2015 as the Office Manager. (Raskin Tr. at 18:25-19:3, 32:21-33:3, 34:11-19; Raskin Aff., ¶ 3).

## RESPONSE TO PARAGRAPH 5

Admit for purposes of this motion, but dispute any relevance and note that the record reflects that Ms. Raskin commenced her employment in June 2015. *See* Raskin Dep. 18:25-19:3, 32:21-24, 34:11-15.

## DEFENDANTS' PARAGRAPH 6

6.      As Office Manager, Ms. Raskin is responsible for handling the day-to-day matters at the Firm, including: (1) onboarding of newly hired employees; (2) assisting with the Firm's accounting and paying bills; (3) managing payroll and employee benefits; (4) monitoring employees' workload, attendance, and work performance; (5) communicating with specialists regarding the Firm's IT needs; and (6) ordering office supplies. (Raskin Tr. at 37:12-38:7, 96:17-

97:6; Raskin Aff., ¶ 3).  Prior to the onset of the Coronavirus Disease 2019 ("COVID-19") pandemic in March 2020, Ms. Raskin also used to manage the Firm's calendar for depositions and appearances. (Raskin Tr. at 37:12-38:7, 96:17-97:6).

## RESPONSE TO PARAGRAPH 6

Dispute.  Prakhin testified that Ms. Raskin's responsibilities were: (1) "discipline for the office stuff [*sic*]"; and (2) handling human resource issues.  *See* Prakhin Dep. 100:9-101:5. Further, Plaintiff notes that Raskin's responsibilities may have included monitoring the workload, attendance, and work performance of paralegals and other support staff, but dispute that she monitored the same for the Firm's attorneys.  *See* Gabo Dep. 44:4-45:25 (Gabo, rather than Raskin, was responsible for supervising all attorneys who worked in the office and monitoring their work performance).

## DEFENDANTS' PARAGRAPH 7

7.    In 2016 or 2017, the Firm updated its Employee Handbook. (Prakhin Tr. at 140:10-141:24).  However, the majority of the policies and rules remained the same. (*Id*.; *see* Raskin Aff., ¶ 7, Exs. 1, 2).

## RESPONSE TO PARAGRAPH 7

Admit that in or around 2016 or 2017, the Firm updated its Employee Handbook; however, as indicated in Plaintiff's response to Paragraph 4 (*see supra* at Paragraph 4), Plaintiff never received a copy of the updated Employee Handbook when she was re-hired in June 2018, or ever, and was unaware that another version of the Employee Handbook existed.  *See* Plaintiff Dep. 145:14-21; Plaintiff Decl. ¶¶ 13-14.  A review of the provisions in both versions of the Employee Handbook reveal that various policies and rules were in fact changed.  For example, unbeknownst to Plaintiff, Defendants changed the Firm's policy regarding "Personal Cellular Use."  Indeed, the

6

Employee Handbook acknowledged by Plaintiff in June 2014 contained a "Personal Cellular Use" policy stating, in relevant part:

> While at Work, employees are expected to **exercise discretion** in using personal cellular phones. Personal calls during the work hours, regardless of the phone used can interfere with employee productivity, safety and may be distracting to others. Employees are encouraged to make personal calls only during breaks and lunch and to ensure that friends and family members are aware of the office policy.

Ex. 13 at D11927 (emphasis added); *see also* Response to Paragraph 85.

The revised Employee Handbook, which Plaintiff never received, states: "Employees are prohibited from using their cell phones to call or text, watch videos or use internet during work hours." (emphasis omitted). Raskin Aff., Ex. 2 § II.L (revised **non-Bates stamped** Handbook which Defendants submitted in connection with their motion for summary judgment).

## DEFENDANTS' PARAGRAPH 8

8.    The Firm's Employee Handbook specifically states:

### C.  EQUAL EMPLOYMENT OPPORTUNITY PRACTICES

> Company is an equal opportunity employer and makes employment decisions on the basis of merit. Company policy prohibits unlawful discrimination based on genetic characteristics or information, race, color, creed, sex, gender, gender identity, marital status, age, national origin or ancestry, physical or mental disability, medical condition, veteran status, sexual orientation or any other consideration made unlawful by federal, state or local laws. All such discrimination is unlawful. Company prohibits unlawful discrimination and harassment by any employee of Company, including supervisors and co-workers.
>
> To comply with applicable laws ensuring equal employment opportunities to qualified individuals with disabilities, Company will make reasonable accommodations for the known physical or mental  limitations of an otherwise qualified individual with a disability who is an applicant or an employee unless undue hardship would result.

> Any applicant or employee who requires an accommodation in order to perform the essential functions of the job should contact YURIY PRAKHIN ESQ or his or her duly authorized designee and request such an accommodation, and confirm such a request in writing.

(Raskin Aff., Ex. 2).

## RESPONSE TO PARAGRAPH 8

Admit that the Firm's Employee Handbook contains a policy regarding "Equal Employment Opportunity Practices," but dispute that the Firm adhered to the policy and dispute any relevance. The record shows that Prakhin did not require any requests for an accommodation to be memorialized in writing. *See* Prakhin Dep. 150:25-151:24 ("If I know that such and such accommodation can help the person, I definitely will provide this person with [an] accommodation with or without [writing]." Also, as noted previously, Plaintiff never received a copy of the version of the Employee Handbook cited by Defendants in Paragraph 8. *See* Plaintiff Decl. ¶¶ 13-14.

## DEFENDANTS' PARAGRAPH 9

9.    Regarding work hours and attendance, the Firm's Employee Handbook specifically states:

### C.  WORKING HOURS AND SCHEDULES

Company is normally open for business from 9:00 AM to 5:30PM with a half-hour unpaid lunch period included, Monday through Friday. All employees are expected to be at their desk or work station no later than 9:00 AM unless they have prior approval to begin work at a different time.

***

### E.  PUNCTUALITY AND ATTENDANCE

Employees are expected to report to work every day as scheduled, on time, and prepared to start work. Employees are also expected to remain at work for their entire work schedule, except for meal or rest periods or when required to leave on authorized

Company business.

> If you are unable to report for work on any scheduled work day, you must call the office at least one hour before the time you are scheduled to begin working. Employees must also inform their supervisor of the expected duration of any absence. Absent extenuating circumstances, you must call in on every day you are scheduled to work and will not report to work.

> Excessive absenteeism or tardiness, excused or not, will not be tolerated.

> If you fail to report for work without any notification to your supervisor and your absence continues for a period of three days, Company will consider that you have abandoned your employment and have voluntarily terminated.

(Raskin Aff., ¶ 9, Ex. 2).

## RESPONSE TO PARAGRAPH 9

Admit that the Firm's Employee Handbook contains policies regarding "Working Hours and Schedules" and "Punctuality and Attendance," but dispute that Plaintiff violated these policies (*see* Response to Paragraph 10) and dispute any relevance. Also, as previously noted, Plaintiff never received a copy of the version of the Employee Handbook cited by Defendants in Paragraph 9. Plaintiff Decl. ¶¶ 13-14.

## DEFENDANTS' PARAGRAPH 10

10. Plaintiff rarely worked 40 hours per week during her employment with the Firm from June 2018 through December 2018. (Raskin Aff., Ex. 4).

## RESPONSE TO PARAGRAPH 10

Dispute. Pursuant to the policy regarding "Timekeeping Procedures" stated in both the Employee Handbook acknowledged by Plaintiff in 2014 and in the updated version, only non-exempt employees (employees who are eligible to receive overtime pay, which does not include Plaintiff) were required to track their hours worked for purposes of calculating payroll. *See* Ex.

13 at D11924 § II.E; Raskin Aff., Ex. 2 § II.E.  Indeed, the "Timekeeping Procedures" policy states: "All non-exempt employees are required to record time worked for payroll purposes. Employees must record their own time at the start and at the end of each work period, including before and after the lunch break."  Ex. 13 at D11924 § II.E; Raskin Aff., Ex. 2 § II.E.

Eventually, this self-recording procedure was replaced with a time tracking machine that recorded the time employees clocked-in and out, but only the Firm's non-exempt staff (such as paralegals, receptionists, and administrators) were required to use this machine to track their hours worked.  Plaintiff Decl. ¶¶ 16-17; *see* Plaintiff Dep. 177:7-15 & Errata Sheet 3 ("I wasn't an hourly employee, and I didn't clock in and out to track the hours that I worked. . . .  I wasn't hired to be an hourly employee, and I wasn't always there because I would be in court or [at] depositions."). Considering attorneys at the Firm were not required to clock-in and clock-out, the timesheets generated by Defendants' time-keeping system and cited in Raskin's Affidavit do not accurately reflect the number of hours Plaintiff worked on a weekly basis.  *See* Raskin Aff. Ex. 4.  Further, during Prakhin's deposition, he confirmed that the time keeping machine was not meant to be utilized by attorneys: "this is a machine that we use mostly for paralegals, not for attorneys. But attorneys use this punch-in machine as well, but, however, ***it [does] not reflect the real hours they work***."  Prakhin Dep. 303:9-20 (emphasis added).

Additionally, based on time records produced by Defendants, ***none*** of the Firm's attorneys regularly "worked" more than 40 hours per week from June 2018 and December 2018.  *See* Ex. 14 at D11839-47 (Lilit Avetisyan's time records) (reflecting that from June 2018 through December 2018, Ms. Avetisyan never worked 40 hours per week); *id*. at D11870-2 (Irene Gabo's time records) (reflecting that from June 2018 through December 2018, Gabo never worked more than 40 hours per week and failed to clock-in and clock-out at all on any days during the weeks of

10

June 18, 2018, June 21, 2018, June 28, 2018, July 5, 2018, July 12, 2018, July 19, 2018, August 9, 2018, August 16, 2018, August 30, 2018, September 6, 2018, September 13, 2018, and September 27, 2018); *id*. at D11873-8 (Gregory Nahas's time records) (reflecting that from June 2018 through December 2018, Mr. Nahas never worked more than 40 hours per week); *id*. at D11885-8 (Nick Serlin's time records) (reflecting that from June 2018 through December 2018, Mr. Serlin never worked more than 40 hours per week); *id*. at D11879-84 (Stephen Revis's time records) (reflecting that from June 2018 through December 2018, Mr. Revis worked more than 40 hours per week on three occasions – during the weeks of August 2, 2018, August 23, 2018, and October 11, 2018); *id*. at D11862-9 (Sandy Beron's time records) (reflecting that from June 2018 through December 2018, Ms. Beron worked more than 40 hours per week on two occasions – during the weeks of July 26, 2018 and October 18, 2018); *id*. at D11891-902 (Defendants hired Gil Zohar in or around December 2018 and accordingly, Defendants only produced his time records from January 1, 2019 through December 31, 2019; however, in 2019, the Firm's time records reflect Mr. Zohar worked more than 40 hours per week on two occasions – during the weeks of March 28, 2019 and June 13, 2019).

Moreover, payroll documents produced by Defendants' accountants demonstrate that Plaintiff did in fact regularly work 40 hours per week from June 2018 through September 2018, before Plaintiff began experiencing blurry vision.  *See* Ex. 15 at D13052-56 (Defendants' accountants' payroll records); *see also* Plaintiff Dep. 178:7-10 (stating that she worked at least 40 hours a week while working at the Firm); Plaintiff Decl. ¶¶ 19-20 (Plaintiff worked an average of 50 to 55 hours per week and routinely worked nights and weekends on her cases).

Notwithstanding the fact that Plaintiff routinely worked considerably more than 40 hours per week, Defendants never communicated to Plaintiff any requirement that she work more than

40 hours per week, or that she utilize the Firm's time recording machine; as the Employee

Handbook she received only required non-exempt hourly employees, and not attorneys, to clock-

in and -out.  *See* Ex. 13 at D11924 § II.E; Plaintiff Decl. ¶¶ 16-18, 21; Plaintiff Dep. 157:12-24

("[Q:] When you started back with Mr. Prakhin in 2018, was there any discussion regarding

expectations for the amount of hours you should work per week? [A:] No. [Q] What was your

understanding of what the hour requirement was? [A:] I didn't believe there was one. Just the work

had to be done.").

## DEFENDANTS' PARAGRAPH 11

11.     The Firm's Leaves of Absence policy is set forth in the Employee Handbook.

(Raskin Aff., Ex. 2).  In relevant part, this policy provides:

### D.     LEAVES OF ABSENCE

> Company may grant leaves of absence to employees.  It is important to request any leave in writing as far in advance as possible, to keep in touch with your supervisor or YURIY PRAKHIN ESQ during your leave, and to give prompt notice if there is any change in your return date.

***

### e. Reinstatement

> Upon the submission of a medical certification from a health care provider that an employee is able to return to work, the employee will, in most circumstances, be offered the same position held at the time of the leave or an equivalent position.

(*Id*.)

## RESPONSE TO PARAGRAPH 11

Admit that the Firm's Employee Handbook contains a policy regarding "Leaves of

Absence," but dispute that Defendants adhered to the policy, dispute Plaintiff violated the policy

(*see* Responses to Paragraph 88-89), and dispute any relevance.  Indeed, Plaintiff regularly notified

Raskin and Prakhin when she needed to take time off from work to obtain medical treatment or

12

attend doctor's appointments, but Defendants never asked for these requests to be made in writing. *See* Raskin Dep. 68:19-22 ("[Q:] You mentioned that you spoke with [Plaintiff] at some point about taking medical leave; right? [A:] Yes. Yes."); 151:21-152-6 ("[Plaintiff] said that she needs a few days and to see a doctor or to get some treatment. I said fine, sure, whatever helps."); 152:16-25 ("[W]hen she advised me about her missing [a] day or two here and there, she would call me mostly on my cell."); *see also* Plaintiff Dep. 200:19-202-25 ("[Q:] Did you keep your employer apprised of your absences from work? [A:] Yes. [Q:] How did you do that?] [A:] Well, there were times I would advise [Raskin] that I needed to go to the doctors, and she would advise [Prakhin]. And then other times, when I would take the days or the two weeks, I asked before I did it. I asked [Prakhin] [] to take some time off to figure out what was wrong. [] [Q:] At any time between September 2018 and November 2018, did you provide your employer with any physician note regarding your absences from work? [A:] No, I was not requested to provide one." [Q:] Do you know whether or not you were required to provide one? [A:] Not that I was ever made aware of."). Defendants had every opportunity to request (or at a minimum remind Plaintiff) that Plaintiff memorialize her leaves of absences in writing, but failed to do so, because this was not a policy that they adhered to. Also, as previously noted, Plaintiff never received a copy of the version of the Employee Handbook cited by Defendants in Paragraph 11. Plaintiff Decl. ¶¶ 13-14.

## DEFENDANTS' PARAGRAPH 12

12. The Firm's Temporary Disability Leave policy is also set forth in the Employee Handbook. (*Id.*) In relevant part, this policy provides:

### 3. Temporary Disability Leave

Any full-time or part-time employee who is temporarily disabled and unable to work due to a temporary disability, will, upon request, be granted a leave of absence without pay for the period of his or her disability, subject to applicable law and provided that it does not present an undue hardship to Company.

*\*\**

**b. Notice Obligations**

An employee who requires a temporary disability leave of
absence must notify YURIY PRAKHIN ESQ or his or her
immediate supervisor in writing of the need for such a leave. The
employee must provision as much advance notice as practicable
specifying that a need for the leave exists, the date such leave will
begin, and the expected duration of the leave. The notice must be
accompanied by a medical certification of a health care provider that
verifies the existence of the temporary disability, the anticipated
duration of the disability, and the dates the leave is expected to
begin and end.  An employee who requests such a leave may
be required to provide additional medical certifications from time to
time thereafter in order to provide updated information regarding
the employee's condition.

*\*\**

Before returning to work from a medical leave of absence,
an employee must provide a written verification from the
employee's health care provider that indicates that he or she is fit
to return to work. When determining whether an employee who is
disabled within the meaning of applicable law is able to return to
work, the health care provider should make an individualized
assessment of whether the employee can, with or without
reasonable accommodation, perform the essential functions of the
position.

**RESPONSE TO PARAGRAPH 12**

Admit that the Firm's Employee Handbook contains a policy regarding "Temporary

Disability Leave," but dispute that Defendants adhered to the policy, dispute that Plaintiff violated

the policy (*see supra* at Paragraph 11), and dispute any relevance.  Also, as noted previously,

Plaintiff never received a copy of the version of the Employee Handbook cited by Defendants in

Paragraph 12.  Plaintiff Decl. ¶¶ 13-14.

14

**DEFENDANTS' PARAGRAPH 13**

13.    The Firm's Employee Handbook establishes a Confidentiality Policy, which in relevant part provides:

### F.  CONFIDENTIALITY

Information about Company, its employees, customers, suppliers and vendors is to be kept confidential and divulged only to individuals within Company with a need to receive, and authorized to receive, such information. If in doubt as to whether information should be divulged, err in favor of not divulging information and discuss the situation with your supervisor.

All records and files maintained by Company, in whatever form, are confidential and remain the property of Company. Records and files are not to be disclosed to any outside party in any manner without the express written permission of the Company.

Confidential information may not be removed from Company premises without express written authorization.

Employees will be required to enter into and strictly comply with a written confidentiality agreement as a condition of employment or continued employment. Why do we need that?

(*Id*.)

**RESPONSE TO PARAGRAPH 13**

Admit that the Firm's Employee Handbook contains a policy regarding "Confidentiality," but dispute that the Firm's Employment Handbook states, "Why do we need that?", and dispute that Plaintiff violated the policy (*see* Response to Paragraph 87).  It appears the phrase "Why do we need that?" was commentary inadvertently left in by Defendants' counsel questioning the need to include the statements set forth in Paragraph 13 in their 56.1 Statement of Undisputed Facts. Plaintiff likewise questions this inclusion and disputes its relevant.  Moreover, as noted previously, Plaintiff never received a copy of the version of the Employee Handbook cited by Defendants in Paragraph 13.  Plaintiff Decl. at ¶¶ 13-14.

15

<u>**DEFENDANTS' PARAGRAPH 14**</u>

14.     The Firm's Employee Handbook also contains an Internet, E-Mail, and Computer Use Policy, which in relevant part provides:

**K.     INTERNET, E-MAIL, AND COMPUTER USE POLICY**

> The use of Law Office of Yuriy Prakhin's automation systems, including computers, fax machines, and all form of Internet/intranet access, is for company business and for authorized purposes only.
>
> *** 
>
> Unless specifically granted in this policy, any non-business use of the Company's automation systems is expressly forbidden.
>
> If you violate these policies, you could be subject to disciplinary action, up to and including dismissal.

(*Id.*)

<u>**RESPONSE TO PARAGRAPH 14**</u>

Admit that the Firm's Employee Handbook contains a policy regarding "Internet, E-mail, and Computer Use," but dispute that Plaintiff violated the policy and dispute any relevance.  To the extent Defendants allege Plaintiff violated the policy regarding "Internet, E-mail, and Computer Use," it bears noting that numerous employees used the Firm's computers for personal, non-business purposes.  *See* Ex. 16 at D00353-54 (Gabo emailing about CVS coupons); D01440-41 (Gabo and Raskin exchanging emails about a party and when they will meet after work); D01975 (personal conversations among Firm employees regarding taking cigarette breaks and ordering Chinese food); D01980 (personal conversations among Firm employees regarding a bar in New York City and ordering lunch); D02066 (employees discussing ordering coffee and going out for drinks); D02069 (employees discussing the dating life of a paralegal, her social media account, and her prospects for marriage); D05582 (another attorney at the Firm emailing

16

photograph of an undressed individual).

## DEFENDANTS' PARAGRAPH 15

15.    The Firm's Personal Cellular Use policy ("Cellular Use Policy") is set forth in the

Employee Handbook as follows:

   **L.      PERSONAL CELLULAR USE**

   **Employees are prohibited from using their cell phones to
call or text, watch videos or use internet during work hours.**

(*Id.*) (emphasis original).

## RESPONSE TO PARAGRAPH 15

Admit that the Firm's Employee Handbook contains a policy regarding "Personal Cellular

Use," but dispute that Plaintiff violated the policy (*see* Response to Paragraph 85) and dispute any

relevance.  It bears noting that Defendants deceptively cite to the updated Employee Handbook,

which was never provided to Plaintiff at any time.  Plaintiff Decl. ¶¶ 13-14; *see* Response to

Paragraph 7.  The "Personal Cell Phone policy" stated in the Employee Handbook provided to and

acknowledged by Plaintiff in June 2014 merely asks employees to "exercise discretion in using

personal cellular phones."  *See* Ex. 13 at D11927.  As discussed *supra* at Paragraph 7, Plaintiff

never received the updated version of the Employment Handbook reflecting Defendants' revised

policy language regarding "Personal Cellular Use" and Plaintiff was not advised of any new

polices upon being rehired by Prakhin in June 2018.  Plaintiff Dep. 161:5-10.

Further, it was understood that while Prakhin prohibited personal cell phone use, phone

calls and text messaging for emergencies or for work related purposes were certainly allowed.  *Id.*

at 109:22-110:6 ("[Q:] The cell phone was – the cell phone use in the office was prohibited? [A:]

Generally, except for emergencies and if it was work related."); *id.* at 188:14-189:11 & Errata

Sheet 4 ("[Q:] And your understanding was that cell phone use was prohibited during work hours

correct? [A:] Unless there were emergencies or it was somewhat work related, somehow work related. [Q:] Did you use your cell phone in the office during work hours? [A:] If there were an emergency or [it was] work related. [] [Q:] Did you text on your cell phone during work hours? . . . . [A:] I don't recall, but we were allowed to text if it was work related."

Indeed, from June 2018 through December 2018, Plaintiff routinely used her cell phone to communicate with clients, co-counsel, opposing counsel, insurance adjusters, investigators, negotiators, court reporters, court personnel, and Firm staff, which is not prohibited under the Personal Cellular Use policy found in the Employment Handbook acknowledged by Plaintiff in June 2014. *See* Ex. 13 at D11927; Plaintiff Decl. ¶ 22. In fact, Plaintiff, like all other attorneys, were required to use their cell phones during working hours to communicate with clients, opposing counsel, court reporters, or the Firm's support staff for depositions and client preparation sessions. Plaintiff Decl. ¶ 23. Plaintiff was also required to use her cell phone during working hours when meeting opposing counsel or co-counsel for court conferences. *Id*. Likewise, Plaintiff was encouraged to use her cell phone to keep in touch with Firm's support staff as to her whereabouts with respect to depositions and court appearances. *Id.* ¶ 24; Ex. 17 at PLAINTIFF 001479.

Moreover, other attorneys and paralegals at the Firm regularly used their cell phones during working hours. *See* Ex. 18 (compilation of numerous instances of Firm employees using their cell phones during working hours); *id.* at D00353 (Gabo emailing Plaintiff using her cell phone during working hours); D01299 (Beron forwarding an email using her cell phone); D01414 (Prakhin forwarding an email using his cell phone); D01415 (Gabo emailing Raskin using her cell phone during working hours); D01417-18 (Gabo emailing Larssen using her cell phone during working hours); D01505 (Gabo instructing Raskin to update SAGA using her cell phone); PLAINTIFF 001664 (Larssen notifying Plaintiff that she would call her from Larssen's cell phone).

18

Indeed, Belous testified that she often used her personal cell phone to communicate with Plaintiff during working hours. *See* Belous Dep. 34:22-35:16 ("[Q:] [H]ow did you communicate with [Plaintiff] when you were working at the [Firm]? [A:] Different ways: [p]hone, text, email. . . . [Q:] And when you say 'text[,]' that would be text messaging on your cellphone; right? [A:] Correct. [Q:] And when you say you communicated with her by phone, was that always on the [Firm's] phone system, or did you ever communicate on your cellphone? [A:] It was both." *See also id.* at 57:23-58:9 (acknowledging that Plaintiff notified Belous of her termination during a phone call to Belous's cellphone). This is also true for Raskin and Larssen. *See* Raskin Dep. 153:10-16 (acknowledging that when Plaintiff was not in the office, Plaintiff and Raskin spoke on Raskin's cellphone mostly); Larssen Dep. 101:12-22 (acknowledging that she used her cell phone to speak and text Plaintiff). *See also* Response to Paragraph 85.

## DEFENDANTS' PARAGRAPH 16

16.    On June 29, 2018, Mr. Prakhin sent an office-wide instant message that stated: "The rule of this office. You cannot use your cell phone during the work hours, unless it is emergency and you are out of your office space!" (Prakhin Aff., Ex. 5).

## RESPONSE TO PARAGRAPH 16

Admit that Prakhin sent an office-wide message on June 29, 2018, but dispute any relevance. Defendants claim they fired Plaintiff for *inter alia*, her purportedly "repeated" use of her cell phone in the office. *See* Responses to Paragraphs 15, 85 and 124. In support, Defendants cite the office-wide message wherein Prakhin reminded **all** Firm employees of the "Personal Cellular Use" policy. *See* Ex. 19 at D01951. However, as Plaintiff wrote in her reply to Prakhin's message, she made personal use of her cell phone at the office because "it actually was an emergency." *Id.*; *see infra* at Response to Paragraph 17.

19

**DEFENDANTS' PARAGRAPH 17**

17.    Plaintiff responded to Mr. Prakhin via instant message apologizing and promising it "[w]on't happen again." (*Id.*)

**RESPONSE TO PARAGRAPH 17**

Admit that Plaintiff wrote "[w]on't happen again" in response to the office-wide message regarding personal cellphone use, but dispute that this is a partial citation and note that the full text of Plaintiff's response reads, "***Sorry, it actually was an emergency***.  Won't happen again." Ex. 19 at D01951 (emphasis added); *see* Response to Paragraph 16.

**DEFENDANTS' PARAGRAPH 18**

18.    SAGA is a case management database system that was used by the Firm in 2018. (Prakhin Aff., ¶ 5; Raskin Aff., ¶ 11).

**RESPONSE TO PARAGRAPH 18**

Admit that SAGA is a case management database system that was used by the Firm during the relevant time period, but dispute that all Firm attorneys entered SAGA notes regularly.  *See* Responses to Paragraphs 61-62, 64.

**B.    Plaintiff's First Period of Employment with the Firm**

**DEFENDANTS' PARAGRAPH 19**

19.    In September 2012, Plaintiff was hired by the Firm as a paralegal.  (Pl. Tr. at 90:22-91:9, 92:18-93:24; Prakhin Aff., ¶ 4).

**RESPONSE TO PARAGRAPH 19**

Admit that Plaintiff was hired by the Firm in 2012, but dispute Defendants' characterization that Plaintiff was hired to be a paralegal and dispute any relevance.  Indeed, Prakhin hired Plaintiff "as a paralegal ***with the agreement that once [Plaintiff is] admitted, [Plaintiff] will be an attorney there***[.]"  Plaintiff Dep. 92:18-24 (emphasis added), 93:15-21 ("[Q:]

20

Well, you told me when you first started working for him you worked for him as a paralegal?  [A:] Because I was in the process of being admitted.  So I was hired to be an associate attorney, and I was a paralegal for about a month-and-a-half and then I was admitted.").  Further, Prakhin testified that Plaintiff applied for a "junior associate" position with the Firm in 2012 and she was subsequently hired for the same role.  *See* Prakhin Dep. 184:18-185:9; 186:14-16 ("[Q:] [In 2012], did you have an opening for a junior associate? [A:] Yes."); 187:21-23 ("[Q:] What was her official title, attorney[?]  [A:] Attorney. Attorney.").

**DEFENDANTS' PARAGRAPH 20**

20.    Plaintiff received a copy of the Firm's Employee Handbook and signed an acknowledgement indicating the same. (Raskin Aff., Ex. 1).

**RESPONSE TO PARAGRAPH 20**

Admit Plaintiff eventually received a copy of the Firm's Employee Handbook in 2014, almost two years after she began working for Defendants in 2012.  Plaintiff Dep. 90:22-91:2; Prakhin Aff. ¶ 4.  Plaintiff received the Firm's Employee Handbook on June 13, 2014 and signed the acknowledgment on that date, over 21 months after she began her first term of employment with Defendants in September 2012.  Plaintiff Dep. 96:6-97:19; *see* Ex. 13 at D11941 (Plaintiff's signed acknowledgement June 13, 2014).  However, Defendants never provided Plaintiff with an Employee Handbook when they rehired her to the Firm in June 2018 (*see* Response to Paragraph 7).  Indeed, Plaintiff never received the revised version of the Firm's Employment Handbook, which Defendants have been referencing and citing to throughout their 56.1 Statement of Undisputed Facts.  Plaintiff Decl. ¶¶ 13-14.

**DEFENDANTS' PARAGRAPH 21**

21.    At the commencement of her employment, Plaintiff received training on how to use

SAGA. (Pl. Tr. at 104:5-17; Prakhin Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 21**

Dispute. While Prakhin swears in his affidavit that Plaintiff received training regarding SAGA (*see* Prakhin Aff. ¶5), this contradicts his deposition testimony where he unequivocally stated that employees do not receive training on the Firm's policies. *See* Prakhin Dep. 144:2-17 ("[Q:] Any training at all provided to employees regarding the handbook or the policies in it? [A:] No. I am assuming the people that are hired [by the Firm], they can read and understand English, therefore, there's no specific training[.]"). Even assuming, *arguendo*, that Defendants trained Plaintiff on SAGA, Defendants omit the fact that this training occurred during Plaintiff's first term of employment – six years before Defendants rehired her in June 2018. *See* Plaintiff Dep. 104:5-19. There is nothing in the record to support the assertion that Plaintiff received any training at all on SAGA during the term of employment at issue in this litigation. Further, Defendants had no specific rules or requirements as to what tasks or information is to be included in SAGA entries or who was responsible for entering same. *See id.* at 102:12-103:4 (Plaintiff testifying that she learned what types of tasks she should enter into SAGA from other attorneys); *see id*. at 100:7-14 ("[Q:] What type of information was required to be entered into SAGA? [A:] It really depends on the appearance. I mean, the rules always changed. Sometimes we would give the order to the paralegal or the calendar clerk, and she would enter the dates. Other times we had to enter our own dates.").

Indeed, it was typically the paralegals and other support staff that were responsible for making SAGA entries for the attorneys in the cases they were assigned to. *See* Ex. 20 (compilation of emails where Firm attorneys instruct paralegals and other support staff to enter SAGA notes for their cases); *e.g., id.* at D01460 (Gabo instructing Raskin to "add emails to saga"); D01628 (Gabo

asking Belous to "check if [the Firm] paid any expenses to [the] old attorney to put in saga"); D01690 (Zohar instructing Larssen on inserting various SAGA entries).; *see also* Plaintiff Decl. ¶ 26. In fact, Prakhin sought out paralegals that were specifically experienced in entering SAGA notes as such was an essential part of their job. *Id*. ¶ 33; Ex. 33 at D05220-21, D05229-30.

**DEFENDANTS' PARAGRAPH 22**

22.    Plaintiff was supervised by Mr. Prakhin and Managing Attorney Irene Gabo ("Ms. Gabo"). (Pl. Tr. at 92:18-93:24; Prakhin Aff., ¶ 4).

**RESPONSE TO PARAGRAPH 22**

Admit that Gabo directly supervised Plaintiff, but dispute that Prakhin directly supervised Plaintiff. *See* Prakhin Dep. 189:9-23 (describing Gabo as Plaintiff's direct supervisor and testifying that Plaintiff worked well "under Irene Gabo's supervision"). *See* Gabo Dep. 27:19-21 ("[Q:] And you worked very closely with [Plaintiff]; correct? [A:] Yes."). Plaintiff also notes that the cited evidence, namely the testimony cited from Plaintiff's deposition, does not support this proffered factual proposition that Prakhin "supervised" Plaintiff in violation of Local Rule 56.1(d). Indeed, Prakhin's own testimony demonstrates that his assessment of Plaintiff was based on his observations and his conversations with Gabo which is consistent with how Prakhin assessed the work of all attorneys at the Firm. *Id*. at 190:13-191:6 ("[Q:] [I]s that how you would typically assess an attorney's performance, . . . based on your observations, and conversations with the managing attorney? [A:] Yes.").

**DEFENDANTS' PARAGRAPH 23**

23.    In November 2012, Plaintiff was admitted to the New York State bar. (Pl. Tr. at 93:3-4).

**RESPONSE TO PARAGRAPH 23**

Admit for purposes of this motion, but dispute any relevance.

## DEFENDANTS' PARAGRAPH 24

24.    Upon admission to the Bar, Plaintiff was promoted to an Associate position with the Firm, working under the close supervision of Ms. Gabo. (Prakhin Tr. at 184:18-187:20; Pl. Tr. At 93:93:15-24; Prakhin Aff., ¶ 4; Raskin Aff., ¶ 4).

## RESPONSE TO PARAGRAPH 24

Admit Gabo supervised Plaintiff (*see* Response to Paragraph 22), but dispute the remainder of the allegations in Paragraph 24.  The record shows that Defendants hired Plaintiff for an Associate position upon her admittance to the New York State Bar and Defendants' characterization that Plaintiff was subsequently "promoted" to an Associate role is devoid of any evidentiary basis.  *See* Response to Paragraph 19.

## DEFENDANTS' PARAGRAPH 25

25.    At the time Plaintiff was hired and after her admission to the Bar, Mr. Prakhin described the responsibilities of an Associate. (Pl. Tr. at 94:14-21).

## RESPONSE TO PARAGRAPH 25

Admit Plaintiff's job responsibilities were described to her at the time Defendants hired her, but dispute Prakhin described the same after her admission to the Bar and dispute any relevance.  Prakhin stated during his deposition that he had two conversations with Plaintiff regarding her job responsibilities – "One before [her hiring] and [one] immediately after [Plaintiff's] hiring."  Prakhin Dep. 163:8-20.

## DEFENDANTS' PARAGRAPH 26

26.    After being admitting to the Bar, Plaintiff received trainings on representing clients at court appearances and conducting depositions. (Pl. Tr. at 104:5-17; Prakhin Aff., ¶ 5).

24

**RESPONSE TO PARAGRAPH 26**

Admit that a more senior associate at the Firm "accompanied [Plaintiff] to [an appearance to] show [her] where to go" and that Plaintiff was "given a list of questions that [she] should generally ask at a defendant's deposition[,]" (Plaintiff Dep. 104:5-17), but dispute any relevance. Plaintiff developed these skills during the time she practiced from 2012 through 2017, a skillset she ultimately utilized to pursue an Associate position at Mallilo & Grossman (*see* Response to Paragraph 27).

**DEFENDANTS' PARAGRAPH 27**

27.    In February 2017, Plaintiff voluntarily resigned from her employment with the Firm to pursue an opportunity at Mallilo & Grossman, another plaintiff-side personal injury law firm. (Pl. Tr. at 122:23-128:5; Raskin Aff., ¶ 4; Prakhin Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 27**

Admit for purposes of this motion, but dispute Defendants' characterization that Plaintiff left the Firm to pursue "an opportunity" as opposed to an Associate attorney position at Mallilo & Grossman and dispute any relevancy.  *See* Plaintiff Dep. 125:10-12.   It bears noting that a colleague of Plaintiff learned of an open position at Mallilo & Grossman and subsequently informed Plaintiff, later passing Plaintiff's resume along to those at Mallilo & Grossman responsible for hiring attorneys.  *See* Plaintiff Dep. 122:23-123:18.

**C.    Plaintiff is Rehired by the Firm**

**DEFENDANTS' PARAGRAPH 28**

28.    In 2018, Mr. Prakhin was looking for a new Associate for the Firm.  (Prakhin Tr. at 195-196; Prakhin Aff., ¶ 6).

**RESPONSE TO PARAGRAPH 28**

Admit Prakhin sought a new Associate for the Firm, but dispute the characterization that

25

Prakhin sought to hire an Associate other than Plaintiff.  The record clearly demonstrates that Prakhin reached out to Plaintiff in or around April 2018 to May 2018 in an effort to recruit her back to the Firm.  *See* Prakhin Dep. 196:3-8 ("[Q:] [W]ho brought up the prospect of [Plaintiff] returning to your firm first; was it you or [Plaintiff]? [A:] It was me because I was looking for the attorney."  Moreover, Prakhin incentivized Plaintiff to return to the Firm with a salary increase and an assignment of paralegals to help manage her case load.  As Plaintiff testified at her deposition: "[Prakhin] asked me ***what it would take*** for me to come back, and I was still at [Mallilo & Grossman].  I said it would take at the very least to match what I get at [Mallilo & Grossman] or to at least match it or beat it.  And I said in order to come back, I would need paralegals or a paralegal[.]" Plaintiff Dep. 137:13-22 (emphasis added); *see also* Prakhin Dep. 196:21-197:3 ("I increased her salary up to, as far as I remember, $100,000. $110,000.  I don't recall the exact number.  It was an [incentive] for her, as far as I think, to come back to my office."  Prakhin further incentivized Plaintiff to return to the firm by giving Plaintiff her own case load and five percent of cases she settled.  *See* Plaintiff Dep. 138:14-20; Prakhin Dep. 197:17-198:2 ("I said to her as I say to any other attorney, in case of satisfactory performance, the bonuses will be given in the amount of five percent of the attorney's fee from the case they settle or they try.").

**DEFENDANTS' PARAGRAPH 29**

29.     In 2018, Mr. Prakhin met with Plaintiff. (Pl. Tr. at 136:25-137:16; Prakhin Tr. at 196:9-13; Prakhin Aff., ¶ 6).

**RESPONSE TO PARAGRAPH 29**

Admit for purposes of this motion, but note that Prakhin and Plaintiff met to discuss the terms of her second period of employment at the Firm prior to her resigning from her Associate position at Mallilo & Grossman in May 2018.  *See* Plaintiff Dep. 135:12-136:2 ("And then he said

are you looking [for a new job], and I said no, but we can discuss it.  It depends on what you're offering, and then it – and then I came in and spoke to him a few days after that.").  Further, Prakhin and Plaintiff had one conversation over the phone to discuss the terms of her second employment prior to the meeting that occurred in or around April 2018 to May 2018 and a subsequent telephone conversation following their meeting.  *Id*. at 136:25-138:2.

**DEFENDANTS' PARAGRAPH 30**

30.    During this meeting, Mr. Prakhin and Plaintiff discussed the possibility of reemploying Plaintiff as an Associate with the Firm. (Pl. Tr. at 136:25-137:16; Prakhin Tr. at 196:9-197:16; Prakhin Aff., ¶ 6).

**RESPONSE TO PARAGRAPH 30**

Admit for purposes of this motion.  *See* Responses to Paragraphs 28-29.

**DEFENDANTS' PARAGRAPH 31**

31.    Plaintiff indicated that she would be interested in returning to the Firm if Mr. Prakhin matched or increased her current salary. (Pl. Tr. at 135:15-138:20).

**RESPONSE TO PARAGRAPH 31**

Admit for purposes of this motion that Plaintiff sought a salary increase as a condition of returning to the Firm, but reiterate that it was also agreed that Plaintiff would receive at least one paralegal to be assigned to her.  *See* Plaintiff Dep. 137:13-138:2; *see* Responses to Paragraphs 28-29.  It also bears noting that Prakhin viewed re-hiring Plaintiff as an investment given the experience she gained at Mallilo & Grossman and how well she performed during her first period of employment at the Firm from 2012 through 2017.  *See* Prakhin Dep. 197:4-16 ("I gave her whatever I think is [an investment] with the experience she obtained, new experience she obtained [at Mallilo & Grossman].  As I said, trial experience, working independently. It was important for

27

me, therefore, [to] increase the salary offer up to $100,000, and she accepted that.").

**DEFENDANTS' PARAGRAPH 32**

32.     Plaintiff represented to Mr. Prakhin that she had gained significant experience as an associate at Mallilo & Grossman. (Prakhin Tr. at 196:9-197:16; Pl. Tr. at 128:16-135:10; Prakhin Aff., ¶ 6).

**RESPONSE TO PARAGRAPH 32**

Admit that Plaintiff had gained significant experience as an Associate at Mallilo & Grossman, but dispute Defendants' characterization of Plaintiff having misrepresented the same and dispute any relevance.  Indeed, while an Associate at Mallilo & Grossman, Plaintiff gained valuable trial experience and Mallilo & Grossman tasked her with managing her own cases.  *See* Plaintiff Dep. 130:8-25 ("[Q:] Would you be assigned at the beginning of the matter? [A:] I would be asked to work on a case from the beginning of it, yes. . . . [Q:] When you say you would be asked to work on a case, do you mean that if a new client came you might be able to draft a complaint for that matter? . . . . [A:] I would intake the client and then oversee the case."); *Id.* at 133:9-11 ("[Q:] [Plaintiff's resume] also states that you served as lead counsel on two jury trials; is that correct? [A:] Yes."); *Id.* at 131:4-15 ("[I]f a case is going to go to trial, I would be responsible to prepare for trial, even take it to [trial.]"); Prakhin Dep. 195:11-20 ("[Plaintiff] was working [at Mallilo & Grossman] with a lot of files, independently, without supervision[.]"); *Id.* at 197:4-16 ("I [do] not recall whether I asked her about her salary [at Mallilo & Grossman].  I do not recall that, but I gave her whatever I think is a profit with the experience she obtained[.]  As I said, trial experience, working independently." ); *see also* Gabo Dep. 31:15-18 (Gabo testifying that she believed Mallilo & Grossman was "a more experienced firm[.]").

**DEFENDANTS' PARAGRAPH 33**

33.     After the meeting, Mr. Prakhin offered Plaintiff an Associate position at an increased salary of $100,000. (Pl. Tr. at 138:14-20; Prakhin Tr. at 195:4-197:16; Prakhin Aff., ¶ 6; Raskin Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 33**

Admit that Prakhin offered Plaintiff an increased salary of $100,000 if she returned to the Firm, but dispute that the offer to increase Plaintiff's salary was the only component of the agreement to re-hire Plaintiff.  *See* Responses to Paragraphs 28-29, 31, and 34; Plaintiff Dep. 140:17-25 ("[Q:] So what was different from the offer Mr. Prakhin made you to resume with the firm from what it was when you left the firm? [A:] I was given 25,000 more dollars from when I left because it went from [$75,000] to [$100,000].  I was told I would have one or two paralegals around for support and a much larger caseload, which meant I would make more money on settling cases.").  Plaintiff further disputes that Prakhin offered an increased salary *after* they met in or around April 2018 to May 2018.  *See* Prakhin Dep. 196:9-197:16 (Prakhin testifying that *during* the meeting with Plaintiff in or around April 2018 through May 2018, he offered Plaintiff a salary increase to $100,000).  Prakhin further agreed to give Plaintiff a percentage of the fees the Firm collected on cases Plaintiff settled.  *See* Plaintiff Dep. 138:14-20 (stating that Prakhin offered to give Plaintiff a paralegal, a caseload, "and a percentage of the [fees the Firm collected from settlements that Plaintiff handled].").

**DEFENDANTS' PARAGRAPH 34**

34.     In addition to her salary, Plaintiff was eligible for a discretionary bonus consisting of 5% of the Firm's fee collected from settlements she negotiated. (Pl. Tr. at 138:14-20, 171:13-22; Prakhin Tr. at 197:18-198:11; Prakhin Aff., ¶ 6; Raskin Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 34**

Dispute.  Pursuant to the terms of Prakhin's offer to Plaintiff, Plaintiff was entitled to a **non-discretionary** 5% of the Firm's fee of any settlement negotiated by Plaintiff which was agreed to by Prakhin when he recruited Plaintiff back to the Firm in 2018.  *See* Plaintiff Dep. 106:24-107:24 ("[Q:] So if [the] firm got a third of whatever settlement amount was agreed upon, you got 5 percent of that third; is that correct? [A:] [Y]es. [] [Q:] And were you ever compensated for 5 percent of any case you settled? [A:] Yes."); *Id*. at 126:7-9 ("[Q:] Well, at [the Firm] you received 5 percent of any settlement, correct? [A:] [Y]es."); *Id*. at 138:14-20 (Plaintiff testifying that Prakhin agreed to give her a percentage of the Firm's fee of any settlement negotiated by Plaintiff as part of the negotiations to rehire her to the Firm); *Id*. at 171:13-22 ("[Q:] [O]ne of the deals that you made with Mr. Prakhin when you returned to his office in 2018 was that you would receive 5 percent of any cases you settled; is that correct? [] [A:] That was my initial deal with him, yes.").

## DEFENDANTS' PARAGRAPH 35

35.    Plaintiff's resumé states that while employed at Mallilo & Grossman, Plaintiff: (1) acted as lead counsel on jury trials; (2) managed a caseload from inception to conclusion; (3) conducted depositions; (4) drafted pleadings; and (5) researched, prepared, and argued discovery and dispositive motions. (Donnelly Decl., Ex. M).

## RESPONSE TO PARAGRAPH 35

Dispute.  The cited evidence does not support this factual proposition in violation of Local Rule 56.1(d) as Defendants misstate and cherry-pick responsibilities Plaintiff lists to describe her employment experience at Mallilo & Grossman.  *Compare* Ex. 23 at PLAINTIFF 001538-39. Moreover, Plaintiff disputes the order in which Defendants have selectively enumerated Plaintiff's responsibilities beginning with (1) – which is not the manner in which Plaintiff elected to list the experience she gained on her resume.  For example, under the Experience section titled "Mallilo

and Grossman, Esqs." Plaintiff's resume states:

> Civil litigation practice. Manage caseload from inception until conclusion. Conduct depositions. Research, prepare, and argue discovery and dispositive motions. Appear on settlement conferences and mediations. Prepare and represent clients at municipal hearings and depositions. Prepare discovery demands and responses. Draft pleadings including complaints and bill of particulars. Perform legal research on diverse issues. Review and dissect medical records and reports. Served as lead counsel on two jury trials.

*Id*.

## **DEFENDANTS' PARAGRAPH 36**

36.     Plaintiff only conducted one trial at Mallilo & Grossman, which she lost. (Donnelly Decl., Ex. N).

## **RESPONSE TO PARAGRAPH 36**

Dispute. While Plaintiff did conduct a summary jury trial where the verdict was in favor of the defendant, she also served as lead counsel on *a bifurcated trial*. *See* Plaintiff Decl. ¶ 8; Ex. 24 at D014867; *see also* Plaintiff Dep. 133:9-11 ("[Q:] [Plaintiff's resume] also states that you served as lead counsel on two jury trials; is that correct? [A:] Yes."); 133:12-135:11 (regarding the details of the two jury trials where Plaintiff served as lead counsel – "[Q:] Can you distinguish [the two trials]? [A:] One was a summary jury trial and the other one was a regular bifurcated trial."); Ex. 24 at D014867. Further, Plaintiff gained vast experience preparing her other cases for trial in the event they proceeded to that stage of litigation. *See* Plaintiff Dep. 131:4-132:2 ("[I]f a case is going to trial, I would be responsible [for preparing for] trial[.]"). Additionally, Prakhin valued the experience Plaintiff gained while trying other cases "as a second chair" which provided her with experience in, *inter alia*, conducting jury selection. *See* Prakhin Dep. 195:11-196:2. Indeed, in mid-August 2018, Prakhin was so impressed with Plaintiff's litigation and trial skills that he

assigned her to second chair a trial in a case that assigned to another attorney.  *See* Ex. 25 at D00725.

**DEFENDANTS' PARAGRAPH 37**

37.    Plaintiff did not manage her own caseload and instead was assigned to assist partners with their caseloads. (Pl. Tr. at 129:5-132:17).

**RESPONSE TO PARAGRAPH 37**

Dispute.  The cited evidence does not support this proffered factual proposition in violation of Local Rule 56.1(d).  Defendants mischaracterize Plaintiff's testimony without quoting the full question to which Plaintiff was responding to.  Indeed, the question to which Plaintiff was responding to asked whether Plaintiff received a case load "***as soon as [she] started*** at Mallilo & Grossman[.]" Plaintiff Dep. 129:5-6 (emphasis added).  While Plaintiff testified that she was not assigned a caseload "as soon as [she] started" with the law firm, she was later assigned cases that she "managed" and "oversaw" from inception to resolution.  Plaintiff Dep. 130:13-133:23.

Plaintiff did in fact manage her own cases and did not only "assist partners with their caseloads."  *See* Plaintiff Decl. ¶¶ 7-8.  The record is clear that the Managing Attorney or other partners at Mallilo & Grossman directed Plaintiff to oversee cases after she conducted the initial intake of a prospective client and assessed the prospective client's damages.  *See* Plaintiff Dep. 131:18-132:17 ("I would oversee that certain things are done on a case, and once it gets past the [preschedule stage], sometimes I would be assigned to take it all the way to trial.").  Undoubtedly, Plaintiff returned to the Firm in June 2018 with "more experience and a better – better knowledge, [of New York Civil Practice Law and Rules] and caseloads[.]"  Gabo Dep. 46:2-9 (acknowledging Plaintiff was given a heavy workload while working at Mallilo & Grossman – "I think they threw a lot at her at Mallilo & Grossman.").

**D.**    **Plaintiff's Second Period of Employment with the Firm**

**DEFENDANTS' PARAGRAPH 38**

38.    Plaintiff commenced her second period of employment with the Firm on June 18, 2018. (Prakhin Tr. at 206:2-5; Prakhin Aff., ¶ 9; Raskin Aff., Ex. 4).

**RESPONSE TO PARAGRAPH 38**

Admit that Plaintiff commenced her second period of employment with the Firm on June 18, 2018.  *See* Responses to Paragraphs 28-31.

**DEFENDANTS' PARAGRAPH 39**

39.    The essential duties of the Associate position included: (1) representing clients at court hearings; (2) conducting and defending depositions; (3) drafting motions; and (4) negotiating settlements. (Prakhin Tr. at 285:13-286:16; Prakhin Aff., ¶¶ 33-34; Pl. Tr. at 94:22-95:3).

**RESPONSE TO PARAGRAPH 39**

Admit that Plaintiff's duties included representing clients at court hearings, conducting and defending depositions, drafting motions, and negotiating settlements and note that Plaintiff was able to perform the essential duties of the Associate position before and after her vision deteriorated in September 2018.  *See* Plaintiff Dep. 94:22-95:3; *see also* Responses to Paragraphs 120-21.

**DEFENDANTS' PARAGRAPH 40**

40.    Plaintiff acknowledges that engaging in settlement discussions on behalf of clients is the responsibility of the attorney. (Pl. Tr. at 153:9-11).

**RESPONSE TO PARAGRAPH 40**

Admit, partially, that engaging in settlement discussions may be a responsibility of an attorney, but dispute relevance.  Also, the cited evidence does not support the proposition that only

attorneys were responsible for engaging in settlement negotiations at the Firm, in violation of Local Rule 56.1(d). Plaintiff testified that settlement negotiations "[s]hould be done by attorneys or there was a negotiator [at the Firm]." Plaintiff Dep. 153:9-11. Additionally, Prakhin testified during his deposition that the final "say" regarding settlement was his responsibility, and his alone. *See* Prakhin Dep. 188:24-189:8 ("[T]he conversations [regarding settlement], those conversations should be kept only with me. So, the final decision regarding the case is upon me.").

Lastly, paralegals at the Firm play a significant role in facilitating case settlements. For example, paralegals routinely communicate settlement offers to the Firm's clients, obtain clients' authorizations to accept settlement offers, coordinate with workers compensation insurance carriers regarding settlement, negotiate medical liens, and seek information and records from clients in order to facilitate settlement negotiations. *See* Ex. 26 at D01323 (Gabo directing Larssen to assess whether cases are "ripe" for mediation and to coordinate with a private mediation company regarding the same); D01702 (Gabo instructing a paralegal to get "consent to settle" from a client's workers compensation insurance carrier); D01732 (Gabo and Prakhin directing Belous to speak with a client in order to assess his injuries); D01793 (same); D01802 (Gabo directing paralegals to speak to a client regarding medical treatment for purposes of settlement); D01953 (office message about a legal assistant having difficulty in determining a settlement because another Firm attorney did not provide her with certain information.); D01960 (paralegal messaging attorneys at the Firm seeking advice on what to tell a client regarding receiving additional medical treatment for purposes of settlement); D03656-57 (Gabo directing Larssen to check on a settlement and then to contact opposing counsel regarding the same); D04100 (an email sent from Belous to Prakhin notifying him that a client declined a settlement offer); D08338 (Gabo emailing Larssen to speak with a witness about how a client fell, in order to assess liability). In fact, Prakhin sought

34

out and interviewed paralegals that were experienced in communicating directly with clients, opposing counsel, and insurance carriers to facilitate settlements; and expressed that such tasks were essential parts of their job.  Ex. 21 at D05220-21, D05229-30; Plaintiff Decl. ¶ 33.

**DEFENDANTS' PARAGRAPH 41**

41.    The essential duties of an Associate also included: (1) entering case notes into the Firm's case management database, SAGA; (2) communicating with clients; (3) reviewing work completed by paralegals; (4) being available to work at least forty (40) hours per workweek; and (5) following the Firm's policies and procedures as set forth in the Employee Handbook.  (Prakhin Tr. at 285:13-286:16; Prakhin Aff., ¶¶ 36-37).

**RESPONSE TO PARAGRAPH 41**

Dispute.  *See* Responses to Paragraphs 10, 21, 40, 42, 53, 60, 64-65, 71, 85, 87-89.

**DEFENDANTS' PARAGRAPH 42**

42.    After Plaintiff commenced employment with the Firm in 2018, Defendants quickly realized that Plaintiff's work performance was not satisfactory.  (Prakhin Tr. at 207:21-208:16; Prakhin Aff., ¶ 13).

**RESPONSE TO PARAGRAPH 42**

Dispute.   Plaintiff worked for Defendants for approximately five years, where she performed the essential duties of an Associate, received consistent raises and bonuses, and was considered a valued member of the Firm before leaving for Mallilo & Grossman. *See* Plaintiff Dep. 105:3-23; Prakhin Dep. 188:8-16 ("[Q:] What was your assessment of [Plaintiff's work performance during her first term of employment with the Firm]?  [A:] [] [U]nder the supervision of [Gabo] she was performing okay. Good."); 189:13-23 ("There was no complaints from [Gabo]. I saw that she worked her 40 hours weekly.  She was appearing [to court] on time.  I didn't have

any problems with her back [in those] days."); 189:24-190:6 ("[Q:] You said [you believed Plaintiff] was okay or good at her job because there were no complaints and because you observed her working and she seemed to be doing fine?  [A:] Yes."); 192:8-16 ("[Plaintiff] settled cases, and her performance was satisfactory, and she was getting bonuses, yes."); 197:17-198:2 ("[Bonuses are only paid] if the general performance is satisfactory."); 194:22-24 ("[Q:] Were you happy that Ms. Ruderman resigned in 2016?  [A:] No. No."); *see* Gabo Dep. 27:16-18 ("[Q:] Did you think she was a good attorney? [A:] I did."); 28:19-29:7 (Gabo acknowledging that she cried when she learned that Plaintiff had accepted an Associate position at Mallilo & Grossman "[b]ecause [she] would miss her" and because she would "miss the contribution [Plaintiff] provided during her initial employment [at the Firm.]").

In early 2018, Prakhin recruited Plaintiff back to the Firm because she was a strong performer. *See* Plaintiff Dep. 135:12-138:20; Responses to Paragraphs 28-31.  When Defendants rehired Plaintiff in June 2018, she was assigned 50-70 cases.  Prakhin Dep. 207:5-9.  In mid-August 2018, Prakhin was so impressed with Plaintiff's litigation and trial skills that he assigned her to second chair a trial in a case that assigned to a different attorney. *See* Ex. 25 at D00725 ("Tell [Plaintiff] to second seat.").  Shortly thereafter, in September and October 2018, Prakhin assigned to Plaintiff an additional 123 cases, on top of those she was already managing, in anticipation of the departure of Gabo from the Firm (*see* Prakhin Dep. 222:4-224:18; Gabo Dep. 53:14-54:10; *see also* Ex. 27 at D01600 (Gabo confirming the number of cases transferred to Plaintiff – "I had 198 cases, 75 went to [Beron]. [The] [r]est should be [Plaintiff's].")), an unmistakable acknowledgement of Plaintiff's qualification for her role.  Indeed, Defendants' vesting of Plaintiff with paralegals and additional responsibilities after four months of employment directly contradicts their claim that Plaintiff was terrible at her job from the moment they rehired

her.  *See* Prakhin Dep. 198:12-21 ("When she started, she didn't have paralegals.  But then, three months, probably around three months, I assigned her first paralegal, then the second paralegal.  ***Because she was getting cases***.  I was giving her more and more cases and that's how I decided that she needs paralegals." (emphasis added); Gabo Dep. 46:10-14 ("[Q:] So you think she was a better attorney than she was during her initial stint at the [Firm], at which time she was less experienced? [A:] Yes."); *see also* Response to Paragraph 46).  Indeed, rather than exhibiting performance issues, the record reflects that Plaintiff received an even greater caseload, additional responsibilities, and two paralegals – despite her vision rapidly deteriorating in October 2018, clearly evincing Plaintiff's strong work performance in the beginning months of her second term of employment at the Firm.

Further, Prakhin never notified Gabo, the Managing Attorney of the Firm at the time, that there were any issues with Plaintiff's work performance during her second term of employment with the Firm.  Gabo Dep 46:15-19 ("[Q:] At any time in 2018, did Mr. Prakhin ever tell you he was dissatisfied with the quality of [Plaintiff's] work? [A:] No.").  Similarly, any alleged deficiencies in Plaintiff's work performance that purportedly occurred at the onset of Plaintiff's second term of employment at the Firm is also belied by Raskin's deposition testimony and the record.  *See* Raskin Dep. 109:14-110:2 ("[Plaintiff] started fine, no complaints, and then it started to decline at the end of September I believe, beginning of October[,]" – which was around the same time Plaintiff's vision began to rapidly deteriorate); Ex. 28 at PLAINTIFF 001059 (Gabo introducing Plaintiff to another attorney in an email and vouching "for [Plaintiff] as a ***great attorney and a colleague***." (emphasis added)).

Lastly, as late as November 26, 2018 – immediately prior to Prakhin learning of Plaintiff's LHON diagnosis and that her impairment was permanent and untreatable – Prakhin stated to

Plaintiff that he intended to "keep [her] on" and continue employing her, further undermining any argument that Prakhin took issue with Plaintiff's work performance at the onset of her second term of employment with the Firm.  Ex. 29 at PLAINTIFF 001429.

## DEFENDANTS' PARAGRAPH 43

43.     By August 2018, Mr. Prakhin began searching for an attorney to replace Plaintiff. (Prakhin Tr. at 280:23-283:21; Prakhin Aff., ¶ 14; Zohar Aff., ¶ 4).

## RESPONSE TO PARAGRAPH 43

Dispute.  In an audio recording produced by Defendants, Raskin notified Prakhin that Plaintiff was out of the office seeking medical treatment due to her disability which began to worsen in October 2018 through November 2018.  *See* Ex. 30 at PLAINTIFF 1477 (transcript of audio recording, translated from Russian to English).  In response to which Prakhin said, "I'm going to have to start looking" – an obvious allusion to firing Plaintiff and searching for her replacement.  *Id*.  Defendants have submitted no evidence other than affidavits from Prakhin and the Firm's current Managing Attorney, Gil Zohar ("Zohar"), to suggest that the Firm made any efforts to hire an attorney to replace Plaintiff "[b]y August 2018."  Tellingly, these affidavits are riddled with inconsistencies that fail to sufficiently demonstrate that Plaintiff's work performance was so terrible as to warrant seeking a replacement or that Defendants even sought a replacement as early as August 2018.  For example, despite Prakhin's deposition testimony where he stated that he sought to find an Associate to replace Plaintiff in June 2018 through September 2018 by placing job postings on www.Indeed.com and www.ZipRecruiter.com, Defendants have failed to produce any documents or evidence suggesting these job postings exist.  *See* Prakhin Dep. 281:23-282:4; Huot Decl. ¶ 6.

More importantly, during Prakhin's deposition, he testified "when I interviewed [Zohar], it was *literally days before I fired* [Plaintiff,]" and "I already decided that with such kind of bad performance I cannot keep [Plaintiff] any longer."  Prakhin Dep. 235:6-17 (emphasis added).  In other words, even if Prakhin supposedly met with Zohar in "late August 2018, early September" as he alleges in his new affidavit (Prakhin Aff. ¶ 14), Prakhin explicitly testified that he only considered hiring Zohar to replace Plaintiff, "literally days" before he terminated Plaintiff.  Prakhin Dep. 235:6-17; *id.* at 235:18-20 ("[Q:] You hired Mr. Zohar to replace [Plaintiff]? [A:] Yes."); 317:6-10 ("[Q:] When did you first consider hiring Mr. Zohar to replace [Plaintiff]? [A:] [S]everal days prior to the day when I fired [Plaintiff].").

Moreover, despite Plaintiff's purported work performance issues, which Defendants allege began to manifest shortly after she began her second term of employment at the Firm, Prakhin did not consider hiring Zohar in August or September, when they first met.  Prakhin Dep. 316:21-317:5 ("[B]ack to this time, *September, there was no conversation about hiring him*.") (emphasis added).  In fact, Prakhin waited to terminate Plaintiff until December 2018, *7 months* after Plaintiff began her second term of employment at the Firm; yet only 2 weeks after she disclosed her diagnosis to Defendants.  *Id*. at 283:2-11; Plaintiff Decl. ¶ 161.

## DEFENDANTS' PARAGRAPH 44

44.    Ms. Gabo was the Firm's Managing Attorney during Plaintiff's second period of employment until October 1, 2018.  (Prakhin Aff., ¶¶ 4, 16; Pl. Tr. at 143:7-17).

## RESPONSE TO PARAGRAPH 44

Admit for purposes of this motion, but note that Gabo was also Plaintiff's supervisor and the Firm's Managing Attorney during the first period of Plaintiff's employment with the Firm.  *See* Prakhin Dep. 189:9-12; Gabo Dep. 9:13-24; *see* Responses to Paragraphs 6, 22.

**DEFENDANTS' PARAGRAPH 45**

45.     Patricia Belous was hired as a paralegal by the Firm in August 2018.  (Prakhin Tr. at 198:12-21; Belous Tr. at 17:5-10; Belous Aff., ¶¶ 2, 4).

**RESPONSE TO PARAGRAPH 45**

Admit for purposes of this motion.  As discussed *supra* and *infra* (*see* Responses to Paragraphs 42 and 46), once Defendants increased Plaintiff's caseload, following Gabo's departure from the Firm, Defendants also assigned Belous to Plaintiff to help manage the same (*see* Prakhin Dep. 207:10-16).

**DEFENDANTS' PARAGRAPH 46**

46.     Ms. Belous was assigned to work with Plaintiff.  (Prakhin Tr. at 198:12-21; Belous Tr. 14-16; Belous Aff., ¶ 5; Prakhin Aff., ¶ 12).

**RESPONSE TO PARAGRAPH 46**

Admit for purposes of this motion, but note that Gabo and Plaintiff notified Belous that she would be assigned to Plaintiff during Belous's interview for the paralegal position at the Firm.  *See* Belous Dep. 24:10-16.  Belous's assignment to Plaintiff was also consistent with the terms agreed upon by Prakhin and Plaintiff when the Firm rehired Plaintiff in June 2018.  *See* Plaintiff Dep. 138:14-20 ("[H]e did tell me he would give me a paralegal[.]"); 140:17-25 ("I was told I would have one or two paralegals around for support[.]").  Indeed, Belous was also assigned to Plaintiff after she received Gabo's cases in the fall of 2018.  *See* Prakhin Dep. 198:12-21 ("But then, three months, probably around three months, I assigned her first paralegal, then, the second paralegal. ***Because she was getting cases***.  I was giving her more and more cases and that's how I decided that she needs paralegals.") (emphasis added).  In other words, despite Plaintiff's alleged work performance issues, Prakhin nevertheless deemed Plaintiff capable of managing two paralegals

and approximately 200 cases.  *See* Responses to Paragraphs 42, 45.

**DEFENDANTS' PARAGRAPH 47**

47.    Erica Larssen was hired as a paralegal by the Firm in September 2018.  (Larssen Aff., ¶¶ 4; Prakhin Aff., ¶ 18).

**RESPONSE TO PARAGRAPH 47**

Admit for purposes of this motion. *See* Responses to Paragraphs 42 and 46.

**DEFENDANTS' PARAGRAPH 48**

48.    Ms. Gabo resigned from the Firm to commence her own law practice effective October 1, 2018.  (Prakhin Aff., ¶ 16).

**RESPONSE TO PARAGRAPH 48**

Admit for purposes of this motion, but note that upon Gabo's resignation in October 2018, Prakhin transferred approximately 100 to 125 cases to Plaintiff (*see* Prakhin Dep. 222:7-223:15; Gabo Dep. at 53:14-54:10); Ex. 27 at D01600 (Gabo confirming that out of the 198 cases she had, 123 "should be [Plaintiff's]") in addition to the 50 to 70 cases Plaintiff already had, in an acknowledgment of Plaintiff's ability to handle the same (*see* Gabo Dep. 54:23-55:2), approximately ten weeks after Prakhin rehired Plaintiff and four weeks after Plaintiff's vision began to deteriorate.  *See* Response to Paragraph 42.

Additionally, following Gabo's departure from the Firm in early October 2018, she continued to mediate and settle cases on the Firm's behalf – cases that were previously transferred to Plaintiff.  *See* Gabo Dep. 60:19-62; Ex. 31 at D00001 (Gabo conveying a settlement demand to defense counsel in an email dated November 28, 2018 and stating she is still "helping out with mediations, etc."); D00833 (Gabo reminding Belous, Larssen, and Raskin that she will continue coming into the Firm's office every Saturday to work on cases "as before"); D00855 (Gabo asking

Larssen to send her a client's medical records so that she can settle the client's case – a case that was originally assigned to Plaintiff (*compare* D07456 – a list of Plaintiff's cases that includes the same client's name)); D01546-47 (Gabo emailing defense counsel on October 7, 2018 regarding potential settlement of four (4) cases, one of which was transferred to Plaintiff on September 17, 2018 (*see* D07652)); D01608-10 (Gabo contacting defense counsel regarding the wrong settlement amount in an email dated October 13, 2018); D01299 (an email dated November 15, 2018 from Beron to Gabo acknowledging that Gabo would be responsible for settling cases going forward and that they "each have our own incentives to settle cases."); D01449 (an email from Gabo to Raskin, Prakhin, and Beron informing them that Prakhin had given her authority to mediate "ALL matters" on the Firm's behalf until the end of 2018); D03718 (Gabo discussing settlement demands in a client's case on October 13, 2018); D07423 (an email from Gabo to Beron and Plaintiff notifying them that she will "continue trying to settle the cases that were previously assigned to me up to my departure.").

In combination with the type of cases given to Plaintiff upon her re-hiring in July 2018 (*see infra* Paragraphs 72, 78), as well as the agreement between Prakhin and Gabo whereby Gabo was given approval to settle the cases previously assigned to Plaintiff (cases that had a greater likelihood of settling compared to the cases initially assigned to Plaintiff upon her second period of employment – *see* Responses to Paragraphs 72, 78), Defendants deprived Plaintiff of any meaningful opportunity to settle cases on the Firm's behalf. *See* Responses to Paragraphs 74-75.

**DEFENDANTS' PARAGRAPH 49**

49.    In late September 2018, Ms. Larssen was assigned to work with Plaintiff. (Prakhin Aff., ¶ 18; Larssen Aff., ¶ 7; Gabo Tr. at 35:2-6).

**RESPONSE TO PARAGRAPH 49**

Admit for purposes of this motion and note that Larssen was assigned to Plaintiff to help her manage approximately 200 cases that she was responsible for following Gabo's departure. *See* Response to Paragraph 42 and 44-46. Further, Larssen's assignment to Plaintiff was in accordance with the agreement between Prakhin and Plaintiff whereby Prakhin promised to assign a paralegal to Plaintiff as a condition of Plaintiff agreeing to return to the Firm in July 2018. *See* Response to Paragraph 46.

**DEFENDANTS' PARAGRAPH 50**

50.     Plaintiff assigned Ms. Larssen to draft summons and complaints.  (Belous Tr. at 61:10-62:6; Larssen Aff., ¶ 8; Pl. Tr. at 148-149).

**RESPONSE TO PARAGRAPH 50**

Admit for purposes of this motion, but dispute that drafting summonses and complaints fell outside the purview of Larssen's responsibilities and dispute relevance.  Indeed, paralegals at the Firm, including Larssen, were regularly assigned to draft summonses and complaints by other attorneys. *See* Plaintiff Dep. 150:7-13 ("[W]hen an intake is done, when [Prakhin] would intake the client, he would take down certain information and put it in a folder, and the folder would go to me, and then it would go directly to the paralegal to draft the summons and complaint[.]"); 150:20-24 ("[Q:] I'm asking you what you did.   [A:] That's what I did.   All attorneys with paralegals followed generally the same procedures.  So when I say 'we,' 'they,' it is also what I did.").  Moreover, Prakhin also directed Larssen to draft summonses and complaints. *See* Plaintiff Dep. 150:25-151:7 & Errata Sheet 3 ("[Q:] So you would give them a file of information they needed to draft the summons and complaint? [A:] No, sometimes it would go directly from – [Prakhin] would sometimes give them the file and tell me I gave the file to Erica to draft a summons for Bob Smith."); *see also* Ex. 32 at D013661 (a portion of Gabo's SAGA entries indicating she

tasked a paralegal named Olga to "draft amended [summons & complaint]."); Ex. 31 at D00833 (Gabo reminding Larssen, Belous, and Raskin to "please make sure to have your work checked by [Beron] before it goes out [including] (motions, [summons & complaints, notices of claims, and bills of particulars]").

Indeed, Larssen also acknowledges that drafting summonses and complaints fell well within her regular responsibilities as a paralegal at the Firm. *See* Larssen Dep. 51:24-52:7 ("[Q:] What are your job duties as a paralegal [at the Firm]? [A:] I handled the drafting of the complaints of the cases that are assigned to us[.]"). Moreover, Prakhin sought out paralegals that were experienced in drafting summonses and complaints and communicated that such tasks were an essential part of their job. Ex. 21 at D05220-21, D05229-30; Plaintiff Decl. ¶ 33.

## DEFENDANTS' PARAGRAPH 51

51.    Plaintiff assigned paralegals to draft motions.  (Larssen Aff., ¶ 8; Donnelly Decl., Ex. R).

## RESPONSE TO PARAGRAPH 51

Admit for purposes of this motion, but dispute that drafting motions fell outside the purview of paralegals' responsibilities and dispute relevance.  Paralegals such as Larssen and Belous regularly performed this type of work for Plaintiff (long before her disability), as well as for all other attorneys at the Firm. *E.g.* Ex. 31 at D00833 (Gabo reminding Larssen, Belous, and Raskin to "please make sure to have your work checked by [Beron] before it goes out [including] motions, [summons & complaints, notices of claims, and bills of particulars]"); Ex. 33 at PLANTIFF 001082 (Plaintiff asking paralegal to draft a motion to compel, and noting "Let me see the motion before it goes out."); PLAINTIFF 001089 (directing paralegals to draft bill of particulars and noting "let me look it over before it goes out."); *see id.* at D01982 (paralegal being

asked by Firm attorney to draft a motion to compel); D03812 (Beron asking Larssen to review a

case file and various orders for purposes of preparing a motion for leave to file a new Notice of

Issue); *see also* Larssen Dep. 51:24-52:7 ("I drafted a few motions"). In fact, Prakhin sought out

paralegals that had experience drafting motions and had communicated that such tasks were an

essential part of their job. Ex. 21 at D05220-21, D05229-30; Plaintiff Decl. ¶ 33.

Further, the record clearly indicates that attorneys had great discretion in the work they

assigned to paralegals, including the drafting of various motions. *See* Raskin Dep. 104:22-106:8

("[Q:] The paralegal's job is to do whatever the attorney needs to assist in working on the case?

[A:] Correct,[] [they may be assigned to] write some easy motions."); 106:16-107:11 ("[Q:] Is the

paralegal's job as simple as [helping] the attorney with whatever he or she needs on the case, or

does the [F]irm dictate specific tasks that are for paralegals, and specific tasks that are for

attorneys? [A:] [ E]very [attorney assigned to a case] who has paralegals assigns work to that

paralegal."); 108:9-13 ("[Q:] And [Plaintiff], just like any other attorney, was given discretion to

assign tasks to paralegals as she saw fit; right? [A:] Correct.").

## DEFENDANTS' PARAGRAPH 52

52.    Plaintiff assigned Ms. Belous to draft discovery demands and responses. (Belous

Aff., ¶ 7; Pl. Tr. at 154:6-155:25).

## RESPONSE TO PARAGRAPH 52

Admit for purposes of this motion and dispute relevance. Paralegals regularly performed

this type of work for Plaintiff (long before her disability), as well as all other attorneys at the Firm.

*E.g.*, Ex. 33 at PLAINTIFF 001089 (directing paralegals to draft bill of particulars and noting "let

me look it over before it goes out."). Indeed, all attorneys at the Firm regularly assigned the

drafting of discovery demands and responses to paralegals. *Id*. at D01720 (Firm attorney

expressing Prakhin's rule that "[p]aralegals send out trial subpoenas."); D01759-60 (Prakhin and Gabo asking Larssen to send out requests for medical records, Medicaid liens, and workers compensation liens in a client's case); D01779 (Gabo directing Larssen to subpoena additional medical records in a client's case); *see* Plaintiff Dep. 154:24-155:7; *see also* Raskin Dep. 108:4-8 ("[Q:] Ms. Raskin, so Ms. Larssen's and Ms. Belous's job duties were the same as any other paralegal, except they were assigned to [Plaintiff]; right?" [A:] Correct."; *see also* Responses to Paragraph 51. Further, Belous testified that her job duties as a paralegal included, *inter alia*, doing intakes, "*discovery*," speaking with clients, *requesting medical records*, and ***drafting Bill of Particulars***. Belous Dep. 24:24-25:7 (emphasis added). In fact, Prakhin sought out paralegals that had experience in drafting discovery demands and responses and had communicated that such tasks were an essential part of their job. Ex. 21 at D05220-21, D05229-30; Plaintiff Decl. ¶ 33.

## DEFENDANTS' PARAGRAPH 53

53.     If Plaintiff was absent from the office, she would not respond to client inquiries, but would direct her paralegals to do so.  (Pl. Tr. at 153:15-19, 157:25-159:5).

## RESPONSE TO PARAGRAPH 53

Dispute.  The cited evidence does not support the proffered factual proposition in violation of Local Rule 56.1(d).   Plaintiff states that client communications generally could be done by attorneys or paralegals, depending on "the substance of the communication and the availability of the attorney."  Plaintiff Dep. 153:15-19.  Nowhere in the evidence cited by Defendants does Plaintiff state that she directed her paralegals to respond to client inquires in the event that she was out of the office.  *See id.*; 157:25-159:5.  In fact, Plaintiff testified that when she is not in the office, she is not advised of inquiries from clients "unless there is some dire emergency" and usually if a "paralegal can address the [client's] issue, she should."  *Id.* at 158:24-159:5.

46

Further, both Larssen and Belous acknowledged during their depositions that speaking with clients fell within the ambit of their regular paralegal responsibilities. *See* Belous Dep. 24:24-25:7 (acknowledging her regular paralegal responsibilities included "speak[ing] with clients"); *see* Larssen Dep. 51:24-52:13 (acknowledging her job duties included speaking with clients – "[Q:] Did you make phone calls to clients? [A:] The ones that speak English, yes."). Documents produced by Defendants also demonstrate that the Firm's paralegals and support staff were frequently communicating with clients. *See* Ex. 34 at D00017 (Beron acknowledging in an email that "clients are being called by myself and Raskin at the same time."); D00855 (Gabo asking Larssen if a client had already undergone surgery and to forward the client's medical records once Larssen receives them); D01553 (Belous stating that she "called client to get friends [*sic*] info [*sic*] and he said he will call [her] back[,]" and later followed up with the client regarding the same.); D01567 (paralegal notifying Gabo of her intention to call a client to update her on the status of her settlement payment). In fact, Prakhin sought out paralegals that had experience in directly communicating with clients and expressed that this was an essential part of their job. Ex. 21 at D05220-21, D05229-30; Plaintiff Decl. ¶ 33.

**DEFENDANTS' PARAGRAPH 54**

54.    Several clients, including, but not limited to, Natalia Generalova, Azfar Khan, Laura Shvarts, Vitaliy Lyutyk, and Marina Zhernyakova, complained to Mr. Prakhin about Plaintiff's failure to appropriately communicate with them about their cases. (Prakhin Aff., ¶¶ 30-35, Exs. 1-4).

**RESPONSE TO PARAGRAPH 54**

Dispute. The record is far from clear as to which attorney at the Firm was responsible for working on these clients' cases and who was responsible for communicating with these clients.

*See* Plaintiff Decl. ¶ 82.  Prior to October 1, 2018, as the Firm's managing attorney, Gabo handled the vast majority of communications with clients, if not all, and rarely, if ever, attended court appearances and depositions, tasks left to junior associates.  *Id*. ¶ 83.  Clients often insisted on speaking to Gabo and considered Gabo to be their attorney.  *Id* ¶ 85.

First, Ms. Generalova states in her affidavit that after Gabo left the Firm in October 2018, Plaintiff was assigned to her case and "never called [her], never called [her] back, and never responded to [her] messages."  Generalova Affidavit 1, ECF No. 71-1.  However, documents produced by Defendants reveal that Gabo was still handling Ms. Generalova's case as late as December 8, 2018.  *See* Ex. 35 at D01816 (discussing various next steps in Ms. Generalova's case with Prakhin in December 2018).  Another email indicates that Greg Nahas was the attorney that worked on Ms. Generalova's case after Gabo's departure.  *See id*. at D10969; D09622-23 (email exchange between Prakhin and Gabo regarding Ms. Generalova's case on December 8, 2018).

Further, while Laura Shvarts states that Plaintiff was assigned to her "during the second half of 2018" and Plaintiff "never called and never responded to [Shvarts's] calls" (Shvarts Aff., ECF No. 71-4), Defendants' documents show that Gabo was still responsible for Ms. Shvarts's case as late as October 2018 (*see* Ex. 35 at D01546-47 (Gabo attempting to negotiate a settlement of Ms. Shvarts's case)) and November 2018 (*see id.* at D01204 (Gabo directing Raskin to prepare mediation "packets" for Ms. Shvarts's case on November 14, 2018).  The records also show that Ms. Shvarts's case was actually assigned to another Firm attorney, Sandra Beron, rather than Plaintiff.  *See id.* D01203 (Beron emailing Prakhin in response to Gabo's request for mediation packets for Ms. Shvarts's case: "As you can see, the original request to mail the packets was sent only to Irene Raskin. . . . Going forward, on cases that are mine, or have been transferred to me

recently, should, at the least, have me CC'd on such emails from the start.  Really, I should be assigning my assistants to do packets and etc").

Additionally, Prakhin states in his affidavit that Ms. Zhernyakova "observed Plaintiff walking around the Firm on her cell phone, laughing[,]" and waited to speak "with Plaintiff for over half an hour[.]"  Prakhin Aff. ¶ 35.  However, as discussed in Paragraph 86, Prakhin's statement constitutes inadmissible hearsay.  *See* Response to Paragraph 86.  Even assuming, *arguendo*, that Prakhin's statement regarding Ms. Zhernyakova's dissatisfaction with Plaintiff is admissible, it is not clear that Plaintiff was the handling attorney for her case.  *Id*.

Plaintiff never spoke to Mr. Khan nor was she responsible for handling his case; Gabo or Prakhin were the handling attorneys for this case.  *See* Ex. 35 at D01409 (Gabo directing Raskin to "diary" a court notice in Mr. Khan's case); Plaintiff Decl. ¶ 89.  It also bears noting that during Plaintiff's second period of employment at the Firm, Mr. Khan was in a relationship with Prakhin's stepdaughter, Masha Lakhmatova.  *Id*. ¶ 88.  Thus, any affidavit signed by Mr. Khan must be viewed within the context of the personal relationship Mr. Khan had with Prakhin's stepdaughter, Prakhin, and Prakhin's family.

While Defendants now claim that client complaints motivated their decision to fire Plaintiff, Prakhin himself testified at his deposition that he was unconcerned with such complaints, as "it could happen with any attorney."  Prakhin Dep. 211:21-212:8.  This is consistent with Plaintiff's testimony that "[t]here was an office wide directive to communicate more with clients, but not that I recall was there any personal discussion with me about communicating with clients and lack thereof."  Plaintiff Dep. 157:25-158:12.

Moreover, the fact that Defendants were able to produce the affidavits of four (4) individuals who purportedly took issue with Plaintiff's lack of communication is directly at odds

49

with Prakhin's deposition testimony and contradicts Gabo's unequivocal deposition testimony. *See* Prakhin Dep. 209:13-23 ("I had a ***couple*** of complaints from the clients, ***but only a couple***, ***not much***, that she did not return phone calls.  It was not major[.]" (emphasis added); Gabo Dep. 52:18-25 ("[Q:] [D]id any clients ever complaint to the [Firm] about [Plaintiff] during her second term of employment? [A:] No.").

Further, lack of communication between the Firm and the clients was ubiquitous and had resulted in several clients seeking to leave the Firm.  *See* Plaintiff Dep. 157:25-158:12 ("[Q:] [D]id you receive any information regarding client complaints about your lack of communication? [A:] Specifically mine? No. Not that I recall.  Once again, I believe there was an office-wide complaint. There was an office wide directive to communicate more with clients, but not that I recall was there any personal discussion with me about communicating with clients and lack thereof." ); *see also* Ex. 36 at PLAINTIFF 001473-74 (transcript of an audio recording of Prakhin discussing a client who wanted to leave the Firm after Beron failed to conduct depositions or contact the client or witnesses for almost 1.5 years.  Prakhin notes that the client was unhappy and sought to leave the Firm – "Sandy [Beron]  – she's a crafty lady.  She went ahead and gave [the case] to [Plaintiff] – as if to say this has nothing to do with me – but that's not a solution" and "No, [Plaintiff has] nothing to do with it."  Prakhin concludes "This is no good.  This is simply outrageous.").  Plaintiff was praised for her responsiveness to her clients and on one occasion, Prakhin asked Plaintiff to contact a displeased client to repair the client's perception of the Firm.  The client complained to Prakhin:

> Someone from your office called, again a new person. [] I called your office to speak to you an[d] was asked why I called[.] I find this ridiculous that when I call to speak to you it's always impossible and also every time someone calls me from your office with a different name asking the same questions over and over.  This was a major surgery and requires long rehabilitation.  I am in a lot of pain

> and struggle.  I also find that people in your office have no manners
> or compassion, just simple etiquette, such as how are you, or [do
> you] feel better[?] People who answer the phone are always rude.

Ex. 35 at D06441.

The affidavits from Firm clients must also be viewed within the context of the unethical

manner in which Prakhin conducts his practice.  For example, in a recorded phone call produced

by Defendants, Prakhin instructs a client to lie at his deposition about the manner in which he

sustained injuries that formed the basis of a lawsuit.  *See* Ex. 37 at PLAINTIFF 001466-67.  After

the client advised Prakhin explicitly that he fell in a manner that deviated from the testimony

Prakhin had previously prepared for him, Prakhin asked him, "Why are you talking all that

bullshit?"  *Id.*  Prakhin further coached his client stating the following:

> There are things I told you yesterday! . . . There are things we can
> only talk about to each other. . . . If you don't understand, then I
> don't know, how else can I say it?  Why are you telling her all that?
> Once, twice?  Slipped.  On what?  On shit, forgive me?

*Id*.

Even as the client complained that the testimony would be inaccurate and the story would

not make sense, Prakhin again coached his client to simply repeat the testimony that Prakhin

instructed him to say the day before, "quietly and calmly," otherwise, "[w]e'll lose the case.

Straightaway."  *Id.*

Despite incriminating recordings such as this, Prakhin continues to surreptitiously record

all conversations on the Firm's phone system as part of a "routine practice" (Prakhin Dep. 320:17-

323:15), even after being admonished by the Grievance Committee for the Second, Eleventh, and

Thirteenth Judicial Districts that doing so "entails a sufficient lack of candor and a sufficient

element of trickery as to render it ethically impermissible."  *See* Ex. 38 at 10.

In a separate matter, Defendants have been accused of asking a client to sign a blank piece of paper, after which the Firm would print an engagement letter onto it – thereby binding the client to an engagement letter she never read.  *See* Prakhin Dep. 336:6-337:8; *see also* Ex. 39 (Transcript of the Deposition of Tatyana Bianco) 75:23-76:14 ("[Prakhin] gave me a blank page and asked me to sign [it].  He said I just don't want to waste your time now, we will fill it out.  We will type everything that is needed, we will print it over [at the office].").

It is against this backdrop – that of a law firm and lead attorney unrestrained by morality, ethics, or professional rules, with a demonstrated willingness to advise clients to lie under oath – that the affidavits Defendants obtained from their clients ***and family members*** must be viewed.

**DEFENDANTS' PARAGRAPH 55**

55.    Mr. Lyutyk intended to hire new counsel as a result of his experience with Plaintiff. (Prakhin Aff., ¶ 33, Ex. 3).

**RESPONSE TO PARAGRAPH 55**

Dispute.  *See* Response to Paragraph 54.

**DEFENDANTS' PARAGRAPH 56**

56.    Plaintiff requested that Ms. Belous pay her rent and electric bills each month. (Belous Aff., ¶ 11).

**RESPONSE TO PARAGRAPH 56**

Admit that Plaintiff may have requested Belous pay her rent and electric bills on three (3) occasions from October 2018 through December 2018, but dispute any relevance.  *See* Belous Aff. ¶ 11.  Even assuming, *arguendo*, that Plaintiff directed Belous to pay her rent and electric bills, these *de minimis* tasks did not unduly burden Belous and did not deprive her of performing her essential duties.  *See* Response to Paragraph 92.  Such requests also did not unduly burden the

Firm as Defendants do not pay overtime to any of their hourly workers, including paralegals. Plaintiff Decl. ¶ 78.  The cited evidence must also be weighed in the context of Plaintiff's vision deteriorating in September 2018, months before Plaintiff was officially diagnosed with LHON, a debilitating disease that causes an individual to lose their vision over a short period of time.

**DEFENDANTS' PARAGRAPH 57**

57.    Plaintiff requested that Ms. Belous address parking tickets that Plaintiff had incurred. (Belous Aff., ¶ 11; Prakhin Tr. at 273, 286).

**RESPONSE TO PARAGRAPH 57**

Admit Plaintiff may have requested Belous pay parking tickets that Plaintiff incurred, but dispute any relevance.  *See* Responses to Paragraphs 56 and 92.

**DEFENDANTS' PARAGRAPH 58**

58.    Plaintiff instructed Ms. Larssen to order her food.  (Larssen Aff., ¶ 14).

**RESPONSE TO PARAGRAPH 58**

Admit that Larssen may have ordered food for Plaintiff on occasion, but dispute Defendants' characterization of Plaintiff's and Larssen's relationship as one in which Plaintiff frequently instructed Larssen to do her personal bidding.  This is patently false.  Plaintiff and Larssen had a close relationship during the relevant time period, one that went beyond that of a supervisor and subordinate and they spoke about personal matters frequently, including Plaintiff's disability.  *See* Ex. 40 at D01679 (Larssen wishing Plaintiff well after she underwent treatment to correct her blurry vision – "Hope you are starting to feel a little better but don't worry – we got you" and sent a smiley emoticon); PLAINTIFF 001390 ("[Plaintiff:] I was like '[l]isten, if I leave, I'm taking [Larssen].' I was like, '[Larssen is coming with me.]' . . . So, thank you very much for being there and for – [Larssen:] No, absolutely.").  Defendants' characterization of their

relationship during the relevant time period as anything other than caring is disingenuous.

**DEFENDANTS' PARAGRAPH 59**

59.     On October 3, 2018, Plaintiff called Ms. Larssen and instructed Ms. Larssen to go outside and pick up medicine from Plaintiff's uncle.  (Donnelly Decl., Ex. [Rec. 597]; Larssen Aff., ¶ 14).

**RESPONSE TO PARAGRAPH 59**

Admit for purposes of this motion, but dispute any relevance.  *See* Responses to Paragraphs 56 and 58.

**DEFENDANTS' PARAGRAPH 60**

60.     Plaintiff only sometimes reviewed the work performed by her paralegals.  (Pl. Tr. at 152:12-18; Belous Tr. at 54:22-23, 61:10-62:6; Larssen Aff., ¶ 9; Belous Aff., ¶ 9).

**RESPONSE TO PARAGRAPH 60**

Dispute.  The cited evidence does not support the proffered factual proposition in violation of Local Rule 56.1(d).  During her deposition, Plaintiff stated that she sometimes reviewed a client's ***intake file before*** tasking one of her paralegals to draft summonses and complaints, but testified that she reviewed drafts of summonses and complaints after her paralegals submitted them. Plaintiff Dep. 152:12-18; 155:5-14 (Plaintiff stating that while paralegals generally draft discovery responses, drafts were reviewed by her).  Other evidence also demonstrates that Plaintiff reviewed her paralegals' work product.  *See* Ex. 33 at PLAINTIFF 001082 (Plaintiff directs paralegal to draft motion to compel and emphasizes that she will "see the motion before it goes out."); PLAINTIFF 001089 (Plaintiff directs paralegals to draft bill of particulars, and to "let me look it over before it goes out."); Ex. 41 at PLAINTIFF 001405-15 (Plaintiff instructing Larssen

to complete various tasks and to send her Larssen's final work product when she finishes).

**DEFENDANTS' PARAGRAPH 61**

61.     Attorneys were required to enter accurate notes about their assigned cases into SAGA to ensure that there are accurate records for the files that can be reviewed by any attorney in the Firm in the event that coverage is required for a court appearance or deposition or to response to inquiries from clients.  (Prakhin Aff., ¶¶ 5, 37; Raskhin Aff., ¶¶ 11, 12; Pl. Tr. at 60).

**RESPONSE TO PARAGRAPH 61**

Dispute.  The Firm's paralegals and support staff were responsible for entering notes and keeping cases updated in SAGA.  *See* Ex. 20 (compilation of emails where Firm attorneys instruct paralegals and other support staff to enter SAGA notes for their cases); *e.g., id.* at D01460 (Gabo instructing Raskin to "add emails to saga"); D01628 (Gabo asking Belous to "check if [the Firm] paid any expenses to [the] old attorney to put in saga"); D01690 (Zohar instructing Larssen on inserting various SAGA entries); D09559 (Gabo directing Raskin to "Please add emails to saga so when whoever does the package for NAM [they] can put in the right demand."); *see also* Plaintiff Decl. ¶ 26.  As Raskin explained in her sworn affidavit, the "SAGA database stores notes and entries by case file" name; therefore, all such entries will appear as if they were entered by the attorney to whom the case was assigned to – regardless who made the entry.  *See* Ex. 22 ¶¶ 2-3. *See* Response to Paragraph 21, 62, and 65.

**DEFENDANTS' PARAGRAPH 62**

62.     Plaintiff was informed that she was expected to enter notes into SAGA following a deposition.  (Donnelly Decl., Ex. P).

**RESPONSE TO PARAGRAPH 62**

Dispute.    Defendants cite an email Beron sent to all attorneys at the Firm – not only

Plaintiff – asking them to enter deposition notes into SAGA "***if possible***."  *See* Ex. 42 at D07450

(emphasis added).  However, attorneys and support staff at the Firm routinely failed to enter notes

into SAGA and Gabo testified that the failure to enter SAGA notes was so common that it would

have been an invalid and unprecedented basis upon which to terminate an attorney.  *See* Gabo Dep.

69:9-81:3 (not aware of a single attorney who was ever terminated for failing to enter SAGA notes

as frequently as they should); Plaintiff Dep. 160:13-22 ("Generally, the office should keep all notes

and cases up-to-date.  It doesn't always happen."); 183:23-184:3 ("[Q:] Do you know whether

other attorneys in the office routinely put their notes in? . . . [A:] I know that others in the office

did not always put their notes in."); *see also* Responses to Paragraphs 61, 64-65.

**DEFENDANTS' PARAGRAPH 63**

       63.     Plaintiff acknowledges that it was her job responsibility as an Associate at the Firm

to enter notes into SAGA after completing a deposition.  (Pl. Tr. at 183:5-8).

**RESPONSE TO PARAGRAPH 63**

       Dispute.  As discussed *supra* at Paragraphs 61-62, it was the responsibility of the Firm's

paralegals and support staff to enter notes into SAGA and ensure that the Firm's cases are updated.

*See* Ex. 20.  *See* Responses to Paragraphs 61-62 and 64-65.

**DEFENDANTS' PARAGRAPH 64**

       64.     Plaintiff did not enter any notes into SAGA for numerous depositions at which she

appeared.  (Donnelly Decl., Ex. Y).

**RESPONSE TO PARAGRAPH 64**

       Dispute.  The frequency and sufficiency of Plaintiff's SAGA entries were on par with that

made by other attorneys at the Firm.  However, as explicitly stated in Raskin's sworn affidavit,

when attorneys depart from the Firm, their cases are "reassigned to multiple other attorneys" in

the SAGA program.  *See* Ex. 22 ¶ 3.  In this process, the user data for all entries is changed to the attorney who takes over the case.  *Id.*; Plaintiff Decl. ¶ 28.  As a result, SAGA entries previously entered by Plaintiff now appear as though they were entered by the attorneys to whom each of her cases were transferred to.  Ex. 22 ¶ 3.  As Raskin explained "[t]he SAGA database stores notes and entries by case file," and all such active cases were reassigned upon Plaintiff's departure.  *Id.* ¶¶ 2-3.  As a result, numerous SAGA entries currently being displayed under the names of other Firm attorneys were initially entered by Plaintiff.

Moreover, Defendants' emails reflect that all Firm attorneys and support staff were routinely delinquent in entering SAGA notes.  *See* Ex. 43 at D01311 (attorney at the Firm apologizing for not having updated SAGA following a preliminary conference); D01948 (Raskin states that a paralegal was "upset [with Nahas] ***again*** over some notes.") (emphasis added); D05714 (Plaintiff noting that there are no SAGA entries regarding a client's Examination Before Trial); D07450 (an email Beron sent to all attorneys at the Firm – not only Plaintiff – asking them to enter deposition notes into SAGA "***if possible***." (emphasis added); D10358 (discussing SAGA deficiencies that predated Plaintiff's employment); D011069 (another Firm attorney not having put Examination Before Trial notes in SAGA); Ex. 44 at PLAINTIFF 1410-12 (Larssen complaining to Plaintiff about the inadequacy of SAGA entries in a client's case); *see also* Gabo Dep. 73:9-14 ("[Q:] Was failing to input EBT notes a problem that [Plaintiff] only had, or that other attorneys had as well?  . . . [A:] I think other attorneys had as well."); *id.* at 74:8-12 ("[Q:] And [attorneys'] notes were not always being put into SAGA or not being put into SAGA in a timely manner? . . . [A:] Correct."); *see also* Responses to Paragraphs 61-62 and 65-70.

Indeed, Gabo testified that there was a pervasive, Firm-wide failure to enter SAGA notes by all attorneys and support staff but that such failures would be an invalid and unprecedented basis on which to fire an attorney:

> Q:   In your experience working at the [F]irm, how diligent were attorneys [] about entering notes in SAGA?
>
> A:   Not very diligent.
>
> Q:   And you'd say that generally about the attorneys, or are you speaking about any particular person?
>
> A:   Generally.
>
> Q:   [T]hey didn't update SAGA as frequently as they should?
>
> A:   As I'd like them to. . . .
>
> Q:   And that was an ongoing concern at the [Firm]?
>
> A:   True.
>
> Q:   And that included in 2018, up until you left; right?
>
> A:   Yes. . . .
>
> Q:   In your opinion, would [not entering SAGA notes] have been a valid basis to terminate [Plaintiff's] employment?
>
> A:   No.
>
> Q:   Are you aware of any attorney, in all of your time working at the [F]irm, who's been fired for failing to update or enter notes into SAGA as frequently as he or she should?
>
> A:   No.

Gabo Dep. 69:9-81:3.

Moreover, Defendants employed Plaintiff for five years without taking issue with her SAGA notes. *See* Raskin Dep. 98:13-18 ("[Q:] Do you recall whether [Plaintiff] kept SAGA up to date at that time? I believe she did. I don't remember any complaints[.]"). They also rehired

her less than a year later, further underscoring the fact that they had no problem with Plaintiff's SAGA notes. Even assuming, *arguendo*, that Plaintiff failed to input SAGA notes more often than other attorneys at the Firm, Prakhin did not consider these to be a serious issue. *See* Gabo Dep. 46:20-47:12 ("[Q:] Did [Prakhin] view [Plaintiff's SAGA notes] as a serious issue? [A:] No.").

Finally, while Defendants cite to Plaintiff's alleged failure to enter sufficient case notes in SAGA, they fail to acknowledge the dissonance between this critique and their denial of Plaintiff's requests for JAWS (speech-to-text computer software), Dragon (speech dictation device), and OrCam (specialized glasses that enable visually impaired persons to understand text and identify objects through audio feedback), as reasonable accommodations that would allow her to enter SAGA notes far more easily. *See* Plaintiff Dep. 180:8-18 ("[Q:] Should there be notes accompanying [an EBT entry]? . . . [A:] I don't think I could have put them in since I didn't have assistive software at that time."); *see also* Response to Paragraph 121.

## DEFENDANTS' PARAGRAPH 65

65.   From June 18, 2018, through December 14, 2018, Plaintiff only entered 54 notes into SAGA. (Raskin Aff., ¶ 13, Ex. 3; Prakhin Aff., ¶ 38).

## RESPONSE TO PARAGRAPH 65

Dispute. As stated *supra* at Paragraph 64, the SAGA records produced by Defendants are incomplete and unreliable. The frequency and sufficiency of Plaintiff's SAGA entries were on par with that made by other attorneys at the Firm. Plaintiff estimates, *conservatively*, that she made at least 50 to 75 SAGA every week, aside from the entries routinely entered by the Firm's paralegals and support staff on her cases. Plaintiff Decl. ¶ 27. However, as explicitly stated in Raskin's sworn affidavit, when attorneys depart from the Firm, their cases are "reassigned to multiple other attorneys" in the SAGA program. *See* Ex. 22 ¶ 3. In this process, the user data for all entries is

changed to the attorney who takes over the case. *Id.*; Plaintiff Decl. ¶ 28. As a result, SAGA entries previously entered by Plaintiff now appear as though they were entered by the attorneys to whom each of her cases were transferred to. *See* Ex. 22 ¶ 3. As Raskin explained "[t]he SAGA database stores notes and entries by case file," and all such active cases were reassigned upon Plaintiff's departure. *Id.* ¶¶ 2-3. As a result, numerous SAGA entries currently being displayed under the names of other Firm attorneys were initially entered by Plaintiff. *See also* Responses to Paragraphs 62 and 64.

**DEFENDANTS' PARAGRAPH 66**

66.    From June 18, 2018, through December 14, 2018, Sandra Beron entered 1,073 notes into SAGA. ((Raskin Aff., ¶ 13, Ex. 3).

**RESPONSE TO PARAGRAPH 66**

Dispute. The Firm's paralegals and support staff were responsible for entering notes and keeping cases updated in SAGA (*see* Ex. 20 (compilation of emails where Firm attorneys instruct paralegals and other support staff to enter SAGA notes for their cases)). It should also be noted that while Beron had an assigned paralegal at all relevant times, Plaintiff began her second term of employment in June 2018 (Prakhin Dep. 206:2-5) but was not provided with a paralegal until approximately three months later. *Id.* at 198:12-21; Plaintiff Dep. 187:17-24 (Plaintiff was not assigned a paralegal until September). *See also* Responses to Paragraphs 61-62, 64-65, 67.

**DEFENDANTS' PARAGRAPH 67**

67.    From June 18, 2018, through December 14, 2018, Irene Gabo entered 2,449 notes into SAGA. (*Id.*)

**RESPONSE TO PARAGRAPH 67**

Dispute.  As stated *supra* at Paragraph 61, the Firm's paralegals and support staff were responsible for entering notes into SAGA and ensuring cases were updated.  *See, e.g.*, Ex. 20 (compilation of emails where Gabo directs paralegals and other support staff to enter SAGA notes on her cases); *see also* Responses to Paragraphs 21, 61-62, 64-65.

**DEFENDANTS' PARAGRAPH 68**

68.    From June 18, 2018, through December 14, 2018, Lilit Avetisyan entered 1,770 notes into SAGA.  (*Id.*)

**RESPONSE TO PARAGRAPH 68**

Dispute and refer to Responses to Paragraphs 61-67.

**DEFENDANTS' PARAGRAPH 69**

69.    From June 18, 2018, through December 14, 2018, Gregory Nahas entered 746 notes into SAGA.  (Donnelly Decl., Ex. CC).

**RESPONSE TO PARAGRAPH 69**

Dispute and refer to Responses to Paragraphs 61-68.

**DEFENDANTS' PARAGRAPH 70**

70.    From June 18, 2018, through December 14, 2018, Nicholas Serlin entered 598 notes into SAGA.  (Donnelly Decl., Ex. DD).

**RESPONSE TO PARAGRAPH 70**

Dispute and refer to Responses to Paragraphs 61-69.

**DEFENDANTS' PARAGRAPH 71**

71.    Settling cases was an essential responsibility of attorneys at the Firm and necessary for the Firm's financial viability.  (Prakhin Aff., ¶ 7).

**RESPONSE TO PARAGRAPH 71**

Dispute. Plaintiff understood that representing the best interest of her clients was an essential responsibility of being an attorney at any firm. Plaintiff Decl. ¶ 73. Plaintiff was not aware that the Prakhin Firm imposed obligations on their attorneys to enter into settlements that sacrificed value for clients in the interest of padding the Firm's statistics. *Id*. Plaintiff submits that such policies are not ethical practices and are not in the best interest of the clients. *Id.*

**DEFENDANTS' PARAGRAPH 72**

72.    Between June 2018 and December 2018, Plaintiff received a total of $650 in bonus compensation from settlements. (Prakhin Aff., ¶ 40; Donnelly Decl., Ex. EE)

**RESPONSE TO PARAGRAPH 72**

Admit that Plaintiff may have only received $650 in bonus compensation from cases she settled, but dispute that this is reflective of Plaintiff's ability to perform her job duties and dispute any relevance. Plaintiff further submits that her essential and fundamental job duty as an attorney is to represent the best interests of her clients, rather than entering into "fire-sale" settlements in order to receive extra bonuses and pad the Firm's settlement statistics. Plaintiff Decl. ¶ 73.

Further, upon commencing her second period of employment at the Firm, Gabo assigned Plaintiff cases in their infancy, which required more than six (6) months to settle, a reality that Prakhin also understood. As Gabo testified at her deposition:

> Q:    Did [Prakhin] ever tell you he was dissatisfied with the number of cases [Plaintiff] was settling? And again, I mean in 2018, from the point she was rehired up until her termination.
>
> A:    ***I don't think so, because the ones she got were very new, so I don't think she had an opportunity to actually settle anything*** between the time she came back and the time I left.
>
> Q:    What do you mean the cases were new? They were in the early stages of litigation?

> A:      Correct.  I didn't want to give her something that was already, you know, post note of issue stage.  So I think most of the stuff she got was newer.

Gabo Dep. 47:13-48:5 (emphasis added).

As Gabo went on to explain, premises liability cases (the only type of case Plaintiff handled at the Firm in 2018), typically do not settle until several months into discovery:

> Q:      Based on your experience in personal injury law, are there typical points at which a premises liability case specifically is more or less likely to be settled over the life of a case?
>
> A:      I would say after the first six months you get a better idea.
>
> Q:      Why is that?
>
> A:      Because initially when you take a case and you do your investigation and you send out your letters to the landowner, sometimes it takes months just to get a letter back [saying] that they took it to the insurance company, and [then] we [could] have second notice, third notice, last note notice.  But once they answer, you have to get the medical [records].  If the client has a fracture, you know, there's six weeks in a cast and eight weeks of physical therapy. So all of that [takes] time.  So I would say it would be six months and after.
>
> Q:      And essentially, [] it's difficult to settle a premises case where you don't have [discovery] regarding the [premises] where the accident happened and the nature of the injury?
>
> A:      Correct.
>
> Q:      And that typically takes a little time because people don't get you documents as quickly as you would like[?]
>
> A:      Not only that. You also need to prove negligence, and you need to prove that they knew about the defect.  So sometimes you need to get into the deposition stage.  It all takes time.

Gabo Dep 49:7-50:19.

In other words, Plaintiff's settlements simply cannot be compared side-by-side with those of other attorneys (*see supra* at Paragraphs 75-76 and 131-32), as her cases were never considered

likely to settle until months after she took them on.  Indeed, none of Plaintiff's cases went to trial from June 2018 through December 2018.  *See* Plaintiff Dep. 172:16-20.

Moreover, when Plaintiff was first rehired in June 2018 she was only responsible for 20 to 40 cases that were in their early stages of litigation. *See* Gabo Dep. 33:20-34-11 ("[S]he started with 20 to 40 [cases]. . . .  I wanted to give her something that was in the early stages of litigation, so she can kind of, you know, get into it.").  It was not until in or around October 1, 2018 that Gabo transferred approximately 123 cases to Plaintiff.  *See* Gabo Dep. 54:2-10; Ex. 27 at D01600 (Gabo calculating that 123 cases were transferred to Plaintiff).  However, as stated *supra* at Paragraph 48, following Gabo's departure from the Firm in early October 2018, she continued to settle cases on the Firm's behalf – cases that were previously transferred to Plaintiff and had a greater likelihood of settling given these cases were in the late stages of litigation.  *See* Gabo Dep. 60:19-62:13; Ex. 31; *see also* Response to Paragraph 48.  Given the infancy of Plaintiff's cases as well as Prakhin providing Gabo with authority and a financial incentive to settle any transferred cases, Gabo's assessment was correct that Plaintiff did not have "an opportunity to actually settle anything . . . ."  Gabo Dep. 47:13-22.

Moreover, considering Plaintiff was terminated on December 14, 2018 and the fact that all of Plaintiff's cases involved premise liability – which understandably require a minimum of six (6) months for the prospect of settlement to become likely – it was unrealistic for Plaintiff to have been able to generate substantial revenue for the Firm.  This reality is acknowledged by Prakhin in his deposition testimony.  Prakhin Dep. 305:13-24. ("[Q:] Do you think it's possible that the revenue might have come in at a later?  [A:] It's possible. . . . Part of the revenue definitely [could] come at a later date[.]"); *see also* Response to Paragraph 131 (discussing Zohar's ability to generate revenue for the Firm months after receiving Plaintiff's cases following her termination).

**DEFENDANTS' PARAGRAPH 73**

73.    Plaintiff's settlements generated only $13,000 of revenue for the Firm.  (Prakhin Aff., ¶ 40)

**RESPONSE TO PARAGRAPH 73**

Admit Plaintiff may have only generated $13,000 of revenue for the Firm, but dispute any relevance.  *See* Response to Paragraph 72 and 131.

**DEFENDANTS' PARAGRAPH 74**

74.    From June 2018, through December 2018, the Firm collected approximately $1,420,000 in fees from settlements that Irene Gabo negotiated.  (Prakhin Aff. at ¶ 42).

**RESPONSE TO PARAGRAPH 74**

Admit that Gabo made $1,420,000 in fees for the Firm, but dispute any relevance. However, Gabo managed 250 of her own cases and 500 cases of other Firm attorneys (Gabo Dep. 53:3-7) – cases that she was able to work on and develop for months, if not years, prior to Plaintiff having rejoined the Firm in June 2018.  Additionally, as stated *supra* at Paragraphs 48 and 72, following Gabo's departure from the Firm in early October 2018, Prakhin gave her the authority and the financial incentive to continue settle all cases – even cases transferred to Plaintiff that were viable for settlement.  *See* Gabo Dep. 60:19-62:19; Ex. 31.  As such, Gabo's high settlement figures, as compared to Plaintiff's or any other Firm attorney, is entirely unsurprising.  *See* Responses to Paragraphs 48 and 72.

**DEFENDANTS' PARAGRAPH 75**

75.    Ms. Gabo earned a total of $71,000 in bonus compensation from her settlements. (*Id*.; Donnelly Decl., Ex. GG).

**RESPONSE TO PARAGRAPH 75**

Admit Gabo earned $71,000 in bonus compensation, but dispute any relevance. *See* Responses to Paragraphs 72 and 74.

**DEFENDANTS' PARAGRAPH 76**

76.     From June 2018, through December 2018, the Firm collected approximately $171,700 in fees from settlements that Sandra Beron negotiated.  (Prakhin Aff. at ¶ 41).

**RESPONSE TO PARAGRAPH 76**

Admit that Beron earned approximately $171,700 in fees for the Firm, but dispute any relevance.  It is further noted that Beron, like Gabo, was undoubtedly able to settle cases that she worked on and developed for months, if not years, prior to Plaintiff rejoined the Firm in June 2018. Gabo Dep. 53:3-7; *see* Response to Paragraph 72.

**DEFENDANTS' PARAGRAPH 77**

77.     Ms. Beron earned a total of $8,585 in bonus compensation from her settlements. (*Id.*; Donnelly Decl., Ex. FF)

**RESPONSE TO PARAGRAPH 77**

Admit Beron earned $8,585 in bonus compensation from her settlements, but dispute any relevance. *See* Response to Paragraph 72 and 76.

**DEFENDANTS' PARAGRAPH 78**

78.     Mr. Prakhin advised Plaintiff that she needed to settle more cases.  (Prakhin Aff., ¶ 39).

**RESPONSE TO PARAGRAPH 78**

Dispute.  While Prakhin claims to have met with Plaintiff on three occasions to discuss her performance (*see* Prakhin Dep. 213:9-218:22), he never testified to having told Plaintiff that she

needed to settle more cases. *See* Plaintiff Decl. ¶ 71. Further, as detailed in Response to Paragraph 72, Prakhin never expressed to Gabo any dissatisfaction with the number of cases Plaintiff was settling as Prakhin clearly understood that the cases assigned to Plaintiff were in their infancy and not ripe for settlement – thereby Plaintiff did not have an opportunity to settlement any cases. Gabo Dep. 47:13-48:5; 51:6-52:8 (acknowledging that Prakhin never told Gabo that he was dissatisfied with Plaintiff's work). Moreover, Plaintiff always understood that her ethical obligations were to litigate cases in the best interest of her clients and to settle cases only upon the informed consent of her clients. Plaintiff Decl. ¶¶ 73-74. Plaintiff disputes that Prakhin ever met with Plaintiff on any occasion to discuss her performance or her settlement of cases and further submits that Defendants' current position regarding pushing settlements reflects policies that are not ethical and are not in the best interest of the clients. *Id.* ¶¶ 71-74, 76-77; *see* Response to Paragraph 72. No other witnesses or a shred of documentary evidence to corroborate the occurrence of these alleged meetings. Huot Decl. ¶ 9.

At bottom, there are no other witnesses or a shred of documentary evidence to corroborate the occurrence of any alleged meetings (*see id.* ¶ 9) and Plaintiff disputes having had any discussions with Prakhin or anyone else about her alleged poor performance. Plaintiff Decl. ¶ 76; Plaintiff Dep. at 174:25-175:3.

## DEFENDANTS' PARAGRAPH 79

79.    Plaintiff acknowledges her inability to review documents, pictures, or videos presented at depositions. (Pl. Tr. at 25:2-10, 111:4-114:15, 250:17-251:5).

## RESPONSE TO PARAGRAPH 79

Dispute. The cited evidence does not support the proffered factual proposition in violation of Local Rule 56.1(d). Plaintiff acknowledged that she had difficulty reviewing documents and

pictures presented at depositions ***without*** the aid of her assistive devices and software.  *See* Plaintiff

Dep. 25:2-10; 111:9-21.  Indeed, Plaintiff testified unequivocally during her deposition that she

can review documents (*see id.* at 55:18-21), photographs (*id.* at 50:5-9), and videos (*id.* at 50:10-

11) with the help of assistive devices like those she asked the Firm to provide her as a reasonable

accommodation.  Defendants' suggestion that a blind person cannot adequately handle a deposition

or perform other job functions is easily disprovable.  Moreover, following her termination in

December 2018, Plaintiff made numerous court appearances and conducted and defended

approximately 175 depositions on a *per diem* basis for numerous law firms and lawyers.  *Id*. at

48:2-57:24; *see generally* Ex. 9, "Plaintiff's privilege log."  With her assistive devices, Plaintiff

was able to review ***thousands*** of pages of documents, medical records, discovery responses,

photographs, police reports, transcripts and other case file records, prepare clients for depositions,

conduct and defend approximately 175 depositions, and prepare detailed and comprehensive

deposition reports for each of these examinations.  *Id*.; Plaintiff Decl. ¶¶ 126, 169; *see also*

Response to Paragraph 84.

## DEFENDANTS' PARAGRAPH 80

80.    On October 17, 2018, Plaintiff appeared as counsel at a deposition for one of the

Firm's clients.  (Donnelly Decl., Exs. SS, TT).

## RESPONSE TO PARAGRAPH 80

Admit for purposes of this motion, but dispute any relevance.[4]

## DEFENDANTS' PARAGRAPH 81

81.    During the deposition, surveillance footage was reviewed.  (*Id.*)

---

[4] Defendants cite to transcripts of audio recording; however, these transcripts were never produced to Plaintiff's counsel during discovery.  Huot Decl. ¶ 7.  Therefore, Defendants' reliance on these exhibits in their motion and accompanying 56.1 statement is improper and these exhibits should be disregarded.

**RESPONSE TO PARAGRAPH 81**

Admit for purposes of this motion, but dispute any relevance. Such surveillance footage has always been provided to counsel ahead of depositions – which provides Plaintiff an opportunity to review the footage with her assistive devices. Plaintiff Decl. ¶ 171; Plaintiff Dep. 226:7-12 & Errata Sheet 4 ("I don't need assistance at viewing surveillance video at depositions. I viewed that video in advance. I viewed that video before]."). *See* Response to Paragraph 82.

**DEFENDANTS' PARAGRAPH 82**

82.    Plaintiff was unable to review the surveillance footage and "faked" her way through the deposition. (*Id.*)

**RESPONSE TO PARAGRAPH 82**

Dispute. Defendants reference an incident where Plaintiff was unable to view surveillance footage at a deposition, though they deliberately omit crucial details and context. As Plaintiff explained, both in a contemporaneous, recorded phone call with Larssen (*see* Ex. 45 at PLAINTIFF 001383), and again at her deposition, she suffered from severe side effects, including particularly blurred vision, migraines, nausea and extreme dizziness due to receiving an intravenous dose of "3,000 milligrams of steroids" as part of an experimental treatment for her disability. *See* Ex. 46 at PLAINTIFF 1396; *see also* Plaintiff Dep. 226:10-15 & Errata Sheet 4 ("I don't need assistance at viewing surveillance video at depositions. I view that video in advance. I viewed that [before]. I had probably taken – because I had taken 3,000 grams of steroid. I don't need assistance [with videos at a deposition]."); Plaintiff Decl. ¶¶ 41, 171. As the deposition was about to end, opposing counsel began playing a surveillance video on the screen which Plaintiff had reviewed and viewed ahead of the deposition. *Id.* ¶ 122. Indeed, Plaintiff was already familiar with the video and had prepared her client to be ready to respond to questions related to the video

ahead of time.  *Id.*  However, at that moment during the deposition, Plaintiff was having extreme difficulty seeing the video because of the sudden onset of side effects she was experiencing.  *Id.* Opposing counsel asked Plaintiff's client the predictable questions they had prepped, and the client responded truthfully just as they had discussed.  *Id.* ¶ 123.  Following the deposition, Plaintiff immediately ran to the train as she needed to get home as soon as possible as she was extremely ill.  *Id.*  Plaintiff then proceeded to exit the train four stops earlier in order to vomit.  *Id.*  Plaintiff vomited several times on the street and several times again at home.  *Id.*

The only reason Plaintiff had difficulty seeing the video during the deposition is because she was suffering from extreme side effects of her medical treatment.  *Id.* at 126.  This is not a standard occurrence and has never happened again.  *Id.*  Defendants' attempt to frame this episode as indicative of Plaintiff's abilities, generally, is strikingly disingenuous and false.

For example, following Plaintiff's termination from the Firm, she worked for various law offices and lawyers in a *per diem* capacity, defending or taking approximately 175 depositions and making numerous court appearances and arguing motions on behalf these firms.  *See* Plaintiff Dep. 52:3-7 ("[Q:] And you can be retained as per diem to represent either side? You can either represent the plaintiff and take the defendant's deposition? [A:] Right."); Ex. 9 (Plaintiff's privilege log); Plaintiff Decl. ¶ 169.  Plaintiff has consistent and repeated business from the law firms and attorneys that retain her – indicating the high quality of her work.  Plaintiff Decl. ¶ 169.

**DEFENDANTS' PARAGRAPH 83**

83.      On December 11, 2018, Plaintiff appeared as counsel at a deposition for one of the Firm's clients.  (Donnelly Decl., Exs. UU, VV).

**RESPONSE TO PARAGRAPH 83**

Admit for purposes of this motion, but dispute any relevance. *See* footnote to the Response to Paragraph 80.

**DEFENDANTS' PARAGRAPH 84**

84.     During this deposition, Plaintiff was unable to review a picture that was presented as an exhibit. (*Id.*)

**RESPONSE TO PARAGRAPH 84**

Dispute.  Plaintiff testified unequivocally during her deposition that she can review documents (*see* Plaintiff Dep. 55:18-21), photographs (*id.* at 50:5-9), and videos (*id.* at 50:10-11) with the help of assistive devices like those she asked the Firm to provide her as a reasonable accommodation.  Defendants' suggestion that a blind person cannot adequately handle a deposition or perform other job functions is easily disprovable.

Further, Defendants claim that Plaintiff was "unable to perform her duties as counsel at depositions."  Mem. of Law in Supp. of Defs' Mot. for Summ. J. at 12, ECF No. 69.  This is patently false.  *See* Plaintiff Dep. 25:2-10; 111:9-21.  Indeed, Plaintiff testified unequivocally during her deposition that she can review documents (*see id.* at 55:18-21), photographs (*id.* at 50:5-9), and videos (*id.* at 50:10-11) with the help of assistive devices like those she asked the Firm to provide her as a reasonable accommodation.  Defendants' suggestion that a blind person cannot adequately handle a deposition or perform other job functions is easily disprovable. Moreover, following her termination in December 2018, Plaintiff made numerous court appearances and conducted and defended approximately 175 depositions on a *per diem* basis for numerous law firms and lawyers.  *Id.* at 48:2-57:24; *see generally* Ex. 9, "Plaintiff's privilege log."  With her assistive devices, Plaintiff was able to review ***thousands*** of pages of documents, medical records,

discovery responses, photographs, police reports, transcripts and other case file records, prepare

clients for depositions, conduct and defend approximately 175 depositions, and prepare detailed

and comprehensive deposition reports for each of these examinations.  *Id.*; Plaintiff Decl. ¶¶ 169-

170; *see also* Response to Paragraph 84; Responses to Paragraphs 78, 82.

**DEFENDANTS' PARAGRAPH 85**

85.    Plaintiff repeatedly used her cellphone in the office for personal matters.  (Prakhin

Tr. at 253:13-25, 274:16-22; Belous Aff., ¶ 10; Raskin Aff., ¶ 10; Prakhin Aff., ¶¶ 43-44).

**RESPONSE TO PARAGRAPH 85**

Dispute.  As noted *supra* at Responses Paragraphs 15-16, Defendants changed the Firm's

Personal Cellular Use policy when they updated the Employee Handbook (*see* Response to

Paragraph 7).  As noted in Plaintiff's Responses to Paragraphs 15-16, Plaintiff never received a

copy of the updated Employee Handbook when the Firm rehired her in June 2018 or at any point

thereafter.  Plaintiff Dep. 145:14-17; Plaintiff Decl. ¶¶ 13-14.  Prior to the update, the Personal

Cellular Use policy only required that employees "exercise discretion" and discouraged only

"personal," as opposed to professional, cell phone use.  Ex. 13 at D11927.  Regardless, rather than

for personal reasons, Plaintiff regularly used her cell phone to communicate with clients,

adversaries, negotiators, investigators, court reporters, and experts via cell phone.  Plaintiff Decl.

¶ 22.  As such, Plaintiff frequently used her cell phone during working hours which was necessary

for her to carry out her work.

Defendants also claim they fired Plaintiff for her purportedly "repeated" use of her cell

phone in the office.  In support of this, they cite a single internal message wherein Prakhin told his

***entire staff*** that they could not make personal calls except for emergencies. Ex. 47 at D01951.

However, Defendants fail to apprise the Court of crucial context for this isolated example of

Plaintiff's office cell phone use. As Plaintiff wrote in her reply to Prakhin's message, she made personal use of her cell phone at the office because "it actually was an emergency." *Id*.

At bottom, Plaintiff routinely used her cell phone to communicate with clients and adversaries and perform other work-related activities – which is not prohibited under any policy. Plaintiff Decl. ¶ 22. Tellingly, Prakhin's and Raskin's sham affidavits fail to explain exactly how they determined that Plaintiff's supposed "constant[]" and "repeated" cell phone use was for personal, as opposed to professional, purposes. *See* Raskin Aff. ¶10; Prakhin Aff. ¶ 43-44. Similarly, Prakhin failed to explain how he could have determined that Plaintiff was texting for personal reasons as opposed to work-related purposes during his deposition. *See* Prakhin Dep. 277:16-24. Indeed, during Plaintiff's deposition she testified that she acknowledged that she used her cell phone in the office during work hours, but only "[if it was] an emergency or work related." Plaintiff Dep. 188:23-189:3; *see also id*. at 189:7-11 ["Q:] Did you text on your cell phone during work hours? . . . [A:] I don't recall, but we were allowed to text if it was work related.").

Moreover, other attorneys and paralegals at the Firm frequently used their cell phones for during working hours. *See* Ex. 47 (compilation of numerous emails demonstrating that the Firm's employees regularly use their cellphones during working hours) at D00353 (Gabo emailing Plaintiff using her cell phone during working hours); D01299 (Beron forwarding an email using her cell phone); D01414 (Prakhin forwarding an email using his cell phone); D01415 (Gabo emailing Raskin using her cell phone during working hours); D01417-18 (Gabo emailing Larssen using her cell phone during working hours); D01505 (Gabo instructing Raskin to update SAGA using her cell phone); *see also* Ex. 47 at PLAINTIFF 001664 (Larssen notifying Plaintiff that she would call her from Larssen's cell phone); PLAINTIFF 001436 (Larssen notifying Plaintiff that Prakhin had just sent her a text message, asking her to "Come to my office?").

73

Lastly, during her deposition, Belous confirmed that she often used her personal cell phone to communicate with Plaintiff during working hours. *See* Belous Dep. 34:22-35:16 ("[Q:] [H]ow did you communicate with [Plaintiff] when you were working at the [F]irm?  [A:]  Different ways: [p]hone, text, email. . . . [Q:] And when you say 'text[,]' [] that would be text messaging on your cellphone; right?  [A:] Correct.  [Q:] And when you say you communicated with her by phone, was that always on the [F]irm's phone system, or did you ever communicate on your cellphone? [A:] It was both." *See also id*. at 57:23-58:9 (acknowledging that Plaintiff notified Belous of her termination during a phone call to Belous's cellphone).  This is also true for Raskin and Larssen. *See* Raskin Dep. 153:10-9 (acknowledging that when Plaintiff was not in the office, Plaintiff and Raskin spoke on Raskin's cellphone mostly); Larssen Dep. 101:12-22 (acknowledging that she used her cell phone to speak and text Plaintiff).

## DEFENDANTS' PARAGRAPH 86

86.     A client, Ms. Zhernyakova, complained to Mr. Prakhin about Plaintiff after she was required to wait for over half an hour while she observed Plaintiff walking around the office talking and laughing on her cellphone.  (Prakhin Aff., ¶ 35).

## RESPONSE TO PARAGRAPH 86

Dispute.  Defendants cite to Paragraph 35 of Prakhin's sham affidavit, but this cited evidence is inadmissible evidence to support this proffered factual proposition, thereby violating Local Rule 56.1(d).  Indeed, Ms. Zhernyakova has not signed an affidavit, and Prakhin's testimony regarding Ms. Zhernyakova's observations and impressions constitutes inadmissible hearsay.  *See Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01 Civ.4426 CBM, 2004 WL 758303, at *13 (S.D.N.Y. Apr. 7, 2004) (finding defendant's claims of defamation hearsay where he relies on a statement conveyed to him by a third party "made to prove the truth of the matter that the . . .

statements were actually made."). Even assuming, *arguendo*, that the cited evidence is admissible (which it is not), other attorneys at the Firm were responsible for handling Ms. Zhernyakova's case – not Plaintiff. Ex. 48 at D014546 (a SAGA entry entered by Anna Broxmeyer, another attorney at the Firm, memorializing an email Anna Broxmeyer sent to Ms. Zhernyakova requesting her social media passwords); *see* Response to Paragraph 54.

**DEFENDANTS' PARAGRAPH 87**

87.    Plaintiff removed confidential client documents from the Firm and retained such documents. (Pl. Tr. at 228:4-13; Donnelly Decl., Ex. X).

**RESPONSE TO PARAGRAPH 87**

Admit that Plaintiff removed client files for the purposes of preparing for and appearing for court conferences and depositions on behalf of her clients, but dispute the remainder of the allegations in this Paragraph and dispute any relevance. Defendants belabor the point that Plaintiff removed confidential client files from the Firm (*see* Plaintiff Dep. 117:16-120:11) without acknowledging that attorneys and support staff at the Firm frequently removed physical case files and forwarded themselves electronic versions of client files in order to work on cases at night or over the weekends, and to adequately represent their clients at court appearances, conferences, or depositions. *See, e.g.*, Larssen Dep. 12:17-24 ("[Q:] Do you still use [your personal Gmail account] for any purpose? . . . [A:] I used that during Covid when we were working from home so I can e-mail myself at home some documents."). Indeed, Plaintiff admits she removed files "only to either do work at home or only for work related reasons." Plaintiff Dep. 118:16-22; 119:22-25 ("[Q:] So did you ever remove a physical file from the [Firm] other than, obviously, to go to court or a deposition[?] [A:] No, not that I know of, no." Here, the same is true for the files Defendants reference. *See* Ex. 49 at PLAINTIFF 000603-51; Plaintiff Decl. ¶ 97 (stating that Plaintiff emailed

herself the client's documents in anticipation of a court appearance/deposition).

In fact, adversaries as well as paralegals and attorneys at the Firm, including Gabo and Prakhin, regularly forwarded Plaintiff portions of clients' case files so Plaintiff could have remote access to the same when she was out of the office attending depositions, hearings, and court appearances.  Ex. 50 at PLAINTIFF 000315 (Gabo forwarding a portion of a client's case file to Plaintiff's personal Gmail account); PLAINTIFF 000348-49 (Prakhin forwarding a portion of a client's case file to Plaintiff's personal Gmail account); PLAINTIFF 000518-19 (same); PLAINTIFF 000664-71 (Larssen forwarding several case documents to Plaintiff's personal Gmail account); PLAINTIFF 000684-85 (opposing counsel forwarding a stipulation of discontinuance for Plaintiff's signature to Plaintiff's personal Gmail account); D01678 (Larssen forwarding work-related emails to Plaintiff's personal Gmail account).

Lastly, following Plaintiff's discriminatory termination, she anticipated filing a lawsuit and was aware of her obligation to preserve all documents related to her employment, necessitating the retention of the client's documents, which were ultimately produced in compliance with her discovery obligations.  Plaintiff Decl. ¶¶ 100-01. As such, Plaintiff did not "remove" and "retain" confidential client documents in violation of the Firm's policy.

## DEFENDANTS' PARAGRAPH 88

88.      Between August 2018 and December 2018, Plaintiff was absent from work at total of 25 days.  (Raskin Aff., Ex. 4)

## RESPONSE TO PARAGRAPH 88

Dispute.  Prakhin and Raskin both testified that Defendants did not maintain a complete accounting of Plaintiff's absences, nor did they determine on which dates Plaintiff was or was not seeking medical treatment prior to firing her.  *See* Prakhin Dep. 298:10-299:15; Raskin Dep. 154:7-

155:23.  Defendants base their false proposition on Plaintiff's sporadic use of the Firm's time tracking machine.  However, as Prakhin explained at his deposition, the time keeping machine was not meant to be utilized by attorneys: "this is a machine that we use mostly for paralegals, not for attorneys.  But attorneys use this punch-in machine as well, but, however, *it [does] not reflect the real hours they work*." Prakhin Dep. 303:9-20 (emphasis added).  As detailed *supra* at Response to Paragraph 10, neither Plaintiff nor any other attorney at the Firm regularly used the time tracking machine.  *See* Responses to Paragraphs 10 and 89; Ex. 13 at D11924 at II.E; Raskin Aff., Ex. 2 at II.E.  As such, Defendants' calculation of Plaintiff's absences based on her failure to use to the time keeping machine is entirely inaccurate.

Of the 25 days Defendants allege Plaintiff was "absent from work" (*see generally infra* at Paragraph 89), Plaintiff was actually working in the office or conducting depositions on five (5) of these dates.  *See* detailed Response to Paragraph 89.  On two (2) other such dates, Plaintiff worked remotely as the Firm permitted its attorneys to work from home due to a severe snowstorm. *Id.*  Defendants provided Plaintiff with a ten (10) day unpaid leave of absence, during which Plaintiff was mostly hospitalized and receiving various testing and experimental treatment for her disability.  *Id*.  For the remaining eight (8) days, Plaintiff sought intensive medical treatment at NYU Langone and Columbia University, and was recovering from the extensive side effects of such rigorous treatment.  *Id*.

Even on days when Plaintiff was out of the office for a medical appointment or recovering from treatment, she consistently worked from home, performing a considerable amount of work on her cases, including *inter alia*, working on motions, reviewing discovery, communicating with clients, negotiating settlements, preparing for depositions and court appearances, coordinating assignments with paralegals, and reviewing the work performed by paralegals.  Plaintiff Decl. ¶¶

77

107, 127.  Especially during this time, Plaintiff routinely worked late into the night and over the weekends to stay on top of her cases.  *Id.* ¶¶ 46, 107.

In other words, Plaintiff was not absent nearly as much as Defendants claim she was.  *See* detailed Response to Paragraph 89.  On days when Plaintiff was absent, she had medical appointments or was recovering from intensive treatment.  *Id.*  And even when Plaintiff was receiving and recovering from rigorous treatment, she was still consistently performing considerably work on her cases. *E.g.*, Ex. 44 at PLAINTIFF 001411 (Plaintiff asking Larssen to "[e]mail me the EBT memo and just the injuries and liens when you have a chance" on October 18, 2018 – despite recovering from rigorous IV steroid drips – so she could work on her cases from home); Plaintiff Decl. ¶¶ 112-28.

Even assuming, *arguendo*, that Plaintiff's was attendance was problematic, other attorneys at the Firm were regularly absent, but were never disciplined.  *See* Ex. 51 at PLAINTIFF 001478 (transcript of an audio recording where Prakhin and Raskin discuss Lilit Avetisyan's attendance – "[Raskin:] Yes. Lilit is not likely to be in today. [Prakhin:] Is her doggie sick or what? [Raskin:] No. Something to do with her apartment and the management – I don't know – ***with her every week she has a day off***.") (emphasis added); Ex. 52 at PLAINTIFF 001481 (transcript of an audio recording, where Prakhin and Raskin discuss Beron's attendance – There is "no sound and no sign from [Beron] at all.  She's out galivanting at a bar mitzvah or a Bris – I don't know where.").

## DEFENDANTS' PARAGRAPH 89

89.  Plaintiff was absent from work on the following dates: September 26, 2018 (no medical appointment); September 27, 2018 (no medical appointment); September 28, 2018 (medical appointment); October 4, 2018 (no medical appointment); October 5, 2018 (medical appointment); October 8, 2018 (medical appointment); October 9, 2018 (no medical

78

appointment); October 10, 2018 (medical appointment); October 11, 2018 (no medical appointment); October 12, 2018 (no medical appointment); October 15, 2018 (no medical appointment); October 16, 2018 (no medical appointment); October 18, 2018 (no medical appointment); October 19, 2018 (no medical appointment); November 5, 2018 (medical appointment); November 9, 2018 (no medical appointment); November 15, 2018 (no medical appointment); November 16, 2018 (medical appointment); November 19, 2018 (no medical appointment); November 20, 2018 (medical appointment); November 21, 2018 (no medical appointment); November 23, 2018 (no medical appointment); November 26, 2018 (no medical appointment); November 27, 2018 (medical appointment); and November 30, 2018 (no medical appointment).  (*Id*.; Donnelly Decl., Exs. JJ - MM).

## RESPONSE TO PARAGRAPH 89

Plaintiff disputes the vast majority of the representations made in the paragraph.  As an initial matter, exempt attorneys, such as Plaintiff, do not consistently use the time keeping machine.  Prakhin Dep. 303:9-20 ("this is a machine that we use mostly for paralegals, not for attorneys. But attorneys use this punch-in machine as well, but, however, ***it [does] not reflect the real hours they work***.") (emphasis added); Ex. 13 at D11924 at II.E; Raskin Aff., Ex. 2 at II.E; *see also* Responses to Paragraphs 10 and 88.  As such, Defendants' record of Plaintiff's absences, as simply those days where she did not clock-in, is wildly inaccurate – as set forth below.   More importantly, almost all dates listed here as those where Plaintiff did not have a medical appointment are demonstrably incorrect and contravened by the records, as set forth below. Moreover, even on days where Plaintiff did have a medical appointment, she still came to the office in either the morning or the afternoon or proceeded to work on her cases from home.  Further details and documentary evidence for each disputed date is set forth as follows:

- **September 26, 2018 (Wednesday):** Defendants claim Plaintiff was absent from work without a medical appointment.  <u>Dispute</u>.

  - Plaintiff was at NYU Langone for an MRI.  Plaintiff Decl. ¶ 109.  While accompanying Plaintiff for the MRI, her father had a stroke and they went to the hospital.  *Id.*  Raskin notified Prakhin of both Plaintiff's medical appointment and her father's emergency.  *See* Ex. 53 at PLAINTIFF 001476 ("Lena's Dad had a stroke . . . . He took her for an MRI, she's with him in the hospital . . . . she's got her own appointments there today and tomorrow.  He's in the same hospital.  In that NYU – in short – she's out until Monday").

  - Defendants provided Plaintiff with three days of unpaid leave from September 26, 2018 through September 28, 2018 in order to attend this (and the two subsequent) medical appointments.  Ex. 55 at D13053-54 (Plaintiff had three days of unpaid leave).

- **September 27, 2018 (Thursday):** Defendants claim Plaintiff was absent from work without a medical appointment.  <u>Dispute</u>.

  - On this date, Plaintiff had a brain MRI at NYU Langone.  *See* Ex. 54 at PLAINTIFF 000026 and PLAINTIFF 000031.  Also, as noted above, Defendants were specifically on notice of Plaintiff's medical appointment.  *See* Ex. 53 at PLAINTIFF 001476.

  - As noted above, Defendants provided Plaintiff with unpaid leave for September 27, 2018 in order to attend this medical appointment.  Ex. 55 at D13053-54.

- **September 28, 2018 (Friday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff had a medical appointment with Dr. Cynthi Pillai for a Visual Field Test and neuro-ophthalmic evaluation (Ex. 54 at PLAINTIFF 000026) but <u>dispute</u> that she did not perform work that day.  In fact, Plaintiff worked on her cases from home after her medical appointment, despite being out on unpaid leave.  Plaintiff Decl. ¶ 111.

  - Even though Plaintiff took unpaid leave for September 28, 2018, she still performed considerable work on this date.  *Id.*; Ex. 55 at D13053-54.

- **October 4, 2018 (Thursday):** Defendants claim Plaintiff was absent from work without a medical appointment.  <u>Dispute</u>.

- Plaintiff was not absent from work on this day.  In fact, Plaintiff traveled to a lengthy deposition that concluded at or around 4:30 p.m.  Plaintiff Decl. ¶ 112.  Plaintiff did not return to the office after the deposition.  *Id.*  Raskin specifically informed Prakhin about Plaintiff's whereabouts.  Ex. 53 at PLAINTIFF 001479 ("[Prakhin]: So where's Lena today? At the doctor's again? [Raskin]: No. She's already been at the EBT, she finished that [at] 4:30.").

- **October 5, 2018 (Friday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff had a medical appointment for a retinal consultation and physiologic testing at the NYU Eye Center (Ex. 54 at PLAINTIFF 000015 and D014913-14921) but <u>dispute</u> that she was absent from work on this date.  Plaintiff visited the doctor in the morning, at 9 a.m., (D014918) and then returned to work in the office shortly before lunch.  Plaintiff Decl. ¶ 113.  Moreover, Defendants were completely aware of Plaintiff's whereabouts.  Ex. 53 at PLAINTIFF 001480 "Lena's at the doctor in the morning.  Then she said she'll be in.").

- **October 8, 2018 (Monday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff had a medical appointment with Dr. Cynthi Pillai for an eye examination (Ex. 54 at PLAINTIFF 000026) but <u>dispute</u> that she was absent from work on that date.  In fact, Plaintiff went to the office early in the morning and then left for her 2 p.m. appointment in the afternoon.  Plaintiff Decl. ¶ 114.  Again, Defendants were specifically aware that Plaintiff was working in the office that day and left for the doctor's appointment in the afternoon.  Ex. 53 at PLAINTIFF 001475 ("[Prakhin]: Where is Lena Ruderman? [Raskin]:  She's gone to see the doctor.  She had a 2 o'clock appointment with the doctor.").

- **October 9, 2018 (Tuesday):** Defendants claim Plaintiff was absent from work without a medical appointment.  <u>Dispute</u>.

  - Defendants were made well aware that on this date, Plaintiff was at NYU Langone getting a spinal tap before going to the hospital for three days to receive 3,000 mg doses of IV steroid drips. Ex. 53 at PLAINTIFF 001658 ("Tomorrow spinal tap and then I'm going to the hospital for iv got 3 days and hope after I'm much better.  Praying."); PLAINTIFF 001477 ("[Prakhin]: Tell me, what's going on with Lena? … [Raskin]: Well, she's doing some kind of IV.  She said maybe this week she's be back in.  Like three days ago when I showed you her text. [Prakhin]: Right. I did see that.").

- Defendants provided Plaintiff with four days of unpaid leave from October 9, 2018 through October 12, 2018 in order to attend these medical appointments. Ex. 55 at D13053 (Plaintiff took four days of unpaid leave).

- **October 10, 2018 (Wednesday):** Defendants claim Plaintiff was absent from work but did have a medical appointment. Admit.

  - Admit that Plaintiff was absent from work as she was in the hospital receiving her first of three doses of IV steroid drips. Ex. 54 at PLAINTIFF 000027. As detailed above, Defendants were well aware of Plaintiff's whereabouts. Ex. 53 at PLAINTIFF 001477 and PLAINTIFF 001658.

  - Also as noted above, Defendants provided Plaintiff with unpaid leave for this day because she receiving these treatments. Ex. 55 at D13053.

- **October 11, 2018 (Thursday):** Defendants claim Plaintiff was absent from work without a medical appointment. Dispute.

  - Plaintiff was in the hospital receiving her second of three doses of IV steroid drips. Ex. 54 at PLAINTIFF 000025-27. As detailed above, Defendants were on notice of Plaintiff's hospitalization. Ex. 53 at PLAINTIFF 001477 and PLAINTIFF 001658.

  - Also as noted above, Defendants provided Plaintiff with unpaid leave for this day because she receiving these treatments. Ex. 55 at D13053.

- **October 12, 2018 (Friday):** Defendants claim Plaintiff was absent from work without a medical appointment. Dispute.

  - Plaintiff was in the hospital receiving her third and final dose of IV steroid drips. Ex. 54 at PLAINTIFF 000025-27. As detailed above, Defendants were on notice of Plaintiff's treatments. Ex. 53 at PLAINTIFF 001477 and PLAINTIFF 001658.

  - Also as noted above, Defendants provided Plaintiff with unpaid leave for this day because she receiving these treatments. Ex. 55 at D13053.

- **October 15, 2018 (Monday):** Defendants claim Plaintiff was absent from work without a medical appointment.

  - Admit that Plaintiff did not work from the office on this date as she was recovering from the spinal tap procedure and from receiving three rigorous rounds of IV steroid drips. Plaintiff Decl. ¶ 119; Ex. 53 at D01679. However, Plaintiff still worked on her cases from home, exchanging messages with Larssen and speaking to her about

82

her cases and providing Larssen with direction on her assignments and answering her questions.  Plaintiff Decl. ¶ 119.

- **October 16, 2018 (Tuesday):** Defendants claim Plaintiff was absent from work without a medical appointment.

    - *See* Plaintiff's response for October 15, 2018 above.

- **October 18, 2018 (Thursday):** Defendants claim Plaintiff was absent from work without a medical appointment.

    - Admit that Plaintiff did not work from the office on this date as she was extremely ill and suffering from a major side effect of the steroid drips she had just received. Plaintiff Decl. ¶ 127.  However, Plaintiff did a considerable amount of work from home, including, reviewing discovery, communicating with clients, negotiating settlements, and reviewing the work performed by paralegals.  Ex. 41 at PLAINTIFF 001405-15 (audio recording discussing Plaintiff's work that day); Plaintiff Decl. ¶ 127.

- **October 19, 2018 (Friday):** Defendants claim Plaintiff was absent from work without a medical appointment.

    - *See* Plaintiff's response for October 18, 2018 above.

- **November 5, 2018 (Monday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

    - Admit that Plaintiff had a medical appointment for a brain MRI at NYU Langone (Ex. 54 at PLAINTIFF 000016 and D014922-14933).  However, Plaintiff's appointment was in the morning at 10:45 a.m. (D14930) and she returned to work for the remainder of the day.  Plaintiff Decl. ¶ 129.

- **November 9, 2018 (Friday):** Defendants claim Plaintiff was absent from work without a medical appointment.  Dispute.

    - Plaintiff went to a medical appointment at NYU Langone for a spinal MRI.  Ex. 54 at PLAINTIFF 000026 and PLAINTIFF 000031).  Plaintiff worked from home on her cases for the remainder of the day.  Plaintiff Decl. ¶ 130.  Defendants were aware of her whereabouts and Plaintiff spoke with Larssen and Belous throughout the day.  *Id*.

- **November 15, 2018 (Thursday):** Defendants claim Plaintiff was absent from work without a medical appointment.  Dispute.

- On this day, Plaintiff attended Columbia University Laboratories of Personalized Genomic Medicine to conduct prescribed testing in order to obtain a diagnosis for her disability. Ex. 54 at PLAINTIFF 000023-24. Plaintiff also received a second dose of steroid IV drips at NYU Langone. *Id.* at PLAINTIFF 000027. New York City was experiencing a severe snowstorm on this day and Prakhin advised all attorneys that they could work remotely if they chose. Plaintiff Decl. ¶ 131. Plaintiff worked from home for the remainder of the day performing substantial work on her cases. *Id.*

- **November 16, 2018 (Friday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff attended a medical appointment with Dr. Odell at Columbia University for genetic testing in order to obtain a diagnosis for her disability. Ex. 54 at PLAINTIFF 000027. Plaintiff also received a third dose of steroid IV drips at NYU Langone. *Id.* at PLAINTIFF 000027. New York City was experiencing a severe snowstorm for the second day and Prakhin advised all attorneys that they could work remotely if they chose. Plaintiff Decl. ¶ 132. Plaintiff worked from home for the remainder of the day performing substantial work on her cases. *Id.*

- **November 19, 2018 (Monday):** Defendants claim Plaintiff was absent from work without a medical appointment.

  - Admit that Plaintiff did not work from the office on this date as she was recovering from receiving her final dose of IV steroid drips. Plaintiff Decl. ¶ 133; Ex. 54 at PLAINTIFF 000027. However, Plaintiff worked from home and spoke to her paralegals throughout the day. Plaintiff Decl. ¶ 133.

- **November 20, 2018 (Tuesday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff was admitted to NYU Langone Hospital for an urgent plasmapheresis – or a plasma transfusion on November 20, 2018, and was discharged on Sunday, November 25, 2018. Ex. 54 at PLAINTIFF 000027; Plaintiff Decl. ¶ 134. Defendants were aware of Plaintiff's hospitalization and provided her with three days of unpaid leave. Ex. 55 at D13053; Plaintiff Decl. ¶ 134.

- **November 21, 2018 (Wednesday):** Defendants claim Plaintiff was absent from work without a medical appointment. <u>Dispute</u>.

- As detailed above, Plaintiff was hospitalized and was receiving plasma transfusions from November 20, 2018 to November 25, 2018. Ex. 54 at PLAINTIFF 000027; Plaintiff Decl. ¶¶ 134-37 (including over Thanksgiving). Defendants were aware of Plaintiff's hospitalization and provided her with three days of unpaid leave. Ex. 55 at D13053; Plaintiff Decl. ¶ 134.

- **November 23, 2018 (Friday):** Defendants claim Plaintiff was absent from work without a medical appointment. <u>Dispute</u>.

  - *See* Plaintiff's response for November 21, 2018 above.

- **November 26, 2018 (Monday):** Defendants claim Plaintiff was absent from work without a medical appointment. <u>Dispute</u>.

  - On this date, Plaintiff received her LHON diagnosis from Dr. Odell at Columbia University. Plaintiff Decl. ¶ 140. Before learning of her diagnosis, Plaintiff spoke with Prakhin over the telephone in the morning. *Id.* ¶ 139. Prakhin expressed his intention to continue Plaintiff's employment – saying he "would keep [Plaintiff] on." Plaintiff thanked him and told him that she had every intention to continue to work but that she would need certain accommodations. *Id.* Prakhin told Plaintiff he would meet with her in the office on Wednesday, November 28, 2018 to discuss her diagnosis and "to figure things out." *Id.;* Ex. 56 at PLAINTIFF 01433. Plaintiff worked from home for the remainder of the day performing substantial work on her cases. *Id.* at PLAINTIFF 001433-35 (audio recording discussing Plaintiff's work); Plaintiff Decl. ¶ 141.

- **November 27, 2018 (Tuesday):** Defendants claim Plaintiff was absent from work but did have a medical appointment.

  - Admit that Plaintiff attended a medical appointment at NYU Langone. Ex. 54 at PLAINTIFF 000030-32. However, Prakhin was aware of this appointment and Plaintiff continued to work from home for the remainder of the day performing substantial work on her cases. Plaintiff Decl. ¶ 142.

- **November 30, 2018 (Friday):** Defendants claim Plaintiff was absent from work without a medical appointment. <u>Dispute</u>.

  - Plaintiff was in the office on November 30, 2018 and had a lengthy conversation with Prakhin wherein he pressured her to take disability leave. Plaintiff Decl. ¶ 156. Plaintiff advised that she did not want to go out on disability leave as she wanted to continue working and was committed to her job. *Id.* ¶ 158; Plaintiff Dep. 252:13-18. Later that day, Plaintiff also spoke to Raskin and Gabo about Prakhin

pressuring her to take disability leave.  Plaintiff Decl. ¶ 157; Ex. 57 at D01566 (email regarding disability forms Defendants requested that Plaintiff complete).

**DEFENDANTS' PARAGRAPH 90**

90.    Plaintiff's absences from work required other attorneys to assume the essential functions of Plaintiff's position to ensure that the Firm was satisfying its obligations to its clients. (Raskin Tr. at 128:14-22; 153:3-9).

**RESPONSE TO PARAGRAPH 90**

Dispute.  Regardless of Plaintiff attending medical appointments or recovering from rigorous medical treatment and hospitalization, Plaintiff routinely continued working on her cases either from the office (before and after her appointments) or from home.  *E.g.,* Ex. 53 at PLAINTIFF 001480 (Plaintiff will return to work after her doctor's appointment); PLAINTIFF 001475 (Plaintiff was in the office before her afternoon doctor's appointment); PLAINTIFF 001405 (Plaintiff working from home on October 18, 2018 despite recovering from rigorous medical treatments); PLAINTIFF 001433-35 (Plaintiff working from home on November 26, 2018);  Plaintiff Decl. ¶¶ 107-41 (Plaintiff routinely performed a considerably amount of work on her cases from home, including drafting motions, discovery responses and demands, and summonses and complaints, reviewing records, communicating with clients, negotiating settlements, preparing for depositions and court appearances, coordinating assignments with paralegals, and reviewing the work performed by paralegals.).  Plaintiff also routinely worked at night after dinner and almost every single weekend, to further promote the best interests of her clients.  *Id*. at ¶¶ 46, 97, 107.

Plaintiff disputes Defendants' characterization of her medical appointments creating an undue burden for other Firm attorneys.  As an initial matter, as a Firm-wide policy, most appearances and Court conferences are handled by per diem attorneys or more junior attorneys,

regardless of the assigned attorneys' availability. Plaintiff Decl. ¶ 84. Moreover, it is standard Firm practice to have attorneys cover each other's appearances and depositions, especially considering the location of such attorneys' other appearances and depositions. Plaintiff Decl. ¶ 80. Even after the onset of Plaintiff's disability, she continued to cover court appearances for various attorney, including Beron. *E.g.*, Ex. 52 at PLAINTIFF 001481 (Plaintiff covered Beron's EBT because Belon "didn't want to" go. Raskin notes that there was "no sound and no sign from [Beron] at all" and that now Beron is "out galivanting at a bar mitsvah or a Bris – I don't know where."); *see also* Prakhin Dep. 276:20-24 (acknowledging the Firm's attorneys cover each other's appearances and depositions); 278:5-12 (same). This is a standard practice at the Firm and Defendants grossly overstate the burden Plaintiff placed on other attorneys as a result of her seeking treatment for her disability. *Id.*; *see* Plaintiff Dep. 159:9-21 ("[Q:] You stated earlier that attorneys would often cover for each other? [A:] Yes. [Q:] At preliminary conferences? . . . [A:] Sometimes I would do [court appearances] for other people. Sometimes they would do it for me. It depends on the calendar that day."); *see also* Response to Paragraph 91.

## DEFENDANTS' PARAGRAPH 91

91.    Other attorneys in the Firm were unduly burdened by being reassigned Plaintiff's appearances and depositions, and having to review Ms. Belous and Ms. Larssen's work. (Raskin Aff., ¶¶ 18-20; Belous Aff., ¶ 8; Larssen Aff., ¶ 9).

## RESPONSE TO PARAGRAPH 91

Dispute. *See* Response to Paragraph 90.

## DEFENDANTS' PARAGRAPH 92

92.    Ms. Belous and Ms. Larssen were unduly burdened by having to perform their paralegal duties as well as the work Plaintiff directed them to perform. (Belous Aff., ¶¶ 12; Larssen

Aff., ¶¶ 8, 10-11, 16; Prakhin Tr. at 273).

**RESPONSE TO PARAGRAPH 92**

Dispute. Despite Defendants' insistence that Larssen and Belous were overworked and ill-equipped to handle assignments given to them by Plaintiff (which were ordinarily done by paralegals at the Firm – *see* Responses to Paragraphs 48-53, 91), the record clearly demonstrates that Larssen and Belous rarely, if ever, worked overtime, or were not able to complete their assignments on time. *See* Prakhin Dep. 254:13:21 ("[Paralegals] do not work more than 40 hours."); 254:25-255:7 ("[Q:] During the period of [Plaintiff] working for you in 2018, did you ever pay [Larssen] overtime? [A:] Not as I recall. [Q:] Did you ever pay [Belous] overtime over that same period? [A:] Not as I recall.").

Further, both Larssen and Belous testified that they spoke to Plaintiff about their caseload over the phone on a near daily basis. Larssen Dep. 101:12-16; Belous Dep. 53:22-25. Even when Plaintiff was out receiving medical treatment and attending doctor's appointments, Prakhin had no issue with her paralegals taking a more assistive role in her work. *See* Gabo Dep. 86:6-19 ("I believe [Prakhin and I] discussed [Plaintiff's] caseload and agreed that, for the time being, she has two paralegals that could do most of the work, and, until we figure out what's going on, let them do the work.").

E.    **Plaintiff's Medical Condition**

**DEFENDANTS' PARAGRAPH 93**

93.    In September 2018, Plaintiff claims that she began to experience blurry vision. (Pl. Tr. at 189:24-190:12).

**RESPONSE TO PARAGRAPH 93**

Admit that Plaintiff began experiencing blurry vision in September 2018, but dispute Defendants' characterization that Plaintiff "claim[ed]" to be experiencing the same. *See* Plaintiff

Dep. 189:24-190:12 ("I started experiencing blurry vision."); 194:11-195:25 ("[I] was pretty concerned, and I would express my concern that my vision is blurry. So I would tell people in the office."); Prakhin Dep. 123:11 – 126:5 ("She complained about the issues with her eyes, yes."); 237:7-246:21 ("She said that she has some vision problems."); Belous Dep. 37:3-14 ("She . . . said she was having a problem with her eyes."); Gabo Dep. 81:21-87:9 ("[S]he would tell me that things became blurrier"); 35:16-19 ("[Plaintiff] was not a complainer."); Raskin Dep. at 63:7-25 ("she was complaining to me that she had a blurry vision."); 68:19-70:24; 121:23-126:17 (acknowledging that Plaintiff disclosed her issues of blurry vision); 135:13-137:16; 139:10-150:4; Ex. 58 at D14882 (Medical records from September 19, 2018 reporting that Plaintiff was "complaining of blurry vision located in both eye(s) constantly. This started 1 week ago."). In other words, Defendants doubt the veracity of Plaintiff's experience and her disability, which is unsurprising considering if the opposite were true, the parties would most likely not be engaged in the present litigation. Within a few weeks, Plaintiff had difficulty reading text, was unable to drive, and her vision got progressively worse. Plaintiff Decl. ¶ 36.

## DEFENDANTS' PARAGRAPH 94

94.    Ms. Raskin encouraged Plaintiff to seek medical advice regarding her blurry vision. (Raskin Tr. at 122; Raskin Aff., ¶ 14).

## RESPONSE TO PARAGRAPH 94

Admit that Raskin and Plaintiff spoke about Plaintiff's blurry vision in September, but dispute Defendants' characterization that Raskin "encouraged" Plaintiff to seek medical advice. While Defendants seek to portray Raskin in a caring and supportive light, this is simply untrue. Since Plaintiff disclosed her medical condition in September 2018, Raskin doubted Plaintiff's disability and believed that Plaintiff had *fabricated* her impairment. *See* Raskin Dep. 66:13-20 ("I

start[ed] questioning myself if [her vision impairment] was truthful or not.  Yeah, I had those thoughts."); 66:21-67:23 ("I can't tell you if it was truthful or not, and that's when I start[ed] thinking that [her vision impairment] might  not be [true]."); 68:6-18 ("[Q:] Sitting here today, do you think that [Plaintiff's] alleged vision impairment has been fabricated? . . . [A:] Yes, I do.").

**DEFENDANTS' PARAGRAPH 95**

95.    Defendants granted Plaintiff's request for a leave of absence in October 2018 to attend medical appointments.  (Pl. Tr. at 239:11-13; Raskin Tr. at 151:6-152:15; Raskin Aff., ¶¶ 15-17; Prakhin Aff., ¶¶ 20-22).

**RESPONSE TO PARAGRAPH 95**

Admit for purposes of this motion that Defendants approved Plaintiff's requests for unpaid leaves of absences, but note that Prakhin's sham affidavit states: "In early to mid-October 2018, Plaintiff requested additional time off from work.  Once again, this request was made verbally. [] Despite the fact that Plaintiff did not provide any documentation, Plaintiff's request for time off from work was granted."  Prakhin Aff. ¶ 21.  Tellingly, during Prakhin's deposition, he could not recall whether Plaintiff obtained his approval before taking a leave of absence.  *See* Prakhin Dep. 292:20-293:7 ("[Q:] The first leave of absence, did [Plaintiff] obtain your approval prior? [A:] I think so."); 294:15-19 (acknowledging that he could not recall which of Plaintiff's absences were approved).  At no time did Defendants request medical documentation relating to her request for a leave of absence in October.  Plaintiff Decl. ¶ 108.

**DEFENDANTS' PARAGRAPH 96**

96.    Defendants granted Plaintiff's request for a leave of absence in November 2018. (Pl. Tr. at 239:11-13; Raskin Tr. at 151:6-152:15; Raskin Aff., ¶¶ 21-22; Prakhin Aff., ¶¶ 23-24).

**RESPONSE TO PARAGRAPH 96**

Admit for purposes of this motion, but dispute that this leave of absence was for Plaintiff to seek medical treatment in Florida and dispute any relevance.  *See* Responses to Paragraphs 97-99.

**DEFENDANTS' PARAGRAPH 97**

97.     Plaintiff requested, and Defendants approved, a leave of absence for Plaintiff to obtain medical treatment in Florida.  (Prakhin Tr. at 292-293; Prakhin Aff., ¶ 23; Raskin Tr. at 124:21-125:18, 151:6-20; Raskin Aff., ¶ 21).

**RESPONSE TO PARAGRAPH 97**

Dispute.  Plaintiff never requested a leave of absence to go to Florida to receive medical treatment nor did she go to Florida to seek medical treatment during her employment with Defendants.  Plaintiff Decl. ¶ 160.  Plaintiff requested and received an unpaid leave of absence for four days (excluding Thanksgiving, when the Firm was closed) from November 20 to November 24 – during which she was hospitalized at NYU Langone and receiving plasma transfusions.  *See* Plaintiff Dep. 196:22-197:11; Plaintiff Decl. ¶ 134; *see* Response to Paragraph 89.

Moreover, Plaintiff testified that she did not go to Florida to receive diagnostic testing until March 2019 – well after her employment with Defendants ended.  *See* Plaintiff Dep. 240:6-16.  Notably, during Raskin's deposition, she struggled to recall any details regarding the substance of her alleged conversation with Plaintiff about a trip to Florida or when the conversation occurred, yet Raskin was conveniently able to detail same in her sham affidavit.  *See* Raskin Dep. 151:6-20; Raskin Aff. ¶ 21.

**DEFENDANTS' PARAGRAPH 98**

98.     Plaintiff did not receive any medical testing or treatment in Florida during her

employment with the Firm.  (*See* Donnelly Decl., Exs. JJ - MM).

**RESPONSE TO PARAGRAPH 98**

Admit for purposes of this motion.  *See* Plaintiff Dep. 240:6-16 (acknowledging that she did not go to Florida until March 2019 – after her employment with Defendants); Plaintiff Decl. ¶ 160; Response to Paragraph 97.

**DEFENDANTS' PARAGRAPH 99**

99.    At no time during Plaintiff's employment with the Firm did Plaintiff provide Defendants with any medical documentation indicating that she received medical treatment in Florida, or any other medical treatment.  (Pl. Tr. at 217:19-21, 239:8-10; Raskin Aff. ¶¶ 17, 22; Prakhin Aff., ¶¶ 22-24).

**RESPONSE TO PARAGRAPH 99**

Admit that Plaintiff did not receive medical treatment in Florida during her employment with the Firm.  *See* Response to Paragraph 97.  Dispute that Defendants ever requested or even so much as suggested that Plaintiff provide them any medical documentation at all for any of her treatment.  Plaintiff Decl. ¶ 108.  Indeed, not a single document, recording, or correspondence has been produced to support Defendants' assertion that they requested such medical documentation.  Huot Decl. ¶ 8.  Plaintiff denies ever receiving any such request (Plaintiff Decl. ¶ 108), and Gabo similarly denied that either Prakhin or Raskin ever requested medical documentation from Plaintiff.  *See* Plaintiff Dep. 205:14-206:13 ("[Q:] At any time during your employment with the [Firm], did you provide [Prakhin] or anybody at the firm with any medical records? [A:] No, I was never requested to do that."); Gabo Dep. 103:9-104:4 ("[Q:] To your knowledge, did [Raskin] ever ask [Plaintiff] to provide [documentation]? [A:] Not to my knowledge.").

92

**DEFENDANTS' PARAGRAPH 100**

100.    Plaintiff received a diagnosis in November 2018.  (Donnelly Decl., Ex. MM).

**RESPONSE TO PARAGRAPH 100**

Admit for purposes of this motion, but note that Plaintiff was diagnosed with LHON Leber disease from Columbia University Laboratories ("Columbia") on November 26, 2018.  *See* Ex. 54 at PLAINTIFF 000023-24; Plaintiff Dep. 202:13-203:18.

**DEFENDANTS' PARAGRAPH 101**

101.    Plaintiff advised Mr. Prakhin and Ms. Raskin that she received a medical diagnosis. (Raskin Aff., ¶ 27, Prakhin Aff., ¶ 27).

**RESPONSE TO PARAGRAPH 101**

Admit that Plaintiff notified Prakhin and Raskin in person on November 28, 2018 about her diagnosis.  Plaintiff Decl. ¶ 143; Plaintiff Dep. 203:24-205:10.  Just two days earlier, on November 26, 2018, Prakhin called Plaintiff before she learned of her diagnosis and expressed that he wanted to continue to employ Plaintiff.  Ex. 59 at PLAINTIFF 001429.  Plaintiff confirmed to Prakhin that "I fully intend on working.  Thank you.  But you will have to accommodate me somehow."  *Id.* at PLAINTIFF 001433.  Prakhin told Plaintiff that they will meet in-person on Wednesday, November 28, 20218 "[to] figure things out." *Id*. at PLAINTIFF 001428.

On November 28, 2018, Plaintiff met with Prakhin in person wherein she disclosed to him that she was diagnosed with LHON and that she is almost completely blind.  Plaintiff Decl. ¶ 143; *Id*. at 203:24-205:10; Gabo Dep. at 91:13-92:16 (acknowledging that Plaintiff told her she was diagnosed "with a hereditary condition that would affect her vision for the rest of her life.").  As Plaintiff began explaining the details of her disability and the information she received from the doctor, Prakhin interrupted her saying that he was not interested in any such details but merely

wanted to know if the condition was treatable or if it would improve.  Plaintiff Decl. ¶ 144; Prakhin Dep. 245:16-20 ("*I cut her off* because, again, I'm not the doctor.  I cannot understand the details and substance of the disease.") (emphasis added).

Plaintiff explained that the impairment was permanent and that there was no known cure. Plaintiff Decl. ¶ 144.  Prakhin asked how Plaintiff was going to do her job.  *Id.* ¶ 145.  Plaintiff emphasized that she fully intends to keep working just as before; that she still has her peripheral visions (as opposed to central visions), and that she will need certain accommodations but that she is fully committed to continuing to work.  *Id.*  Plaintiff reiterated her request for certain accommodations such as the OrCam glasses, the Jaws software, and Dragon dictation.  *Id.* ¶ 146; Prakhin Dep. 250:13-16 (Prakhin testified that Plaintiff explained her medical condition to him and requested accommodations, stating that "She can't see very well without some kind of glasses [and] [s]he needs some computer program to work in a normal way.").  Plaintiff stated that she had been working with her impairment for months and nothing had changed now except that they had a diagnosis.  Plaintiff Decl. ¶ 147.  While Plaintiff was explaining to Prakhin her diagnosis, Prakhin interrupted her and told her that he was not interested in the details, but just wanted to know if Plaintiff's condition was treatable or if it would improve.  Plaintiff explained that the impairment was permanent and that there was no known cure, but that she had been researching some experimental treatment that may improve her impairment and she just needed some more time to learn more about them.  *Id.* ¶¶ 148-49.  Plaintiff again reiterated her requests for the accommodations but Prakhin ignored these requests and instead wished her luck with the experimental treatment saying, "we'll see what happens, maybe you'll get better."  *Id.* ¶ 150.

Plaintiff also told Raskin about her diagnosis in-person on that same day and recalls the conversation being rather similar to the one she had with Prakhin.  *Id.* ¶ 151.  Plaintiff reiterated

her requests for accommodations but Raskin told her to direct such inquiries to Prakhin.  *Id.* ¶ 152.

At no time did Defendants request a doctor's note discussing her diagnosis or any medical treatment received.  Plaintiff Decl. ¶ 153; Plaintiff Dep. 205:19-206:10.

**DEFENDANTS' PARAGRAPH 102**

102.    Plaintiff did not provide any medical documentation to Mr. Prakhin or Ms. Raskin regarding her medical diagnosis.  (Raskin Aff., ¶ 28; Prakhin Aff., ¶ 27).

**RESPONSE TO PARAGRAPH 102**

Plaintiff admits that she did not provide any medical documentation, but disputes that any such request was made.  *See* Response to Paragraph 99.  Indeed, while Prakhin and Raskin claim to have made such requests (*see* Prakhin Dep. 131:25-133:22; Raskin Dep. 129:2-132:22), not a single document, recording, or correspondence has been produced to support this assertion.  Huot Decl. ¶ 8.  On the other hand, Plaintiff denies having ever received any such request, and Gabo similarly denied that either Prakhin or Raskin ever requested medical documentation from Plaintiff.  *See* Plaintiff Dep. 205:14-206:13 ("[Q:] At any time during your employment with the [Firm], did you provide [Prakhin] or anybody at the firm with any medical records? [A:] No, I was never requested to do that."); Gabo Dep. 103:9-104:4 ("[Q:] To your knowledge, did [Raskin] ever ask [Plaintiff] to provide [documentation]? [A:] Not to my knowledge.").

On the contrary, Defendants did not care about the details of Plaintiff's medical condition and expressed that they were completely uninterested in such details or even whether her disease was called Lebers, "Lieberman", "Silverman", "Lieberman, or Schusterman, or any other name of this disease."  Prakhin Dep 250:18-21.  In fact, when Plaintiff tried to explain the details of her disability and the information she received from the doctor, Prakhin interrupted her saying that he was not interested in any such details.  Plaintiff Decl. ¶¶ 144, 154; Prakhin Dep. 245:16-20 ("***I cut***

*her off* because, again, I'm not the doctor.  I cannot understand the details and substance of the disease.") (emphasis added).

**DEFENDANTS' PARAGRAPH 103**

103.    Plaintiff never provided Defendants with any documentation from any of her healthcare providers regarding her medical condition or any requests for leave.  (Pl. Tr. at 205:14-206:2, 217:12-21; Raskin Aff. ¶¶ 17, 22, 28; Prakhin Aff., ¶¶ 22-24, 27).

**RESPONSE TO PARAGRAPH 103**

Plaintiff admits that she did not provide any documentation from her health care providers regarding treatment or requests for leave, but disputes any such request was made. *See* Responses to Paragraphs 99 and 102; Plaintiff Dep. 201:20-25 ("[Q:] At any time between September 2018 and November 2018, did you provide your employer with any physician note regarding your absences from work? [A:] No, I was not requested to provide one.").

**F.    Defendants Provided Plaintiff with Reasonable Accommodations**

**DEFENDANTS' PARAGRAPH 104**

104.    From September through December 2018, Ms. Raskin engaged in numerous discussions with Plaintiff regarding her blurry vision, magnifying devices, and installing software onto Plaintiff's Firm-provided computer.  (Raskin Tr. at 121:23-125:18, 145:22-147:13, 157:21-158:16; Pl. Tr. at 194:11-195:6, 212:7-20, 253:3-12).

**RESPONSE TO PARAGRAPH 104**

Admit that Plaintiff had several discussions with Raskin about her impairment wherein Plaintiff requested various reasonable accommodations including a full page magnifier, Dragon dictation, OrCam glasses specifically designed for the visually impaired, and a computer program called JAWS which is also designed for the visually impaired.  Plaintiff Dep. 222:18-20.  Neither Raskin nor Defendants ever provided Plaintiff with ***any*** of the requested accommodations,

resulting in Plaintiff being required to purchase all assistive devices at her own expense. *Id.* at 211:22-212:6; 222:21-22; 214:20-215:11; 215:20-216:6; Ex. 60 at PLAINTIFF 000057-58 (a copy of a receipt of Plaintiff's purchase of OrCam glasses); PLAINTIFF 000060-63 (a copy of a receipt of Plaintiff's purchase of a full-page magnifier from www.Amazon.com); PLAINTIFF 000053 (a copy of a receipt of Plaintiff's purchase of JAWS software).  Rather than reimbursing Plaintiff for these devices, Raskin testified that she was merely pleased that the devices were helping Plaintiff. Raskin Dep. 148:15-23.  ("As long as they're helping you, that's great").

**DEFENDANTS' PARAGRAPH 105**

105.    Ms. Raskin approved Plaintiff to take time off to attend medical appointments. (Raskin Tr. at 125:14-18, 151:6-152:15; Raskin Aff., ¶¶ 15-17, 21-22).

**RESPONSE TO PARAGRAPH 105**

Admit that Raskin approved Plaintiff to take *unpaid* time off to attend medical appointments for purposes of this motion, but it should be noted that shortly before firing Plaintiff and two days after she disclosed her diagnosis, Defendants pressured her to go out on short-term disability, as evidenced by an email referencing disability forms Defendants required Plaintiff to complete (*see* Ex. 57 at D01566; Plaintiff Decl. ¶ 156) and a recorded conversation wherein Prakhin told Plaintiff shortly before her termination, "[M]ost likely we expect to file disability because I don't know any other way." Ex. 61 at PLAINTIFF 001482.

**DEFENDANTS' PARAGRAPH 106**

106.    Plaintiff was provided with leave to attend her medical appointments.  (Pl. Tr. at 199:22-200:2, 239:11-13).

**RESPONSE TO PARAGRAPH 106**

Admit and refers to Response to Paragraph 105, but dispute any relevance.

**DEFENDANTS' PARAGRAPH 107**

107.    Defendants approved Plaintiff's request to purchase magnifying devices.  (Pl. Tr. at 212:11-18, 253:3-12).

**RESPONSE TO PARAGRAPH 107**

Dispute.  Defendants did not purchase any magnifying devices for Plaintiff.  On the contrary, Plaintiff purchased a full-page magnifier herself and a lighted magnifier lens and was never reimbursed.  *See* Plaintiff Dep. 213:10-214:19 ("I was told to purchase [the full-page magnifier] myself.  I was never told I would be reimbursed."); 252:24-253:12; *see also* Ex. 60 at PLAINTIFF 000062-63 (a copy of a receipt of Plaintiff's purchase of a full-page magnifier from www.Amazon.com); *see also* Responses to Paragraphs 104, 108-10 (Plaintiff similarly purchased OrCam glasses and JAWS software, and Defendants refused to reimburse her).  While Plaintiff was waiting for the full-page magnifier and lighted magnifier lens to arrive, another Firm attorney, Anna Broxmeyer, gave her a small hand-held magnifying glass that Ms. Broxmeyer which that Ms. Broxmeyer already had in her possession.  Prahkin Dep. 127:15-128:19.  Defendants never purchased any assistive devices for Plaintiff and never reimbursed her for same.  Plaintiff Dep. 211:22-212:6; 222:21-22; 214:20-215:11; 215:20-216:6.

**DEFENDANTS' PARAGRAPH 108**

108.    Plaintiff used the full-page magnifier at work.  (Larssen Tr. at 76:23-77:9, 78:22-79:6).

**RESPONSE TO PARAGRAPH 108**

Admit that Plaintiff used the full-page magnifier at work for purposes of this motion, but note that Plaintiff purchased this device herself and was never reimbursed.  *See* Plaintiff Dep. 213:10-214:19 ("I was told to purchase it myself.  I was never told I would be reimbursed.");

252:24-253:12; *see also* Ex. 60 at PLAINTIFF 000062-63 (a copy of a receipt of Plaintiff's purchase of a full- page magnifier from www.Amazon.com). *See* Response to Paragraph 107.

However, as Plaintiff's vision continued to deteriorate, she found other assistive devices that could better serve her impairment, such as OrCam glasses, Dragon Dictation, and the JAWS software. *See* Plaintiff Decl. ¶ 50; Plaintiff Dep. 211:22-212:6. Plaintiff requested that Defendants provide her with these assistive devices but Defendants refused to provide such accommodations. Plaintiff Dep. at 211:22-212:6; 222:21-22; 214:20-215:11; 215:20-216:6.

**DEFENDANTS' PARAGRAPH 109**

109.    Defendants engaged an IT specialist to enlarge the text on Plaintiff's Firm-provided computer. (Raskin Tr. at 125:2-18; Raskin Aff., ¶ 23).

**RESPONSE TO PARAGRAPH 109**

Dispute. The font on Plaintiff's computer was never enlarged. Plaintiff Decl. ¶ 58. The purported IT specialist who Defendants claim to have engaged to enlarge Plaintiff's text has no recollection of performing such work. *See* Ex. 8, "Pusachev Dep." 107:21-108:14 ("[Q:] Did [Raskin] ever ask you to increase the font size on [Plaintiff's] computer? [A:] I don't remember. [Q:] Do you recall ever in fact increasing the font size on [Plaintiff's] computer? [A:] I don't remember. . . . [Q:] [S]o you have no recollection of increasing the font size on [Plaintiff's] computer? [A:] I don't recall it, no.").

**DEFENDANTS' PARAGRAPH 110**

110.    Defendants permitted Plaintiff to upload software of her choice to the Firm's computers. (Pl. Tr. at 223:22-224:17; Prakhin Tr. at 136:7-17; Raskin Tr. at 145:22-147:13; Larssen Tr. at 83:22-85:5; Prakhin Aff., ¶ 25; Raskin Aff., ¶ 24; Larssen Aff., ¶ 12).

**RESPONSE TO PARAGRAPH 110**

Dispute.  Plaintiff asked Defendants multiple times to provide her with Dragon, a speech-to-text dictation software program, which the Firm previously purchased for another employee, but was denied this accommodation.  *See* Plaintiff Dep. 214:20-216:16.  Similarly, Plaintiff asked Defendants to provide her with JAWS software – a program that reads text aloud from a computer screen.  *See* Prakhin Dep. 250:15-16 ("She needs some computer program to work in a normal way"); Plaintiff Decl. ¶¶ 62-63.  However, Defendants refused to provide Plaintiff with this assistive software or allow her to install it on the Firm computers.  Plaintiff Dep. 224:8-17.  Instead, Plaintiff was required to purchase JAWS at her own expense and was never reimbursed.  Ex. 60 at PLAINTIFF 000053 (a copy of the receipt for Plaintiff's purchase of JAWS); Plaintiff Dep. 222:18-223:6.

After Plaintiff purchased JAWS at her own expense, she attempted to have the program installed on her Firm computer, but Prakhin intervened and discouraged her from doing so.  *See* Plaintiff Dep. 222:14-224:17 ("[Prakhin] was uncomfortable that I was using his computer and installing new software on it.").  Indeed, when Plaintiff attempted to install JAWS with the help of a friend, Prakhin told her "make sure he doesn't mess up my computer systems."  *See id*. at 253:13-254:12; Plaintiff Decl. ¶ 62-63.

While Prakhin claims to have authorized Pusachev to install JAWS on Plaintiff's computer (*see* Prakhin Dep. 260:17-261:19), Pusachev himself has no recollection of having any such discussion with Prakhin or ever being told to install any software on Plaintiff's computer.  *See* Pusachev Dep. 106:24-107:24.

**DEFENDANTS' PARAGRAPH 111**

111.   In November 2018, Defendants offered Plaintiff a leave of absence, which was rejected by Plaintiff.  (Raskin Tr. at 64:2-14; Raskin Aff., ¶ 26).

**RESPONSE TO PARAGRAPH 111**

Dispute that Defendants "offered" that Plaintiff go out disability leave as a purported "accommodation."   In fact, Defendants pressured Plaintiff to go out on disability leave almost immediately after learning of her LHON diagnosis and fired her when she refused to do so. Plaintiff Decl. ¶ 156.  Indeed, just two days after learning that Plaintiff's vision impairment was permanent and incurable, Defendants pressured her to go out on short-term disability leave.  *See* Ex. 57 at D01566; *see also* Ex. 61 at PLAINTIFF 001482 ("[M]ost likely we expect to file disability because I don't know any other way.").  Plaintiff rejected Defendants' attempts to push her out on disability leave because, as she explained, she wanted to continue working and was committed to continuing her employment just as before except with certain accommodations.  Ex. 56 at PLAINTIFF 001433 ("I fully intend on working.  Thank you.  But you will have to accommodate me somehow"); Plaintiff Decl. ¶ 159;  Plaintiff Dep. 240:3-5 (Plaintiff testifying as to why she did not want to go out on disability leave: "Because I don't think I'm entirely disabled. I can still [work.]"); 251:20-252:4 ("I can function and work and live on my own and continue working."); 252:13-18 ("[A]s far as I understand, if you're disabled, you can't work and I intend on working if I can work.").

**DEFENDANTS' PARAGRAPH 112**

112.   Plaintiff acknowledges that Mr. Prakhin suggested that Plaintiff take a leave of absence.  (Pl. Tr. at 201:5-6, 68:19-10; Prakhin Aff., ¶ 28).

**RESPONSE TO PARAGRAPH 112**

Dispute the characterization that Prakhin "suggested" that Plaintiff take a leave of absence. *See* Responses to Paragraphs 105 and 111.

**DEFENDANTS' PARAGRAPH 113**

113.    Plaintiff refused to accept Defendants' offer to take a leave of absence, stating that that she was not disabled.  (Raskin Tr. at 64:2-14, 158:2-10; Prakhin Aff., ¶ 28; Donnelly Decl., Ex. A, ¶ 42).

**RESPONSE TO PARAGRAPH 113**

Dispute.  Again, Defendants mischaracterize their insistence that Plaintiff would go out on disability leave as an accommodation. *See* Responses to Paragraphs 105 and 111. Similarly, Plaintiff disputes that she did not apply for disability because she was not disabled.  Plaintiff declined to apply for disability leave because she did not believe her disability impaired her ability to continue working (which it did not with the aid of assistive devices), and she intended to continue doing so.  *See* Plaintiff Dep. 239:23-240:5 ("[Q:] To date, have you ever applied for disability?  [A:] No. [Q:] Why not? [A:] Because I don't think I'm entirely disabled. I can still [work.]"); 251:20-252-4 ("I can function and work and live on my own and continue working."); 252:13-18 ("[A]s far as I understand, if you're disabled, you can't work and I intend on working if I can work."); 257:3-11 ("[Q:] And you stated that you did not want to apply for disability because you don't consider yourself to be disabled; is that correct? . . . [A:] No, that's not what I said. [Q:] What did you say? [A:] That I don't like to call myself disabled.").

**DEFENDANTS' PARAGRAPH 114**

114.    Plaintiff did not provide Defendants any receipts for reimbursement following her purchase of any assistive devices.  (Pl. Tr. at 214:9-19, 217:9-11, 223:3-17; Raskin Aff., ¶ 30).

**RESPONSE TO PARAGRAPH 114**

Plaintiff admits that she did not provide any receipts following her purchase of any assistive devices, but disputes that any such requests were made. Plaintiff requested reimbursement or even contribution towards the purchase of various assistive devices but was denied. Plaintiff Dep. 214:24-215:2 ("I asked for reimbursement for OrCam glasses or contribution to their purchase"); 216:21-25 (Plaintiff testified that she spoke to Prakhin about needing assistive devices and told him that they were "very expensive and I needed help to pay for them."). However, Defendants made it explicitly clear to Plaintiff that if she wanted any assistive devices that she had requested, that she would have to purchase them at her own expense. Plaintiff Dep. 214:14-15 ("I was told to purchase it myself"). Prakhin testified at his deposition that even now he would merely "consider" covering the cost of any such assistive devices. Prakhin Dep. 261:20-24.

**DEFENDANTS' PARAGRAPH 115**

115. Plaintiff never submitted any medical documentation to Defendants indicating any accommodation that would have allowed her to perform essential functions of the Associate position. (Pl. Tr. at 205:14-206:2, 217:12-21; Prahkin Aff., ¶ 29).

**RESPONSE TO PARAGRAPH 115**

Admit that Plaintiff did not submitted medical documentation accompanying her requests for accommodations, but dispute that any such requests for records were ever made. Plaintiff Decl. ¶ 153. As discussed at length *supra* Paragraphs 99, 102-03, Plaintiff denies that Defendants ever requested medical documentation for any reason. (*see* Plaintiff Dep. 205:14-206:13; Gabo Dep. at 103:9-104:4; *see also* Responses to Paragraphs 99, 102-03) and while Prakhin and Raskin claim to have made such requests (*see* Prakhin Dep. 131:25-133:22; Raskin Dep. 129:14-132:22), not a single document has been produced to support this. *See* Responses to Paragraphs 99, 102-03.

103

Tellingly, during Raskin's deposition, she testified that requiring written requests for accommodations is not the Firm's practice.  *See* Raskin Dep. 59:20-60:13 ("If someone needs a new [devices], it doesn't have to be written anywhere; they come to me, ask for it, and we [] order it for them.").

**DEFENDANTS' PARAGRAPH 116**

116.    Plaintiff discontinued using JAWS because she "soon realized it was intended for individuals who were completely blind rather than visually impaired."  (Pl. Tr. at 229:4-230:18; Donnelly Decl., Ex. L at No. 11).

**RESPONSE TO PARAGRAPH 116**

Dispute.  Defendants mischaracterize Plaintiff's testimony.  In fact, Plaintiff discontinued her attempts at installing JAWS on her Firm computer because Prakhin "was uncomfortable that [Plaintiff] was using his computer and installing new software on it."  Plaintiff Dep. 224:8-17.  Plaintiff did not install the program and was terminated shortly thereafter.  *See* Pusachev Dep. at 107:4-108:14.  Plaintiff then purchased an Apple Mac computer in late December which contained "similar pre-installed functions" as JAWS, functions Plaintiff found "easier to use" and suited her "need better," thus rendering JAWS duplicative – and expensive.  *See id.* at 229:10-230:12; Plaintiff Decl. ¶ 64.  Plaintiff also found cellphone applications that better assisted Plaintiff's disability.  *See* Plaintiff Decl. ¶ 65.  (including the "Seeing AI Smartphone Application [] which reads anything on a screen" and the "Be My Eyes Smartphone Application" which allows users "to call in and Be My Eyes operators will read documents, books, text, signs, describe or identify things, or otherwise assist the visually impaired.")  As Plaintiff explained in her deposition: "Jaws, if he had allowed me and assisted me in installing it, that would have helped me. . . . Dragon would have helped me, yes.  I was never provided that. . . . I just found different solutions after I was

terminated."    Plaintiff Dep. 225:7-13; Raskin Dep. 146:8-16 (acknowledging that Plaintiff identified JAWS as a program that would help her).

## DEFENDANTS' PARAGRAPH 117

117.    Plaintiff she [*sic*] does not know if JAWS would have assisted her in performing her job functions, such as conducting depositions.  (Pl. Tr. at 225:14-22).

## RESPONSE TO PARAGRAPH 117

Dispute.  As stated in Response to Paragraph 110, JAWS is a program that reads text aloud from a computer screen and would have assisted Plaintiff in performing her job responsibilities such as reviewing records and conducting depositions.  *See* Plaintiff Dep. 224:24-225:13 ("J[AWS], if [Prakhin] allowed me and assisted me in installing [JAWS], that would have helped me.").  Plaintiff further testified that assistive devices such as JAWS would have enabled her to conduct depositions.  *Id*. at 113:12-21 ("[I]f I know [that I'll be attending a deposition] that requires a set of extensive documentation, then I will have an assistive device with me, like my laptop, and it could be emailed to me, and then the laptop can read it to me."); Raskin Dep. 146:8-16 (acknowledging that Plaintiff identified JAWS as a program that would help her).

Indeed, throughout Plaintiff's deposition, counsel for Defendants asked Plaintiff to review exhibits and other documents relevant to this litigation.  *See* Plaintiff Dep. 88, 111-12, 121, 164. Plaintiff was unable to read the documents because she did not have access to her assistive devices, but testified that an assistive device such as a program that can "read [the documents] to [her]" would have enabled her to review the documents.  *See id*. at 111:7-112:9.

Lastly, Plaintiff testified that she currently uses a pre-installed program on her Apple Mac computer that serves the same function as JAWS, thereby rendering JAWS duplicative and expensive.  *See* Response to Paragraph 116; Plaintiff Dep. 229:10-230:12; Plaintiff Decl. ¶ 64.

Plaintiff has repeatedly utilized this feature to conduct depositions on behalf of numerous law firms and attorneys as part of her *per diem* work.  *See* Ex. 9 (Plaintiff's privilege log); Ex. 62 at PLAINTIFF 001260-97; Plaintiff Decl. ¶ 67. Indeed, since Plaintiff's termination from Defendants, Plaintiff has been able to conduct and defend approximately 175 depositions and attend numerous court conferences.  *See* Ex. 9; Plaintiff Decl. ¶¶ 126, 169.

## DEFENDANTS' PARAGRAPH 118

118.    On November 9, 2018, Plaintiff purchased OrCam glasses for $3,599.00.  (Donnelly Decl., Ex. NN).

## RESPONSE TO PARAGRAPH 118

Admit for purposes of this motion. While Plaintiff requested that Defendants reimburse Plaintiff for such glasses, explaining that they were too expensive and that Plaintiff needed help paying for them, Defendants refused to pay for the glasses requiring Plaintiff to purchase them at her own expense.  Plaintiff Dep. 214:24-215:2; 216:21-25; Plaintiff Decl. ¶ 59.

## DEFENDANTS' PARAGRAPH 119

119.    Plaintiff returned the OrCam glasses she purchased because she "didn't find them very useful."  (Pl. Tr. at 220:24-221:5).

## RESPONSE TO PARAGRAPH 119

Dispute.  Plaintiff returned the OrCam glasses because they were not *as* useful as other devices and programs that were "more helpful" or the "equivalent [as the OrCam glasses]." Plaintiff Dep. 220:24-221:19; Raskin Dep. 148:12-23 (acknowledging that OrCam glasses were helping Plaintiff).  These devices or programs included other "apps on the phone or iPad that did similar [functions as OrCam]."  Plaintiff Dep. 220:24-221:19.  Indeed, Plaintiff testified that the OrCam glasses did in fact assist her in being able to see documents better, but Plaintiff discovered

after Prakhin terminated her that cheaper assistive devices existed. *Id.* at 221:20-222:3. In fact, when Gabo travelled to Israel in or around April 2019, Plaintiff asked Gabo if she could purchase a pair of OrCam glasses there, because OrCam glasses are manufactured in Israel and Plaintiff suspected they would be cheaper. *See* Gabo Dep. 113:21-114:8. Plaintiff explained that she "found different [and cheaper] solutions after [she] was terminated." Plaintiff Dep. 225:7-13.

**DEFENDANTS' PARAGRAPH 120**

120. Plaintiff remained unable to perform the essential functions of her position as an Associate at the Firm even after she began using assistive devices and software. (Prakhin Aff., ¶ 26; Larssen Aff., ¶¶ 13, 15; Belous Aff., ¶ 9).

**RESPONSE TO PARAGRAPH 120**

Dispute. Plaintiff was able, and is currently able to perform the essential functions of an Associate at the Firm with the use of her assistive devices; as Plaintiff routinely performs the very same functions on a regular basis in her current role as a *per diem* attorney for numerous law firms. *See* Ex. 9 (Plaintiff's privilege log). With the use of her assistive devices, Plaintiff has conducted and defended approximately 175 deposition on a *per diem* basis for numerous law firms. *See generally id.*; *see also* Plaintiff Dep. 48:2-57:24. Indeed, with her assistive devices, Plaintiff is able to able to make court appearances, argue motions, review thousands of pages of documents, medical records, discovery responses, photographs, police reports, transcripts and other case file records, review video recordings such as surveillance footage, prepare clients for depositions, conduct and defend approximately 175 depositions, and prepare detailed and comprehensive deposition reports for each of these examinations. *See* Ex. 9; Plaintiff Decl. ¶¶ 67, 126, 169; *see also* Responses to Paragraphs 79 and 84.

Defendants fired Plaintiff two weeks after she disclosed her LHON diagnosis, without engaging in any interactive process or providing her an opportunity to explore devices to assist her. Plaintiff testified that with the help of magnifying devices and computer software, she *is* capable of performing all job duties for which she was responsible for at the Firm. *See* Plaintiff Dep. 224:3-228:3; *see also* Responses to Paragraphs 82 and 84; Plaintiff Decl. ¶ 66; Raskin Dep. at 146:8-16 (acknowledging that Plaintiff identified JAWS as a program that would help her); *id*. at 148:12-23 (acknowledging that OrCam glasses were helping Plaintiff); Gabo Dep. 108:15-18 (acknowledging that Plaintiff told Gabo that she had asked the Firm to provide her with Dragon). This is supported by the *per diem* work Plaintiff has performed for various law firms since her termination. *See generally* Ex. 9; Ex. 62 at PLAINTIFF 001260-97; *see* Plaintiff Dep. 47:20-57:24. As such, with the aid of assistive devices, Plaintiff has demonstrated that she is beyond capable of performing the essential functions of an Associate at the Firm. *See generally* Ex. 9.

Further, when Plaintiff interviewed for Associate positions at various law firms following her termination, she testified that she disclosed her disability and told the interviewers that she "will need some assistance or some assistive devices to perform the job" and "I'm capable of performing the job but will need some assistive devices or assistance." *See* Plaintiff Dep. 72:20-74:14. When asked what kind of assistance Plaintiff needed, she would state "I have software that I would need installed or a computer that has accessibility features, and that I have a device that magnifies and reads to me, so I would [] need one of those or something like it." *Id*. at 75:5-12.

**DEFENDANTS' PARAGRAPH 121**

121.    Plaintiff never identified a reasonable accommodation that would allow her to perform the essential functions of the Associate position. (Prakhin Aff., ¶ 29; *see* Raskin Aff., ¶ 31).

**RESPONSE TO PARAGRAPH 121**

Dispute.   During her employment, Plaintiff requested that Defendants reasonably accommodate her by providing five different devices to assist her with her vision impairment: (i) a magnifying glass; (ii) a full-page magnifier; (iii) the software program called Dragon; (iv) OrCam glasses; (v) and JAWS.  *See* Plaintiff Dep. 211:19-215:19.  Defendants provided Plaintiff with a magnifying glass that was already in their possession but denied the remaining four accommodations and refused to reimburse Plaintiff for any purchase of assistive devices.  *See* Response to Paragraph 114; Prakhin Dep. 250:15-16 ("She needs some computer program to work in a normal way").  Plaintiff was required to purchase a full-page magnifier at her own expense and was never reimbursed.  *See* Plaintiff Dep. 213:10-214:19, 252:24-253:12.  Plaintiff asked Defendants multiple times to provide her with Dragon, which the Firm previously purchased for another employee, but was declined.  *See id.* at 214:22-216:16.  Plaintiff requested OrCam glasses and asked for help in paying for them, but Defendants refused.  *See id.* at 216:17-217:8.  Lastly, Plaintiff requested the JAWS software (Prakhin Dep. 250:15-16) but was later required to purchase it at her own expense without reimbursement. Ex. 60 at PLAINTIFF 000053 (a copy of the receipt for Plaintiff's purchase of JAWS); Plaintiff Dep. 222:18-223:6.   Moreover, after Plaintiff purchased JAWS at her own expense, she attempted to have the program installed on her Firm computer, but Prakhin intervened and discouraged her from doing so.  *See* Plaintiff Dep. 223:24-224:17 ("[Prakhin] was uncomfortable that I was using his computer and installing new software on it."); *see also* Response to Paragraph 110.

In other words, Plaintiff identified *several* reasonable accommodations that would have enabled her to continue performing her essential job responsibilities.  Plaintiff Dep. 224:24-225:13 ("[JAWS would have helped me], if [Prakhin] allowed me and assisted me in installing it, that

would have helped me. [] Dragon would have helped me, yes.  I was never provided that and, at that time, magnifying things were helping me and OrCam was helping me.  I just found different solutions after I was terminated."); Raskin Dep. 146:8-16 (acknowledging that Plaintiff identified JAWS as a program that would help her); *id.* at 148:12-23 (acknowledging that OrCam glasses were helping Plaintiff); Gabo Dep. 108:15-18 (acknowledging that Plaintiff told Gabo that she had asked the Defendants to provide her with Dragon).

**DEFENDANTS' PARAGRAPH 122**

122.    Plaintiff never submitted any requests for accommodation in writing, as required by the Employee Handbook.  (Pl. Tr. at 201:9-19; 216:7-12; Raskin Aff., Exs. 1, 2).

**RESPONSE TO PARAGRAPH 122**

Dispute. *See* Responses to Paragraphs 99, 102-03, 115, and 121.

**G.    Plaintiff's Termination for Unsatisfactory Performance**

**DEFENDANTS' PARAGRAPH 123**

123.    Mr. Prakhin decided to terminate Plaintiff because of her poor work performance. (Prakhin Tr. at 272:21-277:8, 304:13-22, 368:4-369:16; Prakhin 30(b)(6) Tr. at 125:13-126:23, 129:19-130:10; Prakhin Aff., ¶ 45).

**RESPONSE TO PARAGRAPH 123**

Admit that Prakhin terminated Plaintiff, but dispute that it was due to any purported "poor work performance."  As discussed at length, Plaintiff worked for Defendants for approximately five years, receiving consistent raises along the way, before leaving for another law firm.  *See* Plaintiff Dep. 105:3-23.  In early 2018, Prakhin recruited Plaintiff back to the Firm.  *See id.* at 135:12-138:20.  Within just a few months of Plaintiff's hire, Prakhin decided to assign her over 123 additional cases, on top of the 50-70 she was already managing.  *See* Prakhin Dep. 222:4-224:18; Gabo Dep. 53:14-54:10.

Plaintiff disputes that Prakhin or anyone else had ever spoken to her about any alleged poor performance (*see* Prakhin Dep. 213:9-218:22) and there are no records or any witnesses to corroborate any such alleged discussions. Plaintiff Dep. 174:25-175:3.; Huot Decl. ¶ 9; Plaintiff Decl. ¶ 76. Further, Gabo, who worked closely with Prakhin to supervise Plaintiff, testified unequivocally that Prakhin never expressed any dissatisfaction with Plaintiff's work. *See* Gabo Dep. 51:6-52:8.

Tellingly, every non-employee of the Firm who has offered testimony in this matter has unequivocally denied that Plaintiff's performance was anything but exceptional, both before and after the loss of her vision. *See* Gabo Dep. 46:2-14; 130:25-131:7 (acknowledging Plaintiff's termination "was a surprise."); Ex. 63, Declaration of Steven Korytny; Ex. 64, Declaration of Nicholas Serlin. In fact, as late as November 26, 2018, Prakhin expressed his intention to continue Plaintiff's employment. Ex. 29 at PLAINTIFF 001429 ("[Prakhin] wants to keep me on."). It was not until after he learned that her impairment was permanent and incurable that he tried to push Plaintiff out on disability leave and then terminated her when she refused. *See* Ex. 57 at D01566; *see also* Ex. 61 at PLAINTIFF 001482 ("[M]ost likely we expect to file disability because I don't know any other way."); Plaintiff Decl. ¶ 156.

Notably, on December 14, 2018, as Prakhin was terminating Plaintiff, she specifically inquired whether the termination was based on any work-related performance issues. Plaintiff Decl. ¶ 165. Prakhin admitted that he had not seen any decline in Plaintiff's work performance or noticed any work performance deficiencies, but stated, "I don't have a choice. I don't know how you'll handle cases with your condition." *Id*. at ¶ 164. Instead, he told Plaintiff "I'm a business man. I don't see how this is worth it for me." *Id*. ¶ 166. The conversation culminated in Prakhin expressing to Plaintiff that if her untreatable disability somehow improved, then "he would be

happy to hire [Plaintiff] back if [her] condition somehow improved." *Id.* ¶ 167.

## DEFENDANTS' PARAGRAPH 124

124.    Plaintiff's work performance was unsatisfactory because Plaintiff failed to: (1) timely respond to or communicate with clients; (2) perform the work assigned to her and reassigned such work to paralegals; (3) review documents prepared by paralegals on her behalf; (4) enter case notes into the Firm's SAGA database; (5) follow the rules provided in the Employee Handbook; and (6) efficiently and proactively settle cases. (Prakhin Aff., ¶ 45).

## RESPONSE TO PARAGRAPH 124

Dispute. *See* Responses to Paragraphs 42, 50-55, 60, 65-66, and 72-73.

## DEFENDANTS' PARAGRAPH 125

125.    Plaintiff's employment with the Firm was terminated effective December 14, 2018. (Prakhin Aff., ¶ 46).

## RESPONSE TO PARAGRAPH 125

Admit for purposes of this motion.  *See* Response to Paragraph 123.

## H.    The Firm's Employment of Gil Zohar

## DEFENDANTS' PARAGRAPH 126

126.    In late August 2018, early September 2018, Mr. Prakhin was searching for a trial attorney for the Firm.  (Prakhin Aff., ¶ 14).

## RESPONSE TO PARAGRAPH 126

Dispute.  *See* Responses to Paragraphs 43 and 127.

## DEFENDANTS' PARAGRAPH 127

127.    In late August 2018, early September 2018, Mr. Prakhin met with Gil Zohar, an experienced trial attorney with over 20 years of trial experience, to discuss retaining him to be an of counsel trial attorney for the Firm.  (*Id.*; Zohar Aff., ¶¶ 3, 4.)

**RESPONSE TO PARAGRAPH 127**

Dispute. The record is unclear as to when Prakhin actually met Zohar; however, Prakhin testified that he interviewed Zohar "literally days" before he terminated Plaintiff.  Prakhin Dep. 235:11-12 ("when I interviewed [Zohar], it was ***literally days before I fired*** [Plaintiff,]") (emphasis added); 235:18-20 ("[Q:] You hired Mr. Zohar to replace [Plaintiff]? [A:] Yes."); 317:6-10 ("[Q:] When did you first consider hiring Mr. Zohar to replace [Plaintiff]? [A:] [ S]everal days prior to the day when I fired [Plaintiff].");  *see also* Raskin Dep. 156:19-157:20 (Raskin acknowledging that, as the Firm's office manager, she could not remember when she first heard Zohar's name, when he began handling trials, when he first performed work of any kind for the Firm, and stating his first day of full-time employment was January 2, 2019); *see also* Response to Paragraph 43.

Additionally, Prakhin's testimony unequivocally stated that in September 2019, "there was no conversation about hiring [Zohar]."  Prakhin Dep. 316:21-317:5; *see also id*. at 18:11-15 ("[Zohar] [d]id not work back at the time that [Plaintiff] worked in my office.").  Defendants' payroll records show that Zohar did not receive any wages from the Firm until the week of December 27, 2018 through January 2, 2019.  *See* Ex. 65 at D13119-28.  Lastly, in an email dated December 19, 2018, Gabo notified Larssen, Belous, and Raskin that "[Zohar] is starting after New Years and will probably take over [Plaintiff's] cases and do trial."  Ex. 31 at D00833.

**DEFENDANTS' PARAGRAPH 128**

128.    Mr. Zohar was hired by the Firm of counsel trial attorney for the Firm from September 2018 through December 2018.  (Prakhin Tr. at 316-317; Prakhin Aff., ¶ 15; Zohar Aff., ¶¶ 4-5).

**RESPONSE TO PARAGRAPH 128**

Dispute.   *See* Response to Paragraph 127.

**DEFENDANTS' PARAGRAPH 129**

129.    In December 2018, Mr. Prakhin hired Mr. Zohar to act as the Firm's managing attorney.  (Prakhin Aff., ¶ 50; Prakhin Tr. at 234, 317; Zohar Aff., ¶ 5).

**RESPONSE TO PARAGRAPH 129**

Admit that Zohar was hired in December 2018 but dispute that he was hired to be anything other than Plaintiff's replacement.  Indeed, Prakhin did not interview Zohar until "literally days before I fired [Plaintiff,]" and hired Zohar for the express purpose of *replacing* Plaintiff.  Prakhin Dep. 235:10-12; 235:18-20 ("[Q:] You hired Mr. Zohar to replace [Plaintiff]? [A:] Yes.").

Further, Zohar began working after Plaintiff's termination; and he took over Plaintiff's office and her case files.  Ex. 31 at D00833; Raskin Dep. 157:12-16 (Zohar's first day was January 2, 2019).  Defendants completely misconstrue the relevance of Zohar's hire, which speaks to the date on which they began planning to fire Plaintiff – after they learned of her incurable disability.

**DEFENDANTS' PARAGRAPH 130**

130.    Mr. Zohar had extensive experience as an attorney and possessed qualifications superior to those of Plaintiff.  (Prakhin Aff., ¶ 50; Prakhin Tr. at 234).

**RESPONSE TO PARAGRAPH 130**

Admit Zohar is an experienced attorney, but dispute that he possessed qualifications superior to those of Plaintiff, and dispute any relevance.  *See* Responses to Paragraphs 127 and 129.

**DEFENDANTS' PARAGRAPH 131**

131.    From January 2019 through July 2019, the Firm collected approximately $1,448,000, in fees from settlements that Mr. Zohar negotiated.  (Prakhin Aff., ¶ 51).

**RESPONSE TO PARAGRAPH 131**

Dispute.  The only cited evidence in support of this factual proposition is Prakhin's sham affidavit; Defendants never produced any documents reflecting the amount of fees the Firm collected from settlements that Zohar negotiated.  Huot Decl. ¶ 10.  It should be further noted that Defendants attempt to justify Plaintiff's termination through *post-hoc* comparisons between her settlements and those generated by Zohar – who Defendants admit took on all of Plaintiff's cases, and was hired for the explicit purpose of replacing her.  Prakhin Dep. 235:18-20; Ex. 31 at D00833. These comparisons offer zero insight into Prakhin's motive for firing Plaintiff and whether Plaintiff would have collected the same, if not more, amount in fees had she been provided with reasonable accommodations and continued working her cases.  Prakhin could not have been retroactively motivated by accolades Zohar had not yet earned, on cases he had not managed, and about which Prakhin obviously could not have known when he decided to fire Plaintiff.  *See* Response to Paragraph 72.

**DEFENDANTS' PARAGRAPH 132**

132.    Mr. Zohar earned a total of $72,400 in bonus compensation from his settlements. (*Id*.)

**RESPONSE TO PARAGRAPH 132**

Dispute.  The record is unclear as to whether Zohar earned a bonus from settling a single case or if he received a single miscellaneous mid-year bonus.  Ex. 65 at D13123.  However, were it not for Plaintiff's discriminatory termination, she no doubt would have had the same opportunity to receive the same amount in bonuses as Zohar, if not more.  *See* Response to Paragraph 131.

115

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Eastern District of New York, and this Court's motion rules, Plaintiff Yelena Ruderman ("Plaintiff"), sets forth the following Statement of Undisputed Material Facts about which she contends there are no issues to be tried.

133.    The Second Department Ethics Committee investigated Prakhin for recording phone calls at the Firm. Prakhin Dep. 323:18-324:10.

134.    Plaintiff did not receive the updated Employment Handbook.    Plaintiff Dep. 145:14-17.

135.    Plaintiff requested Dragon be provided to her a couple of times, but Defendants never helped her find it.  Plaintiff Dep. 215:20-216:2.

136.    During the relevant time period, Azfar Khan was the boyfriend of Prakhin's stepdaughter, Masha Lakhmatova.  Plaintiff Decl. ¶ 88.

137.    Prakhin loaned Larssen $10,000 to pay restitution in connection with her grand larceny conviction.  *See* Larssen Dep. 27:19-30:9.

138.    Prakhin loaned Larssen money so that she could pay off her E-Z Pass bills.  Larssen Dep. at 131:15-132:16.

139.    Plaintiff entered at least 50 to 75 SAGA notes each week. Plaintiff Decl. ¶ 27.

140.    Following her termination, Plaintiff has taken or defended approximately 175 depositions.  Plaintiff Decl. ¶ 169.

Dated: New York, New York
      July 6, 2021

                        **FARUQI & FARUQI, LLP**

                        By: */s/ Innessa M. Huot*
                            Innessa Melamed Huot

Alex J. Hartzband
Camilo M. Burr

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com
ahartzband@faruqilaw.com
cburr@faruqilaw.com

*Attorneys for Plaintiff*