# EXHIBIT 63

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

YELENA RUDERMAN,

         Plaintiff,

v.

LAW OFFICE OF YURIY PRAKHIN, P.C. and YURIY PRAKHIN, in both his individual and professional capacities,

         Defendants.

Case No.: 1:19-cv-02987-RJD-RLM

## DECLARATION OF PETER COATES

I, PETER COATES, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. On or around July 31, 2019, Yuriy Prakhin ("Prakhin") hired me to work as an Associate at the Law Offices of Yuriy Prakhin, P.C. (the "Firm").

2. Prakhin offered to pay me a salary of $105,000.00 and bonuses equal to 5% of the Firm's fees on all judgments or settlements I obtained.

3. Soon after Prakhin hired me, I was assigned to a number of cases formerly handled by Yelena Ruderman ("Ruderman"), who previously worked for the Firm as an Associate.

4. The Firm uses a program called SAGA to track activity in all cases handled by its attorneys.

5. On or around August 15, 2019, Prakhin and Irene Raskin ("Raskin"), the Firm's Officer Manager, instructed me to delete and change various SAGA entries entered by Ruderman.

6. Prakhin claimed that Ruderman's SAGA entries were, in some unspecified way, inaccurate, but would not provide any further explanation.

1

7. I refused to delete or alter Ruderman's SAGA entries because I believed doing so would be unethical and illegal.

8. When I explained this to Prakhin, he asked me why I would not follow his and Raskin's instructions.

9. I told Prakhin that I was unwilling to delete or revise Ruderman's SAGA entries because I had no reason to believe they were inaccurate, and no personal knowledge of the events described therein.

10. Prakhin then asked me if I was an "ethical attorney," to which I responded, "Yes."

11. Prakhin then told me to leave his office and meet with Raskin.

12. When I met with Raskin, I told her—just as I had told Prakhin—that I was unwilling to delete Ruderman's SAGA entries.

13. Raskin became irate, and berated me that I must follow Prakhin's instructions.

14. Still, I refused to delete or alter Ruderman's SAGA entries.

15. Soon thereafter, Prakhin and Raskin instructed IT Solutions Plus ("IT Solutions") to delete Ruderman's SAGA entries.

16. IT Solutions, of which Alexander Pusachev ("Pusachev") is a member, handles all IT-related matters for the Firm.

17. On or around August 30, 2019, I first witnessed employees of IT Solutions—specifically, Pusachev and two other men named Igor and Sasha, respectively—in the Firm's offices late at night deleting Ruderman's SAGA entries.

18. That same day, I complained to Raskin and Gil Zohar ("Zohar"), the Firm's Managing Attorney, that I believed it was unethical for Prakhin to have instructed IT Solutions to delete Ruderman's SAGA entries.

2

PLAINTIFF 001950

19. In response, Zohar shrugged and told me, "See no evil, hear no evil."

20. This disposition toward unethical or illegal conduct—*i.e.*, to remain willfully blind to or outright ignore such conduct—was very common at the Firm, as employees feared retaliation by Prakhin and Raskin for speaking out.

21. In fact, Raskin regularly reminded all attorneys other than Zohar that she was their boss and could fire them for refusing to follow her instructions.

22. These instructions often concerned the litigation of the Firm's cases and management of the Firm's business.

23. For example, despite not being an attorney, Raskin often directed attorneys regarding questions to ask and objections to assert during depositions.

24. Shortly after witnessing IT Solutions delete the SAGA entries, I discovered several new folders on the Firm's computer system labeled "ben," which I later learned were created by IT Solutions to store deleted SAGA entries.

25. Only employees of IT Solutions and Prakhin had access to the "ben" folders.

26. I also heard employees of IT Solutions referring to "ben" when discussing their deletion of SAGA entries.

27. At least eleven "ben" folders were accessed and/or modified on June 23, 2019, August 9, 2019, August 12, 2019, August 14, 2019, August 15, 2019, August 18, 2019, August 21, 2019, August 24, 2019, and September 15, 2019.

28. I also later learned Prakhin altered other attorneys' SAGA entries (or had instructed IT Solutions to alter them) to make it appear that the attorneys did less work on cases than they actually did.

PLAINTIFF 001951

29. Prakhin did this to justify not paying the Firm's attorneys bonuses on cases they settled.

30. Indeed, like myself, several attorneys at the Firm were promised bonuses equal to 5% of the Firm's fees on their cases.

31. Prakhin was notorious for finding ways to deny attorneys the bonuses they were owed.

32. Prakhin's refusal to pay attorneys their bonuses was a regular subject of employee complaints.

33. I have also witnessed Prakhin settling other attorneys' cases without their knowledge.

34. On other occasions, I heard Prakhin direct paralegals to settle other attorneys' cases, then later having those attorneys' SAGA entries regarding prior settlement discussions deleted.

35. Tellingly, despite working at the Firm for several months and resolving numerous claims, I never received any bonuses on the cases I settled.

36. In or around November 2019, I learned that Prakhin had loaned one of the Firm's paralegals, Erica Larssen ("Larssen"), approximately $30,000.00 to pay restitution in connection with criminal charges based on fraud against Larssen's prior employer.

37. Also in or around November 2019, Raskin directed me to prepare and sign two sworn statements to send to the New York State Department of Labor.

38. Prakhin told me to write in the sworn statements that two former Associates of the Firm—Steven Revis ("Revis") and Gregory Nahas ("Nahas")—were intoxicated at work.

PLAINTIFF 001952

39. Specifically, Raskin told me to swear under penalty of perjury that I personally witnessed Revis and Nahas not only being intoxicated at work, but also drinking at their desks and reporting to work under the influence of narcotics.

40. She instructed me to prepare the sworn statements to justify terminating Revis and Nahas "for cause" and to preclude them from collecting unemployment benefits.

41. However, I never witnessed Revis or Nahas intoxicated or high at work, just as I had never witnessed either of them drinking at their desks.

42. Later, I complained to Prakhin and Zohar that Raskin's request that I draft and sign false sworn statements was unethical.

43. As I explained to them, I found Raskin's request outrageous, and I was unwilling to sign a sworn statement (let alone two of them) attesting to facts that I did not know to be true.

44. Despite acknowledging that they were aware Raskin had asked me to prepare the sworn statements, Prakhin and Zohar both told me that I has somehow "misunderstood" what Raskin said.

45. Prakhin frequently offered this same response when employees complained about unethical or illegal conduct they were asked to perform at Raskin's direction—even though Raskin was herself acting at Prakhin's direction.

46. Unsurprisingly, neither Prakhin nor Zohar ever clarified what they believed Raskin actually meant when she directed me to prepare the false sworn statements.

47. On or around the evening of November 15, 2019, I witnessed employees of IT Solutions come to the Firm's offices to delete SAGA entries once again.

48. When they arrived at the Firm's office, one employee of IT Solutions, Igor, demanded that I leave because I believe he did not want me to witness them deleting SAGA entries.

5

49. However, because I was working late and was responsible for closing the Firm's offices, I refused, which angered Igor.

50. I also witnessed employees of IT Solutions come to the Firm's offices on or around February 13, 2020 to delete SAGA entries, and on several other occasions from in or around November 2019 through February 2020.

51. Indeed, over this time period, IT Solutions visited the Firm's offices to delete or change SAGA entries at least once every three weeks.

52. That same day, I again complained to Prakhin and Zohar that deleting SAGA entries was unethical.

53. Unsurprisingly, my complaints were ignored.

54. Further, Prakhin and Raskin maintained cameras in their offices, through which they were able to monitor and watch the Firm's employees throughout each day.

55. One such camera was pointed at my desk, which I believe was due to my prior complaints about the deletion of SAGA entries and Raskin's request that I draft and sign false sworn statements.

56. Prakhin and Raskin often watched me on these cameras from their computer monitors.

57. On a daily basis, Raskin called me from her office and asked why I was "not typing" or told me to "work harder."

58. On or around March 9, 2020, Arvid Gitelman ("Gitelman"), also an Associate at the Firm, came into my office and told me that I was supposedly not a "team player" because I refused to delete Ruderman's SAGA entries, and that Zohar and Prakhin were going to fire me as a result.

6

PLAINTIFF 001954

59. Throughout the remainder of March 2020, Gitelman's harassment of me only escalated.

60. Gitelman began referring to me using derogatory terminology pertaining to sexual orientation and age.

61. Other employees at the Firm engaged in similar retaliatory harassment as well.

62. For example, paralegals frequently printed and then posted revealing and graphic photographs of clients and their injuries on my desk.

63. This was a clear violation of the clients' privacy rights.

64. In or around March 2020, I complained to Prakhin, Zohar, and Raskin about the posting of these inappropriate photographs, as well as Gitelman's harassment.

65. Characteristically, my complaints were ignored, and this time also met with explicit threats of retaliation.

66. Specifically, Prakhin threatened me, "You are making false accusations and you will be terminated."

67. Nothing about my complaints to Prakhin was false.

68. Later that same month, Prakhin informed me that he would no longer pay my salary, but would instead pay me a flat fee for each assignment I completed.

69. Prakhin gave me a document that listed various tasks (*e.g.*, drafting motions or Bills of Particulars) and assigned a dollar amount to each.

70. Prakhin wrote on the list, "Peter – you must complete each task item [*sic*] and bill as fee [*sic*] or you will not be paid regardless of how long it takes." (emphasis in original).

71. He further warned me that if I did not complete these assignments, I would be terminated.

7

72. Prakhin terminated my employment on April 9, 2020.

73. Prakhin claimed to have fired me due to the financial impact of the COVID-19 pandemic and promised to reach out to rehire me at a later date; however, I soon saw job postings for my position on various internet job boards.

74. In truth, I believe Prakhin fired me in retaliation for my complaints.

75. Throughout my employment at the Firm, I took contemporaneous notes and kept other documentation concerning all of the above-summarized events.

76. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 5-19-22
Jersey City, New Jersey

_____
Peter Coates
5/19/22

PLAINTIFF 001956