**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YELENA RUDERMAN,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>LAW OFFICE OF YURIY PRAKHIN, P.C. and<br>YURIY PRAKHIN, in both his individual and<br>professional capacities,<br><br>　　　　　　Defendants. | Civil Action No.: 1:19-cv-2987-CBA-RLM |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................... 1

I. OPPOSITION TO MOTION *IN LIMINE* NO. 1: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING HER MEDICAL PROVIDERS AS WITNESSES AT TRIAL ....................................................... 1

    A. Plaintiff Timely Disclosed the Medical Providers ........................ 2

    B. The Medical Providers May Testify as Fact Witnesses ................ 11

    C. Testimony from the Medical Providers Is Relevant and Admissible under FRE 403 ................................................ 12

    D. The Court Should Not Re-Open Discovery Based on Defendants' Willful Failure to Depose the Medical Providers ........................ 13

II. OPPOSITION TO MOTION *IN LIMINE* NO. 2: PLAINTIFF'S MEDICAL RECORDS ARE ADMISSIBLE ................................................ 14

    A. The Medical Records Are Admissible Under the Diagnosis or Treatment Exception to the Hearsay Rule ................................ 15

    B. The Business Records Exception Applies ................................ 16

    C. The Medical Records Are Relevant ...................................... 21

    D. The Medical Records Are Admissible under FRE 403 ................ 22

III. OPPOSITION TO MOTION IN LIMINE NO. 3: PLAINTIFF SHOULD NOT BE PRECLUDED FROM TESTIFYING ABOUT HER DISABILITY AND EMOTIONAL DISTRESS DAMAGES ........................................ 24

    A. Testimony about Plaintiff's Disability .................................. 24

    B. Testimony about Plaintiff's Emotional Distress: ...................... 27

IV. OPPOSITION TO MOTION *IN LIMINE* NO. 4: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING CERTAIN LAY WITNESSES AT TRIAL ................................................ 28

    A. Plaintiff Timely Disclosed the Lay Witnesses ........................ 29

    B. The Lay Witness' Testimony Is Relevant .............................. 35

    C. The Court Should Not Re-Open Discovery Based on Defendants' Willful Failure to Depose the Lay Witnesses ........................ 38

V. OPPOSITION TO MOTION *IN LIMINE* NO. 5: THE DECLARATIONS OF NICHOLAS SERLIN, STEVEN KORYTNY, AND PETER COATES ARE RELEVANT AND ADMISSIBLE ............................................ 38

VI. OPPOSITION TO MOTION *IN LIMINE* NO. 6: PLAINTIFF'S RECENTLY PRODUCED DOCUMENTS ARE ADMISSIBLE EVIDENCE OF MITIGATION THAT DID NOT YET EXIST DURING DISCOVERY ............ 44

VII. OPPOSITION TO MOTION *IN LIMINE* NO. 7: PLAINTIFF DOES NOT INTEND TO OFFER THE 2017 DEPOSITION TRANSCRIPT LISTED IN THE PRETRIAL ORDER ...................................................... 46

VIII.   OPPOSITION TO MOTION *IN LIMINE* NO. 8: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING PAYROLL RECORDS .............................. 47

IX.     OPPOSITION TO MOTION *IN LIMINE* NO. 9: PLAINTIFF DOES NOT INTEND TO OFFER DOCUMENTS RELATING TO PRIOR LAWSUITS ................. 48

X.      OPPOSITION TO MOTION *IN LIMINE* NO. 10: PLAINTIFF SHOULD NOT BE PRECLUDED FROM OFFERING THE NYCBA PROFESSIONAL ETHICS OPINION AT TRIAL ................................................................................. 48

        A.   Exhibit 168 ................................................................................................ 48

        B.   Exhibit 169 ................................................................................................ 48

XI.     OPPOSITION TO MOTION *IN LIMINE* NO. 11: PLAINTIFF SHOULD NOT BE PRECLUDED FROM PRESENTING EVIDENCE REGARDING DEFENDANTS' FINANCIAL RESOURCES ....................................................... 49

XII.    OPPOSITION TO MOTION *IN LIMINE* NO. 12: PLAINTIFF SHOULD NOT BE PRECLUDED FROM SUGGESTING A DOLLAR AMOUNT TO THE JURY ............................................................................................................................ 51

XIII.   OPPOSITION TO MOTION IN LIMINE NO. 13: THE PUNITIVE DAMAGES PORTION OF THE TRIAL SHOULD NOT BE BIFURCATED .................................. 53

CONCLUSION ............................................................................................................................ 55

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                **Page(s)**

*Allen v. Colgate–Palmolive Co.*,
    No. 79 Civ. 1076 (CSH) 1985 WL 191 (S.D.N.Y. Jan. 14, 1985) ...........................................44

*Allen v. Perry*,
    279 F. Supp. 2d 36 (D.D.C. 2003) .........................................................................................43

*Atkinson v. Fischer*,
    No. 07-cv-00368 (GLS) (GHL), 2009 WL 3165544 (N.D.N.Y. Sept. 25, 2009)...................21

*Becknell v. Univ. of Kentucky*,
    17-CV-490 (JMH) (MAS), 2019 WL 1783488 (E.D. Ky. April 23, 2019)...........................51

*Belvin v. Electchester Mgmt., LLC*,
    17-cv-6303 (NGG) (MMH), 2022 WL 10586743 (E.D.N.Y. Oct. 18, 2022) .......................12

*Brady v. Wal-Mart Stores, Inc.*,
    455 F.Supp.2d 157 (E.D.N.Y. 2006) .....................................................................................27

*Brown v. Cornell*,
    17-CV-01036 (MAD) (ATB), 2021 WL 2711511 (N.D.N.Y. July 1, 2021)..........................52

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*,
    No. 14-cv-585 (AJN), 2015 WL 4002468 (S.D.N.Y. July 1, 2015), *aff'd*, 836
    F.3d 153 (2d Cir. 2016)..........................................................................................................39

*Coletti v. Cudd Pressure Control*,
    165 F.3d 767 (10th Cir. 1999) ...............................................................................................43

*Collado v. City of New York*,
    11-cv-9041 (DAB), 2017 WL 4533772 (S.D.N.Y. Sept. 27, 2017) .......................................52

*Coyle v Crown Enterprises, Inc.*,
    No. 05-cv-891F, 2009 WL 763401 (W.D.N.Y. Mar. 19, 2009)..............................................37

*Djangmah v. Falcione*,
    No. 08 Civ. 4027 (KPF), 2013 WL 6388364 (S.D.N.Y. Dec. 5, 2013)..................................18

*Dollman v. Mast Industries, Inc.*,
    08-CV-10184 (WHP), 2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011) .....................................54

*E.E.O.C. v. AutoZone, Inc.*,
    630 F.3d 635 (7th Cir. 2010) .................................................................................................26

*Ebewo v. Martinez*,
    309 F. Supp. 2d 600 (S.D.N.Y. 2004)..................................................................................2, 7

*Edwards v. City of New York*,
    8-2199, 2011 WL 2748665 (E.D.N.Y. July 13, 2011)............................................................52

*EMI Music Marketing v. Avatar Records, Inc.*,
    334 F. Supp. 2d 442 (S.D.N.Y. 2004).......................................................................................6

*Farb v. Baldwin Union Free Sch. Dist.*,
    No. 05-cv-0596 (JS) (ETB), 2008 WL 11435584 (E.D.N.Y. Jan. 14, 2008) ...........................2

*Farghaly v. Potamkin Cadillac-Buick-Chevrolet-Geo, Ltd.*,
    18-CV-11106 (AJN), 2021 WL 4267656 (S.D.N.Y. Sept. 20, 2021) ....................................55

*Felkins v. City of Lakewood*,
    774 F.3d 647 (10th Cir. 2014) ...............................................................................................26

*Ferring Pharm. Inc. v Serenity Pharm., LLC*,
    No. 17-cv-09922 (CM) (SDA), 2019 WL 5682635 (S.D.N.Y. Nov. 1, 2019).................44, 45

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*,
    No. 01–cv–1047, 2002 WL 31108380 (S.D.N.Y. Sept. 23, 2002).........................................34

*Gaffney v. Dep't of Info. Tech. and Telecomm.*,
    579 F. Supp. 2d 455 (S.D.N.Y. 2008)....................................................................................43

*Gissinger v. Yung*,
    No. 04-cv-0534 (BMS) (JO), 2007 WL 2228153 (E.D.N.Y. July 31, 2007) .........................18

*Goldsmith v. Bagby Elevator Co., Inc.*,
    513 F.3d 1261 (11th Cir. 2008)..............................................................................................43

*Gonzalez v. Digital Equip. Corp.*,
    8 F. Supp. 2d 194 (E.D.N.Y. 1998) .......................................................................................22

*Goris v. Breslin*,
    No. 04-cv-5666 (KAM) (LB), 2010 WL 376626 (E.D.N.Y. Jan. 26, 2010),
    *aff'd*, 402 Fed. App'x 582 (2d Cir. 2010) ..............................................................................20

*Gotlin v. Lederman*,
    No. 04-cv-3736 (ILG), 2009 WL 2843380 (E.D.N.Y. Sept. 1, 2009)....................................14

*Grabin v. Marymount Manhattan College*,
    12-CV-3591 (KPF), 2015 WL 4040823 (S.D.N.Y. July 2, 2015).............................25, 26, 27

*Haas v. Delaware & Hudson Ry. Co.*,
    282 Fed. App'x 84 (2d Cir. 2008)............................................................................................7

*Hamza v. Saks Fifth Ave., Inc.*,
    No. 07-cv-5974 (FPS), 2011 WL 6187078 (S.D.N.Y. Dec. 5, 2011).....................................12

*Harris v. Comput Assocs. Int'l, Inc.*,
    204 F.R.D. 44 (E.D.N.Y. 2001) .......................................................................................14

*Hartman v. Snelders*,
    No. 04-cv-1784 (CLP), 2010 WL 11626508 (E.D.N.Y. Jan. 28, 2010) ...............................13

*Hester v. BIC Corp.*,
    225 F.3d 178 (2d Cir. 2000)..............................................................................................36

*Hirschheimer v. Associated Metals and Minerals Corp.*,
    94-CV-6155 (JFK), 1997 WL 528057 (S.D.N.Y. Aug. 27, 1997) ........................................54

*Ismail v. Cohen*,
    706 F. Supp. 243 (S.D.N.Y. 1989), *affd*, 899 F.2d 183 (2d Cir. 1990) ..................................42

*Jacquety v. Baptista*,
    538 F. Supp. 3d 325 (S.D.N.Y. 2021).................................................................................15

*Jean-Laurent v. Hennessy*,
    840 F.Supp.2d 529 (E.D.N.Y. 2011) ...........................................................................49, 53

*Jennings v. AAON, Inc.*,
    14-CV-0347 (CVE) (PJC), 2015 WL 3465834 (N.D. Okla. June 1, 2015)...........................26

*Johnson Elec. N.A. Inc. v. Mabuchi Motor Am. Corp.*,
    77 F. Supp. 2d 446 (S.D.N.Y. 1999)....................................................................................7

*Kasper Glob. Collection & Brokers, Inc. v Glob. Cabinets & Furniture Mfrs. Inc.*,
    952 F. Supp. 2d 542 (S.D.N.Y. 2013).................................................................................19

*King v. Friend of Farmer, Inc., No. 97 Civ. 9264 (BSJ) (RLE)*,
    *2000 WL 290355 (S.D.N.Y. Mar. 21, 2000)* .....................................................................14

*Kravtsov v. Town of Greenburgh*,
    10-CV-3142 (CS), 2012 WL 2719663 (S.D.N.Y. July 9, 2012) ............................................24

*LaVigna v. State Farm Mut. Auto Ins. Co.*,
    736 F. Supp. 2d 504 (N.D.N.Y 2010).............................................................................34, 37

*Lennon v. Seaman*,
    99-CV-2664 (LBS), 2002 WL 109525 (S.D.N.Y. Jan. 28, 2002) ..........................................53

*Maehr v. NRG Home Solar*,
    No. 16-cv-03897 (ADS) (SIL), 2019 WL 1559423 (E.D.N.Y. Apr. 10, 2019)........................6

*Mango v. Buzzfeed, Inc.*,
    316 F.Supp.3d 811 (S.D.N.Y. 2018)..................................................................................51

*McKinney v. Conn.*,
  No. 3:06-cv-2055 (WWE), 2011 WL 166199 (D. Conn. 2011) ...............................................44

*Morgenstern v. Cnty. of Nassau*,
  No. 04-CV-58, 2008 WL 4449335 (E.D.N.Y. Sept. 29, 2008) ..............................................34

*Newton v. City of New York*,
  171 F.Supp.3d 156 (S.D.N.Y. 2016).........................................................................................52

*O'Gee v. Dobbs Houses, Inc.*,
  570 F.2d 1084 (2d Cir. 1978).....................................................................................................15

*Ochoa v. Nuyen*,
  No. 12-2072 (RJL), 2020 WL 2065026 (D.D.C. Apr. 29, 2020) ..........................................42

*Osorio v. Source Enterprises, Inc.*,
  05-CV-10029 (JSR), 2007 WL 683985 (S.D.N.Y. March 2, 2007) ......................................27

*Othman v. Benson*,
  13-CV-4771 (NGG) (SJB), 2019 WL 1118035 (E.D.N.Y. March 11, 2019) ..................51, 52

*Parks v. Blanchette*,
  144 F. Supp. 3d 282 (D. Conn. 2015).......................................................................................21

*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006)................................................................................................10, 28

*Perkins v. Fed. Fruit & Produce Co., Inc.*,
  No. 11-cv-00542 (REB) (KLM), 2012 WL 1658871 (D. Colo. May 3, 2012) ......................44

*Perry v. Ethan Allen, Inc.*,
  115 F.3d 143 (2d Cir. 1997).......................................................................................................22

*In re Pfizer Inc. Sec. Litig.*,
  288 F.R.D. 297 (S.D.N.Y. 2013) ...............................................................................................46

*Preuss v. Kolmar Labs., Inc.*,
  970 F. Supp. 2d 171 (S.D.N.Y. 2013).......................................................................................34

*Ragin v. Newburgh Enlarged City School Dist.*,
  10-CV-2797 (JFK), 2011 WL 2183175 (S.D.N.Y. June 3, 2011)..........................................54

*Ramirez v. N. Y. C. Off-Track Betting Corp.*,
  112 F.3d 38 (2d Cir. 1997).........................................................................................................52

*Richmond v. Gen. Nutrition Ctrs. Inc.*,
  No. 08 Civ. 3577 (PAE) (HBP), 2012 WL 762307 (S.D.N.Y. Mar. 9, 2012).........................9

*Ritchie Risk Linked Strategies Trading (Ir.), Ltd. v. Conventry First LLC*,
    280 F.R.D. 147 (S.D.N.Y. 2012) ....................................................................2

*Rodal v. Anesthesia Group of Onondaga, P.C.*,
    369 F.3d 113 (2d Cir. 2004)........................................................................50

*Rojo v. Deutsche Bank*,
    No. 06-cv-13574 (HB), 2009 WL 3790191 (S.D.N.Y. Oct. 30, 2009) ....................................6

*Ross v. Koenigsmann*,
    9:14-CV-1321(GTS)(DJS), 2017 WL 9511096 (N.D.N.Y. Aug. 16, 2017),
    *report and recommendation adopted sub. nom.*, *Ross v. Mannava*, 2017 WL
    4338883 (N.D.N.Y. Sept. 29, 2017) ..................................................................20

*Sanders v. Ritz–Carlton Hotel Co., LLC*,
    No. 05 Civ. 6385 (PKL), 2008 WL 4155635 (S.D.N.Y. Sept. 9, 2008)................................18

*Scoma v. City of N.Y.*,
    No. 16-cv-6693 (KAM) (SJB), 2021 WL 1784385 (E.D.N.Y. May 4, 2021)..................18, 23

*Scott v. WPIX, Inc.*,
    10 Civ. 4622 (WHP), 2012 WL 2026428 (S.D.N.Y. May 17, 2012) ........................35, 36, 42

*Sepulveda v. City of N.Y.*,
    No. 15-cv-5187, 2020 WL 2836952 (E.D.N.Y. May 29, 2020)............................................16

*Shea v. Royal Enters., Inc.*,
    No. 09 Civ. 8709 (THK), 2011 WL 2436709 (S.D.N.Y. June 16, 2011)...............................16

*Sheils v. Flynn*,
    No. 06-cv-407, 2009 WL 2868215 (N.D.N.Y. Sept. 2, 2009).................................................21

*Simpson v. Pittsburg Corning Corp.*,
    901 F.2d 277 (2d Cir. 1990)..............................................................................54

*Spencer v. Int'l Shoppes, Inc.*,
    No. 06-cv-2637 (AKT), 2011 WL 4383046 (E.D.N.Y. Sept. 20, 2011) ................................11

*Sunenblick v. Harrell*,
    145 F.R.D. 314 (S.D.N.Y. 1993) ..........................................................................54

*Thomas v. Medco*,
    95-CV-8401 (JES) (MHD), 1998 WL 542321 (S.D.N.Y. Aug. 26, 1998)............................52

*U.S. v. Sackett*,
    598 F.2d 739 (2d Cir.1979)..............................................................................16

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012)..............................................................................12

*Update Art, Inc. v. Modiin Pub., Ltd.*,
    843 F.2d 67 (2d Cir. 1988) ................................................................2

*Valanzuolo v. City of New Haven*,
    No. 3:11-cv-1336 (JGM) 2013 WL 1688874 (D. Conn. Apr. 18, 2013) ...............................21

*Vermont Mut. Ins. Co. v. Ciccone*,
    09-CV-00445 (VAB), 2015 WL 4094174 (D. Conn. July 7, 2015) ...........................51

*Williams v. Regus Mgmt. Grp., LLC*,
    No. 10 Civ. 8987, 2012 WL 1711378 (S.D.N.Y. May 11, 2012) ...............................11, 12

*Woolfolk v. Baldofsky*,
    No. 19-cv-3815 (WFK) (ST), 2022 WL 2600132 (E.D.N.Y. July 8, 2022) ...................11, 49

*Wreath v. U.S.*,
    161 F.R.D. 448 (D. Kan. 1995) ............................................................12

*Yan Zhao v. United States*,
    273 F.Supp.3d 372 (W.D.N.Y. 2017) .......................................................47

*Zakre v. Norddeutsche Landesbank Girozentrale*,
    541 F.Supp.2d 555 (S.D.N.Y. 2008) .......................................................27

*Zubulake v. U.B.S. Warburg LLC*,
    382 F. Supp. 2d 536 (S.D.N.Y. 2005) .....................................................42

**Statutes**

42 U.S.C. 12111(10)(B) ........................................................................50

42 U.S.C. § 12102(1)(A)(2)(A) .................................................................22

42 U.S.C. § 12102(2)(A) .......................................................................24

**Other Authorities**

29 C.F.R. § 1630.2 (j)(1)(v) ..................................................................25

FRCP 42(b) ....................................................................................53

FRCP 26(a) ..............................................................................2, 6, 8

FRCP 37(c) ...........................................................................2, 6, 7, 10

FRE 401 ..................................................................................12, 47

FRE 403 ...................................................................................*passim*

FRE 404 .......................................................................................43

FRE 404(b).............................................................................................................42, 43

FRE 404(b)(1)..............................................................................................................42

FRE 405 ........................................................................................................................42

FRE 405(b)....................................................................................................................43

FRE 406 ........................................................................................................................43

FRE 803(4)........................................................................................................15, 17, 19

FRE 803(6)........................................................................................................16, 18, 19

FRE 803(6)(A)(B)........................................................................................................17

N.Y.C. Admin. Code § 8-102 .......................................................................................50

## PRELIMINARY STATEMENT

Plaintiff Yelena Ruderman ("Plaintiff"), by and through her undersigned counsel, hereby submits this memorandum of law in opposition to the motions *in limine* filed by Defendants Law Office of Yuriy Prakhin (the "Firm") and Yuriy Prakhin ("Prakhin") (together, "Defendants").  For the reasons set forth below, Defendants' motion should be denied.

**I.    OPPOSITION TO MOTION *IN LIMINE* NO. 1: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING HER MEDICAL PROVIDERS AS WITNESSES AT TRIAL**

Defendants move *in limine* to preclude Plaintiff from introducing the testimony of the following nine doctors who treated her in connection with her disability or emotional distress: Drs. Anna Shostak ("Shostak"), Martin Falk ("Falk"), Elchine Gajiev ("Gajiev"), Mark Moster ("Moster"), Scott Brodie ("Brodie"), Cinthi Pillai ("Pillai"), Vaidehi Dedania ("Dedania"), and Jeffrey Odel ("Odel") (together, the "Medical Providers").  *See* Memorandum of Law in Support of Defendants' Motions *In Limine* ("Defs. Br.") at 6-10. [1, 2]  As detailed below, Defendants' motion is without merit, as Plaintiff timely disclosed the Medical Providers—thus making re-opening discovery to depose them inappropriate—and their testimony is both relevant and not prejudicial or otherwise inadmissible under FRE 403.  Moreover, the Medical Providers will not provide expert testimony, thus further supporting introduction of such testimony at trial.

---

[1] Without mentioning any of their names, Defendants allege that Plaintiff identified 11 doctors in the parties' Joint Pre-Trial Order (*see* ECF No. 121 ("JPTO")).  *See* Defs. Br. at 6.  However, as reflected in the JPTO, Plaintiff listed only 10 doctors.  *See* JPTO at 7-10.

[2] In the parties' JPTO and Plaintiff's Amended Initial Disclosures, Plaintiff also identified Dr. John Guy ("Guy") as a relevant witness; however, Plaintiff has since learned that Guy is now deceased.  Accordingly, Plaintiff no longer intends to call Guy as a witness or introduce medical records from Guy at trial.  *See* JPTO at Plaintiff's Exhibit 9 (PLAINTIFF 000956-958, 1054-1058).

A.     **Plaintiff Timely Disclosed the Medical Providers**

Defendants argue that the Court should preclude the testimony of the Medical Providers under Federal Rule of Civil Procedure ("FRCP") 37(c).  However, Defendants fail to establish that this drastic remedy is appropriate.  While not identified in Plaintiff's FRCP 26(a) initial disclosures prior to her November 8, 2022 amendment thereto, the Medical Providers *were* disclosed throughout discovery in myriad other ways, and any delay in formally disclosing them was and is harmless.  Therefore, Defendants' first motion *in limine* should be denied.

As a preliminary matter, it bears noting that preclusion is a drastic remedy, and one that that should be exercised with discretion and caution.  *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  Indeed, "preclusion of evidence" under FRCP 37(c) is a "harsh remed[y] and should be imposed only in rare situations."  *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *Farb v. Baldwin Union Free Sch. Dist.*, No. 05-cv-0596 (JS) (ETB), 2008 WL 11435584, at *1 (E.D.N.Y. Jan. 14, 2008) ("[P]reclusion is a severe sanction that is rarely granted[.]").

Although Plaintiff did not list her medical providers on her initial disclosures until her most recent amendment, delays of this kind—or even complete failures to disclose—are excusable where they are substantially justified or harmless.  The failure to disclose is "harmless" where there is "an absence of prejudice."  *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (citations omitted).

Here, Defendants were made aware of each of the Medical Providers well before the close of discovery through several different means.  Specifically, the Medical Providers were clearly and repeatedly identified in, *inter alia*: (i) Plaintiff's document production (*see* Exhibit 1)[3]; (ii)

---

[3] Unless otherwise noted, all exhibits to the Huot Decl. are hereinafter cited as "Ex. __."

emails from Plaintiff's counsel (*see* Ex. 2); (iii) Plaintiff's interrogatory responses (*see* Ex. 3); (iv) Plaintiff's deposition testimony (*see* Ex. 4 (transcript of Plaintiff's deposition ("Plaintiff Dep."))); (v) HIPAA authorizations executed by Plaintiff (*see* Ex. 5); and (vi) medical records, many of which Defendants themselves introduced as exhibits during Plaintiff's deposition. *See infra* at 5-6.

As briefly summarized below, each of the nine Medical Providers was disclosed through multiple means well before the close of fact discovery on January 18, 2021:

(i)  Dr. Anna Shostak – Plaintiff identified Shostak via a HIPAA authorization produced to Defendants on August 11, 2020 (*see* Ex. 5 at 1), and Shostak should have been identified in any documents she produced to Defendants in response to the same.[4]  Shostak is further identified in documents produced by Plaintiff on December 2, 2019 and again on January 10, 2020—*i.e.*, more than two years before the close of discovery.  *See* Ex. 1 at PLAINTIFF 000033-42.  Additionally, Plaintiff discussed her treatment with Shostak throughout her deposition.  *See* Plaintiff Dep. at 20:3-36:17 (discussing Shostak's treatment at length and specifically mentioning her name 33 times).  At Plaintiff's deposition, Defendants also questioned her regarding handwritten notes taken by Shostak, which were part of Plaintiff's initial document production.  *See id.*; Ex. 1 at PLAINTIFF 000033-42.  Finally, as Defendants concede, Plaintiff identified Shostak (along with Falk and Gajiev) in response to Defendants' first set of interrogatories, served on January 10, 2020 (more than two years before the close of fact discovery).  *See* Ex. 3 at 15-16; Defs. Br. at 8 ("Furthermore, in response to Defendants' interrogatory request to identify each medical provider from whom she received medical treatment from August 1, 2012 to present, Plaintiff only listed Dr. Falk, Dr. Shostak, and Dr. Gajiev.").[5]  Indeed, Defendants were indisputably well aware of Shostak as they have

---

[4] Significantly, Defendants failed to produce any medical records they received from Shostak or any of these other Medical Providers through Plaintiff's HIPAA authorizations.  *See* Huot Decl. ¶ 4.  Defendants' failure to produce these documents is especially concerning in light of Defendants' representation in their motion that they ostensibly obtained medical records from the Medical Providers that contained "significantly more documentation that what Plaintiff produced and did not match the documentation Plaintiff allegedly obtained from the same providers."  Defs. Br. 13.

[5] Defendants' contention that Plaintiff identified only Shostak, Falk, and Gajiev is also wrong.  *See* Defs. Br. at 8.  Plaintiff also identified: (i) NYU Langone Health (through which Brodie, Pillai, and Dedania treated Plaintiff); (ii) Columbia University Laboratory of Personalized Genomic Medicine (through which Odel treated Plaintiff); (iii) Wills Eye Institute (through which Moster treated Plaintiff); and (iv) Urban Psychiatry P.C.  *See* Ex. 3.

themselves identified Shostak in the Joint Pretrial Order as a witness they intend to introduce in their case in chief.

(ii)    Dr. Martin Falk – Plaintiff identified Falk via a HIPAA authorization produced to Defendants on August 11, 2020 (*see* Ex. 5 at 1), and Falk should have been identified in any documents he produced to Defendants in response to the same. *See supra* at 3 n.4. Further, Plaintiff produced records from Falk on February 11, 2020, well before the close of discovery. *See* Ex. 1 at PLAINTIFF 000954-55. Additionally, Plaintiff discussed her treatment with Falk throughout her deposition. *See* Plaintiff Dep. at 19:10-36:6, 248:14-18 (discussing Falk's treatment at length and mentioning his name 15 times). At Plaintiff's deposition, Defendants also questioned her regarding a letter from Falk, produced by Plaintiff on February 11, 2020, summarizing her mental health treatment. *See id.*; Ex. 1 at PLAINTIFF 000954-55. Finally, as Defendants concede, Plaintiff identified Falk (along with Shostak and Gajiev) in response to Defendants' first set of interrogatories, served on January 10, 2020 (almost three years ago). *See* Ex. 3 at 15-16; Defs. Br. at 8.

(iii)    Dr. Elchine Gajiev – As with Shostak and Falk, Plaintiff identified Gajiev via a HIPAA authorization (*see* Ex. 5 at 1), in response to which Defendants claim to have received documents. *See supra* at 3 n.4. Plaintiff also produced records from Gajiev on February 11, 2020 (*see* Ex. 1 at PLAINTIFF 000956-58) and again on May 22, 2020, well before the close of discovery. *See id.* at PLAINTIFF 001054-58. Additionally, Plaintiff discussed her treatment with Gajiev throughout her deposition, and Defendants introduced three different exhibits comprising medical records generated by Gajiev. *See* Plaintiff Dep. at 11:18-37:6, 248:14-18 (discussing Gajiev's treatment at length and mentioning his name 20 times); Ex. 1 at PLAINTIFF 001054-57, PLAINTIFF 001058, PLAINTIFF 000956-58. Lastly, as with Shostak and Falk, Defendants concede that Plaintiff identified Gajiev in response to their first set of interrogatories, served on January 10, 2020. *See* Ex. 3 at 15-16; Defs. Br. at 8.

(iv)    Dr. Mark Moster – Plaintiff identified Moster through documents she produced on February 11, 2020, well before the close of discovery, almost two years prior to the close of fact discovery. *See* Ex. 1 at PLAINTIFF 000941-53, 000959-80. Further, Moster is a treating physician at Wills Eye Institute (*see id.*), which Plaintiff identified in response to Defendants' first set of interrogatories, served on January 10, 2020. *See* Ex. 3 at 15-16. Tellingly, Defendants omit this detail from their motion. *See* Defs. Br. at 8.

(v)    Dr. Scott Brodie – Plaintiff identified Brodie via a HIPAA authorization (*see* Ex. 5 at 9), in response to which Defendants claim to have received documents. *See supra* at 3 n.4. Brodie is further identified in documents produced by Plaintiff on December 2, 2019 and again on January 10, 2020,

well before the close of discovery. *See* Ex. 1 at PLAINTIFF 000015, 000021. Further, Brodie is also an ophthalmologist at NYU Langone Health ("NYU"), which Plaintiff identified in response to Defendants' first set of interrogatories, served on January 10, 2020—a detail Defendants again conveniently fail to mention in their motion. *See* Ex. 3 at 15-16; Ex. 1 at PLAINTIFF 000015-21; Defs. Br. at 8.

(vi)   <u>Dr. Cinthi Pillai</u> – Pillai was identified via a HIPAA authorization provided to Defendants on August 11, 2020 (*see* Ex. 5 at 5), in response to which Defendants claim to have received documents. *See supra* at 3 n.4. Pillai is further identified in documents produced by Plaintiff on December 2, 2019 and again on January 10, 2020, well before the close of discovery. *See* Ex. 1 at PLAINTIFF 000015-22, 000025-32. Additionally, Pillai was identified by Plaintiff in her deposition. Plaintiff Dep. at 193:21-196:2-11, 218:11-17 (testifying regarding Pillai's treatment and mentioning her name three times). Further, Pillai is a doctor at NYU, which Plaintiff identified in response to Defendants' first set of interrogatories, served on January 10, 2020, though Defendants again fail to note this in their motion. *See* Ex. 3 at 15-16; Ex. 1 at PLAINTIFF 000015-32; Defs. Br. at 8.

(vii)   <u>Dr. Vaidehi Dedania</u> – Plaintiff identified Dedania in a HIPAA authorization she provided to Defendants (*see* Ex. 5 at 6) and in response to which Defendants represent that they received documents, though Defendants failed to produce them. *See supra* at 3 n.4. Dedania is further identified in documents produced by Plaintiff on December 2, 2019 and again on January 10, 2020, well before the close of discovery. *See* Ex. 1 at PLAINTIFF 000015, 000019-22. Additionally, Plaintiff testified at her deposition about her treatment with Dedania. Plaintiff Dep. at 193:21-196:2-11, 218:11-17. While Plaintiff had trouble recalling Dedania's name at the time, Defendants never followed up on this. *See* Huot Decl. ¶ 5. Further, Dedania is a doctor at NYU, which Plaintiff identified in response to Defendants' first set of interrogatories, served on January 10, 2020, though Defendants again fail to note this in their motion. *See* Ex. 3 at 15-16; Ex. 1 at PLAINTIFF 000015-22; Defs. Br. at 8.

(viii)   <u>Dr. Jeffrey Odel</u> – Odel was identified in documents produced by Plaintiff on December 2, 2019 and again on January 10, 2020, well before the close of discovery. *See* Ex. 1 at PLAINTIFF 000023-27. Further, Odel is a doctor at Columbia University Laboratory of Personalized Genomic Medicine ("Columbia"), which Plaintiff identified in response to Defendants' first set of interrogatories, served on January 10, 2020, though Defendants again omit this from their motion. *See* Ex. 3 at 15-16; Ex. 1 at PLAINTIFF 000023-27; Defs. Br. at 8.

As shown above, Plaintiff identified each of the Medical Providers through several different discovery mechanisms. Contrary to Defendants' contentions, the Medical Providers hardly "appear[ed] out of thin air" (Defs. Br. at 9). Defendants were first made aware of each of the Medical Providers nearly a year prior to the close of discovery at the absolute latest, and were made aware of many of the Medical Providers as early as December 2, 2019.

As courts have repeatedly held, there is no prejudice—and thus failure to disclose is considered harmless under FRCP 37(c)—where, as here, Defendants had knowledge of relevant witnesses' identities through discovery. *See Maehr v. NRG Home Solar*, No. 16-cv-03897 (ADS) (SIL), 2019 WL 1559423, at *7 (E.D.N.Y. Apr. 10, 2019) ("Although the Plaintiff failed to make the necessary disclosures, it is apparent that the Defendant knew of the relevant evidence well before the close of discovery, such that its inclusion at trial does not implicate the concerns normally justifying preclusion under Rule 37(c)."); *Rojo v. Deutsche Bank*, No. 06-cv-13574 (HB), 2009 WL 3790191, at *5 (S.D.N.Y. Oct. 30, 2009) (finding plaintiff's failure to disclose witnesses was "'harmless' because they were 'referred to in documents produced in discovery' and 'mentioned during the depositions of other witnesses[.]'"); *EMI Music Marketing v. Avatar Records, Inc.*, 334 F. Supp. 2d 442, 445 (S.D.N.Y. 2004) (denying preclusion for failure to make FRCP 26(a) disclosures where witnesses were identified in pretrial order more than two months before trial and moving party knew of existence and relevance of undisclosed individuals and exhibits previously through discovery process). The Court's inquiry should end there, as the Medical Providers were indisputably disclosed during discovery.

Notably, other courts have taken an even more tempered approach to precluding evidence or testimony as a sanction under FRCP 37(c), holding that this remedy is so drastic that it should be applied "only in situations where the failure to disclose represents a flagrant bad faith and

callous disregard of the [FRCP]." *Johnson Elec. N.A. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999) (collecting cases); *see also Ebewo*, 309 F. Supp. 2d at 607 n.2 (same) (collecting cases). Defendants have not alleged—and cannot offer any evidence—that Plaintiff has acted in bad faith or otherwise hidden the ball with respect to her treatment by the Medical Providers and their relevance to the upcoming trial. *See generally* Defs. Br. If anything, Defendants have exhibited bad faith based on the revelation that they apparently received documents from the Medical Providers via HIPAA authorizations provided by Plaintiff early in discovery, yet failed to produce the same, despite specific discovery demands calling for the production of such records. *See supra* at 3 n.4. Indeed, Defendants' pursuit of the instant motion in light of their admission that the Medical Providers were identified not only through Plaintiff's HIPAA authorizations, document production, interrogatory responses, and deposition testimony (*see supra* at 3-5)—but also through other documents obtained from the Medical Providers themselves but not produced by Defendants—smacks of bad faith. Given that Defendants have not and cannot establish any bad faith conduct by Plaintiff in discovery, their motion should be denied.

While the touchstones of the analysis remain whether the belated disclosures were harmless (which they were) or made in bad faith (which they were not), some courts have employed a four-factor test to assist in the determination as to whether FRCP 37(c) should be employed to preclude testimony. Under this standard, the Court should consider: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Haas v. Delaware & Hudson Ry. Co.*, 282 Fed. App'x 84, 86 (2d Cir. 2008) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117

(2d Cir. 2006) (alteration in original)).  While these four factors guide the analysis, at its core, the purpose of FRCP 26's disclosure requirement is "to prevent the practice of 'sandbagging' an opposing party with new evidence." *Id.* (quoting *Ebewo*, 309 F. Supp. 2d at 607).  As detailed below, each of these factors militates against preclusion.

First, while Plaintiff did not initially identify all of the Medical Providers in her FRCP 26(a) disclosures, each of the Medical Providers *were* identified through various other means from the very outset of discovery.  *See supra* at 3-5.  As such, any belated disclosure was justified and, more importantly, completely harmless.  Defendants have been on notice that each of the Medical Providers treated Plaintiff and thus had knowledge of relevant information for almost three years now; therefore, Defendants have been anything but "sandbagged" with new evidence.

Second, the testimony of each of the Medical Providers is of the utmost importance.  Moster, Brodie, Pillai, Dedania, and Odel each treated Plaintiff for her medical condition and, as such, are necessary witnesses.  Indeed, they must be permitted to testify as to their assessments of Plaintiff's vision impairment when they treated her, treatments and procedures for the same, and Plaintiff's recovery from the same.  While Plaintiff can of course testify as to what she can and cannot see, the Medical Providers' testimony is necessary to prove to the jury that Plaintiff suffered from a condition which substantially limits her ability to see.  Moreover, on summary judgment, Defendants identified dates on which they purportedly confirmed that Plaintiff was absent for reasons unrelated to her disability.  *See* Ex. 6 at 5.  Given that, on many of those exact same dates, Plaintiff was seeing the Medical Providers to assess the cause of her deteriorating vision, the Medical Providers are relevant to rebut this defense.

Shostak, Falk, and Gajiev are equally crucial to Plaintiff's case, albeit for different reasons.  Each of them provided mental health treatment to Plaintiff, and thus must be permitted to testify

as to the causes of Plaintiff's emotional distress—namely, Defendants' unlawful termination of her employment after she was diagnosed with Leber Hereditary Optic Neuropathy ("LHON"). Shostak, Falk, and Gajiev will provide key testimony regarding Plaintiff's mental health, anxiety, depression, post-traumatic stress disorder, and their treatment of Plaintiff for the same.

Third, Defendants have not and will not suffer any prejudice should the Medical Providers testify at trial.  Plaintiff identified the Medical Providers in several different ways early in and throughout discovery.  *See supra* at 3-5.  As such, Defendants had ample time to review notes and records generated by the Medical Providers—which they received both through Plaintiff's document production and through documents Defendants received from the Medical Providers directly via HIPAA authorizations.  *See supra* at 3 n.4; *see also Richmond v. Gen. Nutrition Ctrs. Inc.*, No. 08 Civ. 3577 (PAE) (HBP), 2012 WL 762307, at *2 (S.D.N.Y. Mar. 9, 2012) (denying motion *in limine* to preclude testimony because "defendants were given sufficient notice of the possibility that persons on the plaintiffs' list of 46 individuals with potentially relevant evidence would testify" and any argument "[t]hat defendants do not, today, have a complete preview of such testimony, and are not in possession of deposition testimony with which to cross-examine these witnesses at trial, is the result of ***defendants'*** choice not to depose these persons") (emphasis in original).

Indeed, Plaintiff produced her Medical Providers' medical records to Defendants on December 2, 2019, January 10, 2020, and February 11, 2020, and provided Defendants with executed HIPAA authorizations on August 11, 2020, well before the close of discovery in January 2021.  *See* Exs. 1-2.  Defendants concede that they received medical records from each of Plaintiff's Medical Providers in response to the HIPAA authorizations.  *See* Defs. Br. 13 ("Defendants obtained official medical records from Plaintiff's healthcare providers using

9

properly executed HIPAA authorizations[.]").  Further, Plaintiff identified the Medical Providers themselves or the hospitals or other healthcare providers for which they work in her interrogatory responses, served on January 10, 2020 (*see* Ex. 3 at 15-16), and also mentioned several of them by name at her deposition.  *See supra* at 3-5.  Defendants offer no evidence to suggest that Plaintiff's identification of the Medical Providers was insufficient or lacking in any way, or that Plaintiff somehow interfered with Defendants' ability to depose the Medical Providers.  Defendants were not sandbagged with new evidence—the harm FRCP 37(c) guards against—but rather were notified of the Medical Providers with months (if not years) prior to the close of discovery.  Despite clear, repeated notice of the Medical Providers' relevance, Defendants made the affirmative choice not to depose them.  Defendants have only themselves—not Plaintiff—to blame for this.

Fourth and finally, while the Court of course has the discretion to allow Defendants to depose the Medical Providers before trial, a continuance would not be appropriate here. Defendants were made aware of the Medical Providers early in and throughout discovery, yet waited until the eve of trial to raise the prospect of deposing them, disingenuously feigning ignorance as to who treated Plaintiff for her disability and emotional distress.  In light of this, Defendants should not be allowed a continuance at the expense of efficiently proceeding with trial after years of litigation.  *See Patterson,* 440 F.3d at 118 (affirming district court's ruling declining to grant a continuance "almost four years of litigation").  For this reason and the others outlined *infra* § II(D), a continuance should not be granted.

In sum, given that Plaintiff's delay in amending her initial disclosures was harmless and not made in bad faith, Defendants' early and ample notice of the Medical Providers, and Defendants' failure to establish any prejudice whatsoever, Plaintiff should be permitted to introduce the Medical Providers as witnesses at trial.

### B.     The Medical Providers May Testify as Fact Witnesses

Defendants argue that the Medical Providers' testimony must be limited to their professional opinions is moot, as Plaintiff has not designated these individuals as expert witnesses, nor does Plaintiff intend to treat them as expert witnesses at trial.  Indeed, "[w]hile expert witnesses must generally provide a written report under Rule 26(a)(2)(B), it is well-settled that treating physicians may 'testify at trial without the requirement of a written report' because they have not been retained or employed to provide expert testimony."  *Woolfolk v. Baldofsky*, No. 19-cv-3815 (WFK) (ST), 2022 WL 2600132, at *5 (E.D.N.Y. July 8, 2022) (quoting *Spencer v. Int'l Shoppes, Inc.*, No. 06-cv-2637 (AKT), 2011 WL 4383046, at *2 (E.D.N.Y. Sept. 20, 2011)).

The Medical Providers will testify only as to the opinions formed as a result of the medical treatment they provided to Plaintiff; therefore, such opinions are properly considered as explanations of the Medical Providers' treatment notes and their treatment, making the Medical Providers fact witnesses, rather than expert witnesses.  Put differently, the Medical Providers may testify as fact witnesses regarding "opinions formed during their treatment, including causation, severity, disability, permanency and future impairments" of Plaintiff's LHON diagnosis.  *Williams v. Regus Mgmt. Grp., LLC*, No. 10 Civ. 8987, 2012 WL 1711378, at *3 (S.D.N.Y. May 11, 2012); *see also Spencer*, 2011 WL 4383046, at *4 ("[T]he physician at issue, to the extent that he/she truly is the doctor who treated Plaintiff for his stroke, will be permitted to testify as a treating physician and will be permitted to offer opinion testimony on diagnosis, treatment, prognosis and causation, but *solely* as to the information he/she has acquired through observation of the Plaintiff in his/her role as a treating physician limited to the facts in Plaintiff's course of treatment.") (emphasis in original).  Given that they will testify only as to the care and treatment of Plaintiff, the Medical Providers are not considered to be "specially employed" experts,  "notwithstanding

that the witness[es] may offer opinion testimony[.]"  *Wreath v. U.S.*, 161 F.R.D. 448, 450 (D. Kan. 1995).

C.    **Testimony from the Medical Providers Is Relevant and Admissible under FRE 403**

Without citation to any authority, Defendants argue that only testimony relating to Plaintiff's LHON diagnosis should be allowed and any testimony relating to Plaintiff's medical history should be excluded, claiming that any testimony outside of these bounds is somehow irrelevant as prejudicial.  Defs. Br. 10.  This is wrong.  As Defendants are aware, evidence is relevant where it "has *any* tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  *Belvin v. Electchester Mgmt., LLC*, No. 17-cv-6303 (NGG) (MMH), 2022 WL 10586743, at *2 (E.D.N.Y. Oct. 18, 2022) (citing FRE 401) (emphasis in original); *see also United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (describing the standard for relevance under FRE 401 as "very low") (quoting *U.S. v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)); *Hamza v. Saks Fifth Ave., Inc.*, No. 07-cv-5974 (FPS), 2011 WL 6187078, at *6 (S.D.N.Y. Dec. 5, 2011) (describing FRE 401 and 402 as "permissive and intended to lead to liberal admission of evidence").

As discussed *supra* at § II(B), the Medical Providers may offer "opinions formed during their treatment, including causation, severity, disabled, permanency and future impairments" of Plaintiff's disability.  *Williams*, 2012 WL 1711378, at *3.  Further, testimony relating to Plaintiff's mental health history, as opposed to her vision impairment, is equally permissible and highly relevant to Plaintiff's claim for emotional distress damages.  *See, e.g.*, *Belvin*, 2022 WL 10586743, at *2 (finding plaintiff's mental health history "plainly relevant" to plaintiff's claim for emotional distress damages).  Indeed, evidence regarding the worsening of Plaintiff's mental health prior to and following Defendants' unlawful termination of Plaintiff is necessary for the jury to assess

12

whether and to what extent Defendants caused Plaintiff's emotional distress.  *See Hartman v. Snelders*, No. 04-cv-1784 (CLP), 2010 WL 11626508, at *21 (E.D.N.Y. Jan. 28, 2010) (holding that a plaintiff's history of mental illness "is relevant to causation and damages" and denying motion *in limine* seeking exclusion of such evidence).

Given the clear relevance of the Medical Providers' testimony under FRE 401 and 402, Defendants attempt to keep such testimony out of trial by arguing that it should be precluded under FRE 403.  To support the relief requested, Defendants offer just three words, baldly asserting that the testimony would be "prejudicial to Defendants."  Defs. Br. at 10.  This is likely because Defendants cannot identify any actual undue prejudice.  Needless to say, merely crying *unfair* prejudice under FRE 403—much less mere prejudice, as Defendants claim here—is not sufficient to carry their burden.  *See* FRE 403 ("The court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: *unfair* prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.") (emphasis added).

### D.   The Court Should Not Re-Open Discovery Based on Defendants' Willful Failure to Depose the Medical Providers

Defendants should not be allowed to re-open discovery for the purpose deposing Plaintiff's Medical Providers, as Defendants have only themselves to blame for their failure to do so during discovery.  Defendants cannot in good conscience argue that they are prejudiced by the identification of the Medical Providers as trial witnesses, because they knew of the existence of these individuals for many months, and even years before discovery closed through HIPAA authorizations and documents they received in response to the same, as well as Plaintiff's document production, interrogatory responses, and deposition testimony.  *See supra* at 3-5.

At no time after each of these disclosures did Defendants make an attempt to depose the Medical Providers, which should foreclose any opportunity to re-open discovery. *See Gotlin v. Lederman*, No. 04-cv-3736 (ILG), 2009 WL 2843380, at *7 (E.D.N.Y. Sept. 1, 2009) ("[A]n application to reopen discovery should be denied where the moving party 'has not persuaded this Court that it was impossible to complete the discovery by the established deadline.'") (citation omitted); *King v. Friend of Farmer, Inc.*, No. 97 Civ. 9264 (BSJ) (RLE), 2000 WL 290355, at *1 (S.D.N.Y. Mar. 21, 2000) (the "party seeking to reopen discovery must show why the court's deadlines could not 'reasonably' have been made 'despite [its] diligence[.]'") (citation omitted) (alterations in original); *Harris v. Comput Assocs. Int'l, Inc.*, 204 F.R.D. 44, 45 (E.D.N.Y. 2001) ("Discovery should not be extended when a party had an ample opportunity to pursue the evidence during discovery.") (collecting cases).

In short, the sole cause of any alleged "prejudice" to Defendants is the result of Defendants' failure to take thorough discovery. This, of course, does not warrant re-opening discovery nearly two years after it closed.

## II.    OPPOSITION TO MOTION *IN LIMINE* NO. 2: PLAINTIFF'S MEDICAL RECORDS ARE ADMISSIBLE

Defendants argue that the Court should order the wholesale preclusion of medical records at trial. *See* JPTO at Plaintiff's Exhibits 1-9. For several reasons, Defendants' motion should be denied. First, while Plaintiff acknowledges that the medical records contain some hearsay statements made by Plaintiff to the Medical Providers, both the diagnosis or treatment exception and the business records exception to the hearsay rule clearly apply. Indeed, the Medical Providers will easily be able to provide necessary foundation to establish the applicability of either exception. The medical records are also relevant. In fact, it is hard to fathom any evidence more indisputably relevant in a disability discrimination action than medical records regarding the disability at issue

and emotional distress. Finally, FRE 403 also supports admissibility. Medical records are routinely introduced in trials of all varieties without confusing jurors and, even if this risk were significant, it in no way substantially outweighs the medical records' high probative value.

### A.  The Medical Records Are Admissible Under the Diagnosis or Treatment Exception to the Hearsay Rule

Plaintiff's medical records are admissible under the aptly named diagnosis or treatment exception to the hearsay rule, which permits introduction of a statement or record that is otherwise hearsay where such statement or record: (i) "is made for—and is reasonably pertinent to—medical diagnosis or treatment;" and (ii) "describes medical history; past or present symptoms or sensations; their inception; or their general cause." FRE 803(4). Tellingly, Defendants make no mention of the diagnosis or treatment exception in their motion. *See generally* Defs. Br. § II.

A cursory review of Plaintiff's medical records reveals that they were both made for and are reasonably pertinent to the Medical Providers' treatment of Plaintiff's disability and mental health, and variously describe Plaintiff's medical history, past and present symptoms, their inception, and their general cause. *See* Ex. 1 at PLAINTIFF 000015-42, 000954-80, 001054-58, 001553-76; *see also O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2d Cir. 1978) ("Rule 803(4) clearly permits the admission into evidence of what [a patient] told [a doctor] about her condition, so long as it was relied on by [the doctor] in formulating his opinion").[6] As such, Defendants' motion is spurious at best and wholly without merit.

---

[6] As detailed *infra* § II(B) in connection with the business records exception, Plaintiff can also authenticate the medical records via testimony from the Medical Providers. The same is true under the treatment and diagnosis exception. *See Jacquety v. Baptista*, 538 F. Supp. 3d 325, 340 (S.D.N.Y. 2021) ("An adequate foundation may be laid under Rule 803(4) by introducing objective evidence of the context in which the statements were made and can include testimony provided by the medical professional who conducted the examination.") (internal quotation marks omitted).

### B.  The Business Records Exception Applies

Contrary to Defendants' contentions in their motion (*see* Defs. Br. § II(B)), Plaintiff's medical records are also admissible under the business records exception.  The business records exception permits courts to admit records which would otherwise be hearsay if: (i) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (ii) "the record was kept in the course of a regularly conducted activity of a business[;]" and (iii) "making the record was a regular practice of that activity."  FRE 803(6).  Moreover, each of these three conditions must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [FRE] 902(11) or (12) or with a statute permitting certification."  *Id.*

As a preliminary matter, medical records are routinely considered admissible under FRE 803(6), "provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated."  *Shea v. Royal Enters., Inc.*, No. 09 Civ. 8709 (THK), 2011 WL 2436709, at * 11 (S.D.N.Y. June 16, 2011); *see also U.S. v. Sackett*, 598 F.2d 739, 742 (2d Cir.1979) (holding that hospital records are admissible if they "were kept in the course of the regularly conducted business activity of the hospital"); *Sepulveda v. City of N.Y.*, No. 15-cv-5187 (RRM) (CLP), 2020 WL 2836952, at *7 n.3 (E.D.N.Y. May 29, 2020) ("Courts in the Second Circuit regularly admit medical records as evidence pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule.") (collecting cases).  This case is no exception.  Plaintiff's medical records are classic examples of business records that fall under this exception to hearsay rule.

Looking to the first two elements of the exception, Plaintiff can establish that the medical records were kept in the course of the Medical Providers' regularly conducted business activity,

and that creating medical records after patient appointments was a regular practice of that activity. *See* FRE 803(6)(A)(B).  As is clear from the records themselves—and as the Medical Providers will each testify at trial—the medical records at issue were kept in the course of their regularly conducted business activity, as indicated by their creation after each of Plaintiff's doctor's appointments, and as is the Medical Providers' (and all other medical professionals') routine practice.

By way of example, Plaintiff saw Brodie during a medical appointment at NYU on October 8, 2018 and Brodie created a record summarizing his treatment of Plaintiff on October 8, 2018— three days later.  *See* Ex. 1 at PLAINTIFF 000015.  Similarly, when Plaintiff visited NYU for an appointment on November 5, 2018, Pillai created a record summarizing the procedure Plaintiff underwent that same day.  *See id.* at PLAINTIFF 000019-22.  In fact, every single medical record created by Plaintiff's Medical Providers was created the same day or shortly after Plaintiff had attended medical appointments with each Medical Providers.[7]

---

[7] *See id.* at PLAINTIFF 000023-24 (medical records created by Odel at Columbia on November 16, 2018, after Plaintiff attended a November 15, 2018 medical appointment), PLAINTIFF 000025-29 (medical records created and signed by Pillai on November 20, 2018, following Plaintiff's medical appointment that same day), PLAINTIFF 000030-32 (medical records created and signed by Pillai on November 30, 2018, following Plaintiff's medical appointment on November 27, 2018), PLAINTIFF 000033 (therapy records created and signed by Shostak on July 31, 2018, following Plaintiff's appointment that same day), PLAINTIFF 000034 (therapy records created and signed by Shostak on October 23, 2018, following Plaintiff's appointment that same day), PLAINTIFF 000035 (therapy records created and signed by Shostak on November 30, 2018, following Plaintiff's appointment that same day), PLAINTIFF 000036 (therapy records created and signed by Shostak on February 5, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000037  (therapy records created and signed by Shostak on April 2, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000038 (therapy records created and signed by Shostak on May 31, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000039 (therapy records created and signed by Shostak on July 23, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000040 (therapy records created and signed by Shostak on August 20, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000959-80 (medical records created and signed by Moster on April 10, 2019, following Plaintiff's appointment that same day), PLAINTIFF 000956-58 (therapy records created and signed by Gajiev on January 6, 2020, following Plaintiff's appointment that same day), PLAINTIFF 001058 (therapy records created and signed by Gajiev on March 18, 2020, following Plaintiff's appointment that same day, PLAINTIFF 001056-57 (therapy records created and signed by Gajiev on April 16, 2020, following Plaintiff's appointment that same day).

Defendants repeated reference to Plaintiff's medical records as "unauthenticated" (Defs. Br. at 1, 10, 12), reflects a fundamental misunderstanding of the business records exception (as well as the diagnosis or treatment exception).  While it is technically accurate that the medical records are currently unauthenticated in the sense that Plaintiff has not had an opportunity to authenticate the records at trial, this is only because the trial has not yet happened.  At trial, Plaintiff will be able to, rather easily, authenticate the medical records under the business records (or treatment and diagnosis) exception through testimony from the Medical Providers who created the records.  *See* FRE 803(6) (requiring that the conditions required by the business records exception be shown by, *inter alia*, "the testimony of the custodian or another qualified witness"); *see also Sanders v. Ritz–Carlton Hotel Co., LLC*, No. 05 Civ. 6385 (PKL), 2008 WL 4155635, at *2 (S.D.N.Y. Sept. 9, 2008) ("Presuming such foundation is established, the hospital records may be admissible under the business records exception to the hearsay rule."); *Djangmah v. Falcione*, No. 08 Civ. 4027 (KPF), 2013 WL 6388364, at *5 (S.D.N.Y. Dec. 5, 2013) (medical records are admissible provided that the party seeking introduction lays a foundation—"that is, to demonstrate that the records at issue are what they seem to be and that they satisfy the requirements of the hearsay exception") (collecting cases); *Gissinger v. Yung*, No. 04-cv-0534 (BMS) (JO), 2007 WL 2228153, at *4 (E.D.N.Y. July 31, 2007) ("If properly authenticated and created in the regular course of business contemporaneously with the occurrence by a person with knowledge, medical records can be admissible as business records."); *Scoma v. City of N.Y.*, No. 16-cv-6693 (KAM) (SJB), 2021 WL 1784385, at *14 (E.D.N.Y. May 4, 2021) ("[T]he court finds that plaintiff's medical records will be admissible at trial, if he lays the proper foundation for such evidence.").

Defendants' assertion that "none of the physicians listed could establish for a majority of the records that the records are what they appear to be or that they conform to the requirements of

the business records exception" (Defs. Br. at 12) is offered without any explanation as to how this could possibly be the case and is completely without merit.  The Medical Providers—as the custodians of the medical records—can indeed authenticate the same at trial through their live testimony, thereby satisfying both the business records and diagnosis or treatment exceptions to the hearsay rule.  Defs. Br. 12; *see also Kasper Glob. Collection & Brokers, Inc. v Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 572 (S.D.N.Y. 2013) ("To be a qualified witness, the person who testifies need only show that he is 'familiar with the record-keeping system of the business in question and [knows] how the records were created.') (citation omitted).  Here, Plaintiff will be able to properly lay a foundation under FRE 803(6) (and FRE 803(4)) because all of the Medical Providers are custodians of the medical records and can provide testimony as to their record-keeping system and how the records were created.

Defendants argue that Plaintiff's medical records are purportedly untrustworthy because: (i) Plaintiff did not produce communications between her or her counsel regarding obtaining the Medical Providers; (ii) Defendants allegedly received more voluminous records; and (iii) because Brodie provided a letter that he forgot to sign and which included a typographical error.  *See* Defs. Br. at 12-13.  None of these arguments have merit.

Defendants have not provided any authority to support their contention that they are entitled to communications between Plaintiff or her counsel and the Medical Providers.  *See id.*  In any event, most importantly, Defendants fail to explain how this has any bearing on authentication or any other aspect of the business records exception.  Indeed, it will be the Medical Providers themselves—not Plaintiff—who will authenticate the records, thus making any correspondence with Plaintiff or her counsel irrelevant.  The fact that Defendants allegedly obtained more voluminous records is of no moment, either.  Defendants do not contend that any particular record

is incomplete and, if this is the case, they should produce the allegedly more voluminous records now—as they should have months (if not years) ago in response to discovery demands served almost three years ago.  With respect to Brodie's letter (*see* Ex. 1 at PLAINTIFF 000015), Brodie will testify that he did, in fact, write and send the letter, making any minor errors therein irrelevant. Lastly, Defendants will of course have the opportunity to cross-examine the Medical Providers in an effort to "un-authenticate" the medical records.  In the unlikely event that the medical records present any issues with respect to admissibility, they should be resolved at trial with the benefit of testimony from the Medical Providers.

Finally, even assuming *arguendo* that Plaintiff cannot authenticate the medical records at trial, those records generated by Dedania, Brodie, Pillai, and Odel are admissible based on Defendants' reliance upon the same at the summary judgment stage.  *See* ECF No. 76, 76-36, 76-37, 76-38, 76-39.  Indeed, Defendants relied on these same records in their motion for summary judgment without once questioning their authenticity.  *See id.*  In doing so, Defendants have waived any objection as to authenticity.  *See Goris v. Breslin*, No. 04-cv-5666 (KAM) (LB), 2010 WL 376626, at *10 n. 1 (E.D.N.Y. Jan. 26, 2010), *aff'd*, 402 Fed. App'x 582 (2d Cir. 2010) (despite the failure of the parties to authenticate medical records, the court, "[n]evertheless . . . considers the medical records because the plaintiff relies on the records in support of his claims and in his opposition to the motion for summary judgment); *Ross v. Koenigsmann*, No. 9:14-CV-1321(GTS)(DJS), 2017 WL 9511096, at *5 n.2 (N.D.N.Y. Aug. 16, 2017) ("To the extent Plaintiff is challenging the authenticity of this particular record, that objection is not properly raised since Plaintiff himself relied upon his ambulatory health records in opposing Defendants' first Motion for Summary Judgment, and in support of his Cross-Motion for Summary Judgment, without

objecting to their authenticity."), *report and recommendation adopted sub. nom.*, *Ross v. Mannava*, No. 9:14-CV-1321 (GTS) (DJS), 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).[8]

## C.    **The Medical Records Are Relevant**

Defendants argue that the medical records are irrelevant, rehashing their argument from their summary judgment briefing that Plaintiff cannot establish that she suffers from a disability. *See* Defs. Br. at 14-15.  As the Court is aware, Defendants' motion for summary judgment was denied.   *See* ECF No. 107.  Moreover, given that Plaintiff alleges that she was subjected to disability discrimination after she lost most of her vision, as supported by hundreds of pages of medical records, Defendants' argument is absurd—and meritless for several other reasons.  *See, e.g.*, *Valanzuolo v. City of New Haven*, No. 3:11-cv-1336 (JGM) 2013 WL 1688874, at *2 (D. Conn. Apr. 18, 2013) ("It has long been the rule within the Second Circuit . . . that 'treating physicians may testify as to opinions formed during their treatment, including causation, severity, *disability*, permanency and future impairments[.]'") (quoting *Williams*, 2012 WL 1711378 at *2) (emphasis added).

Defendants argue that none of the medical records provide any details as to Plaintiff's ability to perform major life activities such as seeing, walking, reading, or working.  Defs. Br. at 15.  This is simply not true.  By way of example only, medical records generated by Dedania on November 5, 2018 emphasize the "importance of wearing safety glasses at all times to protect

---

[8] *See also Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) ("Even if the exhibits are not properly authenticated . . . Mr. Parks relied on Defendants' medical records in opposing Defendants' summary judgment motion without objecting to their authenticity.  Because Mr. Parks relied on these exhibits, the Court will consider them."); *Atkinson v. Fischer*, No. 07-cv-00368 (GLS) (GHL), 2009 WL 3165544, at *3 n.1 (N.D.N.Y. Sept. 25, 2009) (although lack of authentication rendered medical and grievance records "not technically admissible," the court considered the records when granting defendants' motion for summary judgment "because Plaintiff relied on many of the same records in his complaint and in his opposition to the motion for summary judgment."); *Sheils v. Flynn*, No. 06-cv-407, 2009 WL 2868215, at *2 n.2 (N.D.N.Y. Sept. 2, 2009) (same).

patient's better seeing eye and poor vision/visual field in fellow eye."  Ex. 1 at PLAINTIFF 000022.  In another report created by Pillai on November 20, 2018, she describes Plaintiff complaining about blurry vision and worsening vision.  *Id.* at PLAINTIFF 000025.  *See also id.* at PLAINTIFF 000954-955 ("Although she no longer travels by public transportation, she travels independently through the use of car services.  She is able to walk in public without the use of a walking stick for the visually impaired, but asks for assistance from others, when she needs it.").  As such, Plaintiff's medical records establish that she suffers from a deterioration in her vision and a disability that fundamentally affected her a major life activity—seeing.  42 U.S.C. § 12102(1)(A)(2)(A).  Defendants will certainly have an opportunity to convince the jury otherwise.  However, Defendants' contention that Plaintiff does not, in fact, suffer from a disability provides no basis whatsoever to preclude the introduction of the medical records which are indisputably relevant in establishing her disability.

### D. The Medical Records Are Admissible under FRE 403

Defendants argue that the medical records, even if properly authenticated, should be excluded because they would be confusing or misleading to the jury.  Defs Br. 13-14; *see also* FRE 403.  While relevant evidence is admissible, it can be excluded if "its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or be considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Gonzalez v. Digital Equip. Corp.*, 8 F. Supp. 2d 194, 198 (E.D.N.Y. 1998) (citing FRE 403) (emphasis in original).  Indeed, for "relevant evidence to be excluded . . . the imbalance must be substantial." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997).  Defendants argue that, because the medical records involve "technical, specialized medical terminology," the jury will not be able to understand them.  Defs. Br. at 14.  This argument, too, falls flat.

22

As a preliminary matter, medical records are often key components of the record in personal injury, employment, and other trials. Jurors in those trials seemingly manage to comprehend the records, and Defendants offer no reason to believe the jurors here will be unable to do so. Moreover, the records will not simply be provided to jurors without context or explanation. Rather, each of the Medical Providers will explain the medical records created by them, putting any technical terminology into layman's terms for the jury, and Defendants will have an opportunity to cross examine these individuals regarding the same. Additionally, lay jurors will surely understand testimony offered by Shostak, Falk, and Gajiev regarding their diagnosis of Plaintiff having anxiety and depression, which are widely understood mental health issues.

Further, the Court should not exclude evidence of the medical records which reflect the disintegration of Plaintiff's vision, her LHON diagnosis, and her anxiety and depression—before and after Defendants' unlawful termination—as this important evidence speaks to the crux of the case. Allowing the jury to consider these issues through the medical records created by the Medical Providers will not divert the jury from facts essential to the case and control of their verdict. On the contrary, details regarding the nature of Plaintiff's disability and her ability to perform her job functions are crucial elements of both Plaintiff's case-in-chief and Defendants' defenses.

While Plaintiff does not believe any of the medical records implicate FRE 403 concerns, it would certainly be inappropriate to exclude medical records wholesale based on Defendants' broad claim of potential jury confusion. The Court should address issues of this nature, if any, on a case-by-case basis, depending on the particular medical record(s) at issue. *See Scoma*, 2021 WL 1784385 at *14 ("At the time plaintiff introduces such medical evidence, defendants may object on the ground, *inter alia*, that the [medical records are] . . . likely to confuse or mislead the jury to

such an extent that its probative value is substantially outweighed, pursuant to [FRE 403]. Accordingly, defendants' motion to preclude plaintiff's medical records is denied without prejudice to renewal at trial.").

## III.    OPPOSITION TO MOTION IN LIMINE NO. 3: PLAINTIFF SHOULD NOT BE PRECLUDED FROM TESTIFYING ABOUT HER DISABILITY AND EMOTIONAL DISTRESS DAMAGES

### A.    Testimony about Plaintiff's Disability

In their motion, Defendants have requested that the Court issue an order precluding Plaintiff from testifying about "any of her physical or mental health conditions, any diagnoses, any symptoms that arose from any diagnosed condition, or the cause of any symptoms." Defs. Br. at 15. In short, in a disability discrimination case, Defendants are attempting to prevent Plaintiff from testifying about her disability. Defendants' argument is wholly without merit and should be rejected by the Court.

In order to establish a disability under applicable law, an individual need only: (1) "show that [she] suffers from a physical or mental impairment," (2) "identify the activity claimed to be impaired and establish that it constitutes a major life activity," and (3) "show that [her] impairment substantially limits the major life activity previously identified." *Kravtsov v. Town of Greenburgh,* 10-CV-3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012). The plain language of the ADA identifies "seeing" as a major life activity. 42 U.S.C. § 12102(2)(A). Accordingly, in order to establish that the condition constitutes a disability under applicable law, Plaintiff is required to provide evidence showing that her condition (visual impairment) substantially limits her ability to see.

Defendants wrongly contend that Plaintiff should be barred from testifying regarding her medical condition pursuant to Rules 701 and 702 of the Federal Rules of Evidence, because as a lay witness, Plaintiff cannot testify regarding matters based on "scientific, technical, or other

specialized knowledge." Defs. Br. at 15. However, the ADA's implementing regulations make clear that the inquiry regarding whether an impairment or condition constitutes a "substantial limitation" of a major life activity ***"usually will not require scientific, medical, or statistical analysis."*** 29 C.F.R. § 1630.2 (j)(1)(v) (emphasis added).

In this case, Plaintiff should be permitted to testify about her ability to see before she experienced the visual impairment, her diagnosis, as well as her ability to see after she received the diagnosis. This is because the impairment that Plaintiff has suffered has manifested itself in a way that would be obvious to any lay person. The life activity at issue in this case – seeing – is one of the most basic and fundamental activities performed by people on a daily basis. One does not need specific medical knowledge or expertise in order to explain or understand blurry vision. A juror can use their own life experiences and common sense to determine whether Plaintiff's impairment constitutes a disability under applicable law based on the testimony provided. Plaintiff's testimony regarding her condition, and how the condition limited her ability to see, is critical evidence. Indeed, an order precluding Plaintiff from discussing her condition would effectively destroy her ability to prove her case to the jury.

The cases cited by Defendants are easily distinguishable from the case at bar. In *Grabin v. Marymount Manhattan College,* 12-CV-3591 (KPF), 2015 WL 4040823 (S.D.N.Y. July 2, 2015), the plaintiff claimed that she suffered from a blood disorder known as "thalassemia," which she alleged caused her to suffer from various illnesses. In *Grabin*, the court noted that there was no evidence from which a jury could conclude that thalassemia substantially impacted the plaintiff's immune system because "under these circumstances, Plaintiff's alleged disability is necessarily dependent on knowledge of how the body's immune system works, and how thalassemia affects its normal function – evidence that Plaintiff cannot provide herself and has not provided through

any other source." *Id.* at *12.  In this case, however, unlike in *Grabin*, the connection between the impairment suffered (permanent blurry vision) and the major life activity (seeing) is obvious and can be easily comprehended by a reasonable jury through lay testimony.

Defendants' reliance on *Jennings v. AAON, Inc.,* 14-CV-0347 (CVE) (PJC), 2015 WL 3465834 (N.D. Okla. June 1, 2015) is also misplaced.  In *Jennings,* the plaintiff was never diagnosed with any specific medical condition or diagnosis.  Rather, she simply testified that she experienced difficulty breathing while at work.  In contrast, in this case, it is undisputed that Plaintiff attended medical appointments and was diagnosed by medical professionals with a permanent genetic disorder ("LHON") which causes the impairment that she described suffering.

Similarly, in *Felkins v. City of Lakewood*, 774 F.3d 647 (10th Cir. 2014), another case cited by Defendants, the plaintiff did not present any evidence showing a causal connection between her condition (avascular necrosis) and the limitations of major life activities (pain and difficulties walking, standing, and lifting).  *Id.* at 652-53.  In this case, there should be no such concern, as it is readily apparent to any fact-finder that a diagnosis of a disorder causing permanent visual impairment would result in a substantial limitation of the person's ability to see.

In short, unlike the individuals in the cases cited by Defendants, understanding Plaintiff's disabling condition and recognizing the link between her impairment and the limitation of the major life activity does not require special skill, knowledge, or expertise.  It is self-evident.  *See E.E.O.C. v. AutoZone, Inc.,* 630 F.3d 635, 644 (7th Cir. 2010) (denying defendant's motion for summary judgment with respect to the plaintiff's disability discrimination claim, noting that expert testimony was unnecessary to establish a limitation where the limitation "is obvious to an observer and easily described by the sufferer.").  As such, Defendants' motion to preclude Plaintiff's testimony regarding her disability should therefore be denied.

### B.    <u>Testimony about Plaintiff's Emotional Distress</u>

In addition, Defendants move to preclude Plaintiff from testifying about the emotional distress she suffered as a result of her termination, arguing that "Plaintiff lacks the competence to testify about any of her diagnoses or symptoms because she has no medical degree or training." Defs. Br. at 16.  Defendants' argument fails for several reasons.

First, it is worth noting that Defendants have not cited a single case to support their argument that a plaintiff in a discrimination action should be precluded from testifying about emotional distress damages.[9]  Further, Plaintiff intends to testify about her personal experience, and will describe her emotional state and feelings following Defendants' decision to terminate her employment.  Such testimony is plainly relevant for the purpose of determining whether emotional distress damages are warranted, should the jury return a verdict in her favor.

Moreover, one need not be a medical expert to provide, or understand testimony regarding alleged emotional distress damages.  *See Brady v. Wal-Mart Stores, Inc.,* 455 F.Supp.2d 157, 192 (E.D.N.Y. 2006) (noting that a plaintiff in a discrimination action "need not introduce medical testimony or evidence of professional treatment to support a claim of mental injury, but instead may rely on nothing more than 'the complainant's own testimony corroborated by reference to the circumstances of the alleged misconduct.'") (internal citations omitted); *Zakre v. Norddeutsche Landesbank Girozentrale,* 541 F.Supp.2d 555, 568-69 (S.D.N.Y. 2008) (upholding award for emotional damages in an employment discrimination case where the plaintiff testified that she was depressed, had difficulty sleeping, and felt humiliated as a result of the alleged discrimination); *Osorio v. Source Enterprises, Inc.,* 05-CV-10029 (JSR), 2007 WL 683985, at *5 (S.D.N.Y. March 2, 2007) (upholding compensatory damages award of $4 million based on the plaintiff's testimony

---

[9] Defendants' continued reliance on *Grabin* is misplaced, as the court did **not preclude** the plaintiff from testifying regarding alleged emotional distress damages.

regarding emotional distress and damage to her reputation); *Patterson v. Balsamico,* 440 F.3d 104, 119-20 (2d Cir. 2006) (affirming district court's refusal to reduce award for emotional distress in an employment discrimination case where the award was supported only by plaintiff's testimony).

In this case, Plaintiff should be permitted to testify regarding her emotional state during the relevant time period, up to and including the date of trial. Defendant's motion to preclude such testimony should be denied.

## IV.    OPPOSITION TO MOTION *IN LIMINE* NO. 4: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING CERTAIN LAY WITNESSES AT TRIAL

Defendants move *in limine* to preclude the introduction of testimony from several lay witnesses identified by Plaintiff: Tatyana Ruderman, William Lawlor ("Lawlor"), Sandra Beron ("Beron"), Karine Bogoraz ("Bogoraz"), Svetlana Scoll ("Scoll"), Jonathan Shalom ("Shalom"), Dmitry Levitsky ("Levitsky"), Jack Grossman ("Grossman"), John Manessis ("Manessis"), Tommy Sgouras ("Sgouras"), and Christina Guaneri ("Guaneri") (together, the "Lay Witnesses"). Defendants' motion should be denied for several reasons. First, as with the Medical Providers, the Lay Witnesses were each disclosed to Defendants countless times in discovery. Moreover, the Lay Witnesses—Plaintiff's mother, Plaintiff's former colleagues at the Firm, and attorneys to whom Plaintiff submitted job applications and/or performed work for—will variously provide testimony regarding their personal observations regarding Plaintiff's ability to perform her job functions, emotional distress, and mitigation efforts. This testimony is indisputable relevant. Finally, as with the Medical Providers, Defendants' failure to depose Lay Witnesses of which they were made aware during discovery does not warrant re-opening the record on the eve of trial.

A.    **Plaintiff Timely Disclosed the Lay Witnesses**

Defendants complain that Plaintiff did not identify the Lay Witnesses before including them in the parties' JPTO.  *See* Defs. Br. at 17-18.  Once again, this is simply not true.  The identities of the Lay Witnesses were disclosed to Defendants anywhere from 11 months to years before the close of discovery.  Plaintiff disclosed the identities of these individuals through, *inter alia*, her interrogatory responses, document production, and deposition testimony.  Moreover, many of the same witnesses are referenced in documents produced by Defendants and were actually identified by Defendants as individuals who have knowledge and information relevant to this case.  *See generally* Ex. 7 (Defendants' document production); Ex. 8 at 2 (Defendants November 9, 2022 Amended Disclosures).  Indeed, as detailed below, Defendants were made aware of the Lay Witnesses in myriad ways:

(i)    Tatyana Ruderman – Tatyana Ruderman, Plaintiff's mother, is identified in documents produced by Plaintiff on December 2, 2019, more than two years before the close of discovery.  *See* Ex. 1 at PLAINTIFF 000056-58.  Tatyana Ruderman is also identified in documents produced by Plaintiff on July 7, 2021 (*id.* at PLAINTIFF 001526-27) and November 12, 2022. *Id.* at PLAINTIFF 002195.  Additionally, Tatyana Ruderman was identified by Plaintiff throughout her deposition, taken by Defendants on September 24, 2020.  *See* Plaintiff Dep. at 32:16-33:3, 33:12-15, 38:23-39:10, 82:10-21, 89:14-17, 218:11-17, 247:23-248:5.

(ii)   William Lawlor – Lawlor is identified in documents produced by Plaintiff on January 22, 2020 (*see* Ex. 1 at PLAINTIFF 000209, 000540, 000549-550) and on September 23, 2020 (*id.* at PLAINTIFF 001272, 001295, 001334-35), well before the discovery deadline.  Lawlor is also identified in documents produced by Plaintiff on January 8, 2021, also before the discovery deadline.  *Id.* at PLAINTIFF 001544-46, 001550.  Lawlor is further identified in documents produced by Defendants on May 11, 2020 (*see* Ex. 7 at D00494, 00615, 00814), on May 15, 2020 (*id.* at D00834), on May 19, 2020 (*id.* at D01149, 01182), and on July 9, 2020. *Id.* at D01576-77, 01597, 01639, 01713, 05102-03, 07466, 07564-65, 07902-05, 08192, 08267, 10018-19, 10030-51.

Additionally, Plaintiff identified Lawlor in numerous documents, including her initial privilege log, which she produced on August 10, 2020, also well

before the close of discovery. *See* Ex. 9 at PLA PRIV 485, 492, 497, 504-06, 890, 1098-99, 1421, 1629, 1775, 1865, 1974, 1979, 2628, 2652-54, 2887-88, 2896, 2911, 3025, 3056, 3105, 3140-41, 3143-44, 3150, 3156-59, 3237, 3376, 3620, 3873, 3969, 4021, 4087-88.

Plaintiff also identified Lawlor in documents included in her revised privilege log, produced on January 19, 2021 (*id.* at PLA PRIV 4198, 4256, 4269, 4311, 4351-52, 4371, 4373, 4409, 4415, 4418, 4422, 4424, 4613, 4616, 4619, 4686, 4690, 4760, 4860, 5270, 5280-81, 5468) and in a further revised privilege log produced on July 7, 2021. *Id.* at PLA PRIV 5752-57, 5990-92, 6045, 6125, 6189, 6192, 6200, 6219, 6227, 6504, 6507, 6519, 6530, 6552, 6557-59, 6734, 6746, 6753, 6756, 7055-56, 7146, 7240, 7244, 7396, 7401.[10]

(iii)   <u>Sandra Beron</u> – Beron is Plaintiff's former co-worker and is identified in documents produced by Plaintiff on December 2, 2019 (*see* Ex. 1 at PLAINTIFF 000064, 000083), on January 22, 2020 (*id.* at PLAINTIFF 000115, 000121, 000125-26, 000129, 000152, 000163, 000550, 000690-700), and on June 8, 2020 (*id.* at PLAINTIFF 001071, 001077, 001087), well before the discovery deadline. Beron is further identified in hundreds (if not thousands) of documents produced by Defendants. By way of example only, in the documents produced by Defendants on May 11, 2020, Beron was identified in documents Bates-stamped D00017, 00020-21, 00051-53, 00560, 00571, 00589, 00591, 00594, 00615, 00634-35, 00645, 00647, 00659, 00677, 00681, 00684, 00721-722, 00727, 00729, and 00761. *See generally* Ex. 7. In the documents produced by Defendants on May 15, 2020, Beron was identified in documents Bates-stamped D00995, 00997, 00999, 01002, 01005, 01007, 01009, 01011, 01014, 01022, 01024, 01026, 01028, and 01041. *Id.* By way of further example, Beron was identified in Defendants' May 19, 2020 document production at documents Bates-stamped D01142-1144, 1148, 1150, 1155, 1157-58, 1168-1171, 1173-1176, 1181, 1183, 1186, 1188-1189, 1191, 1194, 1202-1203, 1209, 1210-1211, 1214-1215, 1218-1219, 1222. 1224, 1227-1230, 1236, 1239, 1241-1242, 1245-1247, 1251-1256, 1259-1260, 1263, 1264, 1269, 1270, 1272, 1276, 1287-1288, 1293, 1299, 1302-05, 1309-11, 1315-16, 1319, 1328, 1330, 1333, 1335, 1340, 1342, and 1344.

Additionally, Beron was identified by Irene Raskin ("Raskin"), the Firm's office manager and Irene Gabo ("Gabo"), the Firm's former Managing Attorney throughout their respective depositions in late 2020. *See* Ex. 10 (transcript of Irene Raskin's deposition) at 87:19-89:22, 178:15-179:5; *see* Ex. 11 (transcript of Irene Gabo's deposition ("Gabo Dep.")) at 53:20-55:2, 59:21-23, 60:12-65:4, 71:13-72:18, 123:15-20. Plaintiff further identified Beron in response to Defendants' first set of interrogatories served on January 10, 2020. *See* Ex. 3 at 2. Incredibly, Defendants themselves

---

[10] All three privilege logs have been consolidated into Ex. 9.

identified Beron as an individual who would have knowledge concerning allegations in the Complaint or Answer all the way back on December 19, 2019. *See* Ex. 12 at 2.

(iv)   <u>Svetlana Scoll</u> – Plaintiff first contacted Scoll on or around January 7, 2021 and submitted her resume in an attempt to obtain employment and mitigate her damages. *See* Ex. 1 at PLAINTIFF 001593. While this email, sufficiently identifying Scoll, was produced before the close of discovery, all future communications with Scoll occurred after discovery closed, as Plaintiff's efforts to mitigate her damages were ongoing. *See infra* § VII. Nevertheless, Plaintiff identified Scoll in documents she produced on January 8, 2021 (before the close of discovery and one day after Plaintiff contacted Scoll) (*id.* at PLAINTIFF 001666-68, 001673), on July 7, 2021 (*id.* at PLAINTIFF 001770-72, 001780-82), and on November 12, 2022 (*id.* at PLAINTIFF 002245-50, 002270-72). Additionally, Scoll is Plaintiff's current employer as of April 2022. *See* Ex. 1 at PLAINTIFF 002274-81. In other words, Plaintiff would not have known to identify Scoll as a witness prior to the close of discovery as Scoll would not have had relevant knowledge concerning Plaintiff's work performance and ability to perform the essential functions of a full-time attorney until after the close of fact discovery. Notwithstanding the above, Plaintiff did identify Scoll's law firm as an entity where Plaintiff applied for a full-time legal position and interviewed with, in supplemental interrogatory responses served before the close of discovery. *See* Ex. 13 at 6.

(v)   <u>Karine Bogoraz</u> – Bogoraz is identified in documents produced by Plaintiff on August 11, 2020 (*see* Ex. 1 at PLAINTIFF 001150) and on September 23, 2020 (*id.* at PLAINTIFF 1267, 1270, 1272-73, 1276, 1279-80, 1287-88, 1291-92, 1295, 1297), well before the close of discovery. Bogoraz is further identified in documents produced by Plaintiff on January 8, 2021 (*id.* at PLAINTIFF 001510, 001525, 001536, 001541, 001550, 001580, 001597, 001623) (also before the close of discovery), on March 8, 2021 (*id.* at PLAINTIFF 001676), on July 7, 2021 (*id.* at PLAINTIFF 001744-45, 001777-78, 001847, 001849-52, 001857, 001866-67, 001870-71, 001873, 001879-81, 001891-92, 001901, 001903-04, 001917), and on November 12, 2022 (*id.* at PLAINTIFF 002052, 002055, 002060-61, 002077, 002082-83, 002085, 002109, 002113, 002125-27, 002136, 002145-46, 002148-52, 002155, 002166, 002183-88, 002192-94, 002199-2204, 002215-16, 002219, 002222, 002226, 002238, 002244, 002251-69, 002273, 002296-97, 002299-2303).

Additionally, Plaintiff identified Bogoraz in numerous documents included in her August 10, 2020 privilege log, also well before the close of discovery. *See* Ex. 9 at PLA PRIV 497, 504-506, 890, 1098-1099, 1421, 1775, 1865, 1974, 1979, 2628, 2652, 2654, 2896, 3025, 3056, 3140-3141, 3143-3144, 3147, 3150, 3156-3159, 3237, 3376, 3390, 3620, 3873, 3969, 4088.

Plaintiff also identified Bogoraz in documents included in her revised privilege log January 19, 2021 (*id.* at PLA PRIV 4256, 4269, 4311, 4371, 4409, 4415, 4418, 4424, 4613, 4616, 4619, 4686, 4690, 4760, 5025-5027, 5270, 5468) and in a further revised privilege log produced on July 7, 2021. *Id.* at PLA PRIV 5752, 5753-5754, 5755, 5756-5757, 5990, 5991-5992, 6045, 6125, 6189, 6192, 6219, 6227, 6504, 6519, 6552, 6600, 6734, 6746, 6753, 6756, 7146, 7240, 7244, 7396, 7401.

Further, Plaintiff identified Bogoraz and her firm as entities where Plaintiff performed *per diem* work during her deposition on September 24, 2020. *See* Plaintiff Dep. at 48:23-49:7, 57:6-9, 60:2-8, 62:4-9, 67:21-69:2. Lastly, on January 10, 2020, Plaintiff identified Bogoraz's law firm as one of numerous firms to which she submitted an application for employment, with whom she interviewed, and for whom she performed *per diem* work. *See* Ex. 3 at 4-6. Plaintiff identified Bogoraz's law firm again in her supplemental interrogatory responses, served on January 8, 2021. *See* Ex. 14 at 2-3, 6.

(vi)     <u>Jonathan Shalom</u> – Plaintiff started performing work for Shalom on a *per diem* basis after the close of discovery. *See* Ex. 1 at PLAINTIFF 002114. In other words, Plaintiff could have not have conceivably produced documents and been able to identify him as a witness prior to the close of discovery. *See infra* § VI.

(vii)    <u>Dmitry Levitsky</u> – Levitsky is identified in documents produced by Plaintiff on December 2, 2021 (Ex. 1 at PLAINTIFF 000092), on September 23, 2020 (*id.* at PLAINTIFF 001264), on March 8, 2021 (*id.* at PLAINTIFF 001698), and on July 7, 2021. *Id.* at PLAINTIFF 001914. Additionally, Plaintiff identified Levitsky in numerous documents included in her August 10, 2020 privilege log, produced well before the close of discovery. *See* Ex. 10 at PLA PRIV 915, 1528, 1529-1535, 1546, 1547-1553. Moreover, Plaintiff identified Levitsky as an individual for whom she performed *per diem* work during her September 24, 200 deposition. *See* Plaintiff Dep. at 64:6-24 ("[Q:] And were you paid for those services as well? [A:] Yes. Dmitry Levitsky, L-E-V-I-T-Y-S-K-Y. I did a couple [of] depositions for him."). Lastly, before discovery closed, Plaintiff identified Levitsky's law firm as one of the firms with which she sought full-time employment, with which she interviewed, and for which she performed *per diem* work. *See* Ex. 5 at 4-6. Plaintiff identified Levitsky's law firm again in her supplemental interrogatory responses, served upon Defendants on January 8, 2021. *See* Ex. 13 at 2-3, 6.

(viii)   <u>Jack Grossman</u> – Grossman is identified in a document produced by Plaintiff on December 2, 2021 (*see* Ex. 1 at PLAINTIFF 000093). Additionally, Plaintiff identified Grossman and his firm, Mallio & Grossman, as her former employer during her deposition, taken by

Defendants on September 24, 2020.  *See* Plaintiff Dep. at 65:4-6, 69:15-70:20, 123:10-125:21, 126:2- 128:5, 128:25-130:15, 132:18-133:2, 135:9-17, 138:3-6, 139:20-140:4.  Gabo likewise identified Grossman during her deposition on December 12, 2020.  *See* Gabo Dep. at 27:22-28-11, 30:12-16, 46:2-14.  Further, before discovery closed, Plaintiff disclosed that she applied for full-time work at Grossman's law firm and interviewed there after Defendants fired her.  *See* Ex. 3 at 5-6.  Plaintiff identified Grossman's law firm again in her supplemental interrogatory responses, served on Defendants on January 8, 2021.  *See* Ex. 13 at 4, 6.

It also bears noting that Defendants subpoenaed Grossman's law firm during discovery.  *See* Plaintiff's Motion *In Limine* No. 2 (seeking to preclude documents obtained in response to the subpoena).  As such, Defendants' feigned ignorance of Grossman's relevance is particularly disingenuous.

(ix)   <u>John Manessis</u> – Manessis is identified in a document produced by Plaintiff on December 2, 2021 (*see* Ex. 1 at PLAINTIFF 000093).  Notably, Manessis also works at Mallilo & Grossman, the law firm Defendants subpoenaed during discovery.

(x)   <u>Tommy Sgouras</u> – Sgouras is identified in a document produced by Plaintiff on September 23, 2020 (*see* Ex. 1 at PLAINTIFF 001306).  Additionally, Plaintiff identified Sgouras in numerous documents included in her August 10, 2020 privilege log.  *See* Ex. 9 at PLA PRIV 4054-55).  Lastly, Plaintiff disclosed before the end of discovery she had applied for a full-time position at Sgouras's law firm.  *See* Ex. 13 at 6.

(xi)   <u>Christina Guaneri</u> – Guaneri is identified in a document produced by Plaintiff on December 2, 2021 (*see* Ex. 1 at PLAINTIFF 000065, 000069, 000094), albeit by a different surname, Incorvaia.

It is completely disingenuous for Defendants to now feign ignorance regarding the identities of the Lay Witnesses.  Indeed, the countless disclosures of the Lay Witnesses months and even years before Defendants' served their motion belies their baseless claim that they "are not even aware who many of these individuals are[.]"  *See* Defs. Br. at 18.  Similarly, Defendants' position as to the identity of Beron is risible at best, considering they named Beron in their December 19, 2019 responses to Plaintiff's first set of interrogatories and in their November 9, 2022 Amended Disclosures as an individual who could provide relevant testimony and is "likely

to have discoverable information that Defendants' may use to support their defenses." *See* Exs. 12 at 2; 15 at 1. Moreover, Plaintiff disclosed the identity of Tatyana Ruderman—her mother— as early as December 2, 2019, when Plaintiff shared receipts of assistive devices which indicate that they were purchased by Tatyana Ruderman. *See* Ex. 1 at PLAINTIFF 000056-57. Further, the identities of Lawlor, Scoll, Bogoraz, Levitsky, Sgouras, and Grossman were all disclosed in various discovery mechanisms, including, Plaintiff's document production, interrogatory responses, first Privilege Log, and deposition testimony, well before the close of discovery.

Defendants' utter failure to review Plaintiff's document production, interrogatory responses, privilege log, and deposition testimony prior to the close of discovery to glean the identities of the Lay Witnesses and ascertain whether to depose some of, if not all, these individuals is Defendants' fault alone and does not warrant preclusion of the Lay Witnesses. *See Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 177 (S.D.N.Y. 2013) (holding that Defendant's "failure to disclose Dussinger, Matyus, or Bock as potential witnesses does not warrant the severe sanction of striking their testimony because Plaintiffs were well aware of their identities and the scope of their knowledge."); *LaVigna v. State Farm Mut. Auto Ins. Co.*, 736 F. Supp. 2d 504, 511 (N.D.N.Y 2010) (motion to strike denied where affiant supervised plaintiff during period leading up to termination, plaintiff had awareness of affiant's role and involvement of events at issue, and several documents mentioning affiant were turned over); *Morgenstern v. Cnty. of Nassau*, No. 04-CV-58, 2008 WL 4449335, at *2 (E.D.N.Y. Sept. 29, 2008) (finding defendant's failure to disclose witnesses a harmless error where plaintiff was aware of affiant's role in lawsuit, testified about affiant's role in deposition, and served document requests on defendant seeking documents from affiant); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01–cv–1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is

harmless if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (internal quotation marks omitted).

### B.    The Lay Witness' Testimony Is Relevant

Defendants argue, with little to no authority or explanation, that the Lay Witnesses are not relevant.  This is wrong.  Each of the Lay Witnesses will testify as to their personal observations regarding Plaintiff's vision impairment and the quality of her work.  Indeed, Tatyana Ruderman, Plaintiff's mother, has been intimately involved in helping Plaintiff obtain treatment for and cope with her disability, in addition to helping Plaintiff cope with the fallout of her termination and the emotional distress caused by the same.  Beron worked directly with Plaintiff at the Firm, and can speak to, *inter alia*, the quality of Plaintiff's work, her perception as to Plaintiff's standing within the Firm before Plaintiff lost her vision, and the infrequency with which Firm attorneys entered SAGA records.[11]  The other Lay Witnesses all work for law firms to which Plaintiff applied for full-time employment or performed work for.  As such, they can each testify as to Plaintiff's mitigation efforts and her ability to perform her essential job functions following the loss of her vision.  Accordingly, each of the Lay Witnesses has relevant testimony to provide.

The court's decision in *Scott v. WPIX, Inc.*, 10 Civ. 4622 (WHP), 2012 WL 2026428 (S.D.N.Y. May 17, 2012) is particularly instructive:

> First, WPIX contends that because [plaintiff's witnesses] lack personal knowledge of the decision-making process leading to Scott's termination, their testimony concerning her job performance should be precluded . . . But WPIX's argument misses the mark.  [Plaintiff's witnesses] will testify about their observations and opinions of Scott as a news director, not about the decisions leading to her termination.  Such testimony is based on the personal knowledge they gained after working with her . . . Here, however, the testimony could rebut allegations of Scott's performance deficiencies contained in an e-mail [written], shortly before Scott's termination.

---

[11] As outlined in Plaintiff's Motion *In Limine* No. 4, Defendants contend that Plaintiff's failure to enter SAGA notes was one of their primary reasons for firing her.

*Id.* at *3; *cf. Hester v. BIC Corp.,* 225 F.3d 178, 183–84 (2d Cir. 2000) (excluding testimony where witnesses admitted they did not observe plaintiff working).

Similarly, here, the Lay Witnesses will testify only as to opinions that are rationally based on their personal observation and perception, and not based on scientific, technical, or other specialized knowledge regarding Plaintiff's medical condition, as Defendants seemingly fail to grasp. To the extent their testimony strays outside of these limitations, Defendants will have every opportunity to object at trial.

Moreover, it bears noting that Defendants have included five clients of the Firm—Natalia Generalova, Azfar Khan, Vitaliy Lyutyk, Laura Shvarts, and Marina Zhernyakova—on their witness list in the parties' JPTO. *See* ECF No. 121 at 11. Defendants failed to disclose the identities of these individuals until *after* the close of discovery and first listed them in their 26(f) disclosures on November 9, 2022; *i.e.,* one day *after* Plaintiff served Defendants with her Amended Disclosures. *Compare* Ex. 14 at 13 *with* Ex. 8 at 4; *see also* Huot Decl. ¶ 6. More critically, Defendants included Olga Kravitz in their JPTO witness list, but as with the five clients, Defendants never identified her until they served Plaintiff with their Amended Disclosures on November 9, 2022. *See* Ex. 8. Indeed, Plaintiff is unsure who this individual is or what relevance she has to this case. Huot Decl. ¶ 7. Again, without citing any supporting authority, Defendants argue that Plaintiff's Lay Witnesses "should not be able to testify if (1) they did not work directly or supervise Plaintiff; or (2) if they began working with the Firm after the relevant events asserted in Plaintiff's Complaint." Defs. Br. 19. However, Defendants cannot have it both ways. To the extent Defendants intend to offer testimony from Firm clients as to Plaintiff's work performance and qualifications for her job, Plaintiff requires her own witnesses to establish that the opposite is true.

Defendants have never produced the affidavits from the above-referenced Firm clients, first sharing them with Plaintiff by attaching them as exhibits to their motion for summary judgment, long after the close of fact discovery. *See* Ex. 6 at 9. Now that this argument has been made, the testimony of Lawlor, Scoll, Bogoraz, Shalom, Levitsky, Grossman, Manessis, Sgouras, and Guaneri are all necessary to: (i) provide testimony regarding the nature of Plaintiff's work as a *per diem* and full time attorney (and as to Grossman and Manessis, to establish the quality of her work at Mallilo & Grossman prior to working at the Firm); and (ii) to buttress Plaintiff's position that she was qualified to perform the essential functions of her job, with or without accommodation. *See Coyle v Crown Enterprises, Inc.*, No. 05-cv-891F, 2009 WL 763401, at *8 (W.D.N.Y. Mar. 19, 2009) ("In seeking to preclude Plaintiffs' expert witness evidence, Crown asserts that Plaintiffs did not disclose Cartonia as an expert witness until after Plaintiffs were served with . . . Defendant's Summary Judgment Motion[.]  Plaintiffs do not deny failing to disclose Cartonia as an expert witness[]; rather, Plaintiffs maintain they were unaware they needed to obtain an expert witness until after learning that Crown was moving for summary judgment based on the terms of the Lease and its Amendments, including which entity was responsible for repairs at the Premises, rather than solely on the conditions of the Premises at the time of the incident."); *see also LaVigna*, 736 F. Supp. 2d at 511-12 (finding that preclusion of a witness's affidavit was unwarranted where the decision to offer the affidavit "was made in reaction to the changing trajectory of the case, and was not made deceptively or in bad faith.").

Lastly, Defendants oscillate between arguing that the Lay Witness's testimony is entirely irrelevant or conditionally relevant, depending on what each witness might say. *See* Defs. Br. at 23. Thus, Defendants tacitly acknowledge that the Lay Witness's testimony is relevant to at least some aspects of Plaintiff's claims. As such, wholesale preclusion on a motion *in limine* is

inappropriate.  Defendants should instead make their objections, if any, to particular aspects of the Lay Witness' testimony at trial.

    **C.**    **The Court Should Not Re-Open Discovery Based on Defendants' Willful Failure to Depose the Lay Witnesses**

For the same reasons outlined *supra* § II(D), the Court should not re-open discovery for Defendants to depose the Lay Witnesses.  As with the Medical Providers (*see id.*), Plaintiff disclosed the identities of the Lay Witnesses months—and, in many instances, years—before the close of discovery through myriad discovery mechanisms.  Defendants had adequate time to depose these individuals but chose not to do so.  Thus, the re-opening of discovery is not warranted.

**V.**    **OPPOSITION TO MOTION *IN LIMINE* NO. 5: THE DECLARATIONS OF NICHOLAS SERLIN, STEVEN KORYTNY, AND PETER COATES ARE RELEVANT AND ADMISSIBLE**

Defendants ask the Court to preclude introduction of declarations from Nicholas Serlin ("Serlin"), Steven Korytny ("Korytny"), and Peter Coates ("Coates").  *See* Defs. Br. at 20-22; JPTO at Plaintiff's Exhibits 27-29.  Defendants' motion should be denied.  First, Plaintiff does not intend to rely solely upon their declarations.  Assuming they are available for trial, which Plaintiff cannot guarantee, she intends to call them to provide live testimony.  As illustrated by their declarations, Serlin, Korytny, and Coates each have personal knowledge as to the matters on which they will testify.  Put differently, they will not be called to provide lay opinion testimony.  Moreover, with respect to Coates, Plaintiff was unaware that he had relevant information until well after the close of discovery.  As such, he could not have been disclosed earlier and, in any event, Defendants will not suffer any prejudice by his testimony.

Defendants harp on Plaintiff's intent to include three declarations from Serlin, Korytny and Coates, claiming they are inadmissible as a substitute for live testimony.  *See* Defs. Br. at 20-22. However, Plaintiff has never suggested that these individuals will only testify by declaration.

Rather, in addition to listing the declarations as exhibits in the JPTO, Plaintiff has also included these individuals as witnesses.  *See* JPTO at 8.  Since Plaintiff's counsel does not represent Korytny, Serlin, or Coates, Plaintiff cannot guarantee their availability to testify at trial, and has thus included their declarations in the event these individuals are unavailable to testify.  *See, e.g.*, *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-cv-585 (AJN), 2015 WL 4002468, at *2 (S.D.N.Y. July 1, 2015) (permitting both affidavits and live testimony from 15 witnesses), *aff'd*, 836 F.3d 153 (2d Cir. 2016).  As such, if they are able to testify at trial, Defendants will have the opportunity to cross-examine these individuals regarding their live testimony and the testimony they provided in their affidavits.

Second, Defendants argue that Serlin and Korytny offer character evidence without any explanation as to how this is the case.  Defs. Br. at 20.  Indeed, nowhere in the declarations do they proffer evidence regarding Plaintiff's or Defendants' character.  *See generally* Exs. 15-17.  On the contrary, they testify as to matters they personally witnessed.  *See id.*

Third, Defendants claim that Plaintiff cannot introduce statements about Korytny's and Serlin's beliefs as to why Defendants terminated Plaintiff, but offer no authority to support this.  *See* Defs. Br. at 21.  Defendants cite three summary judgment decisions standing for the proposition that a belief alone is insufficient to establish a discrimination claim.  *See id.*  However, Plaintiff has never suggested—and, for obvious reasons, will not suggest—that the jury should rule in her favor based solely on the declarations or testimony of Korytny and Serlin.  Their testimony provides mere pieces of evidence that, together, go to support Plaintiff's claim that she was terminated based on her disability, and not the reasons proffered by Defendants.

Next, Defendants state that "[n]either Mr. Serlin nor Mr. Korytny were Plaintiff's supervisors or involved with Plaintiff's work."  Defs. Br. at 21.  As a preliminary matter, there is

no requirement that a witness supervise a Plaintiff bringing discrimination claims in order for the witness to speak about his personal observations of Plaintiff's work, nor can Defendants point to any case law supporting such a position.  Setting aside this fact, both Serlin and Korytny declare that "[Plaintiff] and I worked together at the Firm over several years, both before and after she lost much of her vision and was diagnosed with Leber's hereditary optic neuropathy ('LHON')."  *See* Exs. 15-16 at ¶ 2.  Serlin further states: "[Plaintiff] was one of [Defendants'] top attorneys[,]" and "[e]ven after [Plaintiff's] vision began to deteriorate, I saw no signs that her performance slipped or that she was unable to keep up with the demands of her job."  *See* Ex. 15 at ¶¶ 5, 10.  Similarly, in Korytny's declaration, he states "[p]rior to [Plaintiff's] diagnosis, no one, including Mr. Prakhin, would have disputed [Plaintiff's] capabilities[,]" and "[t]here were no signs that [Plaintiff's] performance slipped at all following the loss of her vision."  *See* Ex. 16 at ¶¶ 5, 10.  These statements confirm that Serlin and Korytny possess personal knowledge regarding Plaintiff's work—rather than relying upon conjecture or providing opinions based on matters outside of their direct knowledge—as they did in fact work with Plaintiff on particular cases, and as their employment overlapped with her at the Firm.

Additionally, Defendants claim that Korytny left the Firm in September 2018 "before the relevant events asserted in Plaintiff's Complaint."  Defs. Br. at 21.  This is incorrect.  Korytny was still employed by the Firm when Defendants recruited Plaintiff back in May 2018 and when Plaintiff's vision began to deteriorate in early September 2018.  *See* ECF No. 1 ¶¶ 30, 33; Ex. 16 ¶ 2.  As such, he has personal knowledge of Plaintiff's work performance before and after her vision began to deteriorate.

Lastly, it bears noting that Plaintiff produced Serlin's and Korytny's declarations on January 22, 2020, two years before the close of discovery; however, Defendants never deposed these two individuals nor questioned them regarding the statements they made in their declarations.

Defendants complain that Plaintiff did not produce the Coates's declaration until October 26, 2022, after the close of discovery. Defs. Br. at 22. However, Plaintiff could not have produced Coates's declaration before the close of discovery. Plaintiff has never personally met or spoken with Coates. On the contrary, well after the close of discovery, Coates proactively contacted Plaintiff's counsel to provide testimony relevant to Plaintiff's claims.[12] *See* Huot Decl. ¶ 8.

Next, Defendants falsely characterize Coates's testimony as "complaints of discrimination and retaliation unrelated to Plaintiff's lawsuit," when he largely complained of Defendants' unlawful and unethical conduct as directly related to Plaintiff. *See* Ex. 17 ¶¶ 5-10, 17-21, 24-28, 37-52. These allegations directly concern the facts at issue in this case—chiefly, Defendants' spoliation of SAGA records. *See also* Plaintiff's Motion *In Limine* No. 4 (arguing that Defendants' SAGA records are hearsay and inadmissible under the business records exception due to a lack of trustworthiness, including due to apparent spoliation). For example, Coates's testimony makes clear that he was even instructed by Prakhin and Raskin to delete Plaintiff's SAGA Records himself (though he refused to do so). *See id.* ¶¶ 5-14, 52-57. Given Defendants' likely heavy reliance on SAGA records to claim Plaintiff did not perform up to expectations, Coates's testimony as to spoliation of those records is essential to ensure that the SAGA records are viewed in appropriate context (to the extent his declaration and other evidence that the SAGA records have been altered does not preclude their admission altogether). *See, e.g.*, *Ochoa v. Nuyen*, No. 12-

---

[12] Notably, prior to Plaintiff submitting his declaration to Defendants, Coates requested time to retain counsel to assess his own claims against Defendants. Plaintiff's counsel merely complied with his request. Huot Decl. ¶ 8.

2072 (RJL), 2020 WL 2065026, at *2 (D.D.C. Apr. 29, 2020) (ruling that business records exception did not apply in part because notes at issue were "were subject to spoliation").

Next, Defendants assert that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FRE 404(b)(1); *see* Defs. Br. at 22. Defendants are wrong on this account as well. While prior bad acts are not admissible under all circumstances, courts in this Circuit have consistently held that prior or other acts of discrimination *are* admissible to prove a pattern of conduct. *See Zubulake v. U.B.S. Warburg LLC*, 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) ("As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discrimination intent.") (citing *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1156 (10th Cir. 1990) (collecting cases); *Ismail v. Cohen*, 706 F. Supp. 243, 252-53 (S.D.N.Y. 1989), *affd*, 899 F.2d 183 (2d Cir. 1990) ("specific acts of other misconduct may be introduced as extrinsic evidence under [FRE 404(b)] to prove wrongful intent, motive, or pattern of relevant conduct[.]"); *Scott*, 2012 WL 2026428, at *4 (finding that the testimony of plaintiff's coworkers about discrimination they also faced could be relevant). While Defendants understandably would prefer to keep such evidence out of trial, Coates's testimony—live or written—as to discrimination and retaliation against the Firm is admissible.

Additionally, Defendants improperly characterize Coates's testimony as character evidence under FRE 405; however, it is not. Coates's testimony is firmly tied to his personal knowledge. *See* Ex. 17. Moreover, Coates's testimony would largely be used for the purpose of opposing Defendants' attempts to authenticate SAGA records, which have clearly been altered. *See* Plaintiff's Motion *In Limine* No. 4 at 7, 15, 20 (detailing the relevance of Coates's testimony to this issue).

Finally, Coates's testimony is also not proscribed by FRE 404, as he provides specific instances of discriminatory and retaliatory conduct, rather than alleging, generally, that Prakhin has a reputation for the same. *See* FRE 405(b); *see also* FRE 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."); *Gaffney v. Dep't of Info. Tech. and Telecomm.*, 579 F. Supp. 2d 455, 460 (S.D.N.Y. 2008) (deeming testimony from other employees regarding discrimination by employer "relevant to the issues at trial, including Plaintiffs' § 1983 claim that Crosswalks had a policy or practice of discrimination and retaliation," and further ruling that, "[i]nsofar as portions of John's prospective testimony may potentially go beyond the scope of what is permissible, the Court can address specific objections on a case-by-case basis, and give the jury an appropriate limiting instruction as to the purpose for which the testimony is being admitted").[13] Accordingly, Coates's declaration—as well as Serlin's and Korytny's declarations—should not be precluded.

---

[13] See also, *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008) ("The 'me too' evidence was admissible, under Rule 404(b), to prove the intent of Bagby Elevator to discriminate and retaliate."); *Allen v. Perry*, 279 F. Supp. 2d 36, 46-47 (D.D.C. 2003) ("[I]t is settled beyond all question . . . that other acts of discrimination . . . are admissible under Rule 404(b) to prove motive or intent.  If, on the other hand, the selection of Mahmoud was not a prior act of discrimination, and therefore not subject to the constraints of Rule 404(a), it was relevant as bearing on the motive or intent with which Bates acted when he selected Mahmoud. . . . Bates' testimony had substantial probative value because it was related to another instance of potential racial discrimination in the filling of a position by the same person who made the selection at issue in this case.  There was no risk of unfair prejudice to the government since Bates was permitted by the Court's questioning to give the fullest possible explanation for the selection he made, thereby rebutting any claim that he was motivated by racial animus. . . . It was for the jury to then decide whether or not Bates' explanation of his selection of Mahmoud was or was not racially motivated."); *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir. 1999) ("The testimony of other employees about their treatment by the defendant employer is relevant to the issue of the employer's discriminatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motives.") (collecting cases); *Perkins v. Fed. Fruit & Produce Co., Inc.*, No. 11-cv-00542 (REB) (KLM), 2012 WL 1658871, at *4 (D. Colo. May 3, 2012) ("As for the evidence proffered through Torrez, if his testimony involves specific instances of racial discrimination at FFP . . . this type of evidence may be admissible.").

## VI.    OPPOSITION TO MOTION *IN LIMINE* NO. 6: PLAINTIFF'S RECENTLY PRODUCED DOCUMENTS ARE ADMISSIBLE EVIDENCE OF MITIGATION THAT DID NOT YET EXIST DURING DISCOVERY

Defendants move *in limine* to preclude the introduction of documents produced by Plaintiff on November 12, 2022. *See* Defs. Br. § VI; *see also* Ex. 1 at PLAINTIFF 1665-1957 (the particular documents Defendants seek to preclude). Defendants argue that the belated disclosure of these documents was intentional and done to "cause harm to Defendants." Defs. Br. at 23. Tellingly, Defendants gloss over the content of the documents themselves, which proves this to be false. *See id.*

By way of brief background, after a years-long job search following the termination of her employment, Plaintiff finally obtained full-time employment in April 2022, well after discovery closed in January 2021. *See* Ex. 1 at PLAINTIFF 002274-81. In the interim period, Plaintiff continued to perform *per diem* work for various law firms in order to generate an income. Consistent with her obligation to supplement her document production with all evidence that she mitigated her damages, Plaintiff served the documents at issue. *See Ferring Pharm. Inc. v Serenity Pharm., LLC*, No. 17-cv-09922 (CM) (SDA), 2019 WL 5682635, at \*2 (S.D.N.Y. Nov. 1, 2019) ("The duty to supplement continues even after the discovery period has closed.") (quoting *Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011)); *McKinney v. Conn.*, No. 3:06-cv-2055 (WWE), 2011 WL 166199, at \*2 (D. Conn. 2011) ("The fact that discovery has closed has no bearing on Defendant's duty to supplement under Rule 26(e)"); *Allen v. Colgate–Palmolive Co.*, No. 79 Civ. 1076 (CSH) 1985 WL 191 at \*1 (S.D.N.Y. Jan. 14, 1985) ("The obligation to update and supplement responses [to discovery requests] continues even after the close of discovery.").

Indeed, the overwhelming majority of these documents are job applications, résumés, invoices, checks, and tax documents related to *per diem* work, and emails with *per diem* law firms

or prospective employers, as well as job offer letters and records from her current employer.  *See* Ex. 1 at PLAINTIFF 1665-1957.  Plaintiff was not dilatory in her production of these documents but, rather, supplemented her mitigation production periodically (both in this instance and throughout the life of this case), as is appropriate.  *See Ferring*, 2019 WL 5682635 at *2 ("Supplementations need not be made as each new item of information is learned[.]" (citing FRCP 26).

The few non-mitigation documents included in the production are either emails regarding LHON support group meetings (*see* Ex. 1 at PLAINTIFF 001740-42, 1748, 1762-65, 1775, 1790-91, 1797, 1811, 1820-23, 1826-30, 1842, 1865, 1872, 1882, 1897-1900, 1905-09, 1911-14, 1918), or emails with non-profit organizations that provide job support to LHON sufferers, such as trainings on the use of assistive devices or reviewing résumés and cover letters.  *See id.* at PLAINTIFF 001837, 1856, 1868, 1883, 1895-96, 1915-16, 1933-48.  These documents, too, were generated post-discovery and could not have been produced prior to the close of fact discovery.

Defendants claim, without an explanation, that "the prejudice to Defendants resulting from the need to prepare to respond to over 350 pages of new documents is extremely high."  Defs. Br. at 23.  Defendants' conclusory reasoning is specious, to say the least.  Defendants suffer no prejudice here, much less unfair prejudice sufficient to outweigh the probative value of evidence concerning Plaintiff's mitigation efforts.  *See* FRE 403.  Plaintiff was under an obligation to produce these documents, could not have done so during discovery, and supplemented her production months before trial.  Moreover, the documents at issue are no different from the hundreds of other pages of job applications and *per diem* records that Plaintiff produced during discovery.  As such, it is unclear exactly what purportedly herculean effort Defendants must supposedly undertake to account for these documents during trial preparation.

*In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297 (S.D.N.Y. 2013) is instructive:

> Plaintiffs' claims of prejudice are largely conclusory. They argue that had the eRooms been produced earlier, they would have been able to make more informed decisions about their discovery strategy. They also claim they were prejudiced because they could not use the eRoom documents during the *Daubert* hearing, to question witnesses, or in their amended complaint. For example, Plaintiffs claim that draft minute meetings that were belatedly produced could have been useful in deposing defendants McKinnell and Katen because they showed that these defendants likely reviewed clinical trial results of Celebrex and Bextra and that McKinnell knew about Pfizer's interest in an Alzheimer's indication. Pfizer, however, had previously produced a presentation from that same meeting, which was used at Katen's deposition and the final meeting minutes were produced to Plaintiffs in 2008. Therefore, any prejudice to Plaintiffs is minimal . . . There is, however, a distinction between lost usefulness and inconvenience, on the one hand, and prejudice, on the other hand. The examples Plaintiffs have cited do not demonstrate the sort of serious harm to the effective litigation of their case that sanctions are intended to remedy. Finally, whatever prejudice Plaintiffs may have suffered is mitigated by the fact that these productions came well before the trial date.

*Id.* at 325-26 (internal citations omitted).

The same reasoning applies here. Plaintiff produced these mitigation-related records, all of which were generated post-discovery, long before trial. Defendants have not suffered prejudice or identified any steps they would have taken had the production been made earlier, apart from merely reviewing the documents. Indeed, the documents are no different from hundreds of other mitigation documents produced in discovery, with which Defendants did similarly nothing other than review them. As such, Plaintiff should not be precluded from using these records as evidence at trial.

## VII. OPPOSITION TO MOTION *IN LIMINE* NO. 7: PLAINTIFF DOES NOT INTEND TO OFFER THE 2017 DEPOSITION TRANSCRIPT LISTED IN THE PRETRIAL ORDER

Defendants have moved to preclude the introduction of a deposition transcript which is currently listed as Exhibit 143 of the Joint Pretrial Order. Plaintiff does not plan on introducing the transcript in their case in chief. Accordingly, Plaintiff does not oppose Defendants' motion to

preclude the introduction of Exhibits 143 in Plaintiff's case in chief.

## VIII.   OPPOSITION TO MOTION *IN LIMINE* NO. 8: PLAINTIFF SHOULD NOT BE PRECLUDED FROM INTRODUCING PAYROLL RECORDS

Defendants have filed a motion to preclude Plaintiff from presenting her payroll records from 2012 to 2018, as well as the payroll records for Irene Gabo and Sandra Beron, arguing that such records are "irrelevant," and therefore should be barred by FRE 401.  Plaintiff's payroll records are clearly relevant, and Defendants' motion should be denied.

Plaintiff's payroll records from October 2012 to March 2017 demonstrate that Plaintiff received annual raises at the firm, as well as annual bonuses.  Accordingly, these records will establish that Plaintiff would have been entitled to receive annual raises and bonuses, had she not been unlawfully terminated from the Firm in December 2018.  The payroll records for Gabo and Beron – her former colleagues – are also relevant, as Gabo and Beron also received annual raises and bonuses.  The records reflect Defendants' general practice of providing annual raises and bonuses to the attorneys working at the Firm.  It is axiomatic that Plaintiff is entitled to establish economic damages in her presentation of evidence to the jury.  These records are relevant for specifically that purpose – establishing economic damages.  *See Yan Zhao v. United States,* 273 F.Supp.3d 372, 397 (W.D.N.Y. 2017) (denying motion *in limine* which sought to preclude payroll records, noting that "payroll records may be used as evidence of lost wages … [and] must properly be admitted into evidence as business records.").

If Defendants are willing to stipulate that Plaintiff received annual raises and bonuses, and would have been entitled to receive such annual raises and bonuses had she not been terminated, Plaintiff would have no need to introduce such evidence.  However, absent such a stipulation, the payroll records should not be precluded from trial.

IX.   **OPPOSITION TO MOTION *IN LIMINE* NO. 9: PLAINTIFF DOES NOT INTEND TO OFFER DOCUMENTS RELATING TO PRIOR LAWSUITS**

Defendants have moved to preclude Plaintiff from introducing Exhibits 161-166, as listed in the Joint Pretrial Order, which are documents relating to prior lawsuits involving the Defendants.  Plaintiff does not plan on introducing such documents in her case in chief. Accordingly, Plaintiff does not oppose Defendants' motion to preclude the introduction of Exhibits 161-166 in Plaintiff's case in chief.

X.   **OPPOSITION TO MOTION *IN LIMINE* NO. 10: PLAINTIFF SHOULD NOT BE PRECLUDED FROM OFFERING THE NYCBA PROFESSIONAL ETHICS OPINION AT TRIAL**

   A.   **Exhibit 168**

Defendants have moved to preclude the introduction of Exhibit 168 and Exhibit 169, as listed in the Joint Pretrial Order, which are Professional Ethics Opinions.  The New York State Bar Association ("NYCBA") Opinion (Exhibit 168) discusses whether it is ethical for a lawyer to refer clients to a spouse's litigation company.  Plaintiff does not intend to introduce Exhibit 168 in her case in chief.

   B.   **Exhibit 169**

Defendants argue that Exhibit 169, which is an NYCBA Opinion, should be precluded on the basis that it would be used as "improper character evidence."  Defendants' argument must be rejected, because the NYCBA Opinion is plainly admissible under Federal Rule 608.  The uncontroverted evidence in the record indisputably shows that Defendants record all telephone conversations in his office, without disclosing to others (including clients and other attorneys) that they are being recorded.  Under Federal Rule 608(b), "although extrinsic evidence is [generally] not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness, the trial judge may, on cross-examination, allow them to be

inquired into if they are probative of the character for truthfulness or untruthfulness of the witness." *Woolfolk v. Baldofsky,* 19-CV-3815 (WFK) (ST), 2022 WL 2600132, at *2 (E.D.N.Y. July 8, 2022); *Jean-Laurent v. Hennessy,* 840 F.Supp.2d 529, 555 (E.D.N.Y. 2011) ("Rule 608(b) permits a witness to be cross-examined concerning 'character for truthfulness or untruthfulness' with evidence of a witness's specific instances of conduct, if such evidence is probative of truthfulness or untruthfulness.").

The NYCBA Opinion states that "undisclosed taping smacks of trickery and is improper as a routine practice." Ex. 18.  Notably, despite being made aware of the NYCBA Opinion, Defendants continue to engage in this practice of secretly recording conversations.  The NYCBA Opinion, therefore, demonstrates that Defendants routinely deceive their clients and others. Evidence showing that Defendants engage in deceptive and dishonest practices is not only admissible under Rule 608(b), but clearly relevant for purposes of determining Defendants' credibility, as the evidence is clearly probative of Prakhin's untruthfulness, and lack of trustworthiness.

Accordingly, Plaintiff should not be precluded from introducing Exhibit 169 at trial.

## XI.    OPPOSITION TO MOTION *IN LIMINE* NO. 11: PLAINTIFF SHOULD NOT BE PRECLUDED FROM PRESENTING EVIDENCE REGARDING DEFENDANTS' FINANCIAL RESOURCES

Defendants have moved the Court to preclude Plaintiff from introducing evidence relating to Defendants' financial resources, arguing that "Defendants' financial status has no bearing on the outcome of this litigation and is therefore not admissible."  Defs. Br. at 28.  Defendants' motion must be denied.

Defendants have asserted in this litigation (including in the Joint Pretrial Order that was submitted to the Court) that Plaintiff's requests for disability related accommodations "were unreasonable, not effective and/or would have imposed an undue hardship on Defendants."  JPTO

at 4. Accordingly, in order to determine the merit of this defense, the Court and the jury must consider what, under applicable law, constitutes an "undue hardship." It is well settled that "undue hardship is an employer's affirmative defense, proof of which requires a detailed showing that the proposed accommodation would 'require significant difficulty or expense' in light of specific enumerated statutory factors." *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 121-22 (2d Cir. 2004) (internal citations omitted). The "specifically enumerated factors" to be considered are set forth in the ADA, and are as follows:

(i)     the nature and cost of the accommodation needed under this chapter;

(ii)    the ***overall financial resources of the facility*** or facilities involved in the provision of the reasonable accommodations; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii)   the ***overall financial resources of the covered entity***; the overall size of the business of a covered entity with respect to the number of its employees, the number, type, and location of its facilities; and

(iv)    the type of operation or operations of the covered entity, including the composition structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 § U.S.C. 12111(10)(B); *see also* N.Y.C. Admin. Code § 8-102 (containing nearly identical language as the ADA) (emphasis added).

Thus, the plain language of the applicable statutes clearly states that an employer's financial resources should be considered when determining whether a disability related accommodation request would constitute an "undue hardship." Indeed, in this case, Defendants' financial resources are not only relevant, but critical, in determining whether the accommodations requested by Plaintiff would have constituted an undue hardship under applicable law.

The cases cited by Defendants in support of their motion are all easily distinguishable from the case at bar because none of them involve claims of disability discrimination and potential undue hardship defenses. *See Becknell v. Univ. of Kentucky,* 17-CV-490 (JMH) (MAS), 2019 WL 1783488 (E.D. Ky. April 23, 2019) (case involved claim under FMLA for retaliation); *Vermont Mut. Ins. Co. v. Ciccone,* 09-CV-00445 (VAB), 2015 WL 4094174 (D. Conn. July 7, 2015) (case involved the contractual obligations of the parties under an insurance policy); *Mango v. Buzzfeed, Inc.,* 316 F.Supp.3d 811 (S.D.N.Y. 2018) (case involved claims of copyright infringement).

In this case, Defendants have raised an affirmative defense claiming that the provision of disability-related accommodations to Plaintiff would have caused them to suffer an undue hardship. As such, controlling law requires an assessment of Defendants' financial resources and means. Indeed, evidence of Defendants' finances and financial resources are indisputably relevant and must be considered when determining the viability of Defendants' undue hardship defense. Therefore, Defendants' motion to preclude such relevant evidence from the trial should be denied.

## XII.    OPPOSITION TO MOTION *IN LIMINE* NO. 12: PLAINTIFF SHOULD NOT BE PRECLUDED FROM SUGGESTING A DOLLAR AMOUNT TO THE JURY

Defendants have moved the Court to preclude Plaintiff from suggesting a dollar amount to the jury. Defendants' motion should be denied.

It is well settled that "there is no per se prohibition against a plaintiff suggesting a specific dollar amount as to damages in the Second Circuit." *Othman v. Benson,* 13-CV-4771 (NGG) (SJB), 2019 WL 1118035, at *7 (E.D.N.Y. March 11, 2019) (citing *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 912-13 (2d Cir. 1997)); *see also Ramirez v. N. Y. C. Off-Track Betting Corp.,* 112 F.3d 38, 40 (2d Cir. 1997) ("[T]his court has not adopted a ban on suggestions of damage amounts."). Rather, the question is "left to the discretion of the trial judge, who may either prohibit

counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions." *Othman,* 2019 WL 1118035 at *7 .

Indeed, many courts in the Second Circuit have denied motions to preclude the suggestion of specific dollars amounts.  For example, in *Edwards v. City of New York*, 8-2199 (TLM), 2011 WL 2748665, at *2 (E.D.N.Y. July 13, 2011), the Court denied the defendant's motion *in limine* requesting plaintiff's counsel be precluded from suggesting a specific dollar amount as to damages, noting that defendant's counsel would be given an opportunity to respond, and the jury would be cautioned that statements by attorneys are not evidence.  *See also Collado v. City of New York,* 11-cv-9041 (DAB), 2017 WL 4533772, at *4 (S.D.N.Y. Sept.  27, 2017) (denying defendant's motion *in limine,* and permitting plaintiff's counsel to suggest a specific dollar amount, noting that the jury would receive an appropriate limiting instruction); *Newton v. City of New York*, 171 F.Supp.3d 156, 171, n.94 (S.D.N.Y. 2016) ("The Second Circuit allows attorneys to suggest dollar amounts to the jury, where, as here, the jury receives an appropriate limiting instruction."); *Brown v. Cornell,* 17-CV-01036 (MAD) (ATB), 2021 WL 2711511, at *9 (N.D.N.Y. July 1, 2021) (denying defendant's motion *in limine,* and permitting plaintiff's counsel to suggest a specific dollar amount, noting that the jury would receive a limiting instruction before deliberating).  In fact, it should be noted that in *Thomas v. Medco,* 95-CV-8401 (JES) (MHD), 1998 WL 542321, at *15 (S.D.N.Y. Aug.  26, 1998), a case cited by Defendants in support of their motion, the Court determined that the plaintiff's counsel's suggestion of a specific dollar amount was ***not*** inappropriate, noting that "despite defendants' assertion to the contrary, we also conclude that the suggestion by the plaintiff's attorney that [plaintiff] be remunerated in the sum of $300,000 for her emotional injuries ***did not unfairly influence the jury."*** (emphasis added).

In this case, Plaintiff maintains that any concern regarding the potential to "anchor" or "sway" the jury can easily be cured by providing an opportunity for Defendants' counsel to respond to any suggested dollar amount, or by issuing an appropriate limiting instruction to the jury. In the alternative, should the Court be inclined to grant Defendants' motion in this regard, the Court should limit its preclusion order to suggestions regarding non-economic damages only. *See Jean-Laurent v. Hennessy,* 840 F.Supp.2d 529, 558 (E.D.N.Y. 2011) (precluding plaintiff's counsel from submitting a specific dollar amount only with respect to damages for pain and suffering but permitting plaintiff's counsel to submit a dollar amount regarding other compensable damages).

As such, Defendants' motion should be denied, and Plaintiff should not be precluded from suggesting a dollar amount for her damages.

## XIII.   OPPOSITION TO MOTION IN LIMINE NO. 13: THE PUNITIVE DAMAGES PORTION OF THE TRIAL SHOULD NOT BE BIFURCATED

Lastly, Defendants' motion *in limine* requesting that the Court bifurcate the punitive damages portion of the trial should be denied.

Federal Rule 42(b) provides, in relevant part, that the Court "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue." FRCP 42(b). Bifurcation, however, "remains the exception rather than the rule." *Lennon v. Seaman,* 99-CV-2664 (LBS), 2002 WL 109525, at *9 (S.D.N.Y. Jan. 28, 2002). Thus, "while it may be proper in certain instances to bifurcate a trial, separation of issues is not the usual course that should be followed." *Sunenblick v. Harrell,* 145 F.R.D. 314, 317 (S.D.N.Y. 1993). This is because "a single trial 'tends to lessen the delay, expense and inconvenience to all concerned, and the courts have emphasized that separate trials should not be ordered unless such

a disposition is clearly necessary." *Hirschheimer v. Associated Metals and Minerals Corp.,* 94-CV-6155 (JFK), 1997 WL 528057, at *9 (S.D.N.Y. Aug. 27, 1997). The moving party bears the burden of establishing that bifurcation is warranted. *Id.*

In their motion, Defendants have failed to present any compelling reason why bifurcation is warranted. Rather, Defendants simply assert, in conclusory fashion, that bifurcating the trial is "a more efficient method" and "would also avoid any undue prejudice to the Defendants." However, a bifurcated trial would likely be much less efficient, as it would require the Court to provide jury instructions twice, rather than once, as is customary. Further, bifurcation might also require the parties, and the jury to return to the Courthouse to receive a separate instruction and deliberate for another day than may otherwise be necessary.

Moreover, Defendants failed to provide any explanation as to how an instruction regarding punitive damages would cause them unfair prejudice. *See Simpson v. Pittsburg Corning Corp.,* 901 F.2d 277, 283 (2d Cir. 1990) (affirming district Court's denial of motion to bifurcate determination of punitive damages in part because the movant "made no detailed offer of proof to indicate the need for bifurcation.")*; Dollman v. Mast Industries, Inc.,* 08-CV-10184 (WHP), 2011 WL 3911035, at *3 (S.D.N.Y. Sept. 6, 2011) (denying defendant's motion to bifurcate trial as to punitive damages in discrimination case, noting that defendant offered no argument as to why bifurcation was preferable); *Ragin v. Newburgh Enlarged City School Dist.,* 10-CV-2797 (JFK), 2011 WL 2183175, at *3 (S.D.N.Y. June 3, 2011) (denying motion to bifurcate trial regarding punitive damages, where defendant presented no evidence showing that the defendant would be prejudiced or that the jury would be confused with an un-bifurcated trial).

Finally, any concern regarding unfair prejudice can easily be remedied with a cautionary jury instruction regarding punitive damages. *See Farghaly v. Potamkin Cadillac-Buick-Chevrolet-*

*Geo, Ltd.,* 18-CV-11106 (AJN), 2021 WL 4267656, at *2 (S.D.N.Y. Sept. 20, 2021) ("Any potential prejudice that may result from determining punitive damages alongside liability can be addressed through an appropriate limiting instruction.") (internal citations omitted).

For the foregoing reasons, Defendants' motion to bifurcate the trial should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the disputed portions of Defendants' motions *in limine* be denied in their entirety, togethers with such other and further relief as the Court deems just and proper.

Dated: November 28, 2022          **FARUQI & FARUQI, LLP**
      New York, New York

By: */s/ Innessa M. Huot*
    Innessa M. Huot
    Alex J. Hartzband
    Camilo M. Burr
    Annabel R. Stanley

685 Third Avenue, 26th Floor
New York, New York 10017
Tel: 212-983-9330
Fax: 212-983-9331
ihuot@faruqilaw.com
ahartzband@faruqilaw.com
cburr@faruqilaw.com
astanley@faruqilaw.com

Joshua Beldner
**TILTON BELDNER LLP**
626 RXR Plaza
Uniondale, NY 11556
jbeldner@tiltonbelnder.com