1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF NEW YORK

3      YELENA RUDERMAN,                 Docket No.
                                        1:19-cv-02987-CBA-RLM
4           Plaintiff,

5              v.                       Brooklyn, New York
                                        Tuesday, February 22, 2021
6      LAW OFFICE OF YURIY              3:00 p.m.
       PRAKHIN, P.C., ET AL.,
7
            Defendants.
8

9

10                   TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE ROANNE L. MANN
11                UNITED STATES MAGISTRATE JUDGE

12     APPEARANCES:

13     For the Plaintiff:        Faruqi & Faruqi, LLP
                                 ALEX J. HARTZBAND, ESQ.
14                               INNESSA MELAMED HUOT, ESQ.
                                 685 Third Avenue
15                               Suite 26th Floor
                                 New York, New York  10017
16                               212-983-9330

17     For the Defendants:       Putney, Twombly, Hall & Hirson,
                                 LLP
18                               NICOLE ELIZABETH PRICE, ESQ.
                                 521 5th Avenue
19                               Floor 10
                                 New York, New York 10175
20                               212-682-0020

21

22     Transcription Service:    Superior Reporting Services LLC
                                   P.O. Box 5032
23                                 Maryville, TN 37802
                                   865-344-3150

24

25     Proceedings recorded by electronic sound recording;
       transcript produced by transcription service.

1                     P R O C E E D I N G S

2          THE COURT:  This is Judge Mann on the line.  I'm

3    conducting a telephonic hearing in Ruderman versus Law Office

4    of Yuriy Prakhin, et al., 19-cv-2987.  As a preliminary

5    matter, I just wish everyone well and I hope everyone is safe

6    and healthy.

7          Let me begin by taking a roll call.  Who is on the

8    line on behalf of the Plaintiff Yelena Ruderman?

9          MS. HUOT:  Good afternoon, Your Honor.  Thank you.

10   I hope you're doing well, as well.  This is Innessa Huot from

11   Faruqi & Faruqi, and I have on the line with me also Alex

12   Hartzband, also from Faruqi & Faruqi, for the Plaintiff.

13         MR. HARTZBAND:  Yeah.  Hi, Your Honor.

14         THE COURT:  All right.  Welcome to both of you.

15   And who do I have on the line on behalf of the Defendants?

16         MS. PRICE:  Good afternoon, Your Honor.  This is

17   Nicole Price from Putney Twombly representing Defendants.

18         THE COURT:  All right.  And is anyone else on the

19   line for Defendants?

20         MS. PRICE:  No, Your Honor.

21         THE COURT:  All right.  As I said, this is on for a

22   hearing on motions, discovery-related motions.  I will

23   address the issues and have counsel address the issues in the

24   order in which they were presented to the Court.  I realize

25   that's somewhat arbitrary because it was clear that Plaintiff

1   was planning to move to compel, and before the Plaintiff

2   filed her application, the Defendant -- Defendants filed

3   theirs.  But since they came in first and they raise fewer

4   issues, let's address those first.

5          And for the record, I would note that the

6   Defendant's motion to compel is docket entry number 45.  The

7   Plaintiff's opposition is docket entry 49.  And there are two

8   aspects of that motion.  There is a Defendant's request the

9   Plaintiff provide information about the search that she

10  conducted for her communications.  In particular, they note

11  recent production of Google Hangout messages and Plaintiff's

12  representation that she lost her cell phone in March of 2019.

13         The other aspect of the Defendant's motion to

14  compel challenges the Plaintiff's attorneys' eyes only

15  designations and redactions in connection with invoices that

16  she produced for the per diem work that she has been doing

17  since she was terminated by the Defendant.  Those documents

18  go to her efforts to mitigate damages.

19         I'll hear first from defense counsel.  Ms. Price,

20  let me just clarify a few points with you.  In response to

21  your motion, Plaintiff's counsel states that predecessor

22  counsel for Defendants was advised quite some time ago that

23  the Plaintiff had lost her cell phone while on vacation.  Do

24  you have any basis for denying that that disclosure was made

25  quite some time ago?

1          MS. PRICE:  Your Honor, Defendant's new counsel did

2   not receive any information or documentation or notes from

3   prior counsel regarding this matter, loss cell phone.

4   Additionally, Plaintiff's counsel in a meet and confer

5   indicated that they had possibly told this to former counsel

6   in February of 2020, which is the same month that counsel was

7   being transferred.  So it's unclear exactly when former

8   counsel was told, if ever, and if he was told, if that was

9   before the change of counsel occurred.

10          THE COURT:  I take it the short answer is you

11   don't -- you can't deny that that information was provided to

12   predecessor counsel for Defendants?

13          MS. PRICE:  Yes, Your Honor.  We do not know.

14          THE COURT:  And --

15          MS. PRICE:  But we have no information that it was.

16          THE COURT:  Before -- I'm sorry.  I couldn't hear

17   what you said.  You have what?

18          MS. PRICE:  I'm sorry.  We have no indication that

19   it was provided to former counsel.

20          THE COURT:  Well, you have no indication because

21   you said you didn't receive information or notes from

22   predecessor counsel.  That certainly is not an omission that

23   should be attributable to Plaintiff or Plaintiff's counsel.

24   Did you inquire of your predecessor as to whether or not that

25   information had been provided to your predecessor?

1          MS. PRICE:  Your Honor, I'm not sure.  I can find

2    out if other counsel in this case has made that inquiry.  But

3    to my knowledge, we haven't received any communication from

4    former counsel whether or not he knew of this.

5          THE COURT:  And as I understand your motion, what

6    you're seeking in connection with the text messages and

7    instant messages is information about the search that was

8    conducted on behalf of Plaintiff.  Is that right?

9          MS. PRICE:  Yes, Your Honor.  We believe it's

10   appropriate for Plaintiff to provide us with information

11   regarding the time, the manner, what was conducted, what was

12   searched, or allow for a limited reopening of discovery so

13   that Defendants can pursue this issue.

14         THE COURT:  At any time during the discovery

15   period, did you serve any discovery demand regarding the

16   nature of the search that had been conducted?

17         MS. PRICE:  No, Your Honor.

18         THE COURT:  So why should the Court order that

19   information to be provided?

20         MS. PRICE:  Your Honor, I think it's important the

21   timeline here in that Plaintiff had over four months to

22   conduct the searches and respond before she actually produced

23   information that was responsive.  And this occurred, you

24   know, several months after she had represented that she had

25   no responsive documents.  And then all of a sudden, just days

1  before the close of discovery, she apparently did have her

2  responsive documents.  So Defendants were blindsided at the

3  very end of discovery and didn't have the opportunity to look

4  into this further, which is why we are now seeking relief

5  from the Court.

6          THE COURT:  And when you say you were blindsided,

7  that was by the Google Hangout messages that were produced?

8          MS. PRICE:  Yes, Your Honor.  By the Google Hangout

9  messages and the new information about the missing cell

10 phone.

11         THE COURT:  Well, again, you say that it's new,

12 Plaintiff's counsel says it was not new, and you're not in a

13 position to deny that?

14         MS. PRICE:  Yes, Your Honor.

15         THE COURT:  The Google Hangout messages you say

16 were produced days before discovery ended, when did

17 Plaintiff, or Plaintiff's counsel more accurately, respond to

18 the discovery demand by saying that she had no responsive

19 documents?  And I assume by that, you mean no responsive text

20 messages or instant messages?

21         MS. PRICE:  Yes, Your Honor.  It was in September

22 of 2020 that she responded with no -- with the no responsive

23 documents.  And it was just prior to her deposition, which

24 was conducted on September 24th, 2020.

25         THE COURT:  And again, when you say you were

 1  advised that there were no responsive documents, we're

 2  talking specifically about text messages and instant

 3  messages?  I presume that there were documents produced, but

 4  it was only with respect to text messages and instant

 5  messages that you were advised she had no such documents.

 6       MS. PRICE:  Yes, Your Honor.  The request was

 7  specific to text messages, instant messages, any kind of

 8  instant communication, whether it's via chat room or Skype or

 9  the Zoom chat, anything to that effect.  And our request was

10  very specific and detailed different examples of what we were

11  looking for.

12       THE COURT:  All right.  Let me ask, who's going to

13  be speaking on behalf of Plaintiff during this proceeding?

14       MS. HUOT:  I am, Your Honor.  This is Innessa Huot.

15  Thank you.

16       THE COURT:  All right.  Ms. Huot, you produced

17  Google Hangout messages, which you explain in your submission

18  to the Court were retrieved from the Plaintiff's email

19  account.  Why were those produced days before discovery

20  ended?  What was the reason for the delay?

21       MS. HUOT:  Thank you, Your Honor.  And just to

22  note, discovery ended January 18th, 2021.  This was produced

23  in September 2020, so it wasn't really days before.  And the

24  reason for that is quite technical, our firm has IT protocols

25  that block certain communications, like Google chat, and we

1  didn't realize these messages existed until that September

2  2020.  And once we realized that, we produced them

3  immediately, and have since removed those protocols to make

4  sure nothing else is missing.  We double-checked.  Nothing

5  else was missing.  They were produced as soon as we got them.

6       THE COURT:  I'm sorry.  What was the date they were

7  produced?

8       MS. HUOT:  I believe they were produced September

9  2020.  I can confirm that for sure, but I believe Ms. Price

10  just said they were produced shortly before Plaintiff's

11  deposition, and Plaintiff was deposed in September 2020.

12       THE COURT:  What I heard her say, and I'll let her

13  clarify, but I heard her say that in September of 2020, days

14  before the deposition of Plaintiff, the Defendants were

15  informed that there were no responsive text messages, instant

16  messages, and the like.  And I think what she said was that

17  the Google Hangout messages were produced, I don't remember

18  if she said January, but she said days before fact discovery

19  ended.  But let me hear, rather than put words in her mouth.

20       Ms. Price, do you want to clarify?

21       MS. PRICE:  Thank you, Your Honor.  Yes.  The

22  Google Hangout messages were produced to Defendants in one of

23  Plaintiff's discovery productions on January 8th, 2021, and

24  that's indicated by the Bates stamps on those documents.  But

25  the responses to Defendant's demands, which were served in

1  August, we received the responses saying that Plaintiff had

2  no document responses to our demands, which would be demands

3  number 1 and 2 in that set of requests, in September just

4  before Plaintiff's deposition.

5          MS. HUOT:  Your Honor --

6          THE COURT:  I'm sorry, so the date -- the date of

7  production was January, what, for the Google --

8          MS. PRICE:  8th.

9          THE COURT:  January 8th?

10         MS. PRICE:  Yes, Your Honor, of 2021.

11         THE COURT:  All right.  Ms. Huot?

12         MS. HUOT:  Your Honor, I have to go back and check

13  the date of production.  It was produced whenever we got it.

14  I'm not -- I'm going through the documents, as we speak, to

15  assess exactly when it was produced.  The point is these

16  documents are not related to her cell phone.  These documents

17  came from her email, and those emails have a Google chat.

18  That Google chat is a --

19         Oh yeah.  So my colleague just confirmed that it

20  was produced January 8th.  I apologize.  Earlier, I only said

21  September because I thought that's what was being said prior.

22  It was related to her email.  We produced everything.  We

23  produced it then because that's when we received it.

24         We have, like I said before, we have a protocol

25  that blocks certain things on our computer so that we can't

1   chat to each other, and we realized it, that it was there, we

2   produced it.  And we have since removed those things and

3   there's nothing else.  So, you know, we produced it as soon

4   as we got it.  And there's nothing else missing.

5             THE COURT:  Well, what is it that resulted in the

6   discovery of these Google Hangout messages in January after

7   the search had presumably been done back in August or

8   September?

9             MS. HUOT:  Sure, Your Honor.  As far as I remember,

10  now I'm trying to think back specifically, it was a time

11  period when we worked from home, and I recall doing a lot of

12  this analysis on my computer, and I don't have those

13  protocols blocked on my computer from home.  So it's likely

14  that's why it was discovered then, I believe.

15            And going back, I'm not 100 percent sure, but I

16  believe that's what it was, why it happened that way.  There

17  was a time period around Thanksgiving when there was a lot of

18  travel at our firm, and our firm had everybody working from

19  home around that time.  And it was around Thanksgiving to

20  Christmas, around that time to New Years'.  And then around,

21  you know, 14 days after that.  And around this time period, I

22  believe, that's when it was -- if I remember correctly,

23  that's when it was discovered.  But I'm not really sure what

24  else I can say about this.  We produced it.

25            THE COURT:  Well, you're using the passive voice.

1  You almost make it sound like you personally discovered these

2  messages when you were using a home computer that didn't have

3  the same protocols.  Is that accurate that you, yourself,

4  discovered it?

5          MS. HUOT:  That's right, Your Honor.  We personally

6  searched it.

7          THE COURT:  You're saying "we."  You, individually?

8          MS. HUOT:  Yes.  Me and my colleague.  Yes.

9          THE COURT:  And were you the ones who conducted the

10  earlier search in which there was a protocol that prevented

11  the accessing of those messages?

12          MS. HUOT:  Yes.  We conducted all the previous

13  searched on this.  Yes.

14          THE COURT:  "We," meaning you and your colleagues?

15          MS. HUOT:  Yes.

16          THE COURT:  And when you say that there was a

17  protocol that prevented you from accessing the Google Hangout

18  instant messages, I had incorrectly assumed that it was a

19  protocol that was applied to Plaintiff's email account, that

20  it arose out of her email account, and perhaps the

21  Defendant's protocol from her employment, with the

22  Defendant's.  But now I'm wondering if you're saying that

23  what prevented those communications from being accessible was

24  a protocol on your own office computer.

25          MS. HUOT:  That is what it is.  Yes, Your Honor.

1   We have certain websites that are blocked, and we have -- at

2   our office computers, we have certain websites that are

3   blocked, and we have certain chat functions that are

4   disabled.  That's why we didn't see it before.

5              THE COURT:  So it's your law firm, not the

6   Defendant's law firm, that has the protocols that block those

7   communications?

8              MS. HUOT:  Yes.  As far as I know.  I don't know

9   what the Defendant's -- I cannot speak on what protocols

10  Defendant's law firm has.  I do not know.  I know that we

11  can't chat on CHI Chat.  We can't Google chat at our law

12  firm.  That would be blocked.

13             THE COURT:  And when you were able to discover

14  these communications using your home computer, you did -- you

15  did a thorough search and whatever you came up with that was

16  responsive was produced?

17             MS. HUOT:  Yes.

18             THE COURT:  All right.  I'm prepared to rule on

19  this aspect of the Defendant's motion.  I don't believe there

20  is -- well, before, I just want to confirm you did, in fact,

21  notify predecessor counsel for Defendants that your client

22  had lost her cell phone -- the cell phone that she would have

23  had at the time that she was employed at the Defendant's law

24  firm?

25             MS. HUOT:  Yes.  We reported it that -- we told

1    predecessor that it was, in fact, stolen in March 2019 when

2    she was on vacation in the Bahamas.  That she reported this

3    theft to the hotel, whatever it was called, and that was all

4    we knew of it.  Nothing happened.

5            THE COURT:  And this was in a face-to-face

6    conversation, a phone conversation, an email, or how did you

7    communicate it?

8            MS. HUOT:  It was in a telephone conversation.  It

9    was a meet and confirm on discovery.  We had several of

10   these.

11           THE COURT:  All right.  Based on everything I've

12   heard, I don't believe that there is a sufficient basis for

13   concluding that there a spoilation of evidence in this case.

14   But I do think that in the cost of the delay in producing the

15   Google Hangout messages that defense counsel is entitled to a

16   sworn statement from Plaintiff's counsel providing the

17   information that has been provided to the Court in the letter

18   and in this conversation, this hearing, on an unsworn basis.

19           So provide an affidavit confirming the reason for

20   the delay in the production of these messages, how they were

21   discovered, what it is you told predecessor counsel about the

22   lost cell phone, where the Google Hangout messages were

23   located that is through the -- through Plaintiff's email

24   account.  How much time do you need to do that?

25           MS. HUOT:  Under -- or two weeks, tops.

1          THE COURT:  I will take that under advisement.  Why

2     don't we address the other issues in the case and then I can

3     determine -- I'll set up the schedule depending on what else

4     needs to be done.

5          MS. HUOT:  Okay.  Thank you.

6          THE COURT:  All right.  The remaining aspect of

7     Defendant's motion to compel concerns a challenge to

8     Plaintiff's attorneys' eyes only designations and redactions

9     of invoices for the per diem work that the Plaintiff has been

10     doing since she was terminated by Defendant's law firm.  And

11     these go to Plaintiff's efforts to mitigate damages.

12          Let me ask Ms. Price, why did you wait six months

13     before raising this issue with the Court?

14          MS. PRICE:  Your Honor, we were involved in other

15     discovery and really burdened by Plaintiff's numerous

16     demands.  As noted in our papers, we've produced over 13,000

17     documents, reviewed hundreds of phone calls, and dealing with

18     technology experts to get these discovery searches completed.

19     And so unfortunately, we were delayed in address this issue

20     with the redactions and attorneys' eyes only.

21          But ultimately, we met and conferred with

22     Plaintiff, and they refused to change their designations to

23     confidentiality -- confidential only, which we believe is

24     consistent with the parties' agreement and the Court's prior

25     ruling.

1          THE COURT:  Well, as I understand it, they -- you

2    make it sound as if Plaintiff's counsel dug in their heels,

3    but initially, they had redacted the information.  They did,

4    then, un-redact it, and produced it on attorneys' eyes only

5    basis.  So you and your colleagues have had access to the

6    information that the Plaintiff is seeking to prevent

7    Defendants from seeing, correct?

8          MS. PRICE:  Yes, Your Honor.  But I think it's

9    important to note that not all of the invoices were

10   reproduced without the redactions, and that even some of the

11   attorneys' eyes only designated documents still have

12   redactions and it's very difficult to share these with the

13   client because it's just confusing which one is which as far

14   as the redacted versions go.

15         THE COURT:  Well, I've looked at all of them, and

16   of the 50-some-odd invoices that were produced, there are

17   exactly three that contain any redactions.  Putting aside the

18   attorneys' eyes only issue, I see three that have redactions.

19   And you know, by way of example, I'm looking at an October

20   20th, 2020, invoice, and this is docket entry 46-2, page 60.

21   And there's an invoice for depositions and there's a second

22   one, an EUO examination under oath, of a claimant scheduled

23   for a particular day in 2020, and there is a redaction

24   parenthetical that's then redacted but it has the court

25   of -- cost of appearance.

1          So while it's true that neither you nor the Court

2    knows what has been redacted, I can't -- I don't find the

3    argument persuasive that it's confusing and you can't

4    understand these documents unless they're unredacted in total

5    and available for the client to see.

6          The issue in for which these are produced is

7    mitigation of damages.  So you have documents showing the

8    work that the Plaintiff did and what she was paid for it.

9    What is the relevance of, you know, what's the arguable

10   relevance of the information that was redacted and the

11   information that was designated as attorneys' eyes only?

12          MS. PRICE:  Your Honor, just to clarify one point.

13   The confusion with the redactions comes from the documents

14   not designated attorneys' eye only.  And those are the

15   documents we're permitted to share with our client.  So just

16   in having conversations with the client, it's more difficult

17   with the redacted confidential version.

18          Regarding the information in general, Defendants

19   are entitled to this, and it's important that we're able to

20   confirm what work Plaintiff has been doing, especially, to

21   confirm, you know, the rates that she's charging in order to

22   understand her mitigation efforts in full.  Additionally, the

23   parties have a confidentiality agreement that specifies the

24   terms of attorneys' eyes only designations, and it simply

25   doesn't meet the standard.

1          THE COURT:  Before we get to that, what is it that

2     you're unable to ascertain either because of the -- we can

3     put aside the 3 redactions, it's 3 out of 64.  So let's just

4     focus on the information that is attorneys' eyes only, so

5     you're unable to share that with your client, but you have

6     access to it.

7          And from my review of the records, the -- if you

8     look through the records, there are, I think, about three

9     different lawyers or law firms that the Plaintiff performed

10    work for.  To the extent that you want to confirm with those

11    attorneys that she did do this work, and no more than the

12    work that she asserts, you have that information and can

13    confirm that, correct?

14         MS. PRICE:  Yes, Your Honor.  But I think our point

15    is that our client is also entitled to that information, and

16    it doesn't have to necessarily do with the particular

17    relevant or our ability, but that the parties have agreed to

18    certain terms and our client is entitled to this information

19    under those terms.

20         THE COURT:  Well, you say your client is entitled

21    to it, and that's for the Court to determine.  But I'm now

22    asking the relevance, because while it is true as a general

23    principle that parties should not selectively redact from

24    otherwise discoverable documents portions that they deem are

25    not relevant, that standard can be over -- that presumption

1    against unilateral redactions, or in this case attorneys' eye

2    only designation, can be a showing of good cause can overcome

3    that presumption.  And I have not heard anything from you as

4    to why your client needs that information.

5            Plaintiff's counsel offered to provide pseudonyms,

6    so if your client is confused, for example, as to how many

7    different law firms she worked for, she can put A, B, and C,

8    or you could do that.  You've got the -- you know, you have

9    the unredacted documents, but to the extent that you think

10   your client ought to know that, your client doesn't need to

11   know the identities of those law firms or the identities of

12   the law firm's clients, and I haven't heard you provide any

13   justification for providing that information other than your

14   conclusory assertion that your client is entitled to it under

15   the protective order.

16           MS. PRICE:  Your Honor, I think one thing I'll note

17   is that in redacting the names of the law firms it's clear

18   that it's simply just a tactic to make this more confusing

19   given that at Plaintiff's deposition she testified regarding

20   the law firm she had worked for, and this was not a section

21   of highly confidential attorneys' eyes only portion of the

22   deposition, and our client was there and heard this

23   information.  So it doesn't comport that Plaintiff is seeking

24   to redact this or make this attorneys' eyes only given that

25   our clients already had access to this information in a

1    different form.

2          And also, I think we're just trying to understand

3    in full and be able to discuss with our client in full, who

4    is also in the same personal injury realm and can discuss

5    more fully with us, you know, the implications of some of the

6    cases that Plaintiff is working on.

7          THE COURT:  Well, Plaintiff in her letter of

8    January 25th, docket entry 49, lists six reasons why it is

9    proper to redact the clients' names, which I take it you have

10   gotten those clients' names.  You just want to be able to

11   share them with the defendants.  But she points out that many

12   of the clients are minors whose names are not publicly

13   disclosed in their respective lawsuits.  She says disclosure

14   of client names will cause Plaintiff to breach her agreements

15   with the firms that engaged her, which require that she keep

16   the names of the firms' clients strictly confidential.

17          She states that many of Plaintiff's clients never

18   filed lawsuits, so we're not dealing with a matter that's

19   public record.  She says that, for some, the designations are

20   necessary to ensure compliance with confidentiality

21   obligations under the clients' settlement agreements, and she

22   has several other reasons.  But I've heard nothing specific

23   suggesting that your client needs to know who these other

24   clients are, and the arguments that you're making are simply

25   makeweight.

1          MS. PRICE:  I understand what you're saying, Your

2     Honor, but I think, you know, all of the cases Plaintiff cite

3     and all the reasons she gives really go toward not disclosing

4     that information publicly.  And Defendants are perfectly

5     comfortable with simple confidentiality designations, which

6     is the same thing that Defendants have done.  Plaintiffs did

7     not need to know all the details of every case at Defendant's

8     firm, and it's certainly a risk to Defendants to share that

9     information.  And yet, Defendants have been required not to

10    redact information and to only use confidentiality markings,

11    and so we're simply asking for the same sharing of

12    information with -- from Plaintiff.

13         THE COURT:  Well, isn't there a difference?

14    Because, I presume, for most of the information that's been

15    shared with Plaintiff on a confidential basis, she was

16    representing these clients.  She was part of the law firm

17    that was representing these clients, so this is not new

18    information to her.  She was exposed to this information in

19    her capacity as an employee of the defendant law firm.  You

20    are now asking for information concerning clients of the

21    defendant's competitors, so that information is more

22    sensitive and is more deserving of protection.

23         I'd like to ask Plaintiff's counsel -- now, I'm a

24    little bit confused.  Just remind me, did you -- the

25    information that is being withheld from Defendants as opposed

1    to Defendant's counsel, the attorneys' eyes only, is that

2    simply the client identities or was it also the identities of

3    the law firms?

4           MS. HUOT:  Your Honor, we are happy to provide the

5    identities of the law firms.  All we would like is to keep

6    the client names confidential -- I'm sorry, the client names

7    redacted.  We offered to unredact everything else, just the

8    client names to be kept redacted or replaced with pseudonyms

9    like A, B, John Smith, Mike Brown.

10          THE COURT:  Well, when you say redacted, they're

11   redacted from the copies that are accessible to the

12   defendants.

13          MS. HUOT:  Yes.

14          THE COURT:  But defense counsel has access to them,

15   correct?

16          MS. HUOT:  We're happy to produce them in two

17   different ways.  We've already produced them completely

18   unredacted to Defendant's counsel as attorneys' eyes only.

19   They have a record of every single client.  We're also happy

20   to produce them so that the defendant himself can see it with

21   the same versions of the documents except on those documents

22   marked as only confidential, but just redact the client

23   names, that's it.

24          So the only difference would be that the attorneys,

25   Ms. Price, will have the complete document clean, unredacted,

1  marked, attorneys' eyes only, but her client, Mr. Prakhin,

2  will have the same document marked confidential, just the

3  client names redacted.  The firms will not be redacted.

4        THE COURT:  But I want to understand what

5  Defendants now have access to which is not designated as

6  attorneys' eyes only.  Do the defendants have access to the

7  names of the law firms that your client has worked with since

8  her termination by Defendants?

9        MS. HUOT:  They have it in multiple different ways

10  because we submitted, you know, 1099s.  Those names are not a

11  secret.  We're happy to produce that unredacted.  We just

12  haven't had -- in our meet and confer we offered to do this,

13  but they rejected it and then filed this motion, so we are

14  left at a point where we are offering to do this, but there

15  was no response of, yes, we'd do that.

16        THE COURT:  Well, I'm not asking you now what you

17  offered to do.  I mean, I only have the documents in front of

18  me, and I've been asked to compare Exhibit 46-1 and 46-2, you

19  know, Exhibit G and Exhibit H to the motion to compel, and I

20  gather that what the defendant now has access to does not

21  have the names of the firms.  Is that accurate?

22        MS. HUOT:  Yes, that's accurate.  So in the past,

23  we produced only the redacted versions, which is the ones

24  that you see that are redacted.  In August 2020, the parties

25  met and conferred about this and through this meet and confer

1  we agreed that the solution would be to produce these

2  documents unredacted as attorneys' eyes only.  So based on

3  that, we reproduced all these documents as attorneys' eyes

4  only, unredacted, and we thought that was going to resolve

5  the issue based on our prior meet and confers and prior

6  agreements.

7          This was just a new surprise.  That's why we

8  offered to now produce them again and remove everything

9  except for the clients' name, so that's where we are right

10  now.

11          THE COURT:  Well, you say that you've produced them

12  in completely unredacted form, attorneys' eyes only, but of

13  the 64 pages that appear as Exhibit H, which is docket entry

14  46-2, there are three pages that do have redactions, and I

15  take it those are portions that you concluded for some reason

16  that even defense counsel should not have access to that

17  information.

18          MS. HUOT:  I will double-check those.  As far as I

19  remember, I think they implicate some attorney/client

20  communications between Ms. Ruderman and her client.  I'm

21  not -- I have to go back and double-check what the substance

22  was, but I believe it was something related to a

23  communication between them, and it has absolutely nothing to

24  do with mitigation efforts.  It was so-and-so said something,

25  which we, at the time of the production, thought to redact

1   because she can't waive that.  But I believe --

2        THE COURT:  I'm not saying that it's material.  I'm

3   simply trying to get clarification.  To the extent that it's

4   redacted, it should be included on a privilege list.  And as

5   I said, there are three such documents at pages 49, 57, and

6   60 of docket entry 46-2.

7        Plaintiff has offered to reproduce the documents in

8   a form that makes clear that all that is being redacted are

9   client names.  Or in the case of those three documents, if

10  Plaintiff upon review concludes that those do reveal

11  privileged information should then be included in a privilege

12  list.  But otherwise, for the remaining documents, the only

13  thing that should be redacted out is the names of the

14  clients.  Those will be produced to Defendant on a basis

15  of -- a confidential basis, but I find that there is good

16  cause to redact the names of the clients so that -- well, not

17  fully redact them.  Redact them from the copies accessible to

18  Defendants, defense counsel.  Have those names, but I have

19  not heard any reason why defense counsel need those names in

20  order to assess Plaintiff's mitigation efforts, which is the

21  reason why these documents were produced, so that aspect of

22  the motion to compel is granted in limited part only.

23       And I guess in light of the fact that there is

24  additional work that's going to have to be done, I'm going to

25  assume that these confidential, redacted copies should be

1   produced by March 8th.  I'll revisit the deadline after I've

2   gone through all the remaining discovery issues.  But for

3   now, let's say presumptively that Plaintiff's counsel will

4   provide the affidavit on the first aspect of Defendant's

5   motion to compel, and will produce these invoices in the form

6   that we discussed by March 8th.

7            MS. HUOT:  Yes.  Yes, Your Honor.

8            THE COURT:  All right.  That now takes us to the

9   plaintiff's motion to compel.  That was docket entry number

10  47, and let me just open up to that.  The defendants'

11  response is docket entry number 50.

12           There are four aspects to Plaintiff's motion to

13  compel.  In the first, the plaintiff requests an in-camera

14  review of documents identified in Defendant's privilege log.

15  Before Plaintiff files her lengthy application after seeking

16  and obtaining information to file an oversized letter motion,

17  the Court did urge the plaintiff to, you know, not to try and

18  narrow the universe of documents for which she was seeking

19  in-camera inspection.  Plaintiff's counsel did not heed that

20  suggestion, and so now, the Court is being asked to conduct

21  an in-camera review of documents on a 12-page privilege log.

22  I have not counted up the number of documents, but I presume

23  it's hundreds.

24           Ms. Huot, do you know the number of documents for

25  which you're seeking in-camera review?

1            MS. HUOT:  Your Honor, all these descriptions of

2   these documents appear to me virtually identical.  It's

3   possible the majority of them are duplicative.  Some of them

4   are instant messages.  We count about 15 per page, so 15

5   times 12 would be our guess.  I haven't added them up

6   altogether.  I counted on the first 5 pages, 5 times 15; I

7   counted them to be 75.  So 12 times, but again, they do

8   appear to be duplicative, and there's no way -- the reason we

9   had to include all of them was because they're logged as

10  identical, so there's no way to discern the different

11  descriptions.  They just have the same description for all of

12  them, virtually the same.  So 12 times 15 would be 180

13  documents, 180 entries.  That's the best we can come up with

14  from this privilege log.

15            THE COURT:  Well, you raised --

16            MS. HUOT:  It appears (indiscernible) messages.

17  Sorry.

18            THE COURT:  I have to say that this is -- I've been

19  on the bench for decades now, and in most cases, parties

20  agree that documents that are created after litigation

21  commences need not even be included on a privilege log.  So I

22  was somewhat surprised to get this sweeping demand, and

23  you've raised a series of arguments as to why you believe

24  that these communications are not privileged.  And among

25  other things, you talk about a document that was prepared in

1  the regular course of business.  I just want to clarify, all

2  of these communications occurred after Plaintiff ceased

3  working at the defendant's law firm, and indeed, after the

4  lawsuit was brought, correct?

5          MS. HUOT:  Correct, Your Honor.

6          THE COURT:  Okay.  So that if while it's true if

7  she was then employed at the -- if there was a communication

8  about her work and her -- either the quality of her work or

9  her absences, if those occurred while she was working for the

10  defendant law firm, there certainly would be a strong

11  argument that even if that was -- that outside counsel was

12  somehow involved, that those were made in the regular course

13  of business.  But here, those are made after she ceased

14  working for the firm and after litigation was commenced.  So

15  how could those be made in the ordinary course of business?

16          MS. HUOT:  Sure, Your Honor.  And if I could just

17  take one step back, the standard for this, as a matter of

18  law, the defendants need to satisfy a heavy burden in the

19  first instance as their burden to establish the applicability

20  of privilege for these documents.  And every single court

21  that has analyzed this issue, from the Eastern District to

22  the Southern District, to the Second Circuit, to the Supreme

23  Court of the United States has said that conclusory

24  statements on a privilege log such as these, saying that the

25  documents were made at the behest of counsel, even after

1  litigation commenced, every single court said that these

2  conclusory statements are not sufficient to carry this

3  burden.

4          Defendants have the burden to submit additional

5  evidence such as deposition testimony, declarations,

6  affidavits, in-camera review.  Every single case had

7  in-camera review to prove that these have privileged

8  information in them.  In this case, 90 percent of these

9  documents were generated before counsel's involvement, before

10  this counsel's involvement in this case.  I counted 67 --

11          THE COURT:  Can I just stop you?

12          MS. HUOT:  Yeah.

13          THE COURT:  Because you say before this counsel's

14  involvement, but we talked earlier --

15          MS. HUOT:  Yes.

16          THE COURT:  -- about the fact that there was a

17  change in counsel.

18          MS. HUOT:  Yes, Your Honor.

19          THE COURT:  So --

20          MS. HUOT:  But the point is there's no

21  declarations.  There's no evidence that would --

22          THE COURT:  Let me just ask you.  You said 90

23  percent of them occurred before this counsel was involved.

24  Did 90 percent of them occur before any defense counsel was

25  involved?

1          MS. HUOT:  No.  No.  But what I'm saying is just on

2    the first -- I just want to be accurate.  I only looked at

3    the first five pages to make this calculation.  It was like

4    66 out of 75.  But if now -- the point is, is that there is

5    no declaration from predecessor counsel.  There's no

6    deposition testimony.  In fact, deposition testimony shows

7    the exact opposite.

8          What needs to be shown in this case for Defendants

9    to carry their burden, they need to -- every single case that

10   they cited, all the cases that they cited, they need to

11   either submit the documents for in-camera review in addition

12   to submit declarations, in addition to submitting deposition

13   testimony to establish that the defendants here, an

14   individual was deputized to conduct this investigation and

15   then report these findings back to the counsel, not to the

16   defendants, and that there was direct supervision between the

17   outside counsel and the person deputized.  Every single case

18   that they cited supports this and says this is exactly what

19   needs to be shown.

20          In this case, not a shred of this type of evidence,

21   or anything remotely close to this was submitted, and it is

22   their burden to prove this.  And on the privilege log, it

23   clearly says that these documents related to Plaintiff's job

24   performance and her employment.  This goes back to your first

25   point, Your Honor, is that even if they satisfy their burden,

1  which they didn't even attempt to do and did not come close

2  to doing, even if they satisfy it, this is waived for two

3  reasons.

4        First, they submitted hundreds of emails that talk

5  about Plaintiff's job performance and her employment being,

6  you know, whatever it is.  So this is also done in the

7  ordinary course of business, but that's not even the main

8  argument.  The main argument is that it's --

9        THE COURT:  Well, let me stop you because you're

10  going very quickly.

11        MS. HUOT:  All right.

12        THE COURT:  I assume they submitted hundreds of

13  emails that before litigation commenced concerning her

14  performance and her employment, correct?

15        MS. HUOT:  Yes.

16        THE COURT:  So that does not detract from the fact

17  that -- the fact that there were emails on that topic does

18  not mean that emails created after litigation commences and

19  defense counsel is involved, that because it's on the same

20  subject that there's been a waiver.  I understand your

21  argument about you want a further showing from defense

22  counsel.  Put that aside to the moment.

23        MS. HUOT:  Sure.

24        THE COURT:  I take it you concur that simply

25  because there are documents on a certain subject produced

1  before counsel is involved does not mean that communications

2  on the same subject after counsel is involved, and presuming

3  there's a showing that counsel asked that the client collect

4  information and documents, but doesn't mean that there's been

5  a subject matter waiver, correct?

6          MS. HUOT:  No, not exactly, Your Honor.  There's

7  two different points.  The ordinary course of business is one

8  issue, which is what Your Honor is speaking of.  But the

9  at-issue waiver is a separate issue.  Because in this case

10  the defendants' central defense is that Plaintiff's job

11  performance, as he's understood it, was poor, which is why,

12  based on that understanding, he went ahead and terminated

13  her.  That it was not because of discrimination because of

14  her disability.  It was because she had poor job performance.

15          So in this case, they relied on this particular

16  issue, and now what they're doing is they're trying to shield

17  the emails that are on the very same subject area.  It's

18  selective, and that's the case law.  There's extensive case

19  law about the sword and shield arguments that say if you're

20  going to rely on a certain subject matter in general,

21  regardless of the timing -- and by the way, Your Honor, in

22  the Koumoulis case, in that situation, the exact same emails

23  and the exact same type of documents were, in fact, held to

24  be this type of sword and shield even though they were

25  generated after plaintiff filed her EEOC charge and after

1    counsel hired -- after the parties hired counsel.

2           So this sword and shield argument is saying that if

3    you're going to rely on a certain subject area and say that

4    this is my central defense because of plaintiff's job

5    performance, you then can't selectively hide certain other

6    documents that talk about the exact same subject matter.  And

7    practically, that makes sense because in these types of

8    emails, he could have said the exact opposite than what he's

9    saying in the emails he did produce that he's saying is part

10   of his defense.

11          THE COURT:  So I think you are -- with all due

12   respect, I think you are totally missing the limiting

13   principle of the cases that rely on the sword and shield

14   rationale.  Those involve influences where, for example, in

15   the seminal Second Circuit case, whose name will come to me

16   shortly, a defendant was going to testify at trial to

17   reliance on advice of counsel.

18          MS. HUOT:  In Re Grand Jury, right.

19          THE COURT:  No, no.  It was U.S. versus -- it was a

20   pre-trial ruling.  And the Second Circuit said you can't say

21   that you relied on what your attorney told you and not

22   disclose what your attorney told you.  That's different than

23   what you are positing, which is if it's on the same subject

24   matter and you've made disclosures on that subject matter,

25   you can't shield otherwise privileged materials that happen

1  to be on the same subject matter.

2        MS. HUOT:  Your Honor, in the Seal (ph) case, which

3  is the EDNY case from 2019, I believe it does say -- and,

4  Your Honor, I understand that this is -- can go both ways.

5  But in that case, the point is, is that they were saying that

6  if you rely on subject matter in certain communications it

7  does support my position.

8        But in this case, it's the defendant who is making

9  these communications.  These are party admissions.  He's

10 making these communications, not to counsel, he's making them

11 to other witnesses in this case who we deposed who said they

12 have no idea what this is.  They never participated in this

13 litigation.  All they did was gather documents, hard copies

14 of documents, to produce them in discovery.  That's very

15 different --

16       THE COURT:  United States v. Filzarian (ph) is the

17 Second Circuit case.  And again, the reliance on advice of

18 counsel, that is not what's at issue here.  And I understand

19 that you have, you know, you're taking the position that

20 there was a waiver when the witnesses testified about the

21 communications, Prakhin's communications with other employees

22 without any privilege objection.

23       I will say that I looked at those transcript

24 citations, and with one exception, it is totally inaccurate

25 to say that it was without any privilege objection.  What the

1   witnesses testified to was the fact that they had

2   communications with one another, but there was an objection

3   to inquiring into the nature and substance of those

4   communications except as to one.  So it was only the fact of

5   the communications, and not what was discussed.

6          MS. HUOT:  Okay, Your Honor, well taken.

7          THE COURT:  With one exception.

8          MS. HUOT:  In this case, we're not even asking for

9   wholesale production of these documents to us.  We're asking

10  that they be reviewed in-camera.  In the case of In Re Grand

11  Jury, July 6, 2005, that case says that such in-camera review

12  inspections are routine and standard.  And it happens that if

13  defendants oppose that -- in that case, the defendants

14  opposed the in-camera review and the court held that the

15  burden is a very heavy one.  And if you're opposing in-camera

16  review and you didn't provide any other documents besides a

17  privilege log or these conclusory searches, you have

18  absolutely no way of carrying your burden.  And in this case,

19  what Your Honor is talking about, the at-issue waiver or the

20  business record, or the standard course of, whatever,

21  standard course of business --

22         THE COURT:  Ordinary course of business.

23         MS. HUOT:  -- is a secondary issue.  The claim

24  itself is that the burden is on the defendants to prove this.

25  They have to prove that they were supervising the defendants.

1    That the defendant was deputized directly by the attorney,

2    and this is the defendant himself, not even an individual

3    person.  That he was deputized to go conduct an investigation

4    and report back directly to the attorney, not to the

5    defendant.  How can you deputize a defendant himself to

6    report back to not himself, but to the attorney, and that

7    this was created for the purpose of seeking legal advice.

8           There is a case, it's called Medina v. Buther.

9    It's in the Southern District of New York that says that

10   "Where a nonlegal person is asked to provide a response to a

11   matter raised in a document it can't be said that the primary

12   purpose of the document is to seek legal advice because by

13   definition, a nonlegal person cannot render legal advice."

14   And in all the cases cited by the defendants, like in the

15   Gucci (ph) case, in the Carter case, every single case they

16   did three things.  They submitted in-camera review, they

17   submitted deposition testimony, and they submitted tons of

18   declarations.  And in all of those cases, the court was very

19   particular and said that the defendants sufficiently showed

20   that privilege extends to these group of documents because

21   the declarations show that they were directly supervised,

22   that they were deputized, that they reported back to the

23   counsel.

24          However, it fell short of showing that this set of

25   documents, you know, carry the same application, and so this

1    was produced; this was not produced.  In this case, they

2    didn't even try to come close to any of this standard.  So as

3    an initial matter, their motion -- like their burden isn't

4    satisfied.

5              THE COURT:  Well, you may be right, but that

6    doesn't mean that you automatically have a right to have the

7    Court review almost 200 documents in-camera because I can

8    order them to try to satisfy their burden.  And if they don't

9    satisfy their burden, then I can rule that they haven't

10   satisfied their burden.

11             And it's well and good for the Second Circuit to

12   say, you know, from up on the 25th floor that in-camera

13   examination for privilege is routine.  That isn't the way it

14   operates when the judges on the front line have 500 civil

15   cases in addition to their criminal case responsibility.

16   They're not there to sort through hundreds of communications.

17             I just have a couple of other --

18             MS. HUOT:  Your Honor, may I just have --

19             THE COURT:  -- observations to make and one is

20   that -- and I could be misremembering, but I thought that Mr.

21   Prakhin did testify that counsel had asked him to get others

22   to gather documents.  That he had been asked to gather

23   documents and information from others in the firm.  So you

24   may well say that that's an insufficient showing, but to the

25   extent that he did testify, it's not accurate to say that

1    there was no testimony provided at all.

2          And with respect to the ordinary course of

3    business, again, the cases that deal with ordinary course of

4    business do not involve the situation that we have here.

5    They involve insurance companies which are in the business

6    issuing policies and then responding to claims under it, and

7    there's always the looming threat of litigation.  Or in the

8    patent situation where there are patent attorneys who are

9    retained, and that was true in one of the cases that you

10   relied upon, the name of which is somewhat lengthy, and it

11   starts with an R.

12         MS. HUOT:  (Indiscernible).

13         THE COURT:  And that is different than the

14   situation that we have here where you have, you know, yes to

15   the extent that there were these discussions while she was

16   employed there.  Those discussions, you would certainly have

17   a strong argument that they were made in the regular course

18   of business.  But to the extent that they occur after

19   litigation has been filed, and where counsel is already

20   representing the defendant and claims to have asked the

21   client to gather this information, that's a different

22   situation.

23         I would make one other observation, and that is

24   we've been talking in terms of a privilege.  I've been using

25   that as a shorthand for attorney/client privilege and/or work

1   product privilege.  And the standards that you've articulated

2   about having these employees report directly to counsel as

3   opposed to one of the defendants, those points may be well

4   taken if what we're talking about is attorney/client

5   privilege and whether or not this is for the purpose of

6   obtaining legal advice.  It's different if we're talking

7   about work product and an attorney asking a client who works

8   for a firm or company to have the client's underlings gather

9   information for use in the litigation.

10          MS. HUOT:  Your Honor --

11          THE COURT:  I would --

12          MS. HUOT:  Oh, sorry.  I just wanted to clarify.

13  None of these privilege log entries state that any of these

14  communications were made for purposes of gathering documents.

15  If that's what it said, we would have a different conclusion.

16  What these documents -- none of them say that.  They say that

17  they are confidential documents regarding Plaintiff's job

18  performance prepared at the direction of counsel.  None of

19  this -- no --

20          THE COURT:  I said gathering.  I said, yes,

21  gathering documents or information.  I believe Mr. Prakhin

22  said that he had been asked to get information to refresh his

23  recollection, so I wasn't limiting it to gathering documents.

24          MS. HUOT:  Your Honor, I'm sorry.  I don't believe

25  that that's what the testimony was, and I believe that the

1  only testimony on this issue from any of the witnesses was

2  that the only thing they were asked to do was gather hard

3  copies of documents to respond to discovery.  That there

4  isn't -- and I can double-check this, but there wasn't

5  something that -- testimony saying that he was acting because

6  counsel told him to do something about an investigation.  But

7  otherwise, I just wanted to clarify that.

8        THE COURT:  All right.  And I know there's another

9  aspect to your privilege argument, and that is the

10 communications with third parties, but I'd like to hear from

11 defense counsel first with respect to these issues.

12       Let me ask why isn't your showing insufficient to

13 sustain the privilege?  The burden is on the proponent to the

14 privilege.  On what basis could the Court possibly say

15 sustain your burden?

16       MS. PRICE:  Your Honor, we feel that the deposition

17 testimony is sufficient to meet the burden, and the privilege

18 log itself.  We've accurately reflected the dates that these

19 communications occurred, which is clearly during the

20 discovery period of the litigation and well after Plaintiff's

21 suit was filed.  And the deposition repeatedly states that

22 Ms. Raskin, Ms. Larson, and Mr. Prakhin were involved in the

23 collection of information and documentation for this matter.

24       With respect to Ms. Raskin in particular, the

25 question asked of her was other than gathering and collecting

1  documents for discovery, were you involved, and to which she

2  answered no.

3        And so, you know, Plaintiff also has not really

4  shown that that testimony doesn't contradict what's listed on

5  the privilege log.  And --

6        THE COURT:  Well, it's not enough that they were

7  gathering documents.  If Mr. Prakhin, as the principal of the

8  defendant law firm and in his individual capacity, decided to

9  enlist his employees to assist in gathering evidence, he is

10 not representing -- he may be a lawyer, but he's not

11 representing himself in this lawsuit, so that would not be

12 protected by attorney/client privilege or the work product

13 doctrine.  Correct?

14       MS. PRICE:  Yes, Your Honor.  But Plaintiff's

15 document demands and interrogatories specifically requested

16 information about Plaintiff's employment and her work

17 performance, her bonuses, her payroll sheets, and all that

18 sort of information, and it's impossible for the firm, a

19 intangible entity, to collect this information on its own.

20 It has to use its employees to collect this information in

21 order to respond to the demands that Plaintiff propounded on

22 Defendants.

23       THE COURT:  I understand that, but that's beside

24 the point.  If Mr. Prakhin said I am taking it upon myself,

25 you know, my lawyer gave me the -- you know, sent me a copy

1   of the demands and advised -- and he takes it upon himself to

2   enlist his employees to do the gathering, he's not

3   representing himself, so there's no privilege or protection

4   that would apply to the communications between him and his

5   employees.

6           MS. PRICE:  Respectfully, Your Honor, I think I

7   disagree in that if outside counsel instructs Defendant to

8   gather information, Mr. Prakhin could not have gathered all

9   this information on his own.  It's simply impossible.  We're

10  produced over 13,000 pages of information, and it would be

11  simply impossible for anyone to just -- to do all that on his

12  own, especially when he is not the custodian of many of these

13  records.  He has to communicate with the other employees that

14  pulled these records.

15          And I think the case law supports that,

16  specifically in the Carter case or the Gucci case, or in the

17  case the Plaintiff cited in which outside counsel spoke with

18  an in-house attorney or an in-house employee and that

19  employee then went and spoke to other employees.  And all of

20  those communications were privileged because it was the

21  purpose of gathering information to go back to outside

22  counsel to help in the representation.

23          THE COURT:  Well, I take it since you received no

24  information or notes from predecessor counsel that you don't

25  even know what instructions, you know, what in particular the

1     instructions were, if any, from predecessor counsel?

2          MS. PRICE:  No, Your Honor.  We have information

3     from predecessor counsel, just not specific to Ms. Ruderman's

4     cell phone.  We have plenty of documentation from former

5     counsel.  We have emails between former counsel and Mr.

6     Prakhin and other documentation when the case was transferred

7     over.  The distinction is we just never received anything

8     regarding the cell phone in particular.

9          THE COURT:  That wasn't what I understood you to

10    say earlier.  I'm glad that you clarified that.

11    Well, if you have emails from predecessor counsel and those

12    support your position, then those should be provided to the

13    Court, even if it's on an ex parte basis.  But you really

14    have made no factual showing or -- I mean to the extent

15    there's any showing, it's little snippets and statements at

16    depositions.  It's not even any particular portion that

17    you've cited for the court.  I just happen to see it in

18    reading some other portions.

19          But you really have not made any showing whatsoever

20    to sustain the privilege, and I'll give you an opportunity to

21    do that.  And to the extent that you believe you can only do

22    it on an ex parte basis, you can make that application, make

23    the showing on an ex parte basis, and I will review it and

24    determine whether or not it's sufficient.

25          MS. PRICE:  Yes, Your Honor.

1           MS. HUOT:  Your Honor, may I be heard.  The

2     underlying documents, if they are what Ms. Price says, that

3     it is responding to discovery demands.  So if Mr. Prakhin was

4     told by counsel go print out these documents, and then Mr.

5     Prakhin go tells his paralegal print out these documents,

6     that is not protected by privilege.  Even if that was the

7     case, that's why in-camera review, and I know, Your Honor, it

8     may be burdensome and maybe we can narrow it down, but, you

9     know, after consultation with the defendants, but that's the

10    whole point is that the underlying documents need to show

11    opinions, conclusions by counsel, legal theories, legal

12    advice.

13          If it's just go print these documents, which is

14    exactly what Ms. Raskin testified to, that the only thing she

15    was asked to do was compile hard copy documents.  They can't

16    be privileged.

17          THE COURT:  I think again you are -- you're taking

18    a legal principle and totally misunderstanding its scope.

19    The work -- well, let's talk about work product, and there

20    are different forms of work product.  There's mental

21    impressions of an attorney which are entitled to the

22    most -- the highest protection, and then there's ordinary

23    work product.  And the ordinary work product does not have to

24    reflect legal advice or a lawyer's thinking process.

25          If an attorney asks the client to do something and

1    the client gathers that evidence and gives it to the

2    attorney, the communications between the attorney and the

3    client or the client's subordinate may well be protected by

4    ordinary work product.  And then there has to be a showing

5    made if that doctrine applies, then it's the requesting

6    party's burden to show the need for it.  It's not an absolute

7    privilege; it's a doctrine of some protection.  This all

8    strikes me as much ado about nothing.

9          But let me ask defense counsel.  Ms. Huot had

10   stated that the -- and now I have to go and find the

11   privilege logs --

12         MS. HUOT:  Yes.  It is document number 47-1.  It is

13   Exhibit 1.

14         THE COURT:  All right.  She said that the -- and

15   I'm about to open that -- that the descriptions do not

16   indicate that the -- a request to gather documents.  So what

17   are these?  And I'm looking and I'm seeing that the authors

18   are, you know, various -- the parties to these communications

19   are, I assume, you know, individuals who worked for the

20   Defendant law firm.  Were they discussing -- without getting

21   into specifics, were they simply discussing among themselves

22   whether or not the plaintiff was a satisfactory employee?

23   Were they gathering documents?  You're the only one on this

24   conversation who has seen all the documents.  So what's the

25   nature of the documents without getting into specifics?

```
 1              MS. PRICE:  Yes, Your Honor.  The nature of the
 2    documents for the majority is gathering information for
 3    discovery, gathering documents, gathering information to
 4    respond to discovery and to build Defendant's defense.  And
 5    we communicated this to Plaintiff's counsel during a meet and
 6    confer regarding -- we actually had multiple meet and confers
 7    regarding this issue specifically over the summer back in I
 8    don't remember which months it was, but back over the summer.
 9    And we clarified this issue with Plaintiff's counsel.
10              We provided them with our research and our
11    positions, and now they've brought this up much, much later,
12    even though we've already discussed these issues many times,
13    and tried to clarify that these are relevant to discovery and
14    it is not simply random discussions that were had among
15    employees.  And Mr. Prakhin and the other defendants did
16    testify about unprivileged conversations that they had.
17              THE COURT:  Well, you say that they testified about
18    unprivileged documents, and there was one -- there was one
19    witness who -- and let me see, I guess it was Erica Larssen.
20    And unlike the other witnesses, Mr. Prakhin, Ms. Raskin, Mr.
21    Zohar -- I might be getting the genders wrong.  I don't
22    recall specifically.  But with respect to the other three,
23    the attorney defending the deposition instructed the witness
24    not to disclose the substance of the discussion.
25              That was not true for Ms. Larkin (ph.), and her
```

1    testimony at pages 40 to 42 -- no, I'm sorry, it's 31 to 37

2    of her deposition, she did get into the substance of the

3    discussions.  So why wasn't that a waiver?

4         MS. PRICE:  Your Honor, I believe there are some

5    objections in that portion of the discovery testimony, but

6    again, those were referring to discussions that were outside

7    the presence of counsels and not at the direction of counsel.

8    And so defendants agree that those types of communications

9    are not privileged.  If employees simply wish to have a

10   conversation about Ms. Ruderman or this litigation or

11   anything like that, that's not necessarily -- that's not

12   privileged unless it's for the purpose of seeking legal

13   advice, and that's the distinction between the documents on

14   the privilege logs and what Ms. Larssen testified about.

15        THE COURT:  Well, you say it's outside the presence

16   of counsel, outside counsel.  I assume that in none of these

17   communications on the very lengthy privilege list with

18   outside counsel CC'd, so in that respect, all of these

19   communications are outside the presence of the, you know,

20   attorneys in this case defending the defendants.

21        I frankly did not see any difference between the

22   areas that counsel was about to get into, Plaintiff's counsel

23   was about to inquire into Mr. Prakhin, Ms. Raskin, and Mr.

24   Zohar and the counsel defending the deposition said no,

25   you're getting into privileged areas.  I didn't see any

1   distinction between where that testimony was going and the

2   testimony that Ms. Larssen was permitted to give.

3          MS. PRICE:  I understand what you're saying, Your

4   Honor, and that is a good question as to exactly why no

5   objection was made, but even if it's to just that specific

6   portion of Ms. Larssen's testimony, it certainly doesn't

7   waive all of the privilege regarding the communication on the

8   privilege log.

9          THE COURT:  All right.  Is there anything else you

10  want to say?

11         MS. PRICE:  No, Your Honor, just to make the point

12  that again, Defendants welcome the opportunity to provide you

13  with further information if you would like regarding this

14  matter.

15         THE COURT:  Well, it's not what I like; it's what

16  your obligation is.  If you want to disclose all of this

17  information, that would be the easiest way to resolve this,

18  but you have not sustained your burden by simply making broad

19  generalizations unsworn in your letter to the Court.

20         MS. PRICE:  Understood, Your Honor.

21         THE COURT:  Ms. Huot, you know, you criticized

22  opposing counsel for not raising certain issues for six

23  months.  If this was discussed last summer, why did you wait

24  until the eve of the close of discovery to raise this issue

25  and to ask that the court review hundreds of documents in

1    camera?

2          MS. HUOT:  Yes, Your Honor.  Based on Counsel's

3    representation about what the substance of these documents

4    were, we had to wait until after deposition testimony so that

5    we can ask these questions at the deposition.  As soon as the

6    depositions closed, we engaged in the meet and confer

7    process, which as Your Honor knows takes some time.  And we

8    went back and forth, and we were at an impasse, and we

9    documented that impasse, and then moved -- and then we knew

10   there was going to be this particular issue as an impasse and

11   we reported it to the court earlier.  And then we had to wait

12   until we reached an impasse on all the other issues and then

13   made an application to the court.

14         So we had to first wait until the depositions were

15   through, which went up against towards the end of 2020.

16         THE COURT:  All right.  Well, I'm going to give the

17   Defendant an opportunity to make a showing with respect to

18   the applicability of the privilege, and when I say privilege,

19   I use that loosely to encompass attorney work product.  And I

20   will -- I'd be prepared to, as a test of those theories, to

21   look at a handful of documents in camera.  If Defendants want

22   to propose five documents and Plaintiff can propose another

23   five, then I will have those produced to me for in-camera

24   inspection, and I'll take a look at the factual showing the

25   Defendants will have to make in order to sustain the

1    privilege as to all the documents.

2           And I would also encourage the Defendants to look

3    again at Ms. Larssen's testimony and at her communications to

4    see whether or not in fact a privilege can be sustained with

5    respect to her communications given her testimony.

6           MS. PRICE:  Yes, Your Honor.

7           THE COURT:  Now, with respect to the communications

8    with experts, the Defendant cites Rule 26B4D, and let me ask

9    Ms. Huot, since the -- I believe the date for expert -- I'm

10   not sure where expert discovery stands.  The parties were

11   directed to complete expert discovery including depositions

12   by March 5th.  What's the status of expert discovery?

13          MS. HUOT:  Thank you, Your Honor.  And with respect

14   to this issue, I believe it may be moot at this point because

15   in Defendant's letter on page 7, the fourth sentence of the

16   full paragraph, they said that they would produce the

17   communications relating to the expert they do not end up

18   retaining.  The deadline for reporting this has come and

19   gone.  It was February 5th.  They didn't designate anybody,

20   and the discovery on expert's close is in less than two

21   weeks.  So based on their own representations and their

22   letters and their -- I'm sorry, letter, singular, and our

23   meet and confers, multiple, they should not just produce

24   these communications as they haven't retained these people.

25          So there's been no expert discovery and we believe

1   there will be none because nobody was designated.

2       THE COURT:  Well, I think you're conflating several

3   issues here because there are testifying experts and there

4   are non-testifying experts.  And you're assuming that because

5   the defendant has not designated any testifying experts that

6   it follows that they haven't retained any experts, and that's

7   not necessarily the case.  Let me ask, has Plaintiff served

8   any expert disclosures?

9       MS. HUOT:  No, Your Honor.

10      THE COURT:  So Plaintiff does not intend to rely on

11  experts at trial?

12      MS. HUOT:  No, Your Honor.  We were only going to

13  do that if Defendants chose to do that, and it appears

14  Defendants did not choose to do that, so we didn't either.

15      THE COURT:  I'm going to have to go back on other

16  portions of the docket sheet, but did I give a simultaneous

17  date for the exchange of expert disclosures?

18      MS. HUOT:  Your Honor, the way it was set up, it

19  was that the expert discovery was to close on March 5th, and

20  28 days before then would be disclosures.  You've got -- Your

21  Honor has extended the deadline several times.  The first one

22  was docket entry 14 where you set the schedule for

23  disclosures, depositions, and close of discovery.  And since

24  then, it was extended.  So if we use the same timeline, it

25  would be February 5th, 28 days before March 5th.

1        THE COURT:  All right.  So I did set up a date for

2   the simultaneous exchange for expert disclosures.  That was

3   what I was getting at.  And then 28 days later, the expert

4   deposition, so the -- neither Plaintiff nor Defendants have

5   designated any testifying experts.  Ms. Price, is that

6   accurate?

7        MS. PRICE:  Yes, Your Honor, that's accurate.

8        THE COURT:  And have you retained any

9   non-testifying experts?

10       MS. PRICE:  Your Honor, I have to confer with our

11   client on an update regarding that matter, but as stated in

12   our letter and at the meet and confers, Defendants are still

13   willing to produce any of the documents on the privilege log

14   for experts not retained.  And we were planning to make all

15   final decisions by the March 5th deadline, which we had

16   previously told Plaintiff's counsel.

17       MS. HUOT:  But how can we --

18       THE COURT:  Well, I assume that if an expert is

19   retained, that's normally done through counsel, not by the

20   client.

21       MS. PRICE:  Yes, Your Honor.  We understand that

22   that's the normal process.  Our client has been very involved

23   in his defense, so it's just -- it's been a more involved

24   relationship than maybe the standard.  And this makes sense

25   given that Mr. Prakhin is an attorney.

1      THE COURT:  Well, it doesn't make sense in terms of

2  the protections that the attorney of record and the attorneys

3  at that firm have when they're involved in litigation versus

4  the client who may well be an attorney but does not get, for

5  example, work product.  If the client retains an expert, that

6  does not afford them work product protection.

7      MS. PRICE:  Yes, Your Honor.  I understand.  Again,

8  to my knowledge, I have to check regarding whether any

9  experts have been retained or consulting or non-testifying

10  experts.  But again, we informed Plaintiff's counsel that we

11  would advise them by the March 5th deadline if any such

12  non-testifying experts were retained and produced documents

13  on the privilege logs for any that are not retained.

14      THE COURT:  Well, since we have these discovery

15  issues hanging out there and you're using this as a basis for

16  deferring disclosures that you've agreed to make, I'm going

17  to move up that deadline, and I want you to notify the Court

18  by March 1st as to whether or not any of the experts whose

19  communications are reflected on the privilege log have been

20  retained.

21      MS. PRICE:  Yes, Your Honor.

22      THE COURT:  And to the extent that you claim that

23  they have been retained and that therefore -- well, if they

24  have been retained, then you are or are not going to produce

25  them?

1      MS. PRICE: If they have been retained, then we are

2  not planning to produce the communications that are specific

3  to the expert or experts that have been retained. But all

4  the other communications will still be produced regarding the

5  experts.

6      THE COURT: Well, to the extent that it is your

7  intention to continue to withhold documents as protected or

8  privileged, then you're going to have to make a sufficient

9  showing with respect to those communications with experts.

10      MS. PRICE: Yes, Your Honor.

11      THE COURT: All right. Let's --

12      MS. HUOT: Your Honor, yeah, I'm sorry. I just

13  wanted to note I agree with that. Also, I just wanted to

14  note the majority of these communications happened more than

15  a year ago, so something like 10 months, 19 months, I'm not

16  100 percent sure of the count, but you can see they're from

17  2019, early 2020. Well, if they retain them now, it's over a

18  year ago that these communications took place, so I do

19  believe they need to make a showing if they want to make any

20  of them confidential. But I just wanted to make sure the

21  Court is aware of the timeline.

22      THE COURT: I'm aware of the timeline.

23      MS. HUOT: Thank you.

24      THE COURT: All right. That brings us to the

25  second issue, which is documents regarding the grievance

1    committee investigation.  Pursuant to Rule 608B of the

2    Federal Rules of Evidence, extrinsic evidence, ordinarily,

3    it's not admissible to attack the credibility of a witness

4    who may, however, be subject to cross-examination on that

5    matter.  You have the finding -- the conclusion of the

6    investigation, the grievance committee investigation that was

7    done into Mr. Prakhin's practice of recording phone calls.

8    You have an admission that the law firm did in fact record

9    phone calls.

10           The evidence that you're seeking, you're not -- you

11   don't claim that it is relevant to any of the substantive

12   issues in the case.  You're simply trying to find additional

13   impeachment evidence with respect to Mr. Prakhin.  Is that

14   fair to say?

15           MS. HUOT:  Not precisely, Your Honor, although I do

16   appreciate your position on the matter.  The investigation

17   itself is relevant and we want to understand it because in

18   this case, the Defendant testified that he engages in this

19   routine practice of recording conversations.  And then the

20   Ethics Committee of the New York City Bar Association said

21   that this exact practice smacks of lack of candor and is not

22   ethical.  And then Prakhin was reported to the Grievance

23   Committee who conducted an investigation, and then they

24   produced this one-page letter saying that they

25   reviewed -- they reviewed some evidence that was not produced

1    here and concluded there was no breach of conduct.

2         But then they reiterated that it would be unethical

3    and a -- I'm sorry, an ethical violation to make such

4    recordings.  And in in the Defendant's deposition, he

5    testified that he continues to make these recordings.  So we

6    want to understand this investigation because it's really

7    unclear, and we want to be able to use the investigation to

8    prove, you know, that he has a propensity for deception.

9    That's what makes this investigation relevant.

10        THE COURT:  Well, that's exactly what I said.  It

11   simply goes to credibility.  It does not go to the issues in

12   the case, and it's really a frolic and detour to find more

13   impeachment material.  You can certainly question him at

14   trial, as I presume you did at the deposition, about the

15   findings.  Well, I shouldn't say you can.  That will be up to

16   the trial court.

17        MS. HUOT:  Right.

18        THE COURT:  But that does not provide a basis for

19   opening up the investigative style on an issue that has no

20   bearing on the claims in this case other than to impeach Mr.

21   Prakhin.  So that aspect of the Plaintiff's motion is denied.

22        With respect to the next issue in the case, the

23   Saga notes, the internal case notes, the -- I believe that

24   the Plaintiff's position is that one of the reasons that was

25   offered by Defendants, which Plaintiff disputes, one of

1    the -- and this pretextual, but one of the reasons provided

2    for her termination was that she wasn't entering Saga notes

3    about her cases or was entering insufficient notes.  In

4    Defendant's response, the Defendant denies that it

5    was -- that she was terminated because the notes themselves

6    were insufficient.  It's the Defendant's position, as I

7    understand it now, that she was terminated because she wasn't

8    making the Saga notes in all her cases or in all instances

9    when they should have been made.

10           Let me ask Mr. Price, is that an accurate reading

11   of the Defendant's position?

12           MS. PRICE:  Yes, Your Honor.  That's an accurate

13   reading of Defendant's position and Mr. Prakhin's testimony.

14   You know, the cited testimony cited by Plaintiff and I

15   believe by Defendants in this motion is he repeatedly stated

16   it's based on the absence of notes and the failure to enter

17   notes were one of the reasons for her termination.

18           THE COURT:  And let's assume that that is the

19   Defendant's position now and will be the Defendant's position

20   at trial.  Was the plaintiff ever told that she was

21   terminated because the notes that she entered were

22   insufficient as opposed to -- that a note, you know, not

23   that -- to distinguish between failure to make any notation

24   as opposed to the notation that you made was inadequate.

25           MS. PRICE:  Your Honor, I do not believe the

1    deposition testimony covered that at all.  It only reflected

2    Mr. Prakhin's statements about her failure to make notes, and

3    she was repeatedly advised at numerous reviews of her

4    performance that she had failed to make notes and needed to

5    make more entries.

6           THE COURT:  Were there any contemporaneous

7    documents regarding the discussions between Plaintiffs and

8    either Mr. Prakhin or someone at the firm about the

9    Saga -- the need to make notations under Saga?  Was there a

10   written review, any letter, any confirming email?

11          MS. PRICE:  No, Your Honor.  As reflected in Mr.

12   Prakhin's testimony, all of these conversations occurred in

13   person.

14          THE COURT:  All right.  Ms. Huot, do you have -- do

15   you dispute that that was the Defendants' position?

16          MS. HUOT:  Yes, Your Honor.  Ms. Pot -- I'm sorry,

17   Ms. Ruderman was questioned for over an hour on the

18   sufficiency of the entries in the Saga system.  They went

19   through each one to assess whether it was sufficient,

20   criticizing her saying that another attorney could never pick

21   up the file, review your entries, and know what's going on in

22   the case, that this was in her deposition testimony, not Mr.

23   Prakhin's because they questioned her on this for over an

24   hour.  They went through each of her entries and said it was

25   not sufficient.  It was not robust enough.  And in response,

1    she was saying it was on par with all her colleagues, if not

2    better than her colleagues' entries.

3           In this situation, there's actually no dispute that

4    these documents should be produced.  The Defendants have

5    offered to produce them.  The only dispute here is the cost

6    shifting issue that as a background, just to take one step

7    back quickly just to understand the disparity here, in 2019

8    alone, Mr. Prakhin's firm made over $30 million and showed

9    over $11 million in profit.  Separately from this, Mr.

10   Prakhin made an additional $7.6 million individually while

11   plaintiff is struggling to find work and make ends meet.  And

12   under the Zubulake factors, you can't shift costs.

13          Defendants have offered to produce these documents,

14   which were originally in electronic form, then they chose to

15   print them, and now they want to produce it to us for 75

16   cents a page, where a quote from Kinkos has them at 8 cents a

17   page, a quote from Staples has it at 13 cents a page, and the

18   clerk of the court has it at 2 cents per page.  Or they could

19   just -- it's a state-of-the-art firm that Ms. Price is at.

20   They have a scanner.  They've represented that it's about

21   1,000 pages, and in their motion here in their letter, they

22   cite it's over 1,000 pages.  It's certainly not over 2,000

23   pages.  That's four inches of paper.  That would take less

24   than 10 minutes to feed through a scanner.  That's all they

25   have to do, or give it to us, we'll make a copy ourselves.

1    There's actually no dispute that these documents should be

2    produced.  It's just a matter of how they're going to do it,

3    and can they shift the costs?

4         THE COURT:  Well, I'll be the one to determine

5    whether or not they should be produced notwithstanding the

6    fact that counsel apparently -- Defense counsel apparently

7    spent a lot of time questioning Ms. Ruderman about the

8    robustness of her entries.  I guess they determined that they

9    were barking up the wrong tree because they've now suggested

10   that they are going to -- that the approach that they're

11   going to take is that she wasn't making notations when she

12   should be making them as opposed to challenging the

13   sufficiency of the individual entries.

14        MS. HUOT:  But Your Honor, they want --

15        THE COURT:  Excuse me.

16        MS. HUOT:  Excuse me.

17        THE COURT:  To the extent that the Defendant was

18   prepared to stipulate that it is not challenging and is not

19   challenging the robustness of her entries, doesn't that

20   narrow the issue?

21        MS. HUOT:  Your Honor, we want to make -- that may.

22   And we offered to do this before.  We offered the stipulation

23   to them before and they denied this.  We want to make the

24   argument that her entries were more robust.  That's why they

25   were less frequent, to the extent they were less frequent

1  than her colleagues.  So we need to examine the entries

2  because Defendants have put a huge emphasis on these

3  documents.

4        THE COURT:  Well, but they're now prepared to say

5  that it was that she made fewer entries, and to tell you the

6  truth, I mean I'm not familiar with that system and just

7  looking at the attachments, it was somewhat confusing, but I

8  did note that there were relatively few pages of Plaintiff

9  entries as opposed to the entries of other individuals.

10        MS. HUOT:  Your Honor, if there's a disparity in

11  the number, our argument is that her entries were more

12  robust.  They were more detailed than her colleague.  They

13  can't -- if they want to stipulate to that, we'd be happy to

14  accept that.  That would resolve this issue.  Instead, what

15  they have offered to do is produce the documents, which we're

16  also happy to take.

17        THE COURT:  These documents, you've indicated that

18  they are in electronic form, but the Defendants have printed

19  them out to 1,000 pages.  Is that what we're dealing with?

20        MS. HUOT:  As far as I understand.

21        MS. PRICE:  Your Honor, if I may answer your

22  question?

23        THE COURT:  Yes.

24        MS. PRICE:  The Saga records are -- it's a very

25  specific computer type, from what I understand, and they

1   cannot simply be transferred to a file that can be sent

2   electronically.  The only way to obtain them from the Saga

3   platform is to print them.  And to do this, Defendants had to

4   individually click on every single entry and print it out.

5   Defendants have taken the time to do this in an effort to

6   compromise with Plaintiff on this issue so as to not to have

7   to involve the Court's time in this matter, but Plaintiffs

8   rejected over and over again our attempts to compromise, and

9   so we have the printed records available at our offices for

10  her inspection, which is compliant with the Federal Rules of

11  Procedure which repeatedly state in Rule 26 and 34 that

12  making documents available for inspection meets our

13  obligation.

14          THE COURT:  Well, let me just clarify this because

15  I'm getting these numbers thrown out at me, but nobody,

16  despite arguing about the cost, no one bothered to tell the

17  Court how many documents we're talking about, what the cost

18  would be.

19          So let me ask Ms. Price, you printed out all the

20  responsive documents and they're available?

21          MS. PRICE:  Yes, Your Honor.  Ultimately,

22  Defendants decided to bear the cost of printing them out

23  themselves and have made them available for free at

24  Defendants -- at our office of Putney Twombley for

25  Plaintiff's inspection, and it's 1,577 documents.

1            THE COURT:  And what is the cost of copying those?

2            MS. PRICE:  I believe our paralegal charges $90 an

3    hour, and so she would have to spend however much time

4    scanning and copying those.  I'm not sure how long it would

5    take her.

6            THE COURT:  And let me ask Ms. Huot, if those

7    documents were sent to a commercial copier, like a Kinkos,

8    how much do they charge per page?

9            MS. HUOT:  Eight cents per page, Your Honor.

10           THE COURT:  And is that a problem for the

11   Plaintiff?

12           MS. HUOT:  No, Your Honor.  That comes out to

13   $126.16.  We're happy to bear that.  I think that's less time

14   than we've spent on this motion.

15           THE COURT:  All right.  So that's how that will be

16   resolved, that those pages, you know, find a commercial

17   copier who will -- and Counsel should make the arrangements,

18   but the cost will be paid by Plaintiff, but it will be a

19   commercial copier, and it will not be at $90 an hour.

20           MS. HUOT:  Your Honor, can I just please have some

21   clarity on this.  If it's $126, we're happy to bear that.  If

22   we could just take the documents ourselves, that would be

23   fine ourselves.  I just don't -- if they could just fed right

24   through the copy machine to be sent to us, that would be

25   free.  This doesn't have to go through a vendor.  They could

1   just do it on the copy machine in under 10 minutes.  I don't

2   really understand.  If it's $125, we're happy to bear it, but

3   I don't -- I don't know -- we're not going to -- I don't know

4   what the extent of that will be if it's more than that.

5          THE COURT:  Well, what is it that you are proposing

6   to do?  You will personally go and pick them up?

7          MS. HUOT:  No, Your Honor.  I don't -- I think it

8   would cost no money at all if it's fed through a scanner and

9   just emailed to us.  That would take less than 10 minutes.

10  Because of the pandemic, I can't go there to do it myself,

11  but I'm sure that it would have cost less money for Ms. Price

12  to just put them on a scanner and scan it to us, and it would

13  to brief this motion.  I just ask if they can just scan it

14  and email it to us, or I can send them a secure filing.  We

15  don't need it in hard copy.  We could take it in electronic

16  form, which they have it already in hard copy.  They could

17  just feed it through a scanner.  Just to scan 1,500 documents

18  takes less than 10 minutes.  That would be $9.

19         THE COURT:  Well, Ms. Price said that these entries

20  can't be transferred electronically, which frankly, I find

21  hard to believe.

22         MS. HUOT:  No, Your Honor, they're already printed.

23  That's what she means, Your Honor.  I don't mean to put words

24  in her mouth, but I believe what she means is the Defendants

25  have already printed them, and there's 1,577 pages of --

1      THE COURT:  No, what she said -- what she said was

2  they can't be transferred electronically.  You have to print

3  them and we've done that.

4      MS. HUOT:  Yes.

5      THE COURT:  It wasn't that we've done that

6  therefore, we can only -- we'll only produce them in hard

7  copy.  What she stated to the Court, and that the Court finds

8  hard to believe, is that they can't be transferred

9  electronically.

10     MS. HUOT:  Right, right.

11     MS. PRICE:  Your Honor, if I may clarify.  They

12 can't be transferred electronically directly from Saga.  The

13 only way to get them out of the program is to print them,

14 which is what we have done.  Of course, the paper copies

15 could be scanned, but again, it would cost our paralegal $90

16 an hour to scan all of those documents.  And if Plaintiffs

17 would like to pay for that in lieu of coming in herself,

18 that's fine, but Defendants should not have to bear the cost

19 of scanning these documents for Plaintiff's convenience when

20 they've met their discovery obligation.

21     MS. HUOT:  Your Honor, I can't imagine it taking an

22 hour to scan 1,577 pages.  And in this situation where the

23 Plaintiff makes over --

24     THE COURT:  Well, I'm sorry, if it takes an hour,

25 that's $90 --

```
1              MS. HUOT:  Sure.

2              THE COURT:  -- so that's less than --

3              MS. HUOT:  We will pay the $90.

4              THE COURT:  So let me ask Ms. Price, what is it

5     that -- how much is it going to -- do you want to be able to

6     charge Plaintiff's counsel to copy less than 1,600 pages?

7              MS. PRICE:  Your Honor, we would be willing to let

8     her come to our office and copy at the price of any

9     commercial copier.  If she wants to do 8 cents a page, that's

10    fine.  She doesn't have to take it to a third vendor.  We're

11    welcome to use our offices, and that's what we've made

12    available to her.  Plaintiff simply has to come in and COVID

13    I don't think is an excuse given that Plaintiff was happy to

14    do her deposition in-person.  This task does not require the

15    removal of masks.

16             THE COURT:  Well, first of all, that really is

17    unfair because I don't think she was happy to do it.  She

18    talked about her client's visual problems and that her client

19    needed to do it in-person because file sharing was not going

20    to work given her visual problems.  And as I understand it,

21    all other depositions have been done remotely.  So I really

22    don't want to hear that she was happy to do the deposition in

23    person.  So let's be practical about this, and it sounds to

24    me like Defendants are just being vindictive now.

25             You've got 1,600 pages, and I could order you to
```

1    just take those 1,600 and put them in an envelope and -- do

2    you need them in hard copy?  You've got the program, so do

3    you really need to keep them in hard copy?  You can access

4    them electronically.

5            MS. PRICE:  Defendant's Counsel cannot access them

6    electronically.  We only have access to the one hard copy

7    that's currently available.  And Your Honor, respectfully,

8    we're not trying to be vindictive.  We're just not trying to

9    bear any more costs for this expensive discovery process that

10   we've had to go through.

11           THE COURT:  I could ask you what your hourly rate

12   is because I'm sure it's far exceeded the amount of money at

13   issue on this particular aspect of the dispute.  This is

14   exceedingly frustrating.  If the paralegal charges $90 an

15   hour and you want to charge for the paralegal's time to make

16   a copy, it should not take more than an hour.  So then charge

17   the $90 and have the set sent to Mr. Huot.

18           MS. PRICE:  Understood, Your Honor.  And just to

19   clarify, we're charging the $90 or less to Plaintiff?

20           THE COURT:  Yes.  But I understood that you had

21   wanted 75 cents a page, which is not the cost.

22           MS. PRICE:  Your Honor, that was --

23           THE COURT:  This is not intended to be a

24   profit-making business.

25           MS. PRICE:  Understood, Your Honor.  And that was a

1    first offer, and there have been multiple offers to work with

2    Plaintiff since then.  And we're happy to comply with this

3    current arrangement.

4          THE COURT:  All right.  And I'm assuming that what

5    we're talking about is going to be less than an hour to feed

6    the documents into a copy machine.  So charge for the

7    paralegal's time not to exceed $90, and I suppose you're

8    going to want the postage as well, so add the postage and

9    let's move on.

10         MS. PRICE:  Yes, Your Honor.

11         MS. HUOT:  Your Honor, there's one outstanding

12   issue if I may?

13         THE COURT:  Now you're going to ask for years and

14   years of records, correct?

15         MS. HUOT:  No, Your Honor.  No.  We just ask for

16   the records that we requested.  This is a different issue.  I

17   was going to move on.

18         THE COURT:  All right.  I thought there was another

19   issue about whether or not the -- you've asked for all of her

20   Saga entries from 2012 through 2017.

21         MS. HUOT:  Oh, we would -- I thought that was

22   resolved.  We would take any sampling of that just to show

23   that our prior entries were the same as they are right now,

24   that they were the same before as they were after.  She was

25   employed there for four years.  She was never disciplined or

1    terminated for insufficient Saga records in the four years

2    she was there.  We assume the ones before are going to be the

3    same as the ones now.  If Defendants want to stipulate to

4    that, we are absolutely happy to forego this document

5    production, if Defendants will stipulate to that.

6           THE COURT:  Let me hear from Ms. Price.

7           MS. PRICE:  Your Honor, Defendants are not willing

8    to stipulate to that, and also don't feel that the records

9    from Ms. Ruderman's first employment are at all relevant.  At

10   no point in time have Defendants claimed that Ms. Ruderman's

11   Saga entries from her prior employment were good, bad,

12   neutral, or anything.  There's been no comment on her Saga

13   records from that time, and Mr. Prakhin testified regarding

14   his view of Plaintiff's performance during her prior

15   employment at which time she was highly supervised, and you

16   found essentially no issue, not good, not bad is a summary of

17   the testimony.

18          And so the five years of records from Saga, which

19   it's not even clear if we would have access to that given

20   this is extremely old, are simply not relevant.  And it's not

21   necessary to litigate the essential matters in this case.

22           MS. HUOT:  Your Honor, we would just take --

23           THE COURT:  When did her employment end in 2017?

24           MS. PRICE:  Approximately February, Your Honor.

25           THE COURT:  And let me ask Ms. Price, was there any

1  material difference between her Saga entries during her first

2  period of employment and her subsequent period of employment?

3          MS. PRICE:  Respectfully, Your Honor, I don't know.

4  I haven't reviewed those documents.  Those haven't been

5  printed out.

6          THE COURT:  Well, I believe that there is some

7  relevance to the extent that her Saga entries in the first

8  period were not materially different than those afterwards,

9  then certainly that is a circumstance from which Plaintiff

10 could argue that the termination based on inadequate or an

11 insufficient number of Saga entries was pretextual, but the

12 period demanded is overly broad and burdensome.  I will

13 require that those records be produced for a one-year

14 period --

15         MS. HUOT:  We would take --

16         THE COURT:  -- 2000- -- well, if she was there

17 until February of 2017, for the one-year period predating her

18 departure for the first time.

19         MS. HUOT:  Sure, yes, absolutely.

20         MS. PRICE:  Yes, Your Honor.

21         THE COURT:  And I guess those will have to be

22 printed out and then the same ruling with respect to the

23 copying.  I presume we're probably talking about -- well, it

24 might be a much smaller number because this is only

25 Plaintiff's Saga entries and not those of other employees.

 1    So I assume it's going to be a much smaller number of

 2    entries.

 3              MS. PRICE:  Yes, Your Honor.

 4              THE COURT:  And those should be copied and provided

 5    to Plaintiff.

 6              All right.  We have one final issue, and that is

 7    the Defendant's technology consultant, and having read the

 8    varying descriptions provided by the IT person, Mr. Pucachev

 9    (ph.).  Defense Counsel's response to the motion assumes that

10    Mr. Pucachev not only retrieved the documents in question,

11    the IP messenger, but that he also searched those documents.

12    And even his latest iterations of what he did do not say that

13    he conducted the search.  So I'd like to know who is it, Ms.

14    Price, who did conduct the search?

15              MS. PRICE:  Your Honor, our understanding from when

16    we received the documents from Mr. Pucachev was that he did

17    conduct the search.  We understand that unfortunately his

18    testimony did not reflect this, but that was our

19    understanding.  Additionally, I think what's important to

20    emphasize is that Defendants operated on that assumption.  So

21    all of the documents we were provided were simply reviewed

22    for relevance and then produced.  So if anything, we

23    overproduced documents instead of underproducing because a

24    search would have only eliminated more documents.

25              THE COURT:  I'm a little confused because again,

1   your letter does say Mr. Pucachev conducted the search.  That

2   was not his testimony, nor is that what he says on either his

3   errata sheet, which he said I did retrieve and print IP

4   messenger and was paid for that, and then his affidavit, and

5   I'm looking at paragraph 6 and 7, and he says he retrieved

6   messages to the firm's counsel in text format in paragraph 7,

7   "I was able to retrieve messages from the firm's IPMS for all

8   custodians' computers except for Irene Gabo (ph.) and Steven

9   Ravis (ph.), who are no longer employed."

10          So are you saying, if I understand what you're

11  saying, Ms. Price, that Mr. Pucachev produced all the

12  messages that he retrieved, and you went through all of them?

13          MS. PRICE:  Your Honor, I guess that's what

14  occurred.  He originally represented to us when he produced

15  the messages to us that he had searched them, according to

16  the protocol.  That was our understanding when we received

17  the messages.  If he did not search it, then he simply

18  produced all of the messages to us.

19          THE COURT:  Well, again --

20          MS. PRICE:  Either way, all of the messages --

21          THE COURT:  -- he may -- he may have told you that,

22  but that is not what he says in his revised sworn

23  explanation.  He says he was able to retrieve them.  He

24  doesn't say -- all he says is that he retrieved them.  So how

25  were they produced to you, and how many messages were there?

1        MS. PRICE:  Your Honor, they were produced in an

2   electronic format from Mr. Pucachev, and the format was the

3   text format, so there weren't page numbers to associate.  But

4   it came from multiple accounts, all of the custodians were

5   present, and so we simply reviewed what was produced, changed

6   it into the PDF format, and then provided that to Plaintiff's

7   Counsel.

8        So my point is that even if Mr. Pucachev did not do

9   the search and produced everything to us, we have then

10  produced everything to Plaintiff's Counsel because we only

11  reviewed for relevance, assuming he had done the search.

12       THE COURT:  You assumed that he did a search using

13  the search terms?

14       MS. PRICE:  Yes, Your Honor.  Excuse me, relevance

15  and privilege were the only things we reviewed for.

16       THE COURT:  And I understand that there weren't

17  page numbers, but does this mean that what you may have

18  received were the entire contents, like every communication

19  during a certain period of time for a particular custodian?

20       MS. PRICE:  That's possible, Your Honor.  I'm not

21  sure at this point based on Mr. Pucachev's conflicting

22  testimony.  All I know is what we received and what we did

23  once we received that information.

24       THE COURT:  Well, you know, you yourself referred

25  to his conflicting testimony, and the Court is not satisfied

1  that either it or Plaintiff's counsel knows what happened

2  here.  So how do you propose the Court should rectify that

3  situation?

4        MS. PRICE:  Well, I don't think the situation needs

5  to be rectified because relevant responsive documents have

6  been produced, and that's evident from the production.  The

7  worst case scenario is that we over-produced information that

8  we weren't required to produce under the ESI protocol.  If

9  the search was never conducted, we simply produced everything

10  aside completely irrelevant or privileged information.  And

11  so there's no need to rectify anything because there was no

12  harm to Plaintiff.

13        THE COURT:  Well, that again assumes that you were

14  given the appropriate documents to review for relevance and

15  privilege.  And it's unclear to the Court what it is he

16  pulled, you know, what protocol he followed in determining

17  what he needed to retrieve.  And as you say, he's given

18  conflicting sworn statements as to what he did.  I'm not even

19  sure how he would remember since he testified under oath at

20  his deposition that he didn't remember, and then he puts

21  in -- he does an errata sheet and a perfunctory affidavit in

22  which he states that he retrieved these messages, and from

23  that Defense Counsel then argues to the court that he

24  searched for them, which he never says.

25        MS. PRICE:  Yes, I understand, Your Honor, but that

1   was our understanding based on his representations to us that

2   he had searched.

3          THE COURT:  Ms. Huot, what do you propose in order

4   to get to the bottom of this?  You did get 129 pages of

5   messages that were produced by Defendants, correct?

6          MS. HUOT:  I believe it was

7   approximately -- honestly, I did not count it.  What we

8   believe happened, and we're again also unsure, but a review

9   of these records, we think it was retrieved from a single

10  custodian.  It was retrieved from Raskin, and the only

11  communications are between Raskin and other individuals.

12  Other individuals show up on the records when it's a group

13  message or when they're responding to one custodian, Raskin.

14  It's very difficult to understand it if that's what happens,

15  but I believe that's the answer here.

16         We would like a search to be conducted on all of

17  the custodians, as it was supposed to be on the ESI protocol

18  with the search terms.  We don't believe that that was

19  conducted, and in the deposition testimony, Mr. Pucachev did

20  not say it was -- he said the opposite, that it was not

21  conducted.  And again, like Your Honor mentioned, the

22  affidavit now does not say that it was conducted.  We would

23  like that search to be conducted.

24         THE COURT:  Ms. Price, you, in passing you said

25  that when the documents were produced in electronic format,

1  it was from multiple accounts.  We reviewed it and the

2  custodian -- I think you said in the presence of the

3  custodians.  Is that correct?

4       MS. PRICE:  No, Your Honor.  We did not review in

5  the presence of custodian, but we did receive messages from

6  all of the custodians.  And if the Court would like, we can

7  produce ex parte information showing that what Mr. Pucachev

8  provided us was from different custodians, but it's obvious

9  from the documents that we have produced that these

10  conversations are between different individuals.  Plaintiff

11  simply has to match them up, just like Defendants have to do.

12  It was the format that they exist in, and as we indicated in

13  our papers, if you compare the documents, you can figure out

14  who the conversation is between.

15       THE COURT:  Well, Ms. Huot said that from her

16  examination, she concludes that these documents were

17  retrieved from a single custodian, Raskin, that he seems to

18  be involved in all the conversations, and there may be

19  communications with various different people, but he's the

20  common denominator.  I'm not sure how you would persuade me

21  otherwise, nor do I understand why that's something that

22  should be addressed ex parte.  This is not an issue of

23  privilege, unless you're telling me that the way you

24  identified who the custodian was was from a privileged

25  conversation.  But if you're not saying that, then I don't

1   see why you should make an ex parte submission.  I think you

2   should satisfy your adversary that messages from all of the

3   custodians have been provided.

4          MS. PRICE:  Your Honor, two points.  First, yes, it

5   is a privileged communication between counsel that would

6   indicate exactly why all of the custodians were searched.

7   But we have also satisfied our burden to plaintiff, as I just

8   noted, that a comparison of these documents indicates that

9   these are not just between Raskin and someone else, but

10  between the paralegals, between Mr. Prakhins, between

11  Ruderman and her paralegal.  For example, you know, page

12  Bates stamp 1983 compared with page 2064 indicates that this

13  is a conversation between Fellows (ph.) and Larzen (ph.).  So

14  we're really not sure where Plaintiff gets their

15  understanding that this is only a conversation with Raskin.

16         THE COURT:  Well, I don't know, but I think that

17  ought to be a further conversation between counsel, Ms.

18  Price.  You yourself referred to Mr. Pucachev's conflicting

19  testimony.  This is a problem of the defense witness's

20  making.  You should unravel it, and if you can explain -- if

21  you can feel you can demonstrate to the Court that these

22  communications are from different custodians, then

23  demonstrate that to your adversary.

24         All right.  So we now -- I said I would circle back

25  regarding the deadline.  I believe I set one deadline for

1   March 1st.  That was for the Defendants to indicate what, you

2   know, whether they are retaining non-testifying experts and

3   to make the disclosure -- well, and to make the disclosure of

4   those that they said they would make once they made that

5   determination.  The other deadline that was proposed is March

6   8th.  I will set that as the deadline for providing the

7   additional information that I've ordered in connection with

8   these various motions as well as for joint status report from

9   the parties regarding this last issue of the method of search

10  for the IP messenger.

11          MS. HUOT:  Your Honor, may I add one more issue

12  before we close out?  Would that be okay?

13          THE COURT:  Okay.

14          MS. HUOT:  Thank you.  The reason it wasn't brought

15  up in our letters was we thought it was a resolved issue, and

16  I just wanted to make sure to raise it here just in case

17  because we're coming up against the close of discovery.  This

18  relates to the audio recordings.  As early as December 4th,

19  we conferred about the vendor Televox.  And the issue there

20  was these recordings that were at always issue in this case,

21  and the production of this is not really disputed, it's just

22  the timing of it.  So Televox is a vendor that does the phone

23  recordings.  And in the past, Televox only searched for

24  recordings for Prakhin, Ruderman, and Raskin's phone numbers.

25          And then after the meet and confer, Defendants

1   agreed to go ahead and go back to them and get the recordings

2   for the rest of the attorneys.  And we were assured

3   repeatedly, even up until the eve of when our

4   motion -- letter motion was submitted, that this would be

5   produced imminently.  So we didn't think we were at an

6   impasse about it, and we only wanted to address issues that

7   we were at an impasse about in these letters.  To date, like

8   this was already, you know, almost three months -- almost

9   three full months ago, it still hasn't been produced.  So I

10  just wanted to flag this issue.  I didn't want it to go very

11  long without flagging it, but we really need these

12  supportings, and we don't know how much longer we have to

13  wait for them.

14          THE COURT:  Have you raised this recently with

15  opposing counsel?

16          MS. HUOT:  Yeah.  We've been talking about it

17  through email multiple times.  Ms. Price, Nicole, I don't

18  remember how many times we've exchanged information about

19  it -- communications about this.  We have exchanged

20  communications about this, yes.

21          THE COURT:  And --

22          MS. PRICE:  Yes.  We have exchanged communications.

23  The last time we discussed it was, as you stated, right

24  before you had filed your motion papers.  My understanding is

25  that there has been an update and that they will be produced

1   hopefully by this Friday was the latest that I heard --

2          MS. HUOT:  Great.

3          MS. PRICE:  -- but I can certainly provide

4   Plaintiff with an update.

5          THE COURT:  All right.  Well, you can follow up on

6   this.  This is not an issue that's currently before me.  I

7   encourage you to have discussions with one another and to try

8   to resolve that.  I think there have been entirely too many

9   disputes in this case over matters that should have been

10  resolved.  We've now been at this for two and a half hours,

11  so I'm prepared to conclude the proceeding.  Everyone, please

12  take care and stay healthy.  Goodbye.

13         MS. HUOT:  Thank you, Your Honor.  We appreciate

14  your time.

15         MS. PRICE:  Thank you, Your Honor.

16      (Proceedings adjourned at 5:30 p.m.)

17

18

19

20

21

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATE

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6                                    December 28, 2022

7

8    _____      _____

9    Courtney Montgomery                      DATE

10   Legal Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25