**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**YELENA RUDERMAN,**

                                      **Plaintiff,**

    **- against -**

**LAW OFFICE OF YURIY PRAKHIN, P.C.,**
**and YURIY PRAKHIN, ESQ.** *in both his*
*individual and professional capacities*,

                                      **Defendants.**

Case No. 19-cv-02987 (CBA) (LB)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT FIRMS' MOTION FOR NEW TRIAL**

**Bond Schoeneck & King, PLLC**
600 Third Avenue, 22nd Floor
New York, New York 10016
Telephone: (646) 253-2300

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

LEGAL STANDARD REGARDING MOTION FOR A NEW TRIAL ................................... 1

ARGUMENT I – DEFENDANTS ARE ENTITLED TO A NEW TRIAL .............................. 2

POINT I ................................................................................................................................... 2

The Court Erred in its Handling of Plaintiff's Doctors and Mental Health Providers and
Their Corresponding Documentation ............................................................................. 2

POINT II ............................................................................................................................... 17

The Court Erred in its Handling of Plaintiff's Lay Witnesses ............................................. 17

POINT III ............................................................................................................................. 19

The Court Erred in Failing to Dismiss Two Openly Biased Jurors for Cause ..................... 19

POINT IV .............................................................................................................................. 23

The Court Erred in its Bias and Statements in Front of the Jury ......................................... 23

POINT V ............................................................................................................................... 26

The Court Erred in Allowing the Introduction of Defendants' Financial Records and
Denying Bifurcation of Punitive Damages Portion of the Trial and Such Error Improperly
Influenced the Jury's Verdict ........................................................................................ 26

POINT VI .............................................................................................................................. 29

The Court Erred in Instructing the Jury ............................................................................... 29

POINT VII .......................................................................................................................... 30

The Jury's Verdict is So Excessive as to Warrant a New Trial ........................................... 30

ARGUMENT II – ALTERNATIVELY, THE COURT SHOULD REMIT THE DAMAGES
AWARD .................................................................................................................................... 31

POINT I ................................................................................................................................. 32

Damages under the ADA Must be Capped at $50,000 ......................................................... 32

POINT II ............................................................................................................................... 32

The Evidence Does Not Support the Jury's Award of Emotional Distress Damages .......... 32

POINT III ............................................................................................................................. 36

The Evidence Does Not Support the Jury's Award of Actual Damages .............................. 36

Back Pay ............................................................................................................................... 36

Front Pay .............................................................................................................................. 40

POINT IV .............................................................................................................................. 42

Plaintiff Failed to Identify Any Evidence to Support an Award of Punitive Damages ........ 42

CONCLUSION ......................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antoine v. Brooklyn Maids 26, Inc.*,
  489 F.Supp.3d 68 (E.D.N.Y. 2020) ..................................................................43

*Artica v. J.B. Custom Masonry & Concrete Inc.*,
  Nos. 09-CV-3796 (RER), 11-CV-0842 (RER), 2012 WL 11945654 (E.D.N.Y.
  July 26, 2012)....................................................................................................37

*Becknell v. Univ. of Ky.*,
  Case No. 5:17-cv- 490-JMH-MAS, 2019 WL 1783488 (E.D. Ky. April 23,
  2019) .................................................................................................................27

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996)..........................................................................................48

*Bonura v. Chase Manhattan Bank, N.A.*,
  629 F.Supp. 353 (S.D.N.Y. 1986) ....................................................................42

*Brink's Inc. v. City of New York*,
  717 F.2d 700 (2d Cir. 1983)..............................................................................27

*Callahan v. Wilson*,
  863 F.3d 144 (2d Cir. 2017)..............................................................................29

*Catlin Specialty Ins. Co. v. QA3 Financial Corp.*,
  36 F.Supp.3d 336 (S.D.N.Y. July 2, 2014)......................................................29

*Colon v. Metro-North Commuter Railroad Co.*,
  778 Fed. Appx. 7 (2d Cir. 2019) .......................................................................24

*Cruz v Jordan*,
  357 F.3d 269 (2d Cir. 2004)..............................................................................23

*DeCurtis v. Upward Bound Intern., Inc.*,
  No. 09 Civ. 5378 (RJS), 2011 WL 4549412 (S.D.N.Y. Sept. 27, 2011).........50

*DelValle v. White Castle Sys., Inc.*,
  277 A.D.2d 13 (1st Dep't 2000) .......................................................................41

*Dotson v. City of Syracuse*,
  No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011) .....................31

*Duarte v. St. Barnabas Hosp.*,
  341 F.Supp.3d 306 (S.D.N.Y. 2018)................................................................35

i

*Emamian v. Rockefeller Univ.*,
  07 Civ. 3919 (DAB), 2018 WL 2849700 (S.D.N.Y. June 8, 2018)...................................35, 36

*Equal Employment Opportunity Comm. v. United Health Programs of Am., Inc.*,
  14-CV-3673 (KAM) (JO), 2017 WL 10088567 (E.D.N.Y. Sept. 4, 2017) ...........................27

*Garcia v. Comprehensive Ctr.*
  LLC, No. 17-CV-8970, 2019 WL 8274296 (S.D.N.Y. Nov. 21, 2019) ................................50

*Hill v. Airborne Freight Corp.*,
  No. 97-CV-7098, 2003 WL 366641 (E.D.N.Y. Feb. 20, 2003) ...........................................42

*Khan v. Hip Centralized Lab. Servs., Inc.*,
  Civil Action No. CV-03-2411 (DGT), 2008 WL 4283348 (E.D.N.Y. Sept. 17,
  2008) .........................................................................................................................32, 34, 35

*King v. Wang*,
  14-cv-7694 (LJL), 2021 WL 5232454 (S.D.N.Y. Nov. 9, 2021) ..........................................27

*Knox v. John Varvatos Enterprises, Inc.*,
  512 F.Supp.3d 470 (S.D.N.Y. 2012)...........................................................................1, 32, 42

*Kogut v. County of Nassau*,
  Nos. 06-CV-6695(JS)(WDW), 06-CV-6720 (JS)(WDW), 2013 WL 3820826
  (E.D.N.Y. July 22, 2013) .....................................................................................................1

*Lamberson v. Six West Retail Acquisition, Inc.*,
  No. 998 CIV 8053, 2002 WL 59424 (S.D.N.Y. Jan. 16, 2002)..............................................43

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012)...........................................................................................35, 36

*MacMillan v. Millennium Broadway Hotel*,
  873 F.Supp. 2d 546 (S.D.N.Y. 2012).................................................................................31

*Mama's Food Shop v. Robrose Place, LLC*,
  2004 NY Slip Op. 30350 (Sup. Ct., N.Y. County 2004) .......................................................38

*Marcic v. Reinauer Transp. Cos.*,
  397 F.3d 120 (2d Cir. 2005).................................................................................................2

*McEnery v. the City of New York*,
  No. 03 Civ. 6307 (RWS), 2007 WL 1574013 (E.D.N.Y. May 29, 2007) ...............................9

*Mugavero v. Arms Acres, Inc.*,
  680 F.Supp.2d 544 (S.D.N.Y. 2010)..........................................................................37, 38, 41

ii

*Munson v. Diamond*,
  15-CV-00425 (DAB) (BCM), 2017 WL 4863096 (S.D.N.Y. June 1, 2017)..........................50

*Norris v. New York City College of Tech.*,
  No. 07-CV-853, 2009 WL 82556 (E.D.N.Y. Jan. 14 2009) ....................................................48

*Olsen v. County of Nassau*,
  615 F.Supp.2d 35 (E.D.N.Y. 2009) ........................................................................................34

*Pacific Mut. Life Ins. Co. v. Haslip*,
  499 U.S. 1 (1991)....................................................................................................................47

*Parrish v. Sollecito*,
  280 F.Supp.2d 145 (S.D.N.Y. 2003).........................................................................................1

*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006)....................................................................................................50

*Quintero v. Angels of the World, Inc.*,
  19-CV-6126 (DG), 2021 WL 4464123 (E.D.N.Y. Sept. 10, 2021)...................................37, 41

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012)......................................................................................................2

*Rainone v. Potter*,
  388 F.Supp.2d 120 (E.D.N.Y. 2005) .......................................................................................36

*Ravina v. Columbia Univ.*,
  No. 16-CV-2137 (RA), 2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019)............................35, 36

*Rosas v. Artus*,
  No. 05 Civ. 8440 (RJS), 2013 WL 499610 (S.D.N.Y. Jan. 29, 2013)....................................21

*Shah v. Pan Am. World Servs., Inc.*,
  148 F.3d 84 (2d Cir. 1998)......................................................................................................24

*Simpson v. Pittsburg Corning Corp.*,
  901 F.2d 277 (2d Cir. 1990).....................................................................................................27

*Sir Speedy, Inc. v. L&P Graphics, Inc.*,
  957 F.2d 1033 (2d Cir. 1992)...................................................................................................37

*Stampf v. Long Island R. Co.*,
  761 F.3d 192 (2d Cir. 2014).....................................................................................................35

*Styka v. My Merchants Services, LLC*,
  14 Civ. 6198 (ENV) (VMS), 2016 WL 11396819 ..................................................................50

iii

*Taylor v. Stratton Corp.*,
    514 F App'x 68 (2d Cir. 2013) ........................................................................................ 23

*Tencora v. Ba-kal Restaurant Corp.*,
    CV 18-7311, 2020 WL 8771256 (E.D.N.Y. Nov. 30, 2020) ........................................ 50

*Thomas v. iStar Fin., Inc.*,
    508 F.Supp.2d 252 (S.D.N.Y. 2007) ............................................................................ 48

*Thorsen v. Cty. of Nassau*,
    722 F.Supp.2d 277 (E.D.N.Y. 2010) ....................................................................... 35, 36

*Tse v. UBS Financial Servs., Inc.*,
    568 F.Supp.2d 274 (S.D.N.Y. 2008) .................................................................. 37, 43, 48

*United States Securities and Exchange Comm. v. Vali Mgmt Partners*,
    No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ............................................. 29

*United States v. Nelson*,
    227 F.3d 164 (2d Cir. 2002) ....................................................................................... 20, 21

*Wang v. Yum! Brands, Inc.*,
    06-CV1783, 2007 WL 1521496 (E.D.N.Y. May 22, 2007) ......................................... 37

*Watson v. E.S. Sutton, Inc.*,
    No. 02 Civ. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) ............................. 48, 49

*Young v. Cabrera*,
    18-cv-3028 (RPK) (ST), 2023 WL 1785526 (E.D.N.Y. Feb. 6, 2023) ......................... 2

**Statutes**

42 U.S.C. § 1981a(b)(3)(A) ................................................................................................. 32, 43

ADA ................................................................................................................................ 29, 32, 43

Defendant Law .............................................................................................................................. 1

FMLA ............................................................................................................................................ 27

HIPAA ..................................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 59 ................................................................................................................... 2, 29

Fed. R. Civ. P. 59(a)(1)(A) .......................................................................................................... 1

Fed. R. Civ. P. 61 ................................................................................................................... 1, 2

iv

## PRELIMINARY STATEMENT

Defendant Law Office of Yuriy Prakhin, P.C. (the "Firm") (collectively with Individual Defendant, Yuriy Prakhin, Esq., "Defendants"), by and through its attorneys, Bond Schoeneck & King PLLC, respectfully submits this Memorandum of Law in support of its motion for a new trial. A jury trial was held in this matter from February 6-16, 2023. The jury returned a verdict for Plaintiff. The Court entered a final judgment on February 24, 2023. [ECF Doc. #220]. Defendant seeks an Order granting a new trial, or in the alternative, remitting the jury's damages award.

## LEGAL STANDARD REGARDING MOTION FOR A NEW TRIAL

A court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Knox v. John Varvatos Enterprises, Inc.*, 512 F.Supp.3d 470, 479 (S.D.N.Y. 2012) (quoting *Welch v. United Parcel Service, Inc.*, 871 F.Supp.2d 164, 174 (E.D.N.Y. 2012)).

When a party seeks a new trial based upon evidentiary errors, the Court must disregard all "errors and defects that do not affect a party's substantial rights." Fed. R. Civ. P. 61. "The Second Circuit has clarified that a substantial right has been affected only when a jury's judgment was likely to have been 'swayed by the error.'" *Parrish v. Sollecito*, 280 F.Supp.2d 145, 165 (S.D.N.Y. 2003). "Relevant to this inquiry is 'whether or not the evidence bears on an issue that is plainly critical to the jury's decision' and 'whether or not the evidence was emphasized in arguments to the jury.'" *Kogut v. County of Nassau*, Nos. 06-CV-6695(JS)(WDW), 06-CV-6720 (JS)(WDW), 2013 WL 3820826, at *2 (E.D.N.Y. July 22, 2013)*see also, Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (Where there has been an objection, a new trial is warranted if the

court's ruling was "clearly prejudicial to the outcome of the trial," taking the record as a whole.). However, the Court must consider all errors which affect a party's substantial rights. Fed. R. Civ. P. 61.

On a motion for a new trial under Fed. R. Civ. P. 59, the court is permitted to "weigh the evidence and credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). A motion for a new trial "may be granted even if there is substantial evidence supporting the jury's verdict." *Young v. Cabrera*, 18-cv-3028 (RPK) (ST), 2023 WL 1785526, at *3 (E.D.N.Y. Feb. 6, 2023) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

## ARGUMENT I – DEFENDANTS ARE ENTITLED TO A NEW TRIAL

### POINT I

### The Court Erred in its Handling of Plaintiff's Doctors and Mental Health Providers and Their Corresponding Documentation

Plaintiff's conduct with respect to her doctors and mental health providers was egregious and resulted in substantial errors in the admission and rejection of evidence. This resulted in errors that affected Defendant's substantial rights and warrant a new trial. This conduct included Plaintiff's refusal to execute HIPAA authorizations for Defendants to obtain medical documentation regarding her disability and emotional distress, Plaintiff's sworn certification that she had produced all records relating to her disability and mental health, the production of hundreds of documents from Plaintiff's doctors and mental health providers in the days leading up to trial, the requirement to depose one of Plaintiff's mental health providers for a maximum of two hours in the middle of trial, and the production of over 100 pages of records from one of Plaintiff's mental health providers in the middle of trial (which included records that Plaintiff had in her possession but did not turn over despite her previous certification).

2

On November 5, 2019, Defendants served Plaintiff with their First Request for Production of Documents, which included the request for Plaintiff to execute HIPAA authorizations relating to her medical condition and her emotional distress. [**Exhibit B** to Campbell Dec. at #46-49] Plaintiff objected to Defendants' requests and did not produce any HIPAA authorizations, despite having a specific claim for disability discrimination and for medically-supported emotional distress damages. On January 27, 2020, Defendants sent a letter to Plaintiff advising that she must complete HIPAA authorizations for all medical providers that she had identified. Plaintiff still refused to complete the appropriate HIPAA authorizations. [**Exhibit C** to Campbell Dec.]. On March 19, 2020, Defendants sent a third request to Plaintiff requesting that she execute appropriate HIPAA authorizations. [*Id.*.] Instead of complying with these requests, on April 8, 2020, Plaintiff's counsel asserted that "Plaintiff ***has produced all medical records related to her disability and mental health throughout the relevant period***, thereby vitiating the need for her to sign HIPAA-compliant authorizations." [**Exhibit D** to Campbell Dec.].

On April 16, 2020, Defendants requested for the fourth time that Plaintiff execute HIPAA authorizations and reminded her that she is required to do so since she put her physical and mental condition at issue. [**Exhibit E** to Campbell Dec.]. Defendants also reminded Plaintiff that a request for medical documentation from her healthcare provider is appropriate for discovery even when the plaintiff has produced some medical documentation herself. At the time, Defendants were perplexed as to why Plaintiff was so resistant to providing HIPAA authorizations since such are routinely provided in disability discrimination lawsuits and/or in actions seeking emotional distress damages. Indeed, such records often guide the course of discovery and determine whether an expert will be retained.

On April 27, 2020, Defendants filed a motion to compel Plaintiff to execute HIPAA

authorizations. [ECF Doc. #25]. On April 30, 2020, Magistrate Judge Mann denied Defendants' motion, finding that it would be an "unnecessary burden" during the COVID-19 pandemic to require medical providers to re-produce documents already produced to Plaintiff, in reliance on the representations made by Plaintiff and her counsel that they had produced all of her medical and mental health records for the relevant time period and would submit a certification to that fact.[1] [**Exhibit F** E to Campbell Dec.].

On May 18, 2020, pursuant to Magistrate Judge Mann's Order, Plaintiff produced a sworn certification claiming that she "had received and produced all medical records relating to [her] disability and emotional distress." [**Exhibit G** to Campbell Dec. ]. These assurances and certification were made even though it was clear that records of several of Plaintiff's providers were incomplete. As of that date, Plaintiff had provided the following records relating to her disability and emotional distress. [See **Exhibit H** to Campbell Dec.]:

- NYU Langone Health (Plaintiff000015-22) – **8 pages**.

- Dr. Jeffery Odel, Columbia University Laboratories (Plaintiff000023-24) – **2 pages.**

- Dr. Cinthi Pillai (Plaintiff000025-32) – **8 pages**

- Dr. Anna Shostak (Plaintiff000033-42) – **10 pages** from July 31, 2018 through August 20, 2019

- Wills Eye Hospital (Plaintiff00941-953, 959-980) – **35 pages**

- Letter from Martin Falk, Ph.D. (Plaintiff000954-955) – **2 pages**

- Dr. Elchin Gajiev (Plaintiff000956-958, 1054-1058) – **8 pages**

- Dr. John Guy, University of Miami (Plaintiff001553-1576) – **24 pages**

---

[1] Perhaps the Magistrate was swayed by the fact that Plaintiff is a licensed attorney and expected a sworn certification from her to mean something.

4

On August 4, 2020, Defendants again requested Plaintiff to execute HIPAA authorizations "for Plaintiff's ongoing physical and mental health conditions." [**Exhibit I** to Campbell Dec.]. In response, Plaintiff stated that:

> Per the Court's Order Plaintiff submitted a certification on May 18, 2020 that she had produced all medical records but for one provider. On May 20, 2020, Plaintiff produced the outstanding records from that additional provider. Your request for a reproduction of the same medical records going back 1.5 years is duplicative, burdensome, and contrary to the Court's Order. Accordingly, Plaintiff produces completed and executed HIPAA authorizations for medical records and mental health information from May 18, 2020 to the present.

[**Exhibit I** to Campbell Dec.].

On or around September 22, 2020, Defendants served HIPAA authorizations on the following of Plaintiff's physical and mental health providers:

- Dr. Scott Brodie, M.D., Ph.D. of NYU Langone Health;

- Dr. Anna Shostak, M.D.;

- Dr. Martin Falk, Ph.D.;

- Dr. Cinthi Pillai, M.D. of NYU Langone Health, Neurology Department;

- Dr. Elchin Gajiev, M.D.;

- NYU Langone Eye Center; and

- Dr. Vaidehi Dedania, M.D. of NYU Langone Health, Ophthalmology Department.

[**Exhibit J** to Campbell Dec.]:

However, per Magistrate Judge Mann's Order, the requests were limited to records from May 18, 2020 to present.

On October 29, 2020, Defendants served another HIPAA authorization on Dr. Martin Falk, to account for a newly discovered address for him. [**Exhibit K** to Campbell Dec.].

On December 9, 2020, Defendants served HIPAA authorizations on Wills Eye Hospital; Dr. Julia Giyaur, M.D. of New York Laser Vision; and NYU Langone Hospital – Brooklyn.

[**Exhibit L** to Campbell Dec.]. For these three health providers, Plaintiff executed authorizations from June 1, 2018 through present.

On December 11, 2020, Defendants served a second request on Dr. Anna Shostak and Dr. Martin Falk to obtain Plaintiff's mental health records. [**Exhibit M** to Campbell Dec.].

On January 5, 2021, Defendants served a third request on Dr. Anna Shostak at two different locations to obtain Plaintiff's mental health records. [**Exhibit N** to Campbell Dec.]. On January 8, 2021, Defendants served a third request on Dr. Martin Falk to obtain Plaintiff's mental health records. [**Exhibit O** to Campbell Dec.].

The Parties filed the Proposed Joint Pre-Trial Order on May 27, 2022. [ECF Doc. #112]. At this time, Plaintiff did not list any of the above-mentioned doctors or mental health providers as potential witnesses and none of these doctors or mental health providers were listed on Plaintiff's Initial Disclosures. The Parties were ordered to file a revised Joint Pre-Trial Order by October 28, 2022. On October 28, 2022, the revised deadline for the Joint Pre-Trial Order, Plaintiff indicated for the first time that she intended to call Dr. Martin Falk and Dr. Anna Shostak as witnesses at trial and would use a letter from Dr. Falk dated January 27, 2020 as a trial exhibit. [**Exhibit P** to Campbell Dec.]. The inclusion of these two witnesses, as well as other last-minute changes from Plaintiff, necessitated Defendants requesting a brief extension for the Parties to file their pre-trial submissions. The Court granted this request and ordered that the Parties file their revised Joint Pre-Trial Order by November 2, 2022.

On November 1, 2022, Plaintiff, for the first time, signaled her intent to include seven additional doctors on the Parties' Joint Pre-Trial Order – Dr. Elchin Gajiev, Dr. Scott E. Beadle, Dr. Cinthi Pillai, Dr. Vaidehi Dedania, Dr. Jeffrey Odel, Dr. Ali Naini, and Dr. Maihesh Mansukhani as witnesses. [**Exhibits Q-R** to Campbell Dec.].

Again, these and other last-minute changes necessitated a brief extension for the Parties to file their pre-trial submissions. [**Exhibit S** to Campbell Dec.]. The Court granted this request and ordered that the Parties file their revised Joint Pre-Trial Order by November 9, 2022.

On November 8, 2022, Plaintiff served Amended Initial Disclosures to add in Dr. Falk and Dr. Shostak, as well as adding seven additional doctors which had not previously been included in the Initial Disclosures or prior versions of the Joint Pre-Trial Order. [**Exhibits T-U** to Campbell Dec.]. Also on November 8, 2022, Plaintiff added seven additional doctors as potential witnesses on the Parties' Joint Pre-Trial Order. These additional seven doctors, some of which were mentioned by Plaintiff on November 1, 2022, were: Dr. Gajiev, Dr. Moster, Dr. Brodie, Dr. Pillai, Dr. Dedania, Dr. Odel, and Dr. Guy.

Given the untimely disclosure of these doctors and mental health providers, Defendants moved to preclude these individuals as witnesses, or in the alternative, to be allowed the opportunity to depose each of them. [ECF Doc. #138]. During the Pre-Trial Conference, Plaintiff's counsel agreed to only call Dr. Shostak, Dr. Falk, and Dr. Odel to testify and Dr. Gajiev to testify solely with respect to certain prescriptions provided to Plaintiff. [ECF Doc. #154]. Defendants were denied the opportunity of deposing any of these witnesses who would be testifying at trial. [ECF Doc. #154].

On January 10, 2023, Plaintiff requested to substitute Dr. Odel with Dr. Pillai as Dr. Odel had recently suffered a stroke and would be unable to attend the trial. [**Exhibit V** to Campbell Dec.]. Your Honor granted Plaintiff's request, but Defendants were still not given the opportunity to depose this witness.

On January 24, 2023, Defendants served trial subpoenas for records on Dr. Cinthi Pillai, Dr. Martin Falk, Dr. Elchin Gajiev, and Dr. Anna Shostak. [**Exhibit W** to Campbell Dec.]. All of

these doctors had previously been served with HIPAA authorizations (some multiple times). [**Exhibits J, K, M, N, O** to Campbell Dec.].

On February 1, 2023, Plaintiff produced over 100 pages of medical records from Dr. Pillai, all of which were from 2018. [**Exhibit X** to Campbell Dec.] Such records were responsive to Defendants' repeated requests in 2019 and 2020 for Plaintiff's complete medical records and completely contradicted Plaintiff's May 18, 2020 certification that she had produced all "medical records relating to [her] disability and emotional distress." [**Exhibit G** to Campbell Dec.]. Indeed, Plaintiff's original production of medical records from Dr. Pillai consisted only of eight pages and showed just two visit dates: November 20, 2018 and November 27, 2018. The new records contained six new 2018 dates during Plaintiff's employment with Defendants=:September 28, October 8, October 10, November 5, November 9, and November 13, 2018 and over 20 pages of additional records from her November 20 and November 27, 2018 visits.

On February 2, 2023, Defendants moved to preclude the admission of these records and the testimony of Dr. Pillai. [ECF Doc. #191]. On February 4, 2023, Dr. Martin Falk produced 50 pages of mental health treatment records, just two days before the trial in this matter was scheduled to commence. [**Exhibit Y** to Campbell Dec.]. These records went as far back as August 2019, but were not produced until two days before the trial. On February 5, 2023, Defendants moved to preclude the admission of the additional records from Dr. Falk and his testimony. [ECF Doc. #198]. Embedded in both motions was Defendants' alternative argument that in the event that Your Honor does not preclude these witnesses and documents, then the trial should be adjourned to a later date. *See, McEnery v. the City of New York*, No. 03 Civ. 6307 (RWS), 2007 WL 1574013, at *3 (E.D.N.Y. May 29, 2007) (Court adjourned a trial the day it was set to commence for four months due to the revelation of two additional doctors relating to the plaintiff's emotional distress

claim a few weeks before trial since, "while it would be clearly prejudicial to preclude Plaintiff from asserting a claim for emotional or psychological injuries, it would also be prejudicial to allow such a claim to go forward without affording Defendants the discovery of potentially relevant evidence…").

In May 2020, Plaintiff had certified that she had provided all relevant records relating to her disability and her emotional distress. [**Exhibit G** to Campbell Dec.]. However, during the week leading up to the trial and during the trial itself, hundreds of pages of additional records were uncovered and produced. It is unclear how Plaintiff could make this certification in light of the major gaps in her original production. In fact, more records were produced in the week leading up to trial and during the trial than Plaintiff's entire medical record production that she certified was complete in May 2020.

> **The Court**: Then why did you certify back all of those years ago if you had given them the records? You didn't know that?
>
> **Ms. Huot**: We had a reason to believe it was because she went and obtained the records but she had no way of knowing that they were not complete.

[Trial Tr. 152; 11-16].

If Plaintiff had no way of knowing her medical records were not complete, she should not have certified that they were. Furthermore, it is hard to believe that Plaintiff had no idea the records were not complete. First, Dr. Falk only provided a 2-page letter and not any of his underlying notes from his meetings with Plaintiff. Second, the notes from Dr. Pillai and NYU only showed two of Plaintiff's visits during her employment with Defendant Firm.

On Defendants' motions to preclude the belatedly produced documents from Dr. Pillai and Dr. Falk and to preclude their testimony, Your Honor ruled that Plaintiff could not use the additional Dr. Pillai records, but that Dr. Pillai and Dr. Falk could testify and the additional records

from Dr. Falk could be admitted. Your Honor also allowed Defendants to take the deposition of Dr. Falk in the evening during the trial for a maximum of two hours as his records were difficult to read.

In addition to the belatedly-produced medical and mental health records produced on the eve of trial, additional records were produced during the actual trial itself. In the middle of the trial, Defendants learned that: (1) Plaintiff had in her possession additional records from Dr. Shostak that she did not produce; and (2) that Plaintiff had only produced the records that she believed were relevant. During the discovery process, Plaintiff produced just 10 pages of records from Dr. Shostak from July 31, 2018 through August 20, 2019 relating to Plaintiff's emotional distress. [**Exhibit H** to Campbell Dec. at 20-29]. This time period covered Plaintiff's employment with Defendants, as well as a limited amount of time after her termination in December 2018. During discovery, Defendants sought and repeatedly requested additional records from Dr. Shostak, particularly records that would show other stressors in Plaintiff's life as Plaintiff had been treating with Dr. Shostak for many years prior to 2018. However, given Magistrate Judge Mann's Order, Defendants had to rely on the records produced by Plaintiff and were only able to obtain records directly from Dr. Shostak from May 2020 through present, which there were none as Plaintiff had stopped treating with Dr. Shostak in December 2019. Pursuant to this same Order, Plaintiff provided a certification that she had "received and produced all medical records relating to my disability and emotional distress." [See **Exhibit G** to Campbell Dec.]. However, Defendants learned at trial that to Plaintiff this meant, not all the records in their possession, just the records that Plaintiff and her counsel deemed relevant:

> We've met and conferred about it [sic] this has been the subject – we discussed this three years ago when we produced the records from 2018 which was the relevant time period that she started working for Mr. Prakhin. [Defendants] had prior counsel maybe they don't know but this issue has been resolved that we [a]greed

10

to produce these records. We did not hide anything, they knew she had been treating with this physician, this mental health provider, for years. But it was agreed upon that these records would be produced, nothing [w]as hidden and these records were produced. Now, they want different records and M[s]. Shostak explained different records to the future don't exist. Now, during the trial, going back, arguing that we hid something. We did not hide anything. These records are not part of discovery because it was already agreed upon that they were not relevant to the case.

[Trial Tr. 1326:12-13373].

> **The Court**: There was a discussion before the magistrate judge about records that predated her working with Mr. Prakhin [?]
>
> **Ms. Huot**: They never contested because they knew we would provide the relevant records and we understood that the relevant records would be from the time that she started working.

[Trial Tr. 1328: 16-22].

Plaintiff's counsel's insistence that there was an agreement with former counsel for Defendants is a complete fabrication. [**Exhibit Z** to Campbell Dec.]. There was never any such agreement between the Parties. Plaintiff and her counsel unilaterally decided on what they considered relevant in turning over documents to Defendants and then would misleadingly certify, they had turned over all records.  Plaintiff considered only records from July 2018-August 2019 to be relevant and somehow did not consider any of her treatment prior to her employment with Defendants (which consisted of around 10 years) to be relevant. Furthermore, Plaintiff had records in her possession that she never turned over to Defendants until ordered to in the middle of trial by Your Honor.

> **The Court:** I take it plaintiff's counsel is representing to this court that neither she nor Ms. Ruderman personally has had access to reported predating her employment with Yuriy Prakhin. Are you stating that as an officer [of] the court on the record here?
>
> **Ms. Huot:** I don't know, your Honor.
>
> **The Court:** What do you mean you don't know? I'm asking you personally whether you've had access to the records that predate of Dr. Shostak that predate

her treatment, that predate her employment with the firm.

**Mr. Rich:** The second employment Judge.

**Ms. Huot:** Your Honor, it's possible we do but that was not relevant for the production.

**The Court:** Do you have them?

**Ms. Huot**: I don't know it's possible.

**The Court:** Look for them.

**Ms. Huot:** I could.

**The Court**: Look for them. If you have them, I want them produced.

[Trial Tr. 1337:7-1338:1].

Despite Plaintiff's counsel's insistence that she did not know if there were additional records, after a break in the proceedings, Plaintiff's counsel found additional records from Dr. Shostak that were not produced to Defendants and that contained Plaintiff's counsel's handwritten personal notes which indicated they had been reviewed. [See Trial Tr. 1406-1407]. Plaintiff was then asked to look for the original records that did not contain Plaintiff's counsel's personal notes. [Trial Tr. 1408: 2-3]. These records, with the notes from Plaintiff's counsel, were ultimately turned over to Defendants at 2:02 p.m. on February 13, 2023, the sixth day of the trial. [**Exhibits AA-BB** to Campbell Dec.]. These records contained entries from August 2016 through June 2018 that had not been previously provided to Defendants. Dr. Shostak was scheduled to testify the next day, February 14, 2023.

On February 14, 2023, as ordered by Your Honor, Dr. Shostak brought with her any notes and records she had on Plaintiff. These records consisted of over 130 pages, only 10 of which Defendants had prior to this trial. [**Exhibit CC** to Campbell Dec.]. Defendants were ultimately given less than an hour to review these voluminous handwritten records prior to questioning Dr.

Shostak as a witness.

The following chart outlines Plaintiff's production of records, Defendants' requests to providers, and any responses:

| Provider | Records from Plaintiff | Defendants' Requests to Provider | Response | Comments |
|---|---|---|---|---|
| NYU Langone Health/Dr. Scott Brodie | 8 pages (Plaintiff000015-22) | Sept. 22, 2020 | No records | |
| Dr. Jeffrey Odel/Columbia University | 2 pages (Plaintiff000023-24) | n/a | n/a | |
| Dr. Anna Shostak, M.D. | 10 pages from July 31, 2018 through August 20, 2019. (Plaintiff000033-42) | Sept. 22, 2020; Dec. 11, 2020; Jan. 5, 2021; Jan. 24, 2023 | None until during trial | On Feb. 13, 2023, in the second week of trial, Plaintiff provided 29 pages (19 new pages) of Dr. Shostak records. Dr Shostak brought 131 pages of records to trial on Feb, 14, 2023 |
| Dr. Martin Falk, Ph.D. | 2-page letter dated January 27, 2020. (Plaintiff000954-955) | Sept. 22, 2020; Oct. 29, 2020 (corrected address); Dec. 11, 2020; Jan. 5, 2021; Jan. 24, 2023 | None until February 4, 2023 (two days before trial) | Produced 50 pages of records two days before the trial |
| Dr. Cinthi Pillai, M.D. of NYU Langone Health, Neurology Department | 8 pages (Plaintiff000025-32) | Sept. 22, 2020; Jan. 24, 2023 | None | Plaintiff produced over 100 additional pages of records from 2018 on Feb. 1, 2023 – five |

13

| | | | | days before trial |
|---|---|---|---|---|
| Wills Eye Hospital | 35 pages (Plaintiff00941-953, 959980) | Dec. 9, 2020 | | |
| Dr. Elchin Gajiev, M.D. | 8 pages (Plaintiff000956-958, 1054-1058) | Sept. 22, 2020; Jan. 24, 2023 | 31 pages | Received 33 pages of additional records on January 30, 2023 (Gajiev0001-Gajiev0033) |
| Dr. John Guy, University of Miami | 24 pages (Plaintiff001553-1576) | n/a | n/a | |
| NYU Langone Eye Center | None | Sept. 22, 2020 | 72 pages (D014892-D14963) | |
| Dr. Vaidehi Dedania, M.D. of NYU Langone Health, Ophthalmology Department | None | Sept. 22, 2020 | | |
| Dr. Julia Giyuar | None | Dec. 9, 2020 | 11 pages (D014880-D014890) | |
| NYU Langone Health – BK | None | Dec. 9, 2020 | No documents | |

In addition, Your Honor prevented Defendants from questioning Plaintiff and other witnesses about this issue. Plaintiff, an attorney, submitted a sworn certification that she had produced all her medical records relating to her disability and emotional distress. [**Exhibit G** to Campbell Dec.]. Defendants were entitled to question Plaintiff on the submission and execution of her sham certification, as well as her attempts to obtain records. Defendants, however, were repeatedly prevented from doing so.

      **Mr. Rich:** When you worked, generally speaking, as a plaintiff's lawyer, the defendant obtains records of the plaintiff, correct?

**Plaintiff**: Yes.

**Mr. Rich**: The ordinary practice is that the plaintiff signs various authorizations, usually called a HIPAA authorization, that are compliant with the law. They provide that to – the plaintiff's law firm provides it to the defendant and the defendant gets the record on their own, right?

**Plaintiff**: Yes.

**Mr. Rich**: Now, in this particular case, something different happened because during the period which would be discovery here, when COVID happened, offices were closing down, even doctors' offices were closing down and it was –

**Ms. Huot**: Objection.

**The Court**: I am going to sustain the objection to this line of inquiry.

**Mr. Rich**: Your Honor, it goes to the issue of certification of records by somebody who was charged with that –

**The Court:** Oh, no. No, no. We're not going there.

**Mr. Rich**: It also goes to credibility. May I ask, Your Honor, if she certified that all the records were provided?

**The Court:** We're not going to go there. Okay? We're not going to go into that issue.

[Trial Tr. 305:14-306:14].

Defendants were also prevented from asking Dr. Shostak about Plaintiff's request of records from her:

**Ms. Donnelly**: And at some point in 2019 or 2020, did Ms. Ruderman request that you provide her a copy of her records?

**Dr. Shostak**: Yes.

**Ms. Donnelly**: What did she request?

**Ms. Huot**: Objection, relevance.

**The Court**: I will sustain the objection.

**Ms. Donnelly**: Did you provide Ms. Ruderman with copies of your records?

**Dr. Shostak**: I provided her most recent copy. When she ask me, I provided her most recent copy of the record.

15

**Ms. Donnelly**: And when you say "most recent copy;" what are you referring to?

**Ms. Huot**: Objection, relevance.

**The Court**: I will sustain the objection.

**Ms. Donnelly**: Your Honor, I think I am entitled to know what she provided to her and when.

**Ms. Huot**: Your Honor, I object to that.

**The Court**: I will sustain the objection.

[Trial Tr. 1606:11-1607:2].

Defendants were able to question Dr. Falk briefly about this issue. Dr. Falk's testimony directly contradicts Plaintiff's certification and representations to Defendants and to this Court:

**Ms. Donnelly**: At any point in time, did Ms. Ruderman ask you to provide her with your complete note for her sessions.

**Dr. Falk**: No, she didn't.

[Trial Tr. 1260; 2-4].

The above conduct clearly affected Defendants' substantial rights. Plaintiff's dilatory conduct and delays were unduly burdensome and prejudicial to Defendants. Plaintiff refused to allow Defendants to obtain her medical and mental health records directly from her providers. Instead, Plaintiff submitted a certification that all records relating to her medical and mental health had been produced. However, this certification proved to be a complete farce. Since the time of Plaintiff's execution of the certification, hundreds of pages of medical and mental health records have been produced – many of which occurred in the days leading up to the trial and during the trial itself. Then Defendants were prevented from questioning Plaintiff about her certification and production of records. There was little, if any, repercussions for Plaintiff's actions. Plaintiff's actions created a mockery of the discovery rules and encourages a trial by surprise and ambush. Defendants were at a severe disadvantage in not being allowed access to the bulk of the records

pertaining to Plaintiff's disability and mental health treatment until the week before and during the trial.

## POINT II

### The Court Erred in its Handling of Plaintiff's Lay Witnesses

In addition to Plaintiff's egregious behavior regarding her doctors and mental health providers as outlined above in Point I, Plaintiff's conduct with respect to the disclosure of lay witnesses and documents was also problematic.

As mentioned previously, the Parties originally filed their proposed Joint Pre-Trial Order on May 27, 2022. [ECF Doc. #112]. The Parties were then requested to file a revised Joint Pre-Trial Order by October 28, 2022. On October 26, 2022, Plaintiff's counsel produced the declaration of Peter Coates, executed on May 19, 2022, purportedly as a supplemental exhibit to the Joint Pre-Trial Order. [**Exhibits DD-EE** to Campbell Dec.]. In the cover email, Plaintiff's counsel explained that they thought it had been produced but that it must have "slipped through the cracks." [**Exhibit DD** to Campbell Dec.]. On October 28, 2022, the revised deadline for the Joint Pre-Trial Order, Plaintiff then added Peter Coates as an additional witness. Again, as explained previously, these additions necessitated Defendants needing more time for their submissions, which request was granted by Your Honor with a new deadline of November 2, 2022 to submit an updated Joint Pre-Trial Order.

At 5:05 p.m. on November 1, 2022, the day before the revised submission date for the Joint Pre-Trial Order, Plaintiff's counsel informed Defendants for the first time that they intended to include Steven Korytny and Nicholas Serlin as witnesses. [**Exhibit Q** to Campbell Dec.]. At 5:08 p.m. on November 1, 2022, Plaintiff's counsel informed Defendants for the first time that they intended to include an interpreter from TransPerfect to the witness list. [**Exhibit FF** to Campbell Dec.]. These and other last-minute changes necessitated the Parties requesting a brief extension to

17

file their pre-trial submissions. The Court granted this request and ordered that the Parties file their revised Joint Pre-Trial Order by November 9, 2022.

On November 8, 2022, the day before the revised deadline for the Joint Pre-Trial Order, Plaintiff's counsel produced Amended Initial Disclosures. [**Exhibit U** to Campbell Dec.]. Plaintiff's Initial Disclosures only listed Plaintiff, Defendant Prakhin and Irene Raskin. [**Exhibit GG** to Campbell Dec.]. Plaintiff's Amended Initial Disclosures now included the following additional lay witnesses: Irene Gabo, Sandra Beron, Erica Larssen, Patricia Belous, Alexander Pusachev, Steven Korytny, Nicholas Serlin, William Lawlor, Peter Coates, Tatyana Ruderman, Svetlana Scoll, Karine Bogoraz, Jonathan Shalom, Dmitry Levitsky, Jack Grossman, John Manessis, Tommy Sgouras, Christina Guarneri, David J Hernandez, Joanna J. Lambridis, Oleg Ioselevich, and Rachel Kaylie. [**Exhibit U** to Campbell Dec.]. Of these additional lay witnesses listed on Plaintiff's Amended Disclosures, the following lay witnesses were first included on the Joint Pre-Trial Order draft on November 8, 2022: Tatyana Ruderman, William Lawlor, Sandra Beron, Svetlana Scoll, Karine Bogoraz, Jonathan Shalom, Dmitry Levitsky, Jack Grossman, John Manessis, Tommy Sgouras, and Christina Guarneri. At the time of inclusion, Defendants were not even aware of who many of these individuals were, nor did Plaintiff identify who they were. Plaintiff provided their revised Joint Pre-Trial Order draft in track changes to Defendants at 4:11 p.m. on November 8, 2022, the day prior to the deadline. This draft showed that Plaintiff had added in 21 witnesses and 33 exhibits. [**Exhibits HH-II** to Campbell Dec.].

At 5:19 p.m. on Saturday, November 12, 2022, after the filing of the Parties' Joint Pre-Trial Order, Plaintiff produced 351 pages of documents to "supplement" her production. [**Exhibit JJ-KK** to Campbell Dec.]. Plaintiff provided no explanation for this late disclosure. Nor could she. Many, if not most, of the documents are dated in 2021. There was no reason that Plaintiff did

not provide these documents to Defendants for over a year except to cause harm to Defendants.

Given the untimely disclosures of these lay witnesses and documents, Defendants moved to preclude (1) the 351 pages of documents and (2) the following lay individuals as witnesses: Tatyana Ruderman, William Lawlor, Sandra Beron, Nicholas Serlin, Steven Korytny, Peter Coates, Svetlana Scoll, Karine Bogoraz, Jonathan Shalom, Dmitry Levitsky, Jack Grossman, John Manessis, Tommy Sgouras, and Christina Guaneri. [ECF Doc. #138]. Furthermore, if not precluded, Defendants moved to depose any of these witnesses prior to trial. [ECF Doc. #138]. Your Honor denied Defendants' motion to preclude the 351 pages of documents. [ECF Doc #154]. In addition, Your Honor decided that of the lay witnesses Defendants sought to preclude, Plaintiff could call William Lawlor, Sandra Beron, Nicholas Serlin, Steven Korytny, Peter Coates, Svetlana Scoll, and Dmitry Levitsky. [*Id.*]. Of these seven new lay witnesses, Defendants were only given the opportunity to depose Peter Coates. [*Id.*].

The above conduct clearly affected Defendants' substantial rights. Plaintiff's dilatory conduct and delays were unduly burdensome and prejudicial to Defendants. Plaintiff withheld relevant documents from Defendants until after the filing of the Joint Pre-Trial Order. Furthermore, Plaintiff did not disclose the identity of many crucial lay witnesses until well after the close of discovery. There was little, if any, repercussions for Plaintiff's actions. Defendants were at a severe disadvantage in Plaintiff delaying identification of several of her key lay witnesses and in not being allowed the opportunity to depose any of these witnesses except for Peter Coates.

## POINT III

### The Court Erred in Failing to Dismiss Two Openly Biased Jurors for Cause

A new trial is also warranted on the grounds that the Court declined to dismiss two admittedly biased jurors for cause – Juror # 3 (former Prospective Juror #22) and Prospective Juror #22. A cause challenge to a juror's impartiality can rest on a claim of actual bias, or "the existence

of a state of mind that leads to an inference that the person will not act with impartiality." *United States v. Nelson*, 227 F.3d 164, 202 (2d Cir. 2002). "A voir dire admission by the prospective juror of a state of mind prejudicial to a party's interest … is the most common and direct ground on the basis of which actual bias is found to exist." *Id*. "Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid." *Id*. (citing *Bailey v. Bd. of County Comm'rs*, 956 F.2d 1112, 1127 (11th Cir. 1992)). "**A juror who 'could probably be fair and impartial' should not be considered impartial, because 'probably is not good enough**.'" *Id.* (emphasis added) (citing *United States v. Sithithongtham*, 192 F.3d 1119, 1121 (8th Cir. 1999)). Although courts acknowledge that jurors can, in rare instances, theoretically demonstrate an ability to overcome their bias to serve by making clear that such bias would not affect his or her judgment, such assertions must be "unambiguous[]." *Id*.

Here, Juror # 3 (then Prospective Juror # 22) indicated actual bias which should have resulted in the court dismissing her for cause. Juror # 3 was recently fired from her job and felt that she had faced discrimination at this job by the way she was treated.

> **Juror**: Well, this is a case of discrimination. I recently got fired from my job.
>
> **The Court**: You recently were fired from your job?
>
> **Juror:**: I got my job back. I didn't have to go to court or anything, **but I felt it was kind of discrimination for me because** what I did was done by others and they didn't treat me the same way.
>
> **The Court**: Okay. Well, now, as certainly understanding that you've had that experience and been able to get your job back. Would you be able to listen to the evidence objectively in this case and follow the judge's instructions on the law?
>
> **Juror**: I mean, yeah, I think so.
>
> **The Court**: Okay.

**Juror**: But, you know, I mean, I think I could be fair based on the evidence.

**The Court**: Okay.

**Juror**: But I don't know. I mean, sometimes I have my doubts but I do whatever you tell me to do. I try to follow.

[**Exhibit BBB** to Campbell Dec. 43:25-44:19].

Juror # 3's statements indicated a bias that was sufficient for the Court to excuse her, and certainly fell short of an unambiguous assertion that she could be impartial. *Nelson*, 277 F.3d at 202. Juror # 3 could not provide an unqualified response saying instead, "I have my doubts" on being impartial. [**Exhibit BBB** to Campbell Dec. 43: 18-19]. As the case law indicates that an unambiguous assertion of impartiality is required, and that all doubts as to impartiality should be resolved in favor of exclusion, the Court erred in not excusing Juror Number 3 for cause. *See, Nelson*, 277 F.3d at 202; *See also, Rosas v. Artus*, No. 05 Civ. 8440 (RJS), 2013 WL 499610, at *11 (S.D.N.Y. Jan. 29, 2013) ("Prospective jurors who make statements that cast serious doubts on their ability to render an impartial verdict, and who have given less-than-unequivocal assurances of impartiality, must be excused.").

At sidebar, counsel for Defendants challenged Juror # 3 (then Prospective Juror # 22):

The way she answered your [Honor's] questions, she said she would do her best. But she said, I have my doubts. I have my doubts, I mean, you know, when you repeat it again to her I think it's a little bit intimidating, she's obviously trying to please you. **But she made it clear she would have her doubts about being able to be fair and impartial despite the instructions.**

[**Exhibit BBB** to Campbell Dec. 46:9-15].

However, Defendants' counsel's challenge was overruled. Counsel for Defendants renewed their challenge to this Juror and asked Your Honor to ask additional questions: "I would ask if Your Honor could inquire or if I can inquire: Once you are impaneled, you have to be sure that you can be fair through the entire process…it sounded like she would have these percolating

21

feelings." [**Exhibit BBB** to Campbell Dec. 75; 1-7]. Your Honor denied Defendants request and stated, "I am not asking her any more questions about it." [**Exhibit BBB** to Campbell Dec. 75; 10-11]. Ultimately, Juror # 3 was allowed to sit on this jury.

In addition to Juror # 3, Prospective Juror # 16 also indicated actual bias which should have resulted in his dismissal for cause. When called upon, Prospective Juror # 16 provided: "You asked a question about having trouble being impartial. So I've since changed careers but I worked with people with disabilities for 11 and a half years, so I would find it difficult to – I'd probably be biased for the plaintiff." [**Exhibit BBB** to Campbell Dec. 37:13-17]. Your Honor asked if Prospective Juror # 16 would "be able to objectively listen to the evidence and then apply the trial judge's instruction on the law." [**Exhibit BBB** to Campbell Dec. 37: 21-23]. Prospective Juror # 16 answered affirmatively and was not excused.

Furthermore, Prospective Juror # 16 previous career working with people with disabilities was at Job Path, an organization which counsel for Defendants had represented in a previous discrimination lawsuit. Plaintiff's counsel stated that they had no objection to Defense counsel representing that company [**Exhibit BBB** to Campbell Dec. 133: 23-25], which is unsurprising given the Prospective Juror's previous indication of bias towards the Plaintiff.

The Court's failure to strike Prospective Juror # 16 resulted in harm to Defendants because they lost the use of a peremptory challenge. Prospective Juror # 16 should have been excused for (1) his indication that he would be biased towards the Plaintiff; (2) his previous employment with an organization that specializes in assisting individuals with disabilities; and (3) Counsel for Defendants' previous representation of that organization.

The Second Circuit has yet to decide whether a party's "loss of a statutorily guaranteed peremptory strike" is sufficient by itself to demonstrate injury. *See Cruz v Jordan*, 357 F.3d 269,

271 (2d Cir. 2004) (leaving open the question of whether the Supreme Court's decision in a criminal context that a peremptory challenge can "cure" a court's failure to remove a juror for cause in a criminal case to a civil case, "as long as the jury eventually empaneled is impartial."); *Taylor v. Stratton Corp.*, 514 F App'x 68, 73 (2d Cir. 2013) ("Because we conclude that the district court did not abuse its discretion by failing to remove J.M. from the jury pool, we need not decide whether the plaintiff would have been prejudiced by the error even though she exercised a peremptory challenge and J.M. did not sit on the jury."). This Court should find that a loss of a peremptory strike in and of itself is sufficient to constitute an injury.

However, even if the Court found that the loss of a peremptory strike alone is insufficient to demonstrate injury, Defendants have clearly demonstrated injury where the jury eventually empaneled was not impartial. This case is one beyond which Defendants merely lost a peremptory strike – rather this case is one where the loss of that peremptory strike resulted in a jury that included Juror # 3, a biased juror. As the jury that was eventually empaneled was not impartial (*Cruz,* 357 F.3d at 271), a new trial is warranted on these grounds alone.

### POINT IV

### The Court Erred in its Bias and Statements in Front of the Jury

The Court erred in its conduct during trial which demonstrated clear bias prejudicing the Defendants. "In reviewing a challenge to a trial judge's conduct, we determine not whether the trial judge's conduct left something to be desired, but…whether the judge's behavior was so prejudicial that it denied a party a fair, as opposed to a perfect, trial." *Colon v. Metro-North Commuter Railroad Co.*, 778 Fed. Appx. 7, 13 (2d Cir. 2019) (quoting *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir. 1998)). Courts "will reverse on the basis of a judge's improper remarks if the judge expresses [his] opinion on an ultimate issue of fact in front of the jury or [argues] for one of the parties." *Shah*, 148 F.3d at 98 (quoting *Causey v. Zinke (In re Aircrash in*

*Bali, Indonesia)*, 871 F.2d 813, 815 (9ᵗʰ Cir. 1989)).

Here, the Court frequently (1) took over the examination of witnesses, (2) made erroneous rulings that prevented defense counsel from asking pertinent questions, including fully impeaching the plaintiff on her certification as explained in Point I; and (3) demeaned defense counsel in the jury's presence.

A small representative of examples are as follows:

After Mr. Rich attempted to move Defendants' Exhibit AAAAAAAAAAA into evidence, Plaintiff's counsel objected, which was sustained by Your Honor because "it can come in through the doctor." [Trial Tr. 301:15-16].

> Mr. Rich: For the limited purpose, then, of a record, which is of the type that she – just as demonstrative evidence, this is a record of the type that would be used to prepare a bill of particulars. It's the doctor's handwriting.

> The Court: Are you testifying? What's going on here? I don't know where I am. Sometimes I think I'm in a bad movie the way the lawyers are behaving. Can I see you at sidebar.

[Trial Tr. 301: 17-24].

> The Court: Can we get to a question here, Mr. Rich, that might bear some relevance?

> Mr. Rich: Yes, Your Honor.

> The Court: Mr. Rich, can we have a question, please?

> Mr. Rich: Yes, I'm going to ask the Court to take judicial notice –

> The Court: I'm not taking judicial notice of anything.

[Trial Tr. 343: 1-9].

> Mr. DiLorenzo: Explain to me how you tried to operate your law firm based on that model of receiving a third of what you get, if you get anything?

> Mr. Prakhin: Okay, I give you the example. I have a pizzeria on the same block where my office is. I like this pizzeria. They do a great job. Best pizza in

24

Bensonhurst. This is the place where my office is located. And from time to time we go to there to grab a piece of pizza from them. When I come in the pizzeria, always clean, people there, people work there and they still – approximately six or seven people. They're running around, they're fast. They're efficient, and as a result the best pizza. There are always a line of people who are waiting for the pizza. And it's great to have such kind of neighbors next to the place where I work. And one week ago, I came to them again to get a piece of pizza and I see that something is wrong over there. People are aggravated by something. They are arguing with each other. I mean, in plain – it's unusual. Absolutely unusual. I received the order of the pizza with a red face who is jogging back and forth – a

The Court: Is there some reason we're discussing the pizza business at the moment? We need to save some time. In view of the shortness of life, could we not discuss the pizza and discuss your business model, please.

Mr. Prakhin: If you give me one more minute, I will finish.

The Court: No. Just go to how you do your business.

[Trial Tr. 608:9-609:12].

The Court: Mr. Rich, do you have just one question?

Mr. Rich: Two.

The Court: You have two questions?

Mr. Rich: I think so.

The Court: I am counting. I'm counting.

Mr. Rich: I wasn't counting.

The Court: Please don't have it be what happened on December 14th.

Mr. Rich: I feel the heat, Judge.

The Court: That's remarkable because no one seems to have felt it before now.

[Trial Tr. 677; 5-15].

During Mr. Rich's cross-examination of Dr. Falk:

Mr. Rich: That's the stimulus for the flashback, and there's an event, often, not all the time, but there's often an event which triggers it. For example, if an Army veteran were on duty to remove bodies and you saw a black bag that looked like

25

the kind of black bag they dispose bodies of when he's walking –

Mr. Huot: Objection.

The Court: I mean this is going on forever. I'm sorry, I'm going to sustain the objection to that.

[Trial Tr. 1289; 16-24].

The above quotes that occurred throughout the trial are a sample of the statements from Your Honor that prejudiced Defendants and swayed the jury in Plaintiff's favor. As such, Defendants request for a new trial must be granted.

## POINT V

### The Court Erred in Allowing the Introduction of Defendants' Financial Records and Denying Bifurcation of Punitive Damages Portion of the Trial and Such Error Improperly Influenced the Jury's Verdict[2]

This Court's ruling allowing the admission of Defendants' financial records and in failing to bifurcate the punitive damages portion of the trial impacted Defendants' substantial rights. The introduction of Defendants' financial records was irrelevant and prejudicial to Defendants. *See e.g.*, *Becknell v. Univ. of Ky.*, Case No. 5:17-cv- 490-JMH-MAS, 2019 WL 1783488 (E.D. Ky. April 23, 2019) ("At this juncture, the relevant question of fact before this Court is whether the University had a legitimate, non-discriminatory reason for terminating Becknell's employment or alternatively whether the proffered legitimate reason is pretext for [] retaliation. Whether the University's general fund contains one dollar, or one hundred million dollars, is of no moment in determining whether the University terminated Becknell based on her use of FMLA leave.").

---

[2] Any argument that Defendants' financial records should be inadmissible pursuant to an undue hardship is erroneous. Defendants never had a defense that any of Plaintiff's requested accommodations posed an undue hardship to Defendants. In fact, Defendants' claim is that Plaintiff never requested any accommodations from them at all. Any undue hardship argument made by Defendants pertained to the issue that Plaintiff's frequent absences without notice posed an undue hardship on Defendants and their employees to cover for Plaintiff and her cases. Such argument is unrelated to the financial resources of the Defendants.

Furthermore, where punitive damages are involved, "[t]he Second Circuit [] favors bifurcation of the amount of punitive damages." *King v. Wang*, 14-cv-7694 (LJL), 2021 WL 5232454 at *17 (S.D.N.Y. Nov. 9, 2021); *see also, Simpson v. Pittsburg Corning Corp*., 901 F.2d 277, 283 (2d Cir. 1990) ("Our approach to the issue as a matter of federal law has been to favor bifurcation of the amount of punitive damages as the 'preferred method,' but to leave the mode of trial ultimately to the discretion of the district judge."). In addition, bifurcation would "promote the interests of 'convenience, negation of prejudice, and judicial efficiency.'" *Equal Employment Opportunity Comm. v. United Health Programs of Am., Inc.*, 14-CV-3673 (KAM) (JO), 2017 WL 10088567, at *14 (E.D.N.Y. Sept. 4, 2017) (quoting *Vichare v. AMBAC, Inc.*, 106 F.3d 457, 466 (2d Cir. 1996)). The reason for bifurcation is clear – Courts recognize that financial information of a successful organization has the ability to influence and compromise the jury's determination on liability. *Brink's Inc. v. City of New York*, 717 F.2d 700, 707 (2d Cir. 1983) ("permitting unlimited examination before trial of a defendant as to his wealth 'could have unfortunate results' in terms of exerting pressure to compromise…as a 'procedural principle,' evidence of a defendant's wealth cannot be brought out at trial unless and until the jury has brought in a special verdict that the plaintiff is entitled to punitive damages.").

Here, Defendants moved prior to trial to preclude Plaintiff from introducing evidence relating to Defendants' financial status and to bifurcate the punitive damages portion of the trial. [ECF Doc. #138]. Your Honor denied Defendants' motions *in limine* regarding financial records and bifurcation of the punitive damages portion of the trial. [ECF Doc. #154]. Defendants requested reconsideration of this decision [ECF Doc. #161], which Your Honor also denied. Such motion was necessary to prevent any evidence on punitive damages to inappropriately influence the jury's decision on the primary issue of liability, which courts in this circuit have recognized is

a serious risk. As a result of the denial of Defendants' motions, a significant amount of evidence was introduced that undoubtedly influenced the jury.

During the trial, Defendant Prakhin was specifically asked about his tax returns and about how much both him and Defendant Firm made in 2018-2021. In addition, Plaintiff entered into evidence tax returns for Defendant Prakhin and Defendant Firm from 2018-2021 into evidence. [See **Exhibit LL**].

|  | Defendant Firm Revenue | Defendant Prakhin Income |
|---|---|---|
| **2018** | **$17 million** | **$2.2 million** |
| **2019** | **$30 million** | **$7.6 million** |
| **2020** | **$22 million** | **$4.2 million** |
| **2021** | **$20 million** | **$3.6 million** |

[Trial Tr. 574:19-581:12].

In addition to presenting testimony and evidence on Defendants' financial status, Plaintiff's counsel, in her summation, stated the following:

> You've met Mr. Prakhin. He's smart. He knows what to do. He used his own words. He's a businessman. **He runs a successful firm. They generate, literally, tens of millions of dollars, year after year after tear, tens of millions of dollars, and he himself personally has an income of millions of dollars. $8 million one year, $7 million another. His business generates $30 million, $20 million. Those tax returns are in evidence and I encourage you guys to look at them.**

[Trial Tr. 2017:23-2018:6].

The admission of this evidence, the above testimony, and the failure to bifurcate the punitive damages portion of the trial prejudiced the jury and necessitates a new trial.

## POINT VI

## The Court Erred in Instructing the Jury

"A motion for a new *trial* pursuant to Rule 59 on the basis of an erroneous jury instruction should be granted if an instruction was erroneous, unless the error was harmless." *Catlin Specialty Ins. Co. v. QA3 Financial Corp.*, 36 F.Supp.3d 336, 340 (S.D.N.Y. July 2, 2014) (citing *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013)); *see also Callahan v. Wilson*, 863 F.3d 144, 148 (2d Cir. 2017) ("An erroneous jury instruction requires a new trial unless the error is harmless."). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States Securities and Exchange Comm. v. Vali Mgmt Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022) (quoting *Velez*, 730 F.3d at 134).

In Your Honor's Jury Instructions, the jury was instructed on the elements of disability discrimination claims under the ADA, the NYSHRL, and the NYCHRL. [ECF Doc. #221]. Under the ADA, Your Honor instructed:

> Plaintiff must prove by a preponderance of the evidence that: (1) The employer is subject to the ADA; (2) Plaintiff **was** disabled within the meaning of the ADA at the time of her termination; (3) Plaintiff **is** otherwise qualified to perform the 'essential functions' of the job with or without a 'reasonable accommodation' by the employer; and (4) Plaintiff has suffered an adverse employment action as a result of the discrimination.

[ECF Doc #221 at 10] [Trial Tr. 2142; 13-22]. In addition, in explaining the third element, Your Honor instructed "the third element requires the plaintiff to show by a preponderance of evidence that she is otherwise qualified for the job and that, with or without a reasonable accommodation, **she can perform the essential functions of that job**." [ECF Doc #221 at 12] [Trial Tr. 2144; 12-16].

Under the NYSHRL and the NYCHRL, Your Honor issued nearly identical instructions. *See* ECF Doc. #221 at 16-17 [Trial Tr. 2151: 7-15) (NYSHRL); [ECF Doc. #221 at 18-19] [Trial

15476459.5 3/23/2023

Tr. 2154: 11-20] (NYCHRL).

For each claim, Your Honor instructed the jury to determine whether Plaintiff was disabled at the time of her termination, but then instructed the jury in the present to determine whether Plaintiff can perform the essential functions of the job. This instruction was improper. The instruction should not have been whether Plaintiff can *currently* perform the essential functions of the job and is otherwise qualified, but instead whether Plaintiff was otherwise qualified *at the time of her termination*. As explained by Ms. Donnelly in objecting to this instruction, "I think it should be 'was' because we're talking about the time of her termination." [Tr. 2075; 1-5]. Your Honor rejected Defendants' request and stated that "I think it's all right the way it is." [Tr. 2075; 20-22].

As discussed at length in Defendant Firm's renewed motion for judgment as a matter of law, Plaintiff has failed to demonstrate that she could perform the essential functions of her job during the relevant time period (September-December 2018). Plaintiff's witnesses – Dmitry Levitsky and William Lawlor, only testified to her ability to work after her termination. The other two witnesses who discussed her ability to work were Irene Gabo who left the firm before she developed the claimed disability and Sandra Beron who admittedly did not observe her work during the relevant employment period. Therefore, had the jury been properly instructed on the time period of when to determine whether Plaintiff could perform essential functions of the job, the jury would not have found in Plaintiff's favor. The erroneous jury instruction was therefore not harmless and the inclusion of the erroneous jury instruction necessitates a new trial.

## POINT VII

### The Jury's Verdict is So Excessive as to Warrant a New Trial

"When a trial court finds a damages verdict to be excessive, it may order a new trial on all issues or only on the question of damages." *MacMillan v. Millennium Broadway Hotel,* 873 F.Supp. 2d 546, 559 (S.D.N.Y. 2012). Here, the jury's award is so excessive, as set forth in

30

Argument II below, as to demonstrate that it was improperly influenced by factors outside of the evidence adduced at trial, including Plaintiff's counsel's summations. Therefore, the Court should order a new trial.

## ARGUMENT II – ALTERNATIVELY, THE COURT SHOULD REMIT THE DAMAGES AWARD

In the event that the jury's misguided verdict is permitted to stand, the Court should remit Plaintiff's damages award. The jury awarded Plaintiff $535,000 in back pay, $300,000 in front pay, $300,000 in emotional distress, and $600,000 in punitive damages. Even if the Court denies Defendant's renewed motions for judgment as a matter of law or its motion for a new trial, the Court should, at a minimum, remit the damages award as excessive.

While juries are permitted to calculate damages, courts in this Circuit make clear that there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Dotson v. City of Syracuse,* No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011) (quoting *Khan v. Hip Centralized Lab. Servs., Inc.*, Civil Action No. CV-03-2411 (DGT), 2008 WL 4283348, at *6 (E.D.N.Y. Sept. 17, 2008)). Therefore, "[w]hile a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Khan*, 2008 WL 4283348, at *6.

> As the Second Circuit has explained: The trial judge has discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence…This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur). The district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken,…and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a

31

particular, quantifiable error.

*Knox v. John Varvatos Enterprises, Inc.*, 512 F.Supp.3d 470, 492 (S.D.N.Y. 2021) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993) (internal citations and quotations omitted).

## POINT I

### Damages under the ADA Must be Capped at $50,000

The jury awarded Plaintiff damages under the ADA, the NYSHRL, and the NYCHRL. The jury award consisted of back pay (under all three laws), front pay (under all three laws), emotional distress damages (under all three laws), and punitive damages (under the ADA and the NYCHRL only). Under the ADA, the total amount of compensatory damages and punitive damages for an employer with more than 14 and fewer than 101 employees is capped at $50,000. 42 U.S.C. § 1981a(b)(3)(A). Therefore, Plaintiff's award under the ADA must not exceed $50,000.

## POINT II

### The Evidence Does Not Support the Jury's Award of Emotional Distress Damages

The jury awarded Plaintiff $300,000 in emotional distress damages. The award for emotional distress damages was based on Plaintiff's own testimony, the testimony of Dr. Shostak – who Plaintiff had been treating with as early as 2008 – and the testimony of Dr. Falk – who Plaintiff did not see until approximately eight months after her termination.

Plaintiff testified that after her termination: "I stopped sleeping, eating. I lost a ton of weight. I would have panic attacks because in the middle of the day I was worrying about what I was going to do in the future." [Trial Tr. 199; 9-12]. Plaintiff testified that she had never had a panic attack before her termination. [Trial Tr. 199; 13-14]. Plaintiff claimed that on November 30th, she called Dr. Shostak, her psychiatrist because she was worried that Defendant Prakhin was going to fire her. [Trial Tr. 199:17-200:1]. When asked if Plaintiff had seen Dr. Shostak prior to

this, Plaintiff disingenuously responded that she was seeing Dr. Shostak for ADD. [Trial Tr. 200; 2-6]. Plaintiff claimed she could not recall any other reason for why she was seeing Dr. Shostak prior her termination. [Trial Tr. 358; 7-15].[3] Plaintiff then explained that after her termination, she treated with Dr. Shostak for "panic attacks and anxiety and depression." [Trial Tr. 201; 17-19]. Plaintiff also explained that after her termination, she treated with a therapist, Dr. Martin Falk, and a psychiatrist, Dr. Elchine Gajiev. [Trial Tr. 202; 7-11]. Plaintiff testified that Dr. Falk diagnosed her with PTSD, which she suffered after her termination. [Trial Tr. 202; 14-18].

The truth of Plaintiff's treatment is that she began treating with Dr. Shostak as early as 2008. [See **Exhibit CC** to Campbell Dec.]. Her treatment records with Dr. Shostak showed that she had been treating with Dr. Shostak for anxiety and depression as early as 2008. [*Id.*]. The ten years of records prior to her termination contained a multitude of issues Plaintiff had unrelated to her employment with Defendants. Furthermore, while Plaintiff did call Dr. Shostak on November 30, approximately three weeks prior to her termination, it is undisputed that this call occurred very shortly after Plaintiff's diagnosis with LHON. In addition, the notes from Dr. Shostak on that day appear to be focused on this diagnosis and not on any issues with Plaintiff's employment: "It's an emergency. Mother states that patient is legally blind, has [Leber] disease. Patient is more anxious and depressed, has insomnia, Patient did not express suicidal/homicidal ideation. Patient is helpless." [Trial Tr. 1674:22-1675:3].

Plaintiff continued to treat with Dr. Shostak until December 2019. [See **Exhibit CC**]. Dr. Shostak never diagnosed Plaintiff with PTSD. [Trial Tr. 1609; 8-14]. Plaintiff began treating with Dr. Falk on August 8, 2019. [See **Exhibit Y**]. Dr. Falk testified that Plaintiff came to her with a diagnosis of PTSD already. [Trial Tr. 1208; 18-24]. Putting aside the authenticity of Plaintiff's

---

[3] When pressed by Your Honor, Plaintiff stated that "There might have been a month or two where I was anxious about something I don't particularly recall." [Trial Tr. 359; 2-5].

claim of a PTSD diagnosis, Plaintiff also continued her treatment of her depression and anxiety with Dr. Falk. It is unclear how much of her depression and anxiety, if any, can be attributed to the Defendants. What is clear is that Plaintiff had a long history of suffering from depression and anxiety, which understandably was exacerbated by her LHON diagnosis, for which there is no cure, and her legal blindness.

"To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be supported by competent evidence in addition to a plaintiff's subjective testimony." *Olsen v. County of Nassau*, 615 F.Supp.2d 35, 46 (E.D.N.Y. 2009). In the Second Circuit, emotional distress awards are categorized into three groupings: (1) garden-variety; (2) significant; and (3) egregious. *Id.*; *Khan v. HIP Centralized Lab Servs., Inc.*, No. CV-03-2411 (DGT), 2008 WL 4283348, at *10 (E.D.N.Y. Sept. 17, 2008).

> In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration…Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroboration witnesses. Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff.

*Id.* (internal citations and quotation marks omitted).

While an award for emotional distress is inherently speculative, "a legal system [nevertheless] has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 205 (2d Cir. 2014). Plaintiff's emotional distress award is excessive as it "deviates materially from what would be reasonable compensation." *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012). "The critical

34

inquiry…is to compare the damages awarded in this case to the damages awarded in cases involving similar injuries." *Ravina v. Columbia Univ.*, No. 16-CV-2137 (RA), 2019 WL 1450449, at *10 (S.D.N.Y. Mar. 31, 2019).

"Significant emotional distress is generally found only where a plaintiff has offered medical, psychological, or therapist evidence of substantial, long-term psychological harm." *Duarte v. St. Barnabas Hosp.*, 341 F.Supp.3d 306, 320 (S.D.N.Y. 2018); *Emamian v. Rockefeller Univ.*, 07 Civ. 3919 (DAB), 2018 WL 2849700 (S.D.N.Y. June 8, 2018). "For significant emotional distress damages, the courts in this Circuit have routinely found that awards ranging from $100,000 to $500,000 are not excessive." *Id.; Thorsen v. Cty. of Nassau*, 722 F.Supp.2d 277, 293 (E.D.N.Y. 2010). "Usually, however, the top of the range for significant emotional distress damages is $200,000." *Id.; see also Ravina,* 2019 WL 1450449, at *11 (explaining that significant emotional distress claims "typically support damages awards ranging from $50,000 to $200,000"); *Lore*, 670 F.3d at 177-80 (upholding a compensatory damages award of $250,000 for reputational harm and emotional distress – while noting that the award was "generous" – where evidence included evidence of medical treatment, as well as testimony from the plaintiff and her mother that she suffered from "tension headaches, abdominal pain, insomnia, anxiety, and depression"); *Emamian*, 2018 WL 2849700, at *17 (concluding that plaintiff's emotional distress claims "f[ell] into the intermediate, 'significant emotional distress' category," but remitting $2 million emotional distress award to $200,000 where significant emotional distress based on "Plaintiff's own testimony regarding her mental state, her trichotillomania [a condition characterized by a compulsion to pull out one's hair] and physical manifestations of her emotional suffering, as well as the corroborative medical testimony she presented."); *Rainone v. Potter*, 388 F.Supp.2d 120, 124-26 (E.D.N.Y. 2005) (reducing emotional distress award from $175,000 to $50,000 and finding

that the plaintiff's emotional distress claim "f[ell] squarely in the low end of the 'significant' range" where (1) plaintiff testified that he took a six month leave because of his distress at a discriminatory non-promotion; (2) plaintiff saw a therapist for four years and was diagnosed with depression; and (3) plaintiff's wife testified that plaintiff "was depressed, had difficulty sleeping, was completely distraught, frustrated, and completely shattered.").

Here, the award of $300,000 in emotional distress award is above what is in line with the Second Circuit case law for significant emotional distress and is not supported by the evidence at trial. As such, the Court should remit Plaintiff's emotional distress award.

## POINT III

### The Evidence Does Not Support the Jury's Award of Actual Damages

The jury's award of actual damages in this case was based on conjecture as it was premised entirely on Plaintiff's counsel's closing argument, which included incorrect figures and speculation.

The plaintiff "bears the burden of establishing damages with 'reasonable certainty' and damage awards 'may not be based on pure speculation or conjecture.'" *Artica v. J.B. Custom Masonry & Concrete Inc.*, Nos. 09-CV-3796 (RER), 11-CV-0842 (RER), 2012 WL 11945654, at *8 (E.D.N.Y. July 26, 2012) (quoting *Mugavero v. Arms Acres, Inc.*, 680 F.Supp.2d 544, 581 (S.D.N.Y. 2010)). Courts have previously vacated damages awards when based solely on plaintiff's own unsubstantiated testimony. *See Wang v. Yum! Brands, Inc.*, 06-CV1783, 2007 WL 1521496, at *5 (E.D.N.Y. May 22, 2007) (collecting cases).

### Back Pay

"The purpose of a back-pay award is to 'make persons whole for injuries suffered through past discrimination.'" *Quintero v. Angels of the World, Inc.*, 19-CV-6126 (DG), 2021 WL 4464123, at *13 (E.D.N.Y. Sept. 10, 2021) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170,

36

1183 (2d Cir. 1996)). "Back pay is calculated from the date of the discriminatory practice to the date of entry of judgment." *Id.*

While a prevailing plaintiff in a discrimination case may be entitled to a back pay award, which may include lost wages and anticipated raises and/or fringe benefits, case law makes clear that the damage award "must be established with reasonable certainty and may not be based on pure speculation and conjecture." *Mugavero*, 680 F.Supp.2d at 581. Furthermore, "it is plaintiff's burden to present a non-speculative basis for determining economic damages." *Tse v. UBS Financial Servs., Inc.*, 568 F.Supp.2d 274, 308 (S.D.N.Y. 2008); *see also Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) ("[Plaintiff] need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork."); *Mama's Food Shop v. Robrose Place, LLC*, 2004 NY Slip Op. 30350, at *14 (Sup. Ct., N.Y. County 2004) (while damages are not required to be measured with absolutely certainty, damages must be "capable of measurement based upon known reliable factors without undue speculation.").

In addition, "[i]t is well settled under New York law that the plaintiff's uncorroborated testimony as to the amount of lost past or future wages cannot, as a matter of law, satisfy the 'reasonable certainty' standard." *Mugavero*, 680 F.Supp.2d at 581 (quoting *Sir Speedy*, 957 F.2d at 1038). "A plaintiff must submit relevant documentation, such as tax returns or W-2 forms." *Id.* Here, Plaintiff did not submit any of her W2s or tax returns outside of the 1099s for work she performed after her termination. Thus, Plaintiff has failed to provide the relevant documentation to establish any back pay award and has failed to establish her back pay award with reasonably certainty.

During the summation, Plaintiff's counsel attempted to introduce a demonstrative exhibit

outlining Plaintiff's alleged lost wages. [See **Exhibit MM** of Campbell Dec.] [Trial Tr. 2008: 23-25]. Defendants objected to this exhibit as Defendants had never seen it or the damages it listed. [Trial Tr. 2009: 1-2]. Your Honor sustained the objection and explained that: "I think this is more than a demonstrative exhibit. You can tell – I am not going to permit this exhibit into evidence. It should have been introduced. [Plaintiff's counsel] can indicate how the records would show this, but to put this exhibit and to seek to use this, is, I think, inappropriate." [Trial Tr. 2009: 18-22]. However, it is clear that while not allowed to introduce this particular demonstrative exhibit, Plaintiff's counsel read directly from this exhibit and the jury adopted Plaintiff's counsel's explanation in full.

To calculate Plaintiff's back pay, in her summation, Plaintiff's counsel claimed that there is:

> [H]er salary, which is $100,000 a year, plus her Christmas bonus, which is two thousand a year, plus the commissions that she received from her settlements, which is roughly a little bit more than 40,000. All together $42,000…Year over year she would have received a 7.5 thousand dollar raise…I subtracted how much she actually made doing per diem work from that number…And adding everything I just said, and subtracting how much money she actually made, back-pay would be $535,000. That's from the day of this trial, from the day of her termination.

[Trial Tr. 2128:16-2129:8].

The jury accepted this $535,000 number as fact and awarded Plaintiff that amount in back pay. However, Plaintiff's counsel's explanation and calculation of the back pay Plaintiff should be entitled to was not based on evidence in the record and was based on pure conjecture. It is clear that the jury relied on Plaintiff's counsel's improper, erroneous approximations in that regard by awarding the exact same amount that Plaintiff's counsel requested during summation. Plaintiff's only evidence in support of these damages was her own testimony as well as 1099s showing some of Plaintiff's earnings after her termination from Defendant Firm.

In her summation, Plaintiff's counsel claimed that in the six months prior to her termination, Plaintiff earned $20,094 in settlement commission. [Trial Tr. 2011; 14-16]. Plaintiff's counsel therefore claimed that had Plaintiff worked for a full year, her commissions would have been around $40,000. [Trial Tr. 2011: 23-2012:2]. In order to come up with this number, Plaintiff appears to use two documents: (1) Defendants' Exhibit L; and Plaintiff's Exhibit 304. [See **Exhibit NN-OO**]. Defendants' Exhibit L is in evidence and showed that Plaintiff earned commissions of $650 during a six-month period. Plaintiff's Exhibit 304 is not in evidence and is a 2019 1099 from Defendant Firm in the amount of $19,444.00.[4] Furthermore, Plaintiff's Exhibit 304, as explained to Plaintiff's counsel on numerous occasions, is not commission paid to Plaintiff for her settlement of cases, but instead was a referral fee for cases she referred to Defendant Firm. Thus, the amount on Plaintiff's 2019 1099 from Defendant Firm should not be included in the calculation of her settlement commissions, but instead should be deducted from her backpay amount for 2019, as it was income earned in 2019.

In her summation, Plaintiff's counsel also claimed that at Defendant Firm:

> every single year they get a minimum five thousand raise, bare minimum guaranteed, but [Plaintiff] earned more than that. She earned approximately $10,000 [in raises]. We did a conservative. We did 7-and-a-half thousand dollars. We took an average. So, what we did was we went every single year from the time she was terminated and we added 7-and-a-half thousand dollars to her compensation, which is conservative.

[Trial Tr. 2012: 8-15].

Plaintiff claimed that during her first tenure with Defendant Firm everyone would get a "guaranteed $5,000 raise. But if you do a good job, according to Mr. Prakhin, you might get $10,000 which I did." [Trial Tr. 86:1-2]. However, there is nothing in evidence regarding

---

[4] Plaintiff testified that she received compensation from Defendant Firm in 2019 for a case she brought to the Defendant Firm in 2018. Plaintiff did not testify to any amount that was received. [Trial Tr. 204: 23-205: 10].

Defendant Firm's policies and raises during Plaintiff's second tenure. The assumption and speculation that Plaintiff would earn a $7,500 raise every year was wholly inappropriate to say in front of the jury.

Defendant Prakhin confirmed that Plaintiff's salary while at Defendant Firm was $100,000. [Trial Tr. 416; 22-24]. Outside of this corroboration, the rest of Plaintiff's award for back pay is based solely on either the testimony of Plaintiff or Plaintiff's counsel's summation. As Plaintiff has failed to submit corroborating testimony as to the amount of lost wages (outside of her salary) and has failed to submit relevant documentation, only the $100,000 salary can stand to support a back pay award. *See, Mugavero*, 680 F.Supp. 2d at 581-83; *DelValle v. White Castle Sys., Inc.*, 277 A.D.2d 13, 13-14 (1st Dep't 2000). Therefore, Plaintiff's back pay award should be calculated as follows: $100,000 for 2020 and 2021, and 3/12 of $100,000 in 2022[5] ($225,000) subtracted by the amount Plaintiff actually earned in those years as evidenced by her 1099s ($81,426.58)[6] for a total back pay award of **$143,573.42**.

### Front Pay

In Plaintiff's counsel's summation, they claimed that Plaintiff was entitled to $300,000 in front pay. The amount of front pay was explained as follows:

> The front-pay is a projection of how much she would make into the future if she worked at the firm for six years. But we only projected it forward to 2025. So, from the day of this trial to 2025 – today is 2023 – but you count the whole 2023, and the whole 2024, and then the 2025 year. That's three years projecting it forward, subtracting how much she actually makes at her job, that number is $300,000.

[Trial Tr. 2130; 3-9].

At the end of the trial, the jury accepted Plaintiff's counsel's summation as fact and awarded Plaintiff $300,000 in front pay. However, as evidenced through her own testimony,

---

[5] Plaintiff started full-time employment in April 2022.
[6] Plaintiff's 1099s show: $8,850 in 2019; $43,351.31 in 2020; and $29,225.27 in 2021. [See **Exhibits PP-RR**].

Plaintiff is not entitled to any front pay.

"Front pay is awarded at the discretion of a district court where reinstatement is inappropriate and the plaintiff has been unable to find another job. The purpose of front pay is to make victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Quintero*, 2021 WL 4464123, at *14 (quoting *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 227, 286 (2d Cir. 2011)). The court has discretion whether to award front pay. *Id.* However, "an award of front pay cannot be unduly speculative." *Id.* (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992).

Here, Plaintiff is not entitled to front pay as she found comparable alternative full-time employment as of April 2022 with American Transit Insurance Company as an associate attorney.[7] [Trial Tr. 215; 17-25]. According to Plaintiff herself, the type of work is "almost exactly the same" as her work at Defendant Firm. [Trial Tr. 68; 7-9]. Plaintiff testified that her annual compensation at American Transit is $85,000 – just $15,000 shy of her annual compensation at Defendant Firm. [Trial Tr. 219; 21-22]. Courts in this Circuit have explained that the comparable employment need not be identical either in job duties or remuneration. *See, Hill v. Airborne Freight Corp.*, No. 97-CV-7098, 2003 WL 366641 (E.D.N.Y. Feb. 20, 2003); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 362 n.3 (S.D.N.Y. 1986). As Plaintiff found comparable alternative full-time employment in April 2022, she is not entitled to an award of front pay.

---

[7] Even Your Honor indicated that Plaintiff may have failed to prove that she is entitled to front-pay: "I think I am going to make one additional loss of income. I am going to separate that out into front pay – into back-pay and front-pay. Again, that's for appellate reasons. I am somewhat concerned about the lack of proof of front pay." [Trial Tr. 2064; 5-8].

## POINT IV

**Plaintiff Failed to Identify Any Evidence to Support an Award of Punitive Damages**

The jury awarded Plaintiff $600,000 in punitive damages. However, no reasonable jury could find a legally sufficient basis to award punitive damages in this case. "To obtain punitive damages, a plaintiff has two options: A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its action…violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive." *Knox*, 512 F.Supp.3d at 496 (quoting *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005) (internal citations omitted)).

Under the ADA, a prevailing party is entitled to punitive damages "where defendants 'engaged in intentional discrimination…with malice or reckless indifference to [plaintiff's] federally protected rights.'" *Antoine v. Brooklyn Maids 26, Inc.*, 489 F.Supp.3d 68, 101 (E.D.N.Y. 2020) (quoting *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 384 (2d Cir. 2001)). Under the NYCHRL, a plaintiff is entitled to punitive damages "where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Id.* (quoting *Chauca v. Abraham*, 30 N.Y.S.3d 325, 329 (N.Y. 2017)).[8] "These standards 'require, for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law.'" *Tse,* 568 F.Supp.2d at 309 (quoting *Farias v. Instructions Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001)).

The ADA caps the amount of compensatory and punitive damages a plaintiff can recover.

---

[8] Plaintiff is not entitled to punitive damages under the NYSHRL as the NYSHRL did not allow for punitive damages until its amendments in 2019 and any discriminatory actions complained of occurred in 2018.

For an employer with more than 14 and fewer than 101 employees, as is Defendant Firm, that cap

is set at $50,000. 42 U.S.C. § 1981a(b)(3)(A). *See also, Lamberson v. Six West Retail Acquisition,*

*Inc.*, No. 998 CIV 8053, 2002 WL 59424, at *7 (S.D.N.Y. Jan. 16, 2002) ("For an employer the

size of [defendant], the applicable cap would be $50,000, for all non-pecuniary damages, including

punitive damages and compensatory damages combined.").

During the trial, no evidence was presented that would support a finding that Defendants

acted with malice or reckless indifference, the standard for an award of punitive damages under

the ADA and NYCHRL. Here, Plaintiff's counsel claimed that her request for punitive damages

would be based on the allegation that her SAGA records were intentionally deleted and that Peter

Coates would be testifying regarding this allegation:

> Ms. Donnelly: We made the offer that we would not reference the SAGA notes if
> Mr. Coates would not testify and then we wouldn't have to call the rebuttal
> witnesses.
> …
> Ms. Huot: The pretext essentially for [Plaintiff's] termination was the deletion of
> SAGA records. And as part of this case, we request punitive damages and the
> deletion of these records that are pertinent to a litigation because it's very – very,
> you know, important to the case.

[Trial Tr. 748:16-749:4].

> Mr. Beldner: …it's our position that the deletion of [SAGA] records would go to
> intent and go to malice and reckless indifference and would be relevant to damages.
> So, to not include [Mr. Coates] who is going to testify that he – he observed these
> people deleting Ms. Ruderman's notes after she was terminated and after this
> litigation started, that's important testimony that needs to be on…

[Trial Tr. 750; 19-25].

As explained in Point II of Argument I, Plaintiff did not disclose that Mr. Coates had

relevant information to this case until October 26, 2022. Despite the fact that Mr. Coates executed

a declaration in this case dated May 19, 2022, the initial disclosures were never amended and this

declaration was not provided to Defendants until October 26, 2022, some five months after the

date of the declaration.

Given the untimely disclosures, Defendants moved to preclude Mr. Coates from testifying at trial, or in the alternative to depose Mr. Coates. [ECF Doc. #138]. Your Honor denied the motion but granted Defendants the opportunity to depose Mr. Coates. [ECF Doc. #154]. Defendants took the deposition of Mr. Coates on January 25, 2023. Shortly thereafter, Defendants moved for reconsideration of their motion to preclude Mr. Coates from testifying at trial for several reasons. [ECF Doc. #173]. First, Mr. Coates' declaration and his deposition were filled with allegations surrounding his own claims of sexual orientation discrimination and retaliation against Defendants, which occurred well after Plaintiff's employment with Defendant Firm ended, and in fact Mr. Coates' employment did not overlap with Plaintiff's employment at Defendant Firm. Furthermore, it was discovered at his deposition, that Mr. Coates met with Plaintiff's counsel (not the same firm, the same attorneys) in April and/or May 2022 for a consultation in his own case against Defendants – a fact which Plaintiff's counsel failed to disclose. [**Exhibit SS** to Campbell Dec. at 32:3-33:23; 110: 2-20]. During this consultation and as a result of it, Mr. Coates signed the declaration they prepared after meeting with him and he also  provided 10-12 notebooks to Plaintiff's counsel which he claims outlined Defendants "unlawful and unethical conduct" while working at Defendant Firm. [*Id.* at 198: 2-4; 243:8-244:11; see also **Exhibit EE**] Mr. Coates claimed that Plaintiff's counsel retained the notebooks for seven days before returning them to him. [**Exhibit SS** at 243:8-244:11]. Defendants requested the notebooks and answers to certain questions. The attorney Plaintiff's counsel referred Mr. Coates to in May of 2022, directed him not to answer and refused to turn over the notebooks. Defendants appealed to Your Honor for a ruling and we were directed to the Magistrate who denied our requests in part because she indicated it was only a few weeks before trial.

Defendants were unaware of the existence of these notebooks until Mr. Coates' deposition in January 2023. These notebooks were in the possession of the Plaintiff's attorneys for around seven days in May of 2022, and these documents, just like the medical records and notes, were in their possession, concealed from Defendants and never disclosed.

On January 28, 2023, Your Honor denied Defendants' motion for reconsideration and explained that Mr. Coates could testify to the issue of SAGA entries if it is raised by the Defendants at trial.

At trial, while Mr. Coates claimed that Mr. Prakhin and Irene Raskin directed him to delete SAGA notes [Trial Tr. 1115; 1-4], he admitted on cross examination Mr. Prakhin never actually did so and all Ms. Raskin did was ask him to change a date of an EBT in one file. [Trial Tr. 1118:24-1119:4; 1121: 14-16]. However, Mr. Coates did not know whether this change was requested on one of Plaintiff's files. [Trial Tr. 1119: 14-19].  Mr. Prakhin and Ms. Raskin unequivocally denied asking Mr. Coates or anyone else to delete SAGA notes or deleting the records themselves. [Trial Tr. 589:13-19; 1585: 20-1586:7].

Mr. Coates also claimed that Mr. Prakhin and Ms. Raskin directed IT people to come and delete SAGA entries. [Trial Tr. 1115; 1-4]. Mr. Coates' claim is based on his allegation that on August 30, 2019, he personally witnessed two IT people deleting SAGA entries. [Trial Tr. 1128; 14-19]. On cross-examination, he admitted he could barely see his computer screen and what was deleted as the resolution was not working on the computer. [Trial Tr. 1144: 10-14; 1180: 9-20]. Further, he admitted he did not delete any SAGA notes and he, in fact, never saw anyone delete SAGA notes. [Trial Tr. 1131: 20-21; 1149: 6-21]. Mr. Coates admitted that his belief that IT persons were deleting SAGA entries was because of his own refusal to delete anything and that the IT people kept "showing up." [Trial Tr. 1149; 19-21]. He ended up saying he did not know

45

whether any illegal or unethical behavior occurred by anyone at the Defendant Firm [Trial Tr. 1123: 13-15]. Mr. Prakhin and Ms. Raskin unequivocally denied directing anyone to delete SAGA entries. [Trial Tr. 589:13-19; 1585: 20-1586:7]. Furthermore, the two IT people – Igor Shmunko and Alex Pusachev – also unequivocally denied deleting SAGA entries. [Trial Tr. 1348: 20-24; 1391: 12-16].  There was no evidence whatsoever that any SAGA entries were ever deleted by anyone at the Firm.

Based on the representation that Plaintiff claimed their request for punitive damages would be based on their proof of the intentional deletion and spoliation of SAGA records, which was nonexistent, Defendants moved to remove the punitive damages section from the Jury Instructions:

> Ms. Campbell: On page 24 [of the jury instructions], we'd ask for the removal of punitive damages. I don't think plaintiff has proved her case that defendants acted with malice or reckless disregard. A lot of their punitive damages case, we're told it would be based on the testimony of Peter Coates and the deletion of records, which I believe, through the evidence on the record has not been sufficiently proven.
>
> The Court: You mean that [Mr. Coates] is incredible as a matter of law?
>
> Ms. Donnelly: Yes.
>
> Mr. Rich: Judge, his testimony, Mr. Coates's testimony by the time he finished, was that he didn't know what case it applied to, whether or not it had anything to do with Ruderman. He didn't know the name of the case, he had no idea what the date that was being – and he, and he said that he had no idea whether or not the deletion, which he had previously alleged was unethical, was in fact, unethical. He said: I don't know. I don't have enough information. So all of that, taking what he said, amounts to nothing.
>
> The Court: ***I am going to let this go to the jury on punitive damages. If the jury comes back with punitive damages, then we can have a post-verdict discussion***. But the problem with all of this is if I take this away from the jury now and then later, some court much wiser than myself decides that it should have gone to the jury, we would have to do this again. And I do not think any of you want to do this again.

[Trial Tr. 2060: 16-2061:18]. While the punitive damages instruction was included in the jury

instructions, it is  clear that Plaintiff failed to establish that any evidence in the record that an award of punitive damages was warranted and, therefore, the jury instruction was given in error.

Even if Plaintiff did establish that punitive damages were warranted, which she did not, the punitive damages award in this case was excessive. Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991).

The Supreme Court has identified three guideposts for determining whether a punitive damage award is excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm and the punitive damages award, or in other words, the proportion or ratio of punitive damages to compensatory damages; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). Courts in this circuit have consistently applied the standards as laid out in *BMW v. Gore* in determining whether an award of punitive damages was warranted. *See, Thomas v. iStar Fin., Inc.*, 508 F.Supp.2d 252 (S.D.N.Y. 2007); *Tse*, 586 F.Supp.2d at 311; *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005).

The first factor, and "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" for the Court to consider is the degree of reprehensibility of Defendants' conduct. *BMW of North America*, 517 U.S. at 572. "To assess the degree of reprehensibility of a discriminatory act, consideration should be given to (1) whether the act was violent or presented a threat of violence; (2) whether the act was undertaken with deceit or malice as opposed to mere negligence; and (3) whether defendant has engaged in repeated instances of discriminatory conduct." *Tse*, 586 F.Supp. at 312 (citing *Fernandez v. North Shore Orthopedic Surgery & Sports*

*Med., P.C.*, 79 F.Supp.2d 197, 207 (E.D.N.Y. 2000)); *see also Norris v. New York City College of Tech.*, No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14 2009). Here, there is no evidence that Defendants' actions were violent or presented a threat of violence. Nor is there any evidence that Defendants acted out of malice or were acting deceitful. Defendants even offered Plaintiff a leave of absence at a time when she engaged in excessive absenteeism, faking depositions, giving work to paralegals, asking them to be her eyes, and had not asked for an accommodation or had any idea as to how she might perform this job with or without an accommodation. Lastly, Plaintiff provided no evidence that Defendants had engaged in repeated instances of misconduct to other disabled employees or towards herself.

The second factor for the Court to consider is the ratio of punitive damages to compensatory damages. Here, the jury awarded the Plaintiff $1,135,000 in compensatory damages and $600,000 in punitive damages. However, as explained previously, the amount of compensatory damages awarded should be significantly reduced. Plaintiff's award for front pay should be eliminated completely, while Plaintiff's award for back-pay and emotional distress damages should be significantly reduced. These reductions would lead to compensatory damages much lower than the $600,000 punitive damages award.

The last factor for the Court to consider is the difference between the remedy and the civil penalties authorized or imposed in comparable cases. "Under federal law punitive damages are limited to $300,000; under New York state law they are not available. Thus, a plaintiff [] in this state can recover punitive damages in excess of $300,000 only under the New York City Administrative Code §8-502(a). Although jury verdicts in excess of $300,00 occur in New York…only in very few cases can such verdicts [] be affirmed (those brought under the New York City code)." *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739 (KMW), 2005 WL 2170659, at *18

15476459.5 3/23/2023

(S.D.N.Y. Sept. 6, 2005). This holds true in our case except for that due to the size of Defendant Firm, punitive damages are limited to only $50,000 (in combination with any compensatory damages). Therefore, to the extent that an award of punitive damages is above the $50,000 limit, it must be based solely on the NYCHRL.

An award of $600,000 punitive damages is egregious, especially given the facts of this case. "Generally, punitive damages are awarded for sex or race based Title VII claims when a plaintiff is subject to inappropriate touching, physical violence, or threats of physical violence." *Tencora v. Ba-kal Restaurant Corp.*, CV 18-7311 (DRH) (AKT), 2020 WL 8771256, at *27 (E.D.N.Y. Nov. 30, 2020); *see also Garcia v. Comprehensive Ctr.* LLC, No. 17-CV-8970, 2019 WL 8274296, at *9 (S.D.N.Y. Nov. 21, 2019) (awarding $75,000 in punitive damages under Title VII and NYCHRL to plaintiff whose supervisor called her abusive names, "slammed" her laptop closed on her fingers, "closed-fist-punched" her in the face, threatened her with physical violence, called her racially derogatory names, and grabbed her by the shirt collar and dragged her into his office); *Styka v. My Merchants Services, LLC*, 14 Civ. 6198 (ENV) (VMS), 2016 WL 11396819, at (E.D.N.Y. Mar. 15, 2016) (awarding $50,000 in punitive damages under Title VII and NYCHRL where supervisor made "crude verbal comments" and "physically forced himself on the plaintiff by kissing her or grabbing her breasts, thighs, or buttocks" for approximately five months); *DeCurtis v. Upward Bound Intern., Inc.*, No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *5-6 (S.D.N.Y. Sept. 27, 2011) (awarding $75,000 in punitive damages under Title VII and NYCHRL to plaintiff whose supervisor groped her, made sexually explicit comments, sent inappropriate emails, and regularly called her late at night and on weekends to talk about sex); *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) (court reduced jury's award of $20,000 in punitive damages to $10,000 based on defendant's finances where the defendant had physically assaulted

plaintiff, sprayed him with mace, and threatened him with racial slurs); *Munson v. Diamond*, 15-CV-00425 (DAB) (BCM), 2017 WL 4863096 (S.D.N.Y. June 1, 2017) (awarding $30,000 in punitive damages to plaintiff where supervisor repeatedly grabbed her buttocks, sexually propositioned her, and made sexually explicit comments).

There is no evidence in the record to support an award of punitive damages. However, even if there were, based on the above three factors, it is clear that the jury's award of punitive damages was excessive and should be reduced.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court grant its motion for a new trial, or in the alternative remit the damages award, and provide such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
      March 24, 2023

**BOND SCHOENECK & KING, PLLC**

  /s/    MED
Mary Ellen Donnelly, Esq.
Louis P. DiLorenzo, Esq.
Mallory A. Campbell, Esq.
600 Third Avenue, 22nd Floor
New York, New York 10016
Telephone: (646) 253-2300
*Attorneys for Defendants*

50