**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

YELENA RUDERMAN,

                              Plaintiff,              Case No. 19-cv-02987 (CBA) (LB)

    - against -

LAW OFFICE OF YURIY PRAKHIN, P.C.,
and YURIY PRAKHIN, ESQ. *in both his*
*individual and professional capacities*,

                              Defendants.

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT YURIY PRAKHIN'S
MOTIONS FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV.
P. 50, FOR A NEW TRIAL PURSUANT TO RULE 59 AND/OR, IN THE
ALTERNATIVE, FOR RELIEF FROM A JUDGMENT DUE TO FRAUD,
MISREPRESENTATION, OR MISCONDUCT BY AN OPPOSING PARTY AND
SURPRISE PURSUANT TO RULE 60**

_____

                              **LAW OFFICES OF ALAN J. RICH, LLC**
                              560 Montgomery Street, 1st Floor
                              Brooklyn, New York 11225
                              Telephone: (646) 541-5675
                              Arich@Richlaw.US

Of Counsel:

    Alan J. Rich

## **BACKGROUND**

Defendant, Yuriy Prakhin, Esq. seeks 1) judgment as a matter of law under Fed. R. Civ. P. 50, as a reasonable jury lacked a legally sufficient evidentiary basis to find for the Plaintiff on liability and/or, in the alternative, 2) a new trial pursuant to Fed. R. Civ. P. 59; 3) relief from a final judgment due to fraud, misrepresentation, or misconduct by an opposing party Fed. R. Civ. P. 60 (b)(3) and/or mistake, inadvertence, surprise, or excusable neglect pursuant to Fed. R. Civ. P. 60 (b)(1);

Prakhin incorporates by reference all prior motions and post-trial motions, including those by Defendants jointly as well as individually, including those of co-Defendant, Law Office of Yuriy Prakhin, P.C., as if fully advanced here.

Plaintiff Yelena Ruderman asserts disability discrimination pursuant to federal,[1] state and city law, alleging she was terminated because of her disability, and that Defendants failed to accommodate her visual impairment. Plaintiff has 20/250 acuity with LHON, causing low vision. [Trial Transcript is annexed hereto a Defendant Yuriy Prakin Exhibit "A", hereinafter "Def. YP Ex.*;" Trial transcript hereinafter "Tr. 530;" Note: Complete trial transcript does not include jury selection] Plaintiff remained in the employ of the Prakhin firm for some three months with this low vision condition from mid-September 2018 to December 14, 2018. The jury awarded Plaintiff $535,000 in back pay, $300,000 in front pay, $300,000 in emotional distress, and $600,000 in punitive damages.

---

[1] Defendant Yuri Prakin is not subject to damages under the ADA. Nor is he subject to punitive damages under the NYCHRL which was amended to permit punitive damages in 2019, subsequent to this cause of action arising in 2018. Nonetheless, we cite to case law that applies in federal actions because of the similar nature of the claims and their analysis, though we recognize that the NYCHRL is to be construed independently and similar laws are to be viewed as a floor, not a ceiling in construing the NYCHRL. *Loeffler v. Staten Island University Hosp.*, 582 F. 3d 268 (2d Cir. 2009).

It was uncontroverted that essential functions of Plaintiff's job as a senior associate at the Prakhin firm, a plaintiff's personal injury firm, included the ability see evidence and documents, including being able to read hand-written documents, such as medical and other records. Plaintiff admitted being unable to read a hand-written document shown her even with her own chosen adaptive device. [Tr. 300/2-18]. The document was read aloud to its author, Dr. Anna Shostak, plaintiff's psychiatrist for 11 years, who verified that the reading of the handwriting by both Plaintiff's and Defense counsel was accurate.[2] Being able to read hand-written documents was an undisputedly essential function of the job. Irene Gabo, who appeared voluntarily at Plaintiff's request, was the former managing attorney at the Prakhin firm. She explained the various kinds of hand-written documents that would routinely have to be reviewed, including medical records, therapy records, primary care physicians [PCP], some physical therapy facilities, repair receipts, maintenance records, and Big Apple maps, which provide notice of sidewalk defects. The attorney was responsible for ensuring all of the necessary information would be in a document like the Bill of Particulars in which the attorney must describe the theories of the case and all the injuries. It would not be uncommon for images like Googlemaps to be used in premises liability cases and attorneys would have to be able to see them clearly. [Tr. 691, 777-791]. It was an essential function of the job to be able to read these hand-written documents and develop that ability because they were responsible for the final product. [Tr. 803-804].

Another witness called by Plaintiff, attorney Dmitry Levitsky, who formerly worked at the Prakhin firm, has hired Plaintiff for per diem deposition work. She never described what her

---

[2] Shostak's handwritten notes were read to and the reading was verified as accurate first by defense counsel Rich and then by Plaintiff's counsel Huot. Rich read from the Shostak's notes at Tr. 1611-1612; 1675/13-19, 1688/21-1690/6] Tr. 1617/11-16; 1618/19-25; 1620/3-1621/12; 1626/17-1627/12; 1623/12-21; 1655/23-1656-1; 1656/211657/1; 1658/2-9; 1659/4-17; 1665/2-4; 1665/12-13; 1667/10-20; 1668/6-14; 1669/6-10; 1670/12-14; 1672/18-21; 1675/13-19; 1676/5-18; 1677/16-1678/3; 1678/16-18; 1679/15-18; 1680/1-5; 1681/4-8. Plaintiff's counsel Huot read from the doctor's handwritten notes which she then confirmed with Dr. Shostak as accurate at Tr. 1684-1701.

vision deficit was to him but he stated that if he was aware that an attorney could not see an exhibit at a deposition, he would never hire that attorney. [Tr. 1078-1083] .

By Plaintiff's own admission, on at least one occasion she was unable to see an exhibit at a deposition. She described that was simply "faking it, like pretend like I know what's going on." [Trial Exhibit 7T's {TTTTTTT}, Transcript of Audio Rec 384, annexed hereto as Def. YP "B"]. She admittedly did not reveal her inability to see the exhibit to the principal of the firm, Defendant, Yuriy Prakhin. It is undisputed that the essential functions of her job as a senior associate in Defendant's plaintiffs personal injury firm required her to handle a case load independently, be responsible for drafting and reviewing legal documents including Bills of Particulars, pleadings, discovery requests and responses. Essential functions included having to attend physically attend depositions "almost daily" [Tr. 120/12] and appear regularly in court for conferences, motions and trial. A lawyer is required to follow the ethics guideline required of all attorneys, that they act competently, diligently and honestly in their professional dealings, which in this instance alone, Plaintiff failed. In preparing Bills of Particulars and in preparing clients for deposition, she was responsible for reviewing all kinds of documents, including records from doctors, physical therapists, psychiatrists, which she had previously done hundreds of times. [Tr. 292/1-3, 293/4-17].

Plaintiff was required to be able to perform all the essential functions of her job – *not merely some—or most of her functions*. *Jacobs v. NC Administrative Office of the Courts*, 780 F. 3d 562, 581 (4th Cir, 2015)

Plaintiff was unable to read hand-written notes. When shown a hand-written note at trial, Plaintiff offered no evidence that she was able to read it. She did not attempt to demonstrate such an ability in front of the jury. Nor did she offer any expert evidence about her abilities to

function in that regard with or without reasonable accommodations. She acknowledged not being able to see evidence at a deposition and did not proffer any of the required medical testimony to refute that it was because of her condition.

Plaintiff was required to work in a fast-paced office. She acknowledged that going to court and attending depositions on a daily basis were essential functions of the job which was corroborated by Plaintiff's own witnesses, such as attorney Irene Gabo. [Tr. 120/12; 396/10-14, Tr. 808/4-7]. Was Plaintiff capable of performing these tasks at the time? Contemporaneous evidence all points to her not being able to do so with any reliability.

The only contemporaneous documentation from that period shows that Plaintiff was extremely limited in her mobility and function. Plaintiff's treating psychiatrist at the time, Anna Shostak, reported in her February 5, 2019 note, some five months after the onset of Plaintiff's blurry vision in September 2018, that Plaintiff "**need[ed] assistance in everyday activity [including to] walk in a room [that] she needs somebody to go with her outside, to help her in [her] apartment ... on a daily basis for all of her activities, she needed assistance**." [Tr. 1676/19-1677/12]. Plaintiff testified about her ability to perform her current job as a defense lawyer for American Transit Insurance Company as if the job were an equivalent, but on cross-examination Plaintiff admitted that she works from home. When asked if she goes to court, Plaintiff responded, "not often." [Tr. 383/14-25; Tr. 396/10-14]. But when pressed, the ever evasive answer collapsed into the following admission that she never goes to court, something one would presumably know:

> THE WITNESS: For my current employer. I don't know if I've been to court for my current employer. It's all been on Zoom, virtual conferences, but if I had to go to court I would.
>
> THE COURT: Are these virtual court conferences --

4

THE WITNESS: Yes.

[Tr. 383; 21-25]

Defendants learned during Dr. Falk's deposition (which is in evidence), that Plaintiff still was apparently not adapting well to her condition. Falk noted in his record on May 20, 2020 [Def. YP Ex. "L"], that Plaintiff "[f]ell two weeks ago. Fell flat on her face. Needed seven stitches. Went to plastic surgeon. Drank. Took Ativan. Incoherent. Panic attacks and wine." [Tr. 1281, *see also* Falk Dep. 62/6-19, admitted into evidence as Def. Ex. 11-U's at Tr. 1944, attached hereto as Def. YP Ex. "C"]

Defendant did not even get these records until the time of trial – let alone did Plaintiff produce the record of the plastic surgeon that should have been provided. A matter of clear relevance about her ability to walk safely, were among the essential duties of Plaintiff's job, by her own testimony, included going to court for preliminary conferences, compliance conferences, settlement conferences and trial. [Tr. 73/23-74/8]. The Court also prohibited defense counsel Rich from asking Dr. Pillai about a fractured rib which appeared on an MRI in her records stating it was "irrelevant." [Tr. 535/3-8]. Whether a plaintiff who is suffering from limited vision can walk safely from place to place when their job required them to rush around to and in court and to go on depositions daily, was an entirely pertinent question relating to the ability to perform the essential functions of her job. Moreover, a neuro-opthomologist dealing with hundreds of patients with varying degrees of blindness and vision problems, would certainly be a physician who would inquire into common problems such as falls that their newly blind patients suffer.

Moreover, from a mental health perspective, starting with the time that plaintiff began to experience blurry vision, Plaintiff was not only suffering from worsening anxiety and depression, but she stopped going to her psychiatrist and ceased getting critical medications. Dr. Shostak and

5

Dr. Falk both diagnosed Plaintiff with ADD/ADHD, which causes extreme lack of focus and disorganization. Dr. Shostak testified that anxiety and depression exacerbate the symptoms of ADD, and that when such conditions worsen, such as when she began to suffer blurry vision, it would be even more important to treat the exacerbated conditions. Plaintiff stopped going to her psychiatrist altogether at the very time that she needed critical medication to enable her to perform the focus and organizational functions that were peaking at this critical time. [Tr. 1623/9-1624/1; 1279/1-21]. Plaintiff did not go to Dr. Shostak on November 30, 2018. The record shows that her mother came as an emergency visit and there is no indication that Plaintiff went to the appointment. Also, on October 23, 2018 Dr. Shostak's medication record shows that the last time Plaintiff was prescribed Adderall, the ADD medication was on 10/23/2018 and she was prescribed a 30 day supply, 60 tablets. [Shostak record, Def. YP Ex. "D" at p. 127, Trial Exhibit 11 AAAAAAAAAA's]. As the doctor explained, Adderall is a controlled substance by New York State law and a doctor is only permitted to prescribe a 30-day supply and could not provide renewals without seeing the patient in person. Accordingly, when her mother appeared at the November 30, 2018 visit, Dr. Shostak could not prescribe Adderall. As the medication record shows, the next time Plaintiff went to her psychiatrist after her October 23, 2018 visit was February 5, 2019. From the time her 30-day supply prescribed on October 23, which would be toward late November, assuming that Plaintiff is taking her medication, Plaintiff would have gone without ADD medication from late November, when she was diagnosed with LHON, until February 5, 2018 – covering the very time that Plaintiff was in the office during the last two weeks of her work at the firm, off her critical ADD medication which helps her focus, and while otherwise undergoing a emotional crisis. So critical was the doctor's medicating Plaintiff for ADD that every on every single visit since except one, 11/5/10, since beginning treatment in

2008, Dr. Shostak prescribed Adderall [medication record, pp. 3, 43, did not, 55, 76, 77, 78, 127, 128]. If Plaintiff were capable of performing the essential functions of her job, she herself took one of the most important tools away from herself to do so.

"An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform all of the essential functions of her position." *Jacobs v. NC Administrative Office of the Courts*, 780 F. 3d 562, 581 (4th Cir, 2015); *Feliciano v. State of RI*, 160 F. 3d 780, 786 (1st Cir. 1998) (a plaintiff must demonstrate that he is "able to perform all of the essential functions of the position.") "An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not. 42 U.S.C. § 12111(8)." *Williams v. AT&T Mobility Services LLC*, 847 F. 3d 384, 391 (6th Cir. 2017)

The Second Circuit has repeatedly held that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *McMillan v. City of New York*, 711 F. 3d 120, 127 (2d Cir. 2013) (*citing Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)_; *Booker v. Soho Studio Corp*., 2020 WL 363912 (E.D.N.Y. 2020).

An employer should not be punished for having kept an employee on for a time beyond when they can no longer perform all of the essential functions of their job. In *Trobia v. Henderson*, 315 F. Supp. 2d 322 (W.D.N.Y. 2004), the court held:

> The USPS should not be punished from being more generous to plaintiff by allowing him to remain in a job that he was unable to perform. *See Fink v. New York City Dep't of Personnel*, 855 F.Supp. 68, 72 (S.D.N.Y.1994), aff'd, 53 F.3d 565 (2d Cir.1995) ("There is no provision requiring the employer to take account of the disabled individual's preferences in choosing the means of accommodation."); *Querry v. Messar*, 14 F.Supp.2d 437, 445 (S.D.N.Y.1998) ("An employer need only offer a `reasonable accommodation'; it need not provide the employee with the accommodation of her choice."); *see also Phelps*, 251 F.3d at 26; *Basith*, 241 F.3d at 930. Therefore, the USPS did not violate

the Act by removing plaintiff from and failing to return him to the Box Section.

While the inquiry into whether a particular job function is essential is fact-intensive, *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 127 (E.D.N.Y. 2014), "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003); *Lavender v. Verizon New York, Inc.*, No. 17-CV-6687(JS), 2023 WL 1863245, at *16 (E.D.N.Y. Feb. 9, 2023).

 Plaintiff established that she had a disability, based on the testimony of an expert, her neuro-ophthalmologist, Cinthi Pillai, M.D., who as a fact witness provided expert testimony that Plaintiff suffered from what was ultimately diagnosed as Leber's hereditary optic neuropathy ["LHON"], providing a factually supported opinion based on her own diagnosis and treatment that Plaintiff's visual acuity was 20/250 which is legally blind. [Tr. 530]. However, Plaintiff's case must fail because after establishing that she has a disability, she failed to provide the required expert testimony to establish that she was able to perform the essential functions of the job as her low vision blindness condition and what types of reasonable accommodations could enable her to perform the essential functions of the job, require expertise and knowledge beyond the knowledge of a layperson. Importantly, Plaintiff demonstrated at trial that she was unable to read handwritten documents even with her own chosen reasonable accommodation.

When Plaintiff was asked when she was diagnosed with ADD and responded that she takes Adderall, when asked next if she "still [has] ADD" she responded, "I don't know," with her attorney objecting "she's not a medical expert." We agree. Plaintiff is not a medical expert. Where her former treating psychiatrist testified that she has continually diagnosed her with ADD [referred to also as ADHD] since 2008, this witness is unreliable on the simplest of facts, let

alone any area that requires expert testimony. [Tr. 1603 *et seq., see* Shostak record throughout at Def. YP Ex. "D"]

Determining whether expert testimony was necessary to establish whether Plaintiff could perform the essential functions of the job, and what, if any, reasonable accommodations were appropriate to enable her to perform the job, was a simple question in this case. Given that experts are required where the matter is not within the certain knowledge of lay persons, an initial question would be whether a lay person would have the medical, ophthalmological or comparable knowledge about vision as to what LHON is, how it effects people generally and how it affected this Plaintiff's vision and abilities in particular. The second question would be whether a lay person would have the knowledge as to what reasonable accommodations are available, how they function and to what degree they might enable Plaintiff to perform the specific essential functions of Plaintiff's job as a senior associate at the Prakhin firm. For example, Plaintiff claims to have demanded as two of her reasonable accommodations a software program called JAWS [Tr. 136-139] and OrCam glasses [Tr. 130]. Though Plaintiff abandoned both devices as not right for her, would the typical lay person have the requisite knowledge and experience to know whether these proposed assistive devices were appropriate and reasonable accommodations under the circumstances or what, if any others devices might be appropriate, and would they successfully enable her to perform the job? The average lay person would likely not even know of the existence of these assistive devices.

Accordingly, under these circumstance, expert testimony was required to prove Plaintiff's claims. Particularly where the only evidence at trial on the issue of Plaintiff's ability to read a hand-written document demonstrated that she could not when given that opportunity, Plaintiff was required to put forth some competent evidence to rebut that fact, absent being able to do so

at trial. Claiming to have worked with service providers like the Lighthouse Guild [Tr. 362-364], there would certainly have been occupational and technical specialists she worked with who, could have provided the requisite testimony *if they opined that she were able to perform all the essential functions of her job*. The conspicuous absence of any such testimony leads one to infer that no such expert that she worked with would have opined that she could have fulfilled *all the requirements* of that demanding job.

In addition, while Plaintiff claimed that her inability to see the video exhibit at the deposition was a one-time event caused by dizziness resulting from steroids she had taken the day before, the implication was that absent the steroids, she would not have any such problem. Curiously, according to Plaintiff, she had been fine all day but only at the time the exhibit was shown, "towards the end of the deposition they made me feel very nauseous and dizzy." [Tr. 380].

Medical evidence and opinions, and most certainly a medical opinion that attributes causation, must be established by a qualified expert. Having failed to present any such medical expert testimony, her failure to see the exhibit and either pause the deposition or take other appropriate protective action, represents a failure of proof in this action. There is no reasonable accommodation for a decision to abandon her professional obligations to her client, her law firm and to the bar, under the New York State Rules of Professional Conduct, including but not limited to Rule § 1.1 requiring "Competence" and Rule § 1.3 requiring "Diligence." 22 N.Y.C.R.R. Part 1200. In fact, the more likely reason for any dizziness was discussed by Plaintiff herself as captured in the audio recording of her conversation with her paralegal, when she said she felt like she was having a "panic attack," commonly known to cause dizziness.

Defendant also seeks to redress the continued intentional deceptive misrepresentations, that occurred under the unique circumstances of this case where Plaintiff herself obtained and certified that she provided all responsive documents relating to her medical condition, disability and emotional injury claims. In response to a motion by Defendants at the beginning of the COVID pandemic, the Magistrate Judge ruled that rather than overburdening providers with making multiple copies in response to authorizations, that Plaintiff herself, an attorney, would obtain all relevant discovery documents from her providers and certify that she had done so. Plaintiff provided the certification that she had provided all responsive documents. [Ruderman Certification, May 18 2020, annexed hereto at Def. YP Ex. "E"]

However, in the case of some providers, Plaintiff never obtained such documents while certifying that she had, such as in the case of Dr. Falk. [Tr. 156, 161/15-169] In other cases, such as in the case of her psychiatrist, Dr. Shostak, Plaintiff obtained her records but Plaintiff's counsel admitted for the first time only during trial that she actually had the record herself but only provided a small portion of the record that she herself deemed to be relevant.

Having been provided records from 2018 and 2019, but denied any records prior to 2018, Defense counsel was irreparably prejudiced. For the first time, immediately before Dr. Shostak testified, the doctor provided roughly 100 additional hand-written pages of mostly hand-written records. Defense counsel had barely 45 minutes to review these records before being compelled to examine the doctor. [Tr. 1594]

Plaintiff was the first witness to testify in the trial and before she had any reason to think that Defendants would see Dr. Shostak's complete file, Plaintiff testified that she had not seen Dr. Shostak prior to her termination. She essentially claimed all her psychiatric problems (other

than ADD) post-dated her termination, treating with Dr. Shostak for anxiety and depression after termination. [Tr. 201/15-22].

Falsely claiming no pre-existing serious psychiatric history, Plaintiff did state that she believed "once, years ago" that she had been prescribed medication for a bout of anxiety. [Tr. 354/9-12]. In reality, when Dr. Shostak's complete record was produced at trial, it showed that Dr. Shostak had been treating Plaintiff for anxiety and depression since 2008, a full decade before her termination. Moreover, when Plaintiff first went to Dr. Shostak for pshychiatric treatment in 2008, Plaintiff already being medicated by a prior treating psychiatrist for depression and anxiety.

Plaintiff provided a two-page report from her psychotherapist, Dr. Martin Falk, insisting that she had requested and provided all of his records. Defendants never obtained his records, which were largely scribbles in a date book, until days before trial and did not know its contents until during the trial itself. Defendants had to depose the doctor having just been provided his records. Dr. Falk explicitly stated that Plaintiff never requested a copy of his records but rather asked him to write a report, which he wrote for her and physically handed to her. [Falk Dep. 9/20-10/8, Def. YP Ex. "C," admitted into evidence as Def. Ex. 11-U's at Tr. 1944]. Plaintiff's so-called "certification" claiming she had obtained and provided all her records perpetrated a fraud upon the Court.

Defendants were further prejudiced when they were denied medical records referred to in Dr. Shostak's records, including primary care physicians, whose records had never been provided to Defendants, and about whose very existence Plaintiff never informed Defendants.

**LEGAL ARGUMENT**

**LEGAL STANDARD FOR GRANT OF JUDGMENT AS A MATTER OF LAW**

Judgment as a matter of law is warranted under Fed. R. Civ. P. 50(b) where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [individuals] could not arrive at a verdict against him." *Miller v. City of Ithaca*, 914 F.Supp.2d 242, 248 (N.D.N.Y. 2012). "In deciding a motion for judgment as a matter of law, a district court must consider whether "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Harris v. Niagra Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir. 2001).

The party opposing the Rule 50 motion must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *United States v. Real Property Known as 77 East 3rd Street, New York, N.Y.*, 869 F. Supp. 1042, 1056 (S.D.N.Y. 1994). A "mere scintilla of evidence" is insufficient to defeat a motion for judgment as a matter of law. *Id.* Moreover, an inference from that evidence will be upheld only if application of common experience and logic supports it."

## LEGAL STANDARD FOR MOTION FOR NEW TRIAL

A court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence of the giving or refusal of instructions to the jury; or (4) damages are excessive." *Knox v. John Varvatos Enterprises, Inc.*, 512 F.Supp.3d 470, 479 (S.D.N.Y. 2012).

When a party seeks a new trial based upon evidentiary errors, Fed. R. Civ. P. 61 instructs the court to disregard all "errors and defects that do not affect a party's substantial rights." Fed. R. Civ. P. 61. "The Second Circuit has clarified that a substantial right has been affected only when a jury's judgment was likely to have been 'swayed by the error.'" *Parrish v. Sollecito*, 280 F.Supp.2d 145, 165 (S.D.N.Y. 2003). "Relevant to this inquiry is 'whether or not the evidence bears on an issue that is plainly critical to the jury's decision' and 'whether or not the evidence was emphasized in arguments to the jury.'" *Id.*; *See also, Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (Where there has been an objection, a new trial is warranted if the court's ruling was "clearly prejudicial to the outcome of the trial," taking the record as a whole.). However, the Court must consider all errors which affect a party's substantial rights. *See*, Fed. R. Civ. P. 61.

On a motion for a new trial under Fed. R. Civ. P. 59, the court is permitted to "weigh the evidence and credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). A motion for a new trial "may be granted even if there is substantial evidence supporting the jury's verdict." *Young v. Cabrera*, 18-cv-3028 (RPK) (ST), 2023 WL 1785526, at *3 (E.D.N.Y. Feb. 6, 2023) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

## LEGAL STANDARD FOR RELIEF FROM A JUDGMENT BASED ON MISTAKE, INADVERTENCE, SURPRISE, NEW EVIDENCE OR FRAUD, MISREPRESENTATION OR MISCONDUCT BY AN OPPOSING PARTY

Fed. R. Civ. P. 60 (b) provides for relief from a judgment based on mistake, inadvertence, surprise, new evidence or fraud, misrepresentation or misconduct by an opposing party. Rule 60(b) gives the district court a grand reservoir of equitable power to do justice in a particular case, and, subject to the one year time limitation when grounds for relief fall within the

designated categories, the rule should be liberally construed when substantial justice thus will be served. *Radack v. Norwegian America Line Agency, Inc*., 318 F.2d 538 (2d Cir. 1963).

The Second Circuit has held that relief under Rule 60 (b) should be liberally construed to achieve substantial justice. "A district court may "relieve a party ... from a final judgment, order, or proceeding for ... (6) any other reason justifying relief," Fed. R.Civ.P. 60(b), if the movant can demonstrate "extraordinary circumstances" or "extreme and undue hardship." *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272 (2d Cir. 1994). We have held that Rule 60(b)(6) "should be liberally construed when substantial justice will thus be served." *Radack*, 318 F.2d at 542; *see also, Solaroll Shade & Shutter Corp. v. Bio–Energy Sys., Inc.,* 803 F.2d 1130, 1132 (11th Cir.1986); *Blois v. Friday,* 612 F.2d 938, 940 (5th Cir.1980); 11 Wright, Miller & Kane, *Federal Practice & Procedure,* § 2852, at 231 (1995). The rule is broadly phrased and many of the itemized grounds are overlapping, freeing courts to do justice in hard cases when the circumstances generally measure up to one or more of the itemized grounds. *Laguna Royalty Co. v. Marsh*, 350 F.2d 817, 823 (5th Cir. 1965).

Under Rule 60(b)(3), a district court may relieve a party from a final judgment for "fraud." *State Street Bank v. Inversiones Errazuriz*, 374 F. 3d 158, 176 (2nd Cir. 2004) Fed.R.Civ.P. 60(b)(3); accord, *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 661 (2d Cir. 1997).

This Court had to address numerous problems resulting from Plaintiff's failures to produce documents during discovery. Because of the unique ruling by the Magistrate in order to reduce the burden on providers to recopy records, the discovery and production of all treatment related documents rested in the exclusive control of Plaintiff and on their certification that they

had produced all documents. There is no question that a variety of documents were intentionally not requested, were withheld and yet others Defendants were never advised of their existence.

On the first day of trial, when an issue about the late production of complete records of Dr. Pillai was being addressed, the Court stated, "I don't think that discovery was handled in the way it should have been here, but I don't see that there's any prejudice." However, that was only the first day of trial, and Plaintiff would yet to obtain an avalanche of additional documents in response to trial subpoenas – and only obtained same with the direct intervention of the Court with the provider. And having obtained those documents during trial, Defendants saw the names of various doctors and other providers who we were entirely unaware of and do not have so much as a page of discovery from them, such Plaintiff's PCP's, an others.

As many courts have opined, a party should be relieved of a judgment when there was an unconscionable plan that designed to influence the court that prevented the opposing party from fully and fairly presenting his case. Plaintiff has repeated relied on patently false certification that Magistrate Judge Mann accepted as a mechanism to deal with discovery in the extraordinary circumstances of this pandemic. Had Defendants had the discovery they were entitled to during the period of discovery, certainly Defendants would have approached the case differently, *including engaging an expert witness on the issue of disability,* which under the existing circumstances at this trial, there was hardly any evidence to even provide to an expert.

To prevail on a Rule 60(b)(3) motion, a movant "must show that the conduct complained of prevented the moving party from fully and fairly presenting his case." *Taylor v. Texgas Corp.,* 831 F.2d 255, 259 (11th Cir. 1987) (citations and internal quotation marks omitted); *see also Stridiron v. Stridiron,* 698 F.2d 204, 207 (3d Cir. 1983) (same); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir. 1978) (same). These same principles apply when a movant seeks to set

aside a judgment on the basis of fraud on the court. *See Davenport Recycling Associates v. C.I.R.,* 220 F.3d 1255, 1262 (11th Cir. 2000) ("'Fraud on the court must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision,' preventing the opposing party `from fully and fairly presenting his case.'") (quoting *Abatti v. C.I.R.,* 859 F.2d 115, 118 (9th Cir. 1988)); *see also Luttrell v. United States,* 644 F.2d 1274, 1276 (9th Cir. 1980); *Keys v. Dunbar,* 405 F.2d 955, 957-58 (9th Cir. 1969) (per curiam)

## POINT I

**FAILURE TO OFFER EXPERT TESTIMONY AS TO PLAINTIFF'S ABILITY TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB AND AS TO REASONABLE ACCOMMODATION IN AN AREA OF SPECIAL KNOWLEDGE REQUIRES DISMISSAL OF ALL CLAIMS**

Discrimination cases require expert testimony in areas for which jurors lack common knowledge. The failure to provide competent and necessary expert testimony is fatal. In *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6th Cir. 2010), the plaintiff physician brought a disability discrimination claim after he was discharged by the hospital because his Asperger's syndrome caused extreme difficulty communicating with colleagues and patients. This inability to communicate posed serious dangers to patients and could not be reasonably accommodated. In *Jakubowski*, that Plaintiff did proffer an expert opinion. However, Plaintiff's expert had no expertise in patient safety and did not opine on that issue, what was at issue due to his communication inabilities, thus requiring summary judgment. Similarly, in a claim against a manufacturer for negligent design, where Plaintiffs claimed that "proof of proximate cause did not require medical expert testimony," the Second Circuit affirmed a directed verdict against Plaintiff for failure to prove proximate cause. *Fane v. Zimmer, Inc.*, 927 F. 2d 124, 126 (2d Cir. 1991).

Whether "medical evidence is necessary to support a disability discrimination claim is a determination that must be made on a case-by-case basis." *Mancini v. City of Providence*, 909 F.3d 32, 39 (1st Cir. 2018). Courts generally require expert evidence when "a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition." *Id*. at 41 (*citing Felkins v. City of Lakewood*, 774 F.3d 647, 648, 652 (10th Cir. 2014)). In *Heit v. Aerotek, Inc*., 726 F. App'x 648 (9th Cir. 2018), the Court affirmed summary judgment for the defendant where the plaintiff failed to offer medical proof of his self-diagnosis stating: "lay witnesses [like the plaintiff, however, are] incompetent to testify as to the existence . . . of [medical] illnesses." *Id*. at 649 & n.1. The Court recognized that the plaintiff was "competent to testify about the effects of the alleged condition," but held that the "cause of such a condition is a medical question . . . not within the certain knowledge of laymen" and "must be proved by expert testimony." *Id*. at 649. Similarly, Plaintiff Ruderman was not competent to testify that her dizziness that allegedly caused her inability to see an exhibit at a deposition resulted from steroids she had taken the day before. Plaintiff also failed to provide expert testimony as to her abilities and what, if any, reasonable accommodations could enable her to perform the essential function of the job of senior associate at the Prakhin firm.

Where a topic requires special experience, only the testimony of a person possessing that special experience will be received and admission of such testimony is within the sound discretion of the trial court. *Randolph v. Collectramatic, Inc.*, 590 F.2d 844 (10th Cir. 1979). In a discharge claim under the ADA and state law, summary judgement was granted where plaintiff, a truck driver, was suspended under company policy where he did not comply with random drug testing procedures. *Beller v. Wal-Mart Transportation, LLC*, No. 2:17-cv-530, 2019 WL 1409579 (S.D. Ohio March 28, 2019). In *Beller*, the Court held that "Mr. Beller has provided no

expert testimony or any authority indicating that Dr. Davis should have performed a different procedure or that the exam he performed was deficient."

Causation issues which lie within the competence of a jury to determine without expert support are few, and include such claims as injury to an anesthetized patient outside the operative field, foreign objects left behind at surgery, and a psychiatrist's beating of a patient which bespeaks improper treatment. *Pipers v. Rosenow*, 39 A.D.2d 240 (2d Dept. 1972) (reversible error to find malpractice from a blood draw without expert testimony). That is not this case.

**POINT II**

**BY PLAINTIFF'S OWN ADMISSIONS, DEFENDANTS NEVER DENIED HER ANY ACCOMMODATIONS, REQUIRING DISMISSAL OF THE REASONABLE ACCOMMODATIONS CLAIMS**

Yuriy Prakhin continued to keep Plaintiff in his employ for some three months hoping to find a way for her to continue working. Despite Plaintiff's coas that Defendants never paid for any reasonable accommodations, Plaintiff's own EEOC charge proudly stated, "[n]ot once did I ask the Firm to foot the bill as I explored new accommodations that would make working with LHON easier for me." Plaintiff sworn EEOC Charge, Mar. 16, 2019, Def. YP Ex. "F," previously Def. Trial Ex. "A"). While Plaintiff testified that she asked for reimbursement, Not once did she submit a single receipt for any of her purchases. [Tr. 239-241]

There is no claim for failure to provide reasonable accommodations, as at the time of her separation from the Prakhin firm, Plaintiff had all the accommodations she claims to have requested. Plaintiff claims she requested and was denied six different assistive devices. [Tr. 20/22-24]. However, Plaintiff was never denied a single one. Despite emphatically stating in her EEOC Charge that, "[n]ot once did I ask the Firm to foot the bill as I explored new accommodations," *supra,* Plaintiff also confusingly testified that she did ask for reimbursement,

19

**while acknowledging that she never submitted a single receipt for any of her purchases**. [Tr. 239-241]. One cannot possibly be responsible for paying bills that one has not been presented with. While Office Manager Raskin did testify that she provided Plaintiff with magnifiers, for the purposes of this motion, that is not relevant. Of the six assistive devices, Plaintiff actually obtained and used all except one that a different device doubled for.

Plaintiff claims the first adaptive device she wanted to use was a standard magnifying glass. There was one in the office that Plaintiff utilized that another employee was using. [Tr. 126-27]. As Plaintiff's witness Irene Gabo explained, there was a magnifier in the office anyone was free to use. [Tr. 808]. The second adaptive device which Plaintiff found "slightly" helpful was a page magnifier which she used. [Tr. 127-129]. Plaintiff repeatedly stated that she asked Raskin about getting various devices which Raskin told Plaintiff to buy. Why Plaintiff would not give a receipt and seek reimbursement for items she got the OK from Raskin to purchase does not make sense. Moreover, if Plaintiff wanted to buy an item and was not seeking reimbursement, why would she even ask Raskin. She was free to buy whatever she wanted. Raskin's response to purchase these items was implicitly saying that the office would pay for it. If Plaintiff did not understand that, this cannot be a basis for a legal claim that flies in the face of common sense, let alone, only to be followed by an EEOC charge that stated that she never asked the law firm to foot the bill as she explored new accommodations for herself. Defendants are not asking the Court to believe Defendants over Plaintiff. Defendants are simply *asking the Court to believe Plaintiff's original claim under oath to the EEOC*, the first claim that she ever made against Defendants over her obvious subsequent fabrications.

Plaintiff's third claimed assistive device was a lighted magnifying glass which Raskin said she could obtain. [Tr. 129]. The fourth assistive device was OrCam glasses which Plaintiff

purchased at great expense but did not like and then sold on eBay. [Tr. 130, 135]. The device

was suggested by Dr. Pillai but Plaintiff later reported back to the doctor that she stopped using

them -- that it was "annoying because it would talk when she didn't want it to." [Tr. 517/17-

518/22]. These were glasses that identified things the user was looking at. Plaintiff claims to

have asked Defendants to pay for this item. Notwithstanding her Declaration that she never made

such a request, it appears that such an item that Plaintiff quickly abandoned would be a

"reasonable" accommodation anyway.

  The fifth item was Dragon, a program that types what a person dictates. [Tr. 135].

However, while it seems that it was in the office and there was some confusion on that issue, it

was supplanted by her sixth request, which was for a software called JAWS, a "multipurpose

software" that allows a user to speak and give dictation and directions as well as read back what

is on the screen. [Tr. 136/21]. Prakhin "allowed [her] to install it." [Tr. 137/2-15]. While Prakhin

testified that he insisted that his own IT people perform the installation to avoid any problems to

his computer system, Plaintiff claims that Prakhin told her that she could install it which she did,

testifying as follows:

> Q And with respect to the JAWS software you did, in fact, install a
> software program on your computer, correct?
>
> A On my work computer, yes.
>
> Q And you ultimately stopped using the JAWS software program
> because you found it to be for someone who was completely blind,
> correct?
>
> A No, that's not why I stopped using it.

[Tr. 243/24-244/5].

...

> Q In response to interrogatory number 11, you state: JAWS screen
> reader purchased on December 5, 2018 which reads whatever is on

21

the computer screen and what is typed. *Plaintiff began using JAWS but soon realized it was intended for individuals who were completely blind rather than visually impaired.* Correct? That's what it states?

A That's what it states, yes.

Q *And you verified these interrogatories, correct?*

A *Yes. It is for individuals who are completely blind as well.*

[Tr. 247/8-18].

Though Plaintiff said that Mr. Prakhin was concerned that the program not interfere with his computer system, Plaintiff never testified that he told her to either not to install it nor remove it once it was installed.

Plaintiff's witness, Sandra Beron, an attorney previously with the firm, recalled that the software was installed two days after they learned of Plaintiff's actual diagnosis in November 28, 2018. [Tr. 941/19-942/10]. Beron recalled Plaintiff reading something to her from her computer using the software and after awhile Beron recalls Plaintiff was a little slow at the outset but very shortly, Plaintiff was reading to her at a normal speed. [Tr. 974/4-24].

Ultimately, Plaintiff testified that she does not use any of this software because she learned that an ordinary Mac computer has all the necessary programs, which she was provided for without charge by the New York Commission for the Blind. While Plaintiff testified that she contacted them in December 2018, she provided no documentation of any such contact with the Commission nor any organization involved in providing services for the blind at that time. [Tr. 60-61; 217/23-218/15].

Moreover, Plaintiff had her blurry vision condition beginning in mid-September 2018. Defendants waited for three months for Plaintiff to either make or suggest accommodations that would enable her to perform the job. Though there is a significant dispute of testimony with

22

paralegals having testified to Plaintiff's work backing up (and Prakhin having seen it pile up), discounting that, there is no evidence that Defendants denied Plaintiff any reasonable accommodations. Since Plaintiff did not ask for reimbursement, the only question is whether Defendants prohibited Plaintiff or interfered with her usage. Not only did Plaintiff obtain and use these devices, but they were not reasonable accommodations since she herself abandoned them in favor of the Mac.

## **Defendants Employers Are Not Liable for Accommodating Disabilities and for Providing Accommodations Unknown to Them**

There is no dispute that Ruderman never provided a doctor's note nor any medical documentation of any kind to Defendants about her medical condition or how to accommodate it [Tr. 114, 115], even though her doctors, such as Dr. Pillai, would have provided same. [Tr. 509] Office Manager, Irene Raskin, [Tr. 1724] and Yuriy Prakin himself claim to have repeatedly requested any such medical documentation [Tr. 465]. An employee is obligated to provide documentation and information about the disability and the needs for reasonable accommodation upon request. *The Matter of Vinikoff v. New York State Division of Human Rights*, 83 AD 3d 1159 (3rd Dept. 2011)

Notwithstanding, assuming, *arguendo*, no request were made by the employer, an employer is still not responsible for meeting the reasonable accommodations needs of an employee if they have not provided the necessary documentation and information to do so. After Plaintiff had the opportunity to use all the assistive devices she chose and by December 14, 2018 had no further requests that those that had already been used, absent providing the employer with additional information to understand the employee's needs, the employer has no further obligation to accommodate the employee absent additional supporting information. "The

obligation of reasonable accommodation is also limited to the employer's knowledge of the disability that needs to be accommodated. (*Beck v University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 [7th Cir 1996].) In this case, the defendant cannot be held liable for failing to provide the plaintiff with an accommodation since she failed to adequately explain the extent and limits of her restrictions." *Pimentel v. Citibank*, NA, 29 AD 3d 141, 148 (1st Dept. 2006) In the instant case, the Defendants cannot be held liable for failing to provide the plaintiff with an accommodation beyond what accommodations that Plaintiff raised, obtained and had been using as any such accommodations would be beyond their knowledge. Plaintiff's claims must be dismissed.

## POINT III

**PLAINTIFF AVAILED HERSELF OF ALL ACCOMMODATIONS SHE CLAIMS TO HAVE SUGGESTED, AND HER FAILURE TO ADVANCE A "GOOD FAITH INTERACTIVE PROCESS/COOPERATIVE DIALOGUE" BEYOND DEVICES THAT SHE HERSELF USED AND REJECTED REQUIRES THE DISMISSAL OF PLAINTIFF'S EMPLOYMENT AND REASONABLE ACCOMMODATIONS CLAIMS**

Plaintiff's claim fails because she tried and used or rejected every suggested accommodation and made no specific suggestions beyond what she already had. There were no further reasonable accommodations that she requested than those listed above which Plaintiff did not avail herself of at the Prakhin firm – even if some of these assistive devices either did not work for Plaintiff or were not to her liking. Of the six reasonable accommodations that Plaintiff claims to have requested, she got the opportunity to use them all. The other accommodation which Plaintiff was afforded, the additional assistance by her paralegals, was not an issue of dispute about which Plaintiff complained.

Plaintiff's failure to advance the "good faith interactive process" [in federal and state

jurisprudence] or its equivalent, a "good faith cooperative dialogue" under the NYCHRL, is fatal to her claim. There is no "reasonable accommodation" that she proposed that she did not already have access to or that she herself already used and rejected.

Plaintiff had availed herself of every possible accommodation, and she does not dispute that her paralegals were given great leeway to provide assistance, though it was not their responsibility to perform her job. On November 28, 2018, Plaintiff said, "I told him that there's software out there and there's people with visual impairment are able to perform their job with assistance" [Tr. 189/2-13]. That software was JAWS, which Prakhin told her she could install, and which was in fact installed. Plaintiff's witness, Beron, testified this program installed two days after Plaintiff's diagnosis [which would be November 30]. Beron observed Plaintiff using the software successfully. Nonetheless, Plaintiff ultimately rejected the software as being more appropriate for "completely blind" people. [Tr. 247/8-18].

In their final conversation on December 14, 2018, Plaintiff offered nothing new. There was not even any specific accommodation that she even requested because she had already been using the last one, JAWS, for some two weeks, as described by Beron. Plaintiff simply asked to keep the *status* quo in which she was falling further and further behind, stating, "I was like I just need a few accommodations and, just, I'll be able to keep my job just as I have been." [Tr. 184/21-22]. As such, Plaintiff effectively ended any "good faith interactive process" that may have existed. Had Plaintiff said she was in contact with a service organization like the Lighthouse Guild, which provides such services to employees and employers, perhaps there would have been a next step.

Plaintiff claims that she believes she first contacted the New York Commission for the Blind in December 2018—not even suggesting that she did so prior to her separation from the

firm. Yet assuming Plaintiff did so, and certainly there would have been some evidence of that were that the case, this alleged contact is three months after her vision problem arose – three months that Plaintiff fell further back in her workload without solutions. But Plaintiff never did provide her application to any such services. The earliest document provided from the Commission was a letter dated July 15, 2021, two and a half years after she was separated from the firm stating that she is "legally blind." [Tr. 359-351]. Plaintiff never testified that she told Prakhin that she communicated with any organization that would assist her and the firm to explore possible reasonable accommodations for the only reason possible. While it would have been expected that Plaintiff would have presented some evidence or testimony from either one of the services for the blind she claims to have used or from the New York Commission for the Blind, she never did.

A Plaintiff who fails to advance the good faith interactive process is precluded from making such a disability rights claim. In *Tafolla v. County of Suffolk*, No. 17-CV-4897(JS)(AKT), 2021 WL 3675042 (E.D.N.Y. Aug. 19, 2021), the Court stated:

> Plaintiff advances a few additional arguments, all of which are unavailing. Plaintiff contends that the five-pound limitation prescribed by her doctors was distinct from the 'lift, bend, twist, or push' limitation. She also takes issue with the final paragraph of the Heilig Memo, which advised Plaintiff that, in the event she was unable to perform her job responsibilities, even with the accommodation, she would have to take medical leave. However, "the interactive process is a two-way street." *Dillard v. City of Austin*, 837 F.3d 557, 563 (5th Cir. 2016). Thus, to the extent there was any ambiguity as to what her doctors recommended, the proper course was for Plaintiff to raise that issue with Defendants during the interactive process. Instead, Plaintiff abandoned that process without clarifying Defendants' proposed accommodation, as noted supra. The same reasoning applies to the final paragraph in the Heilig Memo: if Plaintiff did not understand the terms of the accommodation, then she had an obligation to seek clarification. *See Nugent*, 303 F. App'x at 946 (holding plaintiff-employee responsible for breakdown of interactive process where defendant-employer signaled receptiveness to her proposed accommodation but plaintiff-employee "failed to follow up").

> But by the time she received the Heilig Memo, Plaintiff had resolved to take medical leave. Further, the parties dispute whether archiving is an essential function of Plaintiff's job as a Clerk Typist. However, "the plain reasonableness of the existing accommodation ends the analysis."

In *Heiden v. New York City Health and Hospitals Corporation*, 20-cv-10288 (LJL), 2023

WL 171888 (S.D.N.Y. Jan. 11, 2023), the Court held,

> Under NYCHRL, '[i]t shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time.' N.Y.C. Admin. Code § 8-107(28)(a). That process involves "good faith . . . written or oral dialogue concerning the person's accommodation needs, potential accommodations that may address those needs, and the difficulties that such accommodations may pose for the covered entity." *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 (1st Dep't 2020) (quoting the Committee Report of in support of Local Law 59). "The failure to engage in a cooperative dialogue is independently actionable under the NYCHRL." *Goldman v. Sol Goldman Invs. LLC,* 2022 WL 6564021, at *5 (S.D.N.Y. Aug. 5, 2022), *report and recommendation adopted,* 2022 WL 4482296 (S.D.N.Y. Sept. 27, 2022); see also id. at *10 (describing such failure as a "per se violation" of NYCHRL). A "cooperative dialogue" must be undertaken in "good faith," *Hosking*, 126 N.Y.S.3d at 102.

As demonstrated below, Plaintiff's failure to advance the "good faith" cooperative dialogue is fatal to her claims.

## **Plaintiff's Inability to Read and Understand Handwritten Documents and Images**

Defendants demonstrated at trial, upon Plaintiff's admission, that she was unable to perform several undisputed essential job functions, including reading handwritten documents, being able to see all exhibits at deposition, and to follow the provisions of the Rules of Professional Conduct ["NYR Prof. Cond."] requiring Competence [§1.1], Diligence [§1.3], Truthfulness in Statements to Others [§4.1], and Responsibilities of a Subordinate Lawyer [§5.2]. Plaintiff's failures to fully and properly perform her job, and her failure to apprise Prakhin of her

inabilities, such as when she admittedly was unable to see an exhibit at a deposition, also demonstrated that she was unable to perform all the essential functions of the job.

This further caused an undue burden upon Prakhin in jeopardizing his clients' cases and his own person professional responsibilities to oversee and ensure ethical compliance of his associates, consistent with his "Responsibilities of Law Firms, Partners, Managers and Supervisory Lawyers" duty to reasonably oversee their performance. [NYR Prof. Cond. §5.1].

Defendants demonstrated that Plaintiff, *by her own admission*, could not read a single word on a hand-written medical record [Tr. 300-301], that both defense counsel Rich and Plaintiff's counsel Huot repeatedly demonstrated they were able to read. The page that Plaintiff was shown was from the record of her own treating psychiatrist, Anna Shostak, M.D., from November 30, 2018.[3] Upon requesting the hard copy, it was handed to Plaintiff. [Tr. 300/2-18].

Plaintiff was unable to read *any* of the handwriting on the document stating as follows:

> Q: Are you able to read that document as for the handwritten parts?
>
> A: No, not really, no. I'm not --
>
> Q You can't read any of it?
>
> MS. HUOT: Your Honor, for the record, neither can I.
> …
> THE COURT: I am going to direct you not to make those kinds of comments -- do you understand -- in front of the jury. You don't do that.
>
> **A** No, I can't.
> …

---

[3] The version of the handwritten note at Def. YP Ex. "J," which was shown to the witness was from a prior version of Dr. Shostak's notes which Plaintiff had exchanged with Defendants but omitted nearly 100 pages, the majority of the record, omitting all treatment records from 2008-1017. Later in the trial, Dr. Shostak appeared pursuant to Defendants' subpoena she brought her complete record which is attached here at Def. YP Ex. "D." The page shown the witness is also at Def. YP Ex. "D" at "Shostak Record Page 117." Note also that these "Shostak Record Page" numbers referred to in this Memorandum, refer to printed page numbers on the upper right-hand corner of each page and not hand markings made by counsel for trial purposes on the upper left."

> Q: Ms. Ruderman, I just want to clarify something. When you said you can't read it, did that refer to your -- that it was not clear or you couldn't make out the handwriting?
>
> A: **I** can't make out the handwriting.

[Tr. 300/21-301/6; 305/2-5]. Though Plaintiff attempts to blame her inability to read a single word from the document on the "handwriting," clearly it was legible and was part of her job to read as a personal injury attorney at the Prakhin firm.

When Dr. Shostak testified, both defense attorney Rich and Plaintiff's counsel read verbatim from the doctor's notes, asking her to confirm if their word-for-word reading of her notes on numerous pages were correct. Both attorneys read numerous parts of the entire record but both also read those handwritten notes from the November 30, 2018 entry note that Rich asked Plaintiff to read from. Rich read from that particular note to Shostak, who confirmed his correct reading of the note. [Tr. 1611-1612; 1675/13-19]. Plaintiff's counsel asked her questions from that same page. [Tr. 1688/21-1690/6].

Both attorneys read the doctor's handwritten notes to her verbatim and Dr. Shostak confirmed each time that what the attorney read in the record was what she had written by hand. First, defense counsel Rich read dozens of lines of entries which Shostak confirmed. [Tr. 1617/11-16; 1618/19-25; 1620/3-1621/12; 1626/17-1627/12; 1623/12-21; 1655/23-1656-1; 1656/211657/1; 1658/2-9; 1659/4-17; 1665/2-4; 1665/12-13; 1667/10-20; 1668/6-14; 1669/6-10; 1670/12-14; 1672/18-21; 1675/13-19 [Nov. 30, 2018] 1676/5-18; 1677/16-1678/3; 1678/16-18; 1679/15-18; 1680/1-5; 1681/4-8]. After Rich's questioning of Dr. Shostak, Plaintiff's counsel also read from the doctor's notes, usually verbatim, directly from the doctor's handwritten notes and asked the doctor to confirm that she was correctly reading her notes correctly.[4] [Tr. 1684-

---

[4] While the Court, outside of the hearing of the jury, made remarks that the record was illegible, this Honorable Court's ability to read the record is not at issue. Rather, this is a skill learned and developed by attorneys in the areas

1701]. By reading numerous entries and confirming them with Dr. Shostak, Plaintiff's counsel

had unwittingly but convincingly demonstrated that the doctor's handwritten notes were legible.

In fact, so convinced that she was able to accurately read Dr. Shostak's note, during attorney

Rich's summation, Huot objected purporting to correct Rich's reading of the medical records.

from the record, presumably correcting Rich's reading of the record with the following exchange

ensuing:

> MR. RICH: ... November -- this 11/30 note. This is critical because what
> you see under, on the right hand side under the date it says PTS, patients
> mother called as an emergency. Now, by the way, this is legible. Most of it
> is legible.
>
> MS. HOUT: Objection. It says "came," not "called."
>
> THE COURT: I'm sorry?
>
> MS. HOUT: It says "came," not "called."
>
> THE COURT: Just don't interrupt.
>
> MR. RICH: As a layperson, you might not be able to read every single
> word, okay, but you need to know basically what's in here. You can read
> Ms. Ruderman's chief complaints: Anxiety. Patient's mother called and, as
> an emergency. And then go down to the bottom, next to the number that
> she circled and said mother without patient, okay? And it says patients
> mother states that patient is legally blind. And says has Leber's disease.
> Patient says she's depressed. She has she's sleepiness, no suicidal ideation.
> And prescribed Xanax. If you go to the next page, excuse me, if you go to
> the medication page which is marked page 125 and you do this by going
> through the entire record.
>
> [Tr. 2105/13-2106/10 reading from Shostak record attached here at Def.
> YP Ex. "D"]

---

of personal injury and employment, such as counsel Rich and Huot, who both demonstrated on the record by
question and answer with Dr. Shostak, that these records were legible. It is undisputed that this skill is an essential
function of the job as a personal injury senior associate at the Prakhin firm. The attorney in developing these skills,
would also learn the related areas of medicine relevant to this practice, such as orthopedics, neurology, physical
medicine and rehabilitation, psychiatry and psychology so that they can understand the information in their clients
medical records and include such information in the Bill of Particulars like the mental and physical conditions
complained of and diagnosed, as well as the types of treatments and medications prescribed. As Ms. Gabo testified,
a personal injury attorney must developed such skills in order to properly represent their client. [Tr. 691, 777-791]

While Plaintiff properly offered expert witness testimony from her neuro-opthomologist, Cinthi Pillai, M.D., to prove that Plaintiff had a disability, she never offered testimony that Plaintiff was able to perform the essential functions of her job – which was not within the purview of her treatment of Plaintiff. Critically, Plaintiff never offered any competent expert opinion as to whether she could perform the essential functions of her job with the duties required of a personal injury attorney at her level and salary as an associate at the Prakhin firm. Such an expert would have to have personal knowledge of her specific vision abilities and limitations and expert knowledge as to what, if any, would be the reasonable accommodations that could enable her to perform all essential functions. Such a person with such expertise could have been a "fact witness" from any number of specialties such as occupational therapy, vocational rehabilitation or adaptive technologies who would be able to testify about the specifics of plaintiff's disabilities and what her measured abilities were with regard to the specific requirements to be able to perform the essential functions of job. Plaintiff could have been evaluated by an "expert witness." Such a "fact" or "expert" witness would have professional, occupational or vocational expertise, and would have had to opine with fact-specific observations and opinions as to Plaintiff's disability, her measured abilities and what, if any reasonable accommodations could have enabled her to perform the essential functions of the specific job this Plaintiff had as a plaintiff's personal injury Senior Associate at the Prakhin firm. While Plaintiff testified that she used the services of disability vocational service provider such as the Lighthouse Guild [Tr. 363], she offered no witness from the Lighthouse Guild nor any vocational or occupational service provider that she used. Nor did Plaintiff even provide the records of such providers as required by the Court order of Judge Mann of Apr. 30, 2020 [Doc.

027, attached here at Def YP Ex. "G"] and as "certified" to by Plaintiff on May 18 2020. [Doc. 191-6, annexed here at Def YP Ex. "E"]

In *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 140 (2d Cir. 1995), the Court stated, "[t]o avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." Both the proposed reasonable accommodation and the requisites of the job must be evaluated in a fact-specific manner.

However, "The reasonableness of an employer's accommodation is a fact-specific question that often must be resolved by a factfinder." *Wernick v. Fed. Rsrv. Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996) ("Whether or not something constitutes a reasonable accommodation is necessarily fact-specific. Therefore, determinations on this issue must be made on a case-by-case basis."). Similarly, any determination regarding a reasonable accommodation, "involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Goonan v. Federal Reserve Bank of New York*, 916 F. Supp. 2d 470 (S.D.N.Y. 2013).

## POINT IV

## PLAINTIFF FAILED TO OFFER THE NECESSARY EXPERT TESTIMONY THAT SHE WOULD BE ABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB WITH OR WITHOUT REASONABLE ACCOMMODATIONS

Defendants do not contest that Plaintiff has a disability. That was properly demonstrated by the testimony of her neuro-opthomologist, Dr. Pillai. However, this doctor was a fact witness and offered no opinion on this issue. Had Plaintiff even proffered an expert fact witness, trained in the area of vision loss and vocational training and adaptive technology, a witness could opine

as to Plaintiff's ability to perform the job, assuming proper qualifications, a proper factual basis and full understanding of all the essential functions of the job. Plaintiff offered no such testimony.

When Plaintiff was shown a Big Apple map, she explained that these were maps she used at the Prakhin firm and they were used to prove notice to the City of New York of the existence of a pothole or defect in the sidewalk. [Tr. 306]. When asked to read from it, she avoided reading the handmade map stating, "I don't recall how to use the map right now." [Tr. 310/24-311/5].

Even when attorney Rich showed her an ordinary printed document and asked her to identify it, Plaintiff was unable to correctly read it the first two times until she was asked "are you sure?" Plaintiff responded, "[n]o. Sorry. It's an employment, employment book, another employment handbook." In fact, the document reads in large print, all capital letters and in bold, "**LAW OFFICES OF YURIY PRAKHIN, ESQ. EMPLOYEE HANDBOOK.**" [Tr. 335/3-11, showing trial exhibit Def. Ex. "E," attached here as Def. YP Ex. "H"]

## POINT V

**PLAINTIFF ADMITTED HER INABILITY TO SEE AN EXHIBIT AT DEPOSITION AND THAT SHE WAS "FAKING" BUT NEVER REPORTED THIS INABILITY TO DEFENDANT YURIY PRAKHIN.**

The record shows the following exchange:

RUDERMAN: So I just had the most horrific day ever. You have no idea. So I -- I still can't see. So I thought I was -- I thought I'd be better off, like I -- I thought I was capable to come back, right?

LARSSEN: Right.

RUDERMAN: So I come back and I realize I -- I can't see shit. Like I get to the EBT and I'm like blinded by the fluorescent lights, blinded by all the people, can't see.

LARSSEN: Oh, my God.

33

RUDERMAN: I felt like panicking, right? Then -- oh, they have a surveillance video where -- with our client in it. Couldn't see shit at all. I couldn't even tell that was our client in it. **Fine. I'm faking it, like, you know, pretend like I -- I know what's going on.**

<u>Transcript of Audio Recording 384</u>, Def. YP Ex. "B"

For Plaintiff, other essential functions included being able to see images and videos which she herself exclaimed she "**couldn't see shit**" and was "**pretend[ing] like I – I know what's going on**" when a video was played at a deposition, a fact that she recklessly failed to report to Prakin or other authorities at the firm. Though Plaintiff was fine health the entire day up until being shown the video, she made a medical claim that she was unable to see properly because she was dizzy from steroids she had been administered previously. Her admission, and failure to report such a situation that endangered the client and the firm, are legitimate and necessary reasons for termination. Plaintiff's mere allegation that her dizziness at that moment was caused by steroids, was an unsubstantiated claim since medical conditions, let alone causation that her medical condition caused her alleged dizziness, must be proven by competent expert medical testimony. Such facts are certainly outside of general knowledge of lay people, and therefore Plaintiff's own lay testimony about the cause of her inability to see an exhibit, is not competent evidence.

It is undisputed that Defendants offered Plaintiff various reasonable accommodations, including a leave of absence and disability leave, which Plaintiff could have returned in very short order, if she were able to demonstrate that she could perform the job, with or without reasonable accommodations. In fact, it is undisputed that Defendants were extremely patient and, as Plaintiff testified, would be "happy" to have Plaintiff working at the firm. [Tr. 195/15-17] Defendants waited three months, from mid-September 2018 until December 14, 2018, to give Plaintiff the opportunity to demonstrate her ability to perform her job while engaging with her,

but Plaintiff never proposed any new reasonable accommodation other than those that were in place – and which were not enabling Plaintiff to perform the essential functions of her job. Plaintiff's own testimony demonstrated her failures to engage in a good faith interactive process/cooperative dialogue, having no new accommodations to offer on December 14, 2018 when Prakhin gave her the options of a leave of absence, disability or separation, thus precluding Plaintiff from asserting her claims.

**POINT VI**

**DUE TO COVID, PLAINTIFF, AN ATTORNEY, WAS UNDER COURT ORDER TO OBTAIN HER RECORDS, PRODUCE AND CERTIFY SAME BUT WITHHELD RECORDS AND THE VERY EXISTENCE OF SEVERAL PROVIDERS SHE USED**

This claim should be dismissed under Fed. R. Civ. P. 60 because Plaintiff and her counsel made continued misrepresentations to defense counsel and the Court and perpetrated a fraud both on Defendants and this Court. In the case of all three motions, the Court must consider the extraordinary procedural history whereby Plaintiff intentionally withheld evidence, much of which was not produced *by the witnesses, not by Plaintiff,* until trial and other of which has still never been produced. Defendants only learned of the very existence of Plaintiff's having gone to various doctors and disability providers from the records that were only first produced at trial – and those were from enforcing Defendants' subpoenas, not because of Plaintiff's production. Plaintiff and her counsel intentionally prejudiced and denied Defendants their rights to a full and proper hearing based on relevant evidence.

The relevant procedural history of Defendants' motions, efforts to obtain documents and Plaintiff's repeated reliance on her own certification that she obtained and produced all relevant documents, is detailed in defense counsel Mary Ellen Donnelly's February 2, 2023 pre-motion letter to preclude testimony of Dr. Pillai [Doc. 191], which was engendered by having been faxed

35

some 100 pages of the doctor's medical records on February 1, 2023, four days before trial began.

The deceptions by Plaintiff began in early 2020. In response to a motion by Defendants for HIPAA authorizations, the Magistrate limited discovery having the Plaintiff herself obtain all her own medical and disability records and then certifying same ruling:

> Regarding defendants' cross-motion to compel plaintiff to produce HIPAA authorizations (DE #25), the Court grants in part and denies in part this application. ***The Court stresses the unnecessary burden that would be placed on the six non-party medical providers and mental health professionals (the "Providers") were this Court to require they produce records already possessed by the parties, particularly during the COVID-19 pandemic.* In addition, plaintiff and/or plaintiff's counsel have offered to provide defendants with a certification detailing the request(s) made to these Providers, and confirming that all documents provided by these Providers to plaintiff were subsequently produced to defendants, without exception.**
>
> <u>Motion Hearing and Discovery Conf. Order</u>, Apr. 30, 2020, Doc. 027, attached hereto at Def. YP Ex. "G;" emphasis supplied]

Plaintiff submitted a Certification stating, under oath, that she personally obtained all had provided all records, save one, and would provide that one outstand record.

> [a]s of February 11, 2020, *I had received and produced all medical records relating to my disability and emotional distress.* Since that time, there were additional records presumably generated by one of my providers...They responded that they should be able to send them this week*. I will produce all such records, without exception, as soon as I receive them.*
>
> ***I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.***"
>
> 5/18/2020 12;43 PM EDT          **YELENA RUDERMAN**
>
> <u>Ruderman Certification</u>, May 18, 2020, previously submitted at Doc. 191-6, attached here at Def. YP Ex. "E," emphasis supplied.

Upon further requests for HIPAA authorizations by defense counsel, Plaintiff's counsel's position was clear that all documents that predated Plaintiff's May 18, 2020 certification were duplicative since Plaintiff certified that all such documents were fully produced. Naturally, defense counsel cannot know to request what they do not know. Plaintiff's counsel's August 11, 2020 email reiterated that they had fully produced all documentation stating,

> With respect to the HIPAA authorizations, as you stated in your email – the Court permitted HIPAA authorizations for Plaintiff's ongoing physical and mental health conditions. Per the Court's Order Plaintiff submitted a certification on May 18, 2020 that she had produced all medical records but for one provider. On May 20, 2020, Plaintiff produced the outstanding records from that additional provider. Your request for a reproduction of the same medical records going back 1.5 years is duplicative, burdensome, and contrary to the Court's Order. Accordingly, Plaintiff produces completed and executed HIPAA authorizations for medical records and mental health information from May 18, 2020 to the present.

Email, August 11, 2020, from Inessa Huot, Esq. to defense counsel, [from Doc. 191-7, emphasis in original].

All the while, Plaintiff testified that other than being diagnosed previously with Attention Deficit Hyperactivity Disorder, to the best of her recollection, she essentially was not under psychiatric treatment prior to her termination by Defendants. Plaintiff so testified before Defendants had been had been provided any of Dr. Shotak's treatment notes prior to 2018. Plaintiff so testified before she had knowledge that Shostak's records would show that Plaintiff had been diagnosed and treated for anxiety and depression since 2008, but came to her already under treatment and medicated for anxiety and depression prior to starting treatment with Shostak in 2008. Shostak's records reveal other medical providers of whom Defendants were never advised of nor provided records.

While credibility is not an generally an issue for a motion for a new trial, in the context of all the other prejudicial evidence that was presented to the jury and the deprivation of the right to

proper discovery, it seems clear that Plaintiff lied about one fact after another. Plaintiff lied to her own psychotherapist, Dr. Falk, that she had been diagnosed by her treating psychiatrist, Dr. Shostak with PTSD, which Dr. Shostak denied ever diagnosing. Plaintiff lied about not having any history other than perhaps a single bout of anxiety prior to her termination in December 2018, while the records Defendants finally obtained at trial after Plaintiff testified, showed that Dr. Shostak had diagnosed her with anxiety and depression from the time she began treating her in 2008, at which time she was already under treatment with a different psychiatrist for anxiety and depression.

When Plaintiff was hired back to the Prakhin firm, all associates were required to go to court and attend depositions nearly every day. However, as described in greater detail below, Dr. Shostak noted in her note of February 5, 2019, testified that five months after the onset of her blurry vision, Plaintiff could not perform any of her daily functions in her own apartment or outside, meaning that she needed assistance in every part of her life, in her apartment, to go outdoors, etc. [Tr. 1677/1-12] It was not until August 2019, that Dr. Shostak recorded in her medical note that Plaintiff was finally able to function. [Tr. 1680/1-9]

This case therefore poses extraordinary procedural and discovery rarities that can only be reasonably viewed as an continued series of intentional misrepresentations by Plaintiff, herself an attorney, personally, and her attorneys – misrepresentations to both defense counsel and the Court. There is a demonstrable pattern of Plaintiff and her counsel of failing to obtain various medical and disability records, failing to advise defense counsel of the existence of various providers, secretly withholding documents from Defendants of which they were in possession, much of which was testified to and admitted to by counsel at trial.

Because of an Order by Magistrate Judge Mann early in the COVID pandemic, Plaintiff was charged with obtaining her records and providing a certification that she had done so and that all such documents were provided. We would learn that some documents were never even requested, such as the records of Dr. Falk, and others were obtained like the records of Dr. Shostak, but Plaintiff's counsel withheld all records predating 2018 and presented the documents with the certification as if the record were complete. It was not, and Plaintiff's counsel for the first time on questioning at trial, revealed that that Plaintiff had pre-2018 records in her possession but that they were not relevant. Plaintiff's counsel also told the Court that she could not produce the records because they had attorney notes on them – belying the concept that they were not relevant since there would be no need for attorneys to make notes all over irrelevant documents. Plaintiff's counsel also falsely claimed that Defendants' prior counsel came to some agreement with Plaintiff's counsel that there was no need to produce pre-2018 documents. This claim was repeated but counsel produced no such agreement.

Prior counsel, Edgar M. Rivera attests to the fact that there was no such agreement as claimed by Plaintiff's counsel as stated in the Declaration. <u>Declaration of Edgar M. Rivera, Esq.</u>, Def. YP Ex. "K"

Defendants only learned of the existence of various providers during the trial, including seeing some 100 pages of handwritten treatment records from Plaintiff's former treating psychiatrist, Anna Shostak, M.D., on the morning of her testimony on the next to last day of trial. Defendants only learned of other the existence of other providers during trial when Plaintiff's treating psychotherapist, Dr. Falk, read his handwritten records to defense counsel during his deposition during the trial.

**POINT VII**

39

**DEFENDANTS WERE FURTHER PREJUDICED IN THAT PLAINTIFF'S
DECEPTION OF WITHHOLDING RECORDS REFERRED TO ADDITIONAL
PROVIDERS THAT THEY ONLY LEARNED ABOUT THROUGH SEEING THE
WITHHELD RECORDS OF DRS. SHOSTAK AND FALK**

The deception by Plaintiff here is sufficiently severe to warrant relief pursuant to Rule 60 with a dismissal of the case. In the alternative, a new trial should be permitted with a reopening of discovery to cure the numerous withholdings and deceptions that caused Defendants to proceed to trial never having seen medical records that Plaintiff certified were provided and missing other documents from providers that Plaintiff never divulged at all. Defendants only learned from the contents of withheld records of Dr. Shostak, Dr. Falk and from Plaintiff's testimony at trial, that records of the following providers should have been produced:

**From the records of Dr. Shostak**:

-Shostak Rec at p. 045PCP Marina Goikhberg, M.D., Dr. Shostak's record, of November 19, 2008 states the "chart is terminated…Follow-up [f/u] by pmd [primary MD; primary care doc] indicating that the primary care doctor may be prescribing medication or other tasks.

-Shostak record, p. 055 indicates on 11/21/11 the client is terminated, follow up by PMD, if necessary, she will call back.

-Shostak record, p. 16 shows the PCP Thomas V. Savino, M.D.

-Shostak record, p. 5, Dr. Rimma Danov, Neuropsychologist,

**Other records**:

-From note in record of Martin Falk, Ph.D., psychologist, testified to at Deposition 62/6-19 revealed note of May 20, 2020 "Fell two weeks ago. Fell flat on her face. Needed seven stitches. Went to plastic surgeon. Drank. Took Ativan. Incoherent. Panic attacks and wine. And then, Zoom support group." Require records of plastic surgeon.

-from Plaintiff's Trial Ex. 4, p.2, states "CT chest with 11/9/18: IMPRESSION: I. Healing (subacute) fracture of the left lateral eighth rib." If a fractured rib is from an injury relating to Plaintiff's vision, this would be relevant to Plaintiff's ability to perform the essential functions of her job, including going to court and general mobility.

-Plaintiff testified at trial regarding the following providers whose records have not been provided when Plaintiff testified she is a "I'm part of all of them," referring to the NY Commission for the Blind and the Lighthouse Guild and unknown other service organizations that provide, "occupational therapy and vocational rehab that help people figure out what kind of

accommodations would be most helpful in their situation." [Tr. 363].

Defendants cannot overstate the prejudice sustained. One can presume that a patient would tell her doctors and service providers relevant information about her condition. The occupational therapy providers would likely have opthomological and occupational therapy records measuring Plaintiff's vision, her abilities, her training and progress. They would all naturally start with initial assessments. The dates alone as to when Plaintiff sought their services, are relevant as to what, if any efforts Plaintiff was making to understand what accommodations could be of potential assistance. Plaintiff testified that she applied to the New York State Commission for the Blind in December 2018 which is amongst the information Defendants had the right to, but for Plaintiffs outright deception.

Having "certified" under oath to the Court and Defendants that they provided all documents, such a fraud upon the Court and against one's adversary, merit dismissal pursuant to Rule 60, including pursuant to Rule 60(b)(3), whereby a district court may relieve a party from a final judgment for "fraud." *State Street Bank v. Inversiones Errazuriz*, 374 F.3d 158, 176 (2d Cir. 2004). *Accord*, *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 661 (2d Cir. 1997).

## POINT VIII

### PUNITIVE DAMAGES CLAIMS SHOULD BE DISMISSED AS DEFENDANTS DID NOT SHOW THE REQUISITE BAD INTENT

To recover punitive damages, the plaintiff must show the defendant acted with malice or reckless indifference to his rights. A punitive damages claim was properly dismissed where defendant employer had granted numerous accommodations for reduced hours and leaves of absence, therefore not showing the requisite malice or recklessness. *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195 (S.D.N.Y. 1999).

Here, it is undisputed that for the entire period from mid-September until her separation from the firm on December 14, 2018, Defendants granted Plaintiff all the leave she requested, even when she did not request it before she took the time. Defendant wanted Plaintiff to be able to continue working in his office, and his decision to continue to keep her there for three months with no sense of being able to count on her was evidence of that. From Prakhin's perspective, Plaintiff's work was piling up even though she had been at work for two straight weeks following her November 28, 2018 diagnosis and was told by her paralegals that she was not keeping up with their work. [Tr. 651-659]. And, in the hope that she could figure out how to adjust to her situation and return to the office, Plaintiff stated that in their last conversation when he offered her leave, Prakhin said, "feel free to call me and come back. I'll be happy to take you back." [Tr. 195/15-17]

As demonstrated above, the claims that Plaintiff was denied reasonable accommodations simply does not hold water based on her own statements and those of her witnesses. Plaintiff's friend and witness Sandra Beron, a former associate at the firm, testified that she knew that within two days after her diagnosis with LHON, she had the adaptive software installed on the computer, saw her using it and Plaintiff was reading to her at normal speed with it. [Tr. 941/19-942/10; Tr. 973/21- 974/24].

In short, Defendant showed nothing but support and empathy for Plaintiff – the precise opposite of the animus or disregard for Plaintiff or her rights that are required for an award of punitive damages.

## POINT IX

**THE ERRONEOUS JURY CHARGE REQUIRES A NEW TRIAL WHERE THE INSTRUCTION WOULD CAUSE A JUROR TO BELIEVE THAT PLAINTIFF MERELY HAD TO SHOW THAT *AT PRESENT* SHE COULD PERFORM THE**

**ESSENTIAL FUNCTIONS OF THE JOB TODAY, AS OPPOSED TO PERFORMING THOSE TASKS AT THE TIME OF HER SEPARATION**

Prakhin incorporates co-Defendants' arguments on the erroneous jury charge. Prakhin notes that additional testimony further added to the confusion of this jury charge as to two different claims, stating "the third element requires the plaintiff to show by a preponderance of evidence that she is otherwise qualified for the job and that, with or without a reasonable accommodation, she can perform the essential functions of that job." [ECF Doc #221 at 12] [Trial Tr. 2144; 12-16]. [ECF Doc #221 at 10] [Trial Tr. 2142; 13-22].

The Second Circuit held in an analogous case, *Norville v. Staten Island University Hosp.*, 196 F. 3d 89, 100 (2d Cir. 1999), as follows:

> An erroneous jury instruction, unless harmless, compels reversal. *See Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 135 (2d Cir.1999). "A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." Id. (quoting Hathaway v. Coughlin, 99 F.3d 550, 552 (2d Cir.1996)) (internal quotation marks omitted); see also United States v. Locascio, 6 F.3d 924, 939 (2d Cir.1993) (holding that court of appeals will reverse based on erroneous instruction if the charge "as a whole" resulted in prejudice). Failure to give a requested instruction, if it results in such a misleading charge, constitutes reversible error. See Castro v. QVC Network, Inc., 139 F.3d 114, 116 (2d Cir.1998).

This instruction is even more likely to have misled jurors in view of the Plaintiff's testimony, when she suggested that attorney duties have changed post-COVID, claiming that the essential functions of the job *in Yuriy Prakhin's office* have changed, when she responded as follows:

> Q: In Yuriy's office, would you say -- is it your understanding that going to court physically was part of the essential function of the job as an attorney?
>
> A: Yes, it was that way in every court pre-COVID. Now the Zoom is the norm.
>
> [Tr. 396; 10-14]

Though she did not mention until cross-examination that in her current legal position she works from the home, Plaintiff stated that as a personal injury defense lawyer handling personal injury cases for American Transit, she "work[s] out of the home ... It's all been on Zoom, virtual conferences.." [Trial Tr. 383; 14-25]. The implication of Plaintiff's testimony is that the practice of law has changed and that performing her job as an attorney for American Transit "out of the home" equates to her being able to do her job at the Prakhin office. With Plaintiff's implicit claim that she can do her job for Prakhin "out of the home" post-COVID because of changes in the legal profession, a juror could easily find that she can today perform the essential functions of the job -- while the correct legal issue is *whether she was able to perform the essential functions of the job on December 14, 2018,* the day she was given the options of taking of leave of absence, going on disability or being separated from the firm.

Secondly, the use of the word "is" directed the jury to measure the abilities of the Plaintiff on February 16, 2023, more than four years after she had gone through extensive vocational and technical assistance to learn how to adapt to her disability. In fact, her psychotherapist, Dr. Falk, noted that it was not until she saw him on April 6, 2021, more than two years after the onset of her low vision condition and her separation from the Prakhin firm, that she finally made a "breakthrough" and realized that of all the technologies she had been going through, all she really needed was a Mac computer which had all the necessary adaptive technology built in. [Trial Tr. 1294-1296; Falk Deposition at Trial was Def. Ex. 11-U's at Tr. 1944, attached hereto as Def. YP Ex. "C," pp. 80-83] Certainly, there is no doubt that after going through the vocational rehabilitation and learning that she did, she would certainly have improved coping skills.

Similarly, her treating psychiatrist, Anna Shostak, testified consistent with her records, that as of her February 5, 2019 visit, Plaintiff "needs assistance in everyday activity [such as to] walk in a room...she needs somebody to go with her outside, to help her in [her] apartment ... [s]o on a daily basis for all of her activities, she needed assistance." [Tr. 1676/19-1677/12]. This doctor visit was *five months after her September 2018* onset of blurred vision. It was not until over eight months after her December 12, 2022 separation from employment at the Prakhin firm, that on August 20, 2019, Dr. Shostak noted for the first time that Plaintiff was "able to do her daily routine." [Tr. 1680/1-9]. Whatever adaptive skills and knowledge Plaintiff may have had on the day this case was given to the jury, she certainly did not have those functional skills on December 12, 2018, the day of her separation from the Prakhin firm.

## POINT X

### PLAINTIFF IS JUDICIALLY ESTOPPED FROM CLAIMING THAT SHE REQUESTED REASONABLE ACCOMMODATIONS BE PAID FOR BY DEFENDANTS BY HAVING STATED SO UNDER OATH

A party who makes a formal filing or statement under oath asserting a specific factual claim is judicially estopped from claiming the a contrary material fact inconsistent with the earlier sworn statement. *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 131 (2d Cir. 2016).

Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken in a prior administrative or legal proceeding. *Robinson v. Concentra Health Services, Inc.*, 781 F.3d 42 (2d Cir. 2015). While judicial estoppel is often not an applicable doctrine in ADA cases, that is only where the apparently contradictory statements are made in different frameworks. For example, as explained in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), an application for Social Security Disability

benefits will require that an individual declare they are totally disabled. However, such disability for SSA purposes does not imply that that individual may not be able to perform work with a reasonable accommodation, making judicial estoppel inapplicable. Accordingly, the word "disability" can have different meanings in different contexts.

Judicial estoppel applies to specific allegations of fact whose meaning is clear, such as here, where Plaintiff made the clear assertion in her EEOC charge that, "[n]ot once did I ask the Firm to foot the bill as I explored new accommodations that would make working with LHON easier for me."

## POINT XI

## DEFENDANTS WERE UNDULY AND SIGNIFICANTLY PREJUDICED BY THE TESTIMONY OF PLAINTIFF'S WITNESS PETER COATES

Plaintiff further irreparably prejudiced Defendants with the testimony of Peter Coates, a witness whom Defendants had previously moved to preclude. His underlying testimony was patently absurd even if taken on its face and the nature of his allegations posed a can of worms that once opened could not be put back. Coates was a former Prakhin associate who had been laid off during COVID. [Tr. 1158]. Pursuant to the Joint Pretrial Order [Doc. 197], Coats would "testify about, *inter alia*, his knowledge regarding the deletion of SAGA records, the Firm's management of SAGA entries, and the spoilation of evidence relevant to this action." Coates, who was referred by Plaintiff's counsel to another attorney to bring a *Wieder*[5] claim against his

---

[5] A *Wieder* claim constitutes the single narrow exception to the at-will employment doctrine where an employer law firm is liable under the theory of an implied in law contract, when it takes adverse employment action against an attorney for refusing to act in violation of his/her ethical obligations. *Wieder v. Skala*, 80 N.Y.2d 628 (1992). This Court can take judicial notice of the Coates Complaint, available on NY State Court WebCivil Supreme website in Coates v. Law Offices of Yuriy Prakhin, P.C., Sup.Ct., Kings Cty., Index No. 527376/2022, Complaint at Doc. No. 1, which states a First Cause of Action for "Breach of Implied Contract pursuant to *Wieder v. Skala*, 80 N.Y.2d 628 (1992)" [**Error! Main Document Only.¶ Error! Main Document Only.**¶41-52], alleging that Coates was directed to "delete and change various SAGA entries " [**Error! Main Document Only.**¶12] which direction constituted "unethical and illegal activities" [¶14], precisely what

former employer, the Prakhin firm, was a loose cannon whose clear intention was to take shots against his former employer, without regard to the limitations placed on him at a Court hearing on December 19, 2022. [Court conference hearing transcript, Dec. 19, 2022 attached at Def. YP Ex. "I" at 52-54. When the Court asked if he would be testifying about "the firm's culture of unethical conduct, discrimination and retaliation," Plaintiff's counsel assured that he would not testify about these issues. However, by the end of his testimony, Coates admitted that he did not personally participate in or witness any acts of spoliation and that he did not delete any notes. Nor did he personally observe anyone else delete any notes relating to Plaintiff. He recanted his original claim that the alleged request to delete a SAGA note was illegal and unethical. [Tr. 1113-19, 1122-23].

Coates' testimony was a bell that could not be unrung. He caused irreparable harm by testifying that Prakhin regularly cheated associates at the firm out of bonuses they earned on settled cases and that one of the reasons for deleting a SAGA record was to show that an attorney had not done work on a case, therefore justifying denial of a bonus—an absurd claim he had to recant because, even if someone deleted a SAGA note, there were other ways based on the actual work in the computer and hard copy file that would show who worked on a given case. [Tr. 1011-1013, 1184-85]. Coates even testified that he suspected that the IT specialists working on his computer were involved in identity theft potentially from clients. [Tr. 1104]. He testified that the practice was negligently run as "on a daily basis, [there were] blown EBT dates, or missed court appearances for all the attorneys." [Tr. 1117]. Strangely, with all the horrible, illegal and unethical practices he claimed to be daily activities at the Prakhin firm, Coates asked to be rehired to work there again. [1199/2-11]

---

Coates testimony at trial acknowledged he had no knowledge whether such direction was unethical or illegal.

Even if there were some probative value to his testimony, the Court should exclude even relevant evidence "if its probative value is substantially outweighed by" the danger of, *inter alia*, unfair prejudice, or confusion of the issues, or misleading the jury, or wasting time. Fed. R. Evid. 403. The Court "[i]s not required to allow the trial to be diverted into an inquiry into an entirely different incident involving to a significant extent different people, places and events." *Lore v. City of Syracuse*, 670 F. 3d 127, 173 (2d Cir. 2012) (citing *Barrett v. Orange County Human Rights Commission*, 194 F.3d 341, 347 (2d Cir. 1999)). In *Lore,* the Court opined that the trial court properly excluded Lore's testimony even if it "would have provided additional evidence that Kerwin's actions were motivated by an intent to retaliate on account of Sgt. Lore's complaints of discrimination," because of the testimony leading to a diversion. *Id.*

## CONCLUSION

This Court should grant Defendants' motions for judgment as a matter of law, in the alternative, a new trial and/or for relief from the Judgment by dismissal pursuant to Fed. R. Civ. P. 60, and/or such other remedies that this Court deems proper.

Dated: New York, New York
          March 24, 2023

  /s/      AJR
          Alan J. Rich
          Law Offices of Alan J. Rich
          560 Montgomery Street
          Brooklyn, New York 11225
          (646) 541-5675

          *Attorneys for Defendant Yuriy Prakhin*