1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2     - - - - - - - - - - - - - - - X
       YELENA RUDERMAN,                 :19CV2987 (CBA)
 3                                      :
              Plaintiff,                :
 4     v.                               :
                                        :United States Courthouse
 5     LAW OFFICE OF YURIY PRAKHIN,     :Brooklyn, New York
       P.C., and YURIY PRAKHIN, in      :
 6     both his individual              :
       and professional capacities,     :February 6, 2023
 7                                      :2:00 p.m.
              Defendants.               :
 8     - - - - - - - - - - - - - - - X
              TRANSCRIPT OF CIVIL CAUSE FOR A JURY TRIAL
 9              BEFORE THE HONORABLE CAROL B. AMON
                   UNITED STATES DISTRICT JUDGE
10
                       A P P E A R A N C E S:
11
       FOR THE PLAINTIFF:    FARUQI & FARUQI, LLP
12                             685 Third Avenue, 26th Floor
                               New York, New York 10017
13                           BY:INNESSA M. HUOT, ESQ.

14                           TILTON BELDNER LLP
                               626 RXR Plaza
15                             Uniondale, NY 11556
                             BY:JOSHUA BELDNER, ESQ.
16
       For the Defendants:   BOND SCHOENECK & KING, PLLC
17                             600 Third Avenue, 22nd Floor
                               New York, New York 10016
18                           BY:MARY ELLEN DONNELLY, ESQ.
                               LOUIS DILORENZO, ESQ.
19                             MALLORY A. CAMPBELL, ESQ.

20                           LAW OFFICES OF ALAN J. RICH
                               250 West 57th Street
21                             New York, New York 10107
                             BY:ALAN J. RICH, ESQ.
22
       Court Reporter:  SOPHIE NOLAN
23                         225 Cadman Plaza East/Brooklyn, NY 11201
                           NolanEDNY@aol.com
24     Proceedings recorded by mechanical stenography, transcript
       produced by Computer-Aided Transcription
25
```

```
                        Proceedings                        2
```

1              (In open court.)

2          (The Hon. Carol B. Amon, presiding.)

3          THE COURTROOM CLERK:  Good afternoon.  We're calling

4    case number 19-cv-2987, *Ruderman v The Law Office of Yuriy*

5    *Prakhin*, civil cause for a trial.

6          May the parties please state your name for the

7    record starting with the plaintiff.

8          MS. HUOT:  Good afternoon, Your Honor.  Innessa Huot

9    from Faruqi & Faruqi for the plaintiff.

10          THE COURT:  Good afternoon.

11          MR. BELDNER:  Good afternoon, Your Honor.  This is

12   Josh Beldner, from the firm of Tilton Beldner for the

13   plaintiff.

14          MR. BURR DiMAURO:  Camilo Burr DiMauro from Faruqi &

15   Faruqi, also for the plaintiff.

16          MS. STANLEY:  Good afternoon.  Annabel Stanley from

17   Faruqi & Faruqi for the plaintiff.

18          MS. HUOT:  With us today we have Miss Yelena

19   Ruderman, the plaintiff, and also a paralegal from our office,

20   Mr. Matthew Gonzalez.

21          THE COURT:  Good afternoon.

22          Go to defendants.

23          MR. DiLORENZO:  Good afternoon, Your Honor.  Lou

24   DiLorenzo, along with Mary Ellen Donnelley and Mallory

25   Campbell, also from Bond Schoeneck & King.

Proceedings                                    3

1          THE COURT:  Okay.

2          MR. DiLORENZO:  And we'll all be participating in

3    the trial.

4          THE COURT:  You're all questioning witnesses?

5          MR. DiLORENZO:  Yes, Your Honor.

6          THE COURT:  Ms. Campbell?

7          MR. DiLORENZO:  Yes.

8          THE COURT:  Where is Ms. Campbell?  Okay.

9          MR. RICH:  For Yuriy Prakhin, Alan J. Rich from the

10   Law Offices of Alan J. Rich LLC.

11         THE COURT:  You've completed jury selection.  Is the

12   jury satisfactory to the plaintiff?

13         MS. HUOT:  Yes, Your Honor.

14         THE COURT:  Is the jury satisfactorily to the

15   defendant law firm and to the individual defendant?

16         MR. RICH:  It is, Your Honor.

17         MR. DiLORENZO:  Yes, Your Honor.

18         THE COURT:  I'm going to give opening instructions.

19   We'll have the jury sworn in.  I'll give open instructions and

20   then the plaintiff will give an opening statement.  The law

21   firm --

22         And are you all both giving opening statements?

23         MR. RICH:  Yes, Your Honor.

24         THE COURT:  With respect to the outstanding motions,

25   when is Dr. Falk supposed to testify?

Proceedings                                           4

1          MR. BELDNER:  He's the last witness, Your Honor, so

2     likely Friday.

3          THE COURT:  And what about Dr. Pillai?

4          MR. BELDNER:  I believe she's subpoenaed for

5     Wednesday.

6          THE COURT:  Who's scheduled to testify today?

7          MS. HUOT:  Plaintiff, Your Honor.

8          THE COURT:  I do not want to keep the jury waiting

9     so I'll take up the applications with respect to both of these

10    witnesses at the conclusion of the --

11         THE COURTROOM DEPUTY:  We're still waiting for a

12    few.

13         THE COURT:  Well, I guess let me ask a couple of

14    questions.  Apparently the jury is not back yet so I can ask

15    at least a couple of questions now:  Ms. Huot reading over

16    your submissions it is not clear to me how it was or when it

17    was that you acquired the additional records of Dr. Pillai.

18         MS. HUOT:  Your Honor, we just received them and we

19    produced them to the defendants --

20         THE COURT:  How did it come about that you just

21    received them?  That doesn't make any sense to me.  How did it

22    come about?

23         MS. HUOT:  At the conference with Your Honor at the

24    last hearing, defendants had referenced that Dr. Pillai's

25    records are incomplete.  We were very surprised by that and

Proceedings                                                5

1   before then, the defendants had sent a subpoena for records to

2   Dr. Pillai and asked our assistance in facilitating the

3   acquisition of those records.  After hearing defendant's claim

4   at the hearing which was on the record, we were very concerned

5   as well.  So we tried -- we facilitated the acquisition of

6   these records.  We called the hospital.  We called the

7   billing -- we called the records department and we tried to

8   expedite it as fast as we could.  We had the plaintiff call.

9   We did everything we could to get it as fast as possible.  We

10  had no idea what was in those records.

11          THE COURT:  Well, I don't understand.  The principal

12  problem with the records as I understand it is there were a

13  whole series of dates from September through November of 2018

14  of visits; correct?

15          MS. HUOT:  Your Honor, I believe the first visit was

16  September 28th.

17          THE COURT:  Okay.  But those are visits.

18          MS. HUOT:  Right.

19          THE COURT:  You've got a client.  Doesn't your

20  client know that the records don't contain the records of all

21  of her visits to the doctor?

22          MS. HUOT:  Your Honor, I believe they do contain --

23  the records did contain those dates.  It contains all the

24  information --

25          THE COURT:  No, that you originally provided it was

SN        OCR        RPR

Proceedings                                                6

1    only two dates 11/20 and 11/27.

2              MS. HUOT:  But the notes of those dates incorporated

3    the notes of the previous dates and when she received those

4    records she thought it was complete.  From -- frankly, from

5    how we understand these records are prepared is that each time

6    you go to the doctor they just add notes to the previous notes

7    and at the end they print everything out so the final know the

8    should have everything from the previous sessions.

9              THE COURT:  Do the final notes that were turned

10   over, the 11/2018 and the 11/27, do they refer to all the

11   other visits?

12             MS. HUOT:  Yes, Your Honor.  That's how we knew she

13   was at the doctors.  Your Honor, may I approach?

14             (Counsel approaches.)

15             THE COURT:  I have -- it visit date of 11/27.

16             MS. HUOT:  If you have 11/20, for example, that's

17   the one I'm looking at but even 11/27 has dates of all the

18   previous dates of the visits on page two three.  The

19   second-to-last page.  That's one example.  I can point to

20   another example.

21             THE COURT:  Okay.  So you're saying that because

22   these dates summarized all the other dates you're assuming you

23   had all the records.

24             MS. HUOT:  We also believed we had all the records

25   because plaintiff did her best to obtain all the records and

Proceedings                                                        7

1   this is what she was given and so we thought this was the full

2   records.

3           THE COURT:  Okay.  Now, let me turn to the -- to the

4   other set of records which is the records of the psychologist,

5   Falk.  I don't understand how you think -- how could you have

6   thought that the two-page letter were the full extent of his

7   records?

8           MS. HUOT:  Your Honor, we questioned him on this

9   issue and Your Honor you can as well, he did not have the

10  other notes.  It was during COVID time and I believe he didn't

11  have them or he didn't even know that he had them and all he

12  had was some appointment logs in a calendar.  Then, he did not

13  receive the initial subpoenas from the defendants.  They were

14  sent to the wrong address.  He didn't even know he had an

15  obligation to provide these.  He didn't even receive the final

16  subpoena from the defendant's until Mr. Michael Kravitz called

17  him and sent it to him internally through his e-mail at which

18  point he didn't know what to do and then he asked us and we

19  said give them everything you have.  Give them absolutely

20  everything.  We didn't even know the records until the

21  defendants had them.

22          THE COURT:  Well, what had he told you previously?

23  You were making certifications the entire time that you had

24  given them all the records.

25          MS. HUOT:  Absolutely and it's our interest to

Proceedings                                                    8

1    provide these reports and to have them.  He told us multiple

2    times that this is all he had.  That all he had was this

3    written up and that's what --

4          THE COURT:  It's two pages where he talks about the

5    case which was given to you I take it as an explanation of

6    what happened.  That was prepared for you.  It's not really a

7    record.

8          MS. HUOT:  Yes, that's right.  We were asking

9    multiple times -- the plaintiff checked multiple times.  We

10   were sure he had no records but now he explains that he did

11   not know he had these other notes until he got the subpoena

12   and he scoured his house and searched for his notes and he

13   found them and he produced them the day that he found them.

14   And all he had was calendar notations and he didn't realize

15   that that would have to be produced because it wasn't medical

16   records.  It was calendar notations of visits.  And he

17   provided it to the defendants.  He provided it to us.  We sent

18   it -- we provided it within two minutes of receiving it.

19         We had nothing to hide.  We wanted these records.

20   We tried to get them earlier.  We didn't know they existed.

21         THE COURT:  The jurors are here.  I'll hear from

22   defendants on this at the end of the day.  I am going to ask

23   you the same question about the jury; is the jury satisfactory

24   so it's on the record before the jury.

25         MS. HUOT:  Yes, Your Honor.

Proceedings                                              9

1          (Pause in proceedings.)

2          (Jury enters.)

3          THE COURT:  Good afternoon, ladies and gentlemen.

4    You can be seated now.  Let me ask is the jury satisfactory to

5    the plaintiff?

6          MS. HUOT:  Yes, Your Honor.

7          THE COURT:  Is it satisfactory to the defendant, the

8    Law Firm of Yuriy Prakhin?

9          MR. DiLORENZO:  Yes, Your Honor.

10         THE COURT:  And is it satisfactory to the individual

11   defendant, Yuriy Prakhin.

12         MR. RICH:  It is Your Honor.

13         THE COURT:  Good afternoon.  Let me just explain to

14   you why I want you to wear masks as opposed to a lot of people

15   who aren't wearing masks.  You're in such proximity to each

16   other that I think it's safer for you to take every precaution

17   that we can because I'm not sure this is all over.  You know,

18   you hear about numbers and all of that.  I put the screen up

19   so that the parties when they address you will -- there will

20   be protection there.

21         In any event, my name is Judge Amon and I am going

22   to be presiding over the trial in the civil action and you

23   heard something about the case earlier.  The plaintiff Yelena

24   Ruderman she's the plaintiff and in this action the plaintiff

25   is suing to recover for disability discrimination.  The

Proceedings                                                    10

1    parties against whom the suit is brought are referred to as

2    defendants and in this action there are two defendants; the

3    law office of Yuriy Prakhin PC and Mr. Prakhin in his

4    individual capacity.  Now, what I want to do is just give you

5    some opening instructions and let me address the most

6    important instruction that I have to give you right now and

7    that's not to discuss the case with anyone.  This includes

8    discussing the case in person, in writing, by phone,

9    electronic means, text messaging, e-mail, Twitter, Facebook,

10   Instagram, blogging, chat rooms, websites or any other ways in

11   which people communicate with each other.  So you may not use

12   any similar technology of social media to communicate about

13   this case even if I've not specifically mentioned it here.

14           Until you retire to deliberate at the end of the

15   trial you must not discuss the case with anyone including your

16   fellow jurors.  And the reason for that is before you -- you

17   hear all the evidence in the case, both sides and their

18   summations to you and the Court's instructions on the law.

19   That's the first time that you are to discuss the case when I

20   send you out to deliberate so it's important that you don't

21   start discussing the case after you hear one witness testify

22   without hearing the balance of the testimony.

23           If you have to tell someone such as your spouse or

24   employer that you are serving on a jury and approximately how

25   long the case is going to last, that's fine, but inevitably

Proceedings                                11

1   someone is going to ask you what the case is about.  Please

2   tell them you are under strict instructions from the court not

3   to discuss the case.  I think the reason for that is obvious;

4   we want you to is decide the case based solely on the evidence

5   in this courtroom and not on the basis of what anyone else has

6   heard about the evidence or thinks about the case.  If you are

7   asked or approached in any way about your jury service or

8   anything else about this case, you should respond that you've

9   been ordered by the judge not to discuss the case.

10          If someone does contact you about the case, you need

11   to report that to the Court as soon as possible, but do not

12   discuss that fact with your fellow jurors because if something

13   were to happen that would affect the ability of one juror to

14   serve fairly and impartially, we don't want it spread to the

15   rest of the jurors.

16          Along the same lines you should not try to access

17   any information about the case or do any independent research

18   on any issue that arises in the case from any out state side

19   sours.  In other words you should not be consulting

20   dictionaries, reference books or anything on the internet.  I

21   know there is a temptation for people to Google the parties or

22   the attorneys or some detail about the case.  Please do not do

23   that.  You as jurors must decide this case based solely on the

24   evidence presented within the four walls of this courtroom.

25          It's extremely important that you make your

SN        OCR        RPR

Proceedings                                                    12

1    determination in this case based only on the evidence that you

2    hear in this room and the instructions that I give you on the

3    law and not on anything else.

4              So, now want to tell you just a little bit about how

5    the trial will proceed.  The lawyers are going to make opening

6    statements and in the opening statements the attorneys will

7    give you an overview of the case and what evidence they think

8    will be produced.  You should understand that what is said in

9    these opening statements is not evidence.  The evidence will

10   come from the witness stand and from any exhibits that are

11   introduced.  So the lawyers are just going to review with you

12   what they think the evidence will show, but again remember

13   that those opening statements themselves do not constitute

14   evidence.

15             After the opening statements plaintiff will proceed

16   with the introduction of evidence.  After plaintiff has

17   completed the introduction of all of their evidence, defendant

18   may present witnesses and exhibits to establish their defense.

19   If defendants do present evidence, plaintiff is then permitted

20   if she wishes to offer additional evidence to rebut

21   defendant's evidence.

22             Each witness by whomever called is first examined by

23   the party who calls the person to testify and then the

24   opposing party is permitted to cross-examine that witness.

25   Now, in order to have the case proceed as expeditiously as

Proceedings                                                         13

1    possible, it may be that a witness called in the plaintiff's

2    case may also be a witness that the defendants wanted to call.

3    So in addition to just cross-examining that witness, the

4    defendant may, for example, wish to elicit evidence on their

5    case too.  So it's -- it's not going to be that necessarily

6    strict dichotomy between plaintiff and defendants case so we

7    do that so that you don't have to sit here for an extra week

8    where they recall the same person back to the stand.  So

9    that's -- that's a little bit of a different scenario.

10         Now, the evidence in this case will consist of the

11   following:  The sworn testimony of any witness no matter who

12   called the witness, all exhibits received into evidence

13   regardless of who may have produced the exhibits, the facts

14   that the parties have stipulated to and all facts that have

15   been judicially noticed that you must take as true for the

16   purposes of this case.

17         I don't know whether this -- they'll be offered in

18   this case or not, but depositions under certain circumstances

19   may also be received in evidence.  Depositions contain sworn

20   testimony which the lawyers for each party being entitled to

21   ask questions.  Deposition testimony may be accepted by you

22   subject to the same instructions that apply to a witness

23   testifying in open court.  Statements and arguments of the

24   lawyers are not evidence in the case and a -- and that is

25   unless made in the context of an admission or stipulation of

Proceedings                                          14

1    factors.  A stipulation is an agreement between both sides

2    that certain facts are true.  When the lawyers on both sides

3    stipulate or agree to the existence of the fact, you must

4    unless otherwise instructed accept the stipulation into

5    evidence and regard that fact as proved.

6            Now, upon the completion of the introduction of

7    evidence the attorneys will make closing statements or

8    summations to you.  In summing up, the attorneys will tell you

9    what they believe the evidence has shown, what inferences they

10   believe you should draw from the evidence and what conclusions

11   they believe you should reach.  Once again, what the attorneys

12   say in their closing statement is not evidence.  The plaintiff

13   sums up first followed by the defendants and then the

14   plaintiff because she bears the burden of proof has the

15   opportunity to make a short rebuttal summation.

16           Now, it's your job to determine the facts.  That's a

17   very important role that you have.  As judge, I have no role

18   at all to Pillai in your determination of the facts.  I will

19   instruct you on the applicable law and you will then retire

20   for your deliberations.  Your function as jurors is to

21   determine what the facts are and apply the rules of law that I

22   give to you to those facts as you determine them to be.  The

23   conclusion you reach will be your verdict.  You will determine

24   what the facts are only from the testimony and the exhibits.

25   You are the sole and exclusive judges of the facts.  I do not

Proceedings                                                          15

1   intend to express any opinion concerning the facts.  If

2   anything I say gives you the impression that I have some

3   opinion of the facts, please disregard it.

4          On the other hand, you are bound to accept the rules

5   of law as I state them.  If you perceive that the law as

6   stated by the lawyers is different than the law stated by me

7   it's my instructions on the law that you have to follow.  At

8   times during the trial an attorney may stand to object to

9   evidence or to a question and what they are doing is asking me

10  to make a ruling of law on the admissibility of evidence.

11  Arguments in connection with those objections are sometimes

12  made outside the presence of the jury.  In other words, I may

13  call the lawyers over here outside of your hearing to discuss

14  their objection.

15         If I sustain an objection, I mean that I think the

16  law does not permit the evidence in question and you are to

17  disregard the questions asked ask and you are not to speculate

18  about how it might have been answered.  You simply do not have

19  any evidence before you on the subject.  If I sustain an

20  objection after an answer is given, I will strike the answer

21  meaning that you are not to consider it at all in your

22  deliberations and you are to act as if that answer had never

23  been given.  If I overrule an objection, it means that I find

24  the law allows the evidence to come before you.  You should

25  not however attach any special weight to evidence that comes

SN        OCR        RPR

Proceedings                                                      16

1   in over objection.  You consider it together with all

2   evidence.

3            Any ruling I make upon such objections of motions

4   will be based on the law.  You must not infer from any such

5   ruling or anything I say during the course of the trial that I

6   express any views as to facts for or against any party to the

7   lawsuit.  I might ask a question of a witness, but I do so

8   solely to bring out matters that I think ought to be brought

9   out and not to indicate any opinion about the facts or the

10  weight you should give the testimony of that witness.

11           Again, you must base your verdict based only on what

12  you see and hear in the courtroom.  Please do not discuss the

13  case, as I said to you before, even among yourselves until all

14  the evidence has been presented and I have instructed you on

15  the law and directed you to begin your deliberations.  You are

16  not to discuss the case even among yourselves before that time

17  and as I said earlier the reason for that is it's important

18  you to keep an open mind and make sure that you hear all the

19  evidence before you discuss the case.

20           Now, the as the sole judges of the facts you must

21  determine which of the witnesses you believe, what portion of

22  their testimony you accept and what weight you attach to it.

23  The law does not require you to accept all the evidence

24  admitted.  In determining what evidence you will accept, you

25  must evaluate the testimony of each witness and determine the

Proceedings                                                  17

1   weight to give it.  There is no magic formula with which to

2   evaluate testimony.  You bring with you all of the experience

3   and background of your lives and every day affairs.  You

4   determine for yourselves the reliability or unreliability of

5   statements made to you by others.

6          The same tests that you use in your everyday

7   dealings are the tests which you should apply here.  The

8   interest or lack of interest of any witness in the outcome of

9   the case, the bias or prejudice of the witness if there be

10  any, the appearance and manner in which the witness gives his

11  or her testimony on the stand, the opportunity the witness had

12  to observe the facts concerning which he or she testified.

13  The probability or improbability of the witness' testimony

14  when viewed in light of all the others in the case are all

15  items to be taken into consideration in determining what

16  weight, if any, you give to that witness's testimony.

17         Also please do not have any discussion with any of

18  the attorneys, parties or witnesses in this case.  By this I

19  mean not only converse about the case, but do not converse at

20  all even to say hello.  It's very important that we maintain

21  the appearance of propriety and if someone saw a juror talking

22  to a party or a lawyer, that person could think that something

23  improper was being discussed.  And the lawyers as officers of

24  the court are particularly sensitive to this.  So if you see

25  one in the lobby downstairs and they turn and walk the other

1   way, they don't mean to be rude.  They just know how important

2   this is.

3            We will now turn to the opening statement for

4   plaintiff's counsel.  But first we have to swear the jurors in

5   thoughDPI.

6            THE COURTROOM DEPUTY:  Please stand and raise your

7   right hand.  Do you each of you solemnly swear or affirm that

8   you will well and truly try this case before you and a true

9   verdict render according to the evidence and law.

10           (Chorus of yeses.)

11           THE COURTROOM DEPUTY:  Thank you.

12           THE COURT:  You can begin Ms. Huot.

13  OPENING STATEMENT

14  BY MS. HUOT:

15           MS. HUOT:  I am a businessman.  I don't know how

16  you'll handle your cases with your condition.  I don't how

17  this is worth it for me, but if your condition improves you're

18  welcome to come back.  Those are the words of your Yuriy

19  Prakhin, owner of the Prakhin Law firm.  Those are the words

20  that he used when he fired my client, Yelena Ruderman, just 16

21  days after she disclosed to him that she was just diagnosed

22  with a permanent, uncurable and life-altering disability.

23           Members of the jury, we're here today because

24  Mr. Prakhin fired Yelena because of her disability, because of

25  her loss of vision.  The defendants will claim that they fired

1   her for different reasons like her poor work performance, but

2   none of those reasons will be supported by any of the evidence

3   or the timeline of events in this case.

4          Yelena began her legal career at Mr. Prakhin's firm

5   even before she was admitted to the bar.  She worked there for

6   five years as an attorney.  She received no complaints, no

7   issues with her work.  Every year she received raises and

8   bonuses.  No issues.  In early 2017 she left the firm to

9   pursue additional responsibilities at another law firm.  She

10  was thriving, so much so that Mr. Prakhin recruited her back.

11  He recruited her back.  He wanted her to come back to the firm

12  less than 15 months after she left.  He promised her more

13  money, paralegals, he promised her a financial stake in the

14  cases that she has.  She was so excited.  Her career was

15  really moving.  She got to the firm and in September of 2018,

16  just three months later, something really traumatic happened,

17  unexpected.  All of a sudden she couldn't see.  She started

18  losing her vision.  She had no idea what was wrong with her.

19  She told everybody she had no idea.  Just figuring out what

20  was wrong with her was an ordeal in and of itself.

21         In October and November right after this started

22  happening she took days off from work.  Some days she had to

23  go to the doctors.  All of these days were unpaid.  She had to

24  go to the doctors she had to get tests she had to figure out

25  what was wrong with her.  She had to get treatments.  She even

Huot - Opening statement                    20

1   was hospitalized and spent Thanksgiving the whole week in the

2   hospital.

3           Over these two months her vision completely

4   deteriorated.  She had still no idea what was wrong with her.

5   After numerous rounds of steroids, after numerous MRIs, after

6   spinal taps, after plasma procedures, after hospitalization,

7   on November 26 she finally received the devastating news:  Her

8   vision loss was caused by a genetic disease called Leber

9   hereditary optic neuropathy, also known as Lebers or LHON.

10  There is no cure for this.  It's permanent.  She will never be

11  able to see the world again the way she did before.

12          Yelena told everybody about her diagnosis including

13  Mr. Prakhin.  She received some supportive.  She received

14  messages from her coworkers like, we got you, we're here for

15  you, we'll help you, but she knew she was capable of working.

16  She knew she was capable of handling her cases.  After all

17  there's lots of blind lawyers out there and she did just that.

18  After she disclosed her diagnosis to Mr. Prakhin she did not

19  miss a single day of work.  She took the initiative to

20  research assistive devices that she could use to help her

21  during her job.

22          She came to Mr. Prakhin and the law firm and made

23  six requests for reasonable accommodations.  She asked for six

24  devices.  Each time she was denied.  First on three separate

25  occasions she asked for three magnifying devices that would

Huot - Opening statement                    21

1   help her read the pages.  Each time denied.  Then she went to

2   Mr. Prakhin and the firm and asked if he can buy her these

3   special glasses called or OrCam glasses that kind of read to

4   you.  Denied.  She was told don't hold your breath.  She then

5   went and purchased them herself.  They were so expensive,

6   thousands of dollars they cost.  She came back to Mr. Prakhin

7   and said, will you help me pay for these?  No, no.

8           Next, number four.  She asked can I get this

9   software called Dragon Dictation.  I've heard of it.  You can

10  talk into it and it types for you.  No.  You can't have it.  I

11  purchased it before for somebody else.  It could be somewhere

12  in the office.  Go find it.  She asked her office manager.

13  She asked Mr. Prakhin again, the office manager again.  Nobody

14  gave it to her.

15          Finally she went to Mr. Prakhin and said I found

16  this software called Jaws.  It's for the vision impaired.  It

17  assists them.  You can put it to the computer.  I heard it's

18  really helpful.  Will you please get it for me.  No.  And not

19  only that not only did he say no, I won't even pay for it to

20  be installed.  So she got a friend.  She got a friend to come

21  into the office to help her install it.  She had trouble

22  installing it she couldn't do it.  He wouldn't help her and he

23  caused her to uninstall it because he was too worried that it

24  would mess up his computers.

25          The next day after she disclosed her disability he

1   didn't help her.  Instead he tried to push her out by having

2   her file for disability.  She didn't want to file for

3   disability.  He didn't ask her once or twice.  He asked her

4   day after day after day.  He demanded that she go out on

5   disability.  Ms. Yelena Ruderman thought filing for disability

6   meant telling the federal government that I'm incapable of

7   working.  But she knew she was not incapable of working.  She

8   wanted to work.  She just wanted to be given the chance to

9   work.  She said no, I don't want to go on disability.  I want

10  to work.

11          Instead of helping her, or accommodating her, he put

12  roadblocks and obstacles in her way.  He didn't give her a

13  chance and then 16 days after she disclosed this to him, he

14  fired her.  On December 14th 2018, Mr. Prakhin called her into

15  the office and explicitly fired her for the specific reason

16  that she's blind.  The words that Mr. Prakhin used are etched

17  in her mind for the rest of her life:  I'm a businessman.  I

18  don't know how you'll handle your cases with the condition.  I

19  don't know how this is worth it for me, but if your condition

20  improves, you are welcome to come back.

21

22          (Continued on the following page.)

23

24

25

1   (continuing.)

2          MS. HUOT:  My name is Innessa Huot and together with

3   Josh Beldner, Camilo Burr and Annabel Stanley, we have the

4   privilege of representing Yelena Ruderman.

5          Over the course of this trial, we will demonstrate

6   that Mr. Prakhin and the Prakhin firm fired her simply because

7   of her disability and that the result of the conduct of the

8   firm and Mr. Prakhin, Yelena suffered significant loss of

9   finances, she suffered financial loss and significant

10  emotional distress.

11         Being fired in such a cold and abrupt way had a

12  lasting impact on her psyche.  She knew she could be a lawyer.

13  She knew she was capable of working, but instead of supporting

14  her, this firm just pulled the rug right from under her feet.

15  This firm that was supposed to help her, to support her.  She,

16  effectively, spent her entire career at this firm, but they

17  would not help her, and they fired her immediately, and that

18  caused her to suffer panic attacks, anxiety, severe

19  depression, sleeplessness, loss of appetite, and a whole range

20  of other significant emotional distress, real emotional

21  distress.  Despite that emotional trauma that she was

22  undergoing, she made every effort to get back on her feet.

23         Immediately after she was fired she applied to

24  hundreds -- literally hundreds of other legal positions, but

25  because of the onset of COVID and the general downturn of the

*Opening Statement - Huot* 24

1    market, it was very hard to get a full-time job, but she still

2    tried and what she did get was per diem jobs where you worked

3    for a firm; not on a continual basis, but as they want to hire

4    you.

5         Just one month after she was fired, she handled --

6    she assisted in handling a one-week long trial, just one month

7    after she was fired with the use of those assistive devices.

8    She handled this for a different firm, and then she continued

9    working for numerous other firms doing exactly the same thing

10   that she was doing at Mr. Prakhin's firm.  She handled

11   literally hundreds of depositions.  She made court

12   appearances, she reviewed documents, she prepped clients, and

13   she did all of that with the use of her assistive device that

14   he never gave her a chance to use.

15        All, during this whole time, she was also still

16   applying for full-time jobs, and finally, on April 22nd, 2022,

17   she landed her full-time job, and now she works, to this day,

18   at American Transit Insurance Company, as a lawyer where she

19   represents clients, she does depositions, she does

20   arbitrations, she goes to court hearings, she reviews

21   documents, she preps clients, she does literally everything

22   she used to do before with the use of her assistive devices.

23        Yelena's disability does not interfere with her

24   ability to do work.  She has very sophisticated devices.  She

25   as a MAC desktop computer that has accessibility features.

1   She has special software that reads to you.  She has software

2   that types what you speak at a level that's much higher and

3   much higher quality than the text-to-talk that we're used to

4   on our cell phones.  She also has special devices that zoom in

5   on portions of the page so she can read them because they're

6   bigger and zoomed in.  She can call -- she can make phone

7   calls and text just like all of us.

8           This case will be proven through Yelena's own

9   testimony.  It will also be proven through the testimony of

10  her treating physician, Dr. Pillai, and also her direct

11  supervisor at the Prakhin firm.  The person who was directly

12  overseeing her work will testify here, and you will hear the

13  testimony of that supervisor and her other colleagues who were

14  with her, performing work side-by-side with her when she

15  started losing her vision and when she was fired.  And you

16  will also hear testimony from Yelena's subsequent employers

17  who will testify to the quality of her work.

18          Dr. Pillai, I mentioned, was her physician from NYU.

19  She treated Yelena and she was a driving force of figuring

20  out, what was wrong with her vision loss?  It was very

21  difficult to figure out at first, like I explained, but

22  Dr. Pillai prescribed a ton of treatments, a lot of different

23  tests, and finally she determined that she was suffering from

24  Leber's.  Dr. Pillai referred her to a different hospital, to

25  Columbia, to get a blood test to confirm that it was, in fact,

1    Leber's and on November 26, 2018, it was confirmed that she

2    was positive for Leber's.

3            There is no cure for this, but Dr. Pillai shared

4    some inspiring words with her.  She said:  You don't have to

5    stop living your life.  You don't have to retreat.  You can

6    continue working.  There's devices out there.  There's

7    organizations that can help you.  Get back on your feet.  Go

8    back to work.  Do your job.  And that's exactly what she

9    wanted to do, had she been given the chance.

10           Irene Gabo will also testify.  Irene Gabo was

11   Yelena's direct supervisor.  She was her direct supervisor for

12   over five years.  Ms. Gabo started her own practice in October

13   of 2018, but she continued working for the Prakhin firm, with

14   the Prakhin firm and she continued working specifically with

15   Yelena up until Yelena's termination.  As managing attorney,

16   Ms. Gabo had the best opportunity to evaluate the performance

17   of dozens of attorneys that worked there during her tenure.

18   She knows what the standards are.  She knows what constitutes

19   superior performance, adequate performance, and sub-par

20   performance, and she knows what conduct causes other attorneys

21   to be fired, and she will come here and she will testify

22   frankly about where Yelena stacks up compared to everybody

23   else.

24           You will also here from Sandra Beron and some of

25   Yelena's other colleagues that worked with her during the time

1   she was losing her vision.  These witnesses will also attest

2   to plaintiff's performance and she was able to do her job, and

3   they will also tell us about the policies of the firm; such

4   as, paralegal use, absences, cell phone use, doctor notes,

5   personal email addresses, and a whole slew of other excuses

6   that the defendants have come up with as to why they actually

7   fired plaintiff, Yelena Ruderman.  All except for blindness.

8          You will also hear from a number of Yelena's

9   subsequent employers who will tell you that Yelena performed

10  work for them very well and the quality of her work, they will

11  attest to.  These are the people that hired Yelena after she

12  had already lost her vision.  After Yelena had already used

13  assistive devices to do work for them, they will testify as to

14  how she handled hundreds of depositions and how she performed

15  very similar work for them that she did when she was working

16  at Prakhin firm.

17         In a few minutes, you will hear from defendants.

18  You will hear defense counsel come up here and throw out a

19  bunch of excuses for why they fired her.  They will throw out

20  a bunch of explanations.  Not only are these explanations

21  fabricated, they are actually inconsistent with one another.

22  I'm sure that at some point in this trial the defendants will

23  actually deny that Yelena has a disability.

24         Then, defendants will claim she's too disabled to do

25  work.  Then we expect them to claim they actually had no

1    obligation to accommodate her, because she didn't give us a

2    doctor's note, but the evidence will show they never once

3    requested a doctor's note, ever.  Surely, she would have just

4    provided it.  Why spend thousands of dollars if I could give

5    you a note?

6            On top of that, we expect the defendants will also

7    claim that they did accommodate Yelena by actually physically

8    allowing her to go to the doctor and be hospitalized, and then

9    they accommodate her by forcing her to try to go on disability

10   leave.

11           At the conclusion of this case, you will hear from

12   Judge Amon and she will explain to you exactly what a

13   reasonable accommodation is, and you will understand, and you

14   will see that that does not qualify as a reasonable

15   accommodation.

16           Members of the jury, you will see the truth through

17   this.  Rather than helping Yelena, Mr. Prakhin just took the

18   easy way out.  He just fired her.  And that's in violation of

19   the federal, state, and city laws.

20           You may have heard of the Americans with

21   Disabilities Act.  You may have also heard about the New York

22   State Human Rights Law, and the New York City Human Rights

23   Law.  At the federal, state, and city level, we, as a society,

24   have passed laws prohibiting employers from treating employees

25   differently because of their race and their religion and

1   disability is no different.  Not only is discrimination

2   immoral and wrong, but it's also illegal.  These are the laws

3   that prohibit discrimination, and these are the laws that

4   apply in this case.

5          At the end of the this case, we will demonstrate how

6   the evidence presented during the trial will support Yelena's

7   claims under these laws.  The evidence will also show the

8   emotional distress that she suffered as a result of these

9   unlawful actions.

10          As you pay attention to this case, please look

11  through the lens of common sense, the same common sense you

12  use in your everyday life.  Not everything is complicated.

13  Sometimes the most obvious answer is the answer.  The

14  clearest.

15          MR. DiLORENZO:  I hate to object during an opening,

16  but I think this is argument.

17          THE COURT:  Why don't we wrap it up, okay?

18          MS. HUOT:  Yes, Your Honor.

19          The clearest evidence to support Yelena's claim is

20  the timeline of events.  That evidence can't be skewed.  It's

21  a fact.  It's plain and simple.  The fact is that Yelena was

22  fired 16 days after she disclosed her diagnosis to Mr. Prakhin

23  making him aware that her disability was permanent.  She was

24  given no chance to show her ability to continue working.  A

25  new attorney was hired immediately and she was pushed right

1   out the door because simply, by his own words, Mr. Prakhin is

2   a businessman and keeping a disabled employee just wasn't

3   worth it for him.

4           Members of the jury, once you've heard all the

5   testimony and considered all of the evidence, it will be clear

6   that the claims of Yelena will be proven by more than a

7   preponderance of the evidence.  You will see that the only

8   fair verdict, the only just verdict, the only verdict

9   consistent with the evidence in this case is a verdict in

10  favor of Yelena.

11          Thank you all so much for your time.

12          THE COURT:  Who is going for the law firm?

13          Mr. DiLorenzo, are you going to give an opening?

14          MR. DiLORENZO:  Yes, for the law firm, thank you,

15  Your Honor.

16  OPENING STATEMENT

17  BY MR. DiLORENZO:

18          MR. DiLORENZO:  Good afternoon, everyone.

19          My name is Louis DiLorenzo.  I represent the law

20  firm in this case.  Over at our defense table, that's Mary

21  Ellen Donnelly, who is also from my law firm and she's going

22  to be representing the Prakhin law firm as well.

23          Alan Rich is representing Mr. Prakhin individually

24  because he was sued by the plaintiff individually, not just

25  his law firm.

1    Next to him is Mallory Campbell who is also from my

2 law firm, and you will see all of these lawyers questioning

3 witness and participating.  I'm just doing the opening

4 statement.

5    Mike Kratochvil is a lawyer and learning for us.  I

6 don't want to represent to you that he's actually an attorney,

7 but he will be soon.

8    So that's our team.  Sometimes when I give an

9 opening statement like this, I think I'm in the wrong

10 courtroom because what I just heard is not the case that I

11 understood we're here for.

12    This case is about two people, basically; primarily

13 two people.  Mr. Prakhin and the plaintiff, Yelena Ruderman.

14 Two people and two decisions that each of them made, and those

15 decisions bring all of us together here in this courtroom, all

16 right?

17    Now, talking about twos, there's at least two

18 reasons why the proof in this case is going to show you Yelena

19 Ruderman cannot win her case; she cannot recover under these

20 disability statutes:

21    The first one is that the time she was terminated

22 from her job, she was not doing her job, and the evidence will

23 show that.

24    The second one -- the second reason is that she

25 decided on her own that she did not want to be considered as

1    disabled; she did not want to take a disability leave even

2    though she wasn't able to perform her job at the time, even

3    though she wasn't sure of what exactly her disability entailed

4    and what she would be able to do or not do, and she didn't

5    have a device or a reasonable accommodation that she ever

6    presented to the employer.

7              Two things that I want you to pay attention to that

8    you just heard:  One is, we never got a note from a doctor.

9    Despite the fact that during that two-and-a-half, three-month

10   period that the plaintiff's attorney was just talking to you

11   about, that she went out -- went out for different times and

12   was away from work, absent, never got a doctor's note saying I

13   was at the doctors, I was at the hospital, this is what's

14   going on.  If she was telling everybody, she wasn't telling

15   Mr. Prakhin, she wasn't telling the office manager.  She

16   missed some 25 days during that time period.

17             And it was mentioned that she had two paralegals

18   that were given to her at work -- and I'm going to talk about

19   them in the minute -- but you are going to see them testify

20   and they are going to tell you what it was like for them to

21   try to do their job when their boss was gone 25 days out of a

22   two-and-a-half-month period, and how she wasn't doing her work

23   and she wasn't supervising their work, and they were being

24   asked to go above and beyond what paralegals in that office

25   are asked to do.

1           All right.  So as I said to you, the evidence is

2    going to show that she wasn't terminated because of her

3    disability and she wasn't denied any accommodation because

4    none was presented to her -- reasonable or otherwise.

5           The evidence will show that she did work previously

6    for the Prakhin law firm.  She worked from 2012 to 2017.  The

7    conditions she worked under was, she was basically a junior

8    associate, didn't have a lot of cases, and she had a

9    supervisor that the plaintiff's attorney mentioned to you, a

10   woman by the name of Irene Gabo, who is going to testify.

11   That was her supervisor during that five-year period, and she

12   worked closely under the supervision of Irene Gabo.

13          And it's true that when Mr. Prakhin needed somebody,

14   he reconnected with the plaintiff and he brought her back to

15   the firm in 2018, roughly, I think June of 2018.  And she came

16   back to that job still under the supervision of Irene Gabo,

17   who worked there every day, who was the managing attorney at

18   the time, and a limited number of cases that she handled.

19   Maybe 50 -- 40, 50, 60 cases.  The numbers aren't exactly

20   clear.

21          And then in September of that year, two significant

22   events occurred that affected her second period of employment.

23          The first was that Irene Gabo, after working many,

24   many years as a managing attorney at the firm, decided to open

25   her own office, so she left.  Because she left, her 200-plus

1    cases had to be divided among people at the firm.  One of the

2    only choices was giving the plaintiff, Ms. Ruderman, a hundred

3    of those cases.

4            So, now, here's what's happened in her professional

5    life:  She's been given a hundred cases.  We also learned

6    while she was gone, she really didn't acquire the experience

7    that she represented when she returned; that she had become a

8    trial lawyer in the meantime, that really wasn't true -- she

9    was given a hundred cases, and in addition, she lost her

10   supervisor, the person that she worked with closely to help

11   her manage the cases.  So now her caseload has tripled and

12   she's lost her mentor Irene Gabo.

13           In addition to that happening in September, she

14   develops a very unfortunate personal problem.  Her vision

15   becomes blurry.  She doesn't know what it's caused by, she

16   goes to several doctors, you will hear about it.  She can't

17   get diagnosed.  As the plaintiff's lawyer said, nobody can

18   figure out what's wrong with her.  This goes on for months and

19   months.

20           Now, it's going to be important for you and you're

21   going to hear a lot of evidence as to what this job is like.

22   The Prakhin firm is a personal injury firm, represents people

23   from all walks of life, everyday life, all kinds of

24   activities, they get injured by some kind of wrongdoing and

25   they're entitled to recover damages, and they sue for those

1    damages.  People from all walks of life.  Those are the

2    clients of the Prakhin firm.

3           The associates that work there as attorneys do all

4    the work that you would expect personal injury lawyers to do.

5    They meet with clients, they intake the case, they conduct

6    depositions, they defend depositions, they make court

7    appearances, they prepare pleadings, they read documents, they

8    spend a lot of time with medical records.  That's a real

9    important part of the job, evaluating medical records and

10   medical injuries.  So they do all those things.  They get

11   cases ready for trial.  Some of them try cases and some of

12   them don't.  If they don't try them, they still get them ready

13   for trial.  So those are the duties that are going on.

14          Now, when Ms. Ruderman suffers the changes in the

15   job, as well as the problems with her blurry vision, the

16   evidence will show you that that took a severe toll on her.

17   Understandably.  A lawyer who thinks he or she is losing their

18   sight, I can't imagine what that does.  As you will hear from

19   the evidence, Ms. Ruderman had already been diagnosed with

20   anxiety.  She had already been seeing doctors to treat her for

21   anxiety.  So one can only imagine what it was like to pile on

22   top of those problems that you will hear about, what it was

23   like to think you might lose your sight and, perhaps, lose

24   your job or your livelihood, being able to support yourself.

25   You will hear about all of that.

1          And what the evidence is going to show is that she

2   denied that had she had a disability.  She denied that this

3   was a problem that would prevent her from doing her job.  And

4   what she did was, she tried to handle her job and handle the

5   disability on her own.  Never bringing a doctor's note in,

6   never demanding an accommodation.  You will hear her --

7   shortly afterwards, you will see a sworn statement that she

8   signed saying that that she not even once asked the firm to

9   pay one penny for an accommodation that she needed.  Not once.

10  Which is a lot different what we just heard the evidence is

11  going to show.  She bragged about that.  She said:  I'm not

12  disabled.  I can do my job.

13         And what was happening, in fact, while she's making

14  this bad decision under incredible stress and anxiety, this

15  bad decision that "I can handle this, I can get away with

16  doing my work, and I can still handle the disability, I know I

17  can."  That's the decision she made on her own.  Remember,

18  she's a personal injury lawyer.  She understands medical

19  records and medical issues.

20         On top of that, her mother's a doctor, so this is

21  not unfamiliar ground for somebody to be dealing with and try

22  to make a good decision.  She made a bad decision.

23         Around the same time in September, when Ms. Gabo

24  leaves, to help her with these cases she was given two

25  paralegals.  And those two paralegals are going to testify

1    that during this period of time -- September, October,

2    November, December -- they were doing her work.  To the point

3    where, at least on one occasion, one of them had to file a

4    complaint without her reviewing it to make sure they didn't

5    miss the statute of limitations, and these are for regular

6    people that have injuries that are entitled to money for their

7    injuries.

8             Those cases, those paralegals will tell you that

9    they were forced to do work without supervision, without

10   having their work checked, it was sent out without it being

11   reviewed by her.  If she -- if she was in the office, which

12   they will tell you was a problem -- and they talked to her

13   about that:  You've got to come in to get this work done.

14   They weren't sending e-mails saying:  We've got your back,

15   don't worry about coming in.  One of them sent a message

16   saying:  You've got to get your ass in here, we need you,

17   somebody has to help us do this work.  So we've got two

18   paralegals doing that work.

19            Does Mr. Prakhin know about that?  Oh, you bet he

20   does.  The paralegals complained to him.  They said, we're

21   doing her work, the work for the clients.  The clients don't

22   know paralegals are doing it who are paid a lot less than her.

23   The clients think the work is being done by attorneys.  They

24   complained to Mr. Prakhin.  They complained to the office

25   manager.  You will hear them both testify about their

1   complaints they got from those paralegals.

2           She will admit to you, you will hear it from her own

3   both because she's already admitted it, that she went to a

4   deposition and she couldn't see a videotape that was played

5   about an accident.  And she talked about it afterwards, almost

6   laughingly, with one of the paralegals that I had to fake it

7   in the deposition, I couldn't even see the videotape.  That

8   was a client's rights being litigated in that deposition room,

9   and her testimony was, I faked it.  That's what Mr. Prakhin

10  was faced with.

11          Unable to determine the medical problem, she

12  experimented, in her own words, trial and error with different

13  things that she saw on the internet.  Again, because she's

14  going to handle this herself.  She's going to handle the

15  disability and keep working despite, as you heard from the

16  plaintiff's lawyer, repeated suggestions that she go on

17  disability leave.

18          If somebody is disabled and having trouble doing

19  their job, the experience is, you take a disability leave.

20  Get things sorted out.  If you can come back, you come back.

21  But things have to be taken care of.  We can't have trial and

22  experiment at the sake and expense of clients and their legal

23  rights.  It doesn't work that way.  Paralegals don't do the

24  work and you don't go to depositions and fake it while you're

25  trying to sort out personal problems and issues that are

1    interfering with ability to do the job.

2        Despite the requirements in the handbook, despite

3    repeated requests, we never got the doctor's note saying

4    here's what's wrong with her, here's what she can do, here's

5    what she's can't do.  No doctors note.  During this entire

6    period of time.  Up to the time that she was terminated.  No

7    doctor's note.  No request for an accommodation.

8        Discussion about things such as:  Can I have a

9    magnifying glass, can I have a magnifying page?  Those were

10   given to her at no expense to her.  Those were easy ones.  My

11   vision is a little blurry, do you think I can have a

12   magnifying glass?  Of course.  And she got it.  She admits she

13   got it.

14       The last thing that was going on during that period

15   was her failure to communicate with clients.  We're actually

16   going to have some clients come in to testify.  Two of the

17   clients.  There were several who complained to Mr. Prakhin.

18   Two of them insisted oncoming in to the office to see him in

19   person to tell him they were going to be pulling their case to

20   another law firm because Ms. Ruderman was not returning their

21   calls.  The paralegals will tell you they kept getting calls

22   from the clients.  And they're not supposed to give legal

23   advice to the clients on the phone.  They will talk to you

24   about what it was like to get those calls.

25       Mr. Prakhin, the head of the firm.  So we've talked

1   about one of the decisions made, right?  The decision she made

2   that she was going to handle her disability, keep her job, and

3   everything was going to be fine, except she wasn't doing the

4   job.

5           It's not to say she couldn't do the job.  It's to

6   say that at that time, that moment, with somebody who had the

7   anxiety problems she had and was dealing with how this is

8   going to affect her life, she didn't do her job.  It didn't

9   happen.  Mr. Prakhin, the head of the firm, a firm with his

10  name on it, is a successful attorney, it's a successful law

11  office, there's 20 people that work there, there's 20

12  employees at that law firm.  It's his responsibility to bring

13  the clients in, to work, to make sure the work gets done, and

14  make sure he meets that payroll every week, every day, every

15  month.

16          And these situations were affecting the rights of

17  the firm's clients and she wasn't properly communicating with

18  them.  We weren't having attorneys pay attention to what

19  matters.  The paralegals were doing the work.  Her absences in

20  this office, in the afternoon the day before appearances, the

21  office manager would schedule appearances, see who's going to

22  Brooklyn, who is going to New York, who is going to Queens and

23  try to cover all the appearances with the least amount of

24  lawyers as they could.  You will find out that oftentimes her

25  absences were on short notice where there was no -- she was a

1    no-show no-call, which forced a scrambling of coverage of her

2    cases, and her appearances as well as other appearances by

3    other attorneys in the office.

4              So we've talked about her decision that she wanted

5    this to work this way.  I don't blame her.  I think it was a

6    bad decision, but it wasn't my decision.  I have no idea what

7    she was going through.  I can't imagine what it was like, but

8    it was a bad decision because something had to give, and what

9    gave was the job.

10             Mr. Prakhin had to make his decision.  He had to

11   decide:  What am I going to do for the good of my law firm?

12   What am I going to do for the good of my clients?  What am I

13   going to do for the good of my reputation?  And despite

14   repeated requests from him and the office manager for the

15   medical information that we just talked about, we didn't

16   get -- they didn't get.  And eventually, he had to make the

17   decision.

18             As you heard several times, it was suggested that

19   she take a disability leave of absence, and at the end, he

20   finally called the question and said look, you've got to

21   take -- either go on leave or I'm going to have to terminate

22   your employment.  And that's what ended up happening.  The

23   employment was terminated.

24             The second decision made by Mr. Prakhin was forced

25   by her decision.  And her decision was voluntarily made.

1   She's a well-educated woman, she's intelligent.  She made that

2   decision, and now she's got to live with it.  His decision

3   came from hers.  She said to him -- and she continues to say

4   she's not disabled, she wants to work.  That's what happened.

5          Now, you are going to hear, as the plaintiff's

6   attorney told you, you are going to hear a great deal of

7   evidence as to what happened after she left the firm.  You are

8   going to hear -- you heard that she went on hundreds of

9   interviews.  Well, four interviews that she testified about

10  were with big law firms.  She went and applied for a job.

11         And she testified at her deposition, which the judge

12  has already mentioned, the deposition testimony that we're

13  hearing about in this case.  In her deposition, when she went

14  to these interviews with four firms, the first thing she told

15  them was:  I have a disability.  I'm going to need an

16  accommodation.  Here's what I'm going to need.

17         Sometimes she would say to the firm:  Do you have

18  other people that are disabled here?  I want to know how you

19  treat them, to accommodate them.

20         Those are the things she said to them during the

21  interview.  These are total strangers that have never met her.

22  But that's not what she said to Mr. Prakhin after all those

23  years working with him.  She said:  I'm not disabled.  I'm not

24  going on disability leave.  I can work.  I can do this job.  I

25  don't need anything.  That's what she said to him after these

1    six years of working for him.

2            She realized that something had to give.  After

3    being terminated from the this job, her life changed.  She

4    accepted the disability.  It sounds like she's worked towards

5    finding accommodations, different ways she can work.  I don't

6    think the job she has today is the same job that she had when

7    she worked at the Prakhin firm.  We will hear about that when

8    we hear other people testify.

9            The testimony that you will hear that was mentioned

10   about the person that knows the best, I believe that reference

11   is to Irene Gabo.  The evidence is going to show that Irene

12   Gabo is not the best person to testify as to the work she was

13   doing after Irene Gabo left.  Irene Gabo came back to the firm

14   very infrequently to work as a consultant.  She was no longer

15   supervising the plaintiff's cases the way she was when she was

16   managing attorney.  She would come in on the weekends, I think

17   every -- at the most, every other Saturday to check on the

18   status of certain things, but she wasn't supervising her on a

19   day-to-day basis.  The people that are closest to what she was

20   doing are the two paralegals because they were doing all the

21   work.

22           Now, we talked about -- we talked about the fact

23   that that job is probably not the same as the one she has

24   today.  But, also, what happened was, after she left, a new

25   managing attorney came in shortly after she left, within a few

1  weeks of her leaving, and all of her cases were assigned to

2  him.  And he will come in and testify, and he will tell you

3  what the paralegal's will also have told you because he's an

4  expert on cases.  He tries cases, and he had to go through

5  those files that were assigned to him that Ms. Ruderman had

6  had for the last four or five months, and he'll tell you what

7  condition those files were in, and you will understand the

8  reason Mr. Prakhin made the decision that he made.

9       Listen, on behalf of our side of the table, all the

10  defense people, I want to thank you for agreeing to sit on

11  this jury.  I know it's not a convenient thing to have to do.

12  It's very important to us to get this problem resolved.  It's

13  five years in the making, pre-COVID.

14       So thanks very much for doing this.  We appreciate

15  it and we're convinced that when you hear all the evidence,

16  you will find for a verdict for the defense.

17       Thank you.

18       THE COURT:  Thank you.

19       Mr. Rich, do you have just a few other comments to

20  make directly relating to --

21       MR. RICH:  I have an opening, Judge.

22       THE COURT:  I just do not want to hear a complete

23  repetition.

24       MR. RICH:  No.  It's certainly not.

25       THE COURT:  Okay.

```
 1   OPENING STATEMENT
 2   BY MR. RICH:
 3           MR. RICH:  Good afternoon, ladies and gentlemen.  My
 4   name is Alan Rich and I represent plaintiff Yuriy Prakhin.
 5   Yuriy Prakhin, the individual.
 6           Yuriy Prakhin, who came here when he was 35 years
 7   old, learned to speak English here, went -- became a driving
 8   instructor in Spring Valley, then opened up his own driving
 9   school and decided he wanted to become a lawyer, and he did.
10   He went to law school, passed the bar, and opened a firm in
11   Bensonhurst on his own.  And, in large part, serves a
12   Russian-speaking community, at present.  About 60 percent of
13   his clientele are Russian-speaking and you will hear, also,
14   that the plaintiff is Russian-speaking, so in that context,
15   she had particular value because she could communicate with
16   clients in Russian.
17           Now, it's been said that the plaintiff -- forgive
18   me, tethered to our laptops -- it's been politely said that
19   she said during a conversation with her own relatively new
20   paralegal, in a kind of confidential way between them, that
21   she said she was faking it.
22           MS. HUOT:  Objection.  Objection, Your Honor.  None
23   of this is in evidence.
24           MR. RICH:  There isn't anything in evidence.
25           THE COURT:  Excuse me.  Let's not argue it.
```

1          Just go ahead.

2          MR. RICH:  And, in fact, while Mr. DiLorenzo was a

3    little more polite that I will be, I will say the

4    less-than-polite words that I will hear when Ms. Ruderman

5    called her paralegal and said:  So, I come back and I realize

6    I can't see shit.  Like, I get to the EBT -- which is the

7    deposition -- and I'm like, blinded by the fluorescent lights,

8    blinded by all the people, can't see.

9          Paralegal responds:  Oh, my God.

10         Ruderman:  I felt like panicking, right?

11         Then, oh -- they have a surveillance video where --

12   a surveillance of the client, with our client in it:  Couldn't

13   see shit at all.  Couldn't even tell that it was our client in

14   it.  Fine.  I'm faking it.  Like, you know, pretend.  Like I

15   know what's going on.

16         This is not just about -- this is about what she was

17   able to do and whether she was involved in what is called the

18   good faith interactive process, which the law mandates.  You

19   have a disability, you go to the employer, the employer asks

20   the questions that they feel are appropriate and they have the

21   absolute right to documentation.

22         She's a lawyer.  She is going to say that for three

23   -- over three months she couldn't come up with a doctor's

24   note?  She acknowledges that she never got -- not even a

25   little doctor's note from a pad.  Not so much as that.  She's

1    a lawyer and she doesn't do that and she says, well, they

2    never asked me for that.  And then they complain that she

3    didn't -- that they didn't reimburse her for the various

4    things that she had bought.  That's in their complaint.  Yet,

5    a couple weeks before -- few weeks before she filed the

6    complaint, where she complains that they didn't reimburse her.

7            In her complaint to the EEOC, which is the Equal

8    Opportunity Employment Commission where you file a charge

9    before you get to serve your complaint in court, she wrote:  I

10   subsequently purchased at my own expense OrCam glasses and

11   Jaws, a screen-reading computer software.  I also paid out of

12   pocket for additional transport costs such as cab fares that I

13   was required as I was learning to adapt to life with LHON.

14   Not once did I ask the firm to foot the bill as I explored new

15   accommodations that would make working with LHON easier for

16   me.  Not once.

17           And she comes here and she says, they didn't get me

18   they, this didn't get me -- here's what happened:  She knew, I

19   bring a doctor's note, I bring this, I bring that.  It's going

20   to be pretty clear that at the very least I'm barely going to

21   be able to do the job.  The job which she said she was faking

22   it.  She said it.  She said she was faking it.

23           So the other issue about what she can and can't do

24   is, can you trust a lawyer who says -- who doesn't tell her

25   boss that when she's at a deposition she can't see the

1    pictures?  Can you trust somebody who doesn't tell you that

2    they can't do the job that you are hired to do to protect your

3    clients?  Because any one of us -- yeah, there's jokes about

4    ambulance chasers -- and you know what, there are, there are

5    crappy lawyers in every area of the law, just like everywhere

6    else -- that's not this guy.  And he is hired by his clients,

7    as you will find out.  He's hired by his clients.  You tell me

8    another lawyer who does this.  At five o'clock when the phones

9    go off, phones get routed to his cell phone.  He talks to his

10   clients.  His clients are who he is, who he takes care of.  He

11   cares about his clients -- excuse me.  Forgive me, my mouth is

12   so dry -- and what --

13           And what you will you find out Ms. Ruderman did when

14   she was contacted by client after client?  She didn't return

15   the calls.  She ran away.  She literally -- you will hear from

16   about one client she literally crossed in front of who came to

17   the firm.  Some five clients who wound up contacting

18   Mr. Prakhin telling him:  Your lawyer isn't calling back.  I'm

19   taking my case someplace else.  That's not just malpractice.

20   It's not just bad business.  There are rules of ethics.

21           The New York Rules of Professional Responsibility.

22   There's one provision that requires that the lawyer be

23   competent; another, diligent; another that applies to people

24   who are in a supervisory capacity that requires that they

25   oversee to make sure that the people under them are doing

1   their job.

2          His license is on the line if she's not doing her

3   job.  And when a client has to come into the office to say I

4   can't get a phone call returned.  You know how easy it is to

5   call a client, even if you are busy, even if the world is

6   crazy.  Clients are amazingly understanding if you contact

7   them.  If you ignore them, of course, you will lose them if

8   you keep ignoring them.  But if you call them, I'm really

9   terribly busy or I have a medical problem, I'm going to be out

10  for the next couple weeks, can I catch up with you then,

11  they're fine.  Unless there's something unique, but usually

12  clients are just calling in to make sure things are being

13  taken care of.

14         On the paralegal's desk things are piling up,

15  piling, piling, piling.  Clients are threatening to leave.

16  The clients whose cases are assigned to Ms. Ruderman.

17         Now, there is this unfortunate twisting of the facts

18  that have been presented here; that it was 16 days from the

19  time that the plaintiff told Mr. Prakhin of her diagnosis.

20  That's true.  It was over three months from the time that she

21  said she had blurry vision and it was clear that she was not

22  able to do many, many of the tasks which commenced this period

23  within which she had about 25 days of absences, several of

24  which she never called in for.

25         You know, if you have a law firm, if you have

*Opening Statement - Rich*                                        50

1    clients, if you -- if you desire to keep the law firm open and

2    not have the Disciplinary Committee contact you because your

3    clients are complaining that you are not doing it, which could

4    wind up with a suspension of your law license, you do

5    something about it.

6          So how long was it?  Mr. Prakhin was aware she had

7    blurry vision for roughly three months.  This had started in

8    September, October, November, December.  The particular

9    diagnosis that she got happened to be from -- as a result of

10   her taking a genetic-related test, but the fact that she had

11   blurry vision in both eyes by the -- first it started in one

12   eye and then it progressed into the other eye.  And, actually,

13   in the very beginning, she went to one doctor who said she

14   seemed to be fine.  It seemed -- apparently, this condition

15   can vary, but on the whole, it generally, over time,

16   progresses and then it stabilizes.

17         So what she can see does stabilize at a certain

18   point with something like 20/250 vision, which means, what

19   does she have to do?  Well, what does a personal injury lawyer

20   have to do?  Well, I will tell you personal injury -- and this

21   is what you will hear, personal injury lawyers deal with

22   basically two things; one is called liability, meaning who is

23   legally responsible, and that's what you do when you figure

24   out how the accident happened.  So what do you do about those

25   issues when the case comes to you and you're a lawyer?  You

1  look at the photographs, you look at reports, you may look at

2  video, because -- for example, most black cars and taxis, they

3  all have video of their own driving.  You have to be able to

4  see those things.

5              Other things.  What do you have to see?  Physical --

6  physical therapy records.  Almost everybody who is involved in

7  some kind of accident, winds up going to physical therapy.  It

8  so happens that a lot of physical therapy offices, in

9  particular, they handwrite their notes.

10

11             (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; 3:14 p.m.)

2          MR. RICH:  This is something that we haven't even

3    heard that she's able to do.  Whatever it is that she might

4    have done, or might even still do for other people.  And let

5    me tell you:  I'm going to presume that based on the

6    percentages of the number of people in the United States who

7    have disabilities, probably most -- everybody in this room

8    has somebody in their family who has a disability.

9          THE COURT:  Counsel, will you stop talking about

10   speculating issues, about things you know, and will you

11   please keep your remarks to what it is that you expect to

12   prove at this trial and not give your own personal views

13   about how personal injury firms work.

14         MR. RICH:  Well, this is what the testimony will

15   show.

16         THE COURT:  Well, I know, but it sounds like

17   you're giving from your own experience.

18         MR. RICH:  Okay.

19         You will hear that the second part is damages,

20   meaning, injuries, how was the person injured.  It is

21   critical to the attorney who was handling that case that

22   they go through the medical records.

23         Now, you'll hear from the paralegal that they very

24   often do a draft of what is called a document called, a

25   document called a "bill of particulars."  It's an old term

*Opening Statement - Mr. Rich*                    53

1    but it just means that's where you specify what the essence

2    of the case is.  What the negligence was and then what the

3    damages was.  You got pages of that stuff in damages.

4            And where does that come from?  It comes from the

5    medical records.  A lawyer in that area can read those

6    documents flat and they learn how to read, handwrite,

7    because they have to.  And it's not just they learning how

8    to read, they, in fact, then learn how to read it in

9    conjunction with other things because they know somebody has

10   a fractured leg then they're going to expect to see

11   handwriting about therapy to the leg.

12           So this is what you will see and this is what was

13   her job at the Prakhin firm.  I don't know exactly what she

14   has to do at her job now and I don't know exactly what she

15   did for other people.  But one thing is clear:  When she was

16   looking for a job, she was telling people that she has a

17   disability when she had no obligation to.  And you will see

18   that under the law, there is -- that's one of the big things

19   the ADA did that you don't have to disclose your disability.

20   Now, if you get an offer of a job, then they can ask do you

21   need an accomodation and then that goes forward.  But she

22   was starting by telling them, it is not is if she wants to

23   sue.

24           MS. HUOT:  Objection.

25           THE COURT:  I'll sustain the objection.

1    MR. RICH:  One thing you will hear is her

2  deposition testimony that she believed that every single one

3  of the potential employers that she went to an interview

4  with discriminated against her based on her disability.  She

5  was asked the question, as you will hear, why didn't you see

6  sue them?  Well, I didn't have enough proof.  The fact is

7  what the evidence will show is, the reason Yuriy Prakhin is

8  here today is because he was in the zone; he's near the

9  accident.  You sue who you think you can collect money from.

10  She couldn't collect money from everybody else she thought

11  she was discriminating against her even though, obviously,

12  she didn't know who the other applicants were.  She even

13  applied to jobs where she wasn't qualified for.  And they

14  discriminated against her because of her disability?  Maybe

15  because she wasn't qualified and that's what this case

16  shows.  This case shows that somebody who is conveniently

17  trying to say, I don't have a disability, or when she was

18  asked, she said I can do everything.

19         There comes a point and it's a horrible thing, to

20  have a condition like this where -- and let's be clear, I

21  don't think anybody said this -- the central vision focus

22  area is blurry like 22/50.  Very, very blurry.  But her

23  peripheral vision, apparently, according to the medical

24  records, is good but that's just on the side.  You can't

25  read to the side.  So what she has to do here in this job

1  was critical, and in this process, she had the opportunity

2  to not say to Yuriy when he spoke to her, and Yuriy didn't

3  say the things they say.  But you will hear what she didn't

4  say was the truth.  The truth is, she could have come to him

5  and said, first of all, Yuriy, this is what I have, here's

6  the doctors note, how do we figure this out?  My suspicion

7  is that because she's never demonstrated at the deposition,

8  she refused to look at -- she refused to try to read any

9  documents so we haven't seen her --

10          MR. BELDNER:  Objection, Your Honor.

11          THE COURT:  Yes, I'm going to sustain the

12  objection to "my suspicion."  Do not inject your own

13  personal views of this.

14          Counsel, are you wrapping this up pretty soon?

15          MR. RICH:  As soon as I can, Judge.

16          THE COURT:  What is as soon as you can?

17          MR. RICH:  Five, ten minutes?

18          THE COURT:  Ten minutes is too much.  If you can

19  wrap it up in five minutes, that'll be fine.

20          MR. RICH:  At the deposition, when she was handed

21  a document she refused to read it.  She said --

22          MS. HUOT:  Objection, Your Honor, that's

23  misstating what happened.

24          THE COURT:  I didn't hear.

25          Go ahead.  Continue.

*Opening Statement - Mr. Rich*                          56

1           MR. RICH:  You'll see what she can and can't do.

2    But what she had an obligation, and the obligation -- and

3    you will see that she didn't follow through on the

4    obligation which is, in this good faith, and good faith is

5    the key, good faith interactive process, which is what it's

6    called in the ADA and in the New York City Law, it's called

7    "good faith cooperative dialogue" but it's the same thing.

8    It means you come to the employer and you have a good faith

9    dialogue.  That has to start with if the employer asks for a

10   document, that has to start with giving him the document so

11   he knows what you have.  Take 25 days off, you can't come up

12   with one note?  And so, this is how it should be -- this is

13   what you will hear didn't happen.  Yuriy this is what I

14   have, here's the note.  I don't know exactly how we're going

15   to do this but let's try X, Y, and Z.  No, with my

16   paralegals, I can do everything.  I can do everything.  You

17   can't.  Maybe you can do certain things but let's find out.

18   But if you start with the premise, I can do everything and

19   you can't, you can't rely on that.  Clients rely on that.

20   Somebody who is injured, who can't work for the rest of

21   their life, is depending on you.  And that's what this case

22   is about.  It's about could she actually do the job and did

23   she give Yuriy the opportunity to see in this good faith,

24   reasonable, good faith interactive process with cooperative

25   dialogue.

*Opening Statement - Mr. Rich*                    57

1           The evidence will show that Yuriy Prakhin, in

2    fact, over this some three months period, kept her as long

3    as he possibly could.  Documents she was telling her

4    paralegals to send legal documents out without her approving

5    them.

6           There's a reason you go to a law firm because they

7    have lawyers, you're not having a paralegal send out a legal

8    document.  Yuriy happens to like to keep his license as a

9    lawyer.  So what I suggest that you -- it's been suggested

10   you use your common sense, yes, use it and you will see

11   Yuriy Prakhin didn't merely keep plaintiff until his office

12   was bleeding, he kept Ms. Ruderman on until his office was

13   bleeding out.  And he didn't have to keep her past that.  He

14   did more than he should have because she had the obligation

15   to come forthrightly in this good faith interactive process.

16   And if she didn't that's very, very tragic and sad.

17           You'll also hear about her psychological and

18   psychotherapy and her psychiatric conditions and that she

19   actually stopped going to the psychiatrist who was

20   prescribing medication for her.  She was scared as hell and

21   she started telling things that weren't true and that's sad,

22   but that is not Yuriy Prakhin's fault.

23           I leave this with you, and you will see the facts.

24   Everyone, and I ask you when you get into that jury room, if

25   you need anything, you turn it over.  You will see the very,

*Y. Ruderman - Direct/Ms. Huot*                    58

1   very sad and simple truth and I thank you for your

2   attention.

3           THE COURT:  All right.  You want to call your

4   first witness, please?

5           MS. HUOT:  Yes, Your Honor.

6           Your Honor, we call Ms. Yelena Ruderman.

7           (Witness takes the witness stand.)

8           THE COURT:  Remain standing and raise your right

9   hand.

10  **YELENA RUDERMAN**, called by the Plaintiff, having been first

11  duly sworn, was examined and testified as follows:

12          THE WITNESS:  I do.

13          COURTROOM DEPUTY:  State your full name for the

14  record.

15          THE WITNESS:  Yelena Ruderman.

16          MS. HUOT:  Your Honor, may we move the Plexiglass?

17          THE COURT:  Yes.  Is that in your line of vision?

18          MS. HUOT:  Yes.

19          THE COURT:  Okay.  Do you want to begin, please.

20  DIRECT EXAMINATION

21  BY MS. HUOT:

22  Q    Good morning, Yelena.

23          THE COURT:  Address her, please, as Ms. Ruderman.

24  Q    Good afternoon, Ms. Ruderman.

25  A    Good afternoon.

1    Q    You just heard Mr. Alan Rich's opening statement and he

2    discussed about you suing other companies.

3                    Have you ever filed another lawsuit?

4    A    No, never.

5    Q    Can you please just tell me a little bit about

6    yourself?

7    A    Sure.  As we just heard, I am legally blind and I'm an

8    attorney.  I am Russian, I immigrated from Belarus here when

9    I was seven years old.  Then I lived in Brooklyn half my

10   life, then moved to Staten Island the other half.  I

11   attended Rutgers College, Rutgers University, and then

12   directly after graduating Rutgers, I went directly to law

13   school, Hofstra University.  And then I eventually became a

14   lawyer like I always wanted to be and a mom.

15   Q    As you sit here today, can you please describe what

16   your vision looks like?

17   A    As I look around, I see silhouettes, I don't see --

18               MR. RICH:  We couldn't hear that.

19               THE WITNESS:  I see silhouettes.

20               MR. DILORENZO:  Maybe she can move closer to the

21   microphone.

22   A    I see silhouettes.  I don't see faces.  If I get up

23   close, I will see faces.  As you see, I'm not walking with a

24   cane or walking into things but, yes, everything is blurry

25   centrally.  Peripherally, it's not as blurry, so I see the

*Y. Ruderman - Direct/Ms. Huot*                    60

1   members of the jury.  I can't see you because you're too far

2   but I see Your Honor and the court reporter.

3   Q    Can you read?  Can you read text messages or make phone

4   calls?

5   A    Sure.  If it's zoomed in enough, I can read it.

6   Otherwise, I use the speech-to-text options.  So I press on

7   the text message, the phone will read it to me.  But

8   otherwise, if that's not an option I can zoom in.

9   Q    How do you read physical papers?

10  A    Physical papers, well, one, if it's very enlarged, I

11  could maybe see it.  Otherwise, I generally use a device

12  called a CTRV which is a screen and you put a document

13  underneath it and you can zoom in as much as you want or you

14  can make it read to you.

15          MR. RICH:  Your Honor, I couldn't hear what that

16  was.

17          THE WITNESS:  A CTRV.

18          MR. RICH:  CTRV.  Thank you.

19  A    That's a physical document.  If they're e-mailed to me,

20  or I can us my computer, I can use a Mac computer with no

21  assistive devices.  The assistive options are already

22  installed in all Mac computers so I have some of them turned

23  on.

24  Q    What if you're on the go, is there a device to read

25  papers while you're on the go?

1   A    One, I can use my cell phone to zoom in and out.  I can

2   take a picture of something or screenshot something.

3   Another device, it's similar to a cell phone, which is a

4   portable magnifier, you press on a button and it will

5   magnify whatever you have in front of you.

6   Q    You mentioned earlier a CRTV.  Where did you get that?

7   Did you purchase it?

8   A    No, I was provided -- it was provided to me by the

9   Commission For the Blind.

10  Q    And what's the Commission For the Blind?

11  A    It's a governmental agency that you register with once

12  you are diagnosed visually impaired or legally blind.  And

13  they have services for visually impaired people which

14  include job services, technical services as in giving you

15  and showing you how to use devices, even emotional services

16  and other stuff.  But you have to register with them first

17  when you get a diagnosis.

18  Q    Did you register with them when you got your diagnosis?

19  A    Yes, almost immediately.

20  Q    How did you register with them?

21  A    I just had to fill out an application and submit

22  medical proof.

23  Q    What medical records did you send to them?

24  A    I sent them the records from Dr. Odel, the doctor that

25  diagnosed me from my genetic testing at Columbia University

1 and I believe it was with Dr. Pillai.

2 Q    Do you remember approximately when it was you applied
3 for the New York State Commission For the Blind?

4 A    It was after my diagnosis.  When my diagnosis -- I
5 received my diagnosis on November 26th.  So I believe it was
6 in December.  But, obviously, to get approval and to get in
7 there and to be assigned a counselor, it takes time.  But I
8 believe I submitted my application in December.

9 Q    Did you receive anything back from the New York State
10 Commission For the Blind?

11 A    After they reviewed my application and my medical
12 records, they -- I was assigned a counselor and I was given
13 a certificate and a card that registered me as legally
14 blind.

15          MS. HUOT:  Your Honor, may I approach the witness?

16          THE COURT:  Yes.

17          (Approaching the witness.)

18          MS. HUOT:  Your Honor, I just want to hand her the
19 devices.

20          THE COURT:  So you're handing the witness a device
21 that allows her to read the exhibit you're showing her?

22          MS. HUOT:  Yes, Your Honor.  I will also ask her
23 about it.

24          And I'm also showing the witness what's been
25 marked as Plaintiff's Exhibit 41.

*Y. Ruderman - Direct/Ms. Huot*                    63

1          MR. RICH:  What is the device called?

2          THE WITNESS:  It's a portable magnifier.

3          THE COURT:  Don't start your cross-examination

4    from counsel table.

5          MR. RICH:  I thought it was being marked as an

6    exhibit.

7          THE COURT:  No, it was an device there was an

8    earlier discussion about the fact that she needed to use

9    assistive devices if you'll recall and this is one of those

10   devices.

11         MS. HUOT:  Yes, Your Honor.

12         Your Honor, would you like me to provide

13   defendants with a copy of exhibit?

14         THE COURT:  Are you putting it up on the screen?

15         MS. HUOT:  Yes, Your Honor.

16         THE COURT:  All right.  Put it up on the screen.

17   I take it this is in your exhibit list?

18         MS. HUOT:  Yes, Your Honor.  It's Exhibit 41.

19         THE COURT:  All right.  41.

20   EXAMINATION BY

21   MS. HUOT:

22   (Continuing.)

23   Q    Ms. Ruderman, I just handed you something marked as

24   Plaintiff's Exhibit 41.

25              Do you recognize this document?

*Y. Ruderman - Direct/Ms. Huot*                    64

1    A    Yes, this is a certification from the Commission For

2    the Blind that I am legally blind.

3    Q    Who sent that document to you?

4    A    It says Shelia Poole.

5    Q    Yes.  Is that document in the same condition as it was

6    when you received it?

7    A    Yes.

8            MS. HUOT:  Your Honor, I would ask that this be

9    moved into evidence and published to the jury.

10            THE COURT:  Exhibit 41 will be received.

11            (Plaintiff's Exhibit 41 was received in evidence.)

12            MR. RICH:  Your Honor, I am trying to locate it.

13            MS. HUOT:  It'll be up on the screen.

14            (A brief pause in the proceedings was held.)

15            THE COURT:  Can everyone see the exhibit then?

16    Q    Ms. Ruderman, is this the certificate you received from

17    the Commission certifying you as legally blind?

18    A    Correct.  Along with the physical card.

19    Q    And did you provide --

20            Did they provide you with a registration

21    number that you could use for your services?

22    A    Yes.

23    Q    Was your vision always like this?

24    A    No, fortunately not, no.  It started being this way in

25    the middle of September of 2018.  Before that, I didn't have

1    any glasses or contact lenses.  I could see almost 20/20.

2    Q    I know we just heard a lot of these things on opening

3    statement and it may sound repetitive but it has to come

4    from you that's why I'm asking again.

5              Can you please explain to us when your sudden

6    loss of vision started.  Were you working at the time?

7    A    When it started, yes, I was employed by the Law Firm of

8    Yuriy Prakhin, Mr. Prakhin.

9    Q    Is that the law firm you're suing in this case?

10   A    Yes.

11   Q    And who owns the Law Firm of Yuriy Prakhin?

12   A    Yuriy Prakhin.

13   Q    Is Mr. Prakhin a defendant in this case, also?

14   A    Yes, he is.

15   Q    Did you close your vision loss to this law firm?

16   A    Yes, I did.  Starting in September of 2018, when I

17   first started having blurry vision, and as it progressed

18   until my final diagnosis on November 26th of 2018.

19   Q    Who did you close to it specifically?

20   A    Well, Mr. Prakhin himself, the office manager,

21   Ms. Raskin, and my paralegals as well as all the associates.

22   I had no problems disclosing it to everyone.

23   Q    When you started losing your vision, were you still

24   performing your job?

25   A    Yes, of course.

1   Q    Did you take time off from work?

2   A    Yes, I took unpaid medical leave twice.  I think it was

3   five days each time or so.

4   Q    Did they eventually figure out what was wrong with you?

5   A    Yes, I was diagnosed with Leber's LHON which is a

6   genetic condition that starts in one eye and then goes to

7   your second eye.  And eventually, it does come to, thank

8   God, to a stop.  But your vision within a few months slowly

9   progresses to a legally blind condition which it ranges.

10  But after 20/200, you're deemed legally blind.  And you lose

11  your central vision and you retain a majority of your

12  peripheral vision which is the side.

13  Q    And I know we've heard this again a couple of times,

14  but will you please testify when were you exactly diagnosed?

15  A    November 26, 2018, is when I received my official

16  diagnosis.

17  Q    Did you inform the law firm of this diagnosis?

18  A    Yes.  On November 26, 2018, I informed multiple people.

19  And then officially in person, I informed Mr. Prakhin of my

20  official diagnosis.

21  Q    Did you inform Ms. Raskin as well?

22  A    Yes.

23  Q    And Ms. Raskin, was that the office manager?

24  A    Yes, she was.

25  Q    After disclosing your diagnosis to Mr. Prakhin, did you

*Y. Ruderman - Direct/Ms. Huot*                    67

1   take any or days off from work?

2   A    After disclosing my diagnosis, no, I continued to work

3   until he terminated me.

4   Q    So you had not been absent a single time after that?

5   A    No, I had no reason to be because I knew what my

6   diagnosis was and there was nothing they could do about it.

7   Q    From September 2018 to December 2018, did you ask

8   Mr. Prakhin for any assistive devices?

9   A    On multiple occasions, I asked him for six assistive

10  devices, yes.

11  Q    You heard Mr. Alan Rich saying something about how you

12  received devices.

13              Did you ever receive a single device?

14  A    I received them when I purchased them myself.

15  Q    Okay.  Did the firm or Mr. Prakhin ever provide you

16  with a single device?

17  A    No.

18  Q    Did the firm or Mr. Prakhin ever offer to pay for any

19  devices?

20  A    Not at all.

21  Q    When were you terminated from the Prakhin Law Firm?

22  A    December 14th.  Either December 14th or December 16,

23  2018.  I believe it was 14th.

24  Q    Who fired you exactly?

25  A    Mr. Prakhin himself.

*Y. Ruderman - Direct/Ms. Huot*                              68

1   Q    Did you practice law since your termination?

2   A    Yes.  Since my termination, I've not stopped practicing

3   law.

4   Q    Do you have a job now?

5   A    Yes, I have a full-time job at American Transit.  But

6   now it's on the other side, defense side, insurance defense.

7   Q    So it's the type of work you do similar but just on the

8   other side?

9   A    It's almost exactly the same.

10  Q    Okay.  Well, now I'd like to go back and discuss your

11  background.

12  A    Okay.

13  Q    Okay.  So you mentioned you went to Rutgers.  Did you

14  graduate?

15  A    In 2006.

16  Q    And then did you go to another school after that?

17  A    I went directly to law school.  I know a lot of people

18  take time off.  I knew I wanted to be a lawyer right away so

19  I went directly to law school.  I was awarded a scholarship

20  and I went.  And I graduated in 2009.

21  Q    Who was your first employer after passing the bar?

22  A    Oh, after passing the bar, it was Mr. Prakhin.

23  Actually, no, after passing the bar, I think admitted it was

24  Mr. Prakhin.  Immediately before, it was him as well.

25  Q    When did you start working for Mr. Prakhin?

1    A    2012.

2    Q    Do you recall approximately what month it was?

3    A    September of 2012.

4    Q    How did you learn about this job opening at the Prakhin

5    firm?

6    A    My mom, as I mentioned, is a doctor and I was looking

7    for a job at the time.  And she passed my resume over to --

8    my mom is a pediatrician but she passed it to the mother of

9    a patient who happened to know Irene Gabo and she said she

10   was looking for a paralegal at the time.

11   Q    And who was Irene Gabo?

12   A    She used to be the managing attorney at Yuriy Prakhin's

13   office.

14   Q    At some point, did you interview with Mr. Prakhin?

15   A    I did, in September 2012.

16   Q    Did you interview with somebody else?

17   A    No.

18   Q    Did you ever interview with Ms. Gabo?

19   A    No, I started working there and then I met her for the

20   first time.

21   Q    So you've never known Ms. Gabo, before?

22   A    No.

23   Q    Did your mother ever know Ms. Gabo?

24   A    No, not before I was hired there.

25   Q    Were you offered a position with Mr. Prakhin's firm?

1   A    Yes.  Initially as a paralegal and then, well, I was

2   offered a position as an associate attorney but I couldn't

3   be one until I was admitted which happened two months after

4   I was hired.

5   Q    And when you were first hired as a paralegal, do you

6   remember what your compensation was?

7   A    Yes, it was $35,000.

8   Q    And when you came an associate attorney, do you recall

9   approximately what your compensation was?

10  A    Yeah, it went up to $45,000.

11  Q    And as an associate attorney, who was your supervisor?

12  A    Irene Gabo.

13  Q    Did you work directly for Ms. Gabo?

14  A    Yes, always.

15  Q    How often did you interact with Ms. Gabo?

16  A    Daily.

17  Q    What kind of law does Mr. Prakhin's firm practice?

18  A    Personal injury law which is when someone has a claim

19  for sustaining some sort of injury and wants to sue an

20  entity that they believe is responsible.  And it could be

21  motor vehicle accidents, medical malpractice, premises

22  liability, labor law.  It varies.

23  Q    You mentioned a few minutes ago that you are now on the

24  other side.  Can you explain what's plaintiff, what's

25  defendant, and what kind of firm Mr. Prakhin's firm is?

*Y. Ruderman - Direct/Ms. Huot*                    71

1    A    Well, plaintiff sues a party which would be the

2    defendant.  So, in this case, I'm a plaintiff and I'm suing

3    Mr. Prakhin.  So he's a defendant, I'm the plaintiff.  And

4    so, Mr. Prakhin does plaintiff's personal injury law and I

5    do defense side.  So I defend people that are being sued,

6    well, insurance company that's being sued this time.

7    Q    Do you specialize --

8              Did the firm specialize in any particular kind

9    of personal injury?

10   A    Yuriy Prakhin's office?

11   Q    Yes.

12   A    Yes.  A lot of trip-and-fall accidents and motor

13   vehicles.  And he did a few other things.

14   Q    As an attorney for Mr. Prakhin's firm, what were your

15   job duties?

16   A    As an attorney, my job duties were to manage cases,

17   then draft motions, review the work of paralegals, attend

18   court conferences, settlement conferences, do depositions,

19   engage in negotiations and settlement discussions, et

20   cetera.

21   Q    So you just mentioned you do depositions.  Can you

22   please explain what that means?

23   A    I would attend depositions.  So sometimes it's called

24   taking a deposition or defending a deposition.  So I'm

25   either -- if it's my client, which for Yuriy Prakhin's

*Y. Ruderman - Direct/Ms. Huot*                    72

1    office, it would be for the plaintiff.  I would be defending

2    a deposition which means I would essentially prepare the

3    client and object if a deposition was -- if there was

4    anything that was being asked that is not correct.  And I

5    would sometimes defend a deposition where I would ask the

6    other side questions.  And a deposition is just sworn

7    testimony under oath where each party asks questions of a

8    witness.

9    Q    And is this part of, like, a discovery process?

10   A    Yes, depositions are part of the discovery process.

11   Q    Can you please explain in general what discovery is?

12   A    After a lawsuit is started, which starts at the summons

13   and complaint, then the discovery process begins where both

14   sides gather information to -- the defense will gather

15   information to defend the claim and the plaintiff will

16   exchange and gather information to pursue the claim which

17   includes medical records, witness statements, photographs.

18   Anything a plaintiff can use to support their claim and the

19   defense can use to dispute it.

20   Q    You heard in the opening statement something referred

21   to as a bill of particulars.

22               Can you please explain that part of discovery

23   and what does that mean?

24   A    After a summons and complaint is done, which is the

25   first stage of a claim.  Well, first stage of a claim is to

*Y. Ruderman - Direct/Ms. Huot*                    73

1    gather information from the client and then assess whether

2    there is one.  But once you file a summons and complaint,

3    you would then do something called a bill of particulars

4    which both sides do, wherein they generally put in the

5    location of the accident, the date of accident, exchange

6    whatever injuries the plaintiff alleges would be put in

7    there along with medical records and such work.

8    Q    Are bill of particulars similar from one case to

9    another?

10   A    Yes, it's a standard template from each firm and one

11   case to another.  A motor vehicle accident will have one

12   bill of particulars and a premises case will have an almost

13   identical one.

14   Q    So does the firm have templates for these bills of

15   particular?

16   A    Yes, they have a sample for every single kind.

17   Q    Are paralegals responsible for preparing these or

18   attorneys?

19   A    Yes.  Actually, Mr. Prakhin puts a number on paralegals

20   of how many they should produce a day.  And when I was

21   hired, he wanted us to do like three to five a day, meaning,

22   the paralegals.  So it's their job duties.

23   Q    You said you attended court conferences.  What are

24   those?

25   A    There could be settlement conferences, it could be

1    compliance conferences, preliminary conferences, which a

2    preliminary conference is the beginning of a case.  And

3    there are deadlines that are set out for how the case should

4    progress.  And a compliance conference is a conference where

5    the attorneys need to discuss the status of a case and what

6    discovery has been and has not been exchanged.  Settlement

7    conferences are to try to settle the case so it doesn't go

8    to trial and if it doesn't go to trial.  We go to trial.

9    Q    You mentioned that one of your responsibilities was to

10   draft motions.  Do you recall that?

11   A    Yes.

12   Q    Can you please explain what a motion is?

13   A    A motion is when you ask the Court for relief that the

14   parties can't stipulate to something, which is an agreement

15   between the parties, then a motion is made to ask the Court

16   to intervene on the party's behalf to compel one to do

17   something or for other relief.

18   Q    So when you have to compel a party to do something,

19   would that be like a discovery motion?

20   A    Yes.  Which is pretty simple and common and standard in

21   our field.

22   Q    So what's another example of a discovery motion?  What

23   does that mean?  Can you explain a discovery motion is?

24   A    Yes, it could be a motion to compel.  It could be a

25   motion to -- a motion to compel would be to ask one side to

1   produce records of some sort or to show up for a deposition

2   or something.  If a side refuses to agree to do something

3   then we would ask the Court to compel them to act.

4   Q    Are these discovery motions pretty common?

5   A    Yes.  As common as the bill of particulars.

6   Q    So, like the bill of particulars, would there be

7   templates for these?

8   A    Yes.  They're standard.  They have standard language

9   with the law in them already and you change the parties'

10   names and the dates and the relief you're seeking.

11   Q    So if the law is already filled in, then who is

12   responsible for preparing these discovery motions?

13   A    Well, because there are so many, generally, the

14   paralegals would do them because they're just so standard

15   and simple.

16   Q    Where do they get the information required to fill in

17   for the discovery motions?

18   A    You can ask an attorney or the information comes from

19   the client, then they would call the client and ask them.

20   They go needed to respond to the motion.  It depends on the

21   motion.

22   Q    Are there other more complicated motions besides

23   discovery motions?

24   A    Yes, summary judgment motions.  That's a more

25   substantive motions attorneys would do.

1    Q    So attorneys would handle more substantive motions but

2    paralegals would do the discovery motioning?

3    A    Yes, correct.

4              THE COURT:  Excuse me.

5              The discovery motions that were done, were they

6    reviewed by an attorney and signed by an attorney before

7    they were sent to the court?

8              THE WITNESS:  Generally, yes.

9              THE COURT:  I hope so.

10              THE WITNESS:  Yes.  At least ones that I was

11    assigned to.

12    Q    Ms. Ruderman, who actually signs all the papers at the

13    Prakhin Law Firm?

14    A    They have Yuriy Prakhin's signature on them.

15    Q    Does Yuriy Prakhin review every single motion?

16    A    I don't know that that's possible to do that.

17    Q    Okay.  So every motion has Yuriy Prakhin's signature on

18    it?

19    A    Most of them do.

20    Q    Okay.  And what's a summary judgment motion?

21    A    It's a more substantive and a lengthier motion.  And

22    usually, it's done at the end of a case.  Sometimes, during

23    the case but it's when a party tells a Court that there's no

24    issues of fact for a jury to decide on and that the Court

25    should just rule as a matter of law.  When that doesn't --

*Y. Ruderman - Direct/Ms. Huot*                    77

1    when the Court does see issues of fact, then we come here

2    and have a jury look at those facts to see if the claim has

3    merit.

4    Q    So if a Court denies a motion for summary judgment then

5    what happens?

6    A    Then the Court is basically saying that there are

7    issues of fact that a jury needs to look at and it can't

8    decide a case as a matter of law.

9    Q    As an attorney, were you responsible for drafting these

10   more substantive motions?

11   A    Yes.

12   Q    Based on your subpoena, working at the Prakhin Law

13   Firm, what were the duties and responsibilities of the

14   paralegals that work there?

15   A    The paralegals are there to -- they're assigned to

16   certain attorneys and they're there to help the attorneys

17   manage their cases.  So they're literally to be the

18   right-hand to an attorney.  So anything an attorney asks,

19   generally, a paralegal should do.  But more specific duties

20   are to write motions, discovery motions, we draft them

21   sometimes.  To do bills of particulars, to obtain

22   information from clients, to communicate with clients in

23   order to obtain information and to update them on statuses,

24   and to get medical records and all various other day-to-day

25   tasks.

1    Q    Are paralegals at the at the Prakhin Law Firm

2    responsible for drafting the complaint?

3    A    Yes.

4    Q    What's a complaint?

5    A    That's a document that describes the merits of a claim,

6    the reason a plaintiff is suing somebody.

7    Q    And where would the paralegals get the information

8    needed to draft the complaint?

9    A    There's templates.  And if I'm correct, actually, in

10   the system that we were using, you just -- it generates them

11   because there are so many going out daily.

12   Q    And would paralegals be required to update the

13   calendars with deadlines or anything like that?

14   A    Yes, that's the job of the paralegals to make sure that

15   we, as attorneys, are constantly out of the office in court

16   and at depositions.  And it's the job of the paralegals to

17   put in dates into our calendars to let us know what's due

18   when.

19   Q    And you explained earlier the discovery process which

20   would be the exchange of information.  Would paralegals be

21   responsible for contacting the clients to gather that

22   information?

23   A    Oh, yes, yes.  Definitely.

24   Q    And how would they do that?

25   A    They would call them and ask them.  Then they would

*Y. Ruderman - Direct/Ms. Huot*                                    79

1   make requests called HIPAA requests for their medical

2   records and for anything else.  Sometimes they would meet

3   with them and they would actually physically exchange

4   materials.

5   Q    So would the clients be then communicating with the

6   paralegals pretty frequently about their cases?

7   A    Yes.

8   Q    Okay.  Would the clients ever also be responsible for

9   drafting stipulations?

10  A    Yes.

11  Q    And what's a stipulation?

12  A    It's an --

13           THE COURT:  Clients or the paralegals?

14           MS. HUOT:  I'm sorry?

15           THE COURT:  Maybe I misheard you, but I thought

16  you said where the clients --

17           MS. HUOT:  I'm sorry, paralegals.

18  A    Yes, paralegals would draft them and generally

19  attorneys would sign them.

20  Q    And what's a stipulation?

21  A    It's a document that details an agreement between two

22  parties.  So if we agreed to -- if we decide to extend a

23  certain date, if we're asking for an adjournment, then you

24  would probably do a stipulation to adjourn.

25  Q    So if a client calls the office asking for an update in

*Y. Ruderman - Direct/Ms. Huot*                    80

1    the case, who would be responsible for handling that kind of

2    call?

3    A    Well, first, it would go to the receptionist and those

4    change pretty frequently.  But then they would transfer the

5    call to the paralegals assigned on the case.  And if the

6    paralegal couldn't handle it or answer the question, then it

7    would go to either the attorney handling the case or to

8    Yuriy Prakhin himself.

9    Q    Why would certain clients be transferred to Yuriy

10   Prakhin directly?

11   A    Either Yuriy Prakhin only wanted to speak to them and

12   notify us of that or clients only spoke to him.

13   Q    Were those certain specific clients?

14   A    Yes, there were those clients in the office, I guess,

15   once he deemed more important clients or the trouble

16   clients.  I'm not sure how you pick them.

17   Q    Earlier, we discussed depositions.

18   A    Yes.

19   Q    Did paralegals Pillai any role in taking or defending

20   depositions?

21   A    No, no.  That's an attorney's job.

22   Q    Would they Pillai any role in assisting the scheduling

23   of a deposition?

24   A    Sure, yes.

25   Q    How would they do that?

1    A    They would call the parties and witnesses that needed

2    to appear and then also speak to the attorney from the

3    office to figure out a mutually agreeable date.

4    Q    Ms. Ruderman, are you familiar with something known as

5    Saga, S-a-g-a?

6    A    Yes, it's the case managing system that Yuriy Prakhin

7    used when I was employed by him.  So it organizes all the

8    cases by name, date of loss or another manner.  And just has

9    all the documents relating to the case, usually, hopefully,

10   scanned in there and any dates should be put in there.  It's

11   a file managing system.  It's almost like a filing cabinet

12   on the computer with a calendar.

13   Q    Based on your experience from working there, can you

14   estimate how many cases does the Law Firm of Yuriy Prakhin

15   have?

16   A    I would say a thousand.

17   Q    Is that at any given time?

18              MR. RICH:  Objection.  Are we talking about

19   presently?

20              THE COURT:  I'm sorry, what's the objection?

21              MR. RICH:  My objection -- I think the question

22   was how many does it have?

23              MS. HUOT:  Your Honor, I said at any given time.

24              MR. RICH:  -- if the witness doesn't work there.

25              MS. HUOT:  Your Honor, that's not what I asked.

*Y. Ruderman - Direct/Ms. Huot*                          82

1       MR. RICH:  I thought you just asked how many

2   cases.

3       THE COURT:  Let's narrow the question.

4       At the time that you worked there, approximately

5   how many cases did the law firm have at a given time?

6       THE WITNESS:  I believe it could be 900 or

7   something.  There's a difference between active cases or --

8   I don't know, I'm not sure.  900?

9   Q    Would that be 900 active cases?

10      MR. RICH:  Objection.

11  A    At one given time.  I don't know.

12      MR. RICH:  Objection.

13      THE COURT:  Is that a guess or do you have some

14  basis to know how many cases the firm had?

15      THE WITNESS:  If you open up Saga, you can look.

16  And I think, at some point, I did see that many.  I'm not

17  sure how many were closed or active.  So I don't know how

18  many active were but a lot.  Hundreds.  Hundreds.

19  Q    How frequently, I'm sorry, do you enter notes into

20  Saga?

21  A    When I was there from the beginning or just...

22  Q    Let's start with from 2012 to 2017.

23  A    It could be up to ten notes a day when we're in the

24  office.  Sometimes more, sometimes less.  Like I said

25  earlier, we were out on depositions and court appearances.

*Y. Ruderman - Direct/Ms. Huot*                    83

1   So we weren't in the office, you couldn't enter notes into

2   Saga.

3   Q    You are not able to access Saga when you're not in the

4   office?

5   A    No, I was not able to access Saga if I was out of the

6   office.

7   Q    When you were in court or out at a deposition that

8   lasted all day, were you not able to access Saga until you

9   got back?

10  A    That's correct.

11  Q    How would you update the case in Saga if you were not

12  in the office?

13  A    I would do it as soon as I was back in the office.  I

14  could also -- there's some emergency I guess I could call a

15  paralegal to do it.  But generally, I would wait until I get

16  back to the office.

17  Q    How would you remember what you had to add into Saga

18  about a case?

19  A    I would take a note either -- it depends on what it

20  was.  I would write down notes for myself or yeah.

21  Q    You just mentioned paralegals.  Did they have access to

22  Saga?

23  A    Yes, daily when they were in the office.

24  Q    And do -- what notes do paralegals enter into Saga?

25  A    Similar to what attorneys do.  They just do a lot more

1  notes because they're in the office much more.

2  Q    So if a paralegal speaks to a client, would they then

3  add that note of the conversation into Saga?

4  A    They should.

5  Q    And after you started working, I'm sorry, just going

6  back to how frequently you enter notes into Saga.  I asked

7  about the time period from 2012 to 2017 how about when you

8  came back in 2018.  How frequently do you enter notes into

9  Saga?

10  A    It would have been the same, but I think I was out of

11  the office a lot.

12  Q    Were you out of the office for work-related reasons?

13  A    For depositions, on depositions, and court importances.

14  Because I tried to enter as much as I can but it's

15  physically impossible when I wasn't there.

16  Q    After you first started working for Mr. Prakhin in

17  2012, did there come a time when you left the firm for

18  another opportunity?

19  A    I did in 2017.  I left to go to a firm called

20  Malillo & Grossman in Queens.

21  Q    And how much notice did you give Mr. Prakhin before

22  leaving?

23  A    Three weeks.

24  Q    It was more than 16 calendar days?

25  A    Yes.  According to my math, yes.

1  Q    Why did you leave Mr. Prakhin's firm in February 2017?

2  A    I thought with Malillo & Grossman I wanted to learn

3  more and I thought it might be a better growth opportunity

4  and just it was time at a change.

5  Q    What kind of firm is Malillo & Grossman?

6  A    Personal injury, pretty much the same firm, but they

7  just do things differently and I wanted to learn from other

8  people not just Yuriy Prakhin.

9  Q    And between September 2012 and February 2017, did you

10  work at any other employers?

11  A    No, just Yuriy Prakhin.

12  Q    So then I know you already said this before but I want

13  reiterate.  When you were first hired as a paralegal, what

14  was your starting salary?

15  A    35,000.

16  Q    When you became an attorney in 2012, what was your

17  salary?

18  A    I became an attorney in November 2012, my salary was

19  45,000.

20  Q    And then how much were you making when you left the

21  firm in February 2017?

22  A    February 2017, when I left, it was 80,000.

23  Q    Can you please explain how your salary increased year

24  over year from 2012 to 2017?

25  A    So every Christmas or -- so every year, you would be

1    guaranteed a $5,000 raise.  But if you do a good job,

2    according to Mr. Prakhin, you might get $10,000 which I did.

3    And then there was a Christmas bonus around the middle of

4    December that was your weekly salary.  So that's how my

5    salary increase to 80.

6    Q    Can you explain that one more time.  What do you mean

7    your weekly salary as the Christmas bonus?

8    A    If you make $500 a week, you would get $500 as your

9    Christmas bonus.  You get make a thousand, you get a

10   thousand dollars as your Christmas bonus.

11   Q    I understand.  When was that paid?

12   A    In the middle of December.  I think starting in 2014,

13   he give us that.

14   Q    So from 2012 to 2017, did you obtain any trial

15   experience while working at the Prakhin Law Firm?

16   A    Yes, I tried two cases.

17   Q    And what was your role in those cases?

18   A    I second sat.  So I didn't do the lead questioning like

19   you are now, I would second seat and advise you.

20   Q    And what kind of work came into second seating?

21   A    Just as much work.  So it was preparing for trial,

22   communicating with the witnesses, clients, review documents,

23   strategizing, opening and closing statements, obtaining any

24   evidence that needed to be obtained, and jury selection.

25            (Continued on the next page.)

Ruderman - direct - Huot                    87

1    BY MS. HUOT:   (Continuing.)

2    Q    And how many of these trials did you do?

3    A    A full trial, I did one and then I also did a summary

4    jury trial which is a one-day trial.

5    Q    And who searched as the lead counsel on both of those

6    trials?

7    A    William Lawlor.

8    Q    And when did these trials occur?

9    A    Shortly before I left, so in 2017.

10   Q    Did Mr. Lawlor express any dissatisfaction with you in

11   the way you performed in these trials?

12   A    No, I thought he was satisfied with my work.

13   Q    From September 2012 to February 2017 during your first

14   stint there, did Mr. Prakhin ever express any concerns about

15   your job?

16   A    No not at all.  He was sad to see me go.

17   Q    And you mentioned Ms. Gabo was your supervisor.  Did she

18   ever express any concerns about your job performance?

19   A    No, never.

20   Q    Did anybody at the Prakhin firm ever express any concerns

21   about your job performance during that time period?

22            THE COURT:  During the period of 2012 to 2017?

23            MS. HUOT:  2012 to 2017.

24   A    The first five years there, no, nobody did.

25   Q    So after you left the firm in 2017 you went to go work

1  for another firm, right?

2  A    Correct.

3  Q    And why did you decide to take that job?

4         THE COURT:  I think we've been over this.  Let's go

5  on to something else.

6  BY MS. HUOT:

7  Q    Well, I would like to know how much were you being paid

8  at that other job?

9  A    80,000 as well, but then when I left I was making 90,000.

10 Q    And how many trials did you do at Mallilo & Grossman?

11 A    Two.

12 Q    Were you the lead attorney on those trials?

13 A    Yes.

14 Q    Or did you second seat them?

15 A    No, I was the lead and only attorney.

16 Q    Did both of those trials go to verdict?

17 A    One was settled and one went to verdict.

18 Q    Did anybody at Mallilo & Grossman ever express any

19 concerns about your job performance?

20 A    No, not at all.

21 Q    At some point did you leave Mallilo & Grossman?

22 A    Yes, in May of 2018 I gave notice.

23 Q    And why did you decide to leave Mallilo & Grossman?

24 A    To go back to the law office of Yuriy Prakhin.

25 Q    Can you describe how that happened?

Ruderman - direct - Huot                                89

1   A    Sure.  It was a weekend when Mr. Prakhin asked me if I

2   knew of any Russian-speaking attorneys looking for a job and I

3   told him I did not and he asked if I was and I told him I'm

4   not because I was employed and he said maybe you want to come

5   in and talk and a few days later I went in to talk.

6   Q    Do you speak Russian?

7   A    Yes.

8   Q    Does Mr. Prakhin speak Russian?

9   A    Yes.

10  Q    What percentage of Mr. Prakhin's clients are of Russian

11  decent?

12          MS. DONNELLY:  Objection.

13          MS. HUOT:  Your Honor, she testified --

14          THE COURT:  Overruled.  Go ahead.

15          Do you know?

16          THE WITNESS:  Yeah, more than a majority, more than

17  60 percent.

18  BY MS. HUOT:

19  Q    What was your response to Mr. Prakhin when he asked you

20  if you knew any Russian speakers and if you were interested in

21  a job?

22  A    I came in and I spoke to him because I wanted to see what

23  he had to offer and I told him in order for me to consider it,

24  he would have to match what I was already making at the old

25  firm.

SN        OCR        RPR

1  Q    Go ahead.

2  A    And so his response to me was he actually gave me more

3  money and told me I would have a larger caseload with a

4  financial incentive and I would be assigned support staff

5  because in my old firm -- at the Queens firm, I had support

6  staff and I wasn't willing to come back without support staff.

7  Q    How much money did he offer you to come back?

8  A    100,000.

9  Q    You mentioned a financial stake in the case, can you

10  explain what that means?

11  A    I would be assigned a caseload and out of every

12  settlement I would get a bonus -- 5 percent bonus of a case.

13  Q    How does the -- how does the firm collect attorneys'

14  fees?

15  A    On contingency fees.  You don't pay the client until the

16  it's resolved and if it's resolved in the client's favor, you

17  get one-third of the fee.

18  Q    So if a case settled for $300,000, how much would the

19  attorney's fees be?

20  A    100,000.

21  Q    And what would your financial incentive be in that

22  100,000?

23  A    Five percent of that.

24  Q    So it would be 5,000?

25  A    Yes.

Ruderman - direct - Huot                    91

1   Q    Did Mr. Prakhin ever ask to see your resume'?

2   A    No, he was on it mostly, so, no.

3   Q    Did Mr. Prakhin ask you to provide any references?

4   A    No, not at all.

5   Q    Did he ask you for your permission to speak to any

6   attorneys at Mallilo & Grossman?

7   A    No.

8   Q    Did you accept his offer?

9   A    His offer was the extra and -- they, yes, I did accept it

10  a few days later.  Not right away.  I had to think about it.

11  Q    Do you recall when you returned back to the Prakhin firm?

12  A    June 18, 2018 a few weeks after I gave notice at my other

13  firm.

14  Q    When you returned back, who was the office manager?

15  A    Ms. Irene Raskin.

16  Q    Was she the same office manager that was there when you

17  left?

18  A    Yes.

19  Q    Had she been there for a while?

20  A    Yes.

21  Q    When you returned to the Prakhin firm in 2018 how many

22  attorneys were at the firm at the time?

23  A    I believe about eight.

24  Q    Was Ms. Gabo still the managing attorney?

25  A    Yes, she was.

Ruderman - direct - Huot                    92

1    Q    Did she again become your direct supervisor?

2    A    Yes.

3    Q    Did you ever get any health insurance?

4    A    Yes, right away.  That was part of the discussion whether

5    I would get health insurance.  And he said yes.

6    Q    And in your conversation with Mr. Prakhin was there any

7    discussion about you being hired as any probationary employee

8    or anything like that?

9    A    No, not at all.  Probationary employees have to wait six

10   months to get health insurance.  So I didn't want to be one

11   and he offered me that because he knew I wouldn't leave my job

12   to become a probation employee.

13   Q    When you returned back to the firm in June of 2018, did

14   you receive any kind of employee handbook?

15   A    No.

16   Q    When you left the first time do you recall if there was

17   any other handbook from earlier?

18          MS. DONNELLY:  Objection.

19          THE COURT:  Overruled?

20          PROSPECTIVE JUROR:  I was handed an employee

21   handbook once and I was asked initially and then the manager

22   took it back which I saw her do with everybody else and I

23   never saw it again.

24   Q    Do you recall what year that was?

25   A    I believe it was around 2014.

Ruderman - direct - Huot                    93

1   Q    Did you ever see another version of that handbook?

2   A    No, to my knowledge none exists.

3   Q    Did you ever see that handbook again?

4   A    No.

5   Q    During your time at Mr. Prakhin's firm, did you ever hear

6   him discussing any antidiscrimination policies or anything

7   like that?

8   A    No.

9   Q    When you returned back to the firm, were you given your

10  own caseload?

11  A    Yes, I started out with 40 cases when I first started

12  back again.

13  Q    In 2018?

14  A    Yes.

15  Q    Who assigned you those cases?

16  A    Ms. Gabo.

17  Q    Aside from your own 40 cases did you perform work for the

18  firm on any other cases?

19  A    When we talk about court appearances and depositions

20  that's not just done on the cases we have.  It's done on all

21  the cases in the office because we often have to share.  If

22  one attorney is going to Kings County, she or he will handle

23  all the cases in Kings County on that day.  If another one is

24  at a deposition -- so calendar issues played a factor in who

25  handled what.

Ruderman - direct - Huot                                        94

1    Q    So how frequently would you conduct a deposition?

2    A    Sometimes it was every day, sometimes it was a few times

3    a week, but definitely every week.

4    Q    During that time how often would you see Ms. Gabo in the

5    office?

6    A    Whenever I was there.

7    Q    Did ms. Gabo every express any concerns to you about your

8    job performance?

9    A    No.

10   Q    And during that time, how often would you see

11   Mr. Prakhin?

12   A    When I was in the office and when he was in the office I

13   would see him.  He would come later and sometimes leave

14   earlier.

15   Q    Approximately what time would he come in?

16   A    Around lunchtime.

17   Q    And what time do you think he leaves by?

18   A    Between 4 and 6.

19   Q    Did he ever express any concerns to you about your work?

20   A    No, never.

21   Q    Now, we mentioned -- one second.

22        We mentioned that Saga system.  What is the purpose

23   of making entries into Saga?

24   A    So that anybody that needs to know anything about the

25   case any employee can look up the case and know what the

1  status is and what's going on and what stage of the litigation
2  process it's at and so that we all are able to kind of manage
3  the cases and know what's going on with them.
4  Q    And if I mentioned just now you go on a court appearance
5  for somebody else's case or a deposition for somebody else's
6  case, would you then be responsible for putting in those Saga
7  notes on somebody else's case?
8  A    Yeah, I could or I could tell the attorney what happened
9  and he could put it in.  It was the responsibility for the
10  note to be there, but sometimes it would be other people, I
11  don't know.
12  Q    In September of 2018, did Ms. Gabo make an announcement
13  to the firm?
14  A    Yes, that she was leaving October 1, 2018 and starting
15  her own practice.
16  Q    And approximately how many cases did Ms. Gabo have at the
17  time?
18  A    At the time she made the announcement it was over 200.
19  Q    What happened with those cases?
20  A    She transferred them to -- she split them up between me
21  and another attorney Sandy Beron.
22  Q    I'm not sure how to pronounce her last name.  How many
23  attorneys were working at the firm at the end of September of
24  2018?
25  A    I believe around eight.

1  Q    And how many cases?

2  A    Seven now that she's leaving.

3  Q    So before she left it was eight --

4  A    I think so.  I'm not sure.

5  Q    Okay.  So the cases you said were split up between you

6  and Sandy?

7  A    Yes.

8  Q    And was there any difference in the types of cases that

9  were assigned to you versus the types of cases that were

10 assigned to Sandy?

11 A    Yes.  Ms. Gabo told me she would be assigning the newer

12 cases to me, the ones that were just starting out because at

13 that time I didn't have much -- I didn't have any paralegals

14 when she first started assigning them to me.

15 Q    So why do you need paralegals to handle the more deeper

16 cases than the newer?

17 A    They're further along in litigation and there's more

18 document collection and communication with clients and some of

19 them are approaching trial prep.  The newer ones you're just

20 starting out so it's not too much because you need time at

21 least to work on them.  The ones in more litigation have

22 shorter deadlines as well.

23 Q    So you understood from Ms. Gabo that you received the

24 newer cases and Sandy received the more developed cases?

25 A    Right.

Ruderman - direct - Huot                    97

1    Q    Before Ms. Gabo left the firm did she provide you with

2    any instructions on what to do with these cases?

3    A    Yes.  She gave like -- she sent out an e-mail, I think a

4    page or two with a couple of sentences as to the status of

5    each case and advice as to what should be done.

6    Q    Did she advise on which of these cases were good for

7    settlement?

8    A    Yes.

9    Q    Do you recall approximately how many cases were on that

10   list?

11   A    On that particular list, it was 116 cases.

12   Q    And do you recall how many of those cases were good

13   candidates for settlement?

14   A    She wrote ten, about.

15   Q    And did you get any further instruction from Ms. Gabo

16   about these ten cases?

17   A    Eventually I believe she settled them, that Yuriy gave

18   her authority to settle the cases that were on the list.

19   Q    So when Ms. Gabo was leaving the firm and she made the

20   announcement you understood she was supposed to leave on what

21   day?

22   A    Starting October 1st.

23   Q    What do you understand about her authority to settle

24   cases at that time before she left?

25   A    Before she left I believe she was to settle as many cases

1    as possible before she left and then it was up to me and Sandy

2    Beron to settle the cases and then I found out that she had a

3    different agreement with Mr. Prakhin to extend her time

4    working on these cases.

5    Q    So did you understand that Ms. Gabo would continue to try

6    to settle those cases?

7    A    Yes, it was Mr. Prakhin's direction to her to settle the

8    cases.

9              MR. RICH:  Your Honor, the exhibit is still up and

10   it hasn't been used for at least an hour.  Can we take it

11   down?

12             MS. HUOT:  That's fine.

13             THE COURT:  All right, continue.

14             MS. HUOT:  Yes, Your Honor.

15   BY MS. HUOT:

16   Q    Did Ms. Gabo have a financial incentive to settle these

17   cases?

18   A    Yes.  She had the same incentive that I had agreed upon

19   with Yuriy; she would get 5 percent of the settlement.

20   Q    And did she continue to get those financial incentives

21   after she left the firm?

22   A    Yes, even though she wasn't working there full-time Yuriy

23   agreed to give her the same financial incentive if she settled

24   the cases.

25   Q    And did Ms. Gabo continue working for the Prakhin firm

1  after October 1, 2018?

2  A    Yes, she would come in on the weekends and would work,

3  yes.

4  Q    Did Ms. Gabo continue making Saga entries?

5  A    Yes.

6  Q    How was she able to make Saga entries?  When was she able

7  to make Saga entries?

8  A    When she came on the weekends.

9  Q    Would that be on Saturdays?

10  A    Yes.

11  Q    I couldn't hear, I'm sorry.

12  A    Yes, yes.

13  Q    Did she continue communicating with clients?

14  A    Yes.

15  Q    Did Ms. Gabo continue mediating these cases?

16  A    Yes, she was the responsible for mediating most of them.

17  Q    Did she continue to settle these cases that were assigned

18  to you?

19  A    Yes.

20  Q    Did Ms. Gabo continue to give you instructions and

21  assignments on these cases?

22            MR. RICH:  Objection, leading.

23            MS. HUOT:  Okay.

24  Q    How would she do that?

25            MR. RICH:  Objection, leading.

1          THE COURT:  I'll overrule the objection, but please

2    just ask her what she did and not in the same form you've been

3    asking it.

4          MS. HUOT:  Okay, Your Honor.

5    BY MS. HUOT:

6    Q    How would she give you assignments and directions on

7    cases?

8          MS. DONNELLY:  Objection.

9          THE COURT:  Overruled.

10   A    On cases she was still working on.

11         THE COURT:  Overruled.

12         MR. DiLORENZO:  Your Honor, we don't know if it's

13   ten cases or the 100 cases.

14         THE COURT:  You can ask on cross then.

15   A    On the cases that she assigned to me, she would give me

16   direction by sending me an e-mail or putting a note into Saga

17   on the weekends.

18   Q    So just to clarify for defendant's attorneys --

19   A    It was on cases assigned to me.

20   Q    So that would be on all the 100 cases?

21   A    116.

22   Q    116 cases?

23   A    Yes.

24   Q    Okay --

25   A    But before that I was also assigned 40 cases.  I'm not

Ruderman - direct - Huot                          101

1   sure if those were included but at least 116, yes.

2   Q    Okay.  I just didn't want to get your answer lost.  Can

3   you explain again how she would give you assignments?  Did you

4   say something about Saga?

5   A    She would put a note into Saga when she would come in on

6   the weekend or send an e-mail or sometimes both.

7   Q    If she puts an assignment into Saga how would you receive

8   that?

9   A    I would only be able to see it when I came into the

10  office the following Monday if I didn't have a court

11  appearance.

12  Q    So, if Ms. Gabo spoke to a client during the week, how

13  would you know that?

14  A    I wouldn't know that unless she directly notified me of

15  that.

16  Q    And if Ms. Gabo worked on a case during the week, how

17  would you know that?

18  A    I wouldn't know that -- if she directly notified me

19  somehow.

20         THE COURT:  Well, if there was an entry made in Saga

21  about something she was doing would that come to your

22  attention?

23         THE WITNESS:  Not unless she told me to look at a

24  note for the case because I would make a -- I wouldn't know to

25  look for that case in Saga unless somebody told me to look up

Ruderman - direct - Huot                                    102

1    the case.

2              THE COURT:  But if it was your case you wouldn't get

3    a notification that an entry was made on one of your cases?

4              THE WITNESS:  Not every time I would know about it

5    unless I went intentionally to look at the case to see when

6    the last note was made, so with 200 of them.

7    BY MS. HUOT:

8    Q    Let's ask more specifically.  Hypothetically you know to

9    look at a case, okay?  So let's say Ms. Gabo calls the client

10   during the week and does some work during the week and --

11   how -- and then you know you want to look at that case, how

12   will you find out what she did through Saga?

13   A    Through Saga I would only know if she put a note the

14   following weekend because during the week if she communicated

15   with the client she wouldn't put it into Saga.

16   Q    She only did that on Saturdays?

17   A    Yes.

18   Q    You wouldn't know until the following week?

19   A    That's correct.

20   Q    Do you call her and ask her about every one of those 116

21   cases?

22   A    In theory, I guess I could, but -- in theory but she

23   wouldn't necessarily know because she would have to look at

24   Saga and she wouldn't have it.

25   Q    Could you please describe -- sorry --

1          THE COURT:  You know what, ladies and gentlemen, why

2    don't we take a brief five-minute recess just to let you go

3    back to the jury room and we'll start in about five minutes.

4          THE WITNESS:  Your Honor, can I get up?

5          THE COURT:  Wait until the jury leaves.

6          (Jury exits.)

7          (In open court.)

8          THE COURT:  Counsel, how much longer is your direct

9    of this witness?

10         MS. HUOT:  It's considerably longer.

11         THE COURT:  All right.

12         MS. DONNELLY:  Your Honor, can we take a comfort

13   break?

14         THE COURT:  Yes, five minutes.

15         (Recess taken.)

16         THE COURT:  I am going to caution plaintiff's

17   counsel to move this along.  I told you I don't have months to

18   try this case and I don't know why we're going into this level

19   of detail.

20         MS. HUOT:  Your Honor, I think it's relevant because

21   defendants are using all of these details as an explanation

22   for why they terminated her.

23         THE COURT:  Whatever is developed you can ask on

24   redirect.  I mean, at this point --

25         MS. HUOT:  They're going to be asking other

1    witnesses that.  She's our key witness, Your Honor.  I'll go

2    as fast as possible.

3            THE COURT:  Okay.  I'm bringing the jury in, is

4    everyone here?

5            (Jury enters.)

6            THE COURT:  Please be seated.  I'll ask counsel to

7    resume questioning.

8            MS. HUOT:  Thank you, Your Honor.

9    BY MS. HUOT:

10   Q    Ms. Ruderman, right before we went on break I asked you

11   why you couldn't call Ms. Gabo to ask about the status of each

12   of these 116 cases.

13   A    Yes.  I said in theory I could but it was so much

14   confusion and I didn't -- she wasn't -- she was -- I don't

15   know.  I couldn't.

16   Q    Why was there confusion?

17   A    Well, I wouldn't even know to call until she put a note

18   in or to e-mail -- if she didn't e-mail me right away so I

19   wouldn't know there was a question or an issue until the

20   following week sometimes.

21   Q    Was there confusion on the work that was being done on

22   these cases?

23   A    Yes.

24   Q    What -- what was that?  What was the confusion?

25   A    It was just hard to know who did what and a lot of times

Ruderman - direct - Huot                105

1    there was duplicate work because I would do something without

2    realizing that she had already done it the week before because

3    there was no note about it.

4    Q    So if Ms. Gabo had called opposing counsel to negotiate a

5    case, you wouldn't know about that?

6    A    Not necessarily, not right away until she came to the

7    office and put a note in.

8    Q    What's the harm in calling opposing counsel multiple

9    times to try and negotiate a case?

10   A    Well, when you're on the plaintiff's side it's like

11   you're desperate, like you're looking for a settlement and

12   that you're scared to try a case so it looks very

13   unprofessional.

14   Q    If you saw a note in Saga about Ms. Gabo calling opposing

15   counsel to negotiate a case how long would you have to wait

16   before you tried to call?

17           MR. RICH:  Objection, leading.

18           THE COURT:  Overruled.

19   A    Months, I don't know.  I'm not sure -- weeks it depends

20   on the agreement.  It's a case-by-case basis.

21   Q    And what's the harm of calling the clients twice?

22   A    Clients don't have faith in the firm that way because if

23   they told you about a surgery they were having and then

24   somebody else calls to ask them if they had a surgery then

25   they feel very neglected and as if people in the office are

Ruderman - direct - Huot                    106

1   not communicating to each other and the case doesn't matter to

2   us.

3   Q    Did any clients complain about being double called?

4   A    Yes.

5   Q    How frequently were these complaints?

6   A    They complained.  I'm not sure -- there were complaints.

7   Q    Okay.

8        MS. HUOT:  Your Honor, may I approach the witness?

9        THE COURT:  Yup.

10       (Counsel approaches.)

11       (Exhibit published to witness, counsel and Court only.)

12   BY MS. HUOT:

13   Q    So I'm referencing Exhibit 271.  Plaintiff's Exhibit 271.

14   Ms. Ruderman I just asked you what was marked as Plaintiff's

15   Exhibit 271.  Do you recognize that document?

16   A    Yes, it's an e-mail from a client -- from Mr. Prakhin

17   that was forwarded to me that was from a client.

18   Q    Did you receive that e-mail?

19   A    Yes, on August 27, 2018.

20       MS. HUOT:  Okay, I would like to enter this into

21   evidence and publish it to the jury.

22       THE COURT:  All right.  271 will be received.

23       (Plaintiff's Exhibit 271 received in evidence.)

24   BY MS. HUOT:

25   Q    So this e-mail says:  Good morning, Yuriy.  I took a

SN      OCR      RPR

Ruderman - direct - Huot                                107

1   picture of my surgical leg in case you want to know.  My

2   surgery was on August 16th at HHS.  I had a total right knee

3   replacement.  I was discharged home on August 19.  Someone

4   from your office called again, a new person.  I was not able

5   to hold a conversation then and I told her that I was not well

6   and was not able to answer questions.  I called your office to

7   speak to you and was asked why I called and, et cetera.  I

8   find this ridiculous that when I called to speak to you it's

9   always impossible and also every time someone calls me from

10  your office with a different name asking the same questions

11  over and over.  This was a major surgery and requires long

12  rehabilitation.  I'm in a lot of pain and struggle.  I also

13  find that people in your office have no manners or compassion.

14  Just simple etiquette such as how are you or feel better.

15  People who answer phones -- people who answer the phone are

16  always rude.  That's all I have to say.  Best regards,

17  Debra -- sorry, Dora.  Thank you.

18              Is this an example of a client calling to complain

19  about being called multiple times by different persons?

20              MR. RICH:  Objection.

21              THE COURT:  This was sent to you.  Did you know who

22  this person was?

23              THE WITNESS:  Yes, I recall.

24              THE COURT:  Was that one of your cases?

25              THE WITNESS:  At some point it became one of my

Ruderman - direct - Huot                    108

1    cases, yes.  It wasn't at the time that she was complaining

2    about.

3    Q    Do you know why this e-mail was sent by Mr. Prakhin to

4    you?

5    A    Yes, to call the client and essentially try to calm her

6    down and talk her -- and ease her concerns.

7    Q    So were you the individual that she was referring to that

8    was picking up the phones?

9    A    No, not at all.

10   Q    This last portion, the one that's referring to the people

11   that picking up the phones being rude.  Who is that

12   referencing?

13                MS. DONNELLY:  Objection.

14                THE COURT:  I'll sustain the objection.

15                MS. HUOT:  Because she has personal knowledge of it,

16   because she spoke to Dora.

17                THE COURT:  Well, then that's hearsay.

18   BY MS. HUOT:

19   Q    Did Mr. Mr. Prakhin ever ask you to call clients after

20   receiving complaints like this about staff being rude?

21   A    Yes.

22   Q    Okay.

23   A    And they often complained about him being rude as well.

24   Q    With respect to the settlement of cases did Ms. Gabo ever

25   give you further transactions on what to do or not to do with

SN        OCR        RPR

Ruderman - direct - Huot                    109

1   those ten cases that were suitable for settlement?

2   A    I dont' recall.  No, I believe she settled them herself.

3   She said she had the authority to settle them and she was

4   going to settle them.

5   Q    How long did this authority extend to?

6            THE COURT:  Authority of whom?

7            THE WITNESS:  Mr. Prakhin gave Ms. Gabo authority to

8   settle cases she previously worked.

9            THE COURT:  For how long?

10           THE WITNESS:  Until February of 2019.

11           THE COURT:  We've been over this a couple of times.

12  Can you move on to something else?

13           MS. HUOT:  Sure.

14  BY MS. HUOT:

15  Q    Did Mr. Prakhin ever direct you to call any client to

16  tell them that you were the new attorney on the case?

17  A    No.

18  Q    Prior to Ms. Gabo leaving did Mr. Prakhin or Ms. Gabo

19  invite any clients in to introduce them to you?

20  A    No, never.

21  Q    Did Ms. Gabo ever call any clients on the phone with you

22  being on the phone to introduce them to you?

23  A    No, never.

24  Q    How would you describe this time period after Gabo's

25  departure?

Ruderman - direct - Huot                    110

1   A    There was a lot of confusion and everybody was scared to

2   step on everybody's toes and hard to keep track of what was

3   going on.

4   Q    When Ms. Gabo left the firm, what happened to her office?

5   A    I actually got her office.

6   Q    Before getting her office where were you sitting?

7   A    Various cubicles.

8   Q    And who made the decision to give you Ms. Gabo's office?

9   A    Mr. Prakhin told me congratulations you just got Irene

10  Gabo's office because it was the second biggest office.

11  Q    And she was the managing attorney?

12  A    Correct.

13  Q    And when did this happen?

14  A    In October of 2018.

15  Q    How did that make you feel?

16  A    It felt like I was on the managing attorney track and

17  that I was being appreciated and promoted from a cubicle to

18  the biggest office.

19  Q    Ms. Ruderman, prior to September 2018 how would you

20  describe your eyesight?

21  A    I was -- it was fine.  I did not need assistance in any

22  way.  No glasses, no contact lenses.

23  Q    What happened to your eyesight in September 2018?

24  A    It slowly started to deteriorate.  It started in one eye

25  and spread to the next.  It became blurry.  Within months I

Ruderman - direct - Huot                                111

1    became legally blind.

2    Q    Do you recall where you were or what you were doing when

3    you first started experiencing the blurriness?

4    A    Yes.  Actually I was working on a weekend on a motion on

5    the computer and I remember that I thought something was wrong

6    with the computer, not my vision.

7    Q    When this happened when you started -- around the time

8    you first started experiencing the blurriness -- not on the

9    weekend but around that time, did you tell anybody in the

10   office?

11   A    Yes, I asked if they had the same issues with their

12   computer as I was having; that it was blurry and then I

13   realized it was my vision and so yes I told everybody that was

14   around.

15

16                (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. HUOT: (Continuing.)

3    Q    Did you tell any of the attorneys in the office?

4    A    Yes.  Everybody knew.

5    Q    Did you notify the office manager, Irene Raskin?

6    A    I did and she told me to go see a doctor.

7    Q    Did you then go see an eye doctor?

8    A    I did, I saw Dr. Guiyar in September.

9    Q    And what did you do at that appointment?

10   A    She -- she told me to take some eyedrops and I will be

11   better, but that didn't work.

12   Q    How many times did you treat with Dr. Guiyar remember?

13   A    Just once.

14   Q    Prior to your appointment with Dr. Guiyar, did you notify

15   Mr. Raskin that you would be attending this appointment?

16   A    Yes.

17   Q    Did Ms. Raskin ever ask you to bring a note from

18   Dr. Guiyar for this appointment?

19   A    No.

20   Q    Following your appointment with Dr. Guiyar, did your

21   vision get better?

22   A    Unfortunately, no.

23   Q    In September while your vision was getting blurry, did

24   you continue to work?

25   A    Yes.

1   Q    Did you continue to attend court conferences?

2   A    Yes, and I continued to drive as well.

3   Q    Did you continue to handle depositions?

4   A    Yes.

5   Q    How frequently?

6   A    Multiple times a week.

7   Q    Were you then referred to, like, an eye specialist after

8   Dr. Guiyar?

9   A    Yes.  I was then referred for -- to NYU Langone and a

10   brain MRI.

11   Q    So I would like to draw your attention to specifically

12   September 26th, 2018.  You mentioned a brain MRI.  Do you

13   recall if that's when it happened?

14   A    Yes.  I can't forget that date, because I -- I was going

15   in for a brain MRI and I was nervous, and I asked my dad to

16   come with me, and while we were waiting for me to get the

17   brain MRI, he suffered a stroke in the waiting area.

18   Q    And what did you do?

19   A    I approached the front desk and told them I -- I asked

20   them to call an ambulance because my dad didn't want me to

21   actually call them because he wanted me to get the brain MRI,

22   and so I asked them to call an ambulance and then I waited for

23   the ER -- yes, the EMS to arrive.

24   Q    Was he taken to an emergency room?

25   A    Yes.  He was eventually admitted to the hospital because

1    he suffered multiple strokes.

2    Q    Did you have to reschedule your MRI?

3    A    Yes.  I rescheduled it for the next day.

4    Q    And did you tell anybody at the firm that this horrific

5    thing just happened?

6    A    Yeah, while waiting for the ambulance, I actually called

7    the office to let them know I wasn't going to come back after

8    my brain MRI, and Ms. Raskin answered the phone.

9    Q    Do you know if Mr. Raskin told Mr. Prakhin about this?

10   A    Yes.

11   Q    How did your MRI go?

12   A    Well, when I eventually had it, it was unremarkable, so

13   we still didn't know what was going on with my vision, because

14   it had nothing to do with my brain.

15   Q    Did Mr. Raskin ever ask for a doctor's note from you or

16   your father or anything like that?

17   A    No.

18   Q    Did you notify Ms. Raskin that you had this appointment

19   scheduled the next day?

20   A    Yes.  I notified them I wasn't going to come in because

21   my dad was in the hospital, and while he was admitted in NYU

22   Langone, I could just cross the street and get my brain MRI,

23   because that's what he wanted me to do.

24   Q    Going back to the question of doctor notes, during the

25   time you worked there from 2012 to 2017, had you ever been out

*Ruderman - Direct - Huot*                                   115

1    of the office for -- because you were sick, you went to the
2    doctor, for any reason?
3    A    I'm sure a handful of times.
4    Q    Were you ever asked for a doctor's note back then?
5    A    No.  No attorneys were, that I know of.  Or anyone,
6    actually.
7    Q    So when you returned back to work on Monday, October 1st,
8    was that the first week that Ms. Gabo was out?
9    A    Yes.  That Friday was her last day.
10   Q    And how did that week go for you?
11   A    It was -- it was difficult.  Aside from my personal
12   issues, I came into 116 -- no.  Over 100 new cases that needed
13   to be handled.
14   Q    And you're also experiencing vision problems at this
15   time?
16   A    That's correct.
17   Q    Despite your vision issues, did you continue to work?
18   A    Yes, I did.
19   Q    Did there come a time in October when you took unpaid
20   leave to get more treatment?
21   A    Yes, because -- yes, I did.  I saw a doctor at NYU who
22   referred me for steroid IV treatment.
23   Q    Do you recall approximately when in October?  Was it the
24   beginning?  The middle?  The end?
25   A    Yes, it was the beginning of October.

1   Q    Do you know how long your leave was, approximately?  Your

2   unpaid leave.

3   A    Three to five days.

4            THE COURT:  How much?

5            THE WITNESS:  Three to five days.

6   Q    What treatment did you undergo during this time?

7   A    I was recommended by Dr. Pillai to get steroid IV fluid

8   treatment, so it was a thousand milligrams of steroids that

9   are injected into you through an IV.

10  Q    And how many -- you said a thousand milligrams.

11           How many days was that treatment for?

12  A    Three consecutive days.

13  Q    Did you get any other procedures?

14  A    I had a spinal tap also.

15  Q    So prior to taking this unpaid leave, did you ask

16  Ms. Raskin about it?

17  A    Yes.

18  Q    Did you --

19  A    Yes, I advised her of it.

20  Q    Did you get it approved by anybody?

21  A    Yes.  Ms. Raskin said it was fine, and Mr. Prakhin said

22  it was fine, because they knew I was trying to figure out what

23  was wrong.

24  Q    You weren't paid for this time; right?

25  A    No, I was not.

1    Q    Okay.  Did anybody ever request documentation?

2    A    No.  Never.  I had it.  If they wanted it, I would have

3    given it to them.

4    Q    When did you return to the office after the steroid

5    injections -- sorry -- steroid -- intravenous steroid

6    treatment and the spinal tap?  When did you return to the

7    office?

8    A    Actually, I believe I had -- October 17th.

9    Q    So why do you remember that date?

10   A    Because prior to that -- actually, I had two rounds of

11   steroid.

12   Q    Yeah, so we're just talking about the first one for now.

13   A    Oh, okay.

14   Q    We'll get to the second one.

15   A    Okay.  October 17th, I believe I returned.  I remember

16   that date because I had a deposition, and during that

17   deposition, I got very sick after these rounds of steroids,

18   and that's -- and I had difficulty -- vomiting, and there was

19   a video involved, and I called my paralegal about it, so I

20   remember that day.

21   Q    You heard a few minutes ago counsel was discussing a

22   video surveillance that you couldn't see.

23   A    Yes.  That was -- that was that day.

24   Q    That was that day?

25   A    So I remember that day, I came in in the morning, because

*Ruderman - Direct - Huot*                                           118

1   it was my first day back, so I had to pick up documents and

2   also review the video, and I came in that morning, actually --

3   I don't -- yes, I came in that morning to prepare for the

4   deposition, then I met with the client, prepared for the

5   deposition, reviewed the video with the client as well.  And

6   then towards the ends of the deposition I felt very sick and

7   had to fake that I was okay; that I wasn't about to vomit.

8   Q    Were you sick because of your vision impairment?

9             MS. DONNELLY:  Objection.

10            THE COURT:  Overruled.

11  A    No.  As I said, it was my steroids -- steroid IV,

12  3,000 milligrams, that made me sick.  That was one of the side

13  effects that was --

14            MS. DONNELLY:  Objection.

15  Q    Was it your client --

16  A    My vision was not making me sick.

17            THE COURT:  I'm sorry, what?

18  A    My vision was not making me physically ill.  The vomit.

19  Q    So was this your client being deposed?

20  A    Yes.  So I just had to prepare the client and make sure

21  the questions were proper at the deposition.  The clients were

22  questioned by the defendant's attorney.

23  Q    Did you meet with the client ahead of time to prepare?

24  A    Yes.  And I met with the client earlier, right before the

25  deposition, and we reviewed the video that's been at issue,

1    yes.

2    Q    Did you have any issues seeing the video at the

3    preparation session?

4    A    No, I didn't get sick then.  I was fine.

5    Q    Did you review any document during that preparation

6    session with your client?

7    A    I had reviewed them before.  I don't know if it was at

8    that second, but I reviewed them that morning.

9    Q    Was your client adequately prepared for the deposition?

10   A    In my opinion, yes.

11   Q    At the deposition, did you have to give any testimony, or

12   was it your client?

13   A    It was my client.

14   Q    When you started feeling sick, why didn't you just stop

15   the deposition?

16   A    The deposition was almost over, and I thought it was

17   beneficial to just pretend I was feeling fine.

18   Q    How long was this video that you were shown?

19   A    Ten seconds maybe.

20   Q    Did your client answer all the questions about the video

21   just as you had expected?

22   A    If I remember correctly, the video was very grainy and

23   she -- the client had difficulty seeing it as well, but she

24   answered the questions as I expected, yes.

25   Q    Did you ever tell Ms. Gabo about what happened?

1    A    I told her I got sick, yes.

2    Q    And what did she say?

3    A    She said I probably should have stayed home and not

4    returned so quickly after my 3,000 milligrams of steroids.

5    Q    Did you tell anybody at the office about what happened?

6    A    Yes.  I called Erica after the deposition to tell her how

7    sick I got.

8              THE COURT:  You called who?

9              THE WITNESS:  My paralegal Erica Larson.

10   Q    And around this time, approximately how many -- how

11   frequently do you handle depositions?

12   A    Almost daily.

13   Q    Are you familiar with the Prakhin firm's phone recording

14   policy?

15   A    Yes.  He records all incoming, outgoing phone

16   conversations on the firm's line -- all of them.

17   Q    So if you call the firm from your cell phone, would that

18   also be recorded?

19   A    Yes, it would be.

20   Q    And if somebody from the firm calls a client to have a

21   conversation, would that also be recorded?

22   A    Yes, it would be, and it was.

23   Q    And it was.

24         How do you know that?

25   A    He was disciplined -- he was -- they tried to discipline

*Ruderman - Direct - Huot*                                          121

1    him by the discipline committee --

2              MS. DONNELLY:  Objection.

3              THE COURT:  Yes, I will sustain the objection.

4    Q    Is there another way that you would know that?

5    A    Yes.  I've heard him listen to conversations with

6    clients, with clients and other attorneys, and conversations

7    between attorneys and attorneys.  I've heard him do it.

8    Q    Did he ever Pillai any of these recordings for you?

9    A    Not that I recall.  There was no need.

10   Q    Did you ever listen to any recordings?

11   A    No, I couldn't do it myself.  I have -- oh, I have with

12   this case.  I've heard myself being recorded, yes.

13   Q    Oh, okay.

14   A    Prior to this case, no.

15   Q    Do you know if your call with Erica Larson about this

16   deposition incident, was that recorded?

17   A    Yes, it was recorded, and played for me.

18   Q    Do you know if Mr. Prakhin was able to listen to it?

19   A    Yes, he was.  I don't know when he listened to it, but,

20   yes, he's able to.

21   Q    So during your spinal tap and your steroid treatment,

22   were you in touch with the office to keep up to date on your

23   cases?

24   A    Yes.  I would call from my home and any chance I got,

25   yes, and I would send e-mails, text messages.

*Ruderman - Direct - Huot*                                     122

1    Q    And who would you communicate with on your cases?

2    A    My paralegals, generally.

3              MS. HUOT:  Your Honor, may I approach the witness?

4              THE COURT:  Yes.  I will be about to show her what's

5    been marked as Plaintiff's Exhibit 26.

6              THE WITNESS:  Yes.

7    Q    Ms. Ruderman, I'm showing you what's been marked as

8    Plaintiff's Exhibit 26.

9              Do you recognize this document?

10   A    It's an email to my Gmail.

11   Q    Yes.

12   A    Me and my paralegal, Erica Larson.

13   Q    Did you send and receive this email?

14   A    Yes.

15             MS. HUOT:  I would like to move this into evidence

16   and publish it to the jury.

17             THE COURT:  All right, 26 will be received.

18             MS. DONNELLY:  Objection that it's not complete.

19   It's only one page.

20             MS. HUOT:  Your Honor, mine's complete.

21             MS. DONNELLY:  It says one of three pages.

22             MS. HUOT:  Mine is three pages.

23             MS. DONNELLY:  Maybe because I can't scroll on

24   the --

25             MR. RICH:  It's a three-page document.

1           MR. DONNELLY:  Thank you.

2           THE COURT:  Okay.  It will be received.

3           (Plaintiff's Exhibit 26 received in evidence.)

4           (Exhibit published.)

5   Q    So here this email is dated October 15th, 2018.

6           Why is Erica Larson sending you this email?

7   A    Because she received a notification from court regarding

8   an upcoming motion that needed to be addressed.

9   Q    Was it normal or typical for paralegals to receive these

10  kinds of notifications?

11  A    Yes.  They went to our work email and then she would

12  sometimes notify me of them, and I would tell her what to do.

13  Q    And you said here:  Diary it.

14          What does that mean?

15  A    It means enter it into SAGA, and put it on the calendar

16  so we're aware of the upcoming court date.

17  Q    And you wrote here in response -- I'm sorry, and she

18  writes here in response:  Don't worry.  We got you.

19  A    Yes.

20  Q    What did you understand that to mean?

21  A    That she'll take care of it and that they're going to

22  help me while I was out of the office for a few days.

23  Q    Did you think there were any issues in your case?

24  A    No.  That -- "we got you" meant they're on top of

25  everything and my cases are being handled.

*Ruderman - Direct - Huot*                                    124

1   Q     So this email is being sent to you at

2   Yelena.Ruderman@gmail.com; is that right?

3   A     That's correct.  That's my personal email address.

4   Q     Why are you using your -- sorry.  Are you able to access

5   the Prakhin law email address when you're not in the office?

6   A     No, I was not.

7   Q     So why are you using your personal email address?

8   A     To continue working when I'm not in the office and to

9   communicate with my paralegals.

10  Q     Was it typical for the attorneys at the Prakhin firm to

11  use their personal email addresses?

12  A     Yes.  It was encouraged.  Before, work purposes, yes.

13  Q     Why is it common for attorneys to use their personal

14  email addresses?

15  A     Because we are often out of the office and it's difficult

16  for us to carry the physical files around.  Sometimes we have

17  to cover something for multiple cases and you can't carry the

18  physical file around, and we can't carry SAGA with us, so we

19  would email ourselves things.

20          MS. HUOT:  Sorry, something is up with your volume.

21          THE COURT:  You mean you would email yourself

22  documents on cases to your personal email?

23          THE WITNESS:  That's correct.

24          MS. HUOT:  Your Honor, her mic --

25          THE COURT:  Is the green light on?

1          THE WITNESS:  Yes, now it is.

2    A    So, yes, we would email ourselves documents to our

3    personal email so we can access them at home our on our phones

4    while we're on the go.

5    Q    So you said when you were covering things.  So say you go

6    to a court conference and you cover more than one case at that

7    court conferences, would you have to take all the physical

8    files with you?

9    A    Yeah.  When my mic was off, I said we didn't want to

10   carry around multiple physical files if we were covering

11   multiple cases in one day, so we would email ourselves

12   whatever was relevant.

13          MS. HUOT:  Can we just check her mic for a second.

14          THE COURT:  It's working.

15          MS. HUOT:  Okay.

16          THE COURTROOM DEPUTY:  It's on.

17          MS. HUOT:  Sorry.

18   Q    What are some of the documents that you would need if you

19   were covering a court conference or a deposition or something?

20   What would you email to yourself that you would need?

21   A    Bill of Particulars, a police report, a motion.

22   Q    A what support?

23   A    A police report --

24   Q    Oh, police report.

25   A    -- a Bill of Particulars, a motion.  Depends on what it

*Ruderman - Direct - Huot*                                    126

1    was.

2    Q    How about medical records?  Would you email those to

3    yourself?

4    A    They are usually part of the Bill of Particulars.

5    Q    How about HIPAA forms?

6    A    They are usually included in the Bill of Particulars.

7    Q    What about tax records?

8    A    If they are relevant, they are also a part of the Bill of

9    Particulars.

10   Q    Have other lawyers ever called you at the firm and asked

11   you to email them documents of these sort?

12   A    Yes.  If they're out of the office and need a document,

13   they would.

14   Q    If you are planning to work from home or on the weekends,

15   would you email yourself these documents?

16   A    Sure.  If I need to write a motion or something, yes, I

17   could.

18   Q    Had you been doing that from 2012 to 2017 as well?

19   A    Yes.

20   Q    After the October 17th, 2018, deposition, when you

21   returned to the office, what did you do?

22   A    I asked for assistive devices.  I looked them up, and I

23   realized I needed assistive devices.

24   Q    What was the first assistive device that you requested?

25   A    Just the standard magnifying glass.  I asked Ms. Raskin

1    for one.

2    Q    What was Ms. Raskin's response?

3    A    She told me to get one myself, but there was another

4    attorney in the office that had one, and so she offered me

5    hers.

6    Q    Who was the other attorney that had one?

7    A    Her name was Annie.  I don't remember her last name.

8    Bosworth or something.  I don't know her last name.

9    Q    So who offered it?  Was it Ms. Raskin or Annie, I

10   couldn't hear you very well.

11   A    It was Annie that offered it to me because she knew I was

12   looking for one.

13   Q    Did Ms. Raskin or Mr. Prakhin ever provide you with a

14   magnifying glass of any kind?

15   A    No.

16   Q    Did you find it useful?

17   A    At that time, yes.

18   Q    What was the second assistive device you requested?

19   A    I heard about a one-page magnifier that my -- would be of

20   assistance, so that was something else I asked them to get me.

21   Q    Who did you ask?

22            THE COURT:  Be more specific.  Who did you ask for

23   that?

24            THE WITNESS:  Ms. Raskin.  I asked Ms. Raskin.

25            (Continued on the following page.)

*Y. Ruderman - Direct/Ms. Huot*                      128

1    EXAMINATION BY

2    MS. HUOT:

3    (Continuing.)

4    Q    And what was her response?

5    A    She told me to go ahead and get it myself.

6    Q    And did you then go ahead about by it yourself?

7    A    I did.

8    Q    Okay.  I'm showing you what's been marked as

9    Plaintiff's Exhibit 16.

10                Ms. Ruderman, I'm showing you what I just

11   marked as Plaintiff's Exhibit 16.

12                Do you recognize this document?

13   A    Yes, it's an e-mail from Amazon for my purchase of the

14   one-page magnifier.

15                MS. HUOT:  I would like to move this into

16   evidence, Your Honor, and publish it to the jury.

17                THE COURT:  All right.  16 will be received.

18                (Plaintiff's Exhibit 16 was received in evidence.)

19   Q    So where did you purchase this full-page magnifier

20   from?

21   A    Amazon.

22   Q    You heard earlier that Mr. Alan Rich say the firm

23   bought you a full-page magnifier.  Did that ever happen?

24   A    No, that's why I purchased one myself.

25                MR. RICH:  Objection.  I didn't state that.

1          THE COURT:  I don't recall that either.

2          MS. HUOT:  I do.

3          THE WITNESS:  I do.

4          THE COURT:  Counsel.

5          MR. RICH:  You're wrong.

6          THE COURT:  Counsel.

7          MS. HUOT:  For the record.

8    A    The firm did not buy it for me.  I bought it myself.

9    Q    It says here you purchased it on November 9, 2018?

10   A    That's correct.

11   Q    Did you find it helpful?

12   A    Yes, slightly.  I did.

13   Q    What was the third assistive device you asked for?

14   A    I found a stronger magnifying glass that lit up, so a

15   lighting magnifying glass.  I asked Ms. Raskin if we could

16   get that at me.  She said I could get whatever I wanted for

17   myself.

18   Q    Can you repeat that, I didn't hear you.

19   A    She said I could get it for myself.

20   Q    Okay.  The next exhibit will be Exhibit 15.

21   A    Yes.

22   Q    Ms. Ruderman, I'm showing you what's been marked as

23   Plaintiff's Exhibit 15.

24          Do you recognize this document?

25   A    Yes, it's another receipt from Amazon sent to my Gmail

*Y. Ruderman - Direct/Ms. Huot*                    130

1   for the lighting magnifier.

2           MS. HUOT:  Your Honor, I would like to enter this

3   into evidence and publish to the jury.

4           THE COURT:  15 will be received.

5           (Plaintiff's Exhibit 15 was received in evidence.)

6   Q   Where did you purchase this lighted magnifier from?

7   A   Amazon.

8   Q   It says you purchased it on November 9, 2018, why did

9   you purchase it?

10  A   Because I realized the firm wasn't going to purchase it

11  for me.

12  Q   Did the firm ever purchase it for you?

13  A   No.

14  Q   Did the firm ever research any magnifiers for you?

15  A   No.

16  Q   Did you find this device helpful?

17  A   Yes, at the time.

18  Q   What was the fourth assistive device that you asked

19  for?

20  A   I believe it was the OrCam glasses, which were glasses

21  I researched could be helpful.  You put them on and then you

22  point to an object and to identifies the object.

23          Can you hear me?  Your mic went off.

24          COURTROOM DEPUTY:  There may be a short.  We have

25  to change out the microphone.  If you can project your voice

*Y. Ruderman - Direct/Ms. Huot*                    131

1   as loud as possible for the moment.

2   A    It's glasses that you put on that if you point to an

3   object, they identify the object for you, or if you hold up

4   a page and point to a page, the glasses can read to you.  So

5   I thought that would be helpful.

6   Q    Did you tell Ms. Raskin about these glasses?

7   A    Yes, I did.

8   Q    What did you tell her?

9   A    I told her that they might be helpful but they're very

10  expensive.

11  Q    Do you recall approximately how much they were?

12  A    Yeah, $3,600.

13           MS. HUOT:  Is the microphone working?

14           COURTROOM DEPUTY:  Yes, she has to speak into the

15  smaller microphone.  Hold it in your hand, yes, that would

16  be better and just hold it toward your mouth.

17           THE WITNESS:  Okay.

18  Q    It's okay.  Take your time.

19  A    Okay.

20  Q    Do you recall how much they were?

21  A    $3,600, 3,600.

22  Q    What did Ms. Raskin tell you when you told her about

23  these glasses?

24  A    She said she'll talk to Yuriy but don't hold my breath,

25  I believe.

1  Q    Did you then, oh, did you ever hear from Yuriy after

2  you were told not to hold your breath?

3  A    After I purchased the glasses myself?

4  Q    Before.  Before.

5  A    No, I never heard anything from Yuriy.

6  Q    Okay.  Did you go ahead and buy the grasses?

7  A    I did.

8  Q    Okay.  The next exhibit will be Exhibit 14.

9  A    Okay.

10 Q    Ms. Ruderman, I'm showing you what's been marked as

11 Plaintiff's Exhibit 14.

12          Do you recognize this document?

13 A    Yes.  It's the receipt for the OrCam glasses that I

14 purchased.  Well, actually, my mom purchased them for me.

15 Q    Is this in the same --

16          MR. RICH:  Your Honor, can we just ask the witness

17 to keep her voice up.  I can't hear.

18          MS. HUOT:  Your Honor, if you want to take a

19 minute we can fix the microphone.  I'm not sure what else to

20 do.

21          MR. RICH:  I think it's if she just keeps her

22 voice up she'll be okay.

23          THE COURT:  Just speak into the microphone.

24 A    Okay.  It's the faxed receipt of the OrCam glasses that

25 my mom helped me purchase or purchased for me.

1  Q    Was this in the same condition it was when you received
2  it.
3  A    That's correct.
4         MS. HUOT:  I would like to move this into evidence
5  and publish it to the jury.
6         THE COURT:  14 will be received.
7         MS. DONNELLY:  I object to it.  Her name is not on
8  here.
9         THE COURT:  She said her mother -- what's your
10 mother's name?
11        THE WITNESS:  Tatiana Ruderman.
12        THE COURT:  And she's the one who purchased them
13 for you?
14        THE WITNESS:  Yes.
15        THE COURT:  Is there still a continuing objection
16 to this?
17        MS. DONNELLY:  No.
18        THE COURT:  Okay.  It will be received.
19        (Plaintiff's Exhibit 14 was received in evidence.)
20 Q    So it says here you purchased the OrCam glasses -- that
21 your mother purchased these OrCam glasses on November 9th.
22 The invoice -- I'm sorry,
23        THE COURT:  So your mother purchased them for you
24 and this is the invoice that shows how much they cost?
25        THE WITNESS:  That's correct.

*Y. Ruderman - Direct/Ms. Huot*                    134

            THE COURT:  You want to move on?  I think we got

that.

Q    After you purchased these glasses, did you wear them in

the office?

A    Yes, I did.

Q    Did Mr. Prakhin see you wearing them?

A    Yes.

Q    Did Ms. Raskin see you wearing them?

A    Yes, she did.

Q    Did you have a follow-up conversation with Mr. Prakhin

about these glasses?

A    I told they were expensive.

Q    How much were they?

A    $3,600.

Q    Did you ask him to him to pay for them?

A    Yes.

Q    What was his response?

A    He said, We'll see, and walked away.

            THE COURT:  And what?

            THE WITNESS:  And walked away.

Q    Did Mr. Prakhin ever pay for these glasses?

A    No.

Q    Did Ms. Raskin offer that the firm would pay for them?

A    No.

Q    Did Mr. Prakhin or Ms. Raskin ever speak to you again

Y. Ruderman - Direct/Ms. Huot                135

1    about these glasses?

2    A    No.

3    Q    Did there come a time when you returned these OrCam

4    glasses?

5    A    Yes.

6    Q    Why did you return them?

7    A    I didn't return them, I sold them on eBay because,

8    despite the hype, they weren't worth the price.  I found out

9    that there were free options on an iPhone that pretty much

10   did the same thing.

11   Q    So there were cheaper alternatives?

12   A    Correct.

13   Q    What was the fifth assistive device you requested?

14   A    Dragon software, dictation software for my computer.

15           MS. HUOT:  Can everybody hear her?  It's

16   little -- good.

17   Q    What did you ask Ms. Raskin about with respect to

18   Dragon?

19   A    I heard and saw that an old employee, he was -- he had

20   Dragon software that the firm purchased for him because he

21   was a slower typer.  And I asked Ms. Raskin if they could

22   purchase the same software for me.

23   Q    What is Dragon software?

24   A    When you speak and the computer types for you.

25   Q    What was Ms. Raskin's response?

*Y. Ruderman - Direct/Ms. Huot*                                    136

1   A    She said to go ask Mr. Prakhin for it since it was

2   already -- she didn't know what it was and she said to go

3   ask Mr. Prakhin for did.

4   Q    Did you then go follow up with Mr. Prakhin?

5   A    I did.  I asked him for it and he said if the firm

6   purchased it, it should be somewhere but you doesn't know

7   where.

8   Q    What did he tell you to do?  How were you supposed to

9   locate it?

10  A    He said to go Ms. Raskin for it.

11  Q    Did you go and ask Ms. Raskin for it?

12  A    Yes.

13  Q    Did Ms. Raskin help you locate it?

14  A    No.

15  Q    So you went back and forth a few times?

16  A    Yes.

17  Q    Did anybody ever locate this device for you?

18  A    No, it was never located.

19  Q    Did you ever receive Dragon software from the firm?

20  A    No, I did not.

21  Q    What was the sixth assistive device that you requested?

22  A    When looking up Dragon, I came across software called

23  JAWS which is a software on the computer where you could

24  talk and type into it, no, where it's to assist you to type

25  and read whatever is on the screen.  So it's a multipurpose

*Y. Ruderman - Direct/Ms. Huot*                    137

1  software.

2  Q    Did you have a conversation with Mr. Prakhin about the

3  purchase of JAWS for you?

4  A    Yes, I told him that might be helpful for me.

5  Q    And you asked Mr. Prakhin directly?

6  A    Yes.

7  Q    And what did he say?

8  A    He said that if I purchased it myself, I can -- install

9  it on -- I can try to install it.

10  Q    Did he offer to pay for the installation?

11  A    No, he wanted to make sure he didn't pay for the

12  installation.  He asked -- when I did finally purchase it, I

13  asked him -- I advised him that I was going to install it

14  and he asked how much it would cost him and I told him

15  nothing and then he allowed me to install it.

16  Q    So let's go back.  Did you actually purchase this

17  software?

18  A    Yes.

19  Q    Okay.  The next exhibit will be Exhibit 13.

20  A    Yes.

21  Q    Ms. Ruderman, I've just showed you what's been marked

22  as Plaintiff's Exhibit 13.

23            Do you recognize this document?

24  A    Yes, it's the receipt for my purchase of Dragon --

25  JAWS.

1    Q    How did you receive this receipt?

2    A    Gmail confirmation.

3    Q    Okay.

4    A    Sent to my Gmail.

5            MS. HUOT:  I'll move it into evidence and publish

6    it to the jury, please.

7            THE COURT:  Is this something else your mother

8    paid for?

9            THE WITNESS:  I have to check.

10           THE COURT:  It says:  Bill to Tatiana Ruderman?

11           THE WITNESS:  Yes.

12           MS. HUOT:  It's to her e-mail.

13           THE COURT:  I understand that.  I'm just trying to

14   move things along.

15           13 will be received.

16           (Plaintiff's Exhibit 13 was received in evidence.)

17   Q    Ms. Ruderman, this invoice shows that JAWS software

18   cost a thousand dollars.  Did your mother purchase this for

19   you?

20   A    Yes.

21   Q    After you or your mother purchased this assistive

22   device, were you able to install it?

23   A    I tried.  I had a friend come help me install it but

24   Mr. Prakhin expressed his nervousness and was worried that I

25   was going to mess up his computer somehow so I couldn't.  I

*Y. Ruderman - Direct/Ms. Huot*                    139

1    uninstalled it.

2    Q    Did Mr. Prakhin or Ms. Raskin ever provide you with any

3    of the three magnifying glasses, the OrCam glasses, the

4    Dragon dictation software or JAWS?

5    A    No, they did not.

6    Q    Did they ever offer to pay contribute to any of these

7    devices, to the purchase of any of these devices?

8    A    No, they did not.

9    Q    Switching gears.

10                   Did you continue to do depositions during this

11   time?

12   A    During what time?  Yes.

13   Q    That's a good question.

14   A    When I was employed there, I always did depositions.

15   Q    And how frequently had you been doing depositions?

16   A    It was the same every week.  Multiple times a week.

17   Q    Did you continue getting treatment for your vision

18   loss?

19   A    I did.  I had another round of steroid IV and something

20   called plasmapheresis when I was admitted to the hospital.

21   Q    So was this in November?

22   A    Yes, it was.

23   Q    So let's start with the IV.  How many days was that,

24   the IV treatment?

25   A    Five.

1    Q    Five days?

2    A    Yes.

3    Q    Do you recall your dosage?

4    A    A thousand milligrams.

5    Q    Thousand milligrams for five days?

6    A    Yes.

7    Q    Are those five consecutive days?

8    A    Yes.

9    Q    Were you out of work for those five days?

10    A    I believe there was a snowstorm that week, so I was

11    only out of work because there was a snowstorm.  But the

12    treatment was in the evening, I would get hooked up to an

13    IV, so I would still work during the day.

14    Q    During the snowstorm, were people working remotely?

15    A    I don't know what people were doing.

16    Q    Fair enough.  Were you working remotely?

17    A    I believe so, yes.  I don't know.  I don't remember.  I

18    had a doctors appointment.

19    Q    Okay.  So let's talk about that.  Was this treatment

20    prescribed by Dr.  Pillai?

21    A    Yes, the treatment for the steroids was prescribed by

22    Dr. Pillai.

23    Q    Did Dr. Pillai refer you to any other specialists?

24    A    Yes, she suspected that I had what you heard as

25    Lieber's and the only way to figure out if that's what I had

*Y. Ruderman - Direct/Ms. Huot*                    141

1    was to go to a specialized genetic blood test which was only

2    available at Columbia Hospital because, at NYU, you would

3    have to wait for months to get it.  So she referred to a

4    specialist at Columbia Hospital.

5    Q    Do you recall that specialist's name?

6    A    Dr. Odel.

7    Q    And what was this test?

8    A    It was a blood test.

9    Q    Was this at the same time that you were getting your IV

10   treatment?

11   A    Yes.  I had both in one day.  I had a blood test and

12   then I had the IV.

13   Q    Did there come a time when you were hospitalized in

14   November?

15   A    Yes.

16   Q    And when was that?

17   A    I don't know exactly but I was there Thanksgiving Day

18   and the day after Thanksgiving.

19   Q    Were you there for a week or just a day?

20   A    No, I was there for a week, and spent Thanksgiving

21   there.

22   Q    Why were you hospitalized, what was happening?

23   A    We were -- the last thing we tried to do was -- if it

24   wasn't Lieber's, we were trying to solve whatever it was and

25   it was called after you plasmapheresis where they tried to

1   can clean out the plasma in my blood.  And I was inserted

2   with a tube in my neck to try to clean it out so I had to be

3   admitted to the hospital.

4   Q    Did you take unpaid leave during this time?

5   A    Yes, I did.

6   Q    Did you notify Ms. Raskin of you being in the hospital?

7   A    Yes.  Right when I was being admitted, I called the

8   office and let everyone know I won't be in the office during

9   Thanksgiving week.

10  Q    Had you received -- what was the unpaid leave

11  permitted?  Was it?

12  A    Nobody objected to it, yeah.

13  Q    Did somebody approve it?

14  A    That's what I was trying to explain.  Ms. Raskin said,

15  Okay, good luck.  And Mr. Prakhin did as well.

16  Q    Did Ms. Raskin or Mr. Prakhin ever request any medical

17  documentation?

18  A    No, not at all.

19  Q    Did you ever get the results back from Dr. Odel's

20  office?

21  A    After I was discharged from the hospital the next day,

22  I was notified of the results of the blood test.

23  Q    And what day was that?

24  A    It was November 26, 2018?

25  Q    And what was the result of the test?

*Proceedings*                                                         143

1              MR. RICH:  Objection, hearsay.

2              MS. HUOT:  What.

3              THE WITNESS:  Positive.

4              MR. RICH:  Objection.

5              MS. HUOT:  I don't understand.

6              THE COURT:  I'll sustain the objection if it's

7    being offered for the truth of the results of the blood

8    test.

9    Q    Based on the blood test that you just received the

10   results from, what did you understand your condition to be?

11             MR. RICH:  Objection.

12             THE COURT:  Ladies and gentlemen, I'm going to

13   excuse you for the evening with the admonition not to

14   discuss the case.  We'll begin first thing 9:30 tomorrow

15   morning.

16             Okay.  Thank you, have a nice evening.  Don't

17   discuss the case.

18             (Jury exits courtroom at 5:20 p.m.)

19             THE COURT:  I take it you have a medical record

20   that establishes that this diagnosis.

21             MS. HUOT:  Yes, Your Honor.  But this is not

22   effect on her state of Mind.

23             THE COURT:  Why are you objecting to this?

24             MR. RICH:  Your Honor, it's --

25             THE COURT:  I mean, there is no real issue here

*Proceedings*                                              144

1    that she had this condition.  And, you know, there is a

2    question but it goes to her state of mind if it's being

3    offered to prove that she had the condition, you're correct,

4    it's hearsay.  But I don't understand why you're really

5    making these kinds of objections.  There's no question in

6    this case that she had this condition, correct?

7              You can step down by the way.

8              THE WITNESS:  Thank you, Your Honor.

9              (Witness leaves the witness stand.)

10             MR. RICH:  Your Honor, before I answer that, I

11   would ask that the answer, who is a lawyer, not jump and

12   answer a question while an objection is pending.

13             THE COURT:  Well, it's hard to hear your

14   objection.

15             MR. RICH:  I was very loud and she stopped and she

16   answered it.

17             THE COURT:  Let's just not worry about that now.

18   Take your seat.

19             But, I mean, why are we having these kinds of

20   objections, it's a waste of time.  There's no question here

21   that she has this condition, correct.

22             MR. RICH:  Your Honor, in this case, these records

23   have come to us so piecemeal we don't know what is what in

24   reality.  Stuff gets dumped on us on the eve of trial, and

25   frankly, we don't even know some of the stuff she's

*Proceedings*                                               145

1    testifying about.

2              MS. HUOT:  These are records that were produced.

3              THE COURT:  Excuse me, we can't all talk over each

4    other at the same time.  You seem to enjoy doing that.

5    Everybody talks over each over each other, we can't do that

6    and it is very difficult for the court reporter and

7    extremely annoying to me so let's stop doing it.

8              Everyone be seated.

9              MS. HUOT:  Your Honor, these are records that were

10   produced years ago.

11             THE COURT:  Yes.  I don't think that there's any

12   question that you have may have medical records that showed

13   that she had this condition.

14             Correct, Counsel?

15             MR. RICH:  We have medical records.  But, Your

16   Honor, we have -- we don't have -- we just found out that we

17   had grossly incomplete medical records.  We don't know if

18   there are other records that just show something else.  This

19   is just they have -- this is for them to prove, let them

20   prove it.

21             MS. HUOT:  Your Honor, this is the 23rd document

22   we produced in this case three years ago.  They had this.

23   This is her blood test.

24             MS. DONNELLY:  Your Honor, the doctor who can

25   certify this record is not testifying.  We have no way of

*Proceedings*                                                    146

1  knowing whether this is a complete record or not.  I have

2  been asking for complete records since 2020.  I asked for

3  HIPAA authorizations because I did not think they were

4  complete.  I was denied that request.  I was only allowed to

5  get them going forward.  So we have been questioning these

6  documents now for three years.

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          147

(Continuing.)

MS. HUOT:  There was never any issue about the blood tests from Dr. Odel.  Surely she can testify that -- she already did testify to this multiple times and this is a document that she received confirming the blood test.  There's no -- there's no expert testimony here.

THE COURT:  Can I see the document?

(Counsel approaches.)

THE COURT:  Who's the doctor?  Who is this doctor?

MS. HUOT:  Dr. Odel.

THE COURT:  You're not calling that doctor.

MR. BELDNER:  We're calling Dr. Pillai.

THE COURT:  Is she going to get this into evidence?

MR. BELDNER:  She received that in --

MS. HUOT:  Dr. Pillai ordered this test.  Plaintiff went and took this test.  Dr. Pillai received these records back, handed it to the plaintiff so she will testify to that. We were just asking her if she took a blood test and if it came out positive when these objections came up.

MR. DiLORENZO:  Your Honor, can we be heard about the records because they're at issue?

THE COURT:  I got those.

MR. DiLORENZO:  We haven't been able to explain our side of the objections we made to these two witnesses in the records.

Proceedings                                      148

1        MR. RICH:  In addition, Your Honor, that's a report

2   just like if you had an MRI report or an X-ray report and the

3   underlying data just like an MRI or X-ray is not in

4   Dr. Pillai's record.  She hasn't seen the underlying data.

5   All she's seeing is an underlying report from somebody.

6        MS. HUOT:  She's not a medical expert.  She can just

7   testify about her medical condition and she received this

8   piece of paper saying the blood test is positive.  It's

9   positive for -- she knows it's positive because she read this.

10       THE COURT:  And it was part of her treatment to

11  request and get those documents.

12       MS. HUOT:  Exactly.  Those can come in.

13       MS. DONNELLY:  What was part of her treatment?

14       MR. BELDNER:  Dr. Pillai's treatment of Yelena, a

15  whole course of treatment that Yelena testified to, that

16  Dr. Pillai will testify to.

17       MS. DONNELLY:  Is that in the records we just got?

18       MS. HUOT:  This is not included in the reports

19  records we got --

20       THE COURT:  You cannot start talking to each other.

21  The court reporter is not going to take down the conversations

22  between each other.

23       This is a record that was produced years ago.  None

24  of this is new or disputed.

25       MR. RICH:  That's not the issue, Your Honor.  This

Proceedings                                              149

1   is a report and just like an orthopedist he can't testify to a

2   fracture based on a report if he hasn't reviewed the X-ray.

3   It's underlying data it's not in her record.  She's just

4   reading a report; classic hearsay.

5         MS. HUOT:  Your Honor, we're not talking about a

6   doctor testifying here that needs to interpret documents.

7   This is her treatment, her own life.  She will testify as to

8   what happened to her personally.

9         What you're discussing, Mr. Rich, is when a doctor

10  has no personal knowledge of something, but for what's in the

11  documents which is why you're saying it has to look a

12  particular way.  She can testify to what's in her head and

13  what she received.

14        THE COURT:  You're talking about the plaintiff?

15        MS. HUOT:  Yes.

16        THE COURT:  But not for the truth of the fact that

17  she's got that condition.  That can relate to her state of

18  mind but to prove that she has that condition you have to

19  offer some medical --

20        MS. HUOT:  And we will but she can testify that she

21  took a blood test that came back positive.  I mean, that goes

22  to her state of mind that she has LHON.

23        MR. DiLORENZO:  We made a motion in limine to

24  prevent the plaintiff from testifying as to her own medical

25  condition.  There's a ruling by you at that conference on that

Proceedings                                           150

1    issue.  We specifically moved and I thought the ruling was

2    that she could testify to symptoms she had or what she

3    experienced but not to what diagnoses were or her medical

4    condition.

5              THE COURT:  Where is that in the --

6              MR. DiLORENZO:  It's in the first motion in limine

7    day.

8              MS. HUOT:  That's not the ruling.

9              (Off the record.)

10             MR. DiLORENZO:  Your Honor, I think it's page 117

11   and 118 of the conference at transcript -- the conference

12   dated December 19th, 2022.  I believe it's the bottom of page

13   117 and the top of 118.

14             THE COURT:  It's in the motion in limine that she

15   can testify about all of her symptoms and not give the

16   diagnosis and that's what everybody understood at the time.

17   So I think we'll have to --

18             MS. HUOT:  Your Honor, the testimony would be

19   offered for her state of mind.  If Your Honor wants us to not

20   provide her with an exhibit of the actual documents, we won't

21   do that, but she can testify about what she understood her

22   condition to be and what she told other people and in this

23   transcript defense counsel is stating they don't dispute the

24   condition.  They just dispute what she told her people about

25   it.  It's not hearsay because it goes to the effect.

```
                        Proceedings                   151
```

1          THE COURT:  Is she going to testify that she told

2    other people that she had this condition.

3          MS. HUOT:  100 percent.

4          MR. BELDNER:  Yes, yes.

5          MS. HUOT:  It goes to notice.

6          THE COURT:  I'll just instruct the jury that it's

7    not being offered for the truth of the fact that she had this

8    condition but on her state of mind that to prove this

9    condition they'll -- plaintiff will have to provide medical

10   testimony, so --

11         MS. HUOT:  Right.

12         THE COURT:  I'll instruct the jury to that.  All

13   right.  Let's just take up now the issue of the documents.

14   There's a motion to preclude the testimony of Dr. Pillai

15   because you didn't get all of the records of Dr. Pillai.

16         When did plaintiff come into possession of the

17   records that were turned over?

18         MS. HUOT:  It's the same day that it was turned

19   over.  I believe it was February 1st.

20         THE COURT:  And where did she get it from?

21         MS. HUOT:  Directly from NYU.

22         THE COURT:  In response to what?

23         MS. HUOT:  Us calling them and requesting them -- us

24   requesting them, plaintiff requesting them.  Multiple efforts

25   were made to request it.  I don't know if it was in response

Proceedings                                                      152

1    to which of these particular efforts, but we had tried to

2    obtain them, days and days in a row in response to Your

3    Honor's comments on the record.  When defendants have stated

4    that they suspect the records are incomplete, they tried to

5    move to preclude Dr. Pillai from testifying and from the use

6    of the records and Your Honor said that you would not be

7    entertaining motions to preclude but you said if you have the

8    records give them to the other side.  If you don't, it's too

9    late.  Let's move on.  So we were very concerned about the

10   incomplete records.

11              THE COURT:  Then why did you certify back all of

12   those years ago if you had given them the records?  You didn't

13   know that?

14              MS. HUOT:  We had a reason to believe it was because

15   she went and obtained the records but she had no way of

16   knowing that they were not complete.

17              THE COURT:  Who went and obtained them?

18              MS. HUOT:  Plaintiff did.  She went and obtained the

19   records and produced them.  She obtained the records multiple

20   times because she obtained them to apply for the New York

21   State Commission for the Blind and was given records and then

22   she went and had to apply for some experimental treatment in

23   2019 and she wanted to obtain records and they were the same

24   records and then she went for this case and she got the same

25   records.  So there was no way that she would think that -- we

Proceedings                                            153

1   did not suspect --

2           THE COURT:  How did you get them in order to turn

3   them over to the defense?

4           MS. HUOT:  Plaintiff went to request them.

5           THE COURT:  And this time she got them all.

6           MS. HUOT:  Just now?

7           THE COURT:  Yes.

8           MS. HUOT:  Because defendant sent a subpoena and we

9   made phone calls to the records department --

10          MR. BELDNER:  The legal department.

11          MS. HUOT:  And we got involved and, you know,

12  plaintiff then contacted them and was like just give them

13  everything, give them give them and we're very concerned and

14  as soon as we got them we gave it to them immediately.

15          MR. RICH:  If I may --

16          MS. HUOT:  One more thing.  They were produced, the

17  records from NYU.  NYU produced records to the defendant,

18  dozens and dozens of pages.

19          THE COURT:  Is it your position that NYU gave them

20  the very records that they're complaining about now?  And how

21  do you know that?

22          MS. HUOT:  Because they were produced in this case.

23  They're on the exhibit list.  I don't know what exhibit number

24  they are.  They're not identical but they incorporate the

25  information.  They incorporate the notes from Dr. Pillai.

Proceedings                                    154

1        THE COURT:  That's what you had given them before.

2        MS. HUOT:  They gave it to us.  So a long time -- in

3   this litigation they went and got documents from NYU

4   themselves pursuant to, like, a HIPAA or subpoena.  I'm not

5   sure.  We weren't copied on every single thing, we now

6   learned.  They received documents from NYU directly that they

7   produced in this case with defendant's Bates number and those

8   were from NYU.  And these are also from NYU.

9        MS. DONNELLY:  Your Honor, if I may; when we went to

10  the Court for the motion to compel on the HIPPA

11  authorizations, we were denied everything up until 2020.  We

12  were able to get HIPAA authorization from the plaintiff from

13  2020 to the present.  We did serve a HIPAA authorization on

14  NYU Eye Center which is different from NYU Neurology which is

15  where Dr. Pillai is.  They gave us the entire file

16  irrespective that it was only 2020 to present.

17       THE COURT:  You got all of these records?

18       MS. DONNELLY:  No, none of these records.

19       THE COURT:  You just said they gave you something.

20  They gave you all the records even though you're --

21       MR. RICH:  From ophthalmology, not neurology.

22  Pillai is a neurologist.

23       MS. HUOT:  We didn't get any of her records.

24       MR. RICH:  Your Honor, on a separate matter,

25  counsel --

Proceedings                                              155

1          THE COURT:  Let her finish.

2          MS. DONNELLY:  We did serve a subpoena on Dr. Pillai

3    and was told there was nothing after 2020.  We were precluded

4    from getting these preexisting records.  The HIPAA

5    authorization I gave them went back to 2019 to see if we could

6    get complete records.  They said that's not what the judge

7    said and provided us with HIPAA authorizations that were from

8    2020 to the present.  We never saw these documents.  I have

9    been trying to get these documents.

10         THE COURT:  Well, there were two exhibits from 2018,

11   two dates.  Where did you get those?  There were two days that

12   you admittedly had.  Where did you get those records from?

13         MS. DONNELLY:  I'm not following you.

14         THE COURT:  There were two dates that you had, two

15   latter dates.

16         MS. DONNELLY:  The plaintiff produced those and told

17   us that they were the complete records of Dr. Pillai.

18         MR. BELDNER:  It was our understanding based on --

19         THE COURT:  A moment ago you said that there were

20   records on their --

21         MR. RICH:  Your Honor, if I may --

22         MS. HUOT:  Let me respond.

23         THE COURT:  Just be quiet until I get a response to

24   this question.

25         MS. HUOT:  Because those earlier records are

SN        OCR        RPR

Proceedings                                          156

1   incorporated in the later records, the defendants do have

2   records with Dr. Pillai in them and the later records, because

3   the HIPAA form was for a later time, the records still

4   incorporate the earlier records because they continue to add

5   notes.  They add notes and when you print them out you have

6   the earlier nodes.

7            MR. RICH:  Your Honor --

8            MS. DONNELLY:  Let me --

9            MR. RICH:  This --

10           MS. DONNELLY:  Let me be clear; there were no

11  records from any physician produced after 2020.

12           THE COURT:  After 2020?

13           MS. DONNELLY:  After.

14           THE COURT:  But they're not seeking to put in

15  records.

16           MS. DONNELLY:  That's all I had authorization for.

17  To suggest I got anything other than from NYU Ophthalmology

18  other than 2019, that's not true.  I never got any notes from

19  Dr. Pillai or from Dr. Falk, and I served him four times.

20           THE COURT:  You what?

21           MS. DONNELLY:  He was served four times.

22           MS. HUOT:  Dr. Falk.  And I never got any records

23  from him.

24           MR. RICH:  Your Honor, with regard to -- an hour

25  hand a half ago -- first of all, the later records do not

Proceedings                                                157

1   incorporate all the information from the earlier dates.

2   That's an absurdity because they are required under New York

3   law to make an entry to record the symptoms.  If they refer to

4   an earlier date that's all it is, it's a reference.  There may

5   be a result of a test or something like that but that's an

6   absurdity, number one.

7              Number two, counsel said about an hour and a half

8   ago when we looked in the later records we saw that there were

9   these earlier visits but didn't do anything to get those

10  records.  They knew that there were these earlier visits so to

11  suggest -- we weren't aware that there were earlier visits and

12  there would be records.  It's absurd because she said an hour

13  and a half ago that she saw from the later records these two

14  earlier visits.

15

16              (Continued on the following page.)

17

18

19

20

21

22

23

24

25

*Proceedings*                                                              158

1   (Continuing.)

2           MR. RICH:  And we never got those records and they

3   knew it.

4           MS. HUOT:  Your Honor, we're not experts in how

5   medical records are kept other than what we've been advised on

6   how these -- these form of records are kept.  There are notes.

7   We thought that was the entirety of the records.  They were

8   provided these records three years ago and those -- the whole

9   point of Dr. Pillai's testimony is to just discuss her

10  treatments and that she referred her to get these -- this

11  tests and then got it back and diagnosed her with LHON.  If --

12          MR. RICH:  If she has --

13          THE COURT:  Hold on.  Do not interrupt her.

14          MR. RICH:  I thought she was done.

15          THE COURT:  She obviously wasn't done.

16          MS. HUOT:  Dr. Pillai is not here testifying as an

17  expert witness.  She's just testifying about her treatment.

18  She can testify from just the notes that we had.  The

19  additional notes were requested by defendants, and it's like a

20  tactic that they begged us for these notes, begged us to help

21  them facilitate getting these notes just to now say:  Now we

22  want to preclude her from testifying because we didn't have

23  these particular notes earlier.

24          But the notes that defendants produced do have

25  reference to Dr. Pillai.  Yes, they're not every single entry

1   of the notes.  But the main reason of why we want Dr. Pillai

2   to testify, they've had those records for years.  They're not

3   surprised by anything here.  She's not here as an expert

4   witness to evaluate and assess different technology, different

5   pictures here, exams or whatever.  She --

6            THE COURT:  So you are not seeking to offer into

7   evidence the records that were not turned over?

8            MS. HUOT:  Your Honor, we just want Dr. Pillai to

9   testify --

10           THE COURT:  You are not seeking to offer those

11  records into evidence; is that correct?  Yes or no.

12           MS. HUOT:  Yes.

13           THE COURT:  Yes, you're not.

14           MS. HUOT:  That's correct.

15           For Dr. Pillai?

16           THE COURT:  Yes.

17           MS. HUOT:  That's correct.  We don't need to.

18           THE COURT:  Okay.  Fine.

19           I understand your concern.  I understand the

20  defendants' concern that they were told that they have all the

21  records, but also three years ago, you would have noticed that

22  maybe there were other records that were missing.

23           MS. DONNELLY:  I did.  That's why we made the motion

24  to compel, and I never understood why they did not give the

25  HIPAA authorizations.

*Proceedings*                                            160

1        In every single case I have, when there's emotional

2   distress or disability case, usually the plaintiff --

3        THE COURT:  Okay.  But that dealt with the

4   magistrate judge's ruling, and we are not going back over all

5   of that.

6        I understand defendants' concern.  I understand

7   defendants being upset to get these records at the very last

8   minute.  I don't see how your prejudiced.

9        MS. DONNELLY:  Your Honor, we might have --

10       THE COURT:  Might have what?

11       MS. DONNELLY:  We might have treated how we were

12  going to approach this differently with those records.  I will

13  tell you why.  Those records have underlying information that

14  would enable them to get the records in from Dr. Pillai.  When

15  they didn't have that information, they couldn't get that in,

16  I don't know that I would have deposed her with respect to

17  what was in those documents.  With what's in the new

18  documents, I might have.

19       THE COURT:  For what?  What would you have asked

20  her?

21       MS. DONNELLY:  Because then she had the underlying

22  test results that she could testify to.

23       MS. HUOT:  Your Honor, actually it's explicitly

24  stated in the documents they already had, that she was the one

25  that referred to get the test --

*Proceedings*                                                                161

1          THE COURT:  All of these records only establish

2    basically one thing, that she had this eye condition; correct?

3          MS. HUOT:  Yes.

4          THE COURT:  I don't think anybody is legitimately

5    disputing that she had this eye condition.

6          MR. BELDNER:  Defendants are.

7          THE COURT:  I didn't ask you to say anything, okay?

8          MR. BELDNER:  Sorry.

9          THE COURT:  I don't see how the defendants are

10   prejudiced by any of this.

11         And I understand your concern about the way that

12   records were handled and about getting things at the last

13   minute, and that's a very valid concern, but, basically, I

14   don't see that there's any prejudice.

15         Both my law clerk and I read through both sets of

16   documents here, and it took, I think, ten minutes to read one,

17   15 minutes to read the other.  Now, I don't see how -- I'm

18   talking now just about Pillai's documents.  I understand your

19   concern.  I don't think that discovery was handled in the way

20   it should have been here, but I don't see that there's any

21   prejudice, and I'm not going to preclude her testimony and the

22   Government -- I mean, the plaintiff doesn't want to offer

23   these exhibits if.  If you want to offer them, you can.

24   You're certainly not precluded from doing that.

25         So let's now take the documents with respect to the

*Proceedings*                                                    162

1    psychiatrist or the psychologist, Dr. Falk.

2              Now, there are all these pages of notes here.  At

3    one point, you said you want to -- I mean, these notes, I

4    guess, basically support the two-page letter that he wrote;

5    correct?  Is there anything inconsistent between his notes and

6    the letter?

7              MS. DONNELLY:  I have no idea.  I can't read half of

8    them.

9              THE COURT:  Well, you know, it's interesting because

10   I just heard testimony about how one of the things plaintiff

11   lawyers need to do is learn how to read doctors' notes with

12   bad handwriting, so somebody didn't learn how to do that on

13   your end?

14             MS. DONNELLY:  I will tell you, honestly, when I was

15   younger, I had an easier time reading these medical records --

16             THE COURT:  They are difficult to read.

17             MR. RICH:  Your Honor, many of them were out of

18   focus.  They were literally copied out of focus.  That's not

19   the same as reading bad handwriting, and there's differences

20   between something that's legible and illegible.  These are

21   largely illegible.  We can't even figure out what's said in

22   these.  If somebody writes a note that's large enough, we can

23   basically make out --

24             THE COURT:  So what would you have done if you would

25   have gotten these notes three years ago?

*Proceedings*                                                    163

1        MS. DONNELLY:  I 100 percent would have deposed this

2   doctor.  100 percent.

3        MS. HUOT:  Your Honor, if I may, they received a

4   detailed letter from him basically expressing the core issues

5   in this case, and they got that letter from him three years

6   ago, and they chose not to depose him.  These notes is exactly

7   the underlying of what is on that letter, evidently.  If they

8   wanted to depose him based on these notes that they can't

9   read, why didn't they depose him based on the letter, the

10   two-page letter that basically expresses the key elements of

11   this case for her emotional distress.  They chose not to

12   depose him.

13        MR. DiLORENZO:  Your Honor, the emotional distress

14   issue -- so the two-page letter, we've been able to pick some

15   things out of those notes.  One, if we read it correctly, was

16   the reason she was upset with her boyfriend was because he got

17   somebody else pregnant at work.  That was the first time she

18   had the anxiety attack.  That's not in the two-page letter.

19   We would have deposed that.  That's a big issue on emotional

20   distress.  That was before he came to work -- before she came

21   to work at the Prakhin firm.

22        MR. RICH:  There's also something --

23        THE COURT:  Listen, listen, I am sick and tired of

24   this.  Behave like professionals before the Court, please.

25   Give me the benefit of that.  And, as I say, the court

Proceedings                                            164

1    reporter, who -- it's quarter to six at night.  I'm trying to

2    resolve these issues late at night so we can have this case

3    moved forward, but I am not doing it under these circumstances

4    where everyone just feels like they've got to spew what they

5    think they ought to say.  I mean, honestly.

6              MS. HUOT:  I'm so sorry.

7              THE COURT:  Did your parents ever tell you "no"?

8    Really.  Honestly.

9              MS. HUOT:  I thought there was confusion.

10             MR. RICH:  Your Honor, with regard to these notes,

11   there are additional things which are noted.  One, which is a

12   couple of words which refer to:  Boyfriend, shit.

13             And another is --

14             THE COURT:  Why can't you ask him about it?

15             MR. RICH:  Well, Your Honor, another is Safe

16   Horizons, which is a New York State organization which

17   protects women who are battered.  We have no notation about

18   anything like that.

19             THE COURT:  When is this doctor coming to testify?

20             MS. HUOT:  Your Honor, Friday.

21             MR. BELDNER:  Friday afternoon.  He's the last

22   witness.

23             MS. HUOT:  There's confusion between two different

24   witnesses, Your Honor.  They're talking about somebody from

25   before plaintiff was hired to the firm.  He started treating

*Proceedings*                                                          165

1   her in 2019.  They're talking about a different witness.  I'm

2   so sorry I interrupted.  I just wanted to clarify.  They're

3   talking about a different person.

4           THE COURT:  You mean there's nothing in these notes

5   about Safe Horizon?

6           MS. HUOT:  No.  He started treating her in 2019

7   after she was fired.  I don't know what they're referring to

8   about pre-Prakhin.  It's a different witness.

9           MR. RICH:  It's in those notes.

10          MR. DiLORENZO:  Your Honor, I'd deposed him before

11  Friday, if you give me the chance.

12          THE COURT:  Pardon me?

13          MR. DiLORENZO:  I would depose him before Friday if

14  you gave me the chance to have him read those notes to me so I

15  can understand them.

16          MS. HUOT:  Your Honor, there's nothing in here

17  about --

18          MR. DiLORENZO:  We can't tell what's in there, Your

19  Honor.  It's an emotional distress case.

20          THE COURT:  Can you have his deposition at night?

21          MR. DiLORENZO:  I will do it any time.

22          THE COURT:  Okay.  Do his deposition.  Work it out

23  and do his deposition at night one night this week after we're

24  done.

25          MR. DiLORENZO:  Thank you, Your Honor.

*Proceedings*                                              166

1        THE COURT:  And the deposition is not to last any

2   longer than two hours, okay?  That's the most amount of time.

3        MR. DiLORENZO:  Will you give me three hours so he

4   can read those notes to me?  It's going to take an hour and a

5   half to read the notes to me.

6        MS. HUOT:  Most of these are calendar entries.  Your

7   Honor, there's only --

8        MR. RICH:  There are notes on each calendar --

9        MS. HUOT:  Hold on a second.  I'm speaking.

10       THE COURT:  Stop it.

11       MS. HUOT:  There's six pages of actual notes.  The

12   rest of them are calendar entries.  There's six pages of

13   notes.

14       MR. DiLORENZO:  Your Honor, I don't want to waste

15   his time or mine.

16       THE COURT:  These notes, I agree, are difficult to

17   read, but I can basically read them, so if there are certain

18   words that you have -- that you can't read that you want to

19   ask him about, that's fine, but I don't think that he needs --

20   would need to read every single thing here.

21       MR. RICH:  Your Honor, those notes, which are -- and

22   I would ask, Your Honor, that they provide us with a copy

23   because when he got the subpoena, he contacted them, we need a

24   copy that's not out of focus.

25       THE COURT:  It's not out of focus.

*Proceedings*                                                  167

1          MR. RICH:  Yes, there are several pages out of

2     focus.

3          MR. DiLORENZO:  If he can bring his originals to the

4     deposition, that would be helpful.

5          THE COURT:  Yes.

6          MR. BELDNER:  The only thing I would say, Your

7     Honor, is that I believe if there are issues with things being

8     out of focus is that these entry books contained information

9     related to other clients, and so I think he was maybe moving

10    stuff around and he was making copies in order to protect the

11    confidential information of other people that he treats.

12         MR. RICH:  That's fine.  We need something in focus.

13         THE COURT:  There's a couple of the calendar

14    entries.  The notes are not --

15         MR. RICH:  Your Honor, he's got notes on the

16    calendar entries --

17         THE COURT:  Please.  Stop it.  I was talking and you

18    interrupted me.

19         MR. RICH:  I'm sorry.  I thought you were finished.

20         THE COURT:  I just don't understand.

21         MR. RICH:  I apologize.

22         THE COURT:  Have him make another copy of the

23    calendar entries.  Ask him to make another copy of the

24    calendar entries and to provide those to counsel.

25         MS. HUOT:  Okay.  Your Honor, would that be in lieu

*Proceedings*                                                    168

1  of the deposition?

2        THE COURT:  No.

3        MS. HUOT:  Your Honor, one more question about the

4  deposition.  Would the deposition be him just reading these

5  notes?

6        THE COURT:  It's going to be two hours, and the

7  defendants have to decide how they want to use those two

8  hours.

9        MS. HUOT:  Okay.

10        THE COURT:  If they want him to read notes the

11  entire time, go for it, but that probably wouldn't be very

12  helpful.

13        MR. DiLORENZO:  I agree with Your Honor.

14        THE COURT:  But two hours is all you've got.  This

15  is after work.

16        MR. DiLORENZO:  I assume he will be cooperative and

17  not give speeches and eat up my two hours.

18        MS. HUOT:  He's not our client.

19        THE COURT:  Can you arrange that?

20        MR. BELDNER:  I will call him right when I leave the

21  courthouse.

22        THE COURT:  Arrange a night to do that.

23        MR. DiLORENZO:  Your Honor, I just know he's pretty

24  cute on not turning his notes over, that's all.

25        MS. HUOT:  Your Honor, I object to that.

*Proceedings*                                                      169

1          MR. BELDNER:  You can question him as to why he

2    didn't have notes.

3          MR. DiLORENZO:  I will.

4          THE COURT:  All right.  We'll begin at 9:30

5    tomorrow.  I'm going to ask plaintiff's counsel to try and

6    move things along.  I mean, I understand that you are trying

7    to deal with every potential argument that the defense may

8    make, but I don't know that it's necessary to do that in all

9    of that detail.  I will ask you to try to speed it up.

10          How much longer do you think this witness is going

11    to be on the stand?

12          MS. HUOT:  Your Honor, give me one second.  I'm

13    sorry.  Your Honor, I think several more hours, but not like a

14    whole day or anything like that.  It's just that it's

15    time-consuming to introduce documents, but we -- we're unable

16    to stipulate to the introduction of certain documents, so we

17    are forced to do them this way.

18          THE COURT:  What documents?

19          MS. HUOT:  Her 1099s.

20          THE COURT:  Couldn't you have stipulated to those

21    Amazon records?

22          MS. HUOT:  Could not have, Your Honor.  The 1099s --

23          THE COURT:  You all wouldn't stipulate to the Amazon

24    records?

25          MS. DONNELLY:  The receipts?

*Proceedings*                                                      170

1          MS. HUOT:  They argued at opening that she didn't

2    buy them, that they bought them for her.  In opening

3    arguments --

4          THE COURT:  Oh, is that why you didn't stipulate to

5    them?

6          MR. DiLORENZO:  We weren't asked to stipulate to

7    them.  Your Honor, we got a sworn statement from her that said

8    she, never not once -- the words are:  Not once did I ask them

9    for reimbursement.

10         We just listened to this testimony today from a

11   lawyer after she signed that sworn statement.

12         THE COURT:  What does that have to do with those

13   Amazon receipts coming into evidence?  You are saying you

14   weren't asked to stipulate to them?

15         MS. DONNELLY:  They're in, aren't they?

16         THE COURT:  Yes, they're in.  I mean, it's -- when

17   are you getting to the heart of your case, which is what --

18   what she said to the defendant and what the defendant said to

19   her?

20         MS. HUOT:  Your Honor, that's coming up in the

21   timeline, but their entire defense to this case is that she

22   wasn't entering SAGA records; that she wasn't settling cases;

23   that she was not performing her job.  Their opening argument

24   discussed this whole faking of the deposition issue.  We had

25   to put it into context.  I think that's critical to our case.

*Proceedings*                                                          171

1           THE COURT:  Who is your next witness after the

2    plaintiff?

3           MS. HUOT:  Dr. Pillai.

4           THE COURT:  And then how many --

5           MS. HUOT:  Oh, I'm sorry -- yes, Dr. Pillai.

6           MR. BLENDER:  We assume that defendants' cross of

7    plaintiff will be extensive, and then Dr. Pillai, and then

8    Mr. Prakhin.

9           THE COURT:  Also, I mentioned to you earlier that

10   when counsel came into the case representing Mr. Prakhin that

11   I didn't want a lot of unnecessary duplication, so that

12   applies to the cross of this witness.  I don't want to hear

13   the same questions asked by both lawyers, and I'm going to cut

14   it off if you do that, so you all think carefully how you want

15   to do the most effective cross of the witnesses so we don't

16   have duplication.

17          All right, I will see you at 9:30.

18          MS. HUOT:  Thank you, Your Honor.

19          MR. BELDNER:  Thank you, Your Honor.

20          MS. RUDERMAN:  Thank you, Your Honor.

21       (Matter adjourned to February 7, 2023, at 9:30 a.m.)

22

23               *      *      *      *      *

24

25

172

<u>I N D E X</u>

OPENING STATEMENT BY MS. HUOT                18

OPENING STATEMENT BY MR. DiLORENZO           30

OPENING STATEMENT BY MR. RICH                45

YELENA RUDERMAN

    DIRECT EXAMINATION BY MS. HUOT           58

<u>E X H I B I T S</u>

Plaintiff's Exhibit 41

Plaintiff's Exhibit 271                      106

Plaintiff's Exhibit 26                       123

Plaintiff's Exhibit 16                       128

Plaintiff's Exhibit 15 was received in
evidence                                     130

Plaintiff's Exhibit 14 was received in
evidence                                     133

Plaintiff's Exhibit 13 was received in
evidence                                     138

# ALL WORD INDEX

1

## $

**$10,000** [1] - 86:2
**$3,600** [3] - 131:12, 131:21, 134:14
**$300,000** [1] - 90:18
**$35,000** [1] - 70:7
**$45,000** [1] - 70:10
**$5,000** [1] - 86:1
**$500** [2] - 86:8

## 1

**1** [2] - 95:14, 99:1
**100** [6] - 100:13, 100:20, 115:12, 151:3, 163:1, 163:2
**100,000** [3] - 90:8, 90:20, 90:22
**10016** [1] - 1:17
**10017** [1] - 1:12
**10107** [1] - 1:21
**106** [1] - 172:11
**1099s** [2] - 169:19, 169:22
**11/20** [2] - 6:1, 6:16
**11/2018** [1] - 6:10
**11/27** [4] - 6:1, 6:10, 6:15, 6:17
**11201** [1] - 1:23
**11556** [1] - 1:15
**116** [7] - 97:11, 100:21, 100:22, 101:1, 102:20, 104:12, 115:12
**117** [2] - 150:10, 150:13
**118** [2] - 150:11, 150:13
**123** [1] - 172:12
**128** [1] - 172:13
**13** [5] - 137:19, 137:22, 138:15, 138:16, 172:17
**130** [1] - 172:15
**133** [1] - 172:16
**138** [1] - 172:18
**14** [5] - 132:8, 132:11, 133:6, 133:19, 172:16
**14th** [4] - 22:14, 67:22, 67:23
**15** [7] - 19:12, 129:20, 129:23, 130:4, 130:5, 161:17, 172:14
**15th** [1] - 123:5
**16** [11] - 18:20, 22:13, 29:22, 49:18, 67:22, 84:24, 128:9, 128:11, 128:17, 128:18, 172:13
**16th** [1] - 107:2
**17th** [3] - 117:8, 117:15, 126:20
**18** [2] - 91:12, 172:3
**19** [1] - 107:3
**19-cv-2987** [1] - 2:4
**19CV2987** [1] - 1:2
**19th** [1] - 150:12
**1st** [3] - 97:22, 115:7, 151:19

## 2

**20** [2] - 40:11

**20/20** [1] - 65:1
**20/200** [1] - 66:10
**20/250** [1] - 50:18
**200** [2] - 95:18, 102:6
**200-plus** [1] - 33:25
**2006** [1] - 68:15
**2009** [1] - 68:20
**2012** [17] - 33:6, 69:1, 69:3, 69:15, 82:22, 84:7, 84:17, 85:9, 85:16, 85:18, 85:24, 86:14, 87:13, 87:22, 87:23, 114:25, 126:18
**2014** [2] - 86:12, 92:25
**2017** [18] - 19:8, 33:6, 82:22, 84:7, 84:19, 85:1, 85:9, 85:21, 85:22, 85:24, 86:14, 87:9, 87:13, 87:22, 87:23, 87:25, 114:25, 126:18
**2018** [36] - 5:13, 19:15, 22:14, 26:1, 26:13, 33:15, 64:25, 65:16, 65:18, 66:15, 66:18, 67:7, 67:23, 84:8, 88:22, 91:12, 91:21, 92:13, 93:13, 95:12, 95:14, 95:24, 99:1, 106:19, 110:14, 110:19, 110:23, 113:12, 123:5, 126:20, 129:9, 130:8, 142:24, 155:10
**2019** [6] - 109:10, 152:23, 155:5, 156:18, 165:1, 165:6
**2020** [8] - 146:2, 154:11, 154:13, 154:16, 155:3, 155:8, 156:11, 156:12
**2022** [2] - 24:16, 150:12
**2023** [2] - 1:6, 171:21
**22/50** [1] - 54:22
**225** [1] - 1:23
**22nd** [2] - 1:17, 24:16
**23rd** [1] - 145:21
**25** [4] - 32:16, 32:21, 49:23, 56:11
**250** [1] - 1:20
**26** [10] - 20:7, 26:1, 66:15, 66:18, 122:5, 122:8, 122:17, 123:3, 142:24, 172:12
**26th** [4] - 1:12, 62:5, 65:18, 113:12
**27** [1] - 106:19
**271** [6] - 106:13, 106:15, 106:22, 106:23, 172:11
**28th** [1] - 5:16
**2:00** [1] - 1:7

## 3

**3,000** [2] - 118:12, 120:4
**3,600** [1] - 131:21
**30** [1] - 172:4
**35** [1] - 45:6
**35,000** [1] - 85:15
**3:14** [1] - 52:1

## 4

**4** [1] - 94:18
**40** [4] - 33:19, 93:11, 93:17, 100:25
**41** [7] - 62:25, 63:18, 63:19, 63:24,

**64:10, 64:11, 172:10**
**45** [1] - 172:5
**45,000** [1] - 85:19

## 5

**5** [2] - 90:12, 98:19
**5,000** [1] - 90:24
**50** [2] - 33:19
**57th** [1] - 1:20
**58** [1] - 172:7
**5:20** [1] - 143:18

## 6

**6** [2] - 1:6, 94:18
**60** [3] - 33:19, 45:12, 89:17
**600** [1] - 1:17
**626** [1] - 1:14
**685** [1] - 1:12

## 7

**7** [1] - 171:21

## 8

**80** [1] - 86:5
**80,000** [2] - 85:22, 88:9

## 9

**9** [2] - 129:9, 130:8
**90,000** [1] - 88:9
**900** [3] - 82:6, 82:8, 82:9
**9:30** [4] - 143:14, 169:4, 171:17, 171:21
**9th** [1] - 133:21

## A

**a.m** [1] - 171:21
**ability** [4] - 11:13, 24:24, 29:24, 39:1
**able** [26] - 20:11, 27:2, 32:2, 32:4, 35:24, 46:17, 47:21, 49:22, 51:3, 52:3, 83:3, 83:5, 83:8, 95:2, 99:6, 101:9, 107:4, 107:6, 121:18, 121:20, 124:4, 138:22, 147:23, 154:12, 163:14
**abrupt** [1] - 23:11
**absence** [1] - 41:19
**absences** [4] - 27:4, 40:19, 40:25, 49:23
**absent** [2] - 32:12, 67:4
**absolute** [1] - 46:21
**absolutely** [2] - 7:19, 7:25
**absurd** [1] - 157:12
**absurdity** [2] - 157:2, 157:6
**accept** [7] - 14:4, 15:4, 16:22, 16:23, 16:24, 91:8, 91:9

ALL WORD INDEX 2

**accepted** [2] - 13:21, 43:4
**access** [7] - 11:16, 83:3, 83:5, 83:8, 83:21, 124:4, 125:3
**accessibility** [1] - 24:25
**accident** [7] - 38:5, 50:24, 51:7, 54:9, 73:5, 73:11
**accidents** [2] - 70:21, 71:12
**accommodate** [4] - 28:1, 28:7, 28:9, 42:19
**accommodating** [1] - 22:11
**accommodation** [8] - 28:13, 28:15, 32:5, 33:3, 36:6, 36:9, 39:7, 42:16
**accommodations** [3] - 20:23, 43:5, 47:15
**accomodation** [1] - 53:21
**according** [4] - 18:9, 54:23, 84:25, 86:2
**acknowledges** [1] - 46:24
**acquire** [1] - 34:6
**acquired** [1] - 4:17
**acquisition** [2] - 5:3, 5:5
**Act** [1] - 28:21
**act** [2] - 15:22, 75:3
**action** [3] - 9:22, 9:24, 10:2
**actions** [1] - 29:9
**active** [4] - 82:7, 82:9, 82:17, 82:18
**activities** [1] - 34:24
**actual** [2] - 150:20, 166:11
**ADA** [2] - 53:19, 56:6
**adapt** [1] - 47:13
**add** [5] - 6:6, 83:17, 84:3, 156:4, 156:5
**addition** [4] - 13:3, 34:9, 34:13, 148:1
**additional** [6] - 4:17, 12:20, 19:9, 47:12, 158:19, 164:11
**address** [7] - 7:14, 9:19, 10:5, 58:23, 124:3, 124:5, 124:7
**addressed** [1] - 123:8
**addresses** [3] - 27:5, 124:11, 124:14
**adequate** [1] - 26:19
**adequately** [1] - 119:9
**adjourn** [1] - 79:24
**adjourned** [1] - 171:21
**adjournment** [1] - 79:23
**admissibility** [1] - 15:10
**admission** [1] - 13:25
**admit** [1] - 38:2
**admits** [1] - 39:12
**admitted** [10] - 16:24, 19:5, 38:3, 68:23, 70:3, 113:25, 114:21, 139:20, 142:3, 142:7
**admittedly** [1] - 155:12
**admonition** [1] - 143:13
**advice** [2] - 39:23, 97:5
**advise** [2] - 86:19, 97:6
**advised** [3] - 116:19, 137:13, 158:5
**affairs** [1] - 17:3
**affect** [2] - 11:13, 40:8
**affected** [1] - 33:22
**affecting** [1] - 40:16

**affirm** [1] - 18:7
**afternoon** [15] - 2:3, 2:8, 2:10, 2:11, 2:16, 2:21, 2:23, 9:3, 9:13, 30:18, 40:20, 45:3, 58:24, 58:25, 164:21
**afterwards** [2] - 36:7, 38:5
**agency** [1] - 61:11
**ago** [14] - 70:23, 117:21, 145:10, 145:22, 148:23, 152:12, 155:19, 156:25, 157:8, 157:13, 158:8, 159:21, 162:25, 163:6
**agree** [4] - 14:3, 75:2, 166:16, 168:13
**agreeable** [1] - 81:3
**agreed** [3] - 79:22, 98:18, 98:23
**agreeing** [1] - 44:10
**agreement** [5] - 14:1, 74:14, 79:21, 98:3, 105:20
**ahead** [8] - 46:1, 55:25, 89:14, 90:1, 118:23, 128:5, 128:6, 132:6
**Aided** [1] - 1:24
**Alan** [7] - 3:9, 3:10, 30:23, 45:4, 59:1, 67:11, 128:22
**ALAN** [1] - 1:20
**alleges** [1] - 73:6
**allowed** [2] - 137:15, 146:4
**allowing** [1] - 28:8
**allows** [2] - 15:24, 62:21
**almost** [9] - 38:5, 51:6, 61:19, 65:1, 68:9, 73:12, 81:11, 119:16, 120:12
**altering** [1] - 18:22
**alternatives** [1] - 135:11
**amazingly** [1] - 49:6
**Amazon** [7] - 128:13, 128:21, 129:25, 130:7, 169:21, 169:23, 170:13
**ambulance** [4] - 48:4, 113:20, 113:22, 114:6
**American** [2] - 24:18, 68:5
**Americans** [1] - 28:20
**AMON** [1] - 1:9
**Amon** [3] - 2:2, 9:21, 28:12
**amount** [2] - 40:23, 166:2
**Annabel** [1] - 23:3
**annabel** [1] - 2:16
**Annie** [3] - 127:7, 127:9, 127:11
**announcement** [3] - 95:12, 95:18, 97:20
**annoying** [1] - 145:7
**answer** [14] - 15:20, 15:22, 29:13, 80:6, 101:2, 107:6, 107:15, 119:20, 144:10, 144:11, 144:12
**answered** [4] - 15:18, 114:8, 119:24, 144:16
**antidiscrimination** [1] - 93:6
**anxiety** [6] - 23:18, 35:20, 35:21, 36:14, 40:7, 163:18
**apologize** [1] - 167:21
**appear** [1] - 81:2
**appearance** [4] - 17:10, 17:21, 95:4, 101:11
**appearances** [9] - 24:12, 35:7, 40:20,

40:21, 40:23, 41:2, 82:25, 93:19
**appetite** [1] - 23:19
**applicable** [1] - 14:19
**applicants** [1] - 54:12
**application** [3] - 61:21, 62:8, 62:11
**applications** [1] - 4:9
**applied** [4] - 23:23, 42:10, 54:13, 62:2
**applies** [2] - 48:23, 171:12
**apply** [6] - 13:22, 14:21, 17:7, 29:4, 152:20, 152:22
**applying** [1] - 24:16
**appointment** [8] - 7:12, 112:9, 112:14, 112:15, 112:18, 112:20, 114:18, 140:18
**appreciate** [1] - 44:14
**appreciated** [1] - 110:17
**approach** [5] - 6:13, 62:15, 106:8, 122:3, 160:12
**approached** [2] - 11:7, 113:19
**approaches** [3] - 6:14, 106:10, 147:8
**approaching** [1] - 96:19
**Approaching** [1] - 62:17
**appropriate** [1] - 46:20
**approval** [1] - 62:6
**approve** [1] - 142:13
**approved** [1] - 116:20
**approving** [1] - 57:4
**April** [1] - 24:16
**arbitrations** [1] - 24:20
**area** [4] - 48:5, 53:5, 54:22, 113:17
**argue** [1] - 45:25
**argued** [1] - 170:1
**argument** [1] - 29:16, 169:7, 170:23
**arguments** [3] - 13:23, 15:11, 170:3
**arises** [1] - 11:18
**arrange** [2] - 168:19, 168:22
**arrive** [1] - 113:23
**aside** [2] - 93:17, 115:11
**ass** [1] - 37:16
**assess** [2] - 73:1, 159:4
**assigned** [17] - 44:1, 44:5, 49:16, 62:7, 62:12, 76:11, 77:15, 80:5, 90:4, 90:11, 93:15, 96:9, 96:10, 99:17, 100:15, 100:19, 100:25
**assigning** [2] - 96:11, 96:14
**assignment** [1] - 101:7
**assignments** [3] - 99:21, 100:6, 101:3
**assist** [1] - 136:24
**assistance** [3] - 5:2, 110:21, 127:20
**assisted** [1] - 24:6
**assisting** [1] - 80:22
**assistive** [19] - 20:20, 24:7, 24:13, 24:22, 27:13, 60:21, 63:9, 67:8, 67:9, 126:22, 126:23, 126:24, 127:18, 129:13, 130:18, 135:13, 136:21, 138:21
**assists** [1] - 21:17
**associate** [4] - 33:8, 70:2, 70:8, 70:11
**associates** [2] - 35:3, 65:21

ALL WORD INDEX                                                    3

**assume** [2] - 168:16, 171:6
**assuming** [1] - 6:22
**attach** [2] - 15:25, 16:22
**attack** [1] - 163:18
**attacks** [1] - 23:18
**attend** [3] - 71:17, 71:23, 113:1
**attended** [2] - 59:11, 73:23
**attending** [1] - 112:15
**attention** [6] - 29:10, 32:7, 40:18, 58:2, 101:22, 113:11
**attest** [2] - 27:1, 27:11
**attorney** [43] - 15:8, 19:6, 26:15, 29:25, 31:6, 32:10, 33:9, 33:17, 33:24, 40:10, 42:6, 43:16, 43:25, 52:21, 59:8, 69:12, 70:2, 70:8, 70:11, 71:14, 71:16, 75:18, 76:6, 77:9, 77:18, 80:7, 81:2, 85:16, 85:18, 88:12, 88:15, 91:24, 93:22, 95:8, 95:21, 109:16, 110:11, 110:16, 118:22, 127:4, 127:6
**attorney's** [2] - 80:21, 90:19
**attorneys** [33] - 11:22, 12:6, 14:7, 14:8, 14:11, 17:18, 26:17, 26:20, 35:3, 37:23, 40:18, 41:3, 73:18, 74:5, 75:25, 76:1, 77:16, 78:15, 79:19, 83:25, 89:2, 91:6, 91:22, 95:23, 100:18, 112:3, 115:5, 121:6, 121:7, 124:10, 124:13
**attorneys'** [1] - 90:13
**August** [3] - 106:19, 107:2, 107:3
**authority** [6] - 97:18, 97:23, 109:3, 109:5, 109:6, 109:7
**authorization** [4] - 154:12, 154:13, 155:5, 156:16
**authorizations** [4] - 146:3, 154:11, 155:7, 159:25
**available** [1] - 141:2
**Avenue** [2] - 1:12, 1:17
**awarded** [1] - 68:19
**aware** [4] - 29:23, 50:6, 123:16, 157:11

# B

**background** [2] - 17:3, 68:11
**bad** [8] - 36:14, 36:15, 36:22, 41:6, 41:8, 48:20, 162:12, 162:19
**balance** [1] - 10:22
**bar** [5] - 19:5, 45:10, 68:21, 68:22, 68:23
**barely** [1] - 47:20
**base** [1] - 16:11
**based** [14] - 11:4, 11:23, 12:1, 16:4, 16:11, 52:5, 54:4, 77:12, 81:13, 143:9, 149:2, 155:18, 163:8, 163:9
**basis** [5] - 11:5, 24:3, 43:19, 82:14, 105:20
**Bates** [1] - 154:7
**battered** [1] - 164:17
**bears** [1] - 14:14
**became** [7] - 45:7, 59:13, 85:16, 85:18, 107:25, 110:25, 111:1
**become** [4] - 34:7, 45:9, 92:1, 92:12

**becomes** [1] - 34:15
**BEFORE** [1] - 1:9
**began** [1] - 19:4
**begged** [2] - 158:20
**begin** [5] - 16:15, 18:12, 58:19, 143:14, 169:4
**beginning** [5] - 50:13, 74:2, 82:21, 115:24, 115:25
**begins** [1] - 72:13
**behalf** [2] - 44:9, 74:16
**behave** [1] - 163:24
**Belarus** [1] - 59:8
**Beldner** [3] - 2:12, 23:3
**BELDNER** [19] - 1:14, 1:15, 2:11, 4:1, 4:4, 55:10, 147:12, 147:14, 148:14, 151:4, 153:10, 155:18, 161:6, 161:8, 164:21, 167:6, 168:20, 169:1, 171:19
**beneficial** [1] - 119:17
**benefit** [1] - 163:25
**Bensonhurst** [1] - 45:11
**Beron** [3] - 26:24, 95:21, 98:2
**best** [5] - 6:25, 26:16, 43:10, 43:12, 107:16
**bet** [1] - 37:19
**better** [5] - 85:3, 107:14, 112:11, 112:21, 131:16
**between** [13] - 13:6, 14:1, 45:20, 74:15, 79:21, 82:7, 85:9, 94:18, 95:20, 96:5, 121:7, 148:22, 162:5, 162:20, 164:23
**beyond** [1] - 32:24
**bias** [1] - 17:9
**big** [3] - 42:10, 53:18, 163:19
**bigger** [1] - 25:6
**biggest** [2] - 110:10, 110:18
**Bill** [5] - 125:21, 125:25, 126:4, 126:6, 126:8
**bill** [9] - 47:14, 52:25, 72:21, 73:3, 73:8, 73:12, 75:5, 75:6, 138:10
**billing** [1] - 5:7
**bills** [2] - 73:14, 77:21
**bit** [3] - 12:4, 13:9, 59:5
**black** [1] - 51:2
**blame** [1] - 41:5
**bleeding** [2] - 57:12, 57:13
**BLENDER** [1] - 171:6
**Blind** [5] - 61:9, 61:10, 62:3, 62:10, 64:2, 152:21
**blind** [10] - 20:17, 22:16, 59:7, 61:12, 62:14, 64:2, 64:17, 66:9, 66:10, 111:1
**blinded** [2] - 46:7, 46:8
**blindness** [1] - 27:7
**blogging** [1] - 10:10
**blood** [14] - 25:25, 141:1, 141:8, 141:11, 142:1, 142:22, 143:7, 143:9, 145:23, 147:2, 147:5, 147:18, 148:8, 149:21
**blurriness** [2] - 111:3, 111:8
**blurry** [14] - 34:15, 35:15, 39:11,

49:21, 50:7, 50:11, 54:22, 59:24, 59:25, 65:17, 110:25, 111:12, 112:23
**BOND** [1] - 1:16
**Bond** [1] - 2:25
**bonus** [6] - 86:3, 86:7, 86:9, 86:10, 90:12
**bonuses** [1] - 19:8
**books** [2] - 11:20, 167:8
**boss** [2] - 32:21, 47:25
**Bosworth** [1] - 127:8
**bottom** [1] - 150:12
**bought** [4] - 47:4, 128:23, 129:8, 170:2
**bound** [1] - 15:4
**boyfriend** [2] - 163:16, 164:12
**bragged** [1] - 36:11
**brain** [8] - 113:10, 113:12, 113:15, 113:17, 113:21, 114:8, 114:14, 114:22
**break** [2] - 103:13, 104:10
**breath** [2] - 24:4, 131:24, 132:2
**brief** [2] - 64:14, 103:2
**bring** [9] - 16:8, 17:2, 31:15, 40:12, 47:19, 112:17, 167:3
**bringing** [2] - 36:5, 104:3
**Brooklyn** [3] - 1:5, 40:22, 59:9
**brought** [3] - 10:1, 16:8, 33:14
**bunch** [2] - 27:19, 27:20
**burden** [1] - 14:14
**BURR** [1] - 2:14
**Burr** [2] - 2:14, 23:3
**business** [1] - 48:20
**businessman** [3] - 18:15, 22:17, 30:2
**busy** [2] - 49:5, 49:9
**button** [1] - 61:4
**buy** [4] - 21:2, 129:8, 132:6, 170:2
**BY** [23] - 1:18, 18:14, 30:17, 45:2, 58:21, 63:20, 87:1, 88:6, 89:18, 98:15, 100:5, 102:7, 104:9, 106:12, 106:24, 108:18, 109:14, 112:2, 128:1, 172:3, 172:4, 172:5, 172:7
**BY:ALAN** [1] - 1:21
**BY:INNESSA** [1] - 1:13
**BY:JOSHUA** [1] - 1:15

# C

**cab** [1] - 47:12
**cabinet** [1] - 81:11
**Cadman** [1] - 1:23
**calendar** [14] - 7:12, 8:14, 8:16, 81:12, 84:24, 93:24, 123:15, 166:6, 166:8, 166:12, 167:13, 167:16, 167:23, 167:24
**calendars** [2] - 78:13, 78:17
**calm** [1] - 108:5
**Camilo** [2] - 2:14, 23:3
**CAMPBELL** [1] - 1:19
**Campbell** [4] - 2:25, 3:6, 3:8, 31:1
**candidates** [1] - 97:13
**cane** [1] - 59:24

ALL WORD INDEX
4

**cannot** [3] - 31:19, 148:20
**capable** [3] - 20:15, 20:16, 23:13
**capacities** [1] - 1:6
**capacity** [2] - 10:4, 48:24
**card** [2] - 62:13, 64:18
**care** [4] - 38:21, 48:10, 49:13, 123:21
**career** [3] - 19:4, 19:14, 23:16
**carefully** [1] - 171:14
**cares** [1] - 48:11
**CAROL** [1] - 1:9
**carol** [1] - 2:2
**carry** [4] - 124:16, 124:17, 124:18, 125:10
**cars** [1] - 51:2
**case** [131] - 2:4, 8:5, 9:23, 10:7, 10:8, 10:13, 10:15, 10:17, 10:19, 10:21, 10:25, 11:1, 11:3, 11:4, 11:6, 11:8, 11:9, 11:10, 11:17, 11:18, 11:22, 11:23, 12:1, 12:7, 12:25, 13:2, 13:5, 13:6, 13:10, 13:16, 13:18, 13:24, 16:13, 16:16, 16:19, 17:9, 17:14, 17:18, 17:19, 18:8, 19:3, 25:8, 28:11, 29:4, 29:5, 29:10, 30:9, 30:20, 31:10, 31:12, 31:18, 31:19, 35:5, 39:19, 42:13, 48:19, 50:25, 52:21, 53:2, 54:15, 54:16, 56:21, 65:9, 65:13, 71:2, 73:8, 73:11, 73:12, 74:2, 74:3, 74:5, 74:7, 76:22, 76:23, 77:8, 80:1, 80:5, 80:7, 81:6, 81:9, 83:11, 83:18, 90:9, 90:12, 90:18, 94:25, 95:5, 95:6, 95:7, 97:5, 101:16, 101:24, 101:25, 102:1, 102:2, 102:5, 102:9, 102:11, 103:18, 105:5, 105:9, 105:12, 105:15, 105:20, 106:1, 107:1, 109:16, 121:12, 121:14, 123:23, 125:6, 143:14, 143:17, 144:6, 144:22, 145:22, 152:24, 153:22, 154:7, 160:1, 160:2, 163:5, 163:11, 164:2, 165:19, 170:17, 170:21, 170:25, 171:10
**case-by-case** [1] - 105:20
**caseload** [4] - 34:11, 90:3, 90:11, 93:10
**cases** [96] - 18:16, 19:14, 20:16, 22:18, 33:8, 33:18, 33:19, 34:1, 34:3, 34:5, 34:9, 34:11, 35:11, 36:24, 37:8, 41:2, 43:15, 44:1, 44:4, 49:16, 71:16, 77:17, 79:6, 81:8, 81:14, 82:2, 82:5, 82:7, 82:9, 82:14, 86:16, 86:17, 93:11, 93:15, 93:17, 93:18, 93:20, 93:21, 93:23, 95:3, 95:16, 95:19, 96:1, 96:5, 96:8, 96:9, 96:12, 96:16, 96:24, 97:2, 97:6, 97:9, 97:11, 97:12, 97:16, 97:18, 97:24, 97:25, 98:2, 98:4, 98:6, 98:8, 98:17, 98:24, 99:15, 99:17, 99:21, 100:7, 100:10, 100:13, 100:15, 100:19, 100:20, 100:22, 100:25, 102:3, 102:21, 104:12, 104:22, 107:24, 108:1, 108:24, 109:1, 109:8, 115:12, 121:23, 122:1, 123:25, 124:17, 124:22, 125:11, 170:22

**catch** [1] - 49:10
**CAUSE** [1] - 1:8
**caused** [4] - 20:8, 21:23, 23:18, 34:15
**causes** [1] - 26:20
**caution** [1] - 103:16
**CBA** [1] - 1:2
**cell** [6] - 25:4, 27:4, 48:9, 61:1, 61:3, 120:17
**Center** [1] - 154:14
**central** [2] - 54:21, 66:11
**centrally** [1] - 59:25
**certain** [11] - 13:18, 14:2, 43:18, 50:17, 56:17, 77:16, 79:23, 80:9, 80:13, 166:17, 169:16
**certainly** [2] - 44:24, 161:24
**certificate** [2] - 62:13, 64:16
**certification** [1] - 64:1
**certifications** [1] - 7:23
**certify** [2] - 145:25, 152:11
**certifying** [1] - 64:17
**cetera** [2] - 17:20, 107:7
**chance** [8] - 22:8, 22:13, 24:14, 26:9, 29:24, 121:24, 165:11, 165:14
**change** [4] - 75:9, 80:4, 85:4, 130:25
**changed** [1] - 43:3
**changes** [1] - 35:14
**charge** [1] - 47:8
**chasers** [1] - 48:4
**chat** [1] - 10:10
**cheaper** [1] - 135:11
**check** [3] - 43:17, 125:13, 138:9
**checked** [2] - 8:9, 37:10
**choices** [1] - 34:2
**chorus** [1] - 18:10
**chose** [2] - 163:6, 163:11
**Christmas** [5] - 85:25, 86:3, 86:7, 86:9, 86:10
**circumstances** [2] - 13:18, 164:3
**city** [2] - 28:19, 28:23
**City** [2] - 28:22, 56:6
**civil** [2] - 2:5, 9:22
**CIVIL** [1] - 1:8
**claim** [14] - 5:3, 18:25, 27:24, 27:25, 28:7, 29:19, 70:18, 72:15, 72:16, 72:18, 72:25, 77:2, 78:5
**claims** [2] - 29:7, 30:6
**clarify** [2] - 100:18, 165:2
**classic** [1] - 149:4
**clean** [2] - 142:1, 142:2
**clear** [8] - 4:16, 30:5, 33:20, 47:20, 49:21, 53:15, 54:20, 156:10
**clearest** [2] - 29:14, 29:19
**clerk** [1] - 161:15
**CLERK** [1] - 2:3
**client** [42] - 5:19, 5:20, 18:20, 46:12, 46:13, 48:14, 48:16, 49:3, 49:5, 71:25, 72:3, 73:1, 75:19, 79:25, 84:2, 90:15, 101:12, 102:9, 102:15, 106:16, 106:17, 107:18, 108:5, 109:15, 118:4,

118:5, 118:15, 118:19, 118:20, 118:23, 118:24, 119:6, 119:9, 119:12, 119:13, 119:20, 119:23, 120:20, 168:18
**client's** [2] - 38:8, 90:16
**clientele** [1] - 45:13
**clients** [59] - 24:12, 24:19, 24:21, 35:2, 35:5, 37:21, 37:23, 38:22, 39:15, 39:16, 39:17, 39:22, 39:23, 40:13, 40:17, 41:12, 45:16, 48:3, 48:6, 48:7, 48:10, 48:11, 48:17, 49:6, 49:12, 49:15, 49:16, 50:1, 50:3, 56:19, 77:22, 78:21, 79:5, 79:8, 79:13, 79:16, 80:9, 80:12, 80:13, 80:14, 80:15, 80:16, 86:22, 89:10, 96:18, 99:13, 105:21, 105:22, 106:3, 108:19, 109:19, 109:21, 118:21, 121:6, 167:9
**close** [3] - 59:23, 65:15, 65:19
**closed** [1] - 82:17
**closely** [2] - 33:12, 34:10
**closer** [1] - 59:20
**closest** [1] - 43:19
**closing** [3] - 14:7, 14:12, 86:23
**cold** [1] - 23:11
**colleagues** [2] - 25:13, 26:25
**collect** [2] - 54:9, 54:10, 90:13
**collection** [1] - 96:18
**College** [1] - 59:11
**Columbia** [4] - 25:25, 61:25, 141:2, 141:4
**comfort** [1] - 103:12
**coming** [4] - 37:15, 164:19, 170:13, 170:20
**commenced** [1] - 49:22
**comments** [2] - 44:19, 152:3
**Commission** [8] - 47:8, 61:9, 61:10, 62:3, 62:10, 64:1, 64:17, 152:21
**committee** [1] - 121:1
**Committee** [1] - 50:2
**common** [7] - 29:11, 57:10, 74:20, 75:4, 75:5, 124:13
**communicate** [7] - 10:11, 10:12, 39:15, 45:15, 77:22, 122:1, 124:9
**communicated** [1] - 102:14
**communicating** [5] - 40:17, 79:5, 86:22, 99:13, 106:1
**communication** [1] - 96:18
**community** [1] - 45:12
**companies** [1] - 59:2
**company** [1] - 71:6
**Company** [1] - 24:18
**compared** [1] - 26:22
**compassion** [1] - 107:13
**compel** [7] - 74:16, 74:18, 74:24, 74:25, 75:3, 154:10, 159:24
**compensation** [2] - 70:6, 70:9
**competent** [1] - 48:23
**complain** [3] - 47:2, 106:3, 107:18
**complained** [6] - 37:20, 37:24, 39:17, 106:6, 108:23

**complaining** [3] - 50:3, 108:1, 153:20
**complains** [1] - 47:6
**complaint** [11] - 37:4, 47:4, 47:6, 47:7, 47:9, 72:13, 72:24, 73:2, 78:2, 78:4, 78:8
**complaints** [5] - 19:6, 38:1, 106:5, 106:6, 108:20
**complete** [10] - 6:4, 44:22, 122:18, 122:20, 146:1, 146:2, 146:4, 152:16, 155:6, 155:17
**completed** [2] - 3:11, 12:17
**completely** [1] - 20:3
**completion** [1] - 14:6
**compliance** [2] - 74:1, 74:4
**complicated** [2] - 29:12, 75:22
**Computer** [1] - 1:24
**computer** [21] - 21:17, 24:25, 47:11, 60:20, 81:12, 111:5, 111:6, 111:12, 135:14, 135:24, 136:23, 138:25
**Computer-Aided** [1] - 1:24
**computers** [2] - 21:24, 60:22
**concern** [6] - 159:19, 159:20, 160:6, 161:11, 161:13, 161:19
**concerned** [3] - 5:4, 152:9, 153:13
**concerning** [2] - 15:1, 17:12
**concerns** [7] - 87:14, 87:18, 87:20, 88:19, 94:7, 94:19, 108:6
**conclusion** [3] - 4:10, 14:23, 28:11
**conclusions** [1] - 14:10
**condition** [29] - 18:16, 18:17, 22:18, 22:19, 44:7, 50:14, 54:20, 64:5, 66:6, 66:9, 133:1, 143:10, 144:1, 144:3, 144:6, 144:21, 145:13, 148:7, 149:17, 149:18, 149:25, 150:4, 150:22, 150:24, 151:2, 151:8, 151:9, 161:2, 161:5
**conditions** [2] - 33:7, 57:18
**conduct** [4] - 23:7, 26:20, 35:5, 94:1
**conference** [9] - 4:23, 74:2, 74:4, 125:6, 125:19, 149:25, 150:11
**conferences** [9] - 71:18, 73:23, 73:25, 74:1, 74:7, 113:1, 125:7
**confidential** [2] - 45:20, 167:11
**confirm** [1] - 25:25
**confirmation** [1] - 138:2
**confirmed** [1] - 26:1
**confirming** [1] - 147:5
**confusion** [7] - 104:14, 104:16, 104:21, 104:24, 110:1, 164:9, 164:23
**congratulations** [1] - 110:9
**conjunction** [1] - 53:9
**connection** [1] - 15:11
**consecutive** [2] - 116:12, 140:7
**consider** [3] - 15:21, 16:1, 89:23
**considerably** [1] - 103:10
**consideration** [1] - 17:15
**considered** [2] - 30:5, 31:25
**consist** [1] - 13:10
**consistent** [1] - 30:9

**constantly** [1] - 78:15
**constitute** [1] - 12:13
**constitutes** [1] - 26:18
**consultant** [1] - 43:14
**consulting** [1] - 11:19
**consuming** [1] - 169:15
**contact** [5] - 11:10, 49:6, 50:2, 65:1, 110:22
**contacted** [3] - 48:14, 153:12, 166:23
**contacting** [2] - 48:17, 78:21
**contain** [4] - 5:20, 5:22, 5:23, 13:19
**contained** [1] - 167:8
**contains** [1] - 5:23
**context** [3] - 13:25, 45:14, 170:25
**contingency** [1] - 90:15
**continual** [1] - 24:3
**continue** [20] - 26:6, 29:24, 55:25, 98:5, 98:13, 98:20, 98:25, 99:4, 99:13, 99:15, 99:17, 99:20, 112:24, 113:1, 113:3, 115:17, 124:8, 139:10, 139:17, 156:4
**Continued** [7] - 22:22, 51:11, 86:25, 111:16, 127:25, 146:7, 157:16
**continued** [5] - 24:8, 26:13, 26:14, 67:2, 113:2
**continues** [1] - 42:3
**Continuing** [4] - 63:22, 128:3, 147:1, 158:1
**continuing** [4] - 23:1, 87:1, 112:2, 133:15
**contribute** [1] - 139:6
**convenient** [1] - 44:11
**conveniently** [1] - 54:16
**conversation** [7] - 45:19, 84:3, 92:6, 107:5, 120:21, 134:10, 137:2
**conversations** [4] - 120:16, 121:5, 121:6, 148:21
**converse** [2] - 17:19
**convinced** [1] - 44:15
**cooperative** [3] - 56:7, 56:24, 168:16
**copied** [2] - 154:5, 162:18
**copies** [1] - 167:10
**copy** [5] - 63:13, 166:22, 166:24, 167:22, 167:23
**core** [1] - 163:4
**correct** [25] - 5:14, 64:18, 72:4, 76:3, 78:9, 83:10, 88:2, 102:19, 110:12, 115:16, 124:3, 124:23, 129:10, 133:3, 133:25, 135:12, 144:3, 144:6, 144:21, 145:14, 159:11, 159:14, 159:17, 161:2, 162:5
**correctly** [2] - 119:22, 163:15
**cost** [4] - 21:6, 133:24, 137:14, 138:18
**costs** [1] - 47:12
**Counsel** [3] - 106:10, 145:14, 147:8
**counsel** [23] - 6:14, 18:4, 27:18, 52:9, 55:14, 63:4, 87:5, 103:8, 103:17, 104:6, 105:4, 105:8, 105:15, 106:11, 117:21, 129:4, 129:6, 150:23, 154:25, 157:7, 167:24, 169:5, 171:10

**counselor** [2] - 62:7, 62:12
**County** [2] - 93:22, 93:23
**couple** [9] - 4:13, 4:15, 47:5, 49:10, 66:13, 97:4, 109:11, 164:12, 167:13
**course** [6] - 16:5, 23:5, 39:12, 49:7, 65:25, 148:15
**COURT** [217] - 1:1, 2:10, 2:21, 3:1, 3:4, 3:6, 3:8, 3:11, 3:14, 3:18, 3:24, 4:3, 4:6, 4:8, 4:13, 4:20, 5:11, 5:17, 5:19, 5:25, 6:9, 6:15, 6:21, 7:3, 7:22, 8:4, 8:21, 9:3, 9:7, 9:10, 9:13, 18:12, 29:17, 30:12, 44:18, 44:22, 44:25, 45:25, 52:9, 52:16, 53:25, 55:11, 55:16, 55:18, 55:24, 58:3, 58:8, 58:17, 58:19, 58:23, 62:16, 62:20, 63:3, 63:7, 63:14, 63:16, 63:19, 64:10, 64:15, 76:4, 76:9, 79:13, 79:15, 81:20, 82:3, 82:13, 87:22, 88:4, 89:14, 92:19, 98:13, 100:1, 100:9, 100:11, 100:14, 101:20, 102:2, 103:1, 103:5, 103:8, 103:11, 103:14, 103:16, 103:23, 104:3, 104:6, 105:18, 106:9, 106:22, 107:21, 107:24, 108:14, 108:17, 109:6, 109:9, 109:11, 116:4, 118:10, 118:17, 120:8, 121:3, 122:4, 122:17, 123:2, 124:21, 124:25, 125:14, 127:22, 128:17, 129:1, 129:4, 129:6, 130:4, 132:23, 133:6, 133:9, 133:12, 133:15, 133:18, 133:23, 134:1, 134:19, 138:7, 138:10, 138:13, 143:6, 143:12, 143:19, 143:23, 143:25, 144:13, 144:17, 145:3, 145:11, 147:7, 147:9, 147:11, 147:13, 147:22, 148:10, 148:20, 149:14, 149:16, 150:5, 150:14, 151:1, 151:6, 151:12, 151:20, 151:22, 152:11, 152:17, 153:2, 153:5, 153:7, 153:19, 154:1, 154:17, 154:19, 155:1, 155:10, 155:14, 155:19, 155:23, 156:12, 156:14, 156:20, 158:13, 158:15, 159:6, 159:10, 159:13, 159:16, 159:18, 160:3, 160:10, 160:19, 161:1, 161:4, 161:7, 161:9, 162:9, 162:16, 162:24, 163:23, 164:7, 164:14, 164:19, 165:4, 165:12, 165:20, 165:22, 166:1, 166:10, 166:16, 166:25, 167:5, 167:13, 167:17, 167:20, 167:22, 168:2, 168:6, 168:10, 168:14, 168:19, 168:22, 169:4, 169:18, 169:20, 169:23, 170:4, 170:12, 170:16, 171:1, 171:4, 171:9
**Court** [13] - 1:22, 11:11, 74:13, 74:15, 75:3, 76:23, 76:24, 77:1, 77:4, 77:6, 106:11, 154:10, 163:24
**court** [30] - 2:1, 11:2, 13:23, 17:24, 24:11, 24:20, 35:6, 47:9, 52:1, 60:2, 71:18, 73:23, 76:7, 78:15, 82:25, 83:7, 84:13, 93:19, 95:4, 101:10, 103:7, 113:1, 123:7, 123:16, 125:6, 125:7, 125:19, 145:6, 148:21, 163:25

**Court's** [1] - 10:18
**courthouse** [1] - 168:21
**Courthouse** [1] - 1:4
**COURTROOM** [8] - 2:3, 4:11, 18:6, 18:11, 58:13, 125:16, 130:24, 131:14
**courtroom** [6] - 11:5, 11:24, 16:12, 31:10, 31:15, 143:18
**cover** [3] - 40:23, 124:17, 125:6
**coverage** [1] - 41:1
**covering** [3] - 125:5, 125:10, 125:19
**COVID** [3] - 7:10, 23:25, 44:13
**coworkers** [1] - 20:14
**crappy** [1] - 48:5
**crazy** [1] - 49:6
**critical** [3] - 52:21, 55:1, 170:25
**cross** [8] - 12:24, 13:3, 63:3, 100:14, 114:22, 171:6, 171:12, 171:15
**cross-examination** [1] - 63:3
**cross-examine** [1] - 12:24
**cross-examining** [1] - 13:3
**crossed** [1] - 48:16
**CRTV** [1] - 61:6
**CTRV** [3] - 60:12, 60:17, 60:18
**cubicle** [1] - 110:17
**cubicles** [1] - 110:7
**cure** [2] - 20:10, 26:3
**cut** [1] - 171:13
**cute** [1] - 168:24

# D

**dad** [3] - 113:15, 113:20, 114:21
**daily** [4] - 70:16, 78:11, 83:23, 120:12
**damages** [5] - 34:25, 35:1, 52:19, 53:3
**data** [3] - 148:3, 148:4, 149:3
**date** [11] - 6:15, 73:5, 79:23, 81:3, 81:8, 113:14, 117:9, 117:16, 121:22, 123:16, 157:4
**dated** [2] - 123:5, 150:12
**dates** [16] - 5:13, 5:23, 6:1, 6:2, 6:3, 6:17, 6:18, 6:22, 75:10, 78:17, 81:10, 155:11, 155:14, 155:15, 157:1
**day-to-day** [2] - 43:19, 77:24
**days** [29] - 18:21, 19:22, 19:23, 22:13, 29:22, 32:16, 32:21, 49:18, 49:23, 56:11, 66:3, 67:1, 84:24, 89:5, 91:10, 116:3, 116:5, 116:11, 116:12, 123:22, 139:23, 140:1, 140:5, 140:7, 140:9, 152:2, 155:11
**deadlines** [3] - 74:3, 78:13, 96:22
**deal** [3] - 42:6, 50:21, 169:7
**dealing** [2] - 36:21, 40:7
**dealings** [1] - 17:7
**dealt** [1] - 160:3
**Debra** [1] - 107:17
**December** [12] - 24:14, 37:2, 50:8, 62:6, 62:8, 67:7, 67:22, 86:4, 86:12, 150:12
**decent** [1] - 89:11

**decide** [9] - 11:4, 11:23, 41:11, 76:24, 77:8, 79:22, 88:3, 88:23, 168:7
**decided** [3] - 31:25, 33:24, 45:9
**decision** [19] - 36:14, 36:15, 36:17, 36:22, 40:1, 41:4, 41:6, 41:8, 41:10, 41:17, 41:24, 41:25, 42:2, 44:8, 110:8
**decisions** [3] - 31:14, 31:15, 40:1
**deemed** [2] - 66:10, 80:15
**deeper** [1] - 96:15
**defend** [4] - 35:6, 71:5, 72:5, 72:15
**defendant** [14] - 3:15, 9:7, 9:11, 12:17, 13:4, 65:13, 70:25, 71:2, 71:3, 153:8, 153:17, 170:18
**defendant's** [6] - 5:3, 7:16, 12:21, 100:18, 118:22, 154:7
**Defendants** [2] - 1:7, 1:16
**defendants** [30] - 2:22, 4:19, 4:24, 5:1, 7:13, 7:21, 8:17, 8:22, 10:2, 12:19, 13:2, 13:6, 14:13, 18:25, 27:6, 27:17, 27:22, 27:24, 28:6, 63:13, 103:21, 152:3, 156:1, 158:19, 158:24, 160:7, 161:6, 161:9, 168:7
**defendants'** [3] - 159:20, 160:6, 171:6
**defending** [3] - 71:24, 72:1, 80:19
**defense** [14] - 12:18, 27:18, 30:20, 44:10, 44:16, 68:6, 71:5, 72:14, 72:19, 150:23, 153:3, 169:7, 170:21
**definitely** [2] - 78:23, 94:3
**deliberate** [2] - 10:14, 10:20
**deliberations** [3] - 14:20, 15:22, 16:15
**demanded** [1] - 22:4
**demanding** [1] - 36:6
**demonstrate** [2] - 23:5, 29:5
**demonstrated** [1] - 55:7
**denied** [8] - 20:24, 21:1, 21:4, 33:3, 36:2, 146:4, 154:11
**denies** [1] - 77:4
**deny** [1] - 27:23
**department** [3] - 5:7, 153:9, 153:10
**departure** [1] - 109:25
**depose** [5] - 163:6, 163:8, 163:9, 163:12, 165:13
**deposed** [5] - 118:19, 160:16, 163:1, 163:19, 165:10
**deposition** [48] - 13:21, 38:4, 38:7, 38:8, 42:11, 42:12, 42:13, 46:7, 47:25, 54:2, 55:7, 55:20, 71:24, 72:2, 72:3, 72:5, 72:6, 75:1, 80:23, 83:7, 93:24, 94:1, 95:5, 117:16, 117:17, 118:4, 118:5, 118:6, 118:21, 118:25, 119:9, 119:11, 119:15, 119:16, 120:6, 121:16, 125:19, 126:20, 165:20, 165:22, 165:23, 166:1, 167:4, 168:1, 168:4, 170:24
**depositions** [24] - 13:18, 13:19, 24:11, 24:19, 27:14, 35:6, 38:24, 71:18, 71:21, 71:23, 72:10, 78:16, 80:17, 80:20, 82:25, 84:13, 93:19, 113:3, 120:11, 139:10, 139:14, 139:15
**depression** [1] - 23:19

**DEPUTY** [7] - 4:11, 18:6, 18:11, 58:13, 125:16, 130:24, 131:14
**describe** [5] - 59:15, 88:25, 102:25, 109:24, 110:20
**describes** [1] - 78:5
**desire** [1] - 50:1
**desk** [2] - 49:14, 113:19
**desktop** [1] - 24:25
**desperate** [1] - 105:11
**despite** [8] - 23:21, 32:9, 38:15, 39:2, 41:13, 115:17, 135:8
**detail** [3] - 11:22, 103:19, 169:9
**detailed** [1] - 163:4
**details** [2] - 79:21, 103:21
**deteriorate** [1] - 110:24
**deteriorated** [1] - 20:4
**determination** [2] - 12:1, 14:18
**determine** [8] - 14:16, 14:21, 14:22, 14:23, 16:21, 16:25, 17:4, 38:11
**determined** [1] - 25:23
**determining** [2] - 16:24, 17:15
**devastating** [1] - 20:7
**developed** [2] - 96:24, 103:23
**develops** [1] - 34:14
**device** [19] - 24:13, 32:5, 60:11, 60:24, 61:3, 62:20, 63:1, 63:7, 67:13, 67:16, 126:24, 127:18, 129:13, 130:16, 130:18, 135:13, 136:17, 136:21, 138:22
**devices** [22] - 20:20, 20:24, 20:25, 24:7, 24:22, 24:24, 25:4, 26:6, 27:13, 60:21, 61:15, 62:19, 63:9, 63:10, 67:8, 67:10, 67:12, 67:19, 126:22, 126:23, 139:7
**diagnosed** [8] - 18:21, 34:17, 35:19, 61:12, 61:25, 66:5, 66:14, 158:11
**diagnoses** [1] - 150:3
**diagnosis** [19] - 20:12, 20:18, 29:22, 49:19, 50:9, 61:17, 61:18, 62:4, 62:5, 65:18, 66:16, 66:17, 66:20, 66:25, 67:2, 67:6, 143:20, 150:16
**dialogue** [3] - 56:7, 56:9, 56:25
**diary** [1] - 123:13
**dichotomy** [1] - 13:6
**dictation** [2] - 135:14, 139:4
**Dictation** [1] - 21:9
**dictionaries** [1] - 11:20
**diem** [1] - 24:2
**difference** [2] - 82:7, 96:8
**differences** [1] - 162:19
**different** [21] - 13:9, 15:6, 19:1, 24:8, 25:22, 25:24, 29:1, 32:11, 36:10, 38:12, 43:5, 98:3, 107:10, 107:19, 154:14, 159:4, 164:23, 165:1, 165:3, 165:8
**differently** [3] - 28:25, 85:7, 160:12
**difficult** [6] - 25:21, 115:11, 124:15, 145:6, 162:16, 166:16
**difficulty** [2] - 117:18, 119:23
**diligent** [1] - 48:23

**DiLorenzo** [35] - 2:23, 2:24, 3:2, 3:5, 3:7, 3:17, 9:9, 29:15, 30:13, 30:14, 30:17, 30:18, 30:19, 46:2, 100:12, 147:20, 147:23, 149:23, 150:6, 150:10, 163:13, 165:10, 165:13, 165:18, 165:21, 165:25, 166:3, 166:14, 167:3, 168:13, 168:16, 168:23, 169:3, 170:6, 172:4
**DILORENZO** [2] - 1:18, 59:20
**DiMauro** [2] - 2:14
**DIRECT** [3] - 58:20, 112:1, 172:7
**direct** [6] - 25:10, 26:11, 92:1, 103:8, 109:15
**directed** [1] - 16:15
**direction** [2] - 98:7, 100:16
**directions** [1] - 100:6
**directly** [13] - 25:11, 44:20, 59:12, 68:17, 68:19, 70:13, 80:10, 101:14, 101:18, 137:5, 151:21, 154:6
**disabilities** [1] - 52:7
**Disabilities** [1] - 28:21
**disability** [38] - 9:25, 18:22, 18:24, 21:25, 22:2, 22:3, 22:5, 22:9, 23:7, 24:23, 27:23, 28:9, 29:1, 29:23, 31:20, 32:1, 32:3, 33:3, 36:2, 36:5, 36:16, 38:15, 38:17, 38:19, 40:2, 41:19, 42:15, 42:24, 43:4, 46:19, 52:8, 53:17, 53:19, 54:4, 54:14, 54:17, 160:2
**disabled** [8] - 27:24, 30:2, 32:1, 36:12, 38:18, 42:4, 42:18, 42:23
**discharged** [2] - 107:3, 142:21
**Disciplinary** [1] - 50:2
**discipline** [2] - 120:25, 121:1
**disciplined** [1] - 120:25
**disclose** [1] - 53:19
**disclosed** [5] - 18:21, 20:18, 21:25, 22:13, 29:22
**disclosing** [3] - 65:22, 66:25, 67:2
**discovery** [18] - 72:9, 72:10, 72:11, 72:13, 72:22, 74:6, 74:19, 74:22, 74:23, 75:4, 75:12, 75:17, 75:23, 76:2, 76:5, 77:20, 78:19, 161:19
**discriminated** [2] - 54:4, 54:14
**discriminating** [1] - 54:11
**discrimination** [3] - 9:25, 29:1, 29:3
**discuss** [15] - 10:7, 10:15, 10:19, 11:3, 11:9, 11:12, 15:13, 16:12, 16:16, 16:19, 68:10, 74:5, 143:14, 143:17, 158:9
**discussed** [4] - 17:23, 59:2, 80:17, 170:24
**discussing** [5] - 10:8, 10:21, 93:6, 117:21, 149:9
**discussion** [5] - 17:17, 39:8, 63:8, 92:4, 92:7
**discussions** [1] - 71:19
**disease** [1] - 20:8
**dispute** [3] - 72:19, 150:23, 150:24
**disputed** [1] - 148:24
**disputing** [1] - 161:5

**disregard** [2] - 15:3, 15:17
**dissatisfaction** [1] - 87:10
**distress** [9] - 23:10, 23:20, 23:21, 29:8, 160:2, 163:11, 163:13, 163:20, 165:19
**DISTRICT** [3] - 1:1, 1:1, 1:9
**divided** [1] - 34:1
**doctor** [22] - 5:21, 6:6, 27:4, 28:8, 32:8, 36:20, 50:13, 61:24, 69:6, 112:6, 112:7, 114:24, 115:2, 115:21, 145:24, 147:9, 147:11, 149:6, 149:9, 163:2, 164:19
**doctor's** [11] - 28:2, 28:3, 32:12, 36:5, 39:3, 39:7, 46:23, 46:25, 47:19, 114:15, 115:4
**doctors** [9] - 6:13, 19:23, 19:24, 32:13, 34:16, 35:20, 39:5, 55:6, 140:18
**doctors'** [1] - 162:11
**document** [26] - 52:24, 52:25, 55:21, 56:10, 57:8, 60:12, 60:19, 63:25, 64:3, 64:5, 78:5, 79:21, 96:18, 106:15, 119:5, 122:9, 122:25, 126:12, 128:12, 129:24, 132:12, 137:23, 145:21, 147:5, 147:7
**documentation** [3] - 46:21, 117:1, 142:17
**documents** [34] - 24:12, 24:21, 35:7, 53:6, 55:9, 57:3, 57:4, 81:9, 86:22, 118:1, 124:22, 125:2, 125:18, 126:11, 126:15, 146:6, 148:11, 149:6, 149:11, 150:20, 151:13, 154:3, 154:6, 155:8, 155:9, 160:17, 160:18, 160:24, 161:16, 161:18, 161:25, 169:15, 169:16, 169:18
**dollars** [4] - 21:6, 28:4, 86:10, 138:18
**done** [16] - 37:13, 37:23, 40:13, 52:4, 72:24, 76:5, 76:22, 93:20, 97:5, 104:21, 105:2, 158:14, 158:15, 162:24, 165:24
**Donnelley** [1] - 2:24
**Donnelly** [1] - 30:21
**DONNELLY** [37] - 1:18, 89:12, 92:18, 100:8, 103:12, 108:13, 118:9, 118:14, 121:2, 122:18, 122:21, 122:23, 123:1, 133:7, 133:17, 145:24, 148:13, 148:17, 154:9, 154:18, 155:2, 155:13, 155:16, 156:8, 156:10, 156:13, 156:16, 156:21, 159:23, 160:9, 160:11, 160:21, 162:7, 162:14, 163:1, 169:25, 170:15
**dont'** [1] - 109:2
**door** [1] - 30:1
**Dora** [2] - 107:17, 108:16
**dosage** [1] - 140:3
**double** [1] - 106:3
**down** [5] - 83:20, 98:11, 108:6, 144:7, 148:21
**downstairs** [1] - 17:25
**downturn** [1] - 23:25
**dozens** [3] - 26:17, 153:18

**Dr** [54] - 3:25, 4:3, 4:17, 4:24, 5:2, 25:10, 25:18, 25:22, 25:24, 26:3, 61:24, 62:1, 112:8, 112:12, 112:14, 112:18, 112:20, 113:8, 116:7, 140:20, 140:22, 140:23, 141:6, 142:19, 147:3, 147:10, 147:12, 147:15, 147:16, 148:4, 148:14, 148:16, 151:14, 151:15, 152:5, 153:25, 154:15, 155:2, 155:17, 156:2, 156:19, 156:22, 158:9, 158:16, 158:25, 159:1, 159:8, 159:15, 160:14, 162:1, 171:3, 171:5, 171:7
**draft** [6] - 52:24, 71:17, 74:10, 77:20, 78:8, 79:18
**drafting** [3] - 77:9, 78:2, 79:9
**Dragon** [9] - 21:9, 135:14, 135:18, 135:20, 135:23, 136:19, 136:22, 137:24, 139:4
**draw** [2] - 14:10, 113:11
**drive** [1] - 113:2
**driving** [4] - 25:19, 45:7, 45:8, 51:3
**dry** [1] - 48:12
**due** [1] - 78:17
**duly** [1] - 58:11
**dumped** [1] - 144:24
**duplicate** [1] - 105:1
**duplication** [2] - 171:11, 171:16
**during** [40] - 7:10, 15:8, 16:5, 20:21, 24:15, 26:17, 26:25, 29:6, 29:15, 32:9, 32:16, 33:11, 37:1, 39:5, 39:14, 42:20, 45:19, 76:22, 87:13, 87:21, 87:22, 93:5, 94:4, 94:10, 101:12, 101:16, 102:10, 102:14, 114:24, 116:6, 117:16, 119:5, 121:21, 139:10, 139:12, 140:13, 140:14, 142:4, 142:8
**duties** [6] - 35:13, 71:15, 71:16, 73:22, 77:13, 77:19

# E

**e-mail** [13] - 7:17, 10:9, 97:3, 100:16, 101:6, 104:18, 106:16, 106:18, 106:25, 108:3, 128:13, 138:12
**e-mailed** [1] - 60:19
**e-mails** [2] - 37:14, 121:25
**early** [1] - 19:8
**ease** [1] - 108:6
**easier** [2] - 47:15, 162:15
**East/Brooklyn** [1] - 1:23
**EASTERN** [1] - 1:1
**easy** [3] - 28:18, 39:10, 49:4
**eat** [1] - 168:17
**eBay** [1] - 135:7
**EBT** [1] - 46:6
**educated** [1] - 42:1
**EEOC** [1] - 47:7
**effect** [2] - 143:22, 150:25
**effective** [1] - 171:15
**effectively** [1] - 23:16
**effects** [1] - 118:13
**effort** [1] - 23:22

ALL WORD INDEX 8

**efforts** [2] - 151:24, 152:1
**eight** [3] - 91:23, 95:25, 96:3
**either** [7] - 41:21, 67:22, 71:25, 80:7, 80:11, 83:19, 129:1
**electronic** [1] - 10:9
**elements** [1] - 163:10
**elicit** [1] - 13:4
**Ellen** [2] - 2:24, 30:21
**ELLEN** [1] - 1:18
**email** [22] - 27:5, 122:10, 122:13, 123:5, 123:6, 123:11, 124:1, 124:3, 124:5, 124:7, 124:11, 124:14, 124:19, 124:21, 124:22, 125:2, 125:3, 125:11, 125:20, 126:2, 126:11, 126:15
**emergency** [2] - 83:14, 113:24
**emotional** [11] - 23:10, 23:20, 23:21, 29:8, 61:15, 160:1, 163:11, 163:13, 163:19, 165:19
**employed** [4] - 65:7, 81:7, 89:4, 139:14
**employee** [7] - 30:2, 92:7, 92:12, 92:14, 92:20, 94:25, 135:19
**employees** [3] - 28:24, 40:12, 92:9
**employer** [7] - 10:24, 32:6, 46:19, 56:8, 56:9, 68:21
**employers** [5] - 25:16, 27:9, 28:24, 54:3, 85:10
**Employment** [1] - 47:8
**employment** [3] - 33:22, 41:22, 41:23
**EMS** [1] - 113:23
**enable** [1] - 160:14
**encouraged** [1] - 124:12
**end** [9] - 6:7, 8:22, 10:14, 29:5, 41:19, 76:22, 95:23, 115:24, 162:13
**ended** [1] - 41:22
**ends** [1] - 118:6
**engage** [1] - 71:19
**English** [1] - 45:7
**enjoy** [1] - 145:4
**enlarged** [1] - 60:10
**entailed** [1] - 32:3
**enter** [9] - 82:19, 83:1, 83:24, 84:6, 84:8, 84:14, 106:20, 123:15, 130:2
**entering** [1] - 170:22
**enters** [2] - 9:2, 104:5
**entertaining** [1] - 152:7
**entire** [6] - 7:23, 23:16, 39:5, 154:15, 168:11, 170:21
**entirety** [1] - 158:7
**entitled** [3] - 13:20, 34:25, 37:6
**entity** [1] - 70:20
**entries** [10] - 94:23, 99:4, 99:6, 99:7, 166:6, 166:12, 167:14, 167:16, 167:23, 167:24
**entry** [5] - 101:20, 102:3, 157:3, 158:25, 167:8
**Equal** [1] - 47:7
**ER** [1] - 113:23
**Erica** [5] - 120:6, 120:9, 121:15,

122:12, 123:6
**error** [1] - 38:12
**ESQ** [6] - 1:13, 1:15, 1:18, 1:18, 1:19, 1:21
**essence** [1] - 53:1
**essentially** [2] - 72:2, 108:5
**establish** [2] - 12:18, 161:1
**establishes** [1] - 143:20
**estimate** [1] - 81:14
**et** [2] - 71:19, 107:7
**etched** [1] - 22:16
**ethics** [1] - 48:20
**etiquette** [1] - 107:14
**evaluate** [4] - 16:25, 17:2, 26:16, 159:4
**evaluating** [1] - 35:9
**eve** [1] - 144:24
**evening** [3] - 140:12, 143:13, 143:16
**event** [1] - 9:21
**events** [3] - 19:3, 29:20, 33:22
**eventually** [7] - 41:16, 59:13, 66:4, 66:7, 97:17, 113:25, 114:12
**everyday** [3] - 17:6, 29:12, 34:23
**everywhere** [1] - 48:5
**evidence** [83] - 10:17, 11:4, 11:6, 11:24, 12:1, 12:7, 12:9, 12:12, 12:14, 12:16, 12:17, 12:19, 12:20, 12:21, 13:4, 13:10, 13:12, 13:19, 13:24, 14:5, 14:7, 14:9, 14:10, 14:12, 15:9, 15:10, 15:16, 15:19, 15:24, 15:25, 16:2, 16:14, 16:19, 16:23, 16:24, 18:9, 19:2, 28:2, 29:6, 29:7, 29:19, 29:20, 30:5, 30:7, 30:9, 31:22, 33:1, 33:5, 34:21, 35:16, 35:19, 36:1, 36:10, 42:7, 43:11, 44:15, 45:23, 45:24, 54:7, 57:1, 64:9, 64:11, 86:24, 106:21, 106:23, 122:15, 123:3, 128:16, 128:18, 130:3, 130:5, 133:4, 133:19, 138:5, 138:16, 147:13, 159:7, 159:11, 170:13, 172:15, 172:16, 172:18
**evidently** [1] - 163:7
**exactly** [14] - 24:9, 26:8, 28:12, 32:3, 33:19, 53:13, 53:14, 56:14, 66:14, 67:24, 68:9, 141:17, 148:12, 163:6
**EXAMINATION** [5] - 58:20, 63:20, 112:1, 128:1, 172:7
**examination** [1] - 63:3
**examine** [1] - 12:24
**examined** [2] - 12:22, 58:11
**examining** [1] - 13:3
**example** [7] - 6:16, 6:19, 6:20, 13:4, 51:2, 74:22, 107:18
**exams** [1] - 159:5
**except** [2] - 27:7, 40:3
**exchange** [4] - 72:16, 73:5, 78:20, 79:3
**exchanged** [1] - 74:6
**excited** [1] - 19:14
**exclusive** [1] - 14:25
**excuse** [5] - 45:25, 48:11, 76:4, 143:13, 145:3

**excuses** [2] - 27:5, 27:19
**exhibit** [12] - 62:21, 63:6, 63:13, 63:17, 64:15, 98:9, 129:20, 132:8, 137:19, 150:20, 153:23
**Exhibit** [33] - 62:25, 63:18, 63:24, 64:10, 64:11, 106:11, 106:13, 106:15, 106:23, 122:5, 122:8, 123:3, 123:4, 128:9, 128:11, 128:18, 129:20, 129:23, 130:5, 132:8, 132:11, 133:19, 137:19, 137:22, 138:16, 172:10, 172:11, 172:12, 172:13, 172:14, 172:16, 172:17
**exhibits** [7] - 12:10, 12:18, 13:12, 13:13, 14:24, 155:10, 161:23
**existed** [1] - 8:20
**existence** [1] - 14:3
**exists** [1] - 93:2
**exits** [2] - 103:6, 143:18
**expect** [5] - 27:25, 28:6, 35:4, 52:11, 53:10
**expected** [2] - 119:21, 119:24
**expedite** [1] - 5:8
**expeditiously** [1] - 12:25
**expense** [2] - 38:22, 39:10, 47:10
**expensive** [3] - 21:5, 131:10, 134:12
**experience** [6] - 17:2, 34:6, 38:19, 52:17, 81:13, 86:15
**experienced** [1] - 150:3
**experiencing** [3] - 111:3, 111:8, 115:14
**experiment** [1] - 38:22
**experimental** [1] - 152:22
**experimented** [1] - 38:12
**expert** [5] - 44:4, 147:6, 148:6, 158:17, 159:3
**experts** [1] - 158:4
**explain** [15] - 9:13, 28:12, 65:5, 70:24, 71:22, 72:11, 72:22, 74:12, 74:23, 85:23, 86:6, 90:10, 101:3, 142:14, 147:23
**explained** [2] - 25:21, 78:19
**explains** [1] - 8:10
**explanation** [2] - 8:5, 103:21
**explanations** [1] - 27:20
**explicitly** [2] - 22:15, 160:23
**explored** [1] - 47:14
**express** [9] - 15:1, 16:6, 87:10, 87:14, 87:18, 87:20, 88:18, 94:7, 94:19
**expressed** [1] - 138:24
**expresses** [1] - 163:10
**expressing** [1] - 163:4
**extend** [3] - 79:22, 98:3, 109:5
**extensive** [1] - 171:7
**extent** [1] - 7:6
**extra** [2] - 13:7, 91:9
**extremely** [2] - 11:25, 145:7
**Eye** [1] - 154:14
**eye** [9] - 50:12, 66:6, 66:7, 110:24, 112:7, 113:7, 161:2, 161:5

VB     OCR     CRR

**eyedrops** [1] - 112:10
**eyes** [1] - 50:11
**eyesight** [2] - 110:20, 110:23

# F

**fabricated** [1] - 27:21
**Facebook** [1] - 10:9
**faced** [1] - 38:10
**faces** [2] - 59:22, 59:23
**facilitate** [1] - 158:21
**facilitated** [1] - 5:5
**facilitating** [1] - 5:2
**fact** [20] - 11:12, 14:3, 14:5, 25:25, 29:21, 32:9, 36:13, 43:22, 46:2, 50:10, 53:8, 54:6, 57:2, 63:8, 76:24, 77:1, 77:7, 149:16, 151:7
**factor** [1] - 93:24
**factors** [1] - 14:1
**facts** [18] - 13:13, 13:14, 14:2, 14:16, 14:18, 14:21, 14:22, 14:24, 14:25, 15:1, 15:3, 16:6, 16:9, 16:20, 17:12, 49:17, 57:23, 77:2
**failure** [1] - 39:15
**fair** [2] - 30:8, 140:16
**fairly** [1] - 11:14
**faith** [10] - 46:18, 56:4, 56:5, 56:7, 56:8, 56:23, 56:24, 57:15, 105:22
**fake** [3] - 38:6, 38:24, 118:7
**faked** [1] - 38:9
**faking** [5] - 45:21, 46:14, 47:21, 47:22, 170:24
**falk** [1] - 3:25
**Falk** [4] - 7:5, 156:19, 156:22, 162:1
**fall** [1] - 71:12
**familiar** [2] - 81:4, 120:13
**family** [1] - 52:8
**far** [1] - 60:1
**fares** [1] - 47:12
**Faruqi** [6] - 2:9, 2:14, 2:15, 2:17
**FARUQI** [2] - 1:11
**fast** [3] - 5:8, 5:9, 104:2
**father** [1] - 114:16
**fault** [1] - 57:22
**favor** [2] - 30:10, 90:16
**faxed** [1] - 132:24
**features** [1] - 24:25
**February** [9] - 1:6, 85:1, 85:9, 85:21, 85:22, 87:13, 109:10, 151:19, 171:21
**federal** [3] - 22:6, 28:19, 28:23
**fee** [1] - 90:17
**fees** [3] - 90:14, 90:15, 90:19
**feet** [3] - 23:14, 23:22, 26:7
**fellow** [2] - 10:16, 11:12
**felt** [3] - 46:10, 110:16, 118:6
**few** [15] - 4:12, 27:17, 43:25, 44:19, 47:5, 66:8, 70:23, 71:13, 89:5, 91:10, 91:12, 94:2, 117:21, 123:22, 136:15
**field** [1] - 74:21

**fifth** [1] - 135:13
**figure** [10] - 19:24, 25:21, 34:18, 50:23, 55:6, 66:4, 81:3, 116:22, 140:25, 162:21
**figuring** [2] - 19:19, 25:19
**file** [8] - 22:2, 37:3, 47:8, 73:2, 81:11, 124:18, 154:15
**filed** [2] - 47:5, 59:3
**files** [5] - 44:5, 44:7, 124:16, 125:8, 125:10
**filing** [2] - 22:5, 81:11
**fill** [2] - 61:21, 75:16
**filled** [1] - 75:11
**final** [4] - 6:7, 6:9, 7:15, 65:18
**finally** [6] - 20:7, 21:15, 24:16, 25:23, 41:20, 137:12
**finances** [1] - 23:9
**financial** [8] - 19:13, 23:9, 90:4, 90:9, 90:21, 98:16, 98:20, 98:23
**fine** [15] - 10:25, 40:3, 46:14, 49:11, 50:14, 55:19, 98:12, 110:21, 116:21, 116:22, 119:4, 119:17, 159:18, 166:19, 167:12
**finish** [1] - 155:1
**finished** [1] - 167:19
**fired** [19] - 18:20, 18:24, 18:25, 22:14, 22:15, 23:6, 23:11, 23:17, 23:23, 24:5, 24:7, 25:15, 26:21, 27:7, 27:19, 28:18, 29:22, 67:24, 165:7
**firm** [117] - 2:12, 3:15, 3:21, 18:19, 19:4, 19:8, 19:9, 19:11, 19:15, 20:22, 21:2, 23:6, 23:8, 23:14, 23:15, 23:16, 24:3, 24:8, 24:10, 25:11, 26:13, 26:14, 27:3, 27:16, 30:12, 30:14, 30:20, 30:21, 30:22, 30:25, 31:2, 33:6, 33:15, 33:24, 34:1, 34:22, 35:2, 36:8, 39:20, 39:25, 40:9, 40:12, 41:11, 42:7, 42:17, 43:7, 43:13, 45:10, 47:14, 48:17, 49:25, 50:1, 53:13, 57:6, 65:9, 65:15, 66:17, 67:15, 67:18, 69:5, 69:25, 70:17, 70:25, 71:8, 71:14, 73:10, 73:14, 82:5, 82:14, 84:17, 84:19, 85:1, 85:5, 85:6, 85:21, 87:20, 87:25, 88:1, 89:25, 90:5, 90:13, 91:11, 91:13, 91:21, 91:22, 92:13, 93:5, 93:9, 93:18, 95:13, 95:23, 97:1, 97:19, 98:21, 98:25, 105:22, 110:4, 114:4, 120:17, 120:20, 124:10, 126:10, 128:22, 129:8, 130:10, 130:12, 130:14, 134:23, 135:20, 136:5, 136:19, 163:21, 164:25
**Firm** [9] - 9:8, 65:7, 65:11, 67:21, 76:13, 77:13, 78:1, 81:14, 86:15
**firm's** [3] - 40:17, 120:13, 120:16
**firms** [4] - 24:9, 42:10, 42:14, 52:13
**first** [39] - 5:15, 10:19, 12:22, 14:13, 18:4, 20:24, 25:21, 31:21, 33:23, 42:14, 50:11, 55:5, 58:4, 58:10, 61:16, 65:17, 68:21, 69:20, 70:5, 72:25, 80:3, 84:16, 85:13, 87:13, 87:24, 92:16,

93:11, 96:14, 111:3, 111:8, 115:8, 117:12, 118:1, 126:24, 143:14, 150:6, 156:25, 163:17
**five** [23] - 19:6, 26:12, 33:11, 44:6, 44:13, 48:8, 48:17, 55:17, 55:19, 66:3, 73:21, 87:24, 90:23, 103:2, 103:3, 103:14, 116:3, 116:5, 139:25, 140:1, 140:5, 140:7, 140:9
**five-minute** [1] - 103:2
**five-year** [1] - 33:11
**fix** [1] - 132:19
**flat** [1] - 53:6
**Floor** [2] - 1:12, 1:17
**fluid** [1] - 116:7
**fluorescent** [1] - 46:7
**focus** [6] - 54:21, 162:18, 166:24, 166:25, 167:2, 167:8, 167:12
**follow** [4] - 15:7, 56:3, 134:10, 136:4
**follow-up** [1] - 134:10
**followed** [1] - 14:13
**following** [12] - 13:11, 22:22, 51:11, 101:10, 102:14, 102:18, 104:20, 111:16, 112:20, 127:25, 155:13, 157:16
**follows** [1] - 58:11
**foot** [1] - 47:14
**FOR** [2] - 1:8, 1:11
**force** [1] - 25:19
**forced** [4] - 37:9, 41:1, 41:24, 169:17
**forcing** [1] - 28:9
**forget** [1] - 113:14
**forgive** [2] - 45:17, 48:11
**form** [2] - 100:2, 156:3, 158:6
**forms** [1] - 126:5
**formula** [1] - 17:1
**forth** [1] - 136:15
**forthrightly** [1] - 57:15
**fortunately** [1] - 64:24
**forward** [3] - 53:21, 146:5, 164:3
**forwarded** [1] - 106:17
**four** [11] - 11:24, 21:8, 42:9, 42:14, 44:6, 156:19, 156:21
**fourth** [1] - 130:18
**fracture** [1] - 149:2
**fractured** [1] - 53:10
**frankly** [3] - 6:4, 26:22, 144:25
**free** [1] - 135:9
**frequently** [10] - 79:6, 80:4, 82:19, 84:6, 84:8, 94:1, 106:5, 113:5, 120:11, 139:15
**Friday** [6] - 4:2, 115:9, 164:20, 164:21, 165:11, 165:13
**friend** [3] - 21:20, 138:23
**front** [3] - 48:16, 61:5, 113:19
**full** [11] - 7:1, 7:6, 24:1, 24:16, 24:17, 58:13, 68:5, 87:3, 98:22, 128:19, 128:23
**full-page** [2] - 128:19, 128:23
**full-time** [5] - 24:1, 24:16, 24:17, 68:5,

ALL WORD INDEX                                    10

98:22
**function** [1] - 14:20

# G

**gabo** [3] - 93:16, 94:7, 98:25
**Gabo** [51] - 26:10, 26:12, 26:16, 33:10, 33:12, 33:16, 33:23, 34:12, 36:23, 43:11, 43:12, 43:13, 69:9, 69:11, 69:18, 69:21, 69:23, 70:12, 70:13, 70:15, 87:17, 91:24, 94:4, 95:12, 95:16, 96:11, 96:23, 97:1, 97:15, 97:19, 98:5, 98:16, 99:4, 99:15, 99:20, 101:12, 101:16, 102:9, 104:11, 105:4, 105:14, 108:24, 109:7, 109:18, 109:21, 110:4, 115:8, 119:25
**Gabo's** [3] - 109:24, 110:8, 110:10
**gather** [5] - 72:14, 72:16, 73:1, 78:21
**gears** [1] - 139:9
**general** [2] - 23:25, 72:11
**generally** [9] - 50:15, 60:11, 73:4, 75:13, 76:8, 77:19, 79:18, 83:15, 122:2
**generates** [1] - 78:10
**genetic** [5] - 20:8, 50:10, 61:25, 66:6, 141:1
**genetic-related** [1] - 50:10
**gentlemen** [4] - 9:3, 45:3, 103:1, 143:12
**given** [23] - 7:1, 7:24, 8:5, 15:20, 15:23, 22:8, 26:9, 29:24, 32:18, 34:5, 34:9, 36:24, 39:10, 62:12, 81:17, 81:23, 82:5, 82:11, 93:9, 117:3, 152:12, 152:21, 154:1
**glass** [6] - 39:9, 39:12, 126:25, 127:14, 129:14, 129:15
**glasses** [23] - 21:3, 47:10, 65:1, 110:22, 130:20, 131:2, 131:4, 131:6, 131:23, 132:3, 132:13, 132:24, 133:20, 133:21, 134:3, 134:11, 134:21, 135:1, 135:4, 139:3
**Gmail** [4] - 122:10, 129:25, 138:2, 138:4
**God** [2] - 46:9, 66:8
**Gonzalez** [1] - 2:20
**Google** [1] - 11:21
**Government** [1] - 161:22
**government** [1] - 22:6
**governmental** [1] - 61:11
**graduate** [1] - 68:14
**graduated** [1] - 68:20
**graduating** [1] - 59:12
**grainy** [1] - 119:22
**grasses** [1] - 132:6
**great** [1] - 42:6
**green** [1] - 124:25
**grossly** [1] - 145:17
**Grossman** [8] - 84:20, 85:2, 85:5, 88:10, 88:18, 88:21, 88:23, 91:6
**ground** [1] - 36:21

growth [1] - 85:3
**guaranteed** [1] - 86:1
**guess** [6] - 4:13, 80:14, 82:13, 83:14, 102:22, 164:4
**Guiyar** [6] - 112:8, 112:12, 112:14, 112:18, 112:20, 113:8
**guy** [1] - 48:6

# H

**half** [9] - 32:9, 32:22, 59:9, 59:10, 156:25, 157:7, 157:13, 162:7, 166:5
**hand** [7] - 15:4, 18:7, 58:9, 62:18, 77:18, 131:15, 156:25
**handbook** [6] - 39:2, 92:14, 92:17, 92:21, 93:1, 93:3
**handed** [4] - 55:20, 63:23, 92:20, 147:17
**handful** [1] - 115:3
**handing** [1] - 62:20
**handle** [15] - 18:16, 22:18, 36:4, 36:15, 36:16, 38:14, 40:2, 76:1, 80:6, 93:22, 96:15, 113:3, 120:11
**handled** [10] - 24:5, 24:8, 24:10, 27:14, 33:18, 93:25, 115:13, 123:25, 161:12, 161:19
**handling** [5] - 20:16, 24:6, 52:21, 80:1, 80:7
**handwrite** [1] - 51:9, 53:6
**handwriting** [1] - 53:11, 162:12, 162:19
**hard** [4] - 24:1, 104:25, 110:2, 144:13
**harm** [2] - 105:8, 105:21
**hate** [1] - 29:15
**head** [3] - 39:25, 40:9, 149:12
**health** [3] - 92:3, 92:5, 92:10
**hear** [53] - 8:21, 9:18, 10:17, 10:21, 12:2, 16:12, 16:18, 25:12, 25:16, 27:8, 27:17, 27:18, 28:11, 34:16, 34:21, 35:18, 35:22, 35:25, 36:6, 37:25, 38:2, 42:5, 42:6, 42:8, 43:7, 43:8, 43:9, 44:15, 44:22, 45:13, 46:4, 48:15, 50:21, 52:19, 52:23, 54:1, 54:5, 55:3, 55:24, 56:13, 57:17, 59:18, 60:15, 93:5, 99:11, 127:10, 129:18, 130:23, 132:1, 132:17, 135:15, 144:13, 171:12
**heard** [31] - 9:23, 11:6, 21:9, 21:17, 28:20, 28:21, 30:4, 31:10, 32:8, 36:10, 38:15, 41:18, 42:8, 52:3, 59:1, 59:7, 65:2, 66:13, 67:11, 72:20, 117:21, 121:5, 121:7, 121:12, 127:19, 128:22, 132:5, 135:19, 140:24, 147:20, 162:10
**hearing** [4] - 4:24, 5:3, 5:4, 10:22, 15:13, 42:13
**hearings** [1] - 24:20
**hearsay** [5] - 108:17, 143:1, 144:4, 149:4, 150:25
**heart** [1] - 170:17
**held** [1] - 64:14
**hell** [1] - 57:20

**hello** [1] - 17:20
**help** [18] - 20:15, 20:20, 21:1, 21:7, 21:21, 21:22, 22:1, 23:15, 23:17, 26:7, 34:10, 36:24, 37:17, 77:16, 123:22, 136:13, 138:23, 158:20
**helped** [1] - 132:25
**helpful** [9] - 21:18, 129:11, 130:16, 130:21, 131:5, 131:9, 137:4, 167:4, 168:12
**helping** [2] - 22:11, 28:17
**hereditary** [1] - 20:9
**herself** [3] - 21:5, 38:14, 109:2
**HHS** [1] - 107:2
**hide** [1] - 8:19
**higher** [2] - 25:2, 25:3
**himself** [3] - 65:20, 67:25, 80:8
**HIPAA** [10] - 79:1, 126:5, 146:3, 154:4, 154:12, 154:13, 154:4, 155:7, 156:3, 159:25
**HIPPA** [1] - 154:10
**hire** [1] - 24:3
**hired** [12] - 27:11, 29:25, 48:2, 48:6, 48:7, 69:24, 70:4, 70:5, 73:21, 85:13, 92:7, 164:25
**Hofstra** [1] - 59:13
**hold** [8] - 21:4, 107:5, 131:3, 131:15, 131:16, 131:24, 132:2, 158:13
**Hold** [1] - 166:9
**home** [5] - 107:3, 120:3, 121:24, 125:3, 126:14
**Hon** [1] - 2:2
**honestly** [2] - 162:14, 164:5
**Honestly** [1] - 164:8
**Honor** [117] - 2:8, 2:11, 2:23, 3:5, 3:13, 3:16, 3:17, 3:23, 4:1, 4:7, 4:18, 4:23, 5:15, 5:22, 6:12, 6:13, 7:8, 7:9, 8:25, 9:6, 9:9, 9:12, 29:18, 30:15, 45:22, 55:10, 55:22, 58:5, 58:6, 58:16, 60:2, 60:15, 62:15, 62:18, 62:22, 63:11, 63:12, 63:15, 63:18, 64:8, 64:12, 81:23, 81:25, 89:13, 98:9, 98:14, 100:4, 100:12, 103:4, 103:12, 103:20, 104:1, 104:8, 106:8, 122:3, 122:20, 124:24, 128:16, 130:2, 132:16, 132:18, 143:21, 143:24, 144:8, 144:10, 144:22, 145:9, 145:16, 145:21, 145:24, 147:20, 148:1, 148:25, 149:5, 150:10, 150:18, 150:19, 152:6, 154:9, 154:24, 155:21, 156:7, 156:24, 158:4, 159:8, 160:9, 160:23, 162:17, 163:3, 163:13, 164:10, 164:15, 164:20, 164:24, 165:10, 165:16, 165:19, 165:25, 166:7, 166:14, 166:21, 166:22, 167:7, 167:15, 167:25, 168:3, 168:13, 168:23, 168:25, 169:12, 169:13, 169:22, 170:7, 170:20, 171:18, 171:19, 171:20
**Honor's** [1] - 152:3
**HONORABLE** [1] - 1:9

**hooked** [1] - 140:12
**hope** [1] - 76:9
**hopefully** [1] - 81:9
**Horizon** [1] - 165:5
**Horizons** [1] - 164:16
**horrible** [1] - 54:19
**horrific** [1] - 114:4
**Hospital** [2] - 141:2, 141:4
**hospital** [10] - 5:6, 20:2, 25:24, 32:13, 113:25, 114:21, 139:20, 142:3, 142:6, 142:21
**hospitalization** [1] - 20:6
**hospitalized** [4] - 20:1, 28:8, 141:13, 141:22
**hour** [5] - 98:10, 156:24, 157:7, 157:12, 166:4
**hours** [7] - 166:2, 166:3, 168:6, 168:8, 168:14, 168:17, 169:13
**house** [1] - 8:12
**Human** [2] - 28:22
**hundred** [3] - 34:2, 34:5, 34:9
**hundreds** [7] - 23:24, 24:11, 27:14, 42:8, 82:18
**Huot** [4] - 2:8, 4:15, 18:12, 23:2
**HUOT** [158] - 1:13, 2:8, 2:18, 3:13, 4:7, 4:18, 4:23, 5:15, 5:18, 5:22, 6:2, 6:12, 6:16, 6:24, 7:8, 7:25, 8:8, 8:25, 9:6, 18:14, 18:15, 23:2, 29:18, 45:22, 53:24, 55:22, 58:5, 58:16, 58:18, 58:21, 62:15, 62:18, 62:22, 63:11, 63:15, 63:18, 63:21, 64:8, 64:13, 79:14, 79:17, 81:23, 81:25, 87:1, 87:23, 88:6, 89:13, 89:18, 98:12, 98:14, 98:15, 99:23, 100:4, 100:5, 102:7, 103:10, 103:20, 103:25, 104:8, 104:9, 106:8, 106:12, 106:20, 106:24, 108:15, 108:18, 109:13, 109:14, 112:2, 122:3, 122:15, 122:20, 122:22, 124:20, 124:24, 125:13, 125:15, 125:17, 128:2, 128:15, 129:2, 129:7, 130:2, 131:13, 132:18, 133:4, 135:15, 138:5, 138:12, 143:2, 143:5, 143:21, 145:2, 145:9, 145:21, 147:2, 147:10, 147:15, 148:6, 148:12, 148:18, 149:5, 149:15, 149:20, 150:8, 150:18, 151:3, 151:5, 151:11, 151:18, 151:21, 151:23, 152:14, 152:18, 153:4, 153:6, 153:8, 153:11, 153:16, 153:22, 154:2, 154:23, 155:22, 155:25, 156:22, 158:4, 158:16, 159:8, 159:12, 159:14, 159:17, 160:23, 161:3, 163:3, 164:6, 164:9, 164:20, 164:23, 165:6, 165:16, 166:6, 166:9, 166:11, 167:25, 168:3, 168:9, 168:18, 168:25, 169:12, 169:19, 169:22, 170:1, 170:20, 171:3, 171:5, 171:18, 172:3, 172:7
**hype** [1] - 135:8
**hypothetically** [1] - 102:8

## I

**idea** [6] - 5:10, 19:18, 19:19, 20:4, 41:6, 162:7
**identical** [2] - 73:13, 153:24
**identifies** [1] - 130:22
**identify** [1] - 131:3
**ignore** [1] - 49:7
**ignoring** [1] - 49:8
**ill** [1] - 118:18
**illegal** [1] - 29:2
**illegible** [2] - 162:20, 162:21
**imagine** [3] - 35:18, 35:21, 41:7
**immediately** [6] - 23:17, 23:23, 29:25, 61:19, 68:24, 153:14
**immigrated** [1] - 59:8
**immoral** [1] - 29:2
**impact** [1] - 23:12
**impaired** [3] - 21:16, 61:12, 61:13
**impairment** [1] - 118:8
**impartially** [1] - 11:14
**importances** [1] - 84:13
**important** [11] - 10:6, 10:20, 11:25, 14:17, 16:17, 17:20, 18:1, 34:20, 35:9, 44:12, 80:15
**impossible** [2] - 84:15, 107:9
**impression** [1] - 15:2
**improbability** [1] - 17:13
**improper** [1] - 17:23
**improves** [2] - 18:17, 22:20
**incapable** [2] - 22:6, 22:7
**incentive** [5] - 90:4, 90:21, 98:16, 98:18, 98:23
**incentives** [1] - 98:20
**incident** [1] - 121:16
**include** [1] - 61:14
**included** [3] - 101:1, 126:6, 148:18
**includes** [1] - 10:7, 72:17
**including** [2] - 10:15, 20:12
**incoming** [1] - 120:15
**incomplete** [4] - 4:25, 145:17, 152:4, 152:10
**inconsistent** [1] - 27:21, 162:5
**incorporate** [1] - 153:24, 153:25, 156:4, 157:1
**incorporated** [2] - 6:2, 156:1
**increase** [1] - 86:5
**increased** [1] - 85:23
**incredible** [1] - 36:14
**independent** [1] - 11:17
**indicate** [1] - 16:9
**individual** [6] - 1:6, 3:15, 9:10, 10:4, 45:5, 108:7
**individually** [2] - 30:23, 30:24
**inevitably** [1] - 10:25
**infer** [1] - 16:4
**inferences** [1] - 14:9
**inform** [2] - 66:17, 66:21
**information** [20] - 5:24, 11:17, 41:15,

72:14, 72:15, 72:16, 73:1, 75:16, 75:18, 77:22, 77:23, 78:7, 78:20, 78:22, 153:25, 157:1, 160:13, 160:15, 167:8, 167:11
**informed** [2] - 66:18, 66:19
**infrequently** [1] - 43:14
**initial** [1] - 7:13
**initiative** [1] - 20:19
**inject** [1] - 55:12
**injected** [1] - 116:9
**injections** [1] - 117:5
**injured** [3] - 34:24, 52:20, 56:20
**injuries** [5] - 35:10, 37:6, 37:7, 52:20, 52:21
**injury** [12] - 34:22, 35:4, 36:18, 50:19, 50:20, 50:21, 52:13, 70:18, 70:19, 71:4, 71:9, 85:6
**Innessa** [2] - 2:8, 23:2
**inserted** [1] - 142:1
**insisted** [1] - 39:18
**inspiring** [1] - 26:4
**Instagram** [1] - 10:10
**install** [7] - 21:21, 137:8, 137:9, 137:13, 137:15, 138:22, 138:23
**installation** [1] - 137:10, 137:12
**installed** [1] - 21:20, 60:22
**installing** [1] - 21:22
**instead** [3] - 22:1, 22:11, 23:13
**instruct** [3] - 14:19, 151:6, 151:12
**instructed** [1] - 14:4, 16:14
**instruction** [2] - 10:6, 97:15
**instructions** [10] - 3:18, 3:19, 10:5, 10:18, 11:2, 12:2, 13:22, 15:7, 97:2, 99:20
**instructor** [1] - 45:8
**Insurance** [1] - 24:18
**insurance** [5] - 68:6, 71:6, 92:3, 92:5, 92:10
**intake** [1] - 35:5
**intelligent** [1] - 42:1
**intend** [1] - 15:1
**intentionally** [1] - 102:5
**interact** [1] - 70:15
**interactive** [4] - 46:18, 56:5, 56:24, 57:15
**interest** [3] - 7:25, 17:8
**interested** [1] - 89:20
**interesting** [1] - 162:9
**interfere** [1] - 24:23
**interfering** [1] - 39:1
**internally** [1] - 7:17
**internet** [2] - 11:20, 38:13
**interpret** [1] - 149:6
**interrupt** [1] - 158:13
**interrupted** [2] - 165:2, 167:18
**intervene** [1] - 74:16
**interview** [5] - 42:21, 54:3, 69:14, 69:16, 69:18
**interviews** [3] - 42:9, 42:14

Case 1:19-cv-02987-CBA-LB    Document 268    Filed 08/11/23    Page 184 of 196 PageID #: 22613

**intravenous** [1] - 117:5
**introduce** [3] - 109:19, 109:22, 169:15
**introduced** [1] - 12:11
**introduction** [4] - 12:16, 12:17, 14:6, 169:16
**invite** [1] - 109:19
**invoice** [3] - 133:22, 133:24, 138:17
**involved** [4] - 46:17, 51:6, 117:19, 153:11
**iPhone** [1] - 135:9
**Irene** [16] - 26:10, 33:10, 33:12, 33:16, 33:23, 34:12, 43:11, 43:13, 69:9, 69:11, 70:12, 110:9, 112:5
**irene** [1] - 91:15
**irrespective** [1] - 154:16
**Island** [1] - 59:10
**issue** [14] - 7:9, 11:18, 47:23, 104:19, 118:25, 143:25, 147:2, 147:21, 148:25, 150:1, 151:13, 163:14, 163:19, 170:24
**issues** [18] - 19:7, 19:8, 36:19, 38:25, 50:25, 52:10, 76:24, 77:1, 77:7, 93:24, 111:11, 115:12, 115:17, 119:2, 123:23, 163:4, 164:2, 167:7
**it'll** [1] - 64:13
**items** [1] - 17:15
**itself** [1] - 19:20
**IV** [10] - 115:22, 116:7, 116:9, 118:11, 139:19, 139:23, 139:24, 140:13, 141:9, 141:12

**J**

**Jaws** [2] - 21:16, 47:11
**JAWS** [5] - 136:23, 137:3, 137:25, 138:17, 139:4
**job** [66] - 14:16, 20:21, 24:1, 24:17, 26:8, 27:2, 31:22, 32:2, 32:21, 33:16, 34:21, 35:9, 35:15, 35:24, 36:3, 36:4, 36:12, 38:19, 39:1, 40:2, 40:4, 40:5, 40:8, 41:9, 42:10, 42:24, 43:3, 43:6, 43:23, 47:21, 48:2, 49:1, 49:3, 53:13, 53:14, 53:16, 53:20, 54:25, 56:22, 61:14, 65:24, 68:4, 68:5, 69:4, 69:7, 71:15, 71:16, 73:22, 78:14, 78:16, 80:21, 86:1, 87:15, 87:18, 87:21, 88:3, 88:8, 88:19, 89:2, 89:21, 92:11, 94:8, 170:23
**jobs** [3] - 24:2, 24:16, 54:13
**jokes** [1] - 48:3
**Josh** [2] - 2:12, 23:3
**JUDGE** [1] - 1:9
**judge** [4] - 11:9, 14:17, 42:11, 155:6
**Judge** [4] - 9:21, 28:12, 44:21, 55:15
**judge's** [1] - 160:4
**judges** [2] - 14:25, 16:20
**judgment** [3] - 75:24, 76:20, 77:4
**judicially** [1] - 13:15
**jump** [1] - 144:11
**June** [3] - 33:15, 91:12, 92:13

**junior** [1] - 33:7
**JUROR** [1] - 92:20
**juror** [2] - 11:13, 17:21
**jurors** [7] - 8:21, 10:16, 11:12, 11:15, 11:23, 14:20, 18:4
**JURY** [1] - 1:8
**jury** [37] - 3:11, 3:12, 3:14, 3:19, 4:8, 4:14, 8:23, 8:24, 9:2, 9:4, 10:24, 11:7, 15:12, 18:23, 28:16, 30:4, 44:11, 57:24, 60:1, 64:9, 76:24, 77:2, 77:7, 86:24, 87:4, 103:3, 103:5, 104:3, 106:21, 122:16, 128:16, 130:3, 135:5, 138:6, 151:6, 151:12
**Jury** [3] - 103:6, 104:5, 143:18
**just..** [1] - 82:21

**K**

**keep** [13] - 4:8, 16:18, 38:15, 40:2, 49:8, 50:1, 52:11, 57:8, 57:11, 57:13, 110:2, 121:22, 132:17
**keeping** [1] - 30:2
**keeps** [1] - 132:21
**kept** [5] - 39:21, 57:2, 57:12, 158:5, 158:6
**key** [3] - 56:5, 104:1, 163:10
**kind** [14] - 21:3, 34:24, 45:20, 51:7, 70:17, 70:25, 71:8, 73:16, 80:1, 85:5, 86:20, 92:14, 95:2, 127:14
**kinds** [4] - 34:23, 123:10, 144:5, 144:19
**KING** [1] - 1:16
**King** [1] - 2:25
**Kings** [2] - 93:22, 93:23
**knee** [1] - 107:2
**knowing** [2] - 146:1, 152:16
**knowledge** [3] - 93:2, 108:15, 149:10
**known** [3] - 20:9, 69:21, 81:4
**knows** [6] - 26:18, 26:20, 43:10, 56:11, 148:9
**Kratochvil** [1] - 31:5
**Kravitz** [1] - 7:16

**L**

**labor** [1] - 70:22
**lack** [1] - 17:8
**ladies** [4] - 9:3, 45:3, 103:1, 143:12
**landed** [1] - 24:17
**Langone** [2] - 113:9, 114:22
**language** [1] - 75:8
**laptops** [1] - 45:18
**large** [2] - 45:11, 162:22
**largely** [1] - 162:21
**larger** [1] - 90:3
**Larson** [4] - 120:9, 121:15, 122:12, 123:6
**last** [17] - 4:1, 4:24, 6:19, 10:25, 39:14, 44:6, 95:22, 102:6, 108:10, 115:9,

127:7, 127:8, 141:23, 160:7, 161:12, 164:21, 166:1
**lasted** [1] - 83:8
**lasting** [1] - 23:12
**late** [2] - 152:9, 164:2
**latter** [1] - 155:15
**laughingly** [1] - 38:6
**LAW** [2] - 1:5, 1:20
**Law** [15] - 2:4, 3:10, 9:8, 18:19, 28:22, 28:23, 56:6, 65:7, 65:11, 67:21, 76:13, 77:12, 78:1, 81:14, 86:15
**law** [62] - 3:15, 3:20, 10:3, 10:18, 12:3, 14:19, 14:21, 15:5, 15:6, 15:7, 15:10, 15:16, 15:24, 16:4, 16:15, 16:23, 18:9, 19:9, 20:22, 30:12, 30:14, 30:19, 30:21, 30:22, 30:25, 31:2, 33:6, 39:20, 40:10, 40:12, 41:11, 42:10, 45:10, 46:18, 48:5, 49:25, 50:1, 50:4, 53:18, 57:6, 59:12, 65:9, 65:15, 66:17, 68:1, 68:3, 68:17, 68:19, 70:17, 70:18, 70:22, 71:4, 75:9, 75:11, 76:25, 77:8, 82:5, 88:24, 124:5, 157:3, 161:15
**Lawlor** [2] - 87:7, 87:10
**laws** [5] - 28:19, 28:24, 29:2, 29:3, 29:7
**lawsuit** [3] - 16:7, 59:3, 72:12
**lawyer** [24] - 17:22, 23:12, 24:18, 31:5, 34:8, 34:17, 35:17, 36:18, 38:16, 45:9, 46:22, 47:1, 47:24, 48:8, 48:18, 48:22, 50:19, 50:25, 53:5, 57:9, 59:14, 68:18, 144:11, 170:11
**lawyers** [18] - 12:5, 12:11, 13:20, 13:24, 14:2, 15:6, 15:13, 17:23, 20:17, 31:2, 35:4, 40:24, 48:5, 50:21, 57:7, 126:10, 162:11, 171:13
**lead** [4] - 86:18, 87:5, 88:12, 88:15
**leading** [3] - 99:22, 99:25, 105:17
**learn** [7] - 53:6, 53:8, 69:4, 85:2, 85:7, 162:11, 162:12
**learned** [3] - 34:5, 45:7, 154:6
**learning** [3] - 31:5, 47:13, 53:7
**least** [9] - 4:15, 31:17, 37:3, 40:23, 47:20, 76:10, 96:21, 98:10, 101:1
**leave** [23] - 28:10, 32:1, 38:17, 38:19, 41:19, 41:21, 42:24, 49:15, 57:23, 66:2, 85:1, 88:21, 88:23, 92:11, 94:13, 97:20, 115:20, 116:1, 116:2, 116:15, 142:4, 142:10, 168:20
**leaves** [4] - 36:24, 94:17, 103:5, 144:9
**leaving** [6] - 44:1, 84:22, 95:14, 96:2, 97:19, 109:18
**Leber** [1] - 20:8
**Leber's** [4] - 25:24, 26:1, 26:2, 66:5
**Lebers** [1] - 20:9
**left** [24] - 19:8, 19:12, 33:25, 42:7, 43:13, 43:24, 43:25, 84:17, 84:19, 85:20, 85:22, 87:9, 87:25, 88:9, 91:17, 92:16, 96:3, 97:1, 97:24, 97:25, 98:1, 98:21, 110:4
**leg** [3] - 53:10, 53:11, 107:1

**legal** [7] - 19:4, 23:24, 38:22, 39:22, 57:4, 57:7, 153:10
**legally** [9] - 50:23, 59:7, 61:12, 62:13, 64:2, 64:17, 66:9, 66:10, 111:1
**legible** [1] - 162:20
**legitimately** [1] - 161:4
**lengthier** [1] - 76:21
**lens** [1] - 29:11
**lenses** [2] - 65:1, 110:22
**less** [4] - 19:12, 37:22, 46:4, 82:24
**less-than-polite** [1] - 46:4
**letter** [10] - 7:6, 162:4, 162:6, 163:4, 163:5, 163:7, 163:9, 163:10, 163:14, 163:18
**level** [3] - 25:2, 28:23, 103:18
**LHON** [6] - 20:9, 47:13, 47:15, 66:5, 149:22, 158:11
**liability** [2] - 50:22, 70:22
**license** [3] - 49:2, 50:4, 57:8
**Lieber's** [2] - 140:25, 141:24
**lieu** [1] - 167:25
**life** [14] - 18:22, 22:17, 26:5, 29:12, 34:5, 34:23, 35:1, 40:8, 43:3, 47:13, 56:21, 59:10, 149:7
**life-altering** [1] - 18:22
**light** [2] - 17:14, 124:25
**lighted** [1] - 130:6
**lighting** [2] - 129:15, 130:1
**lights** [1] - 46:7
**likely** [1] - 4:2
**limine** [3] - 149:23, 150:6, 150:14
**limitations** [1] - 37:5
**limited** [1] - 33:18
**line** [3] - 49:2, 58:17, 120:16
**lines** [1] - 11:16
**list** [5] - 63:17, 97:10, 97:11, 97:18, 153:23
**listen** [6] - 44:9, 121:5, 121:10, 121:18, 163:23
**listened** [2] - 121:19, 170:10
**lit** [1] - 129:14
**literally** [7] - 23:24, 24:11, 24:21, 48:15, 48:16, 77:17, 162:18
**litigated** [1] - 38:8
**litigation** [4] - 95:1, 96:17, 96:21, 154:3
**live** [1] - 42:2
**lived** [1] - 59:9
**livelihood** [1] - 35:24
**lives** [1] - 17:3
**living** [1] - 26:5
**LLC** [1] - 3:10
**LLP** [2] - 1:11, 1:14
**lobby** [1] - 17:25
**locate** [4] - 64:12, 136:9, 136:13, 136:17
**located** [1] - 136:18
**location** [1] - 73:5
**logs** [1] - 7:12

**look** [19] - 29:10, 41:20, 51:1, 55:8, 59:17, 77:2, 77:7, 82:15, 94:25, 101:23, 101:25, 102:5, 102:9, 102:11, 102:23, 149:11
**looked** [2] - 126:22, 157:8
**looking** [6] - 6:17, 53:16, 69:6, 69:10, 89:2, 105:11, 127:12, 136:22
**looks** [2] - 59:16, 105:12
**lose** [4] - 35:23, 49:7, 66:10
**losing** [5] - 19:18, 25:15, 27:1, 35:17, 65:23
**loss** [10] - 18:25, 20:8, 23:8, 23:9, 23:19, 25:20, 65:6, 65:15, 81:8, 139:18
**lost** [4] - 27:12, 34:9, 34:12, 101:2
**Lou** [1] - 2:23
**loud** [2] - 131:1, 144:15
**LOUIS** [1] - 1:18
**Louis** [1] - 30:19
**luck** [1] - 142:15
**lunchtime** [1] - 94:16

## M

**Mac** [2] - 60:20, 60:22
**MAC** [1] - 24:25
**magic** [1] - 17:1
**magistrate** [1] - 160:4
**magnifier** [6] - 61:4, 63:2, 127:19, 128:14, 128:19, 128:23, 130:1, 130:6
**magnifiers** [1] - 130:14
**magnify** [1] - 61:5
**magnifying** [9] - 20:25, 39:9, 39:12, 126:25, 127:14, 129:14, 129:15, 139:3
**mail** [13] - 7:17, 10:9, 97:3, 100:16, 101:6, 104:18, 106:16, 106:18, 106:25, 108:3, 128:13, 138:12
**mailed** [1] - 60:19
**mails** [2] - 37:14, 121:25
**main** [1] - 159:1
**maintain** [1] - 17:20
**major** [1] - 107:11
**majority** [2] - 66:11, 89:16
**Malillo** [3] - 84:20, 85:2, 85:5
**Malilo** [5] - 88:10, 88:18, 88:21, 88:23, 91:6
**Mallory** [2] - 2:24, 31:1
**MALLORY** [1] - 1:19
**malpractice** [2] - 48:19, 70:21
**manage** [4] - 34:11, 71:16, 77:17, 95:2
**manager** [1] - 21:12, 21:13, 32:15, 37:25, 40:21, 41:14, 65:20, 66:23, 91:14, 91:16, 92:21, 112:5
**managing** [1] - 26:15, 33:17, 33:24, 43:16, 43:25, 69:12, 81:6, 81:11, 91:24, 110:11, 110:16
**mandates** [1] - 46:18
**manner** [2] - 17:10, 81:8
**manners** [1] - 107:13

**marked** [11] - 62:25, 63:5, 63:23, 106:14, 122:5, 122:7, 128:8, 128:11, 129:22, 132:10, 137:21
**market** [1] - 24:1
**Mary** [2] - 2:24, 30:20
**MARY** [1] - 1:18
**masks** [2] - 9:14, 9:15
**match** [1] - 89:24
**materials** [1] - 79:4
**math** [1] - 84:25
**matter** [5] - 13:11, 76:25, 77:8, 106:1, 154:24
**Matter** [1] - 171:21
**matters** [2] - 16:8, 40:19
**Matthew** [1] - 2:20
**mean** [19] - 15:15, 17:19, 18:1, 72:23, 74:23, 86:6, 103:24, 123:14, 123:20, 124:21, 143:25, 144:19, 149:21, 161:22, 162:3, 164:5, 165:4, 169:6, 170:16
**meaning** [4] - 15:21, 50:22, 52:20, 73:21
**means** [9] - 10:9, 15:23, 50:18, 53:1, 56:8, 71:22, 72:2, 90:10, 123:15
**meant** [2] - 22:6, 123:24
**meantime** [1] - 34:8
**mechanical** [1] - 1:24
**media** [1] - 10:12
**mediating** [2] - 99:15, 99:16
**medical** [35] - 8:15, 35:8, 35:9, 35:10, 36:18, 36:19, 38:11, 41:15, 49:9, 52:22, 53:5, 54:23, 61:22, 61:23, 62:11, 66:2, 70:21, 72:17, 73:7, 77:24, 79:1, 126:2, 142:16, 143:19, 145:12, 145:15, 145:17, 148:6, 148:7, 149:19, 149:24, 150:3, 151:9, 158:5, 162:15
**medication** [1] - 57:20
**meet** [3] - 35:5, 79:2, 118:23
**meets** [1] - 40:14
**members** [4] - 18:23, 28:16, 30:4, 60:1
**mentioned** [20] - 10:13, 25:18, 32:17, 33:9, 42:12, 43:9, 61:6, 68:13, 69:6, 70:23, 71:21, 74:9, 83:21, 87:17, 90:9, 94:21, 94:22, 95:4, 113:12, 171:9
**mentor** [1] - 34:12
**merely** [1] - 57:11
**merit** [1] - 77:3
**merits** [1] - 78:5
**mess** [2] - 21:24, 138:25
**message** [2] - 37:15, 60:7
**messages** [3] - 20:14, 60:3, 121:25
**messaging** [1] - 10:9
**met** [4] - 42:21, 69:19, 118:4, 118:24
**mic** [4] - 124:24, 125:9, 125:13, 130:23
**Michael** [1] - 7:16
**microphone** [6] - 59:21, 130:25, 131:13, 131:15, 132:19, 132:23
**middle** [4] - 64:25, 86:3, 86:12, 115:24
**might** [13] - 15:18, 16:7, 35:23, 52:3, 52:4, 85:3, 86:2, 131:9, 137:4, 160:9,

ALL WORD INDEX

160:10, 160:11, 160:18
**Mike** [1] - 31:5
**milligrams** [6] - 116:8, 116:10, 118:12, 120:4, 140:4, 140:5
**mind** [8] - 16:18, 22:17, 143:22, 144:2, 149:18, 149:22, 150:19, 151:8
**mine** [2] - 122:22, 166:15
**mine's** [1] - 122:20
**minute** [5] - 32:19, 103:2, 132:19, 160:8, 161:13
**minutes** [11] - 8:18, 27:17, 55:17, 55:18, 55:19, 70:23, 103:3, 103:14, 117:21, 161:16, 161:17
**misheard** [1] - 79:15
**miss** [2] - 20:19, 37:5
**Miss** [1] - 2:18
**missed** [1] - 32:16
**missing** [1] - 159:22
**misstating** [1] - 55:23
**mom** [5] - 59:14, 69:6, 69:8, 132:14, 132:25
**moment** [3] - 40:6, 131:1, 155:19
**Monday** [2] - 101:10, 115:7
**money** [6] - 19:13, 37:6, 54:9, 54:10, 90:3, 90:7
**month** [6] - 24:5, 24:6, 32:9, 32:22, 40:15, 69:2
**months** [17] - 19:12, 19:16, 20:3, 34:18, 34:19, 44:6, 46:23, 49:20, 50:7, 57:2, 66:8, 70:3, 92:10, 103:17, 105:19, 110:25, 141:3
**morning** [7] - 58:22, 106:25, 117:25, 118:2, 118:3, 119:8, 143:15
**most** [10] - 10:5, 29:13, 43:17, 51:2, 52:7, 76:19, 99:16, 166:2, 166:6, 171:15
**mostly** [1] - 91:2
**mother** [8] - 69:8, 69:23, 133:9, 133:21, 133:23, 138:7, 138:18, 138:21
**mother's** [2] - 36:20, 133:10
**motion** [27] - 74:12, 74:13, 74:15, 74:19, 74:22, 74:23, 74:24, 74:25, 75:20, 75:21, 76:15, 76:17, 76:20, 76:21, 77:4, 111:4, 123:8, 125:21, 125:25, 126:16, 149:23, 150:6, 150:14, 151:14, 154:10, 159:23
**motioning** [1] - 76:2
**motions** [17] - 3:24, 16:3, 71:17, 74:10, 75:4, 75:12, 75:17, 75:22, 75:23, 75:24, 75:25, 76:1, 76:5, 77:10, 77:20, 152:7
**motor** [3] - 70:21, 71:12, 73:11
**mouth** [2] - 48:11, 131:16
**move** [13] - 58:16, 59:20, 103:17, 109:12, 122:15, 128:15, 133:4, 134:1, 138:5, 138:14, 152:5, 152:9, 169:6
**moved** [4] - 59:10, 64:9, 150:1, 164:3
**moving** [2] - 19:15, 167:9
**MR** [123] - 2:23, 3:2, 3:5, 3:7, 3:9, 3:16, 3:17, 3:23, 4:1, 4:4, 9:9, 9:12, 29:15,

30:14, 30:17, 30:18, 44:21, 44:24, 45:2, 45:3, 45:24, 46:2, 52:2, 52:14, 52:18, 54:1, 55:10, 55:15, 55:17, 55:20, 56:1, 59:18, 59:20, 60:15, 60:18, 63:1, 63:5, 64:12, 81:18, 81:21, 81:24, 82:1, 82:10, 82:12, 98:9, 99:22, 99:25, 100:12, 105:17, 107:20, 122:25, 123:1, 128:25, 129:5, 132:16, 132:21, 143:1, 143:4, 143:11, 143:24, 144:10, 144:15, 144:22, 145:15, 147:12, 147:14, 147:20, 147:23, 148:1, 148:14, 148:25, 149:23, 150:6, 150:10, 151:4, 153:10, 153:15, 154:21, 154:24, 155:18, 155:21, 156:7, 156:9, 156:24, 158:2, 158:12, 158:14, 161:6, 161:8, 162:17, 163:13, 163:22, 164:10, 164:15, 164:21, 165:9, 165:10, 165:13, 165:18, 165:21, 165:25, 166:3, 166:8, 166:14, 166:21, 167:1, 167:3, 167:6, 167:12, 167:15, 167:19, 167:21, 168:13, 168:16, 168:20, 168:23, 169:1, 169:3, 170:6, 171:6, 171:19, 172:4, 172:5
**MRI** [11] - 113:10, 113:12, 113:15, 113:17, 113:21, 114:2, 114:8, 114:11, 114:22, 148:2, 148:3
**MRIs** [1] - 20:5
**MS** [194] - 2:8, 2:16, 2:18, 3:13, 4:7, 4:18, 4:23, 5:15, 5:18, 5:22, 6:2, 6:12, 6:16, 6:24, 7:8, 7:25, 8:8, 8:25, 9:6, 18:14, 18:15, 23:2, 29:18, 45:22, 53:24, 55:22, 58:5, 58:16, 58:18, 58:21, 62:15, 62:18, 62:22, 63:11, 63:15, 63:18, 63:21, 64:8, 64:13, 79:14, 79:17, 81:23, 81:25, 87:1, 87:23, 88:6, 89:12, 89:13, 89:18, 92:18, 98:12, 98:14, 98:15, 99:23, 100:4, 100:5, 100:8, 102:7, 103:10, 103:12, 103:20, 103:25, 104:8, 104:9, 106:8, 106:12, 106:20, 106:24, 108:13, 108:15, 108:18, 109:13, 109:14, 112:2, 118:9, 118:14, 121:2, 122:3, 122:15, 122:18, 122:20, 122:21, 122:22, 122:23, 124:20, 124:24, 125:13, 125:15, 125:17, 128:2, 128:15, 129:2, 129:7, 130:2, 131:13, 132:18, 133:4, 133:7, 133:17, 135:15, 138:5, 138:12, 143:2, 143:5, 143:21, 145:2, 145:9, 145:21, 145:24, 147:2, 147:10, 147:15, 148:6, 148:12, 148:13, 148:17, 148:18, 149:5, 149:15, 149:20, 150:8, 150:18, 151:3, 151:5, 151:11, 151:18, 151:21, 151:23, 152:14, 152:18, 153:4, 153:6, 153:8, 153:11, 153:16, 153:22, 154:2, 154:9, 154:18, 154:23, 155:2, 155:13, 155:16, 155:22, 155:25, 156:8, 156:10, 156:13, 156:16, 156:21, 156:22, 158:4, 158:16, 159:8, 159:12, 159:14, 159:17, 159:23, 160:9, 160:11, 160:21, 160:23, 161:3, 162:7,

162:14, 163:1, 163:3, 164:6, 164:9, 164:20, 164:23, 165:6, 165:16, 166:6, 166:9, 166:11, 167:25, 168:3, 168:9, 168:18, 168:25, 169:12, 169:19, 169:22, 169:25, 170:1, 170:15, 170:20, 171:3, 171:5, 171:18, 171:20, 172:3, 172:7
**multiple** [16] - 8:1, 8:9, 66:18, 67:9, 105:8, 107:19, 113:6, 114:1, 124:17, 125:10, 125:11, 139:16, 147:4, 151:24, 152:19
**multipurpose** [1] - 136:25
**must** [8] - 10:15, 11:23, 13:15, 14:3, 16:4, 16:11, 16:20, 16:25
**mutually** [1] - 81:3

## N

**name** [17] - 2:6, 9:21, 23:2, 30:19, 33:10, 40:10, 45:4, 58:13, 81:8, 95:22, 107:10, 127:7, 127:8, 133:7, 133:10, 141:5
**names** [1] - 75:10
**narrow** [1] - 82:3
**near** [1] - 54:8
**necessarily** [3] - 13:5, 102:23, 105:6
**necessary** [1] - 169:8
**neck** [1] - 142:2
**need** [21] - 11:10, 37:16, 42:15, 42:16, 42:25, 53:21, 57:25, 74:5, 96:15, 96:20, 110:21, 121:9, 125:18, 125:20, 126:12, 126:16, 159:17, 162:11, 166:20, 166:23, 167:12
**needed** [20] - 33:13, 36:9, 63:8, 75:20, 78:8, 81:1, 86:24, 115:12, 123:8, 126:23
**needs** [4] - 77:7, 94:24, 149:6, 166:19
**neglected** [1] - 105:25
**negligence** [1] - 53:2
**negotiate** [3] - 105:4, 105:9, 105:15
**negotiations** [1] - 71:19
**nervous** [1] - 113:15
**nervousness** [1] - 138:24
**neurologist** [1] - 154:22
**Neurology** [1] - 154:14
**neurology** [1] - 154:21
**neuropathy** [1] - 20:9
**never** [31] - 15:22, 20:10, 24:14, 28:2, 32:8, 32:12, 36:5, 36:6, 39:3, 42:21, 46:24, 47:2, 49:24, 55:7, 59:4, 69:21, 87:19, 92:23, 94:20, 109:20, 109:23, 117:2, 132:5, 136:18, 147:2, 155:8, 156:18, 156:22, 158:2, 159:24, 170:8
**new** [9] - 29:25, 43:24, 45:19, 47:14, 107:4, 109:16, 115:12, 148:24, 160:17
**NEW** [1] - 1:1
**New** [17] - 1:5, 1:12, 1:17, 1:21, 28:21, 28:22, 40:22, 48:21, 56:6, 62:3, 62:9, 152:20, 157:2, 164:16
**newer** [4] - 96:11, 96:16, 96:19, 96:24

**news** [1] - 20:7
**next** [14] - 21:8, 21:25, 31:1, 49:10, 86:25, 110:25, 114:3, 114:19, 129:20, 132:8, 137:19, 142:21, 146:7, 171:1
**nice** [1] - 143:16
**night** [6] - 164:1, 164:2, 165:20, 165:23, 168:22
**no-call** [1] - 41:1
**no-show** [1] - 41:1
**nobody** [4] - 21:13, 34:17, 87:24, 142:12
**nodes** [1] - 156:6
**NOLAN** [1] - 1:22
**NolanEDNY@aol.com** [1] - 1:23
**none** [6] - 19:2, 33:4, 45:22, 93:2, 148:23, 154:18
**normal** [1] - 123:9
**notation** [1] - 164:17
**notations** [2] - 8:14, 8:16
**note** [31] - 28:2, 28:3, 28:5, 32:8, 32:12, 36:5, 39:3, 39:5, 39:7, 46:24, 46:25, 47:19, 55:6, 56:12, 56:14, 83:19, 84:3, 95:10, 100:16, 101:5, 101:24, 102:6, 102:13, 104:17, 105:3, 105:7, 105:14, 112:17, 114:15, 115:4, 162:22
**noted** [1] - 164:11
**notes** [57] - 6:2, 6:3, 6:6, 6:9, 7:10, 8:11, 8:12, 27:4, 51:9, 82:19, 82:23, 83:1, 83:20, 83:24, 84:1, 84:6, 84:8, 95:7, 114:24, 153:25, 156:5, 156:18, 158:6, 158:18, 158:19, 158:20, 158:21, 158:23, 158:24, 159:1, 162:2, 162:3, 162:5, 162:11, 162:25, 163:6, 163:8, 163:15, 164:10, 165:4, 165:9, 165:14, 166:4, 166:5, 166:8, 166:11, 166:13, 166:16, 166:21, 167:14, 167:15, 168:5, 168:10, 168:24, 169:2
**nothing** [7] - 8:19, 67:6, 114:14, 137:15, 155:3, 165:4, 165:16
**notice** [5] - 40:25, 84:21, 88:22, 91:12, 151:5
**noticed** [2] - 13:15, 159:21
**notification** [2] - 102:3, 123:7
**notifications** [1] - 123:10
**notified** [4] - 101:14, 101:18, 114:20, 142:22
**notify** [6] - 80:12, 112:5, 112:14, 114:18, 123:12, 142:6
**November** [17] - 5:13, 19:21, 20:7, 26:1, 37:2, 50:8, 62:5, 65:18, 66:15, 66:18, 85:18, 129:9, 130:8, 133:21, 139:21, 141:14, 142:24
**number** [11] - 2:4, 21:8, 27:8, 33:18, 52:6, 64:21, 73:19, 153:23, 154:7, 157:6, 157:7
**numbers** [2] - 9:18, 33:19
**numerous** [3] - 20:5, 24:9
**NY** [2] - 1:15, 1:23
**NYU** [16] - 25:18, 113:9, 114:21,

115:21, 141:2, 151:21, 153:17, 153:19, 154:3, 154:6, 154:8, 154:14, 156:17

# O

**o'clock** [1] - 48:8
**oath** [1] - 72:7
**object** [9] - 15:8, 29:15, 72:3, 130:22, 131:3, 133:7, 168:25
**objected** [1] - 142:12
**objecting** [1] - 143:23
**objection** [40] - 15:14, 15:15, 15:20, 15:23, 16:1, 45:22, 53:24, 53:25, 55:10, 55:12, 55:22, 81:18, 81:20, 81:21, 82:10, 82:12, 89:12, 92:18, 99:22, 99:25, 100:1, 100:8, 105:17, 107:20, 108:13, 108:14, 118:9, 118:14, 121:2, 121:3, 122:18, 128:25, 133:15, 143:1, 143:4, 143:6, 143:11, 144:12, 144:14
**objections** [6] - 15:11, 16:3, 144:5, 144:20, 147:19, 147:24
**obligation** [7] - 7:15, 28:1, 53:17, 56:2, 56:4, 57:14
**observe** [1] - 17:12
**obstacles** [1] - 22:12
**obtain** [6] - 6:25, 77:21, 77:23, 86:14, 152:2, 152:23
**obtained** [6] - 86:24, 152:15, 152:17, 152:18, 152:19, 152:20
**obtaining** [1] - 86:23
**obvious** [2] - 11:3, 29:13
**obviously** [3] - 54:11, 62:6, 158:15
**occasion** [1] - 37:3
**occasions** [2] - 20:25, 67:9
**occur** [1] - 87:8
**occurred** [1] - 33:22
**October** [16] - 19:21, 26:12, 37:1, 50:8, 95:14, 97:22, 99:1, 110:14, 115:7, 115:19, 115:23, 115:25, 117:8, 117:15, 123:5, 126:20
**Odel** [3] - 61:24, 141:6, 147:10
**odel** [1] - 147:3
**Odel's** [1] - 142:19
**OF** [4] - 1:1, 1:5, 1:8, 1:20
**offer** [15] - 12:20, 53:20, 67:18, 89:23, 90:7, 91:8, 91:9, 134:23, 137:10, 139:6, 149:19, 159:6, 159:10, 161:22, 161:23
**offered** [11] - 13:17, 69:25, 70:2, 92:11, 127:4, 127:9, 127:11, 143:7, 144:3, 150:19, 151:7
**office** [82] - 2:19, 10:3, 21:12, 21:13, 21:21, 22:15, 32:15, 32:24, 33:25, 37:11, 37:24, 39:18, 40:11, 40:20, 40:21, 41:3, 41:14, 49:3, 57:11, 57:12, 65:20, 66:23, 69:13, 71:10, 72:1, 78:15, 79:25, 80:14, 81:3, 82:24, 83:1, 83:4, 83:6, 83:12, 83:13, 83:16, 83:23,

84:1, 84:11, 84:12, 88:24, 91:14, 91:16, 93:21, 94:5, 94:12, 101:10, 105:7, 105:25, 107:4, 107:6, 107:10, 107:13, 110:4, 110:5, 110:6, 110:8, 110:10, 110:18, 111:10, 112:3, 112:5, 114:7, 115:1, 117:4, 117:7, 120:5, 121:22, 123:22, 124:5, 124:8, 124:15, 126:12, 126:21, 127:4, 134:4, 142:8, 142:20
**OFFICE** [1] - 1:5
**Office** [1] - 2:4
**officers** [1] - 17:23
**offices** [1] - 51:8
**Offices** [1] - 3:10
**OFFICES** [1] - 1:20
**official** [2] - 66:15, 66:20
**officially** [1] - 66:19
**often** [7] - 52:24, 70:15, 93:21, 94:4, 94:10, 108:23, 124:15
**oftentimes** [1] - 40:24
**old** [6] - 45:7, 52:25, 59:9, 89:24, 90:5, 135:19
**once** [15] - 14:11, 22:3, 28:2, 30:4, 36:8, 36:9, 47:14, 47:16, 61:11, 73:2, 80:15, 92:21, 112:13, 170:8
**oncoming** [1] - 39:18
**one** [90] - 6:17, 6:19, 10:21, 11:13, 17:25, 24:5, 24:6, 27:21, 31:21, 31:24, 32:8, 34:1, 35:21, 36:9, 37:3, 38:6, 40:1, 43:23, 48:3, 48:16, 48:22, 50:11, 50:13, 50:22, 53:15, 53:18, 54:1, 54:2, 56:12, 60:10, 61:1, 63:9, 66:6, 70:3, 73:2, 73:8, 73:10, 73:11, 73:13, 74:9, 74:16, 74:25, 82:11, 86:6, 87:3, 87:4, 88:17, 90:17, 92:10, 93:22, 93:23, 94:21, 102:3, 102:20, 107:24, 107:25, 108:10, 110:24, 117:12, 117:14, 118:12, 122:19, 122:21, 125:6, 125:11, 127:1, 127:3, 127:4, 127:6, 127:12, 127:19, 128:14, 128:24, 133:12, 141:11, 153:16, 157:6, 160:24, 161:2, 161:16, 162:3, 162:10, 163:15, 164:11, 165:23, 168:3, 169:12
**One** [1] - 37:15
**one-day** [1] - 87:4
**one-page** [2] - 127:19, 128:14
**one-third** [1] - 90:17
**one-week** [1] - 24:6
**ones** [5] - 39:10, 76:10, 96:12, 96:19, 96:21
**onset** [1] - 23:25
**open** [9] - 2:1, 3:19, 13:23, 16:18, 33:24, 50:1, 52:1, 82:15, 103:7
**opened** [2] - 45:8, 45:10
**OPENING** [6] - 18:13, 30:16, 45:1, 172:3, 172:4, 172:5
**opening** [23] - 3:18, 3:20, 3:22, 10:5, 12:5, 12:6, 12:9, 12:13, 12:15, 18:3, 29:15, 30:13, 31:3, 31:9, 44:21, 59:1, 65:2, 69:4, 72:20, 86:23, 170:1, 170:2,

170:23
**ophthalmology** [1] - 154:21
**Ophthalmology** [1] - 156:17
**opinion** [4] - 15:1, 15:3, 16:9, 119:10
**Opportunity** [1] - 47:8
**opportunity** [7] - 14:15, 17:11, 26:16, 55:1, 56:23, 84:18, 85:3
**opposed** [1] - 9:14
**opposing** [4] - 12:24, 105:4, 105:8, 105:14
**optic** [1] - 20:9
**option** [1] - 60:8
**options** [3] - 60:6, 60:21, 135:9
**OrCam** [9] - 21:3, 47:10, 130:20, 132:13, 132:24, 133:20, 133:21, 135:3, 139:3
**ordeal** [1] - 19:20
**order** [5] - 12:25, 77:23, 89:23, 153:2, 167:10
**ordered** [2] - 11:9, 147:15
**organization** [1] - 164:16
**organizations** [1] - 26:7
**organizes** [1] - 81:7
**originally** [1] - 5:25
**originals** [1] - 167:3
**orthopedist** [1] - 149:1
**otherwise** [5] - 14:4, 33:4, 60:6, 60:8, 60:11
**ought** [2] - 16:8, 164:5
**ourselves** [1] - 124:19, 125:2, 125:11
**outcome** [1] - 17:8
**outgoing** [1] - 120:15
**outside** [2] - 15:12, 15:13
**outstanding** [1] - 3:24
**overrule** [2] - 15:23, 100:1
**Overruled** [1] - 118:10
**overruled** [5] - 89:14, 92:19, 100:9, 100:11, 105:18
**oversee** [1] - 48:25
**overseeing** [1] - 25:12
**overview** [1] - 12:7
**own** [22] - 25:8, 26:12, 30:1, 31:25, 33:25, 36:5, 36:17, 38:2, 38:12, 45:8, 45:11, 45:19, 47:10, 51:3, 52:12, 52:17, 55:12, 93:10, 93:17, 95:15, 149:7, 149:24
**owner** [1] - 18:19
**owns** [1] - 65:11

**P**

**P.C** [1] - 1:5
**p.m** [3] - 1:7, 52:1, 143:18
**pad** [1] - 46:25
**page** [27] - 6:18, 6:19, 7:6, 22:22, 25:5, 39:9, 51:11, 86:25, 97:4, 111:16, 122:19, 122:25, 127:19, 127:25, 128:14, 128:19, 128:23, 131:4, 146:7, 150:10, 150:12, 157:16, 162:4,

163:10, 163:14, 163:18
**pages** [10] - 8:4, 21:1, 53:3, 122:21, 122:22, 153:18, 162:2, 166:11, 166:12, 167:1
**paid** [6] - 37:22, 47:11, 86:11, 88:7, 116:24, 138:8
**pain** [1] - 107:12
**panic** [1] - 23:18
**panicking** [1] - 46:10
**paper** [1] - 148:8
**papers** [4] - 60:9, 60:10, 60:25, 76:12
**par** [1] - 26:19
**paralegal** [18] - 2:19, 27:4, 45:20, 46:5, 46:9, 52:23, 57:7, 69:10, 70:1, 70:5, 77:19, 80:6, 83:15, 84:2, 85:13, 117:19, 120:9, 122:12
**paralegal's** [2] - 44:3, 49:14
**paralegals** [45] - 19:13, 32:17, 32:24, 36:25, 37:8, 37:18, 37:20, 37:22, 38:1, 38:6, 38:23, 39:21, 40:19, 43:20, 56:16, 57:4, 65:21, 71:17, 73:17, 73:19, 73:22, 75:14, 76:2, 77:14, 77:15, 78:1, 78:7, 78:12, 78:14, 78:16, 78:20, 79:6, 79:13, 79:17, 79:18, 80:5, 80:19, 83:21, 83:24, 96:13, 96:15, 122:2, 123:9, 124:9
**Pardon** [1] - 165:12
**parents** [1] - 164:7
**part** [11] - 35:9, 45:11, 52:19, 72:9, 72:10, 72:22, 92:4, 126:4, 126:8, 148:10, 148:13
**participating** [2] - 3:2, 31:3
**particular** [9] - 45:15, 50:8, 51:9, 71:8, 73:15, 97:11, 149:12, 152:1, 158:23
**particularly** [1] - 17:24
**Particulars** [5] - 125:21, 125:25, 126:4, 126:6, 126:9
**particulars** [8] - 52:25, 72:21, 73:3, 73:8, 73:12, 75:5, 75:6, 77:21
**parties** [10] - 2:6, 9:19, 10:1, 11:21, 13:14, 17:18, 74:14, 74:15, 79:22, 81:1
**parties'** [1] - 75:9
**party** [9] - 12:23, 12:24, 13:20, 16:6, 17:22, 71:1, 72:7, 74:18, 76:23
**party's** [1] - 74:16
**passed** [4] - 28:24, 45:10, 69:7, 69:8
**passing** [3] - 68:21, 68:22, 68:23
**past** [1] - 57:13
**patient** [1] - 69:9
**Pause** [1] - 9:1
**pause** [1] - 64:14
**pay** [14] - 21:7, 21:19, 29:10, 32:7, 36:9, 40:18, 67:18, 90:15, 134:15, 134:21, 134:23, 137:10, 137:11, 139:6
**payroll** [1] - 40:14
**PC** [1] - 10:3
**pediatrician** [1] - 69:8
**pending** [1] - 144:12
**penny** [1] - 36:9

**people** [40] - 9:14, 10:11, 11:21, 27:11, 31:12, 31:13, 31:14, 34:1, 34:22, 35:1, 37:6, 40:11, 42:18, 43:8, 43:19, 44:10, 46:8, 48:23, 48:25, 52:4, 52:6, 53:15, 53:16, 61:13, 66:18, 68:17, 71:5, 85:8, 95:10, 105:25, 107:13, 107:15, 108:10, 140:14, 140:15, 150:22, 150:24, 151:2, 167:11
**per** [1] - 24:2
**perceive** [1] - 15:5
**percent** [8] - 45:12, 89:17, 90:12, 90:23, 98:19, 151:3, 163:1, 163:2
**percentage** [1] - 89:10
**percentages** [1] - 52:6
**perform** [2] - 32:2, 93:17
**performance** [10] - 19:1, 26:16, 26:19, 26:20, 27:2, 87:18, 87:21, 88:19, 94:8
**performed** [2] - 27:9, 27:14, 87:11
**performing** [3] - 25:14, 65:24, 170:23
**perhaps** [1] - 35:23
**period** [14] - 32:10, 32:16, 32:22, 33:11, 33:22, 37:1, 39:6, 39:14, 49:22, 57:2, 84:7, 87:21, 87:22, 109:24
**peripheral** [2] - 54:23, 66:12
**peripherally** [1] - 59:25
**permanent** [3] - 18:22, 20:10, 29:23
**permission** [1] - 91:5
**permit** [1] - 15:16
**permitted** [3] - 12:19, 12:24, 142:11
**person** [14] - 10:8, 12:23, 13:8, 17:22, 25:11, 34:10, 39:19, 43:10, 43:12, 52:20, 66:19, 107:4, 107:22, 165:3
**personal** [25] - 27:5, 34:14, 34:22, 35:4, 36:18, 38:25, 50:19, 50:20, 50:21, 52:12, 52:13, 55:13, 70:18, 71:4, 71:9, 85:6, 108:15, 115:11, 124:3, 124:7, 124:11, 124:13, 124:22, 125:3, 149:10
**personally** [1] - 149:8
**persons** [1] - 107:19
**phone** [18] - 10:8, 25:6, 27:4, 39:23, 48:9, 49:4, 60:3, 60:7, 61:1, 61:3, 107:15, 109:21, 109:22, 114:8, 120:13, 120:15, 120:17, 153:9
**phones** [7] - 25:4, 48:8, 48:9, 107:15, 108:8, 108:11, 125:3
**photographs** [2] - 51:1, 72:17
**physical** [12] - 51:5, 51:6, 51:7, 51:8, 60:9, 60:10, 60:19, 64:18, 124:16, 124:18, 125:7, 125:10
**physically** [4] - 28:7, 79:3, 84:15, 118:18
**physician** [3] - 25:10, 25:18, 156:11
**pick** [3] - 80:16, 118:1, 163:14
**picking** [2] - 108:8, 108:11
**picture** [2] - 61:2, 107:1
**pictures** [2] - 48:1, 159:5
**piece** [1] - 148:8
**piecemeal** [1] - 144:23
**pile** [1] - 35:21

ALL WORD INDEX

**piling** [4] - 49:14, 49:15
**Pillai** [38] - 4:3, 4:17, 5:2, 14:18, 25:10, 25:18, 25:22, 25:24, 26:3, 62:1, 80:19, 80:22, 116:7, 121:8, 140:20, 140:22, 140:23, 147:12, 147:16, 148:16, 151:14, 151:15, 152:5, 153:25, 154:15, 155:2, 155:17, 156:2, 156:19, 158:16, 158:25, 159:1, 159:8, 159:15, 160:14, 171:3, 171:5, 171:7
**pillai** [2] - 147:15, 154:22
**Pillai's** [5] - 4:24, 148:4, 148:14, 158:9, 161:18
**plain** [1] - 29:21
**plaintiff** [59] - 2:7, 2:9, 2:13, 2:15, 2:17, 2:19, 3:12, 3:20, 4:7, 5:8, 6:25, 8:9, 9:5, 9:23, 9:24, 12:15, 12:16, 12:19, 13:6, 14:12, 14:14, 27:7, 30:24, 31:13, 33:14, 34:2, 45:4, 45:14, 45:17, 49:19, 57:11, 70:24, 71:1, 71:2, 71:3, 72:1, 72:15, 72:18, 73:6, 78:6, 147:15, 147:17, 149:14, 149:24, 151:9, 151:16, 151:24, 152:18, 153:4, 153:12, 154:12, 155:16, 160:2, 161:22, 162:10, 164:25, 171:2, 171:7
**Plaintiff** [2] - 1:3, 58:10
**PLAINTIFF** [1] - 1:11
**plaintiff's** [15] - 13:1, 18:4, 27:2, 32:10, 33:9, 34:17, 38:16, 42:5, 43:15, 71:4, 103:16, 105:10, 106:23, 169:5, 172:11
**Plaintiff's** [23] - 62:25, 63:24, 64:11, 106:13, 106:14, 122:5, 122:8, 123:3, 128:9, 128:11, 128:18, 129:23, 130:5, 132:11, 133:19, 137:22, 138:16, 172:10, 172:12, 172:13, 172:14, 172:16, 172:17
**planning** [1] - 126:14
**plasma** [2] - 20:6, 142:1
**plasmapheresis** [2] - 139:20, 141:25
**played** [3] - 38:4, 93:24, 121:17
**Plaza** [2] - 1:14, 1:23
**pleadings** [1] - 35:7
**Plexiglass** [1] - 58:16
**PLLC** [1] - 1:16
**pocket** [1] - 47:12
**point** [16] - 6:19, 7:18, 27:22, 37:2, 50:18, 54:19, 69:14, 82:16, 88:21, 103:24, 107:25, 130:22, 131:2, 131:4, 158:9, 162:3
**police** [3] - 125:21, 125:23, 125:24
**policies** [2] - 27:3, 93:6
**policy** [1] - 120:14
**polite** [2] - 46:3, 46:4
**politely** [1] - 45:18
**Poole** [1] - 64:4
**poor** [1] - 19:1
**portable** [2] - 61:4, 63:2
**portion** [2] - 16:21, 108:10
**portions** [1] - 25:5
**position** [3] - 69:25, 70:2, 153:19
**positions** [1] - 23:24

**positive** [7] - 26:2, 143:3, 147:19, 148:8, 148:9, 149:21
**possession** [1] - 151:16
**possible** [7] - 5:9, 11:11, 13:1, 76:16, 98:1, 104:2, 131:1
**possibly** [1] - 57:3
**potential** [2] - 54:3, 169:7
**practice** [4] - 26:12, 68:1, 70:17, 95:15
**practicing** [1] - 68:2
**PRAKHIN** [2] - 1:5, 1:5
**Prakhin** [139] - 2:5, 3:9, 9:8, 9:11, 10:3, 18:19, 18:24, 19:10, 20:13, 20:18, 20:22, 21:2, 21:6, 21:13, 21:15, 22:14, 22:16, 23:6, 23:8, 25:11, 26:13, 26:14, 27:16, 28:17, 29:22, 30:1, 30:22, 30:23, 31:13, 32:15, 33:6, 33:13, 34:22, 35:2, 37:19, 37:24, 38:9, 39:17, 39:25, 40:9, 41:10, 41:24, 42:22, 43:7, 44:8, 45:4, 45:5, 45:6, 48:18, 49:19, 50:6, 53:13, 54:7, 57:1, 57:11, 65:8, 65:11, 65:12, 65:13, 65:20, 66:19, 66:25, 67:8, 67:15, 67:18, 67:21, 67:25, 68:22, 68:24, 68:25, 69:4, 69:14, 71:3, 71:4, 73:19, 76:13, 76:15, 77:12, 78:1, 80:8, 80:10, 80:11, 81:6, 81:14, 84:16, 84:21, 85:8, 85:11, 86:2, 86:15, 87:14, 87:20, 88:24, 89:1, 89:8, 89:19, 91:1, 91:3, 91:11, 91:21, 92:6, 94:11, 98:3, 98:25, 106:16, 108:3, 108:19, 109:7, 109:15, 109:18, 110:9, 114:9, 116:21, 120:13, 121:18, 124:5, 124:10, 127:13, 134:6, 134:10, 134:21, 134:25, 136:1, 136:3, 136:4, 137:2, 137:5, 138:24, 139:2, 142:15, 142:16, 163:21, 165:8, 171:8, 171:10
**Prakhin's** [14] - 24:10, 57:22, 69:12, 69:25, 70:17, 70:25, 71:10, 71:14, 71:25, 76:14, 76:17, 85:1, 89:10, 98:7
**prakhin's** [2] - 19:4, 93:5
**pre** [2] - 44:13, 165:8
**pre-COVID** [1] - 44:13
**pre-Prakhin** [1] - 165:8
**precaution** [1] - 9:16
**preclude** [5] - 151:14, 152:5, 152:7, 158:22, 161:21
**precluded** [2] - 155:3, 161:24
**preexisting** [1] - 155:4
**pregnant** [1] - 163:17
**prejudice** [3] - 17:9, 161:14, 161:21
**prejudiced** [2] - 160:8, 161:10
**preliminary** [2] - 74:1, 74:2
**premise** [1] - 56:18
**premises** [2] - 70:21, 73:12
**prep** [1] - 96:19
**preparation** [2] - 119:3, 119:5
**prepare** [5] - 35:7, 72:2, 118:3, 118:20, 118:23
**prepared** [4] - 6:5, 8:6, 118:4, 119:9
**preparing** [3] - 73:17, 75:12, 86:21
**preponderance** [1] - 30:7

**prepped** [1] - 24:12
**preps** [1] - 24:21
**prescribed** [3] - 25:22, 140:20, 140:21
**prescribing** [1] - 57:20
**presence** [1] - 15:12
**present** [6] - 12:18, 12:19, 45:12, 154:13, 154:16, 155:8
**presented** [6] - 11:24, 16:14, 29:6, 32:6, 33:4, 49:18
**presently** [1] - 81:19
**presiding** [2] - 2:2, 9:22
**press** [2] - 60:6, 61:4
**presume** [1] - 52:5
**pretend** [2] - 46:14, 119:17
**pretty** [9] - 47:20, 55:14, 74:20, 75:4, 79:6, 80:4, 85:6, 135:9, 168:23
**prevent** [2] - 36:3, 149:24
**previous** [4] - 6:3, 6:6, 6:8, 6:18
**previously** [3] - 7:22, 33:5, 109:8
**price** [1] - 135:8
**primarily** [1] - 31:12
**principal** [1] - 5:11
**print** [2] - 6:7, 156:5
**privilege** [1] - 23:4
**probability** [1] - 17:13
**probation** [1] - 92:12
**probationary** [2] - 92:7, 92:9
**problem** [7] - 5:12, 34:14, 36:3, 37:12, 38:11, 44:12, 49:9
**problems** [6] - 35:15, 35:22, 38:25, 40:7, 65:22, 115:14
**procedures** [2] - 20:6, 116:13
**proceed** [3] - 12:5, 12:15, 12:25
**Proceedings** [1] - 1:24
**proceedings** [2] - 9:1, 64:14
**process** [10] - 46:18, 55:1, 56:5, 56:24, 57:15, 72:9, 72:10, 72:13, 78:19, 95:2
**produce** [2] - 73:20, 75:1
**produced** [18] - 1:24, 4:19, 8:13, 8:15, 12:8, 13:13, 145:2, 145:10, 145:22, 148:23, 152:19, 153:16, 153:17, 153:22, 154:7, 155:16, 156:11, 158:24
**Professional** [1] - 48:21
**professional** [2] - 1:6, 34:4
**professionals** [1] - 163:24
**progress** [1] - 74:4
**progressed** [2] - 50:12, 65:17
**progresses** [2] - 50:16, 66:9
**prohibit** [1] - 29:3
**prohibiting** [1] - 28:24
**project** [1] - 130:25
**promised** [2] - 19:12, 19:13
**promoted** [1] - 110:17
**pronounce** [1] - 95:22
**proof** [4] - 14:14, 31:18, 54:6, 61:22
**proper** [1] - 118:21
**properly** [1] - 40:17
**propriety** [1] - 17:21
**PROSPECTIVE** [1] - 92:20

ALL WORD INDEX _____ 18

**protect** [2] - 48:2, 167:10
**protection** [1] - 9:20
**protects** [1] - 164:17
**prove** [6] - 52:12, 144:3, 145:19, 145:20, 149:18, 151:8
**proved** [1] - 14:5
**proven** [3] - 25:8, 25:9, 30:6
**provide** [14] - 7:15, 8:1, 63:12, 64:19, 64:20, 67:15, 91:3, 97:1, 127:13, 139:2, 150:20, 151:9, 166:22, 167:24
**provided** [9] - 5:25, 8:17, 8:18, 28:4, 61:8, 155:7, 158:8
**provision** [1] - 48:22
**proximity** [1] - 9:15
**psyche** [1] - 23:12
**psychiatric** [1] - 57:18
**psychiatrist** [2] - 57:19, 162:1
**psychological** [1] - 57:17
**psychologist** [2] - 7:4, 162:1
**psychotherapy** [1] - 57:18
**publish** [6] - 106:21, 122:16, 128:16, 130:3, 133:5, 138:5
**published** [3] - 64:9, 106:11, 123:4
**pulled** [1] - 23:14
**pulling** [1] - 39:19
**purchase** [6] - 61:7, 128:13, 128:19, 130:6, 130:9, 130:10, 130:12, 132:25, 135:22, 137:3, 137:12, 137:16, 137:24, 138:18, 139:7
**purchased** [20] - 21:5, 21:11, 47:10, 67:14, 128:24, 129:9, 130:8, 132:3, 132:14, 132:25, 133:12, 133:20, 133:21, 133:23, 134:3, 135:20, 136:6, 137:8, 138:21
**purpose** [1] - 94:22
**purposes** [2] - 13:16, 124:12
**pursuant** [1] - 154:4
**pursue** [2] - 19:9, 72:16
**push** [1] - 22:1
**pushed** [1] - 29:25
**put** [20] - 9:18, 21:17, 22:11, 60:12, 63:16, 73:4, 73:6, 78:17, 81:10, 95:9, 101:5, 102:13, 102:15, 104:17, 105:7, 123:15, 130:21, 131:2, 156:14, 170:25
**puts** [2] - 73:19, 101:7
**putting** [1] - 63:14, 95:6, 100:16

## Q

**qualified** [2] - 54:13, 54:15
**qualify** [1] - 28:14
**quality** [3] - 25:3, 25:17, 27:10
**quarter** [1] - 164:1
**Queens** [3] - 40:22, 84:20, 90:5
**questioned** [2] - 7:8, 118:22
**questioning** [5] - 3:4, 31:2, 86:18, 104:7, 146:5
**questions** [13] - 4:14, 4:15, 13:21, 15:17, 46:20, 72:6, 72:7, 107:6,

107:10, 118:21, 119:20, 119:24, 171:13
**quickly** [1] - 120:4
**quiet** [1] - 155:23

## R

**race** [1] - 28:25
**raise** [3] - 18:6, 58:8, 86:1
**raises** [1] - 19:7
**ran** [1] - 48:15
**range** [1] - 23:19
**ranges** [1] - 66:9
**Raskin** [33] - 65:21, 66:21, 66:23, 91:15, 112:5, 112:15, 112:17, 114:8, 114:9, 114:15, 114:18, 116:16, 116:21, 126:25, 127:9, 127:13, 127:24, 129:15, 131:6, 131:22, 134:8, 134:23, 134:25, 135:17, 135:21, 136:10, 136:11, 136:13, 139:2, 142:6, 142:14, 142:16
**Raskin's** [2] - 127:2, 135:25
**rather** [1] - 28:17
**ray** [3] - 148:2, 148:3, 149:2
**reach** [2] - 14:11, 14:23
**read** [38] - 21:1, 21:3, 25:5, 35:7, 53:5, 53:6, 53:8, 54:25, 55:8, 55:21, 60:3, 60:5, 60:7, 60:9, 60:14, 60:24, 62:21, 131:4, 136:25, 148:9, 161:15, 161:16, 161:17, 162:7, 162:11, 162:16, 163:9, 163:15, 165:14, 166:4, 166:5, 166:17, 166:18, 166:20, 168:10
**reading** [6] - 4:15, 47:11, 149:4, 162:15, 162:19, 168:4
**reads** [1] - 25:1
**ready** [2] - 35:11, 35:12
**real** [3] - 23:20, 35:8, 143:25
**reality** [1] - 144:24
**realize** [2] - 8:14, 46:5
**realized** [4] - 43:2, 111:13, 126:23, 130:10
**realizing** [1] - 105:2
**really** [9] - 8:6, 19:15, 19:16, 21:18, 34:6, 34:8, 49:8, 144:4, 164:8
**reason** [14] - 10:16, 11:3, 16:17, 22:15, 31:24, 44:8, 54:7, 57:6, 67:5, 78:6, 115:2, 152:14, 159:1, 163:16
**reasonable** [6] - 20:23, 28:13, 28:14, 32:5, 33:4, 56:24
**reasons** [4] - 19:1, 19:2, 31:18, 84:12
**rebut** [1] - 12:20
**rebuttal** [1] - 14:15
**receipt** [5] - 129:25, 132:13, 132:24, 137:24, 138:1
**receipts** [2] - 169:25, 170:13
**receive** [11] - 7:13, 7:15, 62:9, 67:13, 92:14, 101:7, 106:18, 122:13, 123:9, 136:19, 138:11
**received** [48] - 4:18, 4:21, 6:3, 13:12, 13:19, 19:6, 19:7, 20:7, 20:13, 62:5,

64:6, 64:10, 64:11, 64:16, 66:15, 67:12, 67:14, 96:23, 96:24, 106:22, 106:23, 122:17, 123:2, 123:3, 123:7, 128:17, 128:18, 130:4, 130:5, 133:1, 133:6, 133:18, 133:19, 138:15, 138:16, 142:10, 143:9, 147:5, 147:14, 147:16, 148:7, 149:13, 154:6, 163:3, 172:14, 172:16, 172:17
**receiving** [2] - 8:18, 108:20
**receptionist** [1] - 80:3
**recess** [1] - 103:2
**Recess** [1] - 103:15
**recognize** [7] - 63:25, 106:15, 122:9, 128:12, 129:24, 132:12, 137:23
**recommended** [1] - 116:7
**reconnected** [1] - 33:14
**record** [15] - 2:7, 5:4, 8:7, 8:24, 58:14, 129:7, 143:19, 145:25, 146:1, 148:4, 148:23, 149:3, 150:9, 152:3, 157:3
**recorded** [6] - 1:24, 120:18, 120:21, 121:12, 121:16, 121:17
**recording** [1] - 120:13
**recordings** [2] - 121:8, 121:10
**records** [117] - 4:17, 4:25, 5:1, 5:3, 5:6, 5:7, 5:10, 5:12, 5:20, 5:23, 6:4, 6:5, 6:23, 6:24, 6:25, 7:2, 7:4, 7:7, 7:20, 7:24, 8:10, 8:16, 8:19, 35:8, 35:9, 36:19, 51:6, 52:22, 53:5, 54:24, 61:23, 61:24, 62:12, 72:17, 73:7, 75:1, 77:24, 79:2, 120:15, 126:2, 126:7, 144:22, 145:2, 145:9, 145:12, 145:15, 145:17, 145:18, 146:2, 147:16, 147:21, 147:25, 148:17, 148:19, 151:15, 151:17, 152:4, 152:6, 152:8, 152:10, 152:12, 152:15, 152:19, 152:21, 152:23, 152:24, 152:25, 153:9, 153:17, 153:20, 154:17, 154:18, 154:20, 154:23, 155:4, 155:6, 155:12, 155:17, 155:20, 155:25, 156:1, 156:2, 156:3, 156:4, 156:11, 156:15, 156:15, 156:22, 156:25, 157:8, 157:10, 157:12, 157:13, 158:2, 158:5, 158:6, 158:7, 158:8, 159:2, 159:7, 159:11, 159:21, 159:22, 160:7, 160:12, 160:13, 160:14, 161:1, 161:12, 162:15, 169:21, 169:24, 170:22
**recover** [3] - 9:25, 31:19, 34:25
**recruited** [2] - 19:10, 19:11
**redirect** [1] - 103:24
**refer** [4] - 6:10, 140:23, 157:3, 164:12
**reference** [4] - 11:20, 43:10, 157:4, 158:25
**referenced** [1] - 4:24
**references** [1] - 91:3
**referencing** [2] - 106:13, 108:12
**referred** [9] - 10:1, 25:24, 72:20, 113:7, 113:9, 115:22, 141:3, 158:10, 160:25
**referring** [2] - 108:7, 108:10, 165:7
**refused** [3] - 55:8, 55:21

ALL WORD INDEX

**refuses** [1] - 75:2
**regard** [3] - 14:5, 156:24, 164:10
**regarding** [1] - 123:7
**regardless** [1] - 13:13
**regards** [1] - 107:16
**register** [4] - 61:11, 61:16, 61:18, 61:20
**registered** [1] - 62:13
**registration** [1] - 64:20
**regular** [1] - 37:5
**rehabilitation** [1] - 107:12
**reimburse** [2] - 47:3, 47:6
**reimbursement** [1] - 170:9
**reiterate** [1] - 85:13
**relate** [1] - 149:17
**related** [3] - 50:10, 84:12, 167:9
**relating** [2] - 44:20, 81:9
**relatively** [1] - 45:19
**relevant** [3] - 103:20, 125:12, 126:8
**reliability** [1] - 17:4
**relief** [4] - 74:13, 74:17, 75:10
**religion** [1] - 28:25
**rely** [2] - 56:19
**remain** [1] - 58:8
**remarks** [1] - 52:11
**remember** [14] - 12:12, 36:17, 62:2, 70:6, 83:17, 111:5, 112:12, 117:9, 117:15, 117:20, 117:25, 119:22, 127:7, 140:17
**remotely** [2] - 140:14, 140:16
**render** [1] - 18:9
**repeat** [1] - 129:18
**repeated** [3] - 38:16, 39:3, 41:14
**repetition** [1] - 44:23
**repetitive** [1] - 65:3
**replacement** [1] - 107:3
**report** [11] - 11:11, 125:21, 125:23, 125:24, 148:1, 148:2, 148:5, 149:1, 149:2, 149:4
**Reporter** [1] - 1:22
**reporter** [4] - 60:2, 145:6, 148:21, 164:1
**reports** [3] - 8:1, 51:1, 148:18
**represent** [3] - 30:19, 31:6, 45:4
**represented** [1] - 34:7
**representing** [4] - 23:4, 30:22, 30:23, 171:10
**represents** [2] - 24:19, 34:22
**reputation** [1] - 41:13
**request** [7] - 39:7, 117:1, 142:16, 146:4, 148:11, 151:25, 153:4
**requested** [6] - 28:3, 126:24, 127:18, 135:13, 136:21, 158:19
**requesting** [3] - 151:23, 151:24
**requests** [5] - 20:23, 39:3, 41:14, 79:1
**require** [1] - 16:23
**required** [4] - 47:13, 75:16, 78:12, 157:2
**requirements** [1] - 39:2

**requires** [3] - 48:22, 48:24, 107:11
**reschedule** [1] - 114:2
**rescheduled** [1] - 114:3
**research** [3] - 11:17, 20:20, 130:14
**researched** [1] - 130:21
**resolve** [1] - 164:2
**resolved** [3] - 44:12, 90:16
**respect** [6] - 3:24, 4:9, 108:24, 135:17, 160:16, 161:25
**respond** [3] - 11:8, 75:20, 155:22
**responds** [1] - 46:9
**response** [12] - 89:19, 90:2, 123:17, 123:18, 127:2, 128:4, 134:17, 135:25, 151:22, 151:25, 152:2, 155:23
**responsibilities** [3] - 19:9, 74:9, 77:13
**Responsibility** [1] - 48:21
**responsibility** [2] - 40:12, 95:9
**responsible** [11] - 50:23, 70:20, 73:17, 75:12, 77:9, 78:2, 78:21, 79:8, 80:1, 95:6, 99:16
**rest** [4] - 11:15, 22:17, 56:20, 166:12
**result** [5] - 23:7, 29:8, 50:9, 142:25, 157:5
**results** [5] - 142:19, 142:22, 143:7, 143:10, 160:22
**resume** [2] - 69:7, 104:7
**resume'** [1] - 91:1
**retain** [1] - 66:11
**retire** [2] - 10:14, 14:19
**retreat** [1] - 26:5
**return** [5] - 48:14, 117:4, 117:6, 135:6, 135:7
**returned** [12] - 34:7, 49:4, 91:11, 91:14, 91:21, 92:13, 93:9, 115:7, 117:15, 120:4, 126:21, 135:3
**returning** [1] - 39:20
**review** [6] - 12:11, 71:17, 76:15, 86:22, 118:2, 119:5
**reviewed** [9] - 24:12, 37:11, 62:11, 76:6, 118:5, 118:25, 119:7, 119:8, 149:2
**reviewing** [1] - 37:4
**reviews** [1] - 24:20
**RICH** [75] - 1:20, 1:21, 3:9, 3:16, 3:23, 9:12, 44:21, 44:24, 45:2, 45:3, 45:24, 46:2, 52:2, 52:14, 52:18, 54:1, 55:15, 55:17, 55:20, 56:1, 59:18, 60:15, 60:18, 63:1, 63:5, 64:12, 81:18, 81:21, 81:24, 82:1, 82:10, 82:12, 98:9, 99:22, 99:25, 105:17, 107:20, 122:25, 128:25, 129:5, 132:16, 132:21, 143:1, 143:4, 143:11, 143:24, 144:10, 144:15, 144:22, 145:15, 148:1, 148:25, 153:15, 154:21, 154:24, 155:21, 156:7, 156:9, 156:24, 158:2, 158:12, 158:14, 162:17, 163:22, 164:10, 164:15, 165:9, 166:8, 166:21, 167:1, 167:12, 167:15, 167:19, 167:21, 172:5
**Rich** [8] - 3:9, 3:10, 30:23, 44:19, 45:4,

67:11, 128:22, 149:9
**Rich's** [1] - 59:1
**ridiculous** [1] - 107:8
**right-hand** [1] - 77:18
**Rights** [2] - 28:22
**rights** [3] - 38:8, 38:23, 40:16
**roadblocks** [1] - 22:12
**role** [5] - 14:17, 80:19, 80:22, 86:17
**room** [6] - 12:2, 38:8, 52:7, 57:24, 103:3, 113:24
**rooms** [1] - 10:10
**roughly** [2] - 33:15, 50:7
**round** [1] - 139:19
**rounds** [3] - 20:5, 117:10, 117:17
**routed** [1] - 48:9
**row** [1] - 152:2
**rude** [5] - 18:1, 107:16, 108:11, 108:20, 108:23
**ruderman** [1] - 106:14
**RUDERMAN** [4] - 1:2, 58:10, 171:20, 172:6
**Ruderman** [37] - 2:4, 2:19, 9:24, 18:20, 22:5, 23:4, 27:7, 31:13, 31:19, 34:2, 35:14, 35:19, 39:20, 44:5, 46:4, 46:10, 48:13, 49:16, 57:12, 58:6, 58:15, 58:23, 58:24, 63:23, 64:16, 76:12, 81:4, 104:10, 110:19, 122:7, 128:10, 129:22, 132:10, 133:11, 137:21, 138:10, 138:17
**rug** [1] - 23:14
**rule** [1] - 76:25
**Rules** [1] - 48:21
**rules** [3] - 14:21, 15:4, 48:20
**ruling** [7] - 15:10, 16:3, 16:5, 149:25, 150:1, 150:8, 160:4
**Russian** [10] - 45:12, 45:13, 45:14, 45:16, 59:8, 89:2, 89:6, 89:8, 89:10, 89:20
**Russian-speaking** [4] - 45:12, 45:13, 45:14, 89:2
**Rutgers** [2] - 59:11, 59:12, 68:13
**RXR** [1] - 1:14

# S

**sad** [4] - 57:16, 57:21, 58:1, 87:16
**Safe** [2] - 164:15, 165:5
**safer** [1] - 9:16
**Saga** [31] - 81:5, 82:15, 82:20, 83:2, 83:3, 83:5, 83:8, 83:11, 83:17, 83:22, 83:24, 84:3, 84:6, 84:9, 94:22, 94:23, 95:6, 99:4, 99:6, 99:7, 100:16, 101:4, 101:5, 101:7, 101:20, 101:25, 102:12, 102:13, 102:15, 102:24, 105:14
**SAGA** [4] - 81:5, 123:15, 124:18, 170:22
**sake** [1] - 38:22
**salary** [7] - 85:14, 85:17, 85:18, 85:23, 86:4, 86:5, 86:7
**sample** [1] - 73:16

ALL WORD INDEX
20

**Sandra** [1] - 26:24
**Sandy** [5] - 95:21, 96:6, 96:10, 96:24, 98:1
**sat** [1] - 86:18
**satisfactorily** [1] - 3:14
**satisfactory** [5] - 3:12, 8:23, 9:4, 9:7, 9:10
**satisfied** [1] - 87:12
**Saturday** [1] - 43:17
**Saturdays** [2] - 99:9, 102:16
**saw** [17] - 17:21, 38:13, 92:22, 92:23, 105:14, 112:8, 115:21, 135:19, 155:8, 157:8, 157:13
**scanned** [1] - 81:10
**scared** [3] - 57:20, 105:12, 110:1
**scenario** [1] - 13:9
**schedule** [1] - 40:21
**scheduled** [2] - 4:6, 114:19
**scheduling** [1] - 80:22
**Schoeneck** [1] - 2:25
**SCHOENECK** [1] - 1:16
**scholarship** [1] - 68:19
**school** [6] - 45:9, 45:10, 59:13, 68:16, 68:17, 68:19
**scoured** [1] - 8:12
**scrambling** [1] - 41:1
**screen** [7] - 9:18, 47:11, 60:12, 63:14, 63:16, 64:13, 136:25
**screen-reading** [1] - 47:11
**screenshot** [1] - 61:2
**scroll** [1] - 122:23
**searched** [2] - 8:12, 87:5
**seat** [3] - 86:19, 88:14, 144:18
**seated** [3] - 9:4, 104:6, 145:8
**seating** [1] - 86:20
**second** [19] - 6:19, 31:24, 33:22, 41:24, 52:19, 66:7, 86:18, 86:19, 86:20, 88:14, 94:21, 110:10, 117:14, 119:8, 125:13, 127:18, 166:9, 169:12
**second-to-last** [1] - 6:19
**seconds** [1] - 119:19
**see** [71] - 16:12, 17:24, 19:17, 20:11, 28:14, 28:16, 30:7, 31:2, 32:19, 36:7, 38:4, 38:7, 39:18, 40:21, 46:6, 46:8, 46:13, 47:25, 50:17, 51:4, 51:5, 53:10, 53:12, 53:17, 54:5, 56:1, 56:3, 56:23, 57:10, 57:23, 57:25, 59:17, 59:19, 59:22, 59:23, 59:25, 60:1, 60:2, 60:11, 64:15, 65:1, 77:1, 77:2, 82:16, 87:16, 89:22, 91:1, 93:1, 93:3, 94:4, 94:10, 94:13, 101:9, 102:5, 112:6, 112:7, 117:22, 134:6, 134:8, 134:18, 147:7, 155:5, 160:8, 161:9, 161:14, 161:17, 161:20, 171:17
**seeing** [4] - 35:20, 119:2, 119:23, 148:5
**seeking** [4] - 75:10, 156:14, 159:6, 159:10
**seem** [1] - 145:4
**selection** [2] - 3:11, 86:24

**send** [7] - 10:20, 57:4, 57:7, 61:23, 101:6, 121:25, 122:13
**sending** [3] - 37:14, 100:16, 123:6
**sense** [4] - 4:21, 29:11, 57:10
**sensitive** [1] - 17:24
**sent** [16] - 5:1, 7:14, 7:17, 8:17, 37:10, 37:15, 61:24, 64:3, 76:7, 97:3, 107:21, 108:3, 124:1, 129:25, 138:4, 153:8
**sentences** [1] - 97:4
**separate** [2] - 20:24, 154:24
**September** [12] - 5:13, 5:16, 19:15, 33:21, 34:13, 36:23, 37:1, 50:8, 64:25, 65:16, 67:7, 69:3, 69:15, 85:9, 87:13, 95:12, 95:23, 110:19, 110:23, 112:8, 112:23, 113:12
**series** [1] - 5:13
**serve** [4] - 11:14, 47:9, 154:13, 155:2
**served** [2] - 156:19, 156:21
**serves** [1] - 45:11
**service** [1] - 11:7
**services** [5] - 61:13, 61:14, 61:15, 64:21
**serving** [1] - 10:24
**session** [2] - 119:3, 119:6
**sessions** [1] - 6:8
**set** [2] - 7:4, 74:3
**sets** [1] - 161:15
**settle** [12] - 74:7, 97:18, 97:23, 97:25, 98:2, 98:6, 98:7, 98:16, 99:17, 109:3, 109:4, 109:8
**settled** [5] - 88:17, 90:18, 97:17, 98:23, 109:2
**settlement** [11] - 71:18, 71:19, 73:25, 74:6, 90:12, 97:7, 97:13, 98:19, 105:11, 108:24, 109:1
**settling** [1] - 170:22
**seven** [2] - 59:9, 96:2
**several** [6] - 34:16, 39:17, 41:18, 49:23, 167:1, 169:13
**severe** [2] - 23:18, 35:16
**share** [1] - 93:21
**shared** [1] - 26:3
**Shelia** [1] - 64:4
**shit** [2] - 46:6, 46:13, 164:12
**short** [3] - 14:15, 40:25, 130:24
**shorter** [1] - 96:22
**shortly** [3] - 36:7, 43:25, 87:9
**show** [19] - 12:12, 28:2, 29:7, 29:24, 31:18, 31:23, 33:2, 33:5, 35:16, 36:1, 36:11, 41:1, 43:11, 52:15, 54:7, 57:1, 75:1, 122:4, 145:18
**showed** [2] - 137:21, 145:12
**showing** [8] - 61:15, 62:21, 62:24, 122:7, 128:8, 128:10, 129:22, 132:10
**shown** [2] - 14:9, 119:18
**shows** [4] - 54:16, 133:24, 138:17
**sick** [11] - 115:1, 117:17, 118:6, 118:8, 118:12, 118:16, 119:4, 119:14, 120:1, 120:7, 163:23
**side** [19] - 11:18, 25:14, 44:9, 54:24,

54:25, 66:12, 68:6, 68:8, 70:24, 71:5, 72:6, 74:25, 75:2, 105:10, 118:12, 147:24, 152:8
**side-by-side** [1] - 25:14
**sides** [5] - 10:17, 14:1, 14:2, 72:14, 73:4
**sight** [2] - 35:18, 35:23
**sign** [1] - 79:19
**signature** [2] - 76:14, 76:17
**signed** [3] - 36:8, 76:6, 170:11
**significant** [4] - 23:8, 23:9, 23:20, 33:21
**signs** [1] - 76:12
**silhouettes** [3] - 59:17, 59:19, 59:22
**similar** [6] - 10:12, 27:15, 61:3, 68:7, 73:8, 83:25
**simple** [5] - 29:21, 58:1, 74:20, 75:15, 107:14
**simply** [3] - 15:18, 23:6, 30:1
**single** [11] - 20:19, 54:2, 67:4, 67:13, 67:16, 73:16, 76:15, 154:5, 158:25, 160:1, 166:20
**sit** [3] - 13:7, 44:10, 59:15
**sitting** [1] - 110:6
**situations** [1] - 40:16
**six** [8] - 20:23, 43:1, 67:9, 92:9, 164:1, 166:11, 166:12
**sixth** [1] - 136:21
**skewed** [1] - 29:20
**sleeplessness** [1] - 23:19
**slew** [1] - 27:5
**slightly** [1] - 129:12
**slower** [1] - 135:21
**slowly** [2] - 66:8, 110:24
**smaller** [1] - 131:15
**snowstorm** [3] - 140:10, 140:11, 140:14
**social** [1] - 10:12
**society** [1] - 28:23
**software** [17] - 21:9, 21:16, 25:1, 47:11, 135:14, 135:20, 135:22, 135:23, 136:19, 136:22, 136:23, 137:1, 137:17, 138:17, 139:4
**sold** [1] - 135:7
**sole** [2] - 14:25, 16:20
**solely** [3] - 11:4, 11:23, 16:8
**solemnly** [1] - 18:7
**solve** [1] - 141:24
**someone** [7] - 10:23, 11:1, 11:10, 17:21, 70:18, 107:3, 107:9
**someplace** [1] - 48:19
**sometimes** [19] - 15:11, 29:13, 31:8, 42:17, 71:23, 72:5, 76:22, 77:21, 79:2, 82:24, 94:2, 94:13, 95:10, 101:6, 104:20, 123:12, 124:16
**somewhere** [2] - 21:11, 136:6
**soon** [7] - 11:11, 31:7, 55:14, 55:15, 55:16, 83:13, 153:14
**SOPHIE** [1] - 1:22

ALL WORD INDEX

**sophisticated** [1] - 24:24
**sorry** [21] - 79:14, 79:17, 81:20, 82:19, 84:5, 99:11, 102:25, 107:17, 117:5, 118:17, 123:17, 124:4, 124:20, 125:17, 133:22, 161:8, 164:6, 165:2, 167:19, 169:13, 171:5
**sort** [4] - 38:25, 70:19, 75:1, 126:11
**sorted** [1] - 38:20
**sound** [1] - 65:3
**sounds** [2] - 43:4, 52:16
**sours** [1] - 11:19
**speakers** [1] - 89:20
**speaking** [5] - 45:12, 45:13, 45:14, 89:2, 166:9
**speaks** [1] - 84:2
**special** [4] - 15:25, 21:3, 25:1, 25:4
**specialist** [2] - 113:7, 141:4
**specialist's** [1] - 141:5
**specialists** [1] - 140:23
**specialize** [2] - 71:7, 71:8
**specialized** [1] - 141:1
**specific** [4] - 22:15, 77:19, 80:13, 127:22
**specifically** [6] - 10:13, 26:14, 65:19, 102:8, 113:11, 150:1
**specify** [1] - 53:1
**speculate** [1] - 15:17
**speculating** [1] - 52:10
**speech** [1] - 60:6
**speech-to-text** [1] - 60:6
**speeches** [1] - 168:17
**speed** [1] - 169:9
**spend** [2] - 28:4, 35:8
**spent** [3] - 20:1, 23:16, 141:20
**spew** [1] - 164:4
**spinal** [4] - 20:6, 116:14, 117:6, 121:21
**split** [2] - 95:20, 96:5
**spouse** [1] - 10:23
**spread** [2] - 11:14, 110:25
**Spring** [1] - 45:8
**stabilize** [1] - 50:17
**stabilizes** [1] - 50:16
**stacks** [1] - 26:22
**staff** [4] - 90:4, 90:6, 108:20
**stage** [3] - 72:25, 95:1
**stake** [2] - 19:13, 90:9
**stand** [8] - 12:10, 13:8, 15:8, 17:11, 18:6, 58:7, 144:9, 169:11
**standard** [6] - 73:10, 74:20, 75:8, 75:14, 126:25
**standards** [1] - 26:18
**standing** [1] - 58:8
**STANLEY** [1] - 2:16
**Stanley** [2] - 2:16, 23:3
**start** [10] - 10:21, 56:9, 56:10, 56:18, 63:3, 68:25, 82:22, 103:3, 139:23, 148:20
**started** [27] - 19:17, 19:21, 25:15, 26:12, 50:7, 50:11, 57:21, 64:24, 65:6,

65:7, 65:17, 65:23, 69:19, 72:12, 84:5, 84:16, 93:11, 96:14, 110:24, 111:3, 111:7, 111:8, 119:14, 164:25, 165:6
**starting** [9] - 2:7, 53:22, 65:16, 85:14, 86:12, 95:14, 96:12, 96:20, 97:22
**starts** [2] - 66:6, 72:12
**State** [5] - 28:22, 62:3, 62:9, 152:21, 164:16
**state** [13] - 2:6, 11:18, 15:5, 28:19, 28:23, 58:13, 128:25, 143:22, 144:2, 149:17, 149:22, 150:19, 151:8
**STATEMENT** [6] - 18:13, 30:16, 45:1, 172:3, 172:4, 172:5
**statement** [11] - 3:20, 14:12, 18:3, 31:4, 31:9, 36:7, 59:1, 65:3, 72:20, 170:7, 170:11
**statements** [11] - 3:22, 12:6, 12:9, 12:13, 12:15, 13:23, 14:7, 17:5, 72:17, 86:23
**Staten** [1] - 59:10
**STATES** [2] - 1:1, 1:9
**States** [2] - 1:4, 52:6
**stating** [1] - 150:23
**status** [5] - 43:18, 74:5, 95:1, 97:4, 104:11
**statuses** [1] - 77:23
**statute** [1] - 37:5
**statutes** [1] - 31:20
**stayed** [1] - 120:3
**stenography** [1] - 1:24
**step** [2] - 110:2, 144:7
**steroid** [9] - 115:22, 116:7, 117:4, 117:5, 117:11, 118:11, 121:21, 139:19
**steroids** [6] - 20:5, 116:8, 117:17, 118:11, 120:4, 140:21
**still** [16] - 41:9, 24:4, 24:1, 24:15, 33:16, 35:12, 36:16, 52:4, 65:23, 91:24, 98:9, 100:10, 114:13, 133:15, 140:13, 156:3
**stint** [1] - 87:14
**stipulate** [5] - 14:3, 74:14, 169:16, 169:23, 170:4, 170:6, 170:14
**stipulated** [2] - 13:14, 169:20
**stipulation** [6] - 13:25, 14:1, 14:4, 79:11, 79:20, 79:24
**stipulations** [1] - 79:9
**stop** [7] - 26:5, 52:9, 66:8, 119:14, 145:7, 166:10, 167:17
**stopped** [3] - 57:19, 68:2, 144:15
**strangers** [1] - 42:21
**strategizing** [1] - 86:23
**Street** [1] - 1:20
**street** [1] - 114:22
**stress** [1] - 36:14
**strict** [2] - 11:2, 13:6
**strike** [1] - 15:20
**stroke** [1] - 113:17
**strokes** [1] - 114:1
**stronger** [1] - 129:14
**struggle** [1] - 107:12

**stuff** [5] - 53:3, 61:16, 144:24, 144:25, 167:10
**sub** [1] - 26:19
**sub-par** [1] - 26:19
**subject** [2] - 13:22, 15:19
**submissions** [1] - 4:16
**submit** [1] - 61:21
**submitted** [1] - 62:8
**subpoena** [8] - 5:1, 7:16, 8:11, 77:12, 153:8, 154:4, 155:2, 166:23
**subpoenaed** [1] - 4:4
**subpoenas** [1] - 7:13
**subsequent** [2] - 25:16, 27:9
**subsequently** [1] - 47:10
**substantive** [4] - 75:25, 76:1, 76:21, 77:10
**successful** [2] - 40:10
**sudden** [2] - 19:17, 65:5
**sue** [5] - 34:25, 53:23, 54:6, 54:9, 70:19
**sued** [3] - 30:24, 71:5, 71:6
**sues** [1] - 71:1
**suffer** [1] - 23:18
**suffered** [3] - 23:8, 23:9, 29:8, 113:17, 114:1
**suffering** [1] - 25:23
**suffers** [1] - 35:14
**suggest** [3] - 57:9, 156:17, 157:11
**suggested** [2] - 41:18, 57:9
**suggestions** [1] - 38:16
**suing** [5] - 52:9, 59:2, 65:9, 71:2, 78:6
**suit** [1] - 10:1
**suitable** [1] - 109:1
**summarized** [1] - 6:22
**summary** [4] - 75:24, 76:20, 77:4, 87:3
**summation** [1] - 14:15
**summations** [2] - 10:18, 14:8
**summing** [1] - 14:8
**summons** [3] - 72:12, 72:24, 73:2
**sums** [1] - 14:13
**superior** [1] - 26:19
**supervising** [3] - 32:23, 43:15, 43:18
**supervision** [3] - 33:12, 33:16, 37:9
**supervisor** [10] - 25:11, 25:13, 26:11, 33:9, 33:11, 34:10, 70:11, 87:17, 92:1
**supervisory** [1] - 48:24
**support** [10] - 23:15, 29:6, 29:19, 35:24, 72:18, 90:4, 90:5, 90:6, 125:22, 162:4
**supported** [1] - 19:2
**supporting** [1] - 23:13
**supportive** [1] - 20:13
**supposed** [5] - 3:25, 23:15, 39:22, 97:20, 136:8
**surely** [2] - 28:3, 147:3
**surgery** [4] - 105:23, 105:24, 107:2, 107:11
**surgical** [1] - 107:1
**surprised** [2] - 4:25, 159:3

ALL WORD INDEX                                                                    22

**surveillance** [3] - 46:11, 46:12, 117:22
**suspect** [2] - 152:4, 153:1
**suspected** [1] - 140:24
**suspension** [1] - 50:4
**suspicion** [2] - 55:6, 55:12
**sustain** [7] - 15:15, 15:19, 53:25, 55:11, 108:14, 121:3, 143:6
**sustaining** [1] - 70:19
**swear** [2] - 18:4, 18:7
**switching** [1] - 139:9
**sworn** [8] - 3:19, 13:11, 13:19, 36:7, 58:11, 72:6, 170:7, 170:11
**symptoms** [3] - 150:2, 150:15, 157:3
**system** [4] - 78:10, 81:6, 81:11, 94:22

# T

**table** [3] - 30:20, 44:9, 63:4
**tactic** [1] - 158:20
**talks** [3] - 8:4, 48:9, 145:5
**tap** [3] - 116:14, 117:6, 121:21
**taps** [1] - 20:6
**tasks** [2] - 49:22, 77:25
**Tatiana** [2] - 133:11, 138:10
**tax** [1] - 126:7
**taxis** [1] - 51:2
**team** [1] - 31:8
**technical** [1] - 61:14
**technology** [2] - 10:12, 159:4
**template** [1] - 73:10
**templates** [3] - 73:14, 75:7, 78:9
**temptation** [1] - 11:21
**ten** [9] - 55:17, 55:18, 82:23, 97:14, 97:16, 100:13, 109:1, 119:19, 161:16
**tenure** [1] - 26:17
**term** [1] - 52:25
**terminate** [1] - 41:21
**terminated** [8] - 31:21, 33:2, 39:6, 41:23, 43:3, 67:3, 67:21, 103:22
**termination** [3] - 26:15, 68:1, 68:2
**terribly** [1] - 49:9
**test** [20] - 25:25, 50:10, 141:1, 141:7, 141:8, 141:11, 142:22, 142:25, 143:8, 143:9, 145:23, 147:5, 147:15, 147:16, 147:18, 148:8, 149:21, 157:5, 160:22, 160:25
**testified** [6] - 17:12, 42:9, 42:11, 58:11, 89:13, 148:15
**testify** [36] - 3:25, 4:6, 10:21, 12:23, 25:12, 25:17, 26:10, 26:21, 27:13, 32:19, 33:10, 36:25, 37:25, 39:16, 43:8, 43:12, 44:2, 66:14, 147:3, 147:4, 147:17, 148:7, 148:16, 149:1, 149:7, 149:12, 149:20, 150:2, 150:15, 150:21, 151:1, 158:18, 159:2, 159:9, 160:22, 164:19
**testifying** [9] - 13:23, 145:1, 145:25, 149:6, 149:24, 152:5, 158:16, 158:17, 158:22

**testimony** [32] - 10:22, 13:11, 13:20, 13:21, 14:24, 16:10, 16:22, 16:25, 17:2, 17:11, 17:13, 17:16, 25:9, 25:13, 25:16, 30:5, 38:9, 42:12, 43:9, 52:14, 54:2, 72:7, 119:11, 147:6, 150:18, 151:10, 151:14, 158:9, 161:21, 162:10, 170:10
**testing** [1] - 61:25
**tests** [6] - 17:6, 17:7, 19:24, 25:23, 147:3, 158:11
**tethered** [1] - 45:18
**text** [7] - 10:9, 25:3, 25:7, 60:3, 60:6, 60:7, 121:25
**text-to-talk** [1] - 25:3
**Thanksgiving** [5] - 20:1, 141:17, 141:18, 141:20, 142:9
**that'll** [1] - 55:19
**THE** [256] - 1:9, 1:11, 2:3, 2:10, 2:21, 3:1, 3:4, 3:6, 3:8, 3:11, 3:14, 3:18, 3:24, 4:3, 4:6, 4:8, 4:11, 4:13, 4:20, 5:11, 5:17, 5:19, 5:25, 6:9, 6:15, 6:21, 7:3, 7:22, 8:4, 8:21, 9:3, 9:7, 9:10, 9:13, 18:6, 18:11, 18:12, 29:17, 30:12, 44:18, 44:22, 44:25, 45:25, 52:9, 52:16, 53:25, 55:11, 55:16, 55:18, 55:24, 58:3, 58:8, 58:12, 58:15, 58:17, 58:19, 58:23, 59:19, 60:17, 62:16, 62:20, 63:2, 63:3, 63:7, 63:14, 63:16, 63:19, 64:10, 64:15, 76:4, 76:8, 76:9, 76:10, 79:13, 79:15, 81:20, 82:3, 82:6, 82:13, 82:15, 87:22, 88:4, 89:14, 89:16, 92:19, 98:13, 100:1, 100:9, 100:11, 100:14, 101:20, 101:23, 102:2, 102:4, 103:1, 103:4, 103:5, 103:8, 103:11, 103:14, 103:16, 103:23, 104:3, 104:6, 105:18, 106:9, 106:22, 107:21, 107:23, 107:24, 107:25, 108:14, 108:17, 109:6, 109:7, 109:9, 109:10, 109:11, 116:4, 116:5, 118:10, 118:17, 120:8, 120:9, 121:3, 122:4, 122:6, 122:17, 123:2, 124:21, 124:23, 124:25, 125:1, 125:14, 125:16, 127:22, 127:24, 128:17, 129:1, 129:3, 129:4, 129:6, 130:4, 131:17, 132:23, 133:6, 133:9, 133:11, 133:12, 133:14, 133:15, 133:18, 133:23, 133:25, 134:1, 134:19, 134:20, 138:7, 138:9, 138:10, 138:11, 138:13, 143:3, 143:6, 143:12, 143:19, 143:23, 143:25, 144:8, 144:13, 144:17, 145:3, 145:11, 147:7, 147:9, 147:11, 147:13, 147:22, 148:10, 148:20, 149:14, 149:16, 150:5, 150:14, 151:1, 151:6, 151:12, 151:20, 151:22, 152:11, 152:17, 153:2, 153:5, 153:7, 153:19, 154:1, 154:17, 154:19, 155:1, 155:10, 155:14, 155:19, 155:23, 156:12, 156:14, 156:20, 158:13, 158:15, 159:6, 159:10, 159:13, 159:16, 159:18, 160:3,

160:10, 160:19, 161:1, 161:4, 161:7, 161:9, 162:9, 162:16, 162:24, 163:23, 164:7, 164:14, 164:19, 165:4, 165:12, 165:20, 165:22, 166:1, 166:10, 166:16, 166:25, 167:5, 167:13, 167:17, 167:20, 167:22, 168:2, 168:6, 168:10, 168:14, 168:19, 168:22, 169:4, 169:18, 169:20, 169:23, 170:4, 170:12, 170:16, 171:1, 171:4, 171:9
**themselves** [2] - 12:13, 154:4
**theory** [1] - 102:22, 104:13
**therapy** [4] - 51:6, 51:7, 51:8, 53:11
**they've** [2] - 159:2, 164:4
**thinks** [1] - 11:6, 35:17
**third** [2] - 90:17, 129:13
**Third** [2] - 1:12, 1:17
**thoughDPI** [1] - 18:5
**thousand** [8] - 81:16, 86:9, 86:10, 116:8, 116:10, 138:18, 140:4, 140:5
**thousands** [2] - 21:6, 28:4
**threatening** [1] - 49:15
**three** [26] - 6:18, 19:16, 20:24, 20:25, 32:9, 46:22, 46:23, 49:20, 50:7, 57:2, 73:21, 84:23, 116:3, 116:5, 116:12, 122:21, 122:22, 122:25, 139:3, 145:22, 146:6, 158:8, 159:21, 162:25, 163:5, 166:3
**three-month** [1] - 32:9
**three-page** [1] - 122:25
**thriving** [1] - 19:10
**throw** [2] - 27:18, 27:19
**Tilton** [1] - 2:12
**TILTON** [1] - 1:14
**time-consuming** [1] - 169:15
**timeline** [3] - 19:3, 29:20, 170:21
**tired** [1] - 163:23
**today** [8] - 2:18, 4:6, 18:23, 43:6, 43:24, 54:8, 59:15, 170:10
**toes** [1] - 110:2
**together** [3] - 16:1, 23:2, 31:15
**toll** [1] - 35:16
**tomorrow** [2] - 143:14, 169:5
**ton** [1] - 25:22
**took** [9] - 19:22, 20:19, 28:17, 35:16, 66:2, 92:22, 106:25, 115:19, 147:16, 147:18, 149:21, 161:16
**top** [5] - 28:6, 35:22, 36:20, 123:24, 150:13
**total** [2] - 42:21, 107:2
**touch** [1] - 121:22
**toward** [1] - 131:16
**towards** [2] - 43:4, 118:6
**track** [2] - 110:2, 110:16
**tragic** [1] - 57:16
**transactions** [1] - 108:25
**transcript** [3] - 1:24, 150:11, 150:23
**TRANSCRIPT** [1] - 1:8
**Transcription** [1] - 1:24
**transfer** [1] - 80:4

VB        OCR        CRR

**transferred** [2] - 80:9, 95:20
**Transit** [2] - 24:18, 68:5
**transport** [1] - 47:12
**trauma** [1] - 23:21
**traumatic** [1] - 19:16
**treat** [3] - 35:20, 42:19, 112:12
**treated** [2] - 25:19, 160:11
**treating** [4] - 25:10, 28:24, 164:25, 165:6
**treatment** [20] - 115:20, 115:22, 116:6, 116:8, 116:11, 117:6, 121:21, 139:17, 139:24, 140:12, 140:19, 140:21, 141:10, 148:10, 148:13, 148:14, 148:15, 149:7, 152:22, 158:17
**treatments** [3] - 19:25, 25:22, 158:10
**treats** [1] - 167:11
**trial** [27] - 2:5, 3:3, 9:22, 10:15, 12:5, 15:8, 16:5, 23:5, 24:6, 27:22, 29:6, 34:8, 35:11, 35:13, 38:12, 38:21, 52:12, 74:8, 86:14, 86:21, 87:3, 87:4, 96:19, 144:24
**TRIAL** [1] - 1:8
**trials** [7] - 87:2, 87:6, 87:8, 87:11, 88:10, 88:12, 88:16
**tried** [15] - 5:5, 5:7, 8:20, 22:1, 24:2, 36:4, 84:14, 86:16, 105:16, 120:25, 138:23, 141:23, 141:25, 152:1, 152:4
**tries** [1] - 44:4
**trip** [1] - 71:12
**trip-and-fall** [1] - 71:12
**tripled** [1] - 34:11
**trouble** [3] - 21:21, 38:18, 80:15
**true** [8] - 13:15, 14:2, 18:8, 33:13, 34:8, 49:20, 57:21, 156:18
**truly** [1] - 18:8
**trust** [2] - 47:24, 48:1
**truth** [7] - 28:16, 55:4, 58:1, 143:7, 149:16, 151:7
**try** [20] - 11:16, 18:8, 28:9, 32:21, 35:11, 35:12, 36:21, 40:23, 55:8, 56:15, 74:7, 98:5, 103:18, 105:9, 105:12, 108:5, 137:9, 142:2, 169:5, 169:9
**trying** [10] - 38:25, 54:17, 64:12, 116:22, 138:13, 141:24, 142:14, 155:9, 164:1, 169:6
**tube** [1] - 142:2
**turn** [5] - 7:3, 17:25, 18:3, 57:25, 153:2
**turned** [5] - 6:9, 60:22, 151:17, 151:18, 159:7
**turning** [1] - 168:24
**twice** [3] - 22:3, 66:2, 105:21
**twisting** [1] - 49:17
**Twitter** [1] - 10:9
**two** [48] - 6:1, 6:18, 7:6, 8:4, 8:18, 10:2, 20:3, 31:12, 31:13, 31:14, 31:17, 32:7, 32:9, 32:17, 32:22, 33:21, 36:24, 36:25, 37:17, 39:16, 39:18, 43:20, 50:22, 70:3, 79:21, 86:16, 88:11, 97:4, 117:10, 147:24, 155:10, 155:11,

155:14, 157:7, 157:13, 162:4, 163:10, 163:14, 163:18, 164:23, 166:2, 168:6, 168:7, 168:14, 168:17
**two-and-a-half** [1] - 32:9
**two-and-a-half-month** [1] - 32:22
**two-page** [5] - 7:6, 162:4, 163:10, 163:14, 163:18
**twos** [1] - 31:17
**type** [3] - 68:7, 136:24
**typer** [1] - 135:21
**types** [5] - 21:10, 25:2, 96:8, 96:9, 135:24
**typical** [2] - 123:9, 124:10


**U**

**unable** [2] - 38:11, 169:15
**uncurable** [1] - 18:22
**under** [14] - 11:2, 13:18, 23:14, 29:7, 31:19, 33:7, 33:12, 33:16, 36:14, 48:25, 53:18, 72:7, 157:2, 164:3
**undergo** [1] - 116:6
**undergoing** [1] - 23:22
**underlying** [7] - 148:3, 148:4, 148:5, 149:3, 160:13, 160:21, 163:7
**underneath** [1] - 60:13
**understandably** [1] - 35:17
**understood** [6] - 31:11, 96:23, 97:20, 150:16, 150:21, 159:24
**unexpected** [1] - 19:17
**unfamiliar** [1] - 36:11
**unfortunate** [2] - 34:14, 49:17
**unfortunately** [1] - 112:22
**uninstall** [1] - 21:23
**uninstalled** [1] - 139:1
**Uniondale** [1] - 1:15
**unique** [1] - 49:11
**UNITED** [2] - 1:1, 1:9
**United** [2] - 1:4, 52:6
**University** [3] - 59:11, 59:13, 61:25
**unlawful** [1] - 29:9
**unless** [7] - 13:25, 14:4, 49:11, 101:14, 101:23, 101:25, 102:5
**unnecessary** [1] - 171:11
**unpaid** [7] - 19:23, 66:2, 115:19, 116:2, 116:15, 142:4, 142:10
**unprofessional** [1] - 105:13
**unreliability** [1] - 17:4
**unremarkable** [1] - 114:12
**up** [59] - 4:9, 8:3, 9:18, 14:8, 14:13, 21:24, 26:15, 26:22, 27:6, 27:18, 29:17, 39:6, 41:22, 45:8, 46:23, 48:17, 49:10, 49:14, 50:4, 51:7, 55:14, 55:19, 56:11, 59:22, 63:14, 63:16, 64:13, 70:10, 75:1, 82:15, 82:23, 94:25, 95:20, 96:5, 98:1, 98:9, 101:25, 103:4, 108:8, 108:11, 118:1, 121:22, 124:20, 126:22, 129:14, 131:3, 132:17, 132:22, 134:10, 136:4, 136:22,

138:25, 140:12, 147:19, 151:13, 154:11, 168:17, 169:9, 170:20
**upcoming** [2] - 123:8, 123:16
**update** [4] - 77:23, 78:12, 79:25, 83:11
**upset** [2] - 160:7, 163:16
**useful** [1] - 127:16


**V**

**valid** [1] - 161:13
**Valley** [1] - 45:8
**value** [1] - 45:15
**varies** [1] - 70:22
**various** [3] - 47:3, 77:24, 110:7
**vary** [1] - 50:15
**vehicle** [2] - 70:21, 73:11
**vehicles** [1] - 71:13
**verdict** [10] - 14:23, 16:11, 18:9, 30:8, 30:9, 44:16, 88:16, 88:17
**version** [1] - 93:1
**versus** [1] - 96:9
**video** [12] - 46:11, 51:2, 51:3, 117:19, 117:22, 118:2, 118:5, 118:25, 119:2, 119:18, 119:20, 119:22
**videotape** [2] - 38:4, 38:7
**viewed** [1] - 17:14
**views** [3] - 16:6, 52:12, 55:13
**violation** [1] - 28:18
**vision** [39] - 18:25, 19:18, 20:3, 20:8, 21:16, 25:15, 25:20, 27:1, 27:12, 34:14, 35:15, 39:11, 49:21, 50:7, 50:11, 50:18, 54:21, 54:23, 58:17, 59:16, 64:23, 65:6, 65:15, 65:17, 65:23, 66:8, 66:11, 66:12, 111:6, 111:13, 112:21, 112:23, 114:13, 115:14, 115:17, 118:8, 118:16, 118:18, 139:17
**visit** [2] - 5:15, 6:15
**visits** [10] - 5:14, 5:17, 5:21, 6:11, 6:18, 8:16, 157:9, 157:10, 157:11, 157:14
**visually** [2] - 61:12, 61:13
**voice** [3] - 130:25, 132:17, 132:22
**volume** [1] - 124:20
**voluntarily** [1] - 41:25
**vomit** [2] - 118:7, 118:18
**vomiting** [1] - 117:18


**W**

**wait** [5] - 83:15, 92:9, 103:5, 105:15, 141:3
**waited** [1] - 113:22
**waiting** [5] - 4:8, 4:11, 113:16, 113:17, 114:6
**walk** [1] - 17:25
**walked** [2] - 134:18, 134:20
**walking** [2] - 59:23, 59:24
**walks** [2] - 34:23, 35:1

ALL WORD INDEX                                                                24

**walls** [1] - 11:24
**wants** [4] - 42:4, 53:22, 70:19, 150:19
**waste** [2] - 144:20, 166:14
**ways** [2] - 10:10, 43:5
**wear** [2] - 9:14, 134:3
**wearing** [3] - 9:15, 134:6, 134:8
**websites** [1] - 10:10
**Wednesday** [1] - 4:5
**week** [25] - 13:7, 20:1, 24:6, 40:14, 86:8, 94:3, 101:12, 101:16, 102:10, 102:14, 102:18, 104:20, 105:2, 113:6, 115:8, 115:10, 139:16, 140:10, 141:19, 141:20, 142:9, 165:23
**weekend** [5] - 89:1, 101:6, 102:14, 111:4, 111:9
**weekends** [5] - 43:16, 99:2, 99:8, 100:17, 126:14
**weekly** [2] - 86:4, 86:7
**weeks** [7] - 44:1, 47:5, 49:10, 84:23, 91:12, 105:19
**weight** [5] - 15:25, 16:10, 16:22, 17:1, 17:16
**welcome** [2] - 18:18, 22:20
**well-educated** [1] - 42:1
**West** [1] - 1:20
**wherein** [1] - 73:4
**whole** [10] - 5:13, 20:1, 23:19, 24:15, 27:5, 50:15, 148:15, 158:8, 169:14, 170:24
**William** [1] - 87:7
**willing** [1] - 90:6
**win** [1] - 31:19
**wind** [1] - 50:4
**winds** [1] - 51:7
**wish** [1] - 13:4
**wishes** [1] - 12:20
**witness** [43] - 4:1, 10:21, 12:10, 12:22, 12:24, 13:1, 13:2, 13:3, 13:11, 13:12, 13:22, 16:7, 16:10, 16:25, 17:8, 17:9, 17:10, 17:11, 31:3, 58:4, 58:7, 62:15, 62:17, 62:20, 62:24, 72:8, 72:17, 81:24, 103:9, 104:1, 106:8, 106:11, 122:3, 132:16, 144:9, 158:17, 159:4, 164:22, 165:1, 165:8, 169:10, 171:1, 171:12
**Witness** [2] - 58:7, 144:9
**WITNESS** [33] - 58:12, 58:15, 59:19, 60:17, 63:2, 76:8, 76:10, 82:6, 82:15, 89:16, 101:23, 102:4, 103:4, 107:23, 107:25, 109:7, 109:10, 116:5, 120:9, 122:6, 124:23, 125:1, 127:24, 129:3, 131:17, 133:11, 133:14, 133:25, 134:20, 138:9, 138:11, 143:3, 144:8
**witness'** [1] - 17:13
**witness's** [1] - 17:16
**witnesses** [12] - 3:4, 4:10, 12:18, 16:21, 17:18, 27:1, 81:1, 86:22, 104:1, 147:24, 164:24, 171:15
**woman** [2] - 33:10, 42:1
**women** [1] - 164:17

**words** [12] - 11:19, 15:12, 18:18, 18:19, 22:16, 26:4, 30:1, 38:12, 46:4, 164:12, 166:18, 170:8
**work-related** [1] - 84:12
**works** [1] - 24:17
**world** [2] - 20:11, 49:5
**worried** [2] - 21:23, 138:24
**worry** [3] - 37:15, 123:18, 144:17
**worth** [4] - 18:17, 22:19, 30:3, 135:8
**wound** [1] - 48:17
**wrap** [2] - 29:17, 55:19
**wrapping** [1] - 55:14
**write** [3] - 77:20, 83:20, 126:16
**writes** [2] - 123:18, 162:22
**writing** [1] - 10:8
**written** [1] - 8:3
**wrongdoing** [1] - 34:24
**wrote** [4] - 47:9, 97:14, 123:17, 162:4

# X

**X-ray** [3] - 148:2, 148:3, 149:2

# Y

**year** [7] - 19:7, 33:11, 33:21, 85:23, 85:24, 85:25, 92:24
**years** [19] - 19:6, 26:12, 33:24, 42:23, 43:1, 44:13, 45:6, 59:9, 87:24, 145:10, 145:22, 146:6, 148:23, 152:12, 158:8, 159:2, 159:21, 162:25, 163:5
**YELENA** [3] - 1:2, 58:10, 172:6
**Yelena** [29] - 2:18, 9:23, 18:20, 18:24, 19:4, 20:12, 22:5, 23:4, 23:8, 25:19, 26:15, 26:22, 27:7, 27:9, 27:11, 27:12, 27:23, 28:7, 28:17, 29:21, 30:6, 30:10, 31:13, 31:18, 58:6, 58:15, 58:22, 148:14, 148:15
**Yelena's** [9] - 24:23, 25:8, 25:16, 26:11, 26:15, 26:25, 27:8, 29:6, 29:19
**Yelena.Ruderman@gmail.com** [1] - 124:2
**yeses** [1] - 18:10
**YORK** [1] - 1:1
**York** [17] - 1:5, 1:12, 1:17, 1:21, 28:21, 28:22, 40:22, 48:21, 56:6, 62:3, 62:9, 152:20, 157:2, 164:16
**younger** [1] - 162:15
**yourself** [7] - 35:24, 59:6, 124:21, 125:20, 126:3, 126:15, 128:6
**yourselves** [3] - 16:13, 16:16, 17:4
**yup** [1] - 106:9
**yuriy** [1] - 45:6
**Yuriy** [42] - 2:4, 3:9, 9:8, 9:11, 10:3, 18:18, 45:4, 45:5, 54:7, 55:2, 55:5, 56:13, 56:23, 57:1, 57:8, 57:11, 57:22, 65:8, 65:11, 65:12, 69:12, 71:10, 71:25, 76:14, 76:15, 76:17, 80:8, 80:9, 80:11, 81:6, 81:14, 85:8, 85:11, 88:24,

97:17, 98:19, 98:22, 106:25, 131:24, 132:1, 132:5
**YURIY** [2] - 1:5, 1:5

# Z

**zone** [1] - 54:8
**zoom** [4] - 25:4, 60:8, 60:13, 61:1
**zoomed** [2] - 25:6, 60:5