# DEFENDANT YP RULE 60 EXHIBIT "A6"

RULE 60 EXHIBITs for Defendant Yuriy Prakhin

*Ruderman v. Law Office of Yuriy Prakhin, et al.*

19cv02987 (CBA)(LB)

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3
                                    :
4                                   :19CV2987 (CBA)
   YELENA RUDERMAN,                 :
5                                   :
          Plaintiff,                :
6  v.                               :United States Courthouse
                                    :Brooklyn, New York
7  LAW OFFICE OF YURIY PRAKHIN,     :
   P.C., and YURIY PRAKHIN, in      :
8  both his individual             :December 19, 2022
   and professional capacities,     :2:00 p.m.
9                                   :
          Defendants.               :
10 - - - - - - - - - - - - - - - X

11      TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
          BEFORE THE HONORABLE CAROL B. AMON
12            UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S:

14 FOR THE PLAINTIFF:    FARUQI & FARUQI, LLP
                         685 THIRD AVENUE, 26TH FLOOR
15                       NEW YORK, NEW YORK 10017
                         BY:INNESSA M. HUOT, ESQ.
16                          ALEX J. HARTZBAND, ESQ.

17                       TILTON BELDNER LLP
                         626 RXR PLAZA
18                       UNIONDALE, NY 11556
                         BY:JOSHUA BELDNER, ESQ.
19
   FOR THE DEFENDANTS:   BOND SCHOENECK & KING, PLLC
20                       600 THIRD AVENUE, 22ND FLOOR
                         NEW YORK, NEW YORK 10016
21                       BY:MARY ELLEN DONNELLY, ESQ.
                            LOUIS DILORENZO, ESQ.
22                          MALLORY A. CAMPBELL, ESQ.

23
   Court Reporter:  SOPHIE NOLAN
24                  225 Cadman Plaza East/Brooklyn, NY 11201
                    NolanEDNY@aol.com
25 Proceedings recorded by mechanical stenography, transcript
   produced by Computer-Aided Transcription

SN      OCR      RPR

```
                     Proceedings                      2
```

1                     (In open court.)

2                 (The Hon. Carol B. Amon, presiding.)

3           THE COURTROOM CLERK:  Good afternoon.  We're calling

4     case number 19-cv-2987, *Ruderman v The Law Office of Yuriy*

5     *Prakhin*.  This is for a pretrial conference.

6                 Will the parties state their appearance starting

7     with the plaintiff.

8           MS. HUOT:  Good afternoon, Your Honor.  Innessa Huot

9     from Faruqi & Faruqi for the plaintiff.

10          THE COURT:  Good afternoon.

11          MR. BELDNER:  Good afternoon, Your Honor.  This is

12    Josh Beldner, from the firm of Tilton Beldner for the

13    plaintiff.

14          THE COURT:  Good afternoon.

15          MR. HARTZBAND:  Good morning, Your Honor.  Alex

16    Hartzband from Faruqi & Faruqi, also for plaintiff.

17          THE COURT:  Good afternoon.

18          Go to defendants.

19          MS. CAMPBELL:  Good afternoon, Your Honor.  This is

20    Mallory Campbell from Bond Schoeneck & King for the

21    defendants.

22          THE COURT:  Good afternoon.

23          MS. DONNELLY:  Good afternoon, Your Honor.  Mary

24    Ellen Donnelley, Bond Schoeneck & King also for the

25    defendants.

Proceedings                                         3

1          MR. DiLORENZO:  Good afternoon, Your Honor.  Lou

2    DiLorenzo, also from Bond Schoeneck & King.

3          THE COURT:  We have no shortage of lawyers this

4    afternoon.  Everyone can be seated.

5          This matter is on for a pretrial conference.  I have

6    reviewed most of the plaintiff's motions in limine, but I

7    haven't thoroughly reviewed the defendant's*.  They're a bit

8    more extensive.  Let me raise a couple of initial issues.

9    This is scheduled for trial in early February.  Do both sides

10   consent to have the magistrate judge conduct jury selection

11   here?

12         Ms. Huot?  It's just the jury selection.  I'm not

13   talking about trial.

14         MS. HUOT:  No issue, Your Honor.

15         THE COURT:  Defense?

16         MS. DONNELLY:  No issue.

17         THE COURT:  Okay, we'll take care of that.  I will

18   take up some of the legal issues that have been raised here

19   but let me ask, since we're getting close to the trial date,

20   have the parties discussed resolving this case short of trial?

21         MS. HUOT:  Your Honor, we have -- we have attempted

22   settlement discussions.  Plaintiff has reiterated her

23   willingness to engage in such discussions.  However, we don't

24   believe that the offers that have been made were of any

25   significance that would allow us to legitimately consider a

SN        OCR      RPR

Proceedings                                                    4

1    potential resolution.

2         THE COURT:  So, did you ever have a settlement

3    conference with either Judge Dearie or the magistrate judge in

4    this case?

5         MS. HUOT:  Your Honor, we had a settlement

6    conference very early on in this case.  It may have even been

7    just before discovery even opened.  We had an in-person

8    settlement conference with Judge Mann where offers and demands

9    were exchanged and then since then, plaintiff has raised the

10   prospect of engaging in private mediation.  That has been

11   rejected.

12        THE COURT:  What is the defendant's view of this?

13   Is there any possibility of this or not?  I just don't want

14   the parties to get around to thinking about this after we've

15   selected a jury.  That's the problem I have with people not

16   focusing on settlement early on if there's a potential for it

17   because we -- it's a lot of time and effort and attorneys'

18   fees if this can be resolved at this juncture.  You certainly

19   at this point in time know what your respective cases are all

20   about.

21        MS. DONNELLY:  We have discussed the possibility of

22   a settlement conference with our client.  I do not know that

23   he is in lined to do that.  We did make the last settlement

24   offer after Judge Dearie directed us to do so.  There was no

25   response to that.  I don't know if that would help in terms of

Proceedings                                                        5

1   possibly opening the issue of settlement, but as of right now,

2   I would say no.

3           THE COURT:  You did respond you're saying?

4           MS. DONNELLY:  We made the last settlement offer

5   after Judge Dearie directed us to do so.

6           MS. HUOT:  Your Honor, the last settlement offer was

7   half the amount of the initial settlement offer.  So it kind

8   of went backwards by half.  So we advised that that is not

9   something that we would be able to consider.

10          THE COURT:  It certainly doesn't sound like

11  progress.

12          MS. HUOT:  It went backwards, Your Honor.

13          MS. DONNELLY:  I don't recall getting a response,

14  but I will say we were not the attorneys handling this matter

15  at the initial settlement conference.  I don't know if another

16  one would be worthwhile.  I would discuss it with my client if

17  it's helpful.  I always think settlement discussions are

18  helpful, but my clients don't always agree with me.

19          MS. HUOT:  We are open to the discussions but we

20  would like them to move forward not backwards.  We are very

21  open to the possibility, but only if it's productive.  If

22  their clients are willing to engage in good faith

23  negotiations, we have always shown a willingness to do so.

24          THE COURT:  If I talk about money for a moment would

25  the parties prefer I go off the record?

Proceedings                                              6

1        MS. HUOT:  Yes, Your Honor.

2        THE COURT:  Is that acceptable to both sides?

3        MS. CAMPBELL:  Yes, Your Honor.

4        THE COURT:  Okay.  We'll go off the record.

5        (Discussion off the record.)

6        THE COURT:  Let me just raise one question.  As I

7   said, I haven't been able to thoroughly address it, but

8   plaintiffs have admittedly put forth a whole series of

9   additional witnesses that were not in their original

10  disclosure.  Defendants have said at best we should -- that

11  they should be excluded, but at best we should have the

12  opportunity to depose them.  Practically, which of those many

13  witnesses are you really intending on calling at trial?  You

14  just listed a whole group of people, but obviously you're not

15  intending to call all of those people.  So who are the main

16  witnesses in that group that you didn't disclose before that

17  you intend to call.

18       MR. BELDNER:  Your Honor, I think it probably best

19  to break them down into the medical providers and the

20  non-medical providers.  So, with respect to the medical

21  providers which were not originally listed in the plaintiff's

22  initial Rule 26 disclosures, Rule 26 requires that initial

23  disclosures be subject to amendment and supplementation.  We

24  acknowledge that, but Rule 26 *E-1 A only requires the parties

25  supplement their disclosures, quote, if the additional or

SN        OCR        RPR

Proceedings                                              7

1   corrective information has not otherwise been made known to

2   the other parties during the discovery process.

3          In this case, every medical provider and the scope

4   of their knowledge was known to the defendants during

5   discovery.  They were identified in interrogatory responses.

6          THE COURT:  Identified as what in interrogatory

7   responses?

8          MR. BELDNER:  As medical providers, people who

9   treated the plaintiff during this time period.  We provided

10  medical records; specifically from these providers.  The

11  plaintiff provided HIPAA authorizations -- executed HIPAA

12  authorizations for each of those providers and counsel for

13  defendants questioned plaintiff at her deposition regarding

14  her treatment with these providers.  So Rule 26 is designed to

15  prevent sandbagging a party with new evidence at trial and we

16  understand that.  That is not what happened in this case and,

17  indeed, there are a number of cases in the Circuit where

18  courts have expressly ruled that there was no Rule 26

19  violation where the identities of individuals who had not been

20  inclued in Rule 26 disclosures were revealed in discovery and

21  known by the party in discovery and I can provide the

22  citations to some of those cases to Your Honor now or in a

23  supplemental letter if Your Honor would require that.

24          THE COURT:  It's not in your brief?

25          MR. BELDNER:  Well, some are in the opposition, but

SN        OCR        RPR

Proceedings                                                          8

1   it was in response to defendant's reply that -- we did some

2   additional research with respect to what we believe is not a

3   violation of Rule 26.  However, even if there was a technical

4   violation to Rule 26, the harsh penalty of preclusion which is

5   what the defendants are seeking under Rule 37 is not

6   appropriate and the reason for that is the nondisclosure of

7   the medical provider witnesses was harmless and how do we know

8   it's harmless; the 1993 advisory committee notes to Rule 37

9   specifically lists an example of what a harmless violation of

10  Rule 26 would be and, quote, the inadvertent of omission from

11  a Rule 26 --

12          THE COURT:  It wasn't inadvertent.

13          MR. BELDNER:  This would be inadvertent meaning that

14  it was not -- we had disclosed the information in discovery,

15  but we had just not revised our Rule 26 initial disclosures to

16  amend them to include their names for the medical providers.

17  This is the inadvertent omission to a Rule 26 disclosure of

18  the name of a potential witness known to all the parties.  In

19  this case, these witnesses were known to all the parties early

20  on in discovery.

21          And, again, there are numerous cases in this

22  district and in this circuit in which courts have held that

23  the drastic remedy of precluding these witnesses was not

24  appropriate including, for example, a case in the Southern

25  District in which a plaintiff's doctor was identified at her

Proceedings                                                    9

1    deposition as a treating physician, and Judge Gardephe ruled

2    that because the defendant had reason to know during the

3    discovery that the doctor might have information relating to

4    the plaintiff's claims, the failure to disclose his identity

5    in discovery was harmless.  And there are many other cases

6    that say the same thing.

7              So defendants' cannot seriously argue that they were

8    unaware of the identity of these medical providers when they

9    were disclosed in discovery through numerous methods.  They

10   were given the medical documents.  They received HIPAA

11   authorizations which allowed them to obtain their own medical

12   documents of which we have not received back, by the way, Your

13   Honor.  But our position is it's certainly violation, if there

14   is one, was harmless so preclusion would be inappropriate.

15             THE COURT:  Okay.  But you're talking about the

16   medical doctors, right?

17             MR. BELDNER:  Yes.

18             THE COURT:  That's Biddle, Pillai, Faley (ph.),

19   Dedania, Odel, Mami (ph.), and Monchipani (ph.), is that it?

20             MS. HUOT:  Dr. Shostak, Dr. Falk, Dr. Gajiev.

21             MR. BELDNER:  Those would be emotional distress

22   doctors.  Doctors she saw for emotional distress.  And then

23   there are --

24             MS. HUOT:  Then Dr. Moster.

25             THE COURT:  Wait a minute.

SN        OCR        RPR

Proceedings                                    10

1          MS. HUOT:  I can give you the numbers if that would

2   be best.  On the Joint Pretrial Order, I can give you the

3   numbers for the witnesses.

4          THE COURT:  Okay.  Let me look at the Joint Pretrial

5   Order.  Okay.  What page on the Joint Pretrial Order?

6          MS. HUOT:  Page eight, Your Honor.

7          THE COURT:  Okay.

8          MS. HUOT:  Number 14, Dr. Shostak.

9          THE COURT:  These are all new.

10         MS. HUOT:  Your Honor, Dr. Shostak was listed on

11  defendant's pretrial order as a witness and in response to our

12  interrogatories.

13         MR. BELDNER:  And we provided -- yes, Dr. Shostak,

14  we provided her medical records, as well, Plaintiff testified

15  regarding her treatment with Dr. Shostak at the deposition.

16  It's not a new identity other than --

17         THE COURT:  What about --

18         MS. HUOT:  Dr. Falk and Dr. Gajiev, that's numbers

19  15 and 16.  All of these individuals we provided these records

20  in discovery --

21         MR. BELDNER:  Early --

22         MS. HUOT:  -- very, very early on.  Even, I believe

23  Shostak and Falk -- Shostak, for sure, was provided before

24  even discovery opened.  And they were, again, in interrogatory

25  responses, in a deposition, In HIPAA authorizations.

Proceedings                                              11

1          MR. BELDNER:  So there's no new information here.

2          THE COURT:  Okay.  Those three.  Who are the

3    other doctors?  Just go into your pretrial order again, who

4    are the other new doctors?

5          MS. HUOT:  Number 26, Dr. Moster.  Number 27,

6    Dr. Brodie.  Number 28, Dr. Faley.  Number 29, Dr. Dedania,

7    Number 29 (sic), Dr. Odel.  Your Honor, Number 31, Dr. Guy has

8    passed away, so we had in our motion in limine noted that we

9    had no intention of calling him.

10         THE COURT:  That's good.

11         MR. BELDNER:  And the reason why these doctors would

12   be needed --

13         THE COURT:  So answer my first question.

14         MR. BELDNER:  Your first question was, would we call

15   all of them?

16         THE COURT:  Yes, I mean, let's see what we're really

17   disputing here in terms of the potential to do a deposition.

18   What are we really talking about?  Who, of these doctors, do

19   you really intend to call?

20         MR. BELDNER:  Well, with respect to the mental

21   distress doctors, all of them.

22         THE COURT:  Does that, at some point, begin to be

23   cumulative?  Why do you need to call all three doctors?

24         MR. BELDNER:  They treated plaintiff at different

25   times.  And Dr. -- I believe -- Gajiev was prescribing the

Proceedings                                          12

1    medication while the other two were just treating her on a

2    regular basis as a therapist and a psychologist.

3           THE COURT:  And you're definitely, at trial, going

4    to call all three of them?

5           MR. BELDNER:  Our intention right now would be to

6    call all three.

7           MS. HUOT:  Your Honor, if I may just add,

8    Dr. Shostak was actually listed as a witness on defendant's

9    list.  Dr. Gajiev is her current treating psychiatrist and Dr.

10   Falk is her current treating psychologist.  So she has therapy

11   sessions with Dr. Falk, she gets prescribed medications from

12   Dr. Gajiev currently, presently.

13          THE COURT:  So you'd call him and say I --

14          MR. BELDNER:  Yes.

15          THE COURT: -- prescribed this for her?

16          MR. BELDNER:  Yeah, Your Honor, honestly, that would

17   be the extent that we would need him to testify.  If

18   defendants are willing to stipulate that she received this

19   medication which is prescribed --

20          THE COURT:  What kind of medication does Gajiev

21   prescribe?

22          MR. BELDNER:  It's in the records somewhere.

23          THE COURT:  In other words, you wouldn't --

24          MR. BELDNER:  Anti-depressant and anti-anxiety

25   medications, Your Honor.

Proceedings                                                13

1          MS. HUOT:  Yeah.

2          THE COURT:  So you wouldn't call him if you had a

3    stipulation that she was prescribed this medication by that

4    doctor.

5          MR. BELDNER:  Yes, Your Honor, that is truly the

6    only reason we would be going there.

7          THE COURT:  So you would only call --

8          MR. BELDNER:  Falk and Shostak.

9          THE COURT:  Falk and Shostak.

10         MR. BELDNER:  Now --

11         THE COURT:  And then -- now, these other doctors --

12         MR. BELDNER:  Yes.

13         THE COURT: -- they treated her for her condition?

14         MR. BELDNER:  Correct.  And the reason why -- and I

15    can understand why Your Honor might say isn't cumulative, do

16    you need all of these doctors?

17         THE COURT:  Right.

18         MR. BELDNER:  The reason why multiple doctors would

19    be necessary and not just, say, one or two who were treating

20    her at the time or just the doctor who provided her diagnosis,

21    is that the defendants, in this case, really, I think, it's

22    for the first time at the motion for summary judgment stage,

23    they made plaintiff's attendance during the two months

24    immediately before her termination, they made her attendance a

25    central focus and the reason for her termination and, in fact,

Proceedings                    14

1   I believe, either Mr. Prakhin or Ms. Raskin submitted an

2   affidavit in which they specifically stated that plaintiff

3   attended medical appointments on certain dates, but she was

4   absent on all of these other dates, and we need these doctors

5   to rebut that argument because these doctors are going to

6   testify that they treated plaintiff on the dates that we said

7   that she had appointments; and not only was she treated on

8   these dates, but she night need a day after that to recover

9   from the treatment.

10         And so all of these -- the reason provided by the

11  defendants relating to plaintiff's absences or unauthorized

12  absences, which is going to be a reason and a focus of their

13  defense, these doctors are there to testify as to the

14  treatment provided, confirm that the plaintiff had the

15  condition and was being treated for the condition and

16  potentially the recovery for the treatment that was provided.

17         MS. HUOT:  So, Your Honor, if I may also add.  Dr.

18  Odel, that's doctor number 30 on the list, he's the doctor

19  that actually provided her with the diagnosis.

20         The other doctors were treating her during the time

21  period and defendants are disputing that she actually had

22  medical appointments on certain dates.  Those doctors are

23  needed to show that she wasn't just absent for no reason, but

24  she was absent to attend medical appointments, where the

25  defendants are saying that she was not absent to attend

Proceedings                                                    15

1    medical appointments.  We need them to say yes, she was.

2             THE COURT:  Well, don't the records show that?

3             MS. HUOT:  Yes, but we can't get the records in

4    without --

5             THE COURT:  Yeah, I understand.

6             MS. HUOT:  -- someone testifying about the records.

7             THE COURT:  Why was she seeing so many doctors?

8             MS. HUOT:  Because they couldn't figure out what she

9    was -- what her issue was.  At the time she started getting

10   blurry vision, she thought she had a brain tumor.  She didn't

11   know what was wrong with her and she had to go and get

12   different doctors to diagnose her.  She had to seek the

13   assistance and treatment from many different doctors to try to

14   figure out what was wrong with her and to finally get a

15   diagnosis.

16            THE COURT:  But are some of these doctors only

17   necessary to prove that she went to their office that day or

18   in terms of the treatment, which doctors are necessary,

19   really, to establish the treatment?

20            MS. HUOT:  Your Honor, Dr. Odel is the only one that

21   will testify as to her actual diagnosis.  The other doctors

22   are just necessary to show that she was being treated on these

23   particular days that are in the records; and also, on one

24   instance, to show that the day after or the two days after she

25   needed to recover.

SN        OCR        RPR

Proceedings                                                    16

1            MR. BELDNER:  After -- this is like a steroid

2       injection.

3            MS. HUOT:  Yeah.  She received a steroid injection

4       and then after that, she suffered from side effects from the

5       steroid injection, which were -- she would've suffered, like

6       those are obvious side effects.  So we just need the doctor to

7       say that after this treatment these were the side effects that

8       she suffered immediately after the treatments.

9            THE COURT:  Did that happen one time or more than

10      one time?

11           MS. HUOT:  One time.

12           THE COURT:  Which doctor is that?

13           MS. HUOT:  Your Honor, it's either Dr. Brodie -- I'm

14      not 100 percent sure at this moment.  I'd have to look at the

15      records.

16           MR. BELDNER:  It may reflect it in the records.

17           MS. HUOT:  Yes, it's in the records, Your Honor.  I

18      can provide that note to the Court.

19           MR. BELDNER:  And, honestly, Your Honor, you know,

20      one of the -- again, one of the issues is whether the

21      plaintiff was attending these appointments.  The records will

22      reflect when she was attending these appointments.  It's just

23      that defendants have asserted an argument that she was not

24      attending appointments on these dates and if we can't get the

25      records in throughout, you know, if not for these doctors,

Proceedings                                                 17

1    then we need the doctors to get the records in unless the

2    defendants want to stipulate that records come in, which I

3    don't think that they would want to do.

4              MS. HUOT:  If the defendants will stipulate as to

5    the attendance issue, then, we don't need the doctors and we

6    don't need the records.

7              MR. BELDNER:  Except for the diagnosing.

8              MS. HUOT:  Except for the diagnosing, yeah.

9              THE COURT:  But you're saying that the treatment

10   records that have -- that you say defendants have --

11             MR. BELDNER:  Yes.

12             THE COURT: -- establish that she had appointments on

13   these days?

14             MS. HUOT:  Yes.

15             THE COURT:  Okay.  And that the only person who

16   really has substantive testimony to give is Odel.

17             MS. HUOT:  Yes, except for the --

18             THE COURT:  The idea about the steroid injection?

19             MS. HUOT:  Correct.

20             MS. DONNELLY:  Your Honor, we would object to that

21   testimony on the grounds that it would be expert testimony and

22   none of these witnesses -- the steroid treatment doctor, and

23   none of these doctors have been qualified as experts or

24   identified as experts.

25             MR. BELDNER:  Your Honor, if I may?

Proceedings                                                        18

1          THE COURT:  Yes.

2          MR. BELDNER:  You don't need to be -- you don't need

3    to be qualified as an expert in order to offer medical

4    testimony in a case like this.  This is a treating doctor.  He

5    directly observed the plaintiff.  He treated the plaintiff and

6    he is permitted to testify as to his opinions regarding his

7    treatment of the plaintiff and information thereabouts.

8              There's no need in order to prove a disability under

9    the law or to prove a condition for the person to be an

10   expert.

11         THE COURT:  You have -- let me just ask the

12   defendants.  You have the records of all of these doctors;

13   correct?

14         MS. DONNELLY:  That is correct, yes.

15         THE COURT:  And you've had them -- when did you

16   first get them?

17         MS. DONNELLY:  Probably in the middle of discovery.

18         THE COURT:  So why are you prejudiced by any of

19   this?

20         MS. DONNELLY:  Well, with respect to the records is

21   one thing.  Testimony is another thing.  They never --

22         THE COURT:  Brodie, Pillon (ph.), Dedania, basically

23   are just going to principally say, these were her

24   appointments.

25         MS. DONNELLY:  With respect to the records, we do

SN        OCR        RPR

Proceedings                                                    19

1   have the records.  They never identified any of these

2   physicians as potential witnesses.  Not even in the first

3   amended --

4          THE COURT:  No.  Okay.  How are you prejudiced by it

5   now, though?  You know, I don't understand what -- if you were

6   aware of these people, obviously it would have been far

7   preferable to have named these people earlier, I agree with

8   that, but I don't see how you're prejudiced by doctors

9   establishing their records that she had appointments on these

10  days when you've known -- you've had the records and you've

11  known she had appointments and I don't understand what the big

12  deal is.

13         MS. HUOT:  Well, we weren't aware that that was what

14  the testimony was going to be.

15         THE COURT:  Now, you are so...

16         MS. HUOT:  Yes.  I guess, the Joint Pretrial Order

17  said they're going to testify about plaintiff's medical

18  condition, disability, so that was part of the objection.

19         THE COURT:  Did you depose other plaintiff's

20  doctors?

21         MS. DONNELLY:  We did not.  None of them were

22  identified as witnesses at any time during the --

23         THE COURT:  No doctors were identified at all?

24         MS. DONNELLY:  No.  It was also in the middle of

25  COVID where we were doing discovery, so no, no doctors were

Proceedings                                    20

1    deposed.

2         MR. BELDNER:  That's respectfully not correct.  In

3    response to the interrogatories in which the defendants

4    requested the identity of individuals who treated the

5    plaintiff, we specifically identified by name several of these

6    doctors, definitely Falk --

7         MS. HUOT:  Shostak, Gajiev, and Falk.

8         MR. BELDNER:  Shostak, Gajiev and Falk.  And I

9    believe potentially Odel by name, but certainly the medical

10   practices, the eye institute that she went to, we identified

11   those groups and then provided HIPAA authorizations

12   specifically so that the defendant's could get those records

13   and have an opportunity to depose whoever they felt was

14   appropriate.  Defendants made the decision not to depose any

15   doctors.

16        MR. DONNELLY:  We had to go to the Court in order to

17   get the HIPAA authorizations, and the Court specifically

18   indicated that she was going to limit -- the Magistrate Judge

19   specifically indicated she was going to limit the HIPAA

20   authorizations to a specific period of time because she we

21   were in the middle of COVID and she was not going to put the

22   doctors through that.

23        MS. HUOT:  Your Honor, the reason --

24        THE COURT:  What do you mean "limit it to a specific

25   period of time"?

Proceedings                                              21

1          MS. DONNELLY:  The initial medical records submitted

2     in this case were submitted by plaintiff.  They were not

3     certified and there was no indication of how those documents

4     were obtained.  Although plaintiff represented that they were,

5     in fact, complete records, we had reason --

6          THE COURT:  But you got the HIPAA?

7          MS. DONNELLY:  We did get the HIPAA.

8          THE COURT:  And you got the records.

9          MS. DONNELLY:  And we did get the records, that's

10    correct.

11         THE COURT:  So what's the problem now?  I don't

12    understand how you're prejudiced by any of this.  Is there a

13    serious issue as to whether the defendant had this condition?

14    Is that something you're disputing?

15         MR. BELDNER:  Yes.  Sorry.  You can answer.

16         THE COURT:  Yeah, because I don't think you know

17    what it is they're disputing.

18         MS. DONNELLY:  We're just --

19         THE COURT:  Nice of you to let her answer since

20    she's the lady I put the question to.

21         MR. BELDNER:  I apologize.

22         MS. DONNELLY:  We're not disputing that she is

23    alleging that she was diagnosed with this condition and we do

24    have a medical doctor, one medical doctor, that diagnoses her

25    with this condition.

Proceedings                                              22

1      What we are disputing is the disclosure of that
2  condition to the defense.

3      THE COURT:  Yeah, but that has nothing to do with
4  these doctors and whether they should testify.

5      MS. DONNELLY:  No.  And the major of the doctors
6  that they have on their list, as I said, were not even on the
7  original pretrial order that was filed, but really don't have
8  much to do with respect to her actual diagnosis.

9      If it's limited to the times at which she had
10 appointments, then that's something we would probably be okay
11 with, but with respect to anything beyond that, we would not.

12     THE COURT:  All right.  Well, I'll permit the
13 doctors --

14     MR. DiLORENZO:  Your Honor, can I add something to
15 that?

16     THE COURT:  Sure.

17     MR. DiLORENZO:  So in listening to it and this idea
18 that a treating doctor could say that I treated her on Tuesday
19 and then oftentimes there are side effects from this shot,
20 that would be expert opinion being offered by a treating
21 physician who is not identified as an expert unless he treated
22 two days later.

23     THE COURT:  Well, what is he going to say, did she
24 call and complain about it?  Did he treat her for it?

25     MR. BELDNER:  Well, I would say the plaintiff can

Proceedings                                                    23

1  certainly testify that she had an appointment, received the

2  treatment and this caused her to experience whatever symptoms

3  that it caused.

4        What we need the doctor to do -- to testify is just

5  confirm that she was seen at an appointment.  Defendants have

6  been disputing that, even despite the records, that she's been

7  seeing doctors for these appointments.  That's why we need --

8        THE COURT:  Well, no, that's not what she said.

9        MS. HUOT:  No, that's not what she said.

10       THE COURT:  That's not what she said a moment ago,

11 that you said that he needs to testify that that's -- that one

12 of the sequelae of these shot --

13       MR. BELDNER:  The one doctor.

14       THE COURT: -- is that it can -- steroid injection

15 can cause trouble the following day.

16       MS. HUOT:  He would need to testify that she was at

17 the doctor for this treatment on this day and that he gave her

18 steroid injections.  She's going to testify I received steroid

19 injections and because of that, I suffered blah, blah, blah,

20 blah.

21       THE COURT:  Okay.  So you're not having him testify

22 that steroid injections can cause a problem the day after and

23 all of that?  You're not having him testify to that, though?

24       MR. BELDNER:  I don't think he needs to be an expert

25 in order to testify as to that.

Proceedings                                         24

1      THE COURT:  You just said that all he was going to

2  testify to was that he gave the steroid injection and, then,

3  she's going to say the next day, as a result of the steroid

4  injection, it was bothering her and she couldn't go to work.

5      MR. BELDNER:  That is something that we can

6  certainly proffer to the Court, but I don't believe that in

7  order to be -- in order to give testimony to state that a

8  steroid injection, based on his experience treating people,

9  might cause swelling, you don't need to be an expert in order

10  to testify to that.

11      THE COURT:  Well, could we stop dancing around here?

12  Can I get a straight answer?  Do you want to have him testify

13  that steroid injections can cause swelling or not?  Because

14  just a moment ago, between the two of you --

15      MS. HUOT:  Right.

16      THE COURT: -- you said he's just going to testify he

17  gave her a steroid shot and then she's going to say the next

18  day the steroid shot was bothering her and she couldn't go to

19  work.

20      MS. HUOT:  Right.

21      THE COURT:  Now, you intend to have him say

22  something more than that or not, yes or no?

23      MR. BELDNER:  Your Honor, we would be fine with

24  having the doctor --

25      THE COURT:  Okay.

Proceedings                                    25

1        MR. BELDNER:  -- just describe the treatments.

2        THE COURT:  All right.

3        MR. DiLORENZO:  Well, Your Honor, I can save time

4    here.  I think, if all of those doctors are only being offered

5    for the dates and the records, we can work a stipulation out.

6    If your ruling is they're limited to testifying to the dates,

7    the dates are the dates.  That's not going to be a problem.

8    That hasn't been the problem that we've been raising about the

9    absenteeism.  So we can work that out if that's your ruling on

10   the doctors and the testimony on this doctor.

11       THE COURT:  And that if the records reflect that he

12   gave her a steroid shot.  And are you going to agree to the

13   records going into evidence or are you going to require that

14   the doctors be called before the records go into evidence

15   because that's a lot of your objection.  You know, that's the

16   other thing, you're going to have to stipulate to the medical

17   records.

18       MR. DiLORENZO:  Yes.  Your Honor, we wouldn't have

19   any objection to the appointment base records going in without

20   the doctors testifying.

21       MS. HUOT:  We just want to be clear, because the

22   medical records go in, not just the dates of the appointments.

23       MR. DiLORENZO:  Well, no, it's the dates of the

24   appointments that's what we're talking about because the

25   doctors were never disclose, Your Honor.  I mean, to not

Proceedings                                                    26

1    disclose the doctors that are going to be witnesses, to ask us

2    to depose doctors that aren't being identified as witnesses,

3    to raise issues on the other side that we don't want in a

4    case, I mean, I've never dont that.  I've never deposed a

5    doctor that wasn't identified by the other side as a possible

6    witness.

7              MS. HUOT:  Your Honor, these doctors were

8    identified, as I said before, by the records.

9              THE COURT:  Okay.  Look, you know, we keep going

10   back and forth here and it's getting a little irritating.

11             If, in fact, all you want is the doctor's records

12   showing the appointment dates, then you don't need all the,

13   quote, medical records of these doctors.  You would put in the

14   medical records of Odel that's the person who --

15             MS. HUOT:  Right.

16             THE COURT:  -- but you don't actually need the

17   medical records of the other three, correct, you just need

18   their appointment records?

19             MS. HUOT:  And the steroid treatments.

20             THE COURT:  And the fact that she received a steroid

21   treatment on the day that you say she stayed out the next day?

22             MS. HUOT:  She had -- I believe it was a couple of

23   days in a row that she received steroid treatments.

24             THE COURT:  Okay.  So that seems fine.  You can put

25   in those medical records to that extent.  And then Odel, you

Proceedings                                27

1   can call Odel and you can put all of his records in.

2          MS. HUOT:  Okay.  Your Honor, that's for the medical

3   providers, but that's not the same with the therapists.

4          THE COURT:  Let's talk about the therapist.  So

5   these doctors -- well, no.  Gajiev is just the prescriptions?

6          MS. HUOT:  Correct.

7          THE COURT:  So can you agree to the prescriptions?

8          MR. DiLORENZO:  Your Honor, if I understood the

9   prescriptions, they mentioned were anti-depressants and so on.

10  I mean, we would love an opportunity to depose that therapist

11  to find out if the depression is caused by the fact that she

12  believed she's losing her sight and nobody knows what the

13  diagnosis is or is it because she lost her job?

14         MR. BELDNER:  Your Honor --

15         MR. DiLORENZO:  The implication is going to be she's

16  taking anti-depressants because she's depressed having lost

17  her job and that's emotional distress they're attributing to

18  us.

19         I don't know how the therapist could distinguish

20  between what the cause of her depression might be, whether

21  it's loss of job or this serious illness that she believes

22  that she has and nobody can diagnose it correctly.

23         MR. BELDNER:  Your Honor --

24         MR. DiLORENZO:  Something as serious as a lawyer

25  losing his or her sight.

Proceedings                                    28

1          MR. BELDNER:  The defendants had an opportunity to

2     depose Dr. Gajiev for three years and they did not do that.

3     They were aware that this doctor was prescribing our client

4     this medication for a period time.  He was disclosed at --

5     very, very early on, and we provided HIPAA authorizations for

6     the same.  So to allow a deposition at this point, at this

7     late juncture, despite him being identified, we believe would

8     be inappropriate.

9          THE COURT:  But they've been identified at this

10    later juncture too.

11         MS. HUOT:  No.

12         MR. BELDNER:  They were identified three years ago.

13         MS. HUOT:  They were identified in specific response

14    to:  Provide the names of medical providers that treated

15    plaintiff for her medical condition or any emotional distress,

16    and these three names Shostak, Falk and Gajiev were

17    specifically identified and their practice by name.  And

18    Dr. Falk even submitted a letter saying specifically that the

19    emotional distress damages that the plaintiff has sustained is

20    a direct result from her being terminated for her specific

21    disability.  And defendants were provided that very, very

22    early on, about three years ago, and they had ever opportunity

23    to depose these individuals.

24         THE COURT:  You need to call all three of these

25    doctors?

Proceedings                               29

1              MR. BELDNER:  Well, Dr. Gajiev, as we said we don't,

2    if --

3              THE COURT:  But the others -- the others, were they

4    not MDs so they couldn't prescribe medicine or --

5              MS. HUOT:  They were treating her at different

6    points in time.  Dr. Shostak treated her in 2018 to 2019, and

7    Dr. Falk treated her from 2019 to the present.

8              MS. DONNELLY:  I don't believe either Dr. Shostak or

9    Dr. Falk could prescribe --

10             THE COURT:  Are they psychologists or --

11             MS. HUOT:  Dr. Falk is a psychologist, who Doesn't

12   prescribe.

13             THE COURT:  What about Shostak?

14             MS. HUOT:  I'm not 100 percent sure.  Dr. Shostak is

15   on their witness list.

16             THE COURT:  Oh.  Yeah, so how can you complain if

17   she's on your witness list?

18             MS. DONNELLY:  I don't think we're complaining about

19   Dr. Shostak except to the extent they were seeking to offer

20   her for testimony not previously disclosed.

21             THE COURT:  But she's on your list.

22             MS. DONNELLY:  She is on our list, that is correct.

23             THE COURT:  So they can be on their list too.

24             So we're down to a complaint about Falk and the

25   other doctor.

Proceedings                                          30

1          MS. HUOT:  To be clear, Your Honor, we only need the

2     other doctor just for the itemization of the prescriptions

3     that he provided.  If they would just agree -- they have the

4     medical records -- these were the prescriptions provided,

5     these are the medications, we don't need to call him.

6          THE COURT:  Yeah, but who is going to establish that

7     the condition that required those medications were because of

8     her being fired from the job as opposed to her blindness?

9          MS. HUOT:  Dr. Falk.

10         MR. BELDNER:  Plaintiff will testify to that

11    certainly, Your Honor.  And Dr. Falk, who treated her, can

12    also testify as to what their treatment sessions consist of.

13         MR. DiLORENZO:  Your Honor --

14         THE COURT:  But this other doctor did talk to her

15    and meet with her and all of that, right?

16         MS. HUOT:  Well, we're happy -- we would like to

17    include him too.  We were just trying to truncate the issue of

18    witnesses.  We would like to include him.  We have him on our

19    witness list, but if we're trying to cut people out, he's

20    somebody we can cut out because he's -- what we really need

21    him principally for is the list of medications.

22         MR. DiLORENZO:  Your Honor, I think the most

23    prejudicial situation would be if he's allowed to testify to

24    the medication and not tells us -- nobody tells us why.  I'll

25    take a chance without a deposition and cross examine him or

Proceedings                                    31

1   her on the stand as opposed to -- as opposed to just limiting

2   the testimony to here's depression medicine, and then have the

3   plaintiff testify that I think the reason I got this medicine

4   was because I lost my job not because I was afraid that I was

5   going blind.  I think that would prejudice us terribly.

6                 THE COURT:  All right.

7                 MR. DiLORENZO:  And, again, Your Honor, we didn't

8   mean to cause any problems with any of this, but when somebody

9   doesn't identify a doctor as a potential witness, it's hard

10  for the defendants to depose that person and kick over stones

11  that might be a problem later on in the case.  If they're not

12  going to call him as a witness, we're not going to depose him.

13  We're going to choose not to depose him.

14                THE COURT:  Let me just turn to the -- there are

15  another group of lay witnesses?

16                MR. BELDNER:  Yes, Your Honor.

17                THE COURT:  All right.  And where are they listed?

18                MS. HUOT:  They start on page number seven, number

19  two is Tatyana Ruderman, which is plaintiff's mother.

20                THE COURT:  What is she going to testify about?

21                MR. BELDNER:  Ms. Ruderman, plaintiff's mother was

22  identified numerous times at her deposition.  Plaintiff's

23  mother purchased assistive devices to help plaintiff with her,

24  you know, eyesight or attempt to do that.

25                Plaintiff's mother can also testify as to her

Proceedings                              32

1    personal observations regarding plaintiff's behavior following

2    the termination, so that could also go to emotional distress

3    damages as well.

4            We don't -- if we're looking to truncate the list,

5    we recognize that plaintiff's mother was not included on a

6    Rule 26 disclosures and had not been included in an

7    interrogatory response, so we would be willing to forego her

8    testimony in the interest of the Court in order to streamline

9    the process.

10           MS. HUOT:  Also, but that would be if the therapists

11   are allowed in because we need to prove emotional distress.

12           MR. BELDNER:  Correct.

13           MS. HUOT:  So if the therapists are allowed to

14   testify about her emotional distress, then we don't need the

15   mother to also testify about emotional distress.

16           THE COURT:  Okay.  The mother's out.  Who else is

17   new on this?

18           MR. BELDNER:  Hold on.  Let me just -- there are two

19   other individuals who we decided amongst ourselves are out.

20           THE COURT:  Okay.

21           MR. BELDNER:  Your Honor would be happy about that.

22           Dr. John Guy, as we mentioned --

23           THE COURT:  He's dead.  That's a real concession on

24   your part.

25           MR. BELDNER:  Mr. John Manessis.

Proceedings                                                      33

1           MS. HUOT:  Number 23.

2           MR. BELDNER:  And Mr. Thomas Squoras.

3           THE COURT:  He was new as well?

4           MR. BELDNER:  Yes.  Both of these individuals, 23

5    and 24, are out.

6           Now, with respect to Sandra Beron, number six.  She

7    was an attorney who worked with the plaintiff at Mr. Prakhin's

8    firm.  Plaintiff's Rule 26 initial disclosures identified

9    current and former employees of the Prakhin firm, which, of

10   course, Ms. Beron was.  Ms. Beron is not only listed in

11   plaintiff's response to the defendants' interrogatory, she was

12   listed by the defendants in their Rule 26 initial disclosures

13   and in their interrogatory responses.  She's referenced in

14   hundreds of documents exchanged in discovery.

15          THE COURT:  Is she on defendants' witness list?

16          MR. BELDNER:  She is not.

17          MS. DONNELLY:  She is not.

18          She's listed on their 26F as somebody with knowledge

19   of the relevant facts.

20          THE COURT:  What is she going to testify about?

21          MR. BELDNER:  Well, she can testify she worked at

22   the same location as the plaintiff.  She can testify as to her

23   interactions with the plaintiff on a regular basis.

24   Plaintiff's capabilities when she began suffering from the

25   visual impairments as well as after she was terminated.

Proceedings                                        34

1        She also has direct knowledge of all --

2        THE COURT:  What do you mean "as well after she was

3    terminated"?

4        MR. BELDNER:  Meaning what was happening at the firm

5    after plaintiff was terminated.

6        THE COURT:  Well, what's she going to say about

7    that?

8        MR. BELDNER:  Well, specifically, Your Honor,

9    there's an issue here which is that the supervising attorney

10   at the firm is Irene Gabo, who will be testifying in this

11   case, She left the firm, I believe it was September/October

12   2018.  Her cases were distributed by Mr. Prakhin to Sandra

13   Beron and to our client Yelena Ruderman.  So Ms. Beron will

14   have knowledge regarding what happened to the cases which were

15   assigned to Yelena and what happened to those cases after her

16   termination.

17       Also --

18       THE COURT:  Well, why is that -- what do you mean

19   "what happened to those cases a Yelena's termination," why is

20   that relevant?

21       MS. HUOT:  So basically --

22       THE COURT:  Well, can one attorney address this?

23       MR. BELDNER:  Sure.

24       Ms. Gabo continued to handle many of these cases

25   after she left the firm.  Ms. Beron can testify and confirm

Proceedings                                        35

1   that.  One of the reasons or one of the issues that the

2   defendants have raised was Ms. Ruderman's lack of contact or

3   her failure to work on certain cases during the time period

4   where she was suffering from this visual impairment.

5           Ms. Gabo was still handling these cases and

6   Ms. Beron will confirm that this was the arrangement that had

7   happened through the end of the year which was after Yelena's

8   termination.

9           MS. HUOT:  May I just add?  Originally, the

10  defendants had put Ms. Beron on the 26F disclosures and marked

11  her as a comparator.  So Ms. Beron and plaintiff were

12  basically mirror images of each other.  They were colleagues.

13  And when her managing attorney, Irene Gabo, had like 250 cases

14  to disperse, they split up 50 cases to plaintiff and 50 cases

15  to Beron, and they were both working on those cases together.

16          And now the defendants are saying that plaintiff's

17  work performance was terrible, she didn't do anything and

18  everyone had to cover for her work.

19          Beron will testify that plaintiff handled her cases

20  properly, she did everything by -- she did the exact same

21  thing I did.  She had the same cases, she had the same number

22  of cases that I did, we both worked together, everything was

23  doing great.

24          After plaintiff left the firm, Sandra Beron and Gabo

25  helped worked on these cases after plaintiff left, and after

Proceedings                                              36

1   that they hired somebody else to pick up all those cases.

2          So Beron's knowledge is directly relevant not just

3   to what happened what happened after plaintiff left the firm,

4   but relevant to her entire work performance such as put as

5   issue in this case, that plaintiff was a crappy lawyer.

6          THE COURT:  I don't understand what happened after

7   she -- why what happened after she left the firm is relevant?

8          MS. HUOT:  I mean, I think there were -- that's not

9   the issue to focus on.  Her testimony will be relevant as to

10  plaintiff's work performance throughout the entire time, that

11  she was a great worker.  She did her job properly, the same

12  way that Beron will say she did her job.  They were equivalent

13  lawyers and, if anything, plaintiff performed even better

14  because plaintiff had a higher caseload before, she had more

15  cases than Sandra Beron even did.  And then, when Gabo left

16  the firm, they were -- each received the cases and the

17  plaintiff received the lion's share of those cases.  At some

18  point plaintiff had like 200 cases, maybe even more.  And

19  Beron will testify that they both did great work together and

20  everything was perfect until the day that she disclosed her

21  disability and then she was fired.

22         THE COURT:  When you say she's going to testify

23  about defendants discriminatory conduct, what is she going to

24  testify about in that regard?

25         MS. HUOT:  That plaintiff was not provided

Proceedings                                              37

1    accommodations that she requested.

2            THE COURT:  How does she know any of that?

3            MS. HUOT:  Because she --

4            THE COURT:  She can't be repeating what the

5    plaintiff told her.

6            MS. HUOT:  She was in the office at the time

7    plaintiff had -- she's aware of the different accommodations

8    that plaintiff had requested.  From her personal observations,

9    plaintiff walked around in the office asking for magnifying

10   glasses, plaintiff purchased a magnifying glass.  Plaintiff

11   asked whether there was, in the office, a dictation device so

12   that she could dictate, like a Dragon dictation software.

13   Beron can testify about her personal observations.

14           THE COURT:  And this is denied by defendants that

15   she asked for any of this?

16           MS. HUOT:  I believe it is denied.

17           MS. DONNELLY:  No, it's not.

18           THE COURT:  Well, what is the defendants' position?

19   Our position is that we provided her with accommodations such

20   as magnifying glasses.  I don't recall about the dictation

21   software.

22           MS. HUOT:  And it's plaintiff's position that she

23   was not provided with these, that she purchased them on her

24   own and we submitted receipts for same.

25           THE COURT:  Well, I mean, Beron has to be -- you

Proceedings                                          38

1    have to be careful in her testimony about her not just simply

2    repeating what plaintiff said to her.

3         MS. DONNELLY:  And she also has no knowledge of what

4    plaintiff's work product was.  She was not a supervising

5    attorney, she was another associate at the same level in the

6    firm.  They did not share cases.  They had separate cases.

7         THE COURT:  Yeah.  How is she going to know anything

8    about how productive the plaintiff was one way or the other

9    from personal knowledge?

10        MS. HUOT:  Sure.  Well, it's defendants' contention

11   that plaintiff dropped the ball so hard that all the other

12   attorneys at the firm had to pick up the ball and clean up her

13   messes, and that she was such a bad lawyer that everybody else

14   at the firm, including Beron, had to do her work.  And Beron

15   will testify that's not true, plaintiff did a great job.

16   Plaintiff carried the ball all by herself and she did a

17   fantastic particular job on her cases.

18        THE COURT:  How does she know she did a fantastic

19   job on her cases?

20        MS. HUOT:  Because it's a small firm and they all

21   know what each other did.

22        THE COURT:  Well --

23        MS. HUOT:  They're all on these e-mails.  I mean --

24        THE COURT:  Who are the other new lay witnesses?

25        MS. HUOT:  So there's three individuals that could

Proceedings                                    39

1    be grouped together.  Serlin, that's number seven.  Korytny,

2    that's number eight.  Well, actually -- yeah, in quotes that's

3    number -- let's do Serlin and Korytny, That's number seven and

4    eight.  So these individuals --

5              MR. BELDNER:  Yeah.

6              MS. HUOT:  Go ahead.

7              MR. BELDNER:  Both of these individuals, again, were

8    disclosed as current and former employees with respect to the

9    Rule 26 initial disclosures that were submitted.  They were

10   both identified in plaintiff's responses to defendants'

11   interrogatories.  They were both referenced multiple times by

12   plaintiff and Mr. Prakhin at their depositions and both of

13   them submitted written declarations which were provided to the

14   defendants very early on in discovery in this case regarding

15   their personal knowledge and their observations of the

16   plaintiff and her work performance at the firm.

17             And on top of that, I believe one of them,

18   Mr. Korytny, also testified about statements made by

19   Mr. Prakhin regarding plaintiff's disability at the time.

20             MS. HUOT:  And I'd like to note that I don't believe

21   that the defendants have objected to these individuals being

22   used as witnesses in the case.  In their motion in limine, the

23   subject of their motion is an objection as to the admission of

24   the declarations not them as actual witnesses.

25             THE COURT:  Well, you recognize that you can't enter

Proceedings                                      40

1    their declarations.

2         MS. HUOT:  Correct, unless they're unavailable as

3    witnesses.

4         THE COURT:  Well, you're going to have to --

5         MR. BELDNER:  We anticipate that they will be

6    available and we anticipate offering live testimony in both

7    instances.

8         MS. HUOT:  Yes.

9         THE COURT:  But showing unavailability as to not

10   going to be easy to do.

11        MS. HUOT:  We understand.  Defendants' motion in

12   limine was limited to their declarations.

13        THE COURT:  Okay.

14        MS. HUOT:  Which they had for many years now.

15        MS. CAMPBELL:  That's not true, Your Honor.  The

16   fourth motion does list those and we did make a motion to

17   preclude those two witnesses.

18        THE COURT:  Which two?

19        MS. CAMPBELL:  Nicholas Serlin and Steven Korytny.

20        THE COURT:  As having not been revealed before?

21        MS. CAMPBELL:  Yes, that's one of the arguments.

22        Another argument is they're expected to testify on

23   issues where they lack personal knowledge.  They are not

24   supervisors of plaintiff.  They don't have knowledge of her

25   work performance.

Proceedings                                          41

1          THE COURT:  Well, they'll have to lay a foundation.

2    If they don't have knowledge, they don't have knowledge, but I

3    can't really determine that now.

4          MR. DiLORENZO:  Your Honor, to say they've been

5    disclosed because the disclosure said all current and former

6    employees is not enough notice to us that people have to be

7    deposed that are going to be called as witnesses.  I mean,

8    that is such a misuse of the initial disclosures to mislead

9    somebody as to where the case is going and who needs to be

10   deposed.

11         MR. BELDNER:  Your Honor?

12         MR. DiLORENZO:  We deposed a number of people, Your

13   Honor.  We would have deposed those two if they had been

14   listed as potential witnesses.

15         THE COURT:  Did you depose other people who weren't

16   listed as prospective witnesses?

17         MS. DONNELLY:  No.

18         MR. DiLORENZO:  I don't think so, Your Honor.

19         MR. BELDNER:  Your Honor?

20         THE COURT:  Yes.

21         MR. BELDNER:  The defendants were in possession of a

22   written statement submitted and signed by both of these

23   individuals at the very outset of discovery and they were

24   identified in response to plaintiff's interrogatory.

25         THE COURT:  Identified as what?

SN        OCR        RPR

Proceedings                                    42

1          MR. BELDNER:  As witnesses who have knowledge and

2     information regarding the case.

3          THE COURT:  In their declarations?

4          MR. BELDNER:  No.  In plaintiff's responses to

5     defendants' interrogatories, they were listed.

6          THE COURT:  Right.

7          MR. BELDNER:  And on top of that we provided

8     declarations from these individuals.

9          THE COURT:  When did you provide the declarations?

10         MS. HUOT:  At the onset of discovery.  Even one was

11    provided at the settlement conference -- I'm sorry, after the

12    settlement conference before discovery even opened.  So they

13    actually received a preview of their testimony.  For three

14    years now, they've had a preview of their testimony what they

15    would be testifying to at trial.

16         THE COURT:  Well --

17         MS. HUOT:  And in response to Ms. Campbell's

18    statements about their motion in limine.  The point in fact

19    that their fifth motion in limine precluding plaintiff from

20    introducing the declarations of Serlin, Korytny and Coates.

21         MS. CAMPBELL:  The page before has the motion that I

22    was talking about.

23         MR. DiLORENZO:  The fourth motion.

24         MS. CAMPBELL:  Page 17.

25         MS. HUOT:  Page 17, fourth motion in limine

Proceedings                                          43

1    precluding plaintiff from introducing --

2              Oh, I see it.  Okay.

3              MS. CAMPBELL:  Thank you.  It's a different motion.

4              MS. HUOT:  But the point is they've had a preview of

5    this testimony.  They had a preview of this testimony for

6    three years now.

7              MR. BELDNER:  Again, Your Honor, we would just

8    reiterate under Rule 26 and Rule 37 these are individuals that

9    were clearly made known to this other party in discovery, and

10   so if there was a technical violation of the Rule 26, which we

11   would not concede, any violation was harmless, defendants had

12   every opportunity to depose these individuals.  They knew the

13   scope of what their testimony might be and they chose not to.

14             THE COURT:  Let's go through the other list of new

15   witnesses.  Lawlor?

16             MR. BELDNER:  Yes.  So Mr. Lawlor, he worked as an

17   attorney with the plaintiff at Mr. Prakhin's firm.  He

18   directly observed plaintiff's work performance.  I believe he

19   was almost -- you know, he certainly worked with her and

20   directly observed her performance.  He testified about those

21   observations.

22             THE COURT:  Why isn't he cumulative?

23             MR. BELDNER:  Well, the reason why he is a little

24   bit different than the other individuals, Your Honor, is that

25   she also worked with Mr. Lawlor at -- subsequent to her

Proceedings                                        44

1    termination at the Bogoraz firm.  And, so, one of the

2    defendants' arguments, as I understand it in this case, is

3    that plaintiff was unable to perform the essential functions

4    of her job with or without accommodations.

5            Mr. Lawlor has worked with the plaintiff in recent

6    years since her diagnosis and he can testify that she's able,

7    based on his direct observation, that she's able to perform

8    the essential functions of her job.  He can testify she was

9    able to do that before the deterioration of her vision and

10   after the deterioration of her vision.

11           So he's referenced, again, in many documents in the

12   case.  He was identified.  He testified about at the

13   deposition, so we believe he should be --

14           THE COURT:  Testified at what?

15           MR. BELDNER:  Plaintiff testified about Mr. Lawlor

16   at -- defendants' counsel questioned plaintiff about

17   Mr. Lawlor at her deposition and she testified that he was an

18   attorney that she worked with at the Bogoraz firm.

19           THE COURT:  What is he going to say about -- what

20   was his relationship to her at the other firm?

21           MR. BELDNER:  At the first firm?

22           THE COURT:  The second firm, not defendants' firm.

23           MR. BELDNER:  At the Bogoraz firm.

24           MS. HUOT:  So at the Bogoraz firm he was effectively

25   her supervisor.  So he will testify as to the quality of her

Proceedings                                              45

1    work and her performance before and after -- immediately

2    after.

3              MS. DONNELLY:  Your Honor, he did not work with her

4    before.  He was a trial attorney that was contracted by the

5    defendants' firm and did not work directly with her.

6              THE COURT:  Okay.  But why wouldn't it be

7    significant that he worked with her later and that she could

8    perform the job?

9              MS. DONNELLY:  Because I don't think the fact that

10   she worked with him at a later time is necessarily probative

11   with respect to what her ability was at the time she was at

12   the firm.  There could have been other advances in the years

13   following that enabled her to see documents or videos more

14   clearly.  There could have been other changes in her eyesight

15   that allowed her to perform more efficiently.  It's not an

16   equitable snapshot in time to say because she can do this now,

17   she could do this then.

18             THE COURT:  How much later was it?

19             MR. BELDNER:  It was almost immediately after her

20   termination.  And, Your Honor, to defense counsel's point,

21   they can make that argument to the jury and, say, well, the

22   weight of this person's testimony, you know, should be less

23   because it's later in time, but to preclude him from

24   testifying in the case is, again, we would find wholly

25   inappropriate.

Proceedings                                           46

1          THE COURT:  All right.  If Svetlana Scoll.

2          MR. BELDNER:  Okay.  Svetlana Scoll is her current

3     employer.  And Ms. Scoll, she was not identified Rule 26

4     disclosures or in interrogatory responses because Yelena, our

5     client, only began working for her in April 2022.  So --

6          THE COURT:  So what does she have relevant to say?

7          MR. BELDNER:  Well, she can testify as to her

8     ability to perform the functions of the job now.

9          THE COURT:  This is a long time later.  If Lawlor

10    testifies, why do you need Scoll?

11         MR. BELDNER:  Well, I also -- I think the nature of

12    the relationship is a little bit different because when

13    plaintiff was performing work for the Bogoraz firm, she was

14    doing it on a per diem basis.  She was performing depositions,

15    she was covering appearances and things of that nature.

16         Ms. Scoll is or Ms. Scoll's firm is the first

17    full-time employer that plaintiff has worked for since the

18    termination from the Prakhin firm; and so to the extent that

19    there is an argument later on that, oh, sure, maybe plaintiff

20    can cover depositions or she can do certain functions, but she

21    can't do all of the functions necessary for an associate at a

22    firm, Ms. Scoll can directly contradict that testimony.

23         MS. HUOT:  If the defendants are intending to make

24    the argument that, sure, she can be a per diem attorney doing

25    this limited type of work, that doesn't mean that she can be a

Proceedings                                                    47

1    full-time attorney doing regular attorney work.  Ms. Scoll

2    will testify that she can.

3            However, to the extent that the defendants want to

4    stipulate that the things that Mr. Lawlor can testify to as to

5    her ability doing per diem work would be the equivalent of

6    dong full-time associate work, then Scoll's testimony would

7    not be necessary.

8            MR. DiLORENZO:  And we wouldn't be willing to

9    stipulate to that, Your Honor.  And we would object to three

10   years later, testimony about whether she can do the full scope

11   of perhaps a different job.

12           THE COURT:  Do you think she got better?

13           MR. DiLORENZO:  To say that she's otherwise

14   qualified for a job that she left three years earlier.

15           THE COURT:  It seems to go to the weight of it, not

16   to the admissibility.

17           Karine Bogoraz?

18           MS. HUOT:  Karine Bogoraz is the -- she is the

19   managing partner, the managing attorney at the Bogoraz firm

20   that she worked for with Lawlor.

21           THE COURT:  All right.  You've got Lawlor, why do

22   you need her?

23           MS. HUOT:  Okay.  If we have Lawlor, we don't need

24   Bogoraz.

25           THE COURT:  All right.  Thank you.

Proceedings                                                  48

1          MS. HUOT:  Except there are invoices and certain

2     e-mails about, you know, payments of funds that we may need

3     her to authenticate, but I'm --

4          Can plaintiff authenticate that?

5          MR. BELDNER:  Plaintiff can authenticate it.

6          MS. HUOT:  Plaintiff can authenticate that so we

7     don't need Bogoraz if we have Lawlor.

8          THE COURT:  Okay.  Shalom?

9          MS. HUOT:  Shalom is -- oh, sorry.

10         MR. BELDNER:  Sort of in the same boat in that

11    she -- our client began doing work for him in late 2021.

12    Obviously, our client can't testify to the work that she

13    performed for him.  You know, it goes to the mitigation of

14    damages.  It goes to her ability to do the job, but I don't

15    think he's necessary if we can have Lawlor and Ms. Scoll.

16         MS. HUOT:  This is a different or that she did per

17    diem work for to the extent that --

18         THE COURT:  All right.  You don't need her -- him,

19    if you have Scoll and Lawlor.

20         MS. HUOT:  Your Honor, if the defendants are

21    claiming that she didn't mitigate her damages --

22         THE COURT:  Are you going to take different

23    positions from the fellow sitting next to you?

24         MS. HUOT:  No.

25         THE COURT:  I mean, because this gets very

Proceedings                                                      49

1    confusing.  One of you concedes something and the other one

2    then takes it back.

3              MS. HUOT:  No.  No.  Your Honor, I'm sorry.  Well

4    said.

5              THE COURT:  Shalom is out.

6              Dmitry Levitsky.

7              MS. HUOT:  Dmitry Levitsky is an individual that she

8    applied to for employment within two weeks of being terminated

9    from the Prakhin law firm.  He goes to mitigation to show that

10   she immediately mitigated damages, attempted to mitigate

11   damages.  She also then obtained employment with him on a per

12   diem basis and he will testify that she did really good work.

13             To the extent that the defendants are making the

14   argument that she failed to mitigate damages, he would be

15   necessary to show that she almost immediately mitigated her

16   damages or she tried to mitigate her damages.  She engaged in

17   an effort to mitigate her damages within, what, like two weeks

18   of being terminated.

19             THE COURT:  And she got a job with him?

20             MS. HUOT:  Yes, she did per diem work for him in

21   2019.

22             THE COURT:  Why is this problematic?

23             MS. CAMPBELL:  I think our objection to these

24   witnesses is just the untimely -- mainly, the untimely

25   disclosure.

Proceedings                                    50

1          THE COURT:  Yeah, but I mean -- you know, there's

2    nothing that a deposition of this fellow is going to -- would

3    have really helped move the ball forward.  He seems, based on

4    why they're saying they're calling him, is just to corroborate

5    something that's not apparently really contested.  He can

6    testify.

7          Jack Grossman.

8          MS. HUOT:  Jack Grossman would be the same as

9    Levitsky.  She applied to work for Grossman shortly after

10   being terminated.  Your Honor, we recognize that maybe the

11   testimony would be unnecessary if Levitsky is permitted to

12   testify.

13         MR. BELDNER:  It mostly goes to the issue of

14   mitigation --

15         MS. HUOT: Yes.

16         MR. BELDNER:  --  and her efforts to find employment

17   immediately after her termination.

18         THE COURT:  Did she work for Grossman?

19         MR. BELDNER:  No, she applied to work for

20   Mr. Grossman I think in December of 2018.

21         THE COURT:  Well, she can testify to that.

22         MS. HUOT:  Yes.

23         MR. BELDNER:  She can.

24         THE COURT:  We don't need Mr. Grossman to testify to

25   that.

Proceedings                                    51

1          Christine Guaneri?

2          MR. BELDNER:  She's almost the exact same purpose of

3    Ms. Guaneri is of Mr. Grossman, which is it would be

4    documentation that plaintiff was seeking employment, you know,

5    on a full-time basis immediately following her termination.

6    This was in response to defendants' argument that she failed

7    to mitigate damages.  This would support plaintiff's rebuttal

8    of that.

9          THE COURT:  Well --

10         MR. BELDNER:  If defendants are willing to stipulate

11   that she, you know, mitigated and did everything that she

12   could --

13         THE COURT:  They're not going to stipulate she did

14   everything she could, but they're presumably not going to

15   contest the fact that she tried to get a job with these people

16   if, in fact, she did.

17         MR. BELDNER:  Well, Mr. Grossman didn't give her --

18   she didn't get the job with Mr. Grossman.

19         THE COURT:  I said tried to get a job.

20         MR. BELDNER:  I apologize.

21         THE COURT:  I mean, she's going to testify that she

22   made all of these efforts to get a job, right?

23         MR. BELDNER:  Yes.

24         THE COURT:  And the only reason to call any of these

25   people would be if the defendants were going to say she was

SN        OCR        RPR

1  lying about that.

2          Is that going to be the defendants' position?

3          MS. DONNELLY:  We are not claiming she lied about

4  her applications.

5          THE COURT:  So I don't think we need to call those

6  witnesses.

7          MR. BELDNER:  Okay.  There is one more?

8          MS. HUOT:  Levitsky is good but Grossman is out.

9          MR. BELDNER:  Grossman is out.

10         THE COURT:  Manessis is out you said.  Sgouras is

11 out.  Guaneri is out.

12         MR. BELDNER:  Yes, sir.

13         THE COURT: Bogoraz is out.  Shalom is out.

14         MS. HUOT: Yes, sir.

15         THE COURT: Tanya Ruderman is out.

16         MS. HUOT:  Yes.

17         MR. BELDNER:  Yes.  There is one other witness

18 though, Your Honor, that we did not discuss, Peter Coates.

19         MS. HUOT:  He is number 13 on page eight.

20         THE COURT:  What is it that you want to -- because

21 I'm a little bit concerned about his testimony as a matter of

22 substance.  What is it that you expect him to testify to?

23         MR. BELDNER:  Well, Mr. Coates, and we acknowledge

24 he was not disclosed because we didn't know about him until

25 May of 2022, but Mr. Coates will testify that he was directed

Proceedings                                    53

1    by Mr. Prakhin and his office manager, Ms. Raskin, to delete

2    our client's Saga entry notes.

3           And one of the reasons -- one of the primary reasons

4    for the termination being proffered by the defendants was our

5    client's lack of Saga notes.  And he will testify that he was

6    directed to delete her Saga notes and that when he said, no,

7    he observed other individuals, including the defendant -- an

8    individual listed in defendants' witness list, Mr. Pusachev go

9    in and manipulate Saga notes.

10          That's why his testimony is, we believe, crucial,

11   and we never had an opportunity to question Mr. Prakhin or

12   Ms. Raskin about this because this only came about after

13   summary judgment had been decided.  We assume and we will

14   question them at trial about this.  We assume they're going to

15   deny it and so Mr. Coates can certainly be offered to rebut or

16   impeach their testimony.

17          THE COURT:  But what about the firm's culture of

18   unethical conduct, discrimination and retaliation, what is

19   that about?

20          MR. BELDNER:  I don't believe that he would be

21   offering any kind of testimony regarding that.  His testimony

22   would be limited to what he directly observed with respect to

23   actions taken with respect to our client and Saga entries and

24   the management of the Saga entries.

25          THE COURT:  That's a pretty critical witness.  From,

Proceedings                                          54

1    I would think, from the defendants' perspective.

2              MS. DONNELLY:  I'm sorry, Your Honor.

3              THE COURT:  I think it's a significant witness from

4    the defendants' perspective, this guy is going to testify

5    about, you know, spoliation of evidence.  His testimony is

6    clearly relevant.  Do you want to depose him?

7              MS. DONNELLY:  Yes.

8              THE COURT:  All right.  You can depose him before

9    the trial.

10             MR. DiLORENZO:  Thank you, Your Honor.  Our

11   understanding is his testimony is going to be limited to that

12   issue?

13             THE COURT:  Right.  That's someone you can depose.

14             MR. BELDNER:  I think that's everyone we submitted.

15             THE COURT:  Pardon me?

16             Okay.  Have we gone over all the new witnesses?

17             MS. HUOT:  Just to summarize, so we are allowed to

18   put on Lawlor, Beron, Serlin, Korytny, Shostak, Falk, Gajiev.

19   Dmitry Levitsky, Svetlana Scoll, Peter Coates, and Dr. Odel,

20   and that's besides the other witnesses that on their list?

21             THE COURT: Yes.

22             MS. DONNELLY:  I'm sorry, I had Scoll as a no.

23             MS. HUOT:  I had Scoll as a yes.

24             THE COURT:  Which one?  Where is Scoll?

25             MS. HUOT: Her full-time employer

Proceedings                                                55

1          MR. BELDNER:  Her current full-time employer.

2          THE COURT:  Yes, I'll let her testify.

3          MS. HUOT:  The other witnesses are Irene Gabo, those

4    are from their list -- Raskin, Larssen, Belous, Pusachev.

5          MR. HARTZBAND:  And then, with respect to the

6    medical providers, other than Odel, if we are going to

7    stipulate regarding --

8          MS. DONNELLY:  We'll work out a stipulation.

9          MS. HUOT:  Right, and the treatments.

10          MR. DiLORENZO:  There's a limitation.  As I

11    understood it, Your Honor, there's a limitation on that

12    testimony.

13          THE COURT:  Yeah, they're just going to testify

14    to -- who are we talking about now?  I'm sorry.

15          MR. DiLORENZO:  The treatment of the steroids, I

16    guess just that she got them.

17          THE COURT:  Yes, the date that she was there and she

18    got the treatment with the steroids.

19          MS. HUOT:  Your Honor, at this time, I really -- I'd

20    like to bring to the Court's attention a few of witnesses on

21    defendants' list, for example --

22          THE COURT:  Well, let me just finish with this

23    issue.

24          MS. HUOT:  Yes.

25          THE COURT: There are other motions the defendant has

Proceedings                                    56

 1   made that we can deal with.  There are -- you're talking about

 2   plaintiff's motions in limine now?

 3            MS. HUOT:  Your Honor, what I'm talking about is,

 4   there are -- the witnesses on defendants' list for the

 5   pretrial order, there's a few witnesses I wanted to discuss.

 6            THE COURT:  Are they the subject of motions in

 7   limine made by you?

 8            MS. HUOT:  Yes.

 9            THE COURT:  Okay.  Which ones are those?

10            MS. HUOT:  So there is number -- on page 11, number

11   six.

12            THE COURT:  Page 11 of what?

13            MS. HUOT:  Of the Joint Pretrial Order.  Number six,

14   number seven.

15            THE COURT:  Hold on.

16            MS. HUOT:  Yes.  So the Joint Pretrial Order, page

17   11.

18            THE COURT:  Which motion in limine?

19            MS. HUOT:  It is number three.

20            THE COURT:  That's to exclude affidavits, right?

21            MS. HUOT:  And testimony.

22            THE COURT:  This is the motion that you made to

23   preclude their testimony at all?

24            MS. HUOT:  Yes, Your Honor.

25            THE COURT:  And which witnesses is this?

Proceedings                                    57

1         MS. HUOT:  So this would be witness number -- on the

2    Joint Pretrial Order --

3         THE COURT: Right.

4         MS. HUOT: -- number six, Genalova (ph.).  Number

5    seven, Khan.  Number eight, Leo Teek (ph.).  Number nine,

6    Schvotz (ph).  Number ten, Seraniakova (ph.).  And number 14,

7    Kravitz.

8         So Kravitz is an individual that was added by

9    defendants to the Joint Pretrial Order just a few hours before

10   this order was filed.  We, even sitting here today, have

11   absolutely no idea of who this individual is.  We have no clue

12   at all who this person is.  We don't know if it's an employee,

13   a client, a friend, nothing.  And this person was never

14   disclosed in any 26F, in any discovery, in any interrogatory,

15   in any deposition.  We frankly are at a complete loss.

16        The other individuals that I named -- oh, I'm sorry.

17   Shall I continue or --

18        THE COURT:  Well, why don't we start.  What is

19   Kravitz on the defendants' witness list for?

20        MS. DONNELLY:  She was an employee of the

21   defendants' firm, and similar to Beron has knowledge of what

22   was going on with plaintiff with respect to her employment

23   with the firm.

24        MR. DiLORENZO:  Your Honor, some of these were added

25   late because of the names that we were given shortly before

SN        OCR        RPR

Proceedings                                    58

1   the pretrial as well.  If we're going to have co-employees

2   testify, then we wanted some ourselves.

3          MR. BELDNER:  Your Honor, if I may, the employees

4   that were disclosed in the pretrial order and the amended

5   initial disclosures were disclosed for years throughout this

6   litigation.  Ms. Kravitz was never disclosed at any time.

7          THE COURT:  Do you know who she is?

8          MS. HUOT:  We have no idea.

9          MR. BELDNER:  We have no idea who she is.

10         MS. HUOT:  We have no idea.  And, Your Honor,

11  defendants also -- defendants here argue that plaintiff

12  supplemented the disclosures late.  They supplemented the

13  disclosures the day after us.  So to the extent they're

14  claiming that we're late, they're kind of in the same boat.

15         THE COURT:  Yeah, but I just let you --

16         MS. HUOT:  Right.  But we have --

17         THE COURT:  -- the majority of --

18         MS. HUOT:  We have no idea who this person is.  This

19  person was -- at least we disclosed it in our interrogatory

20  responses, in our deposition testimony, in many different

21  ways.  We have no idea who this person is.

22         MR. DiLORENZO:  Well, Your Honor, they disclosed

23  these people as current and former employees and she would

24  fall into that category.  That's where they disclose most of

25  those.

SN       OCR       RPR

Proceedings                                    59

1          Your Honor, when we got this barrage of people, we

2    hadn't seen whose names were before now identified as

3    witnesses, we did react to that admittedly.

4          MS. HUOT:  Your Honor, I don't know what that means

5    they reacted to that admittedly.  Like, we still have no idea

6    who this person is.  Is this person --

7          THE COURT:  Who is she?  Yeah.

8          MR. BELDNER:  Is she an attorney?

9          THE COURT: Does she work at the firm now?

10         MS. HUOT:  We don't even know if she's an attorney.

11         THE COURT:  No, I am asking the defendants.  Who is

12    she?  Does she work at the firm now?  What do you know about

13    her?  I mean --

14         MS. DONNELLY:  I apologize, I'm drawing a blank

15    right now.

16         THE COURT:  Well, she's not going to be able to

17    testify unless you are able to tell us who she is, when she

18    worked there and everything else, otherwise she's not going to

19    testify.

20         MS. DONNELLY:  Okay.

21         THE COURT:  Now, the other people --

22         MS. HUOT:  Yes, shall I continue about the other

23    individuals?

24         THE COURT:  Yeah.

25         MS. HUOT:  So the other individuals are clients of

Proceedings                                              60

1    the firm.

2              THE COURT:  Okay.

3              MS. HUOT:  Now, these clients were never disclosed

4    to us during discovery.  The first time we ever learned about

5    them was on the motion for summary judgment, after discovery

6    closed, defendants submitted their declarations to four of

7    these individuals not even number ten.  Number ten,

8    Seraniakova, never submitted a declaration.  It was just

9    defendants' declaration recounting a conversation that he had

10   with this individual.

11             We had no idea who these individuals were during

12   discovery.  We had no chance to learn about them or to take

13   their depositions at any time.  Their testimony -- their

14   declarations are the subject of our motion to compel are pure

15   hearsay -- and subject to our motion -- I'm sorry.  Not motion

16   to compel, motion in limine.  And their testimony should be

17   precluded because we had absolutely no notice of these

18   individuals and no chance to depose them, no chance to learn

19   anything about them, and no chance to question them about

20   their testimony.

21             MR. DiLORENZO:  Your Honor, during the defendant's

22   deposition, he testified that he received several client

23   complaints.  There was no questioning of him as to the -- at

24   the deposition as to the identity of those clients,

25   information to be turned over as to who those clients were.

Proceedings                                                  61

1    He certainly will be permitted to testify that he received

2    complaints from clients, going to his state of mind and

3    decision to terminate the plaintiff.  These are those clients.

4              MS. HUOT:  Your Honor --

5              THE COURT:  What are each of these clients going to

6    say starting with the first one?

7              MS. DONNELLY:  Each of the clients will testify as

8    to the fact that plaintiff was nonresponsive to them when they

9    reached out to her with respect to their cases and that she --

10   she fell short of providing the service that they expected.

11             MS. HUOT:  Your Honor, I'm glad that counsel has

12   made the point that in the deposition Mr. Prakhin testified

13   that there were complaints from clients, because what he

14   actually testified to in the deposition was that there was

15   only a couple of complaints, it was nothing major, and that

16   this surely could happen to any attorney, and he waved it off

17   as if it was no big deal.

18             And then after the deposition, months later, on the

19   motion for summary judgment, all of a sudden they submitted

20   these declarations, four declarations, plus a fifth one from

21   the plaintiff -- from the defendant saying these severe

22   allegations about how plaintiff was unresponsive.

23             THE COURT:  So you have declarations from all of

24   these people, you know what they're going to say?

25             MS. HUOT:  On summary judgment they submitted

Proceedings                                               62

1    declarations.  We never had a chance to question these

2    individuals during discovery.  We never had a chance to

3    investigate what these individuals, their relationship with

4    the company.  We then found out that one of the individuals is

5    actually the boyfriend of the defendant's stepdaughter, so we

6    never had a chance to explore any of this during the discovery

7    of this case.

8            MS. CAMPBELL:  I just  want to make a quick point

9    about the misrepresentation of the defendant's deposition

10   testimony.  They're kind of omitting some key parts there.

11   The quote is -- and I put this in the opposition -- "It was

12   back to these days, I had a couple of complaints from the

13   client but only a couple, it was not major initially."  And

14   then he goes on.

15           So this is clearly talking about at first he only

16   had a couple of complaints.  It was not major.

17           MS. HUOT: That's all --

18           MS. CAMPBELL:   If they're going to take that quote,

19   though, and to just characterize it as he only received those

20   complaint and that was it is just not true.

21           MS. HUOT:  That's exactly what I testified to, that

22   he never complained -- your colleague just said it, he

23   testified at deposition about these complaints from these

24   individuals, that's not what happened.  He testified that this

25   was not a big deal.  That he only received a couple --

Proceedings                                      63

1          MS. CAMPBELL:  Initially --

2          THE COURT:  Excuse me.  Don't talk over each other.

3          Let me go over again which of these are clients.

4    It's Genalova, Khan, what's that, Schvotz?

5          MS. HUOT:  And Seraniakova.

6          THE COURT:  So they're all clients that are going to

7    testify that they had direct dealings, the direct dealings

8    with the plaintiff and that the plaintiff was a problem?

9          MS. DONNELLY:  Correct.

10         THE COURT:  And they're going to say that they

11   communicated that concern to the firm or to Mr. Prakhin?

12         MS. DONNELLY:  Correct.

13         MS. HUOT:  And, Your Honor, we would say that

14   plaintiff was not even handling their case.

15         THE COURT:  Well, that, you can cross-examine them

16   about.

17         MS. HUOT:  Well, we haven't had a chance to depose

18   them.  We never had a chance to learn anything about them.

19         THE COURT:  Is there one particular defendant that

20   you would want to -- I mean, witness that you would want to

21   depose over the others?

22         MS. HUOT:  Your Honor, first -- we don't know -- we

23   would like to depose all of them because they're all going to

24   provide different types of testimony based on their

25   declarations.  We never had a chance to depose them in

Proceedings                                    64

1   discovery because they weren't disclosed in discovery.  They

2   were disclosed later on and they provided declaration

3   testimony about things that happened three years back.  So

4   their declarations are about discussions that happened three

5   years ago.

6          We would like to depose all of them if they're

7   allowed to testify because they were never disclosed in

8   discovery in any fashion.

9          THE COURT:  Did you seek to exclude their affidavits

10  at summary judgment?

11         MS. DONNELLY:  They did not.

12         MS. HUOT:  Excuse me, Your Honor?

13         THE COURT:  Did you seek to have the judge ignore or

14  exclude their declarations at summary judgment?

15         MS. DONNELLY:  They did not.

16         MS. HUOT:  If I recall correctly, on summary

17  judgment we did make the argument that these declarations

18  should be given -- these affidavits should be given no weight

19  because they were produced just now and not in discovery, and

20  that we raised a bunch of issues with how these declarations

21  run counter to the deposition testimony that the defendants

22  provided.

23         MS. DONNELLY:  That is not accurate.

24         MS. CAMPBELL:  They didn't make a separate motion to

25  strike.

Proceedings                                      65

1          MS. DONNELLY: It was the second --

2          MS. HUOT: No, we did not.

3          THE COURT:  You can't talk over each other.  It's

4    impossible for the Court Reporter to do her job if you're both

5    talking at the same time.

6          MS. HUOT:  What I said exact, we put forth the

7    argument to the Court that the declaration should be

8    disregarded because they were produced only with the summary

9    judgment and never in discovery, that we didn't have a chance

10   to investigate or depose those individuals, and that they're

11   not credible and they're contradictory to the deposition

12   testimony provided by the defendant.  We did not move to

13   strike them.

14         MS. DONNELLY:  The only objection to the affidavit

15   in the motion for summary judgment were that they were

16   relatives of the defendant firm or the defendant individual

17   and could not be considered trustworthy.  Those were the

18   objections raised at the motion.

19         MS. HUOT:  Your Honor, there was many more

20   objections.  There were pages and pages of issues as to why

21   they were contradictory to the deposition testimony, as to why

22   they were not credible, as to why they should be disregarded.

23         THE COURT:  Well, let me just ask the defendants.

24   You know, you complained early about all the new witnesses

25   that you were exposed to, why isn't this a legitimate

Proceedings                                                      66

1   complaint for plaintiffs?

2           MR. DiLORENZO:  Well, Your Honor, first of all, we

3   lost on most of those.  Second of all, these are critical

4   witnesses as well.  Its not inconsistent with the deposition

5   testimony.  At the deposition he said that initially it was

6   not a big deal.  As his affidavit on summary judgment

7   explained, it became a big deal and he recalled five specific

8   complaints from these clients.  And we haven't heard a word

9   about these clients until now.

10          THE COURT:  What do you mean?  It's part of their

11  motion in limine.

12          MR. DiLORENZO:  During the summary judgment motion,

13  the only objection was they all must be related to the

14  defendant.

15          MS. HUOT:  Your Honor, on --

16          MR. DiLORENZO:  And it was inconsistent to the

17  testimony, which it was, because he testified initially it was

18  not a big deal.  And just as Your Honor recognized critical

19  testimony on the other side, we say this is critical testimony

20  for us.

21          THE COURT:  But this wasn't.  I mean, it's a little

22  bit different because it wasn't disclosed in terms of any

23  interrogatories or at any time, was it?  It wasn't disclosed,

24  correct?  Well, it was disclosed at summary judgment.

25          MR. DiLORENZO:  These are critical witness that they

Proceedings                                          67

1    talked about.

2              THE COURT: Pardon me?

3              MR. DiLORENZO:  The one you're allowing us to

4    depose.

5              MR. BELDNER:  We didn't discover him until May of

6    2022.

7              MS. CAMPBELL:  And you didn't tell us about him

8    until October.

9              MR. BELDNER:  Yeah.

10             THE COURT:  Don't talk to each other, please.

11             MS. HUOT:  These individuals were allegedly known to

12   the defendants in 2018, in mid 2018.  And that's the substance

13   of the declaration that they provided was from events that

14   occurred in mid 2018.  Their names or their identities were

15   absolutely never disclosed at any point in time during the

16   discovery of this case which last approximately three years.

17             MR. DiLORENZO:  Well, they're critical --

18             MS. HUOT:  Now, the defendants are saying are

19   critical witnesses to their case.  They're going to talk about

20   plaintiff's performance which is central in this case and

21   they -- this is effectively sandbagging us because we never

22   had an opportunity to know anything about these individuals

23   during the discovery.

24             MR. DiLORENZO:  If I could just add --

25             THE COURT: No.  Just let him --

SN        OCR        RPR

Proceedings                                          68

1          MR. DiLORENZO:  So, Your Honor, they told you that

2     this critical witness they didn't know about him until May,

3     they didn't tell us until October. So we could've done a lot

4     of discovery, instead of racing to do a deposition --

5          THE COURT:  But you can do a deposition.  Here I

6     would be allowing five depositions.

7          MR. DiLORENZO:  Well, Your Honor, when they start

8     putting -- at the eve of trial, they list a ton of coworkers

9     that are going to say she was a terrific employee, the

10    testimony of these clients becomes more important and

11    critical.

12         MS. HUOT: The only --

13         THE COURT:  Do you need to call all five of these

14    individuals or can you narrow it down?

15         MS. DONNELLY:  I think we can probably narrow it

16    down.  I do want to point out, though, they never asked the

17    names, they did ask if there were complaints, but they were

18    identified in document as -- the document names of the cases

19    that were being handled by plaintiff.

20         MS. HUOT:  There's 250 client names.  There's 250

21    cases that she handled.  We had no way of knowing that these

22    were the ones that she wanted --

23         THE COURT:  All right.  Tell me which ones you can

24    narrow it down to?

25         MR. DiLORENZO:  Your Honor, could we have a day just

Proceedings                                                           69

1    to give you those, say, three names?

2              THE COURT:  All right.

3              MS. HUOT:  Your Honor, one more thing.  In the

4    interrogatory responses when they were asked to list the

5    reasons why they terminated plaintiff, they listed a few

6    reasons, but client complaints was not one of the reasons

7    listed in their interrogatory response.  We had no way of

8    knowing that this would be an issue in this case.

9              And, Your Honor, I misheard, did the defendant say

10   they were going to name three of these individuals?

11             THE COURT:  Right.

12             MS. HUOT:  Are we going to know which ones they are

13   now?

14             MR. DiLORENZO:  I asked for a day to name three.

15             MS. HUOT:  Okay.

16             MR. DiLORENZO:  One day.

17             MS. HUOT:  We would like to depose those

18   individuals.

19             THE COURT:  Okay.  You narrow it to three and you

20   can depose the three.

21             MS. HUOT:  Okay.  Thank you.  Wait.  They are

22   narrowing it.

23             THE COURT:  Yes, they narrow it, not you.  And you

24   can depose the three.

25             MS. HUOT:  Okay.  But the declarations are -- that's

Proceedings                                                    70

1    part of our motion.

2              THE COURT:  They can't introduce the declarations

3    unless you call a witness, not even if you called the witness.

4              MS. HUOT:  Right.

5              And, Your Honor, I don't know if this is -- the

6    other issues in our motion in limine kind of deal with the

7    same issue.

8              For example, the first motion in limine deals with

9    their declarations.  And, again, there's a declaration from

10   Mr. Prakhin and Ms. Raskin.  We contend that the declarations

11   shouldn't be submitted because they're going to be providing

12   live testimony.  The declarations are out-of-court statements.

13   I don't know if Your Honor --

14             THE COURT:  Let's just state some basic principles.

15   That's true, they can't put in affidavits and not call

16   witnesses.

17             MR. DiLORENZO:  Your Honor, we concede that.

18             MS. HUOT:  Okay.  Great.

19             MR. DiLORENZO:  It was a reaction to the

20   declarations that were put in -- the number of declarations

21   that were put in by them as attempts to get testimony.  We

22   agree.  If you can't cross-examine somebody, they can't

23   testify.

24             THE COURT:  All right.  Employment records from

25   plaintiff's prior law firm.

SN        OCR        RPR

Proceedings                                    71

1          MS. HUOT:  Yes.  Your Honor, this is an issue where

2   the defendants had subpoenaed plaintiff's prior law firm to

3   obtain records relating to the number of trials that she had

4   conducted.  In this situation, the prior firm submitted an

5   e-mail saying that it's from an individual named Pomara (ph.).

6   And Pomara stated that based on their review of their records,

7   she wrote an e-mail, or he wrote an e-mail, saying that

8   plaintiff did one summary trial.  And they want to submit this

9   evidence and the rest of the subpoenaed documents into this

10  trial.

11         We contend that this is complete hearsay for a

12  number of reasons:  First, just the e-mail itself is not a

13  business record.  This is a nonparty declaration about a

14  summary of records that that individual has reviewed and those

15  records are not produced.

16         MR. DiLORENZO:  Your Honor, we're willing to

17  withdraw the document.

18         MS. HUOT:  Great.  Okay.  So just to be clear, we

19  want to understand the scope of defendants' concession here,

20  it is that all the documents that were obtained by the

21  subpoena would not be produced?

22         THE COURT:  From the Mallilo & Grossman law firm.

23         MR. DiLORENZO:  The only stipulation would be that

24  e-mail being offered for the truth of the matter as hearsay,

25  we withdraw that document.

Proceedings                                    72

1          THE COURT:  What other records do you want to put in

2   from that law firm, if any?

3          MS. HUOT:  The other documents that were received

4   are payroll records from the previous firm.  We don't find

5   that to be relevant.  We can just --

6          THE COURT:  I am trying to find out what the scope

7   of their concession was.  Are you not introducing --

8          MR. DiLORENZO:  We can withdraw them all, Your

9   Honor.

10          THE COURT:  Okay.  Fine.

11          MS. HUOT:  Okay.  The next --

12          THE COURT:  We've dealt with the affidavits of the

13   clients.

14          MS. HUOT:  The fourth issue is the --

15          THE COURT: Saga records.

16          MS. HUOT: -- Saga records.  So, the Saga records,

17   they would be introducing them as purported business records.

18   It's an exception to the hearsay rule, but the principal

19   precondition for documents to be admitted as business records,

20   is that they have an indicia of trustworthiness, an inherent

21   probability of being accurate and trustworthy.   In this

22   situation, the defendants' office manager submitted an

23   affidavit explaining the method in which the Saga records are

24   stored.

25          So just so I can explain to Your Honor, the way that

Proceedings                                    73

1    they're stored, based on the defendant's affidavit, is that

2    the records are stored by the case name, not by an attorney.

3    So it's stored by the case name of each particular case from

4    the firm.  And when an attorney departs the firm, that case is

5    then reassigned to a different attorney.

6           Once that case is reassigned to a different

7    attorney, all the Saga entries made by the departing attorney

8    are transferred to the new attorney.

9           So when they conduct a search for the plaintiff's

10   name to produce the Saga records that she prepared, there

11   would -- all the entries that she made that were on cases that

12   were transferred to the new attorney would not show up under

13   her name.

14          So that is the affidavit that they submitted in

15   response to our motion to compel.  We filed a motion to compel

16   saying give us all of her Saga notes and entries from 2016 and

17   2017 and the Court agreed and said the defendants are ordered

18   to produce those Saga notes and entries.  The defendants

19   produced an affidavit saying we can't.  We can't do it because

20   impossible to reverse this process, and explained that once

21   the attorney leaves, it's automatically altered to the new

22   attorney name.

23          In this case, the defendants have submitted Saga

24   entries for the plaintiff and have now made the argument that

25   she only made 54 Saga notes which is a huge basis for

Proceedings                                                    74

1    terminating her after this acquired knowledge is a basis to

2    terminate her, but these notes are completely untrustworthy.

3    She probably made 54 notes a day, let alone a week, let alone

4    during the six months that she was there.  These notes don't

5    reflect all the notes that she entered because the method of

6    preserving and keeping these notes is untrustworthy.  It's

7    altered.

8          They've entered a second affidavit -- when this was

9    pointed out on summary judgment, that you can't rely on these

10   Saga notes, they're inherently untrustworthy.  Look at what

11   your initial declaration says, your initial affidavit.

12         They then submitted a second affidavit saying, no.

13   No.  No.  Wait a second.  For this particular time period that

14   we're arguing about for 2018, we were able to go and figure

15   out where these cases were assigned to, to what other

16   attorney, and then we were able to go there and figure out

17   which of those notes were entered by plaintiff and produce

18   them.  That is completely, you know, counter to how the

19   business record exception is supposed to be used.

20         And, by the way, none of those 54 notes that were

21   produced were notes that were from other lawyers that were

22   later converted back to plaintiff's notes.  Those original 54

23   notes that were inactive cases that were not transferred to

24   other lawyers.  So for defendants to use those notes now to

25   claim that, oh, well, she only made 54 notes, here, look at

Proceedings                                                          75

1   the business records to prove that this is a basis for

2   terminating her.  It's complete hearsay in and of itself.

3           It does not fit under a business record exception.

4   They don't have a custodian to testify as to how they're

5   preserved because the custodian that they put forth testified

6   initially that he had nothing to do with the search or

7   preservation or maintenance of these Saga records.  And

8   there's no relevance to these.

9           It's highly prejudicial so the balancing test under

10  403 weighs highly in favor of them being precluded.  That's a

11  summary of our motion in limine.

12          THE COURT:  If there's more to be said about it than

13  that, I'd be shocked.

14          MS. HUOT:  Oh, there is one more thing.  And

15  Mr. Coates will testify that he was actually directed to

16  delete those entries and when he refused to do so he observed

17  the other individuals at the firm deleting those entries.

18          MR. DiLORENZO:  Your Honor, the Saga system is

19  inherently reliable.  It's used by the attorneys to keep track

20  of the cases, the status of the case, what is to be done.  She

21  failed to make appropriate entries into the Saga notes.

22          THE COURT:  Well, you intend to argue that there

23  were only 54 entries?

24          MR. DiLORENZO:  Yes, Your Honor.

25          THE COURT:  Meaning that, despite all of the other

Proceedings                                              76

1    testimony that plaintiff says is going to be given by that?

2           MR. DiLORENZO:  We have testimony that contradicts

3    what the plaintiff's lawyer just said, and to me, it goes to

4    the weight of the evidence.  They're clearly business records.

5    They are reliable.  They're used every day in the business.

6           THE COURT:  Well, you know, it seems like --

7           MR. DiLORENZO:  If the jury won't believe us and

8    they'll believe her, but it goes to the weight of the

9    evidence.

10          THE COURT:  The defendant, at trial, will have to

11   lay a foundation for the record.  You could have a preliminary

12   inquiry of the witness at trial.  If you don't think they lay

13   the appropriate foundation and then you can cross-examine

14   about all of those, but I don't think that I can say they're

15   excluded now without hearing the testimony about it.

16          MS. HUOT:  Your Honor, they should be able to --

17   they should be made to produce, like Judge Mann initially

18   ordered, the records from 2016 and 2017 because as the judge

19   initially ruled on our motion to compel, the argument was made

20   if you're going to judge the plaintiff's performance based on

21   her Saga entries from 2018, we should be able to show her Saga

22   entries for 2016 and 2017 when everybody was happy with her

23   work before she had a disability.

24          THE COURT:  Well, what happened?  You had a motion

25   to compel, what happened?

Proceedings                                                77

1          MS. HUOT:  The judge ordered those records to be

2    produced, but the defendants claimed it's impossible to

3    produce them because of the manner in which the records are

4    store and preserved.  Now the defendants are putting forth the

5    argument, never mind, they're stored just find in a reliable

6    way so that we can produce these records for this time period.

7          If they're able to present to the jury and make the

8    argument that they intend to make, that she made these Saga

9    note entries for 2018 and they were wholly insufficient, then

10   they should be made to produce those same exact records for

11   2017 and 2016, which is exactly what Judge Mann ordered so

12   that we can show the jury that it was comparable and the same

13   records that she made in 2016 and '17, when everybody was

14   super happy with her performance and even recruited her back

15   to the firm in 2018 when there were no complaints about her

16   performance.

17          THE COURT:  You have nothing for 2016?

18          MS. HUOT:  Absolutely nothing.

19          THE COURT:  Did you raise that with Judge Mann?

20          MS. HUOT:  Judge Mann ordered them.

21          THE COURT:  Did you hold them in contempt for not

22   producing them?

23          MS. HUOT:  We didn't know that they weren't going to

24   introduce them until just now.  Because they submitted this

25   declaration, this affidavit, from their office saying it's

Proceedings                                              78

1   impossible for us to produce records because of the manner in

2   which they're maintained.

3          So, of course, we thought then they can't use these

4   as business record records because they can't authenticate how

5   they're being preserved because it's impossible to reverse the

6   process of the name being converted to a new attorney.

7          Now, just now, on their opposition to our motion in

8   limine, they submitted a statement saying, I quote -- I'm

9   sorry, I don't want to quote exactly because I'm not sure if

10  this is a direct quote, but it says that the defendants have

11  records showing what cases plaintiff worked on and the dates

12  that she worked on them so that any entries on those cases

13  that plaintiff worked on during her tenure would be attributed

14  to her.  These records were never produced to us.  We don't

15  know how the defendant came up with this conclusion, and still

16  none of the records from 2017 or 2016 were produced to us.

17         But they're magically able to do this for 2018 in a

18  way that will present it to the jury to our detriment, we

19  should be able to cross them on the 2016 and 2017 records to

20  say, look, she did the same thing back then and you were happy

21  with her performance before she had a disability.  So we

22  should be able to get those records.

23         THE COURT:  Why didn't you produce records for 2016

24  and 2017?

25         MR. DiLORENZO:  Your Honor, I think we explained at

Proceedings                          79

1   the time through an affidavit, they didn't exist.  We couldn't

2   get the records of 2016.  It was her first period of

3   employment when she left and then when she came back, is the

4   problem we're talking about now.  And I understand that we

5   responded --  I wasn't involved in that motion, but we

6   responded and that was the end of the motion to compel.

7           This information that we've produced is -- has

8   nothing to do with the 2016 and 2017 records, the subject of

9   that motion.

10          MS. HUOT:  Your Honor, that was will the exact

11  subject of the motion.

12          MR. DiLORENZO:  The 2018 records --

13          MS. HUOT: No.

14          MR. DiLORENZO: -- were not subject of that motion.

15          MS. HUOT: Your Honor, exactly subject to the motion.

16  Judge Mann specifically ordered that 2016 and 2017 records be

17  produced because they want to use the 2018 records.  So, the

18  judge ordered them to produce so that we can make this

19  comparison.  They said, look, 2018 she did deficient Saga

20  entries.  We said, motion to compel, produce 2016 and 2017

21  entries.

22          They responded -- the Court ordered them to do this.

23  They responded saying we can't because of the manner in which

24  the records are stored and preserved.  There is it's -- it

25  automatically converts the names, so when plaintiff left the

SN        OCR        RPR

Proceedings                                            80

1    firm there's no -- her cases were reassigned to somebody else

2    and the name that -- the name attributed to the entry was

3    changed to somebody else.

4           So then we understood --

5           THE COURT:  Well, then how do you have records for

6    2018?

7           MS. HUOT:  Exactly.  We don't.  That's exactly our

8    point.  The 2018 records are completely inaccurate.  It only

9    shows the records of the cases that were never reassigned.

10   There's only 54 entries.  That's like -- you know, she

11   probably makes 54 entries a day let alone in a six-month

12   period.  That's why, Your Honor, we're making the motion in

13   limine now that the 2018 records that they're submitting are

14   completely inaccurate.  They're altered and they're only a

15   fraction of what she actually prepared.  And their

16   deposition -- their declaration testimony, their affidavits,

17   support this; and now they can't even produce the other

18   records that they say from 2016 to 2017.

19          THE COURT:  Well, I don't understand why you

20   couldn't -- what your reason for not producing the records for

21   the prior years are.  I don't understand.  I mean, you know, I

22   haven't read this whole motion before Judge Mann, but why is

23   it that you couldn't produced -- you produced records for

24   2018, they asked for records for 2016 and 2017.  Why couldn't

25   you produce those?

Proceedings                                    81

1          MS. DONNELLY:  They were unavailable at the time;

2     and I -- unfortunately I don't recall.  I think she's

3     misrepresenting what Ms. Raskin said in her affidavit and I

4     don't have it in front of me.

5          THE COURT:  Well, you're going to have to explain to

6     me why these records don't exist, because that's the real

7     issue, which is, do these records exist or not exist?

8          MR. DiLORENZO:  Could we have an opportunity, Your

9     Honor, to submit something in writing on these records?

10         THE COURT:  Yes, and you better submit that by the

11    end of the --

12         MR. DiLORENZO:  End of next week?

13         THE COURT:  No, end of this week.

14         And you can reply to it.

15         MS. HUOT:  I couldn't hear.

16         THE COURT:  I said they need to provide whatever

17    explanation in light of what went on before Judge Mann by the

18    end of this week and you can reply by the end of the following

19    week.

20         MS. HUOT:  Okay.  And we reserve -- we want to just

21    make sure to reserve our objections to the motion with respect

22    to 2018 records, their introduction, you know, as an exception

23    to the hearsay rule as business records.

24         THE COURT:  Well, you know, just per se on that

25    grounds, the fact that Coates is going to testify, you know,

Proceedings                                                82

1  they could believe him or not believe him.  They can lay a

2  foundation -- apart from this other issue about whether you

3  had the other two years before, they can lay a foundation and

4  you can cross-examine about the weight that should be given to

5  these records and everything that you've been talking to me

6  about, you can cross-examine about.

7          MS. HUOT:  But, Your Honor, as a threshold matter,

8  they still need to make a showing as a --

9          THE COURT:  Well, they'll have to do that at trial.

10 If they make a showing, fine.  If they don't, they'll be

11 excluded.  I can't determine right now that they can't make a

12 showing.

13         MS. HUOT:  Okay.  Okay.

14         THE COURT:  And the handbooks, you wanted to exclude

15 the handbooks?

16         MS. HUOT:  Yes, Your Honor.  So there's two

17 handbooks.  There's one from 2002 and that was applicable to

18 her first tenure at the firm.  She first worked at the firm

19 from 2014 to 2017 -- I'm sorry, 2012 to 2017, my apologies.

20         Then there was a second handbook that was prepared

21 in 2016.  She was never given the second handbook.  Deposition

22 testimony from the defendant states that the first handbook

23 that she was given, she signed.  She signed the first

24 handbook, she acknowledged it.  They produced it in discovery.

25         The defendant testified that this first handbook was

SN        OCR        RPR

Proceedings                                    83

1    inapplicable to the second tenure of her employment that

2    started in 2018 because it was replaced with a different

3    handbook.  So the 2002 handbook is totally irrelevant to the

4    time period at issue in this case.  It was replaced by a new

5    handbook.

6            Now, the new handbook is -- we refer to it as the

7    2016 handbook.  This new handbook she never received.  She

8    never signed for it and it was actually never produced in

9    discovery in this case ever.  The first time plaintiff ever

10   saw this handbook when it was attached as an exhibit to their

11   summary judgment motion.

12           This second handbook, she didn't receive.  She

13   didn't know anything about it.  So we contend that it's

14   irrelevant for this case and that it's prejudicial because

15   what the defendants are trying to say is just because she

16   received the first handbook, she should be somewhat aware of

17   the policies that are in the second handbook, but the policies

18   are not the same.  The policies are different.

19           For example, the cell phone use policy which the

20   defendants are going to be relying in this case.  The original

21   policy says that lawyers are supposed to use discretion in

22   using their cell phone and they're encouraged to only use a

23   cell phone during breaks and during lunch.

24           The second handbook says attorneys are prohibited --

25   not attorneys, just employees, are prohibited from using

Proceedings                                      84

1    cellphones during office hours, during work hours.

2          So what the defendants are trying to do is use the

3    first handbook to show that plaintiff is aware of policies in

4    a second handbook which she never received.  That's

5    prejudicial and that's why both of these handbooks need to be

6    excluded because the first one is not relevant to the second

7    tenure of employment, and the second one she never received,

8    and it will confuse and mislead the jury as to what policies

9    applied to her that she was aware of.

10         THE COURT: What is the defendants' argument with

11   regard to this?

12         MS. DONNELLY: So both handbooks were produced to

13   plaintiff.  The first one, I believe, was -- the 2016 one was

14   produced early on, I believe, and I will confirm that.

15         MS. HUOT:  No.

16         MS. DONNELLY:  With respect to the policies, there

17   were -- and by the way, there is a dispute as to whether or

18   not she was provided with the handbook.

19         THE COURT:  Which one?

20         MS. DONNELLY:  The 2016 one.  She states she was

21   not, my client states she was provided with a copy of the

22   handbook.

23         With respect to the cell phone policy, we

24   acknowledge that that's a different policy in the 2016

25   handbook, one that she acknowledged, that she was aware of

Proceedings                                              85

1   and --

2          THE COURT:  How did she acknowledge she was aware of

3   it?

4          MS. DONNELLY:  During her deposition there was an

5   e-mail change or a message exchange where the employees,

6   specifically her, and other employees in the firm were

7   admonished and reminded that the cell phone policy was not to

8   use your cell phone for personal reasons during work hours;

9   and she apologized for doing so and said she wouldn't do it

10  again.

11         THE COURT:  Did she?  Is that part of your reason

12  for why she was let go because she used it after she was

13  advised of that?

14         MS. DONNELLY:  Yes.

15         MS. HUOT:  Your Honor --

16         THE COURT:  Wait until she finishes.

17         MS. DONNELLY:  In addition, with respect there's

18  another aspect of the policies that are relevant.  In the

19  first handbook, there was a requirement that medical notes be

20  provided if there's a leave of absence requested.  The same

21  policy is in existence in the 2016 handbook.  She acknowledges

22  at least receipt of the first handbook which required that

23  medical documentation be provided which she admits she never

24  provided.

25         MS. HUOT:  Your Honor, it is a matter of fact that

Proceedings                                    86

1  the 2016 handbook was never produced in discovery.  This was

2  something that was raised on summary judgment as well, that

3  this was a complete surprise to us that we received this

4  document that was never produced to us ever in this case.

5         The e-mail that the defendants are referring to was

6  directed to every single employee at the firm saying, don't

7  use your cell phone while -- don't use your cell phone for

8  personal matters or something like that.  It was directed to

9  every single person at the firm.  The plaintiff responded

10 saying it was an emergency.  Sorry.  Something to that effect.

11        THE COURT:  But they're claiming she used it for

12 personal reasons after that.

13        MS. HUOT:  They claim that now, right.  But, again,

14 this has nothing to do with a handbook that she never

15 received.  She never received this handbook.

16        THE COURT:  So what?  I mean, the handbook

17 establishes that there was that policy.  So a handbook can be

18 admitted for the purposes of showing that a policy existed.

19        Now, you know, there could be an issue of whether

20 she was aware or not aware of that policy and to prove that --

21 and what they'll say is they'll have testimony that they sent

22 it in an e-mail saying this is the policy and then she

23 violated the policy.

24        MS. HUOT:  But, Your Honor, then, why do you need

25 the handbook?  Why not just use the e-mail to show that this

Proceedings                                    87

1    is the policy.

2            THE COURT:  They can put the handbook in.  The

3    handbooks can come in.

4            MS. HUOT:  Now, the time records, Your Honor, is the

5    next motion in limine.  So if I may?

6            THE COURT:  Sure.

7            MS. HUOT:  The time records in this case have

8    absolutely no relevance or probative value because, like these

9    handbooks that Your Honor just admitted, specifically state

10   that the time machine was required to be used only by

11   nonexempt employees.  It's the paralegals that are hourly

12   workers that are required to use the time clock.  The lawyers

13   and other exempt professionals aren't required to clock in and

14   clock out.

15           And, in fact, the records show that nobody really

16   did.  Nobody ever clocked in or clocked out for 40 hours.

17   Basically every single lawyer at the firm, if you put them all

18   together, only five of them for five weeks have ever worked 40

19   hours at this firm.  And that's because they're always out at

20   court conferences, depositions, mediations, whatnot.

21           And the defendants even testified unequivocally that

22   the time records do not reflect the actual hours that these

23   lawyers work.  That the time records -- the time machine is

24   only used for nonexempt employees.  They're not used for

25   exempt workers.

Proceedings                                    88

1        Now they're trying to use these time records to show

2   that plaintiff was not doing work in the office or something

3   to that effect, and these are very prejudicial.  For example,

4   Gabo clocked in maybe five times in her entire time that she

5   was there.

6        I provided a ton of examples in our motion in limine

7   of different individuals who basically clocked in for maybe 17

8   hours during their entire time period.  Nobody ever used this

9   time clock and the defendants know that.   The defendant

10  specifically testified that this was not a basis -- this was

11  not a basis for terminating her.  That this was not -- that he

12  did not review these records and these records don't reflect

13  the actual working time or the attendance of any lawyer.

14           THE COURT:  Who said that?

15           MS. HUOT:  The defendant did in his deposition

16  testimony.

17           THE COURT:  Okay.

18           MS. HUOT:  So to introduce these records would

19  mislead the jury to make them think that she was supposed to

20  clock in or she was supposed to do something that she wasn't.

21  That she wasn't working enough hours when she clearly was.

22           THE COURT:  All right.  Under those circumstances,

23  what are the relevance of the time -- the clock in time to?

24           MS. CAMPBELL:  So the time records would show,

25  compared to other employees, the amount of absences plaintiff

Proceedings                                                        89

1    had.  And while I understand that if an attorney has an

2    out-of-court appearance -- or out-of-office appearance like a

3    court conference or a deposition, they wouldn't be clocking in

4    and out that day, but they would be expected to -- expected to

5    punch in and out of the office for the second half of the day.

6              THE COURT:  But the testimony is that people

7    there -- as I understand it -- that they're not reliable and

8    people rarely did that.

9              MS. DONNELLY:  The policy of the firm was that they

10   were supposed to clock in and clock out.

11             THE COURT:  Yeah, but it's -- but basically nobody's

12   doing it and then you want to use these records to argue that

13   she was not at work.  It doesn't seem fair.

14             MS. DONNELLY:  It really goes more to show what days

15   she was in and what days she --

16             THE COURT:  How would it show that if people didn't

17   clock in on days they went to court or days that they took

18   depositions?

19             MS. DONNELLY:  Because it would be --

20             THE COURT:  It sounds like they're so unreliable

21   that it wouldn't be fair to use them to show that.

22             MS. DONNELLY:  With respect to the doctor's

23   appointments, it shows what days she -- well, it shows the

24   days she was absent and correlates with respect to the days

25   she was or was not at a doctor's appointment.

Proceedings                                          90

1          THE COURT:  How does that help you?

2          MS. DONNELLY:  Because there were days that she was

3    absent and not at a doctor's appointment.

4          THE COURT:  But we're getting back to the square one

5    which is the records aren't reliable for showing that she was

6    absent because she could have been in court or in deposition

7    and people didn't routinely clock in, so it doesn't show that.

8          MS. DONNELLY:  No, but the testimony of Ms. Raskin

9    was that she would record if somebody was in court or at

10   depositions.

11         THE COURT:  Where?

12         MS. DONNELLY:  On the time records.

13         MS. HUOT:  No.  The time records show no record of

14   court appearances at all.  It's just strictly clocking in and

15   clocking out.

16         THE COURT:  It doesn't sound like you can get these

17   records into evidence from what I'm hearing.  So unless you've

18   got something better to tell me about these records, then I

19   would say ordinarily that this would go to the weight, but

20   basically when the defense himself is admitting that people

21   didn't clock in when they had other things to do, it doesn't

22   seem like it's fair to put these records into evidence.  So

23   I'll exclude them unless you come up with something that

24   sounds better than what I just heard.

25         MR. DiLORENZO:  Your Honor, could we just have an

SN        OCR        RPR

Proceedings                                                    91

1    option to supply something to the Court by the end of the

2    week, if there is anything.

3              THE COURT: If you have something else to say about

4    this, yes.

5              MR. DiLORENZO:  Thank you.

6              MS. HUOT:  We'd like an opportunity to respond.

7              THE COURT:  You have the same opportunity, the next

8    week.

9              MR. BELDNER:  Thank you, Your Honor.

10             MS. HUOT:  The last motion is with regard to what

11   defendants are referring to as confidential documents.  So,

12   the defendants are making the argument that plaintiff

13   improperly retained certain firm documents and that this was

14   apparently a reason to terminate her.

15             So in this case, plaintiff was e-mailed documents,

16   case file documents.  This happened by the defendant himself

17   e-mailing her case file documents.  Her managing attorney

18   e-mailed her case file documents, other attorneys at the firm

19   e-mailed her case file documents.  This was a very routine

20   practice because people worked remotely and people needed

21   these documents for court appearances, for deposition, for

22   out-of-court arguments, mediations, numerous other reasons.

23   People constantly e-mailed firm documents to their personal

24   e-mail address so they can have them remotely.

25             When plaintiff was terminated from the firm for the

Proceedings                                    92

1  explicit reason of her disability, she knew that she

2  contemplated filing a lawsuit.  She immediately preserved

3  anything related to her employment with the firm.  She

4  preserved these documents that were in her e-mail box.  In

5  discovery, she produced these documents.  And the defendants

6  are claiming that she improperly retained these documents that

7  were produced to them in litigation well after the decision to

8  terminate her was made.

9        She did nothing wrong here.  She complied with her

10  litigation hold obligations, and these documents were e-mailed

11  to her by the defendants.  So for the defendants to make the

12  argument that she somehow did something improper by retaining

13  these documents, we're kind of at a loss as to what the

14  relevance of these documents are.

15        And to be clear, she didn't disclose them to anybody

16  else, she produced them in this litigation in response to

17  discovery demands.

18        THE COURT:  Yes.  And there's also the issue of

19  after-acquired evidence.

20        MS. HUOT:  Right.  Exactly.

21        THE COURT:  Why are these documents, the fact that

22  she kept these documents relevant, even if she was wrong in

23  keeping them?

24        MS. DONNELLY:  Well, there are a couple of issues.

25  One is that there's the confidentiality policy in the employee

Proceedings                                                           93

1   handbook that she violated by maintaining these documents

2   after her employment was terminated.

3          She also maintained --

4          THE COURT:  I know, but what's the relevance of

5   that?  It's not why you fired her.

6          MS. DONNELLY:  No, but it is after-acquired evidence

7   and it goes to further evidence that she, in fact, did violate

8   policies of the employer.

9          THE COURT:  But so what?  Unless that's the reason

10  the employer knew it and fired her for that reason.

11         MS. DONNELLY:  She also retained HIPAA documents

12  from clients.

13         THE COURT:  Did she know about that and was that

14  part of the reason that they fired her.

15         MS. DONNELLY:  That was also after-acquired evidence

16  which she produced to her attorney and it does constitute not

17  only a violation of the confidentiality policy, it's also an

18  ethical violation.

19         THE COURT:  Well, so what?  I don't know why

20  anything that happened -- I mean, it's possible, you know that

21  she may say something during the course of her testimony that

22  you could question her about.  She could open the door to your

23  asking her questions about it, but I don't see why it comes in

24  as a matter of course.

25         MR. DiLORENZO:  Well, Your Honor, this issue, if

Proceedings                                          94

1    they were raised as after-acquired evidence, then the question

2    is whether she would have been terminated for those violations

3    once it was discovered.  It wasn't discovered until after she

4    was terminated and gave these -- especially the HIPAA

5    records -- to her attorneys which she had no authority to do,

6    medical records, confidential medical records, concerning

7    individuals that were clients of the firm.

8             THE COURT:  So, I thought the basic after-acquired

9    evidence doctrine is that if it postdates the firing, the

10   evidence can't be used to support an argument that a firing

11   was legitimate?  I thought that's the whole point of the

12   after-acquired evidence.

13            MR. DiLORENZO:  Well, I agree.  But what it can be

14   used is to show that as of the date it was discovered, it cuts

15   off any back pay remedy after that point.  So it wasn't

16   acquired before the termination decision, but it was acquired

17   afterwards.  So it's after-acquired evidence that cuts off

18   remedies after that date.

19            MS. HUOT:  Your Honor, there's a confidentiality

20   agreement in this case.  Are defendant's suggesting that she

21   should have jut deleted these documents that were the subject

22   of discovery demands?  She conducted a litigation hold which

23   is consistent with her ethical obligations and legal

24   obligations.  She has to preserve all documents relating to

25   her employment relating to this case.

Proceedings                                                    95

1          THE COURT:  Well, it's not going to come before the

2     jury, okay.

3          There was another pre-litigation letter that --

4     there was something you raised before this.

5          MS. HUOT:  Yes, Your Honor.  There was a

6     pre-litigation letter that the defendant -- that the plaintiff

7     had sent to the defendants -- oh, here it is.  I'm sorry.

8          Before this lawsuit started, plaintiff sent a

9     pre-litigation letter to the defendants outlining her claims

10    and asking the defendants to engage in settlement discussions

11    with her and she invited them to attempt to resolve this case

12    amicably.  She wanted to come to a resolution multiple times.

13    Throughout this five-page letter, she, you know, raised the

14    concept of settlement, resolution, coming to an amicable end

15    of this case.  And it was immediately before, it immediately

16    preceded her filing the lawsuit, and she forewent filing the

17    lawsuit by sending this letter in an attempt to resolve this

18    case.  Had this case been resolved, she would not have filed

19    this lawsuit.

20         This is clear 408 settlement communications.  The

21    defendants make the argument that it's not 408 settlement

22    communications merely because she didn't specify a specific

23    offer like a sum of money in the letter.  That is completely

24    unsupported by the law.

25         The law is crystal clear on this issue that this is

SN        OCR        RPR

Proceedings                                                96

1    an offer of compromise that -- it even specifically states in

2    the letter that I want to hear from you by March 11, 2019.  I

3    believe that's exactly what it says.  And that if we don't

4    hear from you, we will proceed accordingly.  Yes, March 11,

5    2019.  Should defendants wish to explore such resolutions,

6    please contact us no longer than March 11, 2019.

7             Thereafter, we didn't hear from them.  We

8    immediately filed with the EEOC an almost identical version of

9    this letter itemizing the claims in this case; and then after

10   that, we almost immediately filed the complaint again

11   itemizing the very same claims that were at issue in this

12   letter.

13            So this letter is cumulative, duplicative and aside

14   from that, covered under 408 and should not be admitted at all

15   for any purpose.

16            THE COURT:  Okay.  Why is it relevant?

17            MR. DiLORENZO:  Well, Your Honor, we agree it

18   shouldn't be admitted and it's fine not to admit it and

19   testimony concerning it as well.

20            THE COURT:  Wasn't it on your exhibit list?

21            MR. DiLORENZO:  I think we were thinking of

22   something else, Your Honor.

23            THE COURT:  Okay, it's gone.

24            I think that's all of your objections.

25            MS. HUOT:  Yes, Your Honor.  Let me just double

Proceedings                                                        97

1    check.

2           Your Honor, there is one more thing.  The defendants

3    have listed in their pretrial order, they had specified that

4    they are going to be giving live testimony.  And then in

5    addition to that, they also designated extensive portions of

6    deposition testimony from the plaintiff and the defendant from

7    various witnesses that are on their list, the witness list,

8    and we are not sure whether the defendants intend to provide

9    that testimony in their case in chief in which case we object

10   to that.  It's an out-of-court statement.  They should be

11   providing testimony through their live witnesses.

12          If they want to use the deposition testimony as

13   rebuttal, that's fine, but we want to supply the objection now

14   that they can't be reading in deposition testimony in their

15   case in chief --

16          MR. BELDNER:  When the witnesses are available.

17          MS. HUOT: -- when the witnesses are available.

18          MS. DONNELLY:  We understand that.

19          MR. DiLORENZO:  We understand the rules, Your Honor,

20   on how to use the deposition testimony.

21          MS. HUOT:  We're just confused because it's listed

22   on the Joint Pretrial Order so we didn't want to waive any

23   rights, so we wanted to flag that issue here now.

24          THE COURT:  Okay.  They can use statements of

25   plaintiff in the deposition because they're party admissions.

Proceedings                                                98

1          MR. BELDNER:  Your Honor --

2          THE COURT:  The plaintiff can testify -- in terms of

3  waste of time and cumulative that the plaintiff admits

4  something, right, they don't need to then put the deposition

5  testimony in too, just based on cumulative nature.  But if the

6  plaintiff admitted something in her deposition that she

7  doesn't admit here in court, they can introduce that as a

8  party admission.

9          MR. BELDNER:  Understood, Your Honor.

10          THE COURT: Okay.

11          MR. BELDNER:   Our confusion was, we thought they

12  were just going to be presenting the deposition testimony

13  despite the fact that these witness were going to be here

14  testifying.

15          THE COURT:  No, that would --

16          MR. BELDNER:  It didn't make sense.

17          THE COURT: The objection, the shortness of life also

18  precludes that kind of conduct at a trial as far as I'm

19  concerned.

20          MS. HUOT:  Your Honor, I believe there's one more

21  issue, I just want confer with my colleague.  One second.

22          (Pause in proceedings.)

23          MS. HUOT:  Your Honor, the other item I want to

24  discuss deals with defendants' production of their tax

25  returns.

Proceedings                                        99

1        THE COURT:  Is that anywhere in the papers?

2        MS. HUOT:  That's in their papers, Your Honor --

3   well, so the issue is, before these motions were being

4   briefed, during discovery the plaintiff and the defendants had

5   come to an agreement regarding production of records ahead of

6   a motion to compel.

7        So back in January, Judge Mann had given us a

8   deadline to file all motions to compel relating to all

9   outstanding discovery.  Before then, the parties met and

10  conferred to resolve all outstanding issues that they could

11  resolve.

12       One of the issues that they resolved and came to an

13  agreement on, is that plaintiff was going to provide all prior

14  1099s and W2s going forwarded that weren't generated because

15  this was January of 2001 -- I'm sorry, 2021.  So to the extent

16  that documents weren't yet generated, we were going to produce

17  them.

18       In return, the defendants were going to produce

19  Prakhin and the firm's tax returns.  They had already produced

20  them for 2018 and 2019 but they hadn't yet produced them for

21  2020, 2021 and 2002.  And they said yes, we came to an

22  agreement that this was going to be produced going forward.

23  In fact, these documents are not produced.

24       Recently, we had exchanged e-mails with the

25  defendant saying we've already produced ours, here's

Proceedings                                                        100

1   everything else that has been generated since that time,

2   please provide your documents.

3            They have not responded to that e-mail.  Just

4   recently outside of this courtroom, I inquired about whether

5   defendants would be producing this and counsel has explained

6   that they would discuss this matter today with Your Honor.

7            So we're still waiting for the defendant to produce

8   these records, they're relevant to damages and counsel can

9   provide more information about the relevance.

10           THE COURT:  Well, you were told to produce them

11   according to what counsel has said.  Where are they?

12           MR. DiLORENZO:  We dispute that they're relevant.

13           THE COURT:  Well, forget whether they're relevant,

14   you were going to produce them, so where are they?

15           MS. DONNELLY:  No.  We didn't discuss anything other

16   than the 2020 tax records.  There was no further discussion

17   about producing any additional documents in the future.

18           And one of the issues that we did have with respect

19   to plaintiff is, they were producing documents late.  They

20   were producing documents after we had already submitted the

21   Joint Pretrial Order, and after the motions in limine had been

22   briefed.

23           So before we engaged in any additional document

24   production or discovery, I wanted direction from the Court.

25           MS. HUOT:  Your Honor, the 2020 documents are still

SN        OCR        RPR

Proceedings                                    101

1    not produced.  We produced our 1099s.  Back then, in 2021, the

2    2020 tax records hadn't been generated because those are

3    typically generated in February, April -- February or March of

4    2021 for the 2020 year, and we expected the trial to take

5    place in 2021 at the time or shortly thereafter, so the scope

6    of our conversation dealt with records being generated in the

7    future and we specified 2020 because we didn't think that the

8    trial would be pushed to 2023.  But even still, the 2020

9    records weren't produced.

10             THE COURT:  What do you want now?

11             MS. HUOT:  The 2020 and 2021 --

12             MR. BELDNER:  Tax returns.

13             MS. HUOT: -- tax returns, yeah.

14             THE COURT: You want the 2020 and the 2021 tax

15   returns.

16             MS. HUOT:  Yes.

17             MR. BELDNER:  Correct.

18             THE COURT:  And you've turned over your materials

19   for that?

20             MS. HUOT: Yes.

21             THE COURT:  You say there was an agreement to do

22   that or no?

23             MS. HUOT:  Yes, there was an agreement to do that --

24             THE COURT: Agreement --

25             MS. HUOT:  -- memorialized in writing.

Proceedings                              102

1          MR. DiLORENZO:  Memorialized for 2020, Your Honor.

2   She's saying that it was understood somehow that all the

3   future would be, but the agreement 2020.

4          THE COURT:  Well, what was the understanding.  Can

5   you produce the 2020 and 2021?

6          MS. DONNELLY:  I thought we did, but I don't

7   think they're --

8          THE COURT:  All right.  Well, then produce them,

9   okay.

10          MS. HUOT:  Your Honor, we would like to add those to

11   the Joint Pretrial Order.

12          MR. DiLORENZO:  And we have a motion on those, Your

13   Honor, concerning the bifurcating of the punitive damages

14   issue because that's all irrelevant to --

15          THE COURT:  When you say "bifurcating of punitive

16   damages," you're not seeking a bifurcation of liability and

17   damages per se?

18          MR. DiLORENZO:  No.  No, Your Honor.  I just meant

19   is, if we could have, for example, a special verdict form and

20   ask the jury if they believe that the standard of proof has

21   been met for punitive damages, then they're be a short

22   separate proceeding to figure out what that amount would be

23   including us disclosing what the income is because that's all

24   that relevant for.

25          We think in the case of -- in the case of these

Proceedings                                              103

1    defendants, a law firm, to have the jury hear how much they

2    make would be very prejudicial, and not really probative of

3    anything.  We're a long way from being able to prove in this

4    case punitive damages.  We don't think the burden will be met

5    with punitive damages --

6              THE COURT:  So you're saying what they're making --

7              MR. DiLORENZO:  -- they'll be public disclosure of

8    all that information and the jury will hear how much money the

9    defendants make and why can't they give some of it to the

10   plaintiff.

11             MR. BELDNER:  Your Honor, with respect to relevance

12   as set forth in our motion papers, the defendants have

13   asserted that this was an undue hardship that they couldn't

14   accommodate the plaintiff due to undue hardship.

15             The statute directly states that the defendant or

16   the employer's financial status and financial circumstances

17   are factors listed to be taken into account as to whether or

18   not an accommodation would be an undue hardship.  Defendant's

19   essentially conceded that point in their -- in their reply.

20             But with respect to the issue of -- so I believe

21   that is going -- that information is going to come in as

22   evidence because that's evidence that's clearly relevant with

23   respect to the undue hardship defense.

24             I believe what counsel is saying now is that

25   additional tax information would be prejudicial and that

Proceedings                                                    104

1   bifurcation would be -- would be preferential but bifurcation

2   in this case would be completely inefficient.  The entire line

3   of questioning as to whether or not punitive damages might be

4   awarded is going to be relatively short.

5           I mean, the defendant's net worth their financial

6   circumstances, it's certainly relevant to claims for punitive

7   damages, and the introduction of tax returns and the

8   defendants' simply stating this is what our revenue is and

9   this is our financial circumstances, that's essentially it.

10  You can have that all within one trial.

11          If you bifurcate the trial, you essentially would

12  need people to come back a second day, potentially, and it

13  could mislead the jury and the jury would have to have a

14  special instruction and it lengthens it for no reason.

15          THE COURT:  So we're talking about records of the

16  financial status of the company after she was fired?

17          MR. BELDNER:  Correct.

18          THE COURT:  Because the amount of money the firm was

19  making at the time she was fired is relevant to the undue

20  hardship.

21          MR. BELDNER:  Yes, Your Honor.

22          THE COURT:  So what you're seeking to preclude is

23  the evidence of how much money they've made after she left.

24          MR. BELDNER:  I'm not saying to preclude that at

25  all, we're --

Proceedings                                        105

1          THE COURT:  You're seeking -- that's what you're

2     seeking to bifurcate?   In other words --

3          MR. BELDNER:  We don't want bifurcation.

4          THE COURT:  I'm sorry.  But that's -- the defendants

5     want to keep that piece of evidence out until after a

6     determination as to punitive damages as to whether they are

7     entitled to punitive damages or not?

8          MR. DiLORENZO:  Yes, Your Honor.

9          THE COURT:  Bus is that relevant to even that

10    determination.  In other words, is the amount that they're now

11    making -- can they decide the punitive damages are even called

12    for without knowing that?

13         MR. DiLORENZO:  I definitely think they should, not

14    only can they, they should.  I represented Weil, Gotshal in a

15    three-week jury trial here, a discrimination case, in front of

16    Judge Cogan, and he ruled that the jury would first decide on

17    a special verdict form whether there was an issue of punitive

18    damages and whether the burden was met and then if it was met,

19    then this information would come in as to what the firm

20    generated in terms of profits and revenues and so on.  It only

21    seems fair based on the idea of the kind of money that they

22    would see a law firm generate.

23         MR. BELDNER:  Might I?

24         MR. DiLORENZO:  I'm not sure, Your Honor, about this

25    undue hardship defense.  This is the first I've heard.  I

SN        OCR        RPR

Proceedings                                106

1    would concede that if we raised an undue hardship argument as

2    as to why anything wasn't supplied under the Americans with

3    Disabilities Act or the state or city statute, we would have

4    to produce that information, but I don't think that's going to

5    be a defense.

6              THE COURT:  I'm not sure what you're doing.  Are you

7    seeking to preclude any -- now seeking to preclude just the

8    current money the firm is making or are you seeking to

9    preclude any evidence as to money the firm made even during

10   the time she was working there?  What is it that you're saying

11   shouldn't come in?

12             MR. DiLORENZO:  Well, to the extent they're making a

13   punitive damage claims, all's I'm saying is, it shouldn't be

14   produced -- this jury should not see it until after they make

15   the decision.

16             THE COURT:  But --

17             MR. BELDNER:  Your Honor, they're going to see --

18   I'm sory.

19             THE COURT:  You're saying they shouldn't hear it

20   until afterwards.  What is it that they shouldn't hear until

21   afterwards?

22             MR. DiLORENZO:  The firm's revenue --

23             THE COURT:  At any time during the course of her

24   employment or afterwards, they shouldn't hear it at all?

25             MR. DiLORENZO:  That's correct.  Until they make a

SN        OCR        RPR

Proceedings                                                         107

1    decision as to punitive damages, if they're eligible.

2              MR. BELDNER:  The difference, Your Honor, is that --

3    there's a pretrial order the defendants have specifically

4    asserted an undue hardship.

5              MS. HUOT:  Your Honor, number four on page four, is

6    saying, "Assuming arguendo that plaintiff requested

7    accommodations verbally as she alleges, her requested

8    accommodations were unreasonable, not effective and/or would

9    have imposed an undue hardship on defendants."

10             MR. BELDNER:  So based on that defense, the

11   financial circumstances of an employer as per the statute,

12   evidence related to that, comes in.  I believe that they've

13   almost conceded that point, if I misrepresented the position,

14   okay.

15             Based on that, what I'm saying, though, is the tax

16   returns we have for '17 and '18 or '18 and '19 while she was

17   there, they're going to come in in order to rebut that

18   defense.  So any concern that defense counsel has regarding

19   the jury hearing a big number as to firm revenue, they're

20   already going to hear that number, they're already going to

21   know generally what the firm makes, so there's no reason to

22   bifurcate for punitives because the jury is already going to

23   have an idea of what the firm --

24             MR. DiLORENZO:  Your Honor, we withdraw the claim

25   that undue hardship was presented.  It was a mistake.

Proceedings                                                  108

1       MS. HUOT:  But that's the entire basis of this.

2  This shows the pretext.  The entire litigation strategy for

3  this whole case has been that it's been an undue hardship to

4  continue to employ plaintiff because it would be deemed an

5  undue hardship  for the small law firm.  That's the entire

6  theory of the case for three years.

7       MS. DONNELLY:  That's not true and it's not even

8  raised in the summary judgment motion.

9       MS. HUOT:  All of your interrogatory responses say

10 that.  I mean, I'm not making it up.  You put it in the Joint

11 Pretrial Order.

12      MR. BELDNER:  Your Honor, I would also submit that

13 even if the defendants are to withdraw the defense of an undue

14 hardship, the tax return documents are still relevant and

15 they're still documents because there is a claim of punitive

16 damages and that's information that we should be able to

17 present to the jury.

18      MS. HUOT:  And, Your Honor, it's actually very

19 relevant that all of a sudden now they're withdrawing that

20 defense because their entire motivation for terminating her

21 was that it's too expensive to employ you.  I'm a businessman.

22 I don't see it worth it for me to continue to employ you.

23 It's not profitable for me.  It's not worth it.   That was

24 their entire term- -- the conversation that they had when he

25 terminated her.  If your condition improves, you're welcome to

SN        OCR        RPR

Proceedings                                                    109

1   back and continue working for us.

2           MR. BELDNER:  I believe also one of the reasons

3   that's even in his affidavit, is that her settlement numbers

4   weren't up and she wasn't generating enough revenue for the

5   firm and it's a small firm.  Clearly, the revenue that the

6   firm earns would be relevant to that as well.

7           MS. HUOT:  That's a good point.  That's right.  So

8   in their affidavits, in their deposition testimony, he

9   testified that she wasn't bringing in enough money that the

10  overhead -- the payroll for the firm was something like

11  $967,000 for a six-month period, just the payroll numbers, and

12  that she wasn't bringing in enough money to justify, you know,

13  her continued employment because now that she's blind, like,

14  you know, it was too expensive to keep employing her, so their

15  revenue is clearly important.

16          MR. DiLORENZO:  Your Honor, that's a

17  mischaracterization.  I mean --

18          THE COURT:  Is there any big change in the number?

19  Does the firm revenue go up exponentially after she leaves?

20          MR. DiLORENZO:  I don't think so, Your Honor.

21          THE COURT:  All right.  Then, I'm not going to

22  bifurcate it and I'll permit the evidence to come in.

23          MR. DiLORENZO:  Could we keep out the individual

24  defendants tax returns and just the firm's revenue?

25          THE COURT: Yeah, I think it's just the --

Proceedings                                          110

1          MS. HUOT:  No, Your Honor.

2          THE COURT:  What's the relevance of the individual

3    defendant's income?

4          MR. BELDNER:  He could be individually liable,

5    certainly, under the law and he could be subject to punitive

6    damages as well.

7          MS. HUOT:  He's jointly and severally liability to

8    this issue and he's directly responsible.  He's the

9    decision-maker --

10         THE COURT:  On punitive damages, you mean?

11         MR. BELDNER:  Yeah, he can be responsible.  An

12   individual can be held for punitive damages under the law.

13         MS. HUOT:  Absolutely.

14         MR. DiLORENZO:  I'm not sure that's true, Your

15   Honor, I'd have to check.

16         MS. HUOT:  Your Honor, 100 percent.

17         THE COURT:  Yeah, it's true.

18         MR. DiLORENZO:  Well, I was willing to withdraw the

19   undue hardship defense if we can keep the records out but --

20         THE COURT:  Well, not only that, it doesn't work

21   that you're withdrawing it now because it's an explanation he

22   gave her.  They can show it as a false explanation that he

23   gave her at the time, so you can have your undue hardship

24   back.

25         MR. DiLORENZO:  Thank you.

Proceedings                                    111

1          THE COURT:  I have a question that I want to raise

2    about sealing because parties filed documents and filed them

3    as sealed documents and we actually have a rule that says the

4    documents must not be filed under seal unless did the court

5    happens granted a motion for leave to file under seal.  So

6    that apparently was abandon -- you know, not honored.

7          Now, I understand that Exhibits 5 and 11 are the

8    plaintiff's medical records.  I understand why that should be

9    sealed.  So I'm not going to have you turn around and make a

10   motion now with respect to that.

11         Plaintiff's payroll record at the law firm, why is

12   that -- Exhibit 21, why should that be sealed?  Did the

13   plaintiffs file it under seal?  I don't know who filed it.

14         MS. HUOT:  We filed it under seal because they were

15   defendant documents marked confidential.  So in accordance

16   with our confidentiality agreement, it states that all

17   documents will be filed under seal that are marked

18   confidential, so we respected defendant's designation.

19         THE COURT:  Then why should payroll records for the

20   law firm be under seal?

21         MR. DiLORENZO:  Your Honor, we got an e-mail

22   demanding that we try to get them under seal, so after the

23   fact we scrambled around --

24         MS. HUOT:  Your Honor, that's not accurate.

25         THE COURT:  Is there any reason that the defendants

Proceedings                                               112

1   want the payroll records under seal?

2           MR. DiLORENZO:  No.

3           THE COURT:  There's no reason why the plaintiffs

4   want them under seal?

5           MS. HUOT:  No, Your Honor.  These were not documents

6   of the defendants.

7           THE COURT: They're unsealed.

8           MS. HUOT: These documents that plaintiffs filed

9   under seal because the defendants marked them confidential.

10          THE COURT:  Whatecver.  They're unsealed.

11          MS. HUOT:  We don't mind.

12          THE COURT:  They're internal e-mail correspondences

13  within the defendants' law firm:  Exhibits 36, 39, 40, 41, 44,

14  51 to 54, 60 and 72.

15          MS. HUOT:  Again, plaintiffs filed them under seal

16  because defendants marked them as confidential.  We don't need

17  them to be confidential.  We have no objection.

18          MS. DONNELLY:  I would request that they remain

19  under seal only to the extent that they concern

20  attorney/client communications or client information.

21          THE COURT:  Well, you're going to have to tell me

22  which one of those exhibits do that.  You can't just have

23  stuff filed under seal.  You write me a letter by Friday which

24  says why they need to remain or don't.

25          Sample Saga records.

Proceedings                                    113

1          MS. HUOT:  No objection from the plaintiffs.

2          MR. DiLORENZO:  Your Honor, the Saga records deal

3     almost exclusively with attorney/client privilege matters

4     concerning cases and case handling status and what's going on

5     with the case and so on.

6          THE COURT:  I thought the Saga records were just the

7     numbers?

8          MR. BELDNER:  The notations the attorneys make

9     regarding cases.

10         THE COURT:  On the Saga records?

11         MR. DiLORENZO:  Yes, these are status of the case,

12    you know, work product.

13         THE COURT:  All right.  That can stay.

14         A pre-litigation as to an offer of settlement.

15         MS. HUOT:  That is, Your Honor -- that's the subject

16    of our motion.

17         THE COURT:  But why does it need to stay under seal?

18         MR. DiLORENZO:  It can be withdrawn.

19         MS. HUOT:  That is our pre-litigation settlement

20    communication.

21         THE COURT:  I understand.  So that's coming out

22    anyways.

23         MS. HUOT:  Right.

24         MR. DiLORENZO:  Correct.

25         THE COURT:  Here is my favorite.  The EEOC complaint

SN        OCR        RPR

Proceedings                                        114

1   is sealed, Exhibit 69.

2            MR. DiLORENZO:  It doesn't need to be.

3            MS. HUOT:  No, Your Honor.

4            THE COURT:  Unsealed.

5            Plaintiffs e-mail correspondence with legal

6   recruiters.

7            MS. HUOT:  So, Your Honor, if I can specify which of

8   those should be confidential, I believe --

9            THE COURT:  Exhibit R.

10           MS. HUOT:  I don't have it in front of me in detail

11  but it's a compilation of e-mails and some of those e-mails

12  deal with her current employer relating to some potentially

13  sensitive information with her current employer.  And if I

14  remember correctly, it was certain potential employers.  If I

15  could just also write to you by Friday relating to which

16  specific documents we would like to maintain confidentiality

17  for but it may only be a small number.

18           THE COURT:  Okay.  I will hear from you on that.  I

19  think we've resolved most of the issues.  Let me set down

20  another pretrial conference.  And, if you all could also, in

21  light of the ruling send me revised list of witnesses and

22  exhibit list, revised exhibit list.  The end of the second

23  week of January.

24           THE COURTROOM DEPUTY:  Friday the 13th is open.

25           THE COURT:  January 13th.

SN        OCR        RPR

Proceedings                                             115

1          THE COURTROOM DEPUTY:  January 13th.

2          THE COURT: We'll put it down January 13th in the

3    morning.

4          MR. BELDNER:  Your Honor, I'm out of the country on

5    the 13th and coming back, I think, on the 16th.

6          MS. HUOT:  Would potentially the 12th work?

7          THE COURT:  We have to do it before -- I'm not

8    available the last two weeks in January.

9          MS. HUOT:  Could it be potentially on the 11th?

10         MR. BELDNER:  Yeah, the 11th I'll definitely be

11   here.

12         MS. HUOT: 11th, we're all available.

13         THE COURT:  All right.  January 12th.

14         MS. HUOT: Give us one second, Judge.

15         THE COURT:  Okay.  January 12th at what time, Jim?

16   All right.  10:00 on January 12th.

17         Any other issues that we need to -- I should tell

18   you, as well, I need, according to my pretrial order, I need

19   jury instructions and voir dire requests a week before the

20   trial date.  Okay?

21         MS. HUOT:  Yes, Your Honor.

22         THE COURT:  Don't forget that.  That's important.

23         MS. HUOT:  Your Honor, what will we be going over on

24   January 12th?

25         THE COURT:  Everything you're still complaining

Proceedings                                              116

1    about when we get your other letter.

2              MR. DiLORENZO:  We still have a few.

3              THE COURT: Well, I've been over your limine motions.

4              MS. DONNELLY: There are still a couple.

5              THE COURT:  Which ones did I not address?  I'm

6    sorry.  Let me just look into it a little further, your

7    argument about plaintiff not being -- being precluded from

8    suggesting a dollar amount.  I'll look into that.

9              I guess the others are the -- these ethical

10   opinions, what is going on -- the plaintiff wants to introduce

11   ethical opinions, Exhibits 168 and 169?

12             MR. BELDNER:  Yes, the defense motion is to preclude

13   these opinions.  One of them we conceded that we would not be

14   introducing.

15             THE COURT: That's 168?

16             MR. BELDNER:  Correct.

17             The opinion with respect to, well, the undisclosed

18   taping of clients.  So it's -- evidence in the record here

19   will certainly be at trial that the Prakhin firm has a

20   practice of recording all conversations with attorneys and

21   clients without notifying the person on the other end of the

22   phone that they're being recorded and this opinion states, you

23   know, exactly the opposite.  It says, quote, undisclosed

24   taping is an act of trickery and is improper as a routine

25   practice.

Proceedings                              117

1        Mr. Prakhin testified at his deposition that there

2   was nothing unethical about recording client conversations

3   without disclosing that he's recording conversations.

4   Certainly we'd rebut that; therefore, we believe it's

5   probative as to it's truthfulness and lack of trustworthiness

6   and it's relevant with respect to his credibility, and he

7   continues to do this practice today actually.

8        Defendants, in their reply, stated that there were

9   no allegations made that there was evidence that he was being

10  deceitful.  We submit the very fact that he has this practice

11  and continues to have this practice of recording people

12  without recording them, that alone is deceitful, and the

13  opinion supports that conclusion.

14       THE COURT:  Do defendants want to be heard?

15       MR. DiLORENZO:  Your Honor, it's not illegal.  It's

16  not improper.  There's no evidence that he's been deceitful

17  about it.  We don't know why it's relevant.  We know why they

18  want to use it to prejudice him and make him look bad.  It's a

19  practice that's permitted.  There's no evidence that it's been

20  misused in any way.  And one opinion from an ethics person

21  that expresses the opinion that it's and act of trickery.

22       THE COURT:  I am going to exclude it on 403 grounds.

23  I'm not going to let that come in.

24       What else have we not addressed in your motions?

25       Well, you seek an order precluding plaintiff from

Proceedings                                           118

1   introducing unauthentic medical records, but they have to lay

2   a foundation for any medical -- you understand you have to lay

3   a foundation for any medical records you want to introduce.

4   You have to call somebody to do it.  You understand that?

5             MS. HUOT:  Yes, Your Honor.

6             THE COURT:  Precluding the plaintiff from giving

7   medical testimony.  What is the concern here that plaintiff is

8   going to say she has this condition?

9             MR. DiLORENZO:  I think it will be sorted out, Your

10  Honor, based on the rulings you've made today about doctors

11  and so on.  If we have an objection, we can make it at trial,

12  if she tries to testify to her own diagnosis of what she says

13  her medical condition is.  That's all that's based on.  We

14  weren't sure how everything would fallout with the records or

15  the other doctors.

16            THE COURT: All right.

17            MR. BELDNER:  We just want to make clear, Your

18  Honor, plaintiff must be permitted to testify as to her

19  experiences, her ability to see or lack thereof, the

20  impairments during that time period.

21            MR. DiLORENZO:  We said that in our brief that she

22  can say, I couldn't hear, I couldn't see or whatever her

23  experience was, she can testify to that.  We're not objecting

24  to that.

25            MR. BELDNER:  The reason why I was a little hesitant

SN       OCR       RPR

Proceedings                                    119

1   is because I think in the papers defendants, the way it was

2   written, it appears that defendants sought to prevent

3   plaintiff from testifying regarding any symptom of a diagnosis

4   and, so, you know, blurry vision would be a symptom of her

5   diagnosis.  And so to the extent defendants would be somehow

6   arguing for the preclusion for her to testify about blurry

7   vision, for example, that would -- that is what we were

8   concerned about that, but if that's not the position.

9         The same thing with respect to emotional distress,

10  it was worded the same way and that it was symptoms of

11  emotional distress, so, you know, if she testifies, I felt

12  depressed, that's one thing, but as long as you're not seeking

13  to preclude her testifying as to how she felt.

14        MR. DiLORENZO:  Your Honor, if she testifies I

15  couldn't sleep, I had trouble eating, those kinds of things,

16  that's all fine.

17        THE COURT:  I do not think we have an issue here.

18        Let me just go on to -- I guess there's precluding

19  plaintiff from introducing deposition transcript from 2017.

20        MR. BELDNER:  We had conceded that point.

21        THE COURT:  Okay.  Payroll records we've dealt with,

22  right?

23        MR. DiLORENZO:  Yes.

24        MR. BELDNER:  Did we deal with payroll records?  I

25  think the defendants were arguing that the payroll records

Proceedings                                                120

1    from 2012 to 2017 were irrelevant.  I don't know if that

2    matter had been discussed.

3              MS. HUOT:  I don't think it has, Your Honor.

4              THE COURT:  Okay.  You're trying to enter it as

5    payroll records.

6              MS. HUOT: The payroll records --

7              THE COURT: It's the payroll records for the other

8    individuals that are the issue?  It's -- it's payroll records

9    before 2018?

10             MR. DiLORENZO:  Yes, Your Honor, I think the

11   exhibits include more than just the plaintiff's payroll

12   records.

13             MR. BELDNER:  Well, Judge, I think there's two --

14   there's records from 2012 to 2017 when she worked at the firm

15   for the first period of time and we would like to introduce

16   those records.

17             THE COURT:  For what reason?

18             MR. BELDNER:  It shows every year she performing

19   well, she was receiving an annual bonus, she was receiving a

20   raise.  It shows that she was performing her duties in an

21   exemplary manner and these payroll records would substantiate

22   that.

23             MS. HUOT:  We also need to show that had she

24   continued working at the firm, she would have received this

25   type of raise or this kind of bonus each year that happens.

Proceedings                                        121

1          MR. DiLORENZO:  This is from 2012 to 2017?

2          THE COURT: Yes.  Right.  She worked there before.

3          MR. DiLORENZO:  I don't know how that's relevant to

4   if she was performing well before she left.  My understanding

5   is she voluntarily left for another job and she came back.

6          MS. HUOT:  It goes to show the incremental

7   increases.

8          THE COURT:  Right.  I will let them in.  But the

9   payroll records about other employees --

10         MS. HUOT:  Yes, Your Honor, the defendants had

11  marked them as comparators.  It goes to show that she should

12  be paid in a similar fashion.  The other individuals received

13  raises and bonuses she should receive them as well.

14         MR. BELDNER:  In their interrogatory responses they

15  were listed by the defendants as comparators as attorneys at

16  the firm, so this is used to show damages; had she continued

17  working she would have received comparable bonuses and raises.

18         MR. DiLORENZO:  I think the prior attorneys listed

19  them.  It's fine, Your Honor.  They can all come in.

20         THE COURT:  Okay.  All right.  What are these

21  records about these other lawsuits about?

22         MR. BELDNER:  We've conceded that point.

23         THE COURT:  Okay.  All right.  Is that everything?

24         MS. HUOT:  I believe so.

25         MR. BELDNER:  The only thing is the dollar amount

Proceedings                                        122

1  which Your Honor said you would reserve your decision

2  regarding the plaintiff's ability to suggest that a --

3           MS. HUOT:  If you would like to hear argument on

4  that now, we can discuss it.

5           THE COURT:  No, that's all right.  I can tell you

6  traditionally I had always allowed that and then I noticed

7  that there was a fair amount of case law that says that it was

8  improper.

9           MS. HUOT:  We think it's completely proper, Your

10 Honor.

11          THE COURT:  I want to read the cases again before I

12 finally resolve it.

13          MR. BELDNER:  In short our position would be as long

14 as the jury is given a cautionary limitations then it should

15 be okay.  Thank you, Your Honor.

16          THE COURT:  Okay.  I just want to reread those

17 cases.  As I say, I had thought it was appropriate in the past

18 because what is a jury -- what basis is there for them to come

19 up with any --

20          MR. BELDNER:  We agree, Your Honor.

21          THE COURT:  I will take a look at the cases again

22 before I finally resolve it.

23          MS. HUOT:  And then just to recap, the defendants

24 are going to tell us which three of these clients they would

25 deposed and we can depose them and the defendant's can depose

Proceedings                                              123

1   Mr. Coates.

2          MR. BELDNER:  Right.  And by the end of the week, I

3   believe the defendants are going to provide an explanation

4   regarding the Saga records situation.  We would have a week to

5   respond.  Is that correct, Your Honor?

6          THE COURT:  Correct.

7          MR. BELDNER:  And there's one other thing --

8          MS. HUOT:  You're going to provide a settlement

9   demand.

10         MR. BELDNER:  Oh, and we were going to provide a

11  settlement demand by tomorrow.

12         MS. HUOT:  There was something else.

13         THE COURT:  There was something else.

14         MS. DONNELLY:  Right, we have to get back to them --

15         MS. CAMPBELL:  When was I supposed to get back to

16  them by, tomorrow or --

17         THE COURT: The end of the week.

18         MS. DONNELLY:  End of the week.  Okay.  By the end

19  of the week, which documents.

20         MS. HUOT:  The sealing, okay.

21         THE COURT:  It's been lovely chatting with you.

22                 (Matter adjourned.)

23                    - ooOoo -

24

25