UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

YELENA RUDERMAN,

                 Plaintiff,

    -against-

LAW OFFICE OF YURIY PRAKHIN, P.C.,
and YURIY PRAKHIN, ESQ., in his
individual and professional capacities,

                 Defendants.
------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
19-cv-2987 (CBA) (LB)

**AMON, United States District Judge:**

## INTRODUCTION

Plaintiff Yelena Ruderman ("Ruderman") sued the Law Office of Yuriy Prakhin, P.C. ("Defendant Law Firm") and Yuriy Prakhin ("Prakhin") (collectively, "Defendants"). Ruderman, an attorney and a long-time employee of Defendants, was fired sixteen days after disclosing to Prakhin her diagnosis of Leber Hereditary Optic Neuropathy ("LHON"), an incurable condition that rendered her legally blind. (ECF Docket Entry ("D.E.") # 1 ("Compl.") ¶¶ 3, 47, 72.) In her Complaint, Ruderman asserted causes of action for disability discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"). (Compl. ¶¶ 85-128.)[1]

---

[1] This case was reassigned to me from the Honorable Raymond J. Dearie on August 25, 2022. I presume familiarity with the facts and procedural posture of this case; for additional background, see the January 25, 2022 Memorandum & Order denying Defendants' motion for summary judgment. (D.E. # 107).

On February 16, 2023, after a nine-day trial, a jury returned a verdict in favor of Ruderman and awarded her $1,735,000, comprised of $535,000 in back pay, $300,000 in front pay, $300,000 in damages for emotional distress, and $600,000 in punitive damages. (D.E. # 221 at *28-33 ("Verdict Sheet"); D.E. # 220 ("Judgment").)[2]  The jury found that Ruderman proved, by a preponderance of the evidence, all claims except for the claim of failure to accommodate as against Defendant Prakhin. (Verdict Sheet *3-4.) Before me are Defendants' post-trial motions.[3] For the reasons below, Defendants' renewed motion for judgment as a matter of law is DENIED; Defendants' motion for new trial is DENIED; and Defendants' motion for remittitur of damages is DENIED.

## DISCUSSION

### I.   Defendants' Renewed Motion for Judgment as a Matter of Law

#### A.   Legal Standard

Federal Rule of Civil Procedure 50(b) permits a district court to direct the entry of judgment as a matter of law "if a jury returns a verdict for which there is not a legally sufficient evidentiary basis." Lawson v. Cnty. of Suffolk, 920 F. Supp. 2d 332, 337 (E.D.N.Y. 2013). A party moving for a Rule 50(b) motion faces "a high bar," Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001), and will prevail only if:

---

[2] Citations to pages with an asterisk refer to the PDF page; all other citations refer to the native pagination printed on the document.

[3] The filings are: D.E. # 235 (Defendant Law Firm Renewed Motion); D.E. # 247 (Plaintiff Opposition to Renewed Motion); D.E. # 262 (Defendant Law Firm Reply to Renewed Motion); D.E. # 234 (Defendant Law Firm Motion for New Trial & Remittitur); D.E. # 246 (Plaintiff Opposition to Defendant Law Firm Motion for New Trial & Remittitur); D.E. # 263 (Defendant Law Firm Reply to Motion for New Trial & Remittitur); D.E. # 243 (Defendant Prakhin Motion); D.E. # 249 (Plaintiff Opposition to Defendant Prakhin Motion); D.E. # 266 (Defendant Prakhin Reply).

Further, although Defendants are represented by different counsel, Defendant Prakhin states that he "incorporates by reference all . . . post-trial motions [filed by] . . . co-Defendant." (D.E. # 243 at 1.) I therefore consider Defendants' motions together and, where appropriate, address Defendant Prakhin's additional arguments separately.

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

DiSanto v. McGraw-Hill, Inc., 220 F.3d 61, 64 (2d Cir. 2000) (per curiam) (alteration in original) (citation omitted).  In considering a motion for judgment as a matter of law, a district court must "consider the evidence in the light most favorable to the non-moving party" and "defer to the credibility assessments that may have been made by the jury."  Lawson, 920 F. Supp. 2d at 338 (alteration omitted).

In order to prove her case of disability discrimination, Plaintiff was required to prove that: (1) Defendant was subject to the ADA, NYSHRL, and NYCHRL; (2) Plaintiff was disabled within the meaning of these laws at the time of her termination; (3) Plaintiff was otherwise qualified to perform the "essential functions" of the job with or without reasonable accommodations by the employer; and (4) Plaintiff suffered an adverse employment action as a result of the discrimination.[4]  Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005) (ADA); Sivio v. Vill. Care Max, 436 F. Supp. 3d 778 (S.D.N.Y. 2020) ("The same requirements apply to the . . . NYSHRL.").

To establish a failure-to-accommodate claim under the ADA, the NYSHRL, and the NYCHRL, Plaintiff had to show that: (1) she suffers from a qualifying disability; (2) she requested a reasonable accommodation; (3) she was otherwise qualified to perform the essential functions of the job with a reasonable accommodation; and (4) the Firm refused to make such accommodations. See Lazzari v. New York City Dep't of Parks & Recreation, 751 F. App'x 100, 102 (2d Cir. 2018)

---

[4] Under the NYCHRL, Plaintiff need not show that she suffered an adverse employment action because of her disability and must only show that she was treated "less well" because of her disability.  Awad v. City of New York, No. 13-cv-5753 (BMC), 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014).

3

(summary order) (ADA); <u>Vangas v. Montefiore Med Center</u>, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014) (NYSHRL and NYCHRL).

### B.    Application

Defendants initially made a motion for judgment as a matter of law at the close of Ruderman's case in chief, which I denied.  (Trial Tr. at 1300:11-1310:13.)  In support of their renewed motion, Defendants argue that (i) Ruderman failed to prove that she gave proper notice of her disability, (ii) Ruderman failed to prove that she could perform the essential functions of the job, (iii) Defendants provided her with a sufficient accommodation, (iv) Ruderman failed to request an accommodation, and (v) Defendants fired her for legitimate, non-discriminatory reasons.[5]  Defendant Prakhin (but not Defendant Law Firm) additionally argues that (vi) Ruderman failed to offer expert testimony to support her claims.

### i.    Notice

Defendants first argue that Ruderman failed to give proper notice of her disability because "she never provided the Firm with any documentation regarding her vision impairment or of her diagnosis with LHON."  (D.E. # 235 at 7-8; <u>see also</u> D.E. # 243-1 at 23-24.)  This argument is meritless.

Courts in this circuit have held that an employee is "not required to provide a formal diagnosis or medical evidence in order to put an employer on notice of a disability."  <u>Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of New York City, Inc. Emp. Benefit Funds</u>, No. 17-cv-7895 (DF), 2020 WL 5209779, at *9 (S.D.N.Y. Sept. 1, 2020); <u>see also</u> <u>Malzberg v. New York Univ.</u>, No. 19-cv-10048 (LJL), 2022 WL 889240, at *13 (S.D.N.Y. Mar. 25, 2022) ("Defendant

---

[5] Defendants also argue that there was insufficient evidence to support an award of punitive damages, (D.E. # 235 at 30-31); because this is more appropriately an argument for remittitur, I consider it <u>infra</u> in Section III.

does not cite case law holding that an employee must provide medical documentation for an employer to be on notice of the employee's disability and that, in the absence of medical documentation, the employer cannot be on notice."). Instead, the notice requirement is met if an employer knew or reasonably should have known about the employee's disability. See Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008) (holding that no formal request for accommodation is needed "where the disability is obvious or otherwise known to the employer without notice from the employee" (citation omitted)). In this case, the trial record is replete with evidence demonstrating Defendants' awareness of Ruderman's disability, including (a) Ruderman's approved absences to seek treatment and diagnosis for her vision deterioration, (Trial Tr. at 116:15-23; 184:17-22; 381:7-19); (b) conversations between Prakhin and other colleagues regarding Ruderman's doctor appointments, (id. 551:5-19); and, importantly, (c) Ruderman's meeting with Prakhin on November 26, 2018, when, according to her testimony, she formally disclosed her diagnosis, (id. 187:18-188:5). See Krow v. PineBridge Investment Hold. U.S. LLC, No. 19-cv-5711 (ER), 2022 WL 836916, at *11 (S.D.N.Y. Mar. 21, 2022) ("[T]he employer should have known about the employee's disability where it has received some other kind of concrete notice, as when the employee has required hospitalization or extended leave, or the employee has otherwise provided notice to the employer about a specific disability . . . ."). In this context, Defendants' insistence on the need for a "doctor's note," (D.E. # 243-1 at 23), has no basis in the law.

Defendants cite MacEntee v. IBM, 783 F. Supp. 2d 434 (S.D.N.Y. 2011) for the proposition that notice is defeated where an "employee failed to provide documentation indicating she needed accommodations." (D.E. # 235 at 7.) Certainly, the fact that an employee furnished a doctor's note may be sufficient to show notice, but MacEntee does not hold that such a note is

necessary.   There, the plaintiff, who was suffering from depression, sought paid short-term disability leave, even though she had previously taken six-months of short-term disability leave. 783 F. Supp. 2d at 438-40.  Her employer then explicitly "requested medical documentation to confirm [the plaintiff's] eligibility to continue receiving her benefits and salary." Id. at 440.  In concluding that the plaintiff did not furnish proper notice, the MacEntee court observed that "unlike disabilities that are visible to an employer, the presence, duration and ever-varying severity of depression cannot be adequately perceived or accommodated unless an employee informs in some manner her employer of her limitations as a result of such a disability." Id. at 444.  These facts are distinguishable from this case.   Unlike in MacEntee, Ruderman's disability was apparent—for example, her colleague "understood that [Ruderman] was wearing those [assistive] glasses because she had a visual impairment."  (Trial Tr. at 1811:14-16.)  Moreover, whether Defendants explicitly asked her to provide a doctor's note was a disputed factual matter that both sides addressed through testimony at trial.  (Id. 116:15-117:3; 465:15-466:7.)  For purposes of this Motion, Plaintiff's testimony that no request was made must be accepted.[6]

### ii.      Essential Functions

Defendants next argue that Plaintiff could not perform the essential functions of her position.   Under the ADA, a "qualified" individual is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  "The term 'essential functions' . . . is generally defined in ADA regulations promulgated by the Equal Employment Opportunity Commission ('EEOC') to mean the 'fundamental' duties to be performed in the position in question, but not

---

[6] Defendants insist that the Employee Handbook requires employees to submit medical documentation for any temporary medical absences.  (D.E. # 235 at 2; D.E. # 266 at 35; Trial Ex. E; Trial Ex. F.)  The Firm's internal policy does not override the legal standards for notice and reasonable accommodation.

functions that are merely 'marginal.'" <u>Stone v. City of Mount Vernon</u>, 118 F.3d 92, 97 (2d Cir. 1997) (quoting 29 C.F.R. § 1630.2(n)(1)).

Defendants claim the essential functions of an associate at the Firm are: (1) regular attendance, (2) settling cases, (3) communicating with clients, and (4) managing cases and overseeing work performed by paralegals. (D.E. # 235 at 8-9.) Plaintiff presented evidence that proved she could perform all of these essential functions.[7]

### 1. Regular Attendance

Plaintiff did show that she was capable of regularly attending to the office and her responsibilities with her disability. Although Defendant points to Plaintiff's attendance record from the onset of her symptoms in September 2018 to her termination in December 2018,[8] according to her evidence, Plaintiff's absences were a short-term necessity to diagnose her with LHON, not a condition of her disability that persisted after her diagnosis. Plaintiff testified that once she knew her condition was permanent, rather than a condition she could treat, "I had no reason to miss work. Now I knew my diagnosis and it was untreatable and permanent so what's there to do except keep working and figure out how to live with it." (Trial Tr. at 189:24-190:1.) After disclosing her diagnosis to the Firm, Defendants acknowledge that Plaintiff did not miss another day of work. (<u>Id.</u> at 189:2-24; 400:7-15.)

---

[7] I note that Plaintiff disputes whether these are essential functions of the position. (D.E. # 247 at 11-12.) "Evidence of whether a particular function is essential includes, but is not limited to the employer's judgment as to which functions are essential, the written job description, the amount of time spent performing the function, the consequences of not requiring the employee to perform the function, the work experience of past employees in the position, and the current work experience of employees in similar positions." <u>Sharp v. Abate</u>, 887 F. Supp. 695, 699 (S.D.N.Y. 1995). Since Plaintiff showed that she could perform the essential functions that Defense enumerated, I need not decide whether Defendants' characterization of the essential functions is accurate.

[8] The Parties dispute the number of days that Plaintiff was absent from September 2018 to December 2018. While Defense argues that she was absent for 28 of 59 days, (D.E. # 235 at 2), Plaintiff asserts that payroll records show she was only absent for 18 days, (D.E. # 247 at 14-1.). Regardless of whether Plaintiff was absent 18 or 28 days during the period when she was seeking a diagnosis, the evidence shows that she was not absent for any days of the two weeks after being diagnosed with her disability.

Defendants rely on a case about employee absences that is unrelated to the facts here. In Lewis v. New York City Police Dep't, 908 F. Supp. 2d 313, 326-28 (E.D.N.Y. 2012), Plaintiff was absent from work on 207 days over the course of 17 months for an unspecified medical condition. During this time period, she documented "below standards" performance due to her excessive absenteeism. Id. The facts in Lewis gave no indication that the plaintiff's attendance and performance issues were temporary or unrelated to her condition. Here instead, evidence at trial showed that Ruderman's absences were not a symptom of her disability, but rather of the search for a diagnosis. As discussed below, Plaintiff presented evidence that she was still able to perform the essential functions of her job despite her absences in Fall 2018.

## 2.    Settlements

Defendants assert that Plaintiff was incapable of negotiating settlements based on her condition. They offer raw dollar amounts of settlement bonuses each attorney at the firm achieved, showing that Ruderman earned significantly lower settlement bonuses than her colleagues. (D.E. # 235 at 13-14.) Defendants assert that from June 2018 to December 2018, Plaintiff generated settlement revenue for the Firm of $13,000 and earned settlement bonuses of $650. (Trial Tr. at 458:5-459:18; D.E. # 233 ("Campbell Decl.") at Ex. NN.). In the same period, Ms. Beron, another attorney at the Firm, generated settlement revenue for the Firm of $171,700 and earned $8,585 in settlement bonuses. Ms. Gabo generated revenue for the Firm in the amount of $1,420,000 and earned $71,000 in settlement bonuses during the same period. (Campbell Decl. Ex. XX.)

First, Plaintiff offered evidence that she earned much higher settlement bonuses than Defendants claim here. At trial, Plaintiff presented her IRS 1099 form that shows Defendants' payment of $19,444 made to Plaintiff in 2019 after she was terminated, allegedly as commission for the settlement of one of her prior cases. (D.E. # 248, Ex. 18.) Even if Defendants' dollar value

8

of settlement bonuses generated by Plaintiff were taken as true, the evidence at trial showed that these dollar values were indicative of the type of cases Ruderman was working on, rather than her ability to settle them.  Plaintiff presented evidence that when she returned to the firm in June 2018, she was assigned a large percentage of cases that were unlikely to reach settlement for several months or years.  (Trial Tr. at 95:12-96:14; 97:6-14; 672:15-673:20; 675:5-8.)  The evidence showed that when Plaintiff returned to the Firm, the majority of her cases were transferred from Ms. Gabo, who left soon after Plaintiff arrived.  (Id. at 425:10-13.)  Gabo testified that when she left the firm in 2018, all of the cases she transferred to Ruderman in late September 2018 were premises liability cases which took, on average, "two years, maybe a little longer," before they are even considered "ripe" for settlement.  (Id. at 514:11-14; 516:1-9.)  Ms. Beron confirmed that these types of cases require almost three years "at best" to be ripe for settlement and that settling premises liability cases within a few months of the case being filed in court would be "impossible." (Id. 673:5-24.)  The evidence also showed that after transferring cases to Plaintiff, Gabo remained involved with the settlement and mediation of those cases, which meant that Gabo, not Plaintiff, received credit when those cases settled.  (Id. at 97:1-98:8, 108:24-109:10, 391:12-392:1:, 623:12-15.)

Moreover, the fact that Ruderman generated any settlements during her pre-diagnosis period showed that she was capable of conducting settlements.  Although Defendants argue that Ruderman relied on paralegals to conduct her settlements, (D.E. # 235 at 29), testimony revealed that paralegals engaged in routine tasks related to settlement but did not ultimately settle the cases themselves.  (Trial Tr. at 256:13-22; 1874:15-1875:9.)  Testimony by Firm paralegals confirmed, in fact, that Plaintiff continued to move her cases toward settlement even while out of the office for medical reasons.  (Trial Tr. at 1878:1-1879:18.)

### 3.   Client Communication

Defendants next argue that Plaintiff failed to properly communicate with clients and respond to client inquiries. (D.E. # 235 at 15.) This argument has no merit. Defendants presented three clients as witnesses who complained that Plaintiff failed to adequately communicate with them. (Id. at 1415:3-1418:24; 1468:11-1477:12; 1519:2-20.) Defendant Prakhin also testified that he received complaints from two other clients about Plaintiff's lack of responsiveness. (Id. 424:4-23.) However, Plaintiff testified that that client complaints were common among all lawyers at the firm, (id. at 108), and that she was even asked to contact clients of other lawyers during the period in question to assuage disgruntled clients, (id. at 106). Further, Prakhin never informed Plaintiff that she had received complaints from any clients prior to her termination. (Id. at 197:12-14, 314:20-23; 414:2-415:16.)

In addition, as discussed, delays in client communication from Plaintiff while she was searching for a diagnosis, rather than once she was actually diagnosed with her disability, are indicative of the temporary treatments she received rather than her ability to communicate given her disability. Defendants offer no evidence that Plaintiff's condition itself would have limited her from effectively communicating with her clients.

### 4.   Managing Cases and Overseeing Paralegals

Defendants argue that Plaintiff was incapable of performing the essential function of managing her cases, which includes overseeing work performed by paralegals. (D.E. # 235 at 19; D.E. # 243 at 27.) They primarily argue that she was unable to perform her duties as counsel at depositions because she could not review documents, pictures, or videos presented in that context. (Id.; Trial Tr. at 259:19-265:8; 270:22-273:21). Defendants point to one instance during Plaintiff's employment involving video surveillance footage during a deposition. (D.E. # 235 at 19-20; D.E.

# 243 at 33-34.) Plaintiff admitted after the deposition that she "couldn't see shit at all, I couldn't even tell if that was our client in it. I'm faking it, like pretend like I know what's going on." (Trial Tr. at 260:2-19; Campbell Decl. Ex. YY.).  Plaintiff explained that during the deposition in question, she experienced a sudden onset of severe side effects due to having just received an intravenous dose of "3,000 milligrams of steroids" as part of an experimental treatment for her sudden onset blindness.  (Trial Tr. at 117:15-120:7.)  Dr. Cinthi Pillai, Plaintiff's doctor and a neuro-ophthalmologist, testified to confirm that these side effects are consistent with the treatment Plaintiff received, particularly at the high dosage of steroids she was receiving.  (Id. at 326:18-327:2.)  Plaintiff thus showed that this temporary onset of symptoms was not indicative of her underlying condition, nor of her ability to adequately complete depositions.  Moreover, Plaintiff demonstrated that she could adequately prepare and conduct depositions; she presented evidence of other depositions that she conducted during her employment at the Firm while suffering from LHON, (id. 112:23-113:6; 120:10-12; 196:8-11), depositions that she conducted after her termination from the Firm as a per diem attorney, (id. at 206:18-25), and depositions she has conducted in her current employment position, (id. at 206:18-25).[9]

Defendants last assert that Plaintiff was unable to properly oversee work she was delegating to paralegals.  (D.E. # 235 at 20.)  The evidence instead showed that Plaintiff appropriately

---

[9] Defendant Prakhin also incorrectly asserts that Plaintiff was unable to see handwritten exhibits presented to her at trial. (D.E. # 243 at 27-28; D.E. # 263 at 1-15.) This is a disingenuous retelling of the events that occurred at trial. Defense counsel attempted to admit handwritten notes made by Plaintiff's doctor into evidence by showing them to Plaintiff for the first time on the witness stand. (Trial Tr. at 300:16-301:10.) Plaintiff was able to see the document but could not make out the handwriting of the doctor. (Id. at 305:2-5.) Plaintiff's counsel objected to the admission of these medical records during Plaintiff's testimony, and I sustained the objection. (Id. 301:9-16.) Defendant Prakhin points to several other portions of the record where he alleges that Plaintiff could not adequately read documents presented to her. (D.E. # 243 at 33.) I find all of these instances to be similar misstatements that were the result of technology problems in the courtroom or Defense counsel's unpreparedness. To the extent that Defendant Prakhin argues that deciphering handwriting is an essential function of Plaintiff's job, (D.E. ##243 at 32; D.E. # 266 at 1-15), Defense counsel's effort to conflate difficulty reading sloppy handwriting with vision problems is unpersuasive. Plaintiff testified that she reviews handwritten documents in the course of her work and that she can call the drafter of the document to interpret their notes when certain scripts are "illegible." (Trial Tr. at 293:4-23.)

11

delegated tasks to plaintiffs that they were ordinarily responsible for completing, such as: (1) drafting court filings, (Trial Tr. at 75:4-79:19); (2) communicating with clients regarding discovery, medical appointments, and the status of their cases, (id. at 79:25-80:8); and (3) performing other "day-to-day tasks" required of them by their managing attorneys, (id. 80:19-25; 83:11-15). Testimony from Firm paralegals, supported by emails and audio transcripts presented at trial, also established that even when Plaintiff was out of the office seeking medical treatment, she kept in contact with her paralegals to review cases and action items. (Id. at 121:5-122:17, 1879:10-14.) Defendants' argument that there is undisputed evidence that Plaintiff could not oversee the routine work assigned to paralegals is therefore without merit.[10]

## 5.    Lack of Expert Testimony on Essential Functions

Defendant Prakhin additionally asserts that Plaintiff's claims fail as a matter of law because she was required to offer expert testimony to show that she could perform the essential functions of the job. (D.E. # 243 at 17.) However, the determination of a person's limitations due to their condition "usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(v). The jury was capable of assessing Plaintiff's testimony about what she could and could not do with her limited vision. Although experts may provide essential context in areas where jurors lack common knowledge, Fed. R. Ev. 702, the testimony, documents, recordings, and

---

[10] In Defendant Prakhin's reply brief, he inserts, with no argument, the transcript of an audio conversation between Plaintiff and a paralegal at the Firm shortly after Plaintiff received her LHON diagnosis. (D.E. # 266 at 38-39; Def. Ex. ZZZZZZZ.) It is not clear what counsel intends to establish with this transcript. To the extent that Defendant offers this in support of the argument that Plaintiff could not perform the essential functions of the position, Plaintiff does not say anywhere in the conversation that she cannot work. (See id. (telling Prakhin that she "fully intend[s] on working").)

Defendant Prakhin's reply references several other transcripts of recordings with little context and no citation. (D.E. # 266 at 39-42.) To the extent that these clippings of transcripts are part of the record, I am not persuaded that any of the evidence in these transcripts negates my findings throughout this opinion on what Plaintiff was able to prove at trial.

videos that showed what Plaintiff would be handling on a daily basis were sufficient for the jury to assess whether she could perform the job's essential functions in light of her condition.[11]

### iii.        Legitimate Reasons for Termination

To assert that they fired Plaintiff for legitimate, non-discriminatory reasons, Defendants rely on the prior argument that Plaintiff could not perform the essential functions of her job. (D.E. # 235 at 29.) As discussed, Plaintiff offered evidence that she was capable of performing the essential functions of her job as defined by Defendants. Additionally, the evidence at trial did not support Defendants' argument that Plaintiff was not performing her job to the Defendants' satisfaction, since according to Plaintiff, at no point did anyone at the Firm express concerns to Plaintiff about her job performance. (Trial Tr. at 197:12-20; 314:20-23; 414:2-415:16.) Since Defendants failed to establish as a matter of law that Plaintiff was not performing and could not perform the essential functions of her job, the argument that it is undisputed that they fired her for legitimate, non-discriminatory reasons necessarily fails.

### iv.        Reasonable Accommodation

Plaintiff offered evidence sufficient to meet her burden to show that the Firm failed to accommodate her requests for reasonable accommodations.[12] Defendants first argue that they reasonably accommodated Plaintiff in several ways. (D.E. # 235 at 23; D.E. # 243 at 19.) They contend that the magnifying glass that the office already owned provided Plaintiff with a

---

[11] I note that the Sixth Circuit case Defendant Prakhin cites to support his argument does not stand for the stated proposition. (D.E. # 243 at 17.) In Jakubowski v. Christ Hospital, Incorporated, plaintiff was a doctor who claimed his employment was wrongfully terminated because he had Asperger's. 627 F.3d 195 (6th Cir. 2010). Although plaintiff offered expert testimony during discovery about the ways that the hospital could have accommodated Jakubowski's Asperger's, the parties did not raise the issue of whether expert testimony was necessary to find liability. Id. at 199-200.

[12] Although the jury did not find Defendant Prakhin liable for the failure to accommodate claims, he appears to join in Defendant Firm's arguments and presents his own that the failure to accommodate claims should be dismissed. (D.E. # 243 at 19.)

reasonable accommodation.  (D.E. # 235 at 23-24; D.E. # 243 at 20.)  Plaintiff testified and presented evidence that during her employment she requested six assistive devices from the Firm: (i) a magnifying glass; (ii) a lighted-magnifying glass; (iii) a full-page magnifier; (iv) a Dragon dictation device; (v) OrCam (assistive vision) glasses; and (vi) JAWS software.  (Trial Tr. at 67:7-10, 126:24-37:18.)  Plaintiff testified that she requested all of these devices and that the Firm failed to provide her with any of these devices or to reimburse her for them.[13]  (Id. at 139:6-8.)  Although an employer is not required to provide the precise accommodation an employee prefers, Kemer v. Johnson, 900 F. Supp. 677, 686 (S.D.N.Y. 1995), it does need to provide one that is reasonable, Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 655 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2d Cir. 2003), and the Firm does not argue that any of Plaintiff's requested accommodations would have caused an undue burden, (D.E. # 235 at 22.).  Plaintiff presented evidence that she had to purchase five of these devices herself and was not reimbursed.  (Trial Tr. at 139:6-8.) Defendants also attempt to frame the unpaid leave granted during Plaintiff's treatments and the suggestion that she go on unpaid disability leave as accommodations.  (D.E. # 235 at 24.) However, the Defendants also point to these absences as the grounds for which she was terminated, effectively conceding that they fired Plaintiff for her disability.  (Id.)

---

[13] Although Defendants claim specifically that Plaintiff never asked Defendants to pay for the JAWS program, merely asking for permission to install it, Plaintiff did present testimony that she requested reimbursement and Defendants were opposed to paying for the accommodation:

Q Did you have a conversation with Mr. Prakhin about the purchase of JAWS for you?
A Yes, I told him that might be helpful for me.
Q And you asked Mr. Prakhin directly?
A Yes.
Q And what did he say?
A He said that if I purchased it myself, I can – install it on – I can try to install it.
Q Did he offer to pay for the installation?
A No, he wanted to make sure he didn't pay for the installation.
(Trial Tr. at 137:2-12.)

Defendants next argue that Plaintiff failed to make a reasonable and good faith effort to engage in an interactive process with the Firm. Under the ADA, after an employee has provided notice of their disability, an employer is required to engage in an interactive process with the employee to assess whether the employee's disability can be reasonably accommodated. See Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 658 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2d Cir. 2003). Defendants argue that Plaintiff inhibited this process, contending that a party that "fails to communicate, or withholds important information solely within the knowledge of that party, can be found to have obstructed the [interactive] process in bad faith." (D.E. # 235 at 24; D.E. # 243 at 20); Thompson v. City of New York, No. 98-cv-4725 (GBD), 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9, 2002) (citing Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000)). Plaintiff's evidence showed that she was communicative about her necessary absences, her eventual diagnosis, and her requested accommodations. (Trial Tr. at 111:11-112:19; 114:2-23; 115:19-116:23; 187:20-188:19; 139:2-8.)

Defendants again argue that because Plaintiff did not submit proof of her medical status in writing to the Firm, she withheld necessary information from the Firm. (D.E. # 235 at 24; D.E. # 243 at 23.) As discussed, Plaintiff was not required to provide documentation. See supra Section I.B.i. Plaintiff testified that she put the Firm and her supervisors on notice of her medical condition and was never asked for documentation. See Malzberg v. New York University, 19-cv-10048 (LJL) 2022 WL 889240, at *16 (S.D.N.Y. March 25, 2022) ("The interactive process does not impose on Plaintiff the unilateral obligation to offer a proposed accommodation or provide medical documentation unprompted."). This key fact, that the Firm never asked for documentation, distinguishes the facts here from the cases Defendants cite in their motion. In Thompson, the plaintiff was a special education teacher who alleged, among other claims, ADA discrimination

related to treatment for her cervical cancer. 2002 WL 31760219, at *1. The court ultimately found that the plaintiff could not bring a reasonable accommodation claim because when her employer asked for medical documentation, "[p]laintiff refused to provide it, stating that it had been previously submitted and that the school would have to 'subpoena' it if it wanted it." Id. at *8. Here, by contrast, Plaintiff stated that she was never asked for documentation to support her absences or requests for accommodation. See also Durick v. New York City Dep't of Educ., 202 F. Supp. 3d 277, 290 (E.D.N.Y. 2016) (finding plaintiff abandoned her request for an accommodation when she failed to show up for the medical examination her employer requested).

Defendants also argue that they could not have reimbursed Plaintiff because she did not submit written reimbursement requests to the Firm. (D.E. # 235 at 26; D.E. # 243 at 23.) However, Plaintiff testified that it was routine practice to only submit reimbursement requests for expenses that one knew would be reimbursed. (Trial Tr. at 240:4-14.) As Plaintiff testified, her requests for accommodation and reimbursement were denied in-person, (id.), making any documented reimbursements she would have submitted futile.

Defendants next assert that Plaintiff's case for reasonable accommodation is inconsistent with statements she made to the EEOC before bringing this action. (D.E. # 235 at 25-26; D.E. # 243 at 19.) In her submission to the EEOC, Plaintiff detailed her diagnosis with LHON, her disclosure of her condition to Prakhin, and her subsequent actions to continue working with her condition. After describing being diagnosed and disclosing her condition, Plaintiff stated "[n]ot once did I ask the Firm to foot the bill as I explored new accommodations that would make working with LHON easier for me" but that her employers "later became aware that I had purchased these devices, yet never offered to cover their cost or otherwise accommodate me." (Campbell Decl. Ex. TT at 3.) At trial, Plaintiff stated that she did ask Defendants to purchase or reimburse her for

16

assistive devices and was told they would not be approved.  (Trial Tr. 126:20-131:25; 134:3-137:15.)  Counsel for Defendants cross-examined Plaintiff on this asserted inconsistency during trial, and Plaintiff clarified that "I didn't ask him to reimburse me after I was diagnosed with LHON.  I asked him before I was officially diagnosed." (Trial Tr. at 238-239.)  Whether it was an inconsistency at all or, if so, a material one was an issue of credibility for the jury to resolve.[14]  See Lazzari, 751 F. App'x at 102 (detailing the standard for a reasonable accommodation claim).  This alleged inconsistency did not defeat her claim as a matter of law.

Finally, Defendants argue that Plaintiff failed to show that she could be reasonably accommodated. (D.E. # 235 at 27.)  Defendants assert that Plaintiff ultimately stopped using all the requested devices in favor of other accommodations that she discovered, so there was no accommodation at the time that would have enabled her to perform the job.  (Id.)  But the Firm was not required to provide Plaintiff with "any particular accommodation plaintiff requested, 'only some accommodation, as long as it was reasonable.'"  Williams v. British Airways, PLC, No. 04-cv-0471 (CPS) (SMG), 2007 WL 2907426, at *9 (E.D.N.Y. Sept. 27, 2007) (citing Picinich v. United Parcel Service, 321 F. Supp. 2d 485, 510-11 (N.D.N.Y. 2004)).  Accepting Plaintiff's evidence as I must on this Motion, no reasonable accommodation was offered.  Moreover, Defendants offer no case law or facts to support the assertion that because Plaintiff ultimately transitioned to other assistive devices, her initial accommodation requests must have been

---

[14] Defendant Prakhin also contends that Plaintiff is judicially estopped from arguing that she was not reasonably accommodated based on her statements to the EEOC. (D.E. # 243 at 45.) "The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that is successfully advanced in another proceeding." Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004). To prevail on this claim, "a party invoking judicial estoppel must show that: (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding; and (2) that position was adopted by the first tribunal in some manner, such as rendering a favorable judgment." Id. (alteration and citation omitted). Defendant has failed to make this showing.

unreasonable or ineffective. In sum, Plaintiff presented sufficient evidence to show that the Defendant Firm failed to reasonably accommodate her disability.

## II.     Defendants' Motion for New Trial

### A.     Legal Standard

Federal Rule of Civil Procedure 59(a)(1)(A) permits a district court to "grant a new [jury] trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted." The general grounds for a new trial are: (1) the verdict is against the clear weight of the evidence, (2) the trial court was not fair, (3) substantial error occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury, or (4) damages are excessive. Lawson, 920 F. Supp. 2d at 339. "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). In deciding a Rule 59 motion, a district court can "weigh the evidence [itself]" and "need not view it in the light most favorable to the verdict winner." Id. However, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 106 (2d Cir. 2002).

### B.     Application

#### i.     Medical Witnesses and Records

Defendants move for a new trial and argue that they were prejudiced by misrepresentations and delays in the production of evidence related to Plaintiff's medical history. (D.E. # 234 at 2; D.E. # 243 at 35, 39; D.E. # 266 at 15.) Defendants' objection centers on records and depositions from three of Plaintiff's doctors: (1) Dr. Anna Shostak, Plaintiff's psychiatrist; (2) Dr. Cinthi Pillai,

Plaintiff's neurologist; and (3) Dr. Martin Falk, another of Plaintiff's psychiatrists.  (D.E. # 234 at 9-11.)[15]

Defendants had notice of the existence of all three doctors throughout discovery based on medical records and responses to interrogatories disclosed in 2019.  In December, before the trial in February, Defendants were given notice of Plaintiff's intent to call them as witnesses.  (See D.E. # 197 ("Joint Pre-Trial Order," or "JPTO") at 11 (identifying Dr. Shostak as a witness Plaintiff intended to introduce in her case in chief); D.E. # 233-08 (medical records from Dr. Pillai included in production to Defendants in December 2019); D.E. # 234 at 5-7 (Defendants attempted to subpoena Dr. Falk several times throughout discovery).)  Moreover, I allowed Defendants to depose Dr. Falk during the trial for two hours prior to his in-court testimony.  (Trial Tr. at 165:20-24, 168:3-22.)  Although I do not condone Plaintiff's lack of diligence in obtaining and providing all of Plaintiff's medical records in a timely fashion, Defendants have not shown prejudice. Neither party admitted any of the documents at issue, and Defendants have made no showing as to how these documents would have changed their trial presentation.  (D.E. # 263 at 8.)[16, 17] Although Defendants assert in their reply that the late-produced documents "could and would have changed Defense's case strategy" (D.E. # 263 at 8), Defendants do not explain how this would

---

[15] Defendants' motion mentions several other medical professionals who did not testify at trial and therefore are not addressed in this Memorandum & Order.  (D.E. # 234 at 4-5.)

[16] Defendants also claim prejudice from not being permitted to cross examine Plaintiff about her certification of the medical records.  (D.E. # 234 at 14.)  I sustained Plaintiff's objection to this line of questioning because under Federal Rule of Evidence 403, addressing this issue would have created a needless digression into highly debated discovery issues, which would have implicated trial counsel.  See In re WorldCom, Inc. Sec. Litig., No. 02-cv-3288 (DLC), 2005 WL 375314, at *3 (S.D.N.Y. Feb. 17, 2005) ("To the extent that problems arose during the discovery process, those issues are to be addressed to the Court, not the jury.")

[17] Defendant Prakhin in his filings further alleges "fraud" and "lies" related to the disclosure of Plaintiff's medical history.  (D.E. # 243 at 35, 39; D.E. # 266 at 15.)  Since I find no prejudice from the disclosure of medical records and history, I do not address these arguments.

have changed their approach at trial.    In sum, the late identification by Plaintiff of medical witnesses and the delayed production of medical records does not merit a new trial.

### ii.        Handling of Lay Witnesses

Defendants also allege that Plaintiff "with[eld] the identities of relevant fact witnesses." The witnesses they object to are: (1) Sandra Beron, (2) William Lawlor, (3) Dmitry Levitsky, and (4) Peter Coates. (D.E. # 234 at 19.)[18]  As resolved during motions in limine, I precluded Plaintiff from calling several witnesses but found Defendants were aware of witnesses Beron, Lawlor, and Levitsky as far back as 2019 when the litigation began. (D.E. # 154 at 2.)  Although Plaintiff did not list them as she should have in her initial disclosures, Defendants were aware of these witnesses, who were identified across thousands of pages of documents produced during discovery and identified during depositions and in response to interrogatories.  (See D.E. # 141 at 29-30 (listing the multiple sources of identification for each witness).)  Defendant Prakhin also objects to my decision to allow Peter Coates to testify based on his alleged bias against Defendant Prakhin. (D.E. # 243 at 46-47.)  Defendants were given the opportunity to depose Coates prior to trial and to cross examine him on any alleged animus for the Defendant.  (D.E. # 233-45; see generally Trial Tr. at 1111:10-1202:3.)[19]

### iii.        Failure to Dismiss Jurors

Defendants allege that Magistrate Judge Henry erred by not dismissing two jurors.  (D.E. # 234 at 19.)  Defendants failed to preserve this issue.  On no less than four occasions after raising the juror objections, Defendants declared that the jury as selected was satisfactory.  I twice asked parties if the jury was satisfactory, once before the jury was brought out and once in the presence

---

[18] Defendants' filing also lists several other individuals who did not testify at trial and are therefore not addressed in this Memorandum & Order.  (D.E. # 234 at 19.)

[19] I note in passing that the eccentric Mr. Coates was not a particularly effective witness for the Plaintiff.

of the jury. (Trial Tr. 3:4-7; 9:4-12.) Both times, Defendants affirmed that it was, without raising any objections. (Id.) Magistrate Judge Henry also made this inquiry twice at the conclusion of jury selection, and both times Defendants affirmed that the jury was satisfactory and failed to object. (D.E. # 248, Ex. 30 ("Jury Tr.") at 146:25-147:5; 148:6-11.)

Moreover, if I were to reach the merits of these claims, I would reject them. Courts generally "review a district court's rulings regarding dismissal of jurors for abuse of discretion, and reverse only if there is 'clear abuse' of the district court's discretion." Cruz v. Jordan, 357 F.3d 269, 270 (2d Cir. 2004) (citing United States v. Nelson, 277 F.3d 164, 202 (2d. Cir. 2002). The Second Circuit has made clear that the standard for challenging a juror is a demanding one. "Indeed, there are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury." Nelson, 277 F.3d at 201-202 (citing United States v. Ploof, 464 F.2d 116, 118, n.4 (2d Cir. 1972)).

Defendants objected to Juror #3, who had recently been fired and thought it was "kind of discrimination." (Jury Tr. at 44:3-6.) Juror #3 was not struck by either party and served on the jury. As the court stated in Perez v. Manhattan Jeep Eagle, "Defendants have not pointed to any cases, nor is this Court aware of any precedent, for the proposition that a prospective juror who has experienced employment discrimination is to be automatically struck from a jury panel for cause." No. 92-cv-9521 (DLC), 1997 WL 403458, at *7 (S.D.N.Y. July 17, 1997). Further, Magistrate Judge Henry explicitly asked Juror #3 whether, given her history, she could "objectively review evidence and follow the trial judge's instruction on the law." (Jury Tr. at 44:20-45:2.) Juror #3 answered "Yes." (Id.) Juror #3's clear and unambiguous affirmation indicates that there was no abuse of discretion in failing to dismiss Juror #3. See Lewis v. Am.

Sugar Ref., Inc., 325 F. Supp. 3d 321, 336 (S.D.N.Y. 2018) (ruling that a clear and unambiguous response to whether the juror could be impartial was sufficient to not warrant dismissal).

Defendants also allege that the Magistrate Judge erred by not dismissing Juror #16 for cause because the juror previously worked for over 11 years with people with developmental disabilities. (D.E. # 234 at 16.) Although Juror #16 initially expressed concern that this experience would cause him to be biased in favor of Plaintiff, the juror affirmatively said that he could objectively listen to the evidence and then apply the judge's instructions on the law. (Jury Tr. at 37:13-38:6.) In light of this affirmation, Magistrate Judge Henry did not abuse her discretion by not dismissing the juror. See Lewis, 325 F. Supp. 3d at 336. Moreover, I note that Defendants exercised one of their preemptory challenges to strike this juror. (Jury Tr. at 144:18-147:5.) In the criminal law context, "a party's use of peremptory challenge to remove a juror that should have been struck by the court will not give rise to a claim, post-trial, unless the party foregoes using their peremptory strike and the juror actually sits on the jury." Id. (citing United States v. Martinez-Salazar, 528 U.S. 304, 315-16 (2000)). The Court of Appeals for the Second Circuit has not formally opined on whether this applies to civil cases but has noted, in dicta, that the rule should be the same across the criminal and civil contexts. Id. (citing Cruz v. Jordan, 357 F.3d 269, 271 (2d Cir. 2004)). I conclude that rule applies to civil cases.

### iv.      Statements by the Court

Defendants argue that I erred because my conduct during the trial demonstrates "clear bias" against Defendants. (D.E. # 234 at 23.) According to Defendants, I did this by taking over cross examination of witnesses, making erroneous rulings, and demeaning counsel in the jury's presence. (Id.) The cited examples of this purported bias establish the frivolous nature of this claim. The legal standard to demonstrate bias is a demanding one. The judge's behavior must

have been "so prejudicial that it denied a party a fair . . . trial." Manganiello v. City of New York,

612 F.3d 149, 169 (2d Cir. 2010).

First, I note that none of the examples cited in Defendants' motion remotely constitute my

taking over the examination of a witness.   There were occasions not cited where I asked a few

questions of a witness (see, e.g., Trial Tr. at 109:5-9; 295:5-10), but asking even "numerous and

probing questions of witnesses" is "unquestionably proper." United States v. Manko, 979 F.2d

900, 905 (2d Cir. 1992).   My questioning served the entirely proper purpose of clarifying

ambiguities and in no way suggested I had any view of the case.   To emphasize this point, in my

jury instructions I stated:

> [L]et me be clear that I am expressing no opinion about how you should decide the
> facts of this case.  Nothing that I have said or done in the course of the trial should
> be taken by you as expressing any opinion about the facts.  On occasion I may have
> asked questions of a witness.  You should attach no special significance to these
> because they were asked by the Court.  It is your function, not mine, to determine
> the facts.  If I made an expression, asked a question, or issued a ruling that seemed
> to indicate to you that I do have an opinion about the case, I instruct you to disregard
> it.

(Trial Tr. 2133:3-13.)  My questions did not approach the extent of the trial judge's questions in

Shah, a case cited by Defendants, which were found not to merit a new trial. Shah v. Pan Am.

World Servs., Inc., 148 F.3d 84, 98 (2d Cir. 1998).

Defendants also claim that I expressed bias in my evidentiary rulings.   The only ruling

referred to is the decision to preclude cross-examination of the certification by Plaintiff during

discovery that all of her medical records had been provided.   (D.E. # 234 at 11-12; Trial Tr. at

305:14-306:14.)  This ruling was based on a Rule 403 analysis that the prejudicial and confusing

nature of this evidence substantially outweighed its probative value.  Fed. R. Evid. 403.   As

discussed in Footnote 16, to get into problems with discovery would have resulted in a diversion

into the discovery process, which would have inevitably implicated trial counsel as potential

witnesses.   Moreover, the Second Circuit has repeatedly held that an adverse ruling cannot constitute a claim of judicial bias.  See, e.g., Doe v. E. Lyme Bd. of Educ., 962 F.3d 649, 666 n.27 (2d Cir. 2020) ("Prior adverse rulings are not evidence of judicial bias."); Sheafen Kuo v. Gov't of Taiwan, 802 F. App'x 594 (2d Cir. 2020) ("[A]n adverse ruling is not evidence of bias."); Saleh v. Pastore, No. 21-1073, 2021 WL 4978574, at *3 (2d Cir. Oct. 27, 2021) ("[A]dverse rulings are not evidence of bias.").

Finally, I address the claim that I demeaned counsel for Defendant Prakhin in front of the jury.  (D.E. # 234 at 23.)  As the trial judge, I had a duty to "maintain the order and decorum necessary for a fair trial."  United States v. Bentvena, 319 F.2d 916, 944 (2d Cir. 1963).  Counsel's conduct from the opening statement throughout the trial required enormous judicial restraint. (See, e.g., Trial Tr. 55:6-13 (defense counsel injecting his personal opinion during opening statements); 343:1-9 (asking me during Plaintiff's cross examination to take Judicial Notice of Disciplinary Rules when Plaintiff had not denied that she had an obligation called for by the Rules); 1065:5-1066:7 (suggesting that a witness had an obligation to bring documents to court).) Moreover, my concern for moving the case along and for holding counsel to appropriate behavior was not reserved for Defendant Prakhin's counsel.   For example, Plaintiff's counsel was admonished for speaking out during Defendants' examination, (Trial Tr. 298:23-299:5), and for injecting her personal opinion during summation, (id. 2016:17-21).

### v.    Introduction of Financial Records and Bifurcation of Damages

Defendants raise the same objections to the introduction of financial records that they did pre-trial, alleging that records of the Defendant Firm and Defendant Prakhin's earnings in the years preceding and following Plaintiff's firing were irrelevant and prejudicial to the Defendants.  (D.E. # 234 at 26.)  As I ruled when I denied Defense's motions in limine, the financial records were

relevant to rebut the undue hardship defense that was raised pre-trial. Although Defendants now argue that they did not make an undue hardship defense, (id. at 26 n.2), as I told them pre-trial, Plaintiff still needed to prove that she was fired for discriminatory reasons and that Defendants' stated reasons were mere pretext. When Defendant fired the Plaintiff, the explanation he gave was that it wasn't "worth it to him" to employ her. (Trial Tr. at 394:8-11.) Plaintiff was entitled to introduce records to rebut that explanation to show discrimination, regardless of whether a formal undue hardship defense was asserted.

Defendants also renew their pre-trial arguments seeking to bifurcate the punitive damages portion of the trial from the liability portion. (D.E. # 234 at 26.) Although bifurcation is "favor[ed]," the Second Circuit "leave[s] the mode of trial ultimately to the discretion of the district judge." Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 283 (2d Cir. 1990) (citations omitted) (upholding the district court's denial of bifurcation). District courts routinely decline to bifurcate the liability and damages portions of a trial where the evidence for both overlaps. See, e.g., Mensler v. Wal-Mart Transp., LLC, No. 13-cv-6901 (JCM), 2015 WL 7573236, at *4 (S.D.N.Y. Nov. 24, 2015) (denying bifurcation when the "evidence in this matter regarding liability and damages . . . overlaps"); McLeod v. Llano, No. 17-cv-6062 (ARR) (RLM), 2021 WL 1669732, at *3 (E.D.N.Y. Apr. 28, 2021) (denying bifurcation and noting that any prejudice associated with the admission of defendant's financial means "can be mitigated through an appropriate limiting instruction"). As said above and pre-trial when I denied Defendants' motions in limine on the objection, (D.E. # 154 (Pretrial Conference Transcript Dec. 19, 2022) at 109:21-110:24), the financial information is not merely admissible in the context of punitive damages, but also to rebut Defendants' offered explanation for their decision to terminate Plaintiff's employment. Because of this overlap, I exercised my discretion to deny bifurcation of the evidence of financial records.

### vi.      Error Instructing Jury

Finally, Defendants take issue with allegedly misleading language in the jury instructions. (D.E. # 234 at 29; D.E. # 243 at 42.)  "An erroneous jury instruction requires a new trial, unless the error is harmless."  Velez v. City of New York, 730 F.3d 128, 134 (2d Cir. 2013).  It is well settled that "[a] jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Lore v. City of Syracuse, 670 F.3d 127, 156 (2d Cir. 2012) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 153 (2d Cir. 1997)).  "A jury instruction will be deemed adequate if the charge . . . is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." Id. (internal citation omitted).

Defendants object to the instruction on the third element of Plaintiff's disability-discrimination claim, stating that Plaintiff must prove by a preponderance of the evidence that "Plaintiff is otherwise qualified to perform the 'essential functions' of the job with or without a 'reasonable accommodation' by the employer." (D.E. # 234 at 29; Trial Tr. at 2142:18-20.) Specifically, Defendants assert that the instruction should have contained the word "was" instead of the word "is" to make clear that Plaintiff's ability to perform the essential functions was to be assessed at the time of termination, not at the time of trial.  (D.E. # 234 at 30; D.E. # 243 at 44.) However, later in the instructions, I made this exact distinction when describing the third element of her claim: "The plaintiff must show that she can perform all of the essential functions of the job, with or without reasonable accommodation, at the time of her termination." (Trial Tr. at 2145:17-19 (emphasis added).)  I further elaborated on the static nature of the finding of Plaintiff's ability to complete the job: "[T]he defendant law firm is not required to speculate that the plaintiff's condition will improve if she is not able to fill all of the essential elements of the job at the time in

question." (Id. 2145:23-2146:1.)  The timing of the finding of the third element was thus made

clear, and there was no error.

## III.     Defendants' Motion for Remittitur of Damages

### A.     Legal Standard

Defendants move in the alternative to remit the award of compensatory and punitive

damages.  (D.E. # 234 at 31.)  Federal Rule of Civil Procedure 59(a) permits a district court to

"overturn an excessive award and either unconditionally order a new trial or condition a new trial

on the plaintiff's refusal to accept a reduction, or remittitur, in the award."  Leo v. Long Island

R.R. Co., 307 F.R.D. 314, 321 (S.D.N.Y. 2015).  A remittitur may be authorized in at least two

circumstances:

> (1) where the court can identify an error that caused the jury to include in the verdict
> a quantifiable amount that should be stricken, . . . and (2) more generally, where
> the award is "intrinsically excessive" in the sense of being greater than the amount
> that a reasonable jury could have awarded, although the surplus cannot be ascribed
> to a particular, quantifiable error.

Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (alteration in original) (citation omitted).

Nevertheless, a district court "may not set aside the jury's award as excessive unless 'the award is

so high as to shock the judicial conscience and constitute a denial of justice.'"  Leo, 307 F.R.D. at

321-22 (citation omitted).  Generally, this analysis requires the district court to "discern 'an upper

limit' and assess whether the jury [award] has surpassed it."  Id. at 322.[20]

---

[20] Defendants argue that damages here are capped under the ADA.  (D.E. # 234 at 32.)  Although the ADA
caps the total amount of compensatory damages and punitive damages for an employer with more than 14 and fewer
than 101 employees at $50,000, 42 U.S.C § 1981a(b)(3)(A), damages for the same claims under the NYSHRL and the
NYCHRL are unlimited.  See N.Y. Exec. Law § 297(9).  Therefore, the ADA cap "does not limit the compensatory
and punitive damages otherwise available under the NYSHRL and NYCHRL."  See Antoine v. Brooklyn Maids 26,
Inc., 489 F. Supp. 3d 68, 105 n.15 (E.D.N.Y. 2020) (same, in the Title VII context).

### B. Application

#### i. Emotional Distress Damages

The jury awarded Plaintiff $300,000 in emotional distress damages. "To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be supported by competent evidence in addition to a plaintiff's subjective testimony." Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (citation and quotation marks omitted). In the Second Circuit, emotional distress awards are generally grouped into three categories: (1) garden-variety, (2) significant, and (3) egregious. Graham v. City of New York, 128 F. Supp. 3d 681, 714 (E.D.N.Y. 2015). Parties here agree that this is a significant emotional distress claim, (D.E. # 234 at 36; D.E. # 246 at 44), which is generally described as follows:

> Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. . . . In significant or egregious cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

Thorsen v. Cnty. of Nassau, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010) (citation omitted).

Plaintiff testified that as a result of her termination she stopped "sleeping, eating" and "lost a lot of weight." (Trial Tr. at 199:9-10.) Plaintiff reported that she suffered from "anxiety," "panic attacks," "depression," and "sleeplessness" in addition to experiencing a loss of confidence and identity. (Id. at 201:19-22.) Medical testimony and documents supported Plaintiff's testimony. Following her termination, Plaintiff continued to see her psychiatrist, Dr. Shostak, and also saw a new therapist, Dr. Falk, to treat her deteriorating mental health. (Id. at 201:23-202:18.) Both testified that Plaintiff experienced anxiety attacks, sleeplessness, "constant worrying", and PTSD due to the circumstances of her termination. (Id. at 1208:15-1209:15, 1214:17-1216:17; 1690:7-9; 1697:6-1698:11.) Because of her mental suffering, Plaintiff was placed on several medications

to treat anxiety and depression. (Id. at 1215:1-1216:17; 1232:9-1233:21; 1680:15-1681:17; 1695:2-1696:4.) Plaintiff and both doctors reported ongoing emotional distress from the traumatic events of her termination, with Plaintiff continuing on medication through the period of trial for her depression and anxiety. (Id.)

Defendants emphasize Plaintiff's prior psychiatric treatment to support their argument, (D.E. # 234 at 33), but, in fact, the temporal distance between her prior treatment and her firing supports Plaintiff's emotional distress claim. Plaintiff had been seeing Dr. Shostak since 2008, principally for Attention Deficit Disorder. (Trial Tr. at 354:5-12.) She had also experienced periods of anxiety that were temporarily treated with medication, but Plaintiff was taken off those medications in 2011. (Id. at 1255:3-25, 1291:18-1293:9, 1665:2-23, 1684:2-1687:3.) Plaintiff also never experienced panic attacks during these prior periods of anxiety treatment. (Id. at 199:13-14.) Notably, Dr. Shostak reported that even in October 2018, as Plaintiff was losing her vision, she was not assessed to be suffering from any mental health conditions. (Id. at 1688:11-20.)

Courts vary widely in their assessing of jury awards of compensatory damages. For significant emotional distress damages, the courts in this Circuit "have routinely found that awards ranging from $100,000 to $500,000 are not excessive." Thorsen, 722 F. Supp. 2d at 293. "Usually, however, the top of the range for significant emotional distress damages is $200,000." Duarte v. St. Barnabas Hosp., 341 F. Supp. 3d 306, 320 (S.D.N.Y. 2018) (citation omitted).

When reviewing emotional distress damages with corroborating medical evidence,[21] courts consider factors such as whether there is physical manifestation of the emotional distress, whether

---

[21] Defendants also cite cases where the court reduced emotional distress damages because they found them to be of the "garden variety" kind. (D.E. # 234 at 35.) See, e.g., Duarte, 341 F. Supp. 3d at 321 ("Plaintiff's vague and subjective complaints of insomnia, lower self-esteem, depression, anxiety, and stomach aches and headaches –

such manifestation persists, and whether the discrimination resulted in a loss of job, benefits, or other tangibles. See, e.g., Olsen, 615 F. Supp. 2d at 46-49 (considering for each plaintiff's award of emotional distress what physical manifestations of distress they presented with and whether the symptoms continued to present day); Lore, 670 F.3d at 179 (distinguishing plaintiff from cases with higher damages because plaintiff did not lose her job or benefits).  Courts tend to award damages on the lower end for significant emotional distress claims when there is no permanent, physical manifestation of emotional distress. See, e.g., Rainone v. Potter, 388 F. Supp. 2d 120, 126 (E.D.N.Y. 2005) (finding that $175,000 in compensatory damages was excessive for significant emotional distress because "there was no evidence of physical manifestations of emotional distress or debilitating alterations in lifestyle, and no evidence of permanency.").

Here, Plaintiff presented evidence that she suffered from a physical manifestation of emotional distress that continues to this day from the loss of her job and benefits.  There are certainly cases of this nature where Courts have awarded compensatory damages below $300,000 for emotional distress damages.  See, e.g., Lore, 670 F.3d at 177-80 (upholding compensatory emotional-distress damages of $250,000 as "generous" where Plaintiff did not lose her job or benefits); Emamian v. Rockefeller Univ., No. 07-cv-3919 (DAB), 2018 WL 2849700, at *17-19 (S.D.N.Y. June 8, 2018) (reducing $2 million significant emotional distress award to $200,000 where significant emotional distress was established by "Plaintiff's own testimony regarding her mental state, her trichotillomania [a condition characterized by a compulsion to pull out one's hair] and physical manifestations of her emotional suffering, as well as the corroborative medical testimony she presented").  However, courts have upheld emotional distress damages of $300,000, or far more, in cases with comparable evidence of physical and emotional impact on plaintiffs.

---

unsupported by medical corroboration – establish no more than 'garden variety' emotional distress.").  Those cases are not relevant in view of the evidence of significant emotional distress in this case.

See, e.g., Thorsen, 722 F. Supp. 2d at 293-95 (remitting a $1,500,000 emotional distress award to $500,000 where the plaintiff and treating psychologist testified to the plaintiff's anxiety, depression, difficulty sleeping, anxiety attacks, and medications taken as a result of plaintiff's reduction in job duties); Olsen, 615 F. Supp. 2d at 47-49 (sustaining jury awards of $500,000 and $400,000, respectively, to two plaintiffs based on testimony from the plaintiffs and their doctors about the impact of discrimination in the workplace that did not result in loss of job); Marchisotto v. City of New York, No. 05-cv-2699 (RLE), 2007 WL 1098678, at *3, 9-11 (S.D.N.Y. Apr. 11, 2007) (upholding $300,000 emotional distress award where a psychologist corroborated that the plaintiff suffered from PTSD, depression, and anxiety), aff'd, 299 F. App'x 79 (2d Cir. 2008).

Although the jury's award of emotional distress damages is on the higher end, the award is not so out of line with the range of awards in comparable significant emotional distress cases as to shock my conscience. As such, I decline to reduce the award of emotional distress damages.

ii.     **Lost Pay**

Defendant Firm contests the actual damages awarded by the jury in back pay and front pay. (D.E. # 234 at 36.) Plaintiff bears the burden of proving damages with "reasonable certainty," Loc. No. 46 Metallic Lathers Union & Reinforcing Iron Workers Welfare Tr., Annuity Fund, Pension Fund, Apprenticeship Fund, Vacation Funds, Scholarship Fund, & Other Funds v. Brookman Const. Co., No. 12-cv-2180 (ARR), 2013 WL 5304358, at *3 (E.D.N.Y. Sept. 19, 2013) (quoting Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir.1999)), and damage awards may not be based on "speculation or conjecture," Olaechea v. City of New York, No. 17-cv-4797 (RA), 2022 WL 3211424, at *8 (S.D.N.Y. Aug. 9, 2022) (quoting Trademark Rsch. Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993)).

### 1.    Back Pay

"The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination." <u>Saulpaugh v. Monroe Cmty. Hosp.</u>, 4 F.3d 134, 145 (2d Cir. 1993) (citation omitted).  Prevailing plaintiffs are entitled to back pay calculated as the wages that they lost from the time of discharge until the date of judgment.  <u>Id.</u> at 144.  A standard back pay award includes lost wages as well as "any anticipated raises, step increases, cost of living increases, and other increases necessary to make the plaintiff whole." <u>E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.</u>, 186 F.3d 110, 124 (2d Cir. 1999). Although the basis for back pay need not be shown with "mathematical precision," it must be established with "reasonable certainty." <u>Mugavero</u>, 680 F. Supp. 2d at 581 (citations omitted).

At trial, Plaintiff presented her payroll records as evidence of her anticipatory raises, Christmas bonuses, and wage benefits.  (D.E. # 248, Ex. 17.)  It is undisputed that Plaintiff was earning annual base salary of $100,000 when she was discharged from the firm.  (JPTO at 6.) Plaintiff showed that her salary as an attorney increased from $35,000 in September 2012 to $80,000 in February 2017 when she left for another firm.[22]  (<u>Id.</u>)  When Ruderman returned in 2018, her salary was $100,000.  (<u>Id.</u>)  Ruderman's testimony explained that employees are guaranteed a raise of $5,000 annually but can receive a raise of $10,000 for doing a "good job." (Trial Tr. at 85:23-86:5.)  Plaintiff reportedly received the $10,000 increase several times.  (<u>Id.</u>) On average over the first five years of Plaintiff's employment, her salary increased $9,000 annually.  It is therefore reasonable for the jury to have estimated that her salary would increase $7,500 annually for the years from her firing to judgment.

---

[22] Plaintiff previously made $35,000 before she became an attorney in November 2012. (Trial Tr. at 70:5-7.)

Plaintiff also testified that the Firm paid a Christmas bonus equivalent to an employee's weekly salary. (Trial Tr. at 86:6-13.) Payroll records confirm that "around the middle of December" every year, Plaintiff received an additional sum equal to her weekly paycheck. (Id.; D.E. # 248, Ex. 17.) Payroll records showed that Plaintiff's weekly paycheck in 2018 was $1,923.20 before she was terminated, (id.), so it is reasonable for the jury to conclude that her Christmas bonus would have been the same.

Plaintiff also provided evidence to support her estimated commissions. Plaintiff's IRS Form 1099 was admitted into evidence and showed a payment of $19,444 made to Plaintiff from Defendant Firm in 2019. (D.E. # 248, Ex. 18.) Plaintiff testified that this sum was received from Defendant Firm as commission for a case of hers that settled in 2018.[23] (Trial Tr. at 204:23-205:10.) Defendants submitted evidence that Plaintiff was also paid $650 in commissions during Plaintiff's employment from September 2018 to December 2018. (Id. at 459:6-18; D.E. # 248, Ex. 16.) Plaintiff thus earned $20,094 in settlement commissions during a six-month period at the firm. It would be reasonable for the jury to estimate that she would earn $40,188 in commissions annually had she continued to work at the Firm.

The jury then subtracted wages Plaintiff earned during that period from back pay. Plaintiff submitted documentation of all mitigation pay earned after her termination. (D.E. # 248, Ex. 19 (IRS Form 1099s).) The parties appear to agree on the calculation of mitigation earnings. (D.E. # 234 at 40 (showing mitigation earnings of $8,850 in 2019; $43,351.31 in 2020; and $29,225.27 in 2021); D.E. # 246 at 54 (same).) Plaintiff testified, and documents supported, that Plaintiff

---

[23] Defendants argue in their papers that this was not a commission, but a "referral fee" paid to Plaintiff for a case brought to the Defendant Firm. (D.E. # 234 at 39.) Defendants submitted no evidence of this fact, nor did they argue this at trial.

began working at American Transit Insurance Company in April 2022, earning $85,000 per year. (Trial Tr. at 219:13-22.)

Summing all of Plaintiff's lost wages and subtracting mitigating wages earned would amount to back pay of over $548,000, in excess of the $535,000 the jury awarded. Back pay therefore should not be reduced.

### 2.      Front Pay

The jury also awarded front pay of $300,000. Front pay is awarded "where reinstatement is inappropriate" and "where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr., 652 F.3d 277, 286 (2d Cir. 2011) (internal citations and quotation marks omitted). Defendants do not contend that reinstatement is feasible in this case. They instead argue that Plaintiff cannot recover front pay because she found comparable employment or, in the alternative, that only one year of front pay is appropriate. (D.E. # 234 at 41; D.E. # 263 at 32-33.)

Although Plaintiff found alternative employment in 2022, Plaintiff showed that she makes significantly less at her new job than she would have at the Firm. Even though her work at American Transit Insurance Company is "almost exactly the same" as her work at Defendant Firm, Plaintiff's annual compensation is only $85,000. (Trial Tr. 68:4-9; 215:18-25; 219:21-22.) Although comparable employment need not be identical in remuneration, Hill v. Airborne Freight Corp., No. 97-cv-7098 (FB), 2003 WL 366641, at *5 (E.D.N.Y. Feb. 20, 2003), Plaintiff has shown that she would make substantially more at the Firm via her anticipated wage increases, bonuses, and commissions. (Trial Tr. 416:22-24 (starting salary); 85:25-86:4 (wage increase and bonus); 457:21-25 (settlement commission).) Defendants incorrectly state in their filings that Plaintiff

34

would earn only $100,000 annually at the firm.  (D.E. # 234 at 41.)  However, front pay must factor in what Plaintiff would have been paid had she not been terminated, which includes any promotions, raises, and other benefits. See e.g., Vernon v. Port Auth. of New York & New Jersey, 220 F. Supp. 2d 223, 236-37 (S.D.N.Y. 2002).

As mentioned, Plaintiff would have earned $100,000 in wages, $1,923.20 in Christmas bonuses, and $40,188 in commissions the year she was terminated.  Supra at Section III.B.ii.1. She also could reasonably anticipate a conservative wage increase of $7,500 annually starting from 2018, as well as a small increase of her Christmas bonus.  Id.  While front pay should only be awarded for the period in which the factfinder can reasonably predict Plaintiff's employment prospects, courts generally agree that three years of front pay is not "unduly speculative." See, e.g., Brito v. Marina's Bakery Corp., 19-cv-00828 (KAM), 2022 WL 875099, at *24 (E.D.N.Y. Mar. 24, 2022) (awarding three years of front pay in discrimination case as "not unduly speculative"); Gutierrez v. Taxi Club Mgmt. Inc., No. 17-cv-532 (AMD)(VMS), 2018 WL 3432786, at *8 (E.D.N.Y. June 25, 2018), report and recommendation adopted, 2018 WL 3429903 (E.D.N.Y. July 16, 2018) (three years of front pay is reasonable); Osorio v. Source Enters., Inc., No. 05-cv-10029 (JSR), 2007 WL 683985, at *6 (S.D.N.Y. Mar. 2, 2007) (holding that "a five year front pay award was not unduly speculative or excessive" where the plaintiff had "unique and narrowly focused" skills); Chisolm v. Liberty Lines Transit Inc., No. 08-cv-7894 (GAY), 2013 WL 452408, at *9 (S.D.N.Y. Feb. 6, 2013) (finding that five years of front pay is reasonable). Although Defendants baldly assert that only one year of front pay is appropriate here, (D.E. # 263 at 32), they provide no reasoning for why three years of front pay would be unduly speculative here when Plaintiff has continued in the same line of work since 2013.

Accounting for Plaintiff's expected salary increases from her firing through 2025, including Christmas bonuses and settlement commissions, and subtracting mitigation salary earned at American Transit Insurance Company,[24] would yield front pay of approximately $300,000. I therefore uphold the jury's award of front pay.

### iii.    Punitive Damages

Defendants also contest the jury's award of $600,000 in punitive damages to Plaintiff, arguing both that the award is not warranted under the standard and that the award is excessive. (D.E. # 234 at 42; D.E. # 243 at 41.) Both arguments are unconvincing.

### 1.    Punitive Damages Were Warranted

Damages are awarded "under the statute that provides the greatest recovery." Leon v. Zita Chen, No. 16-cv-480, 2017 WL 1184149, at *9 (E.D.N.Y. March 29, 2017). Under the NYCHRL, punitive damages may be awarded where "'the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" Antoine, 489 F. Supp. 3d at 100 (quoting Chauca v. Abraham, 30 N.Y.3d 325, 329 (2017)).[25] Plaintiff asserts that punitive damages are warranted based on Defendants' failure to accommodate and Plaintiff's termination. (D.E. # 246 at 60-64.)

The circumstances of Plaintiff's firing provide a sufficient basis for punitive damages. When Plaintiff was fired 16 days after disclosing her LHON diagnosis, Plaintiff showed that

---

[24] When calculating front pay, the Court only includes the period in 2023 after judgment to account for the pre-judgment portion of 2023 compensated by back pay.

[25] Defendants cite the ADA standard for punitive damages, which requires "a showing that the [defendants] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Brady, 531 F.3d at 137. However, this case is brought under the NYCHRL, which "requires a 'lower degree of culpability' than is required for punitive damages under other statutes, as it 'requires neither a showing of malice nor awareness of the violation of a protected right.'" Villalta v. JS Barkats, P.L.L.C., No. 16-cv-2772 (RA) (RWL), 2021 WL 2458699, at *17 (S.D.N.Y. Apr. 16, 2021) (citation omitted); see also Chauca, 30 N.Y.3d at 333 (New York Court of Appeals making clear that the standard under the NYCHRL "requires neither a showing of malice nor awareness of the violation of a protected right, representing the

36

Defendants were aware of Plaintiff's legal rights. Defendant Prakhin testified that in the Fall of 2018 when he fired Plaintiff: (1) he was familiar with antidiscrimination laws, including the ADA, NYSHRL, and NYCHRL; (2) he was familiar with the "interactive process" required by applicable law; (3) he was familiar with the "cooperative dialogue" required by applicable law; and (4) he was "fully aware" of his legal obligations as an employer to provide reasonable accommodations to disabled employees. (Trial Tr. at 450:5-451:3.) Plaintiff further showed that Defendants fired her in disregard of those rights; Plaintiff testified that when Defendant terminated her employment, he expressed that "I'm a businessman, I don't see how it's worth it for me." (Id. at 394:8-11.) Moreover, Plaintiff testified that during the same conversation in Prakhin's office, she said "you know, there's protections for people like me, and [Prakhin] said that, you do what you have to do and I'll do what I have to do[.]" (Id. at 195:6-12.) The evidence shows that Defendant Prakhin made the calculus that he would not have to compensate Plaintiff under the law, which is the exact behavior punitive damages seek to deter. See Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) ("[T]he purpose of punitive damage awards is to punish the defendant and to deter him and others from similar conduct in the future." (citing Smith v. Wade, 461 U.S. 30, 54 (1983))). Punitive damages are therefore proper.

### 2.      Punitive Damages Were Not Excessive

As with compensatory damages, courts must not disturb a jury award of punitive damages unless it "shocks the judicial conscience." Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006) (citation omitted). When evaluating whether an award for punitive damages is excessive,

---

lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages"). Since the NYCHRL standard is more generous than the ADA standard, the NYCHRL governs. Leon, 2017 WL 1184149, at *9. Defendants similarly assert the statutory cap on punitive damages in cases brought under the ADA. (D.E. # 234 at 43.) As discussed above in Footnote 20, the NYCHRL has no such cap.

courts consider the factors set forth by the Supreme Court in BMW of North America v. Gore:
(1) the degree of reprehensibility of the conduct, (2) the ratio of punitive to compensatory damages,
and (3) the difference between the award and civil penalties authorized or imposed in comparable
cases. 517 U.S. 559, 574-75 (1996); see also Jennings v. Yurkiw, 18 F.4th 383, 390 (2d Cir. 2021)
(applying the Gore factors to assess the reasonableness of punitive damages awarded).

The first Gore factor, the reprehensibility of the defendant's conduct, is "[p]erhaps the most
important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575.
This "reflects the accepted view that some wrongs are more blameworthy than others." Id. Courts
determine the reprehensibility of a defendant's conduct by considering "(1) whether a defendant's
conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or
malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in
repeated instances of misconduct." Norris v. New York City Coll. of Tech., No. 07-cv-853, 2009
WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009) (quoting Lee v. Edwards, 101 F.3d 805, 809 (2d Cir.
1996) (internal quotation marks omitted). There is no contention here that Defendants acted
violently, and while Plaintiff endured the impact of her discriminatory firing for years, the
termination itself occurred in one incident shortly after Plaintiff notified the Firm of her disability.
(Trial Tr. at 194:1-195:17.) Plaintiff has offered statements by Defendant Prakhin, however, that
indicated that the discriminatory firing was done with more than mere negligence. When
Defendant fired Plaintiff and she reminded him that "there's protections for people like me,"
Plaintiff testified that Defendant Prakhin responded, "you do what you have to do and I'll do what

I have to do[.]" (<u>Id.</u> at 195:6-12.)  This statement indicates a calculus by Defendant that goes beyond negligence and indicates an intentional violation of Plaintiff's rights.

The second <u>Gore</u> factor is the ratio of punitive to compensatory damages, which in this case is 0.53:1. Defendants mainly assert that the ratio is disproportionate because of their previously addressed arguments to reduce compensatory damages.  (D.E. # 234 at 48.)  The Supreme Court has been "reluctant to identify concrete constitutional limits" for the ratio of punitive to compensatory damages. <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 424 (2003).  However, even when courts have acknowledged an outer limit, the cap falls, at its smallest, close to a 1:1 ratio. <u>See id.</u> at 425 (holding that punitive damages awards of "more than four times the amount of compensatory damages might be close to the line of constitutional impropriety" but "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee").  Punitive damages here are almost half of compensatory damages and are therefore not outsized under this factor.

The third <u>Gore</u> factor considers the "difference between this remedy and civil penalties authorized or imposed in comparable cases." <u>Gore</u>, 517 U.S. at 575.  Courts in this circuit have upheld punitive damages awards in cases involving discrimination and termination of employment that exceed the award here. <u>See, e.g.</u>, <u>Zakre v. Norddeutsche Landesbank Girozentrale</u>, 541 F. Supp. 2d 555, 566-67 (S.D.N.Y. 2008) (reducing punitive damages in a gender discrimination and retaliation case with termination to $600,000), <u>aff'd</u>, 344 F. App'x 628 (2d Cir. 2009); <u>Gutierrez</u>, 2018 WL 3432786, at *11 (sex discrimination and retaliatory termination case reducing punitive damages to $850,000); <u>Kauffman v. Maxim Healthcare Servs., Inc.</u>, 509 F. Supp. 2d 210, 221 (E.D.N.Y. 2007) ($551,470 in punitive damages not excessive alongside compensatory damages

of $137,935); Watson v. E.S. Sutton, Inc., No. 02-cv-27399 (KMW), 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005) ($717,000 in punitive damages not excessive). Defendants argue that these cases are distinguishable. (D.E. # 263 at 37-38.) Although no two cases share identical facts, these cases share the common factor of plaintiffs who were terminated for discriminatory reasons and received a varying range of punitive damages based on defendants' conduct. Defendants are also unable to point to more appropriate case comparators. Although Defendants in their briefing cite several cases with lower punitive damages than were awarded here, (D.E. # 234 at 49-50), those cases largely did not involve termination, and defendants in each of those cases had default judgments entered against them. See Tenecora v. Ba-Kal Rest. Corp., No. 18-cv-7311 (DRH), 2020 WL 8771256 (E.D.N.Y. Nov. 30, 2020), report and recommendation adopted in part, 2021 WL 424364 (E.D.N.Y. Feb. 8, 2021) (case where there was a default judgment); Garcia v. Comprehensive Ctr., LLC, No. 17-cv-8970 (JPO) (BCM), 2019 WL 8274296 (S.D.N.Y. Nov. 21, 2019), report and recommendation adopted, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020) (case involving hostile work environment and a constructive discharge claim where there was a default judgment); Styka v. My Merchants Servs. LLC, No. 14-cv-6198 (ENV), 2016 WL 11396819 (E.D.N.Y. Mar. 15, 2016), report and recommendation adopted, 2016 WL 3866550 (E.D.N.Y. July 13, 2016) (case with a default judgment); DeCurtis v. Upward Bound Int'l, Inc., No. 09-cv-5378 (RJS), 2011 WL 4549412 (S.D.N.Y. Sept. 27, 2011) (same); Munson v. Diamond, No. 15-cv-00425 (DAB) (BCM), 2017 WL 4863096 (S.D.N.Y. June 1, 2017), report and recommendation adopted, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017) (same). They also rely on the damages awarded in Patterson, 440 F.3d at 124. (D.E. # 234 at 49-50.) That case is inapplicable because damages were reduced based on the personal financial circumstances of the defendant, and Defendants here have put forth no such argument.

Considering all these factors, I find the $600,000 punitive damages award is not excessive.

## CONCLUSION

For the foregoing reasons, Defendants' renewed motion for judgment as a matter of law is DENIED; Defendants' motion for new trial is DENIED; and Defendants' motion for remittitur of damages is DENIED.  Judgment having been entered, the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: March 25, 2024
      Brooklyn, New York

                s/Carol Bagley Amon
                Carol Bagley Amon
                United States District Judge